UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br><br>BIRD GLOBAL, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11 Cases<br><br>Case No. 23-_____<br><br>(Joint Administration Pending) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO CONTINUE
TO (I) MAINTAIN THEIR CASH MANAGEMENT SYSTEM, (II) HONOR
CERTAIN PREPETITION AND POST-PETITION OBLIGATIONS RELATED
THERETO, (III) USE EXISTING BUSINESS FORMS, AND (IV) PERFORM
INTERCOMPANY TRANSACTIONS, AND (B) GRANTING RELATED RELIEF**

**(Emergency Hearing Requested)**

**Statement of Exigent Circumstances**

The Debtors respectfully request that the Court conduct an emergency hearing on this Motion within two business days of the Petition Date (as defined herein), consistent with Local Rule 9013-1(F). The Debtors maintain and use a number of bank accounts as part of their Cash Management System (as defined herein) to facilitate their business operations, which is inclusive of intercompany transfers of cash. To avoid substantial disruption to the Debtors' business operations and the irreparable harm attendant thereto, the Debtors are seeking immediate relief to continue to use their Cash Management System, honor certain prepetition and post-petition obligations related thereto (including payment of bank fees), use existing Business Forms (as defined herein) and perform certain Intercompany Transactions (as defined herein). The Debtors respectfully request that the Court waive the provisions of Local Rule 9075-1(B), which requires an affirmative statement that a bona fide effort was made to resolve the issues raised in this Motion, as the relief requested herein is urgent in nature and does not lend itself to advance resolution.

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by

and through their proposed undersigned counsel, file this motion (the "Motion"), seeking entry of

---

[1] The address of the Debtors is 392 Northeast 191st Street, #20388, Miami, FL 33179. The last four digits of the Debtors' federal tax identification numbers are: (i) Bird Global, Inc. (3155); (ii) Bird Rides, Inc. (9939); (iii) Bird US Holdco, LLC (8390); (iv) Bird US Opco, LLC (6873); and (v) Skinny Labs, Inc. (8176).

interim and final orders (respectively, the "Interim Order" and "Final Order"), each substantially in the form of the proposed Interim Order attached hereto as **Exhibit A**: (a) authorizing, but not directing, the Debtors to (i) maintain their Cash Management System, subject to the modifications set forth in this Motion and the Interim Order, (ii) honor certain prepetition and post-petition obligations related thereto, (iii) use existing Business Forms, and (iv) perform certain Intercompany Transactions consistent with past practices; (b) waiving investment and deposit guidelines of section 345 of the Bankruptcy Code (as defined below) and those certain *Operating Guidelines & Reporting Requirements for Chapter 11 Debtors in Possession and Chapter 11 Trustees* promulgated by the Office of the United States Trustee for Region 21 (as amended, the "U.S. Trustee Guidelines"); and (c) granting related relief.  In support of this Motion, the Debtors rely on the *Declaration of Christopher Rankin in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration")[2] filed concurrently herewith and incorporated herein, and respectfully state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief sought in this Motion are sections 105(a), 345(b), 363(c), 364(b), and 503(b) of title 11 of the United States Code (as amended, the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and rules 9013-1(F) and (J) of the Local Bankruptcy Rules for the Southern District of Florida (as amended, the "Local Rules").

---

[2] Capitalized terms used but not defined herein have the meanings given to them in the First Day Declaration.

## BACKGROUND

4.       On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "<u>Chapter 11 Cases</u>").

5.       The Debtors operate their businesses and manage their affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.       For a detailed description of the Debtors, the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' businesses and capital structure, the Debtors respectfully refer the Court and parties-in-interest to the First Day Declaration.

## THE DEBTORS' CASH MANAGEMENT SYSTEM

**A.       Overview**

7.       In the ordinary course of business, the Debtors maintain an integrated, centralized cash management system (the "<u>Cash Management System</u>"), which is comparable to other centralized cash management systems used to manage the cash of operating enterprises in a cost-effective, efficient manner.[3] The Debtors use the Cash Management System in the ordinary course of their businesses to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting. The Debtors' controller and treasurer maintain daily oversight over the Cash Management System and utilizes cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions, and the Debtors' accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

---

[3]  For purposes of this Motion, the Cash Management System shall also include the Debtors' use of their accounting methods, business forms, and credit card programs, each as further detailed herein.

12617838-1

**B.      Components of the Cash Management System**

**I.      The Debtors' Bank Accounts and E-Commerce Accounts**

8.      As of the Petition Date, the Debtors' Cash Management System is comprised of eight (8) active bank accounts, one (1) inactive bank account[4] and eleven (11) collateral accounts (each, a "Bank Account" and, collectively, the "Bank Accounts"), which are maintained by Debtors Bird Rides, Inc. ("Bird Rides"), Skinny Labs, Inc., d/b/a Spin ("Spin") and Bird US Opco, LLC ("Bird US Opco"), as well as Non-Debtor Affiliates Bird Treasury Services, LLC ("Bird Treasury") and  Spin Mobility, Inc., at five (5) banks: First Citizens ("FC"), Citibank, ("Citi"), City National Bank ("CNB"), JP Morgan ("JPM" or "JP Morgan") and HSBC (each a "Cash Management Bank", and collectively, the "Cash Management Banks").  A chart with additional description pertaining to each Bank Account is below. Additionally, attached hereto as **Exhibit B** and **Exhibit C** is a list of all Bank Accounts and a diagram depicting how cash flows through the Bank Accounts, respectively.   As of December 17, 2023, the Debtors' Bank Accounts had $1,550,426.57 on deposit in the aggregate.

9.      The Cash Management System also includes 16 active accounts held by the Debtors (the "E-Commerce Accounts" and, together with the Bank Accounts, the "Debtor Accounts"), which they maintain with PayPal, Inc. ("PayPal"), Stripe, Inc. ("Stripe") and Adyen ("Adyen" and, together with PayPal and Stripe, the "E-Commerce Platforms" and, together with the Cash Management Banks, the "Financial Services Providers").   As of December 17, 2023, the Debtor E-Commerce Accounts had approximately $294,331.12 on deposit in the aggregate.

---

[4] The inactive account is held by Non-Debtor Affiliate Spin Mobility, Inc., a wholly owned subsidiary of Debtor Skinny Labs, Inc., d/b/a as Spin, at JP Morgan.

10.     The Cash Management System further includes 66 additional bank accounts and 54 additional e-commerce accounts (collectively, the "Non-Debtor Affiliate Accounts") held by the Non-Debtor Affiliates and maintained with 16 different banks in foreign countries, and PayPal, Stripe and Adyen, respectively, that hold funds in various currencies.  The Cash Management System is organized in a way that manages the separate funding and operating needs of the Debtors and Non-Debtor Affiliates. While cash is transferred as between the Debtor entities and also as between the Debtor entities and certain Non-Debtor Affiliates in the ordinary course of business, as further described below, the Cash Management System described herein refers only to the Debtors' operations, unless otherwise stated.

11.     A description of the flow of funds through the Debtor Accounts is provided below.

| Debtor Account | Debtor Account Description |
|---|---|
| FC Concentration Account (3036) | Bird Rides maintains a master concentration account with FC (the "FC Concentration Account") as part of a cash pooling arrangement with the FC Pass-Through Account, FC Collection Account, FC Disbursement Account, and FC Payroll Account (the "Cash Pool"). All funds in the Cash Pool are automatically concentrated in the FC Concentration Account at the end of each day, and each account in the Cash Pool has a zero-balance arrangement with the FC Concentration Account. All transfers involving the FC Concentration Account, including those described above, occur via the FC Pass-Through Account. |
| | The FC Concentration Account receives funds from the (a) FC Collection Account through automatic daily sweeps, (b) Citi Operating Account through manual transfers, and (c) FC Treasury Account. |
| | Funds from the FC Concentration Account are disbursed to the (a) FC Collection Account, FC Disbursement Account, and FC Payroll Account through automatic and manual transfers, (b) Citi Operating Account through manual transfers, and (c) FC Treasury Account to pay down the Treasury Revolver. As of December 17, 2023, the FC Concentration Account held a balance of $107,312.58 |
| FC Pass-Through Account | Bird Rides maintains a pass-through account with FC (the "FC Pass Through Account") to facilitate transfers between the FC Concentration Account and the (a) FC Collection Account, FC Disbursement Account, and FC Payroll Account, (b) Citi Operating Account, and (c) FC Treasury Account.  The FC |

| Debtor Account | Debtor Account Description |
|---|---|
| (4316) | Pass-Through Account does not hold funds over time and only exists to facilitate transfers.[5] As of December 17, 2023, the FC Pass Through Account held a balance of $0. |
| FC Collection Account (1962) | Bird Rides maintains a collection account with FC (the "FC Collection Account") to receive funds from customer purchases (mostly, partners' purchases of spare parts to repair scooters they rent from the Debtors). The FC Collection Account receives funds from (a) the FC Concentration Account through manual transfers and (b) certain E-Commerce Accounts through manual transfers and automatic daily sweeps. |
| | Funds from the FC Collection Account are disbursed to the FC Concentration Account through automatic daily sweeps. As of December 17, 2023, the FC Collection Account held a balance of $0. |
| FC Disbursement Account (1958) | Bird Rides maintains a disbursement account with FC (the "FC Disbursement Account") to facilitate payments to vendors. The FC Disbursement Account receives funds through automatic and manual transfers from the FC Concentration Account. |
| | Funds from the FC Disbursement Account are disbursed to satisfy vendor obligations via automated clearing house ("ACH") transfers, check, and wire transfer. As of December 17, 2023, the FC Disbursement Account held a balance of $0. |
| FC Payroll Account (1943) | Bird Rides maintains a payroll account with FC (the "FC Payroll Account") to facilitate payments to employees. The FC Payroll Account receives funds through automatic and manual transfers from the FC Concentration Account. |
| | Funds from the FC Payroll Account are disbursed to satisfy employee payroll and benefit obligations via the Debtors' payroll processor and ACH transfer. As of December 17, 2023, the FC Payroll Account held a balance of $0. |
| Citi Operating Account (9115) | Bird Rides maintains an operating account with Citi (the "Citi Operating Account") to facilitate various functions, including Intercompany Transfers. The Citi Operating Account receives funds from (a) the FC Concentration Account through manual transfers, (b) certain Debtor E-Commerce Accounts through manual transfers and automatic daily sweeps, and (c) Non-Debtor Affiliates through manual Intercompany Transfers. Pre-payments by customers for future rides with Bird Rides associated with Bird Rides' digital wallet program (the "Bird Rides Wallet Program") are also deposited into this account. |

---

[5]  Though all transfers involving the FC Concentration Account occur via the FC Pass-Through Account, this step is
    excluded from the discussion contained herein in the interest of simplicity.

| Debtor Account | Debtor Account Description |
|---|---|
|  | Funds from the Citi Operating Account are disbursed to (a) the FC Concentration Account through manual transfers, (b) the Non-Debtor Affiliates through manual Intercompany Transfers, (c) certain Stripe Accounts as necessary to cover customer refunds and amounts due to Fleet Managers, and (d) satisfy vendor obligations via wire transfer. As of December 17, 2023, the Citi Operating Account held a balance of $214,537.11. |
| <u>JPM Concentration Account</u> (1262) | Spin maintains a concentration account with JPM for all needs associated with Spin's business operations. Namely, this account is used for collections, disbursements, operations and payroll ("<u>JPM Concentration Account</u>"). Pre-payments by customers for future rides with Spin associated with Spin's digital wallet program (the "<u>Spin Wallet Program</u>") are also deposited in this account. As of December 17, 2023, the JPM Concentration Account held a balance of $1,175,366.70.[6] |
| <u>Collateral Accounts</u> HSBC (0463) | Bird Rides maintains one collateral account with HSBC (the "<u>HSBC Collateral Account</u>") that holds funds supporting the Debtors' corporate credit card program (the "<u>Corporate Credit Cards</u>"), as the Debtors use Corporate Credit Cards, among other reasons, to pay certain utility costs and vendors.[7] Bird Rides also uses a collateral account at FC (x0964) for this purpose (see below). As of December 17, 2023, this account held a balance of $2,277.03. |
| | * * * |
| FC (0964) | Bird Rides maintains one collateral account with FC that holds funds supporting Corporate Credit Cards. As of December 17, 2023, this account held a balance of $300,000. |
| | * * * |
| FC (4431) | Bird Rides maintains one collateral account with FC that holds funds to secure potential obligations pertaining to the payment of customs duties, taxes and fees on imported shipments. As of December 17, 2023, this account held a balance of $1,842,300. |

---

[6]  Spin's wholly owned subsidiary, Non-Debtor Affiliate, Spin Mobility, Inc., also maintains an account at JPM (x1002); however, it is not in use and has a $0 balance.

[7]  Contemporaneously with the filing of this Motion, the Debtors have filed an *Emergency Motion for Order (I) Authorizing Debtors to Pay (A) Certain Prepetition Employee Obligations and (B) Prepetition Withholding Obligations, (II) Authorizing the Debtors to Maintain Employee Benefit Programs, and (III) Directing Banks to Honor Related Prepetition Transfers* which, among other things, seeks authority to continue using the Corporate Credit Cards in the ordinary course of business.

| Debtor Account | Debtor Account Description |
|---|---|
| | * * * |
| FC (6584) | Bird Rides maintains one collateral account with FC that holds funds to secure potential Worker's Compensation obligations. As of December 17, 2023, this account held a balance of $100,000. |
| | * * * |
| FC (5281) | Bird Rides maintains one collateral account with FC that holds funds to secure potential obligations owed to Verizon Wireless in connection software applications that support the wireless functioning of Bird e-scooters. As of December 17, 2023, this account held a balance of $233,000. |
| | * * * |
| FC (8516) | Bird Rides maintains one collateral account at FC that holds funds to secure potential obligations to cities in connection with liabilities resulting from operations therein. As of December 17, 2023, this account held a balance of $500,000. |
| | * * * |
| FC (6676) | Bird Rides maintains one collateral account at FC that holds funds to secure potential permitting obligations to the state of Florida. As of December 17, 2023, this account held a balance of $25,000. |
| | * * * |
| FC (8309) | Bird Rides maintains one collateral account at FC, as to which the associated letter of credit was drawn on by, and funds were released to, the beneficiary pre-petition. Accordingly, as of December 17, 2023, this account held a balance of $0. |
| | * * * |
| FC (3275) | Bird US Opco, LLC maintains a collateral account at FC related to collections of revenue generated by Bird US Opco, LLC pursuant to the Scooter Lease (as defined below) (the "Opco Collateral Account"), that holds funds supporting the Debtors' obligations under the Loan and Security Agreement with MidCap (the "Loan and Security Agreement"). The Opco Collateral Account is subject to a deposit account control agreement ("DACA"). As of December 17, 2023, the Opco Collateral Account held a balance of $415,774.60. |
| | * * * |
| CNB (2155) | Bird Rides maintains a collateral account at CNB that holds funds to secure potential obligations to cities in connection with liabilities resulting from operations therein. As of December 5, 2023, this account held a balance of $49,779.40. |
| | * * * |

12617838-1

| Debtor Account | Debtor Account Description |
|---|---|
| JPM (2068) | Spin maintains a collateral account at JPM that holds funds to secure potential obligations to cities in connection with liabilities resulting from operations therein. As of December 17, 2023, this account held a balance of $313,183.11. |
| <u>Non-Debtor Affiliate</u><br><br><u>FC Treasury Account</u><br><br>(4795) | Non-Debtor Affiliate Bird Treasury Services LLC ("<u>Bird Treasury</u>") maintains an account with FC (the "<u>FC Treasury Account</u>") that was set up to hold deposits paid by customers for future rides associated with the Bird Rides Wallet Program. Pursuant to a Revolving Loan Agreement for a revolving credit facility (the "<u>Treasury Revolver</u>") and Treasury Management Services Agreement ("<u>Treasury Services Agreement</u>"), both dated September 30, 2022 between Bird Rides and Bird Treasury, Bird Treasury was to (i) receive and lend monies derived from customer deposits made in connection with the Bird Rides Wallet Program to Bird Rides and (ii) administer the Bird Rides Wallet Program, including the processing of refund requests. Although customer pre-payments for future rides associated with the Bird Rides Wallet Program have always been deposited in Bird Rides' Citi Operating Account instead of in the FC Treasury Account, Bird Treasury continues to administer the Bird Rides Wallet Program.<br><br>As of December 17, 2023, the FC Treasury Account held a balance of $1,153.75. |

| Debtor Account | Debtor Account Description |
|---|---|
| <u>E-Commerce Accounts</u><br><br>PayPal (3 Accounts)<br><br>Stripe (11 Accounts)<br><br>Adyen (2 Accounts) | Bird Rides maintains 3 accounts with PayPal (the "<u>PayPal Accounts</u>"), which receive funds from (a) customer purchases and (b) the FC Collection Account through manual transfers. The Debtors typically maintain a balance in the PayPal Accounts to ensure that obligations described below are covered.<br><br>Funds from the PayPal Accounts are disbursed to (a) the FC Collection Account and Citi Operating Account through manual or automated transfers, (b) satisfy vendor and Fleet Manager obligations through manual transfers, and (c) satisfy customer refund requests automatically.<br><br>As of December 15, 2023, the PayPal Accounts held a balance of approximately \$34,599.28 in the aggregate.<br><br><p align="center">* * *</p><br>Bird Rides maintains 11 accounts with Stripe (the "<u>Stripe Accounts</u>"). The Stripe Accounts receive funds from (a) customer purchases and (b) the FC Collection Account through manual transfers. The Debtors typically maintain a balance in the Stripe Accounts to ensure that the obligations described below are covered.<br><br>Funds from the Stripe Accounts are disbursed to (a) the FC Collection Account and Citi Operating Account through manual or automated transfers, (b) satisfy vendor and Fleet Manager obligations through manual transfers, and (c) satisfy customer refund requests automatically.<br><br>As of December 17, 2023, the Stripe Accounts held a balance of approximately \$259,731.84 in the aggregate.<br><br><p align="center">* * *</p><br>Spin maintains 2 accounts with Adyen (the "<u>Adyen Accounts</u>"). The Adyen Accounts receive funds from (a) customer purchases and (b) the FC Collection Account through manual transfers. The Debtors typically maintain a balance in the Adyen Accounts to ensure that the obligations described below are covered.<br><br>Funds from the Adyen Accounts are disbursed to (a) the FC Collection Account and Citi Operating Account through manual or automated transfers, (b) satisfy vendor and Fleet Manager obligations through manual transfers, and (c) satisfy customer refund requests automatically.<br><br>As of December 17, 2023, the Adyen Accounts held a balance of approximately \$278,737.09 in the aggregate. |

12.     As described in further detail below, the Cash Management System generally

facilitates four principal cash management functions: (a) cash collection; (b) cash concentration;

(c) disbursements to fund the Company's operations; and (d) cash transfers among the Debtors and certain Non-Debtor Affiliates.

### a. Cash Collection

13.     The Debtors' historical revenues and expected future revenues are primarily generated through their electric vehicle rental and product sales businesses.  The Debtors' customers pay for the Debtors' electric vehicle rental services via credit card or through the wallet programs and funds are deposited into the Debtor E-Commerce Accounts.  Customers who purchase products are primarily distributors of the Debtors and pay for the Debtors' products using ACH or wires and funds are likewise deposited into the Debtor E-Commerce Accounts.  Funds paid by the Debtors' customers are generally deposited into one of the aforementioned Debtor Accounts depending on the customer, the Debtor entity engaged in business with the customer, and the nature of the services or goods provided to the customer.

### b. Cash Concentration

14.     As described in detail above, funds in each of the various accounts are generally concentrated, through direct or indirect transfers, in the FC Concentration Account and the Citi Operating Account.  From those accounts, the Debtors (a) use or transfer funds, as applicable, to make cash disbursements necessary to run their businesses, including payments to third parties, and (b) transfer funds to satisfy obligations arising under Intercompany Transactions as between the Debtors and as between the Debtors and Non-Debtor Affiliates.

### c. Cash Disbursements

15.     Funds in the FC Concentration Account, FC Disbursement Account, FC Payroll Account, Citi Operating Account, and the E-Commerce Accounts are used by the Debtors to directly or indirectly satisfy various financial obligations arising in the ordinary course of business.

11

In particular, funds in the FC Concentration Account are transferred to one or more of the Debtors' payroll and disbursement accounts from which the Debtors issue or initiate payments by check, wire transfer, ACH, or direct debit to their employees, service providers, and other third parties. In addition, funds are transferred from the FC Concentration Account to the Citi Operating Account, as necessary, in order to satisfy obligations arising in connection with Intercompany Transactions. With respect to payments made on account of Intercompany Transactions, the Citi Operating Account is able to make disbursements to and receive payments from certain Non-Debtor Affiliate Accounts for purposes of receiving payment on or satisfying intercompany obligations. Funds are also sent and received between the FC Concentration Account and the FC Treasury Account.

### d. Cash Transfers

16.     The Cash Management System allows for cash transfers among the Debtors and among the Debtors and Non-Debtor Affiliates. *See* Section D below, which sets forth examples of Intercompany Transactions. Any such funding emanates from the Citi Operating Account into accounts held by Non-Debtor Affiliates.

### II.    Corporate Credit Card Program

17.     The Debtors have issued corporate credit cards to certain of their employees through First Citizens (Mastercard), primarily to pay for miscellaneous ordinary course business expenses incurred by the employees. There are approximately 11 credit cards in use, with approximately $300,000 outstanding in total monthly charges.

### III.   Bank Fees and E-Commerce Fees

18.     The Debtors incur periodic service charges and other fees in connection with the maintenance of their Cash Management System, which charges and fees are generally

12617838-1

automatically withdrawn from the requisite Bank Accounts each month (the "<u>Bank Fees</u>"). The Debtors have historically incurred Bank Fees of approximately $17,000 per month, which are debited from the respective Bank Account for which the Bank Fee was incurred. As of December 17, 2023, the Debtors estimate that approximately $15,000 in Bank Fees have accrued and remain unpaid, all of which will become due and payable within the first 10 days of these Chapter 11 Cases. The Debtors seek authorization, but not direction, to pay these Bank Fees and to continue paying the Bank Fees as they come due in the ordinary course in accordance with past practices on a post-petition basis.

19.    In addition, the Debtors owe certain obligations to the Cash Management Banks pursuant to the account agreements governing the Bank Accounts, including, without limitation, reimbursement obligations for any dishonored or returned checks or in connection with any overdrafts (collectively, the "<u>Bank Account Obligations</u>"). To the extent that there are any outstanding Bank Account Obligations, those amounts are included as part of the outstanding Bank Fees in the preceding paragraph. The Debtors seek authority to pay any Bank Account Obligations to the Cash Management Banks that come due in the ordinary course, which amounts shall be deducted from the requisite Bank Accounts, whether such obligations arose prior to, on, or subsequent to the Petition Date.

20.    Finally, the Debtors incur periodic services charges and other fees in connection with the maintenance of their E-Commerce Accounts with Stipe, PayPal and Adyen, which charges and fees are generally automatically charged against receipts ("<u>E-Commerce Fees</u>"). The Debtors have historically incurred E-Commerce Fees of approximately $500,000 per month, which are debited from the respective credit card processor for which the E-Commerce Fee was incurred. As of December 17, 2023, the Debtors estimate that approximately $250,000 in E-Commerce Fees

13

have accrued and remain unpaid, all of which will become due and payable within the first 10 days of these Chapter 11 Cases. The Debtors seek authorization, but not direction, to pay these E-Commerce Fees and to continue paying the E-Commerce Fees as they come due in the ordinary course in accordance with past practices on a post-petition basis.

C.     **Compliance of the Bank Accounts with the U.S. Trustee Guidelines and Section 345(b) of the Bankruptcy Code**

    I.     **Compliance with the U.S. Trustee Guidelines as to Authorized Depositories**

21.     The U.S. Trustee Guidelines generally require chapter 11 debtors to, among other things, deposit all estate funds into accounts with an authorized depository that agrees to comply with the requirements of the U.S. Trustee's office. Among the Cash Management Banks, JP Morgan is an authorized depository under the U.S. Trustee Guidelines in the Southern District of Florida and the Debtors will close their primary accounts at FC, Citi, CNB and HSBC in order to open new primary accounts at JP Morgan ("Bank Account Changes" or "New Accounts").

    II.     **Compliance with Section 345 of the Bankruptcy Code**

22.     As part of the Cash Management System, the Debtors maintain their cash in Bank Accounts that are insured by the Federal Deposit Insurance Corporation (the "FDIC"). Additionally, the Debtors will be transitioning their primary accounts to JP Morgan. Given the foregoing, the Debtors submit that the Bank Accounts comply with section 345(a) of the Bankruptcy Code and that none of their Cash Management Banks are required to post a bond or security deposit under section 345(b) of the Bankruptcy Code.

    III.     **Compliance with U.S. Trustee Guidelines as to Business Forms**

23.     In the ordinary course of business, the Debtors use certain business forms, including correspondence, checks, letterhead, purchase orders, and invoices (collectively, the "Business Forms"), without reference to their status as debtors-in-possession.  The Debtors also maintain

books and records to document, among other things, their profits and expenses. To avoid significant disruption to their business operations, minimize unnecessary additional expenses to their estates, and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these Chapter 11 Cases, the Debtors request that the Court authorize, but not direct, their continued use of their Business Forms, without reference to the Debtors' status as debtors-in-possession as required by the U.S. Trustee Guidelines, rather than requiring the Debtors to incur the unnecessary expense and delay of ordering entirely new forms or altering current printing arrangements.

### D.      Intercompany Transactions

24.      As described in greater detail in the First Day Declaration, the Company is a global enterprise comprised of approximately 66 affiliated entities with business activities on 5 continents. Although certain Debtors and Non-Debtor Affiliates generate revenue from sales and operations, others rely in part on ordinary course intercompany transactions between the Debtors or between Debtors and Non-Debtor Affiliates (the "Intercompany Transactions") to, among other things, receive services necessary to operate, pay employees and expenses, and manage their day-to-day operations. The Intercompany Transactions are either reflected as intercompany receivables and payables in the Company's books and records (the "Intercompany Balances") or as intercompany notes or loans (the "Intercompany Loans"). The Debtors closely track all fund transfers in their respective accounting systems and, therefore, can ascertain, trace, and account for all Intercompany Transactions. Intercompany Transactions are settled or repaid in the ordinary course of business and on an ongoing basis. To the extent that an entity incurs a payable in the course of an Intercompany Transaction, without settlement, an Intercompany Balance is created.

25.     The Intercompany Transactions occur as part of the daily operation of the Cash Management System, and, as a result, at any given time there may be Intercompany Balances owing between the Debtors or between Debtors and Non-Debtor Affiliates.[8]   The Debtors also benefit significantly from the receipt of incoming cash from various profitable Company entities. Below are some examples of Intercompany Transactions, among others, between the Debtors and Non-Debtor Affiliates that regularly occur in the ordinary course of business.

26.     Intercompany Services Arrangements.   In the ordinary course of business, certain Debtors operate under various intercompany services arrangements with other Debtors and Non-Debtor Affiliates. For instance, Bird Rides and certain Non-Debtor Affiliates are parties to a Strategic Management Services Agreement (the "Strategic Services Agreement"), pursuant to which certain Non-Debtor Affiliates provide various necessary support and management services, such as planning, monitoring, analyzing, and assessing necessities of certain entities in exchange for use of the Debtors' technology platform and other consideration.  Payments made in connection with the Strategic Services Agreement flow to and from the FC Concentration Account.

27.     Bird Rides and certain Non-Debtor Affiliates are also parties to a Service License Agreement (the "Service License Agreement") pursuant to which certain Non-Debtor Affiliates provide various necessary support and management services, such as marketing and other services reasonably required by the Debtors in relation to the development of the Debtors' brand in certain territories, in exchange for use of the Debtors' technology platform and other consideration. Payments made in connection with the Service License Agreement flow to and from the Citi Operating Account.

---

[8] For the avoidance of doubt for purposes of this Motion and the relief requested hereby, the Intercompany Transactions and the Cash Management System do not include dividends, return of capital or similar distributions.

28.    In September of 2022, Bird Rides and Bird Treasury entered into the Treasury Revolver and Treasury Services Agreement, pursuant to which Bird Treasury was to (i) receive and advance monies derived from customer deposits made in connection with the Bird Rides Wallet Program to Bird Rides and (ii) administer the Bird Rides Wallet Program, including the processing of refund requests. Although customer pre-payments for future rides associated with the Bird Rides Wallet Program have always been deposited in Bird Rides' Citi Operating Account instead of in the FC Treasury Account, Bird Treasury continues to administer the Bird Rides Wallet Program. Any payments required in connection with the Treasury Services Agreement flow between the FC Concentration Account and the FC Treasury Account, as applicable.

29.    Scooter Lease.  Bird Rides and Bird US Opco, LLC are parties to a Master Scooter Operating Lease and Servicing Agreement (the "Scooter Lease") pursuant to which Bird US Opco, LLC owns and leases electric scooters to Bird Rides under a payment structure set forth in such agreement.  Under the Scooter Lease, Bird Rides is responsible for all costs of operating the scooters, including maintenance and repairs, customer support functions, Fleet Managers, and insurance.  Scooters contributed by Bird Rides to Bird US Opco, LLC as well as collections from revenue generated by such vehicles and the Opco Collateral Account, among other collateral, comprise collateral under the Loan and Security Agreement.

30.    Bird Rides Funding for Non-Debtor Affiliates. Prior to the Petition Date, from time to time as was necessary, particularly during the winter months when Non-Debtor Affiliates operating in Europe slowed or ceased operations due to cold and inclement weather, Bird Rides would fund certain obligations of European Non-Debtor Affiliates associated with compliance requirements in Europe and/or with their operational needs. Any such funding emanates from the Citi Operating Account into accounts held by European Non-Debtor Affiliates.

31.    As illustrated above, the Debtors engage in Intercompany Transactions among themselves and with Non-Debtor Affiliates on a regular basis in the ordinary course of their businesses, and the continuance of Intercompany Transactions is essential to support their respective operations.    Accordingly, the Debtors request Court authority to continue all Intercompany Transactions in the ordinary course.[9]

## BASIS FOR RELIEF REQUESTED

### I.    The Court Should Authorize the Debtors to Continue to Use the Cash Management System and Pay the Bank Fees

32.    Under 28 U.S.C. § 586(a)(3) and the U.S. Trustee Guidelines, debtors-in-possession are required to, among other things: (a) immediately close all prepetition bank accounts and open new bank accounts, including an operating account, a tax account, and a payroll account; (b) deposit all receipts and make disbursements only from the approved debtor-in-possession account(s); and (c) use new business forms indicating the debtor-in-possession status of chapter 11 debtor.

33.    The continuation of the Cash Management System is nevertheless permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes a debtor-in-possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).    Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter."    *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).    In addition, the Eleventh Circuit has recognized that authorizing debtors to use their prepetition "routine cash management system" is "entirely

---

[9]    The motion provides an overview of the Debtors' typical Intercompany Transactions.    The relief requested herein is applicable with respect to all Intercompany Transactions and is not limited to those Intercompany Transactions described herein.

12617838-1

consistent" with the applicable provisions of the Bankruptcy Code. *In re Charter Co.*, 778 F.2d 617, 621 (11th Cir. 1985) (affirming bankruptcy court's order authorizing maintenance of Debtors' prepetition cash management system). In granting such relief, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in relevant part*, 997 F.2d 1039, 1061 (3d Cir. 1993). The requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (stating that a cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

34.     Here, pending and except for the Bank Account Changes, requiring the Debtors to adopt a new, segmented cash management system during these Chapter 11 Cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations. The Cash Management System provides the Debtors with the ability to efficiently track and report the location and amount of funds, which, in turn, allows the Debtors to track and control such funds, ensure cash availability, and reduce administrative costs through a method of coordinating the collection and movement of funds. Pending and except for the Bank Account Changes, any disruption of the Cash Management System (or requiring the Debtors to adopt a new, segmented cash management system) will have a negative effect on the Debtors' reorganization efforts and needlessly reduce the value of the Debtors' business enterprise. By contrast, maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying post-petition debts and eliminating administrative

12617838-1

inefficiencies.  Finally, maintaining the current Cash Management System will allow the Debtors and their management to focus on their daily responsibilities.

35.     Moreover, the Debtors respectfully submit that parties-in-interest will not be harmed by their maintenance of the Cash Management System, including maintenance of the Bank Accounts and the Intercompany Transactions, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.  Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' respective accounting departments.  Additionally, the Debtors will continue to work closely with the Cash Management Banks to ensure that appropriate procedures are in place to prevent checks that were issued prepetition from being honored without the Court's approval.   In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

**II.     Authorizing the Cash Management Banks to Continue to Maintain, Service, and Administer the Bank Accounts in the Ordinary Course of Business is Warranted**

36.     As discussed above, mandating compliance with the U.S. Trustee Guidelines would needlessly interrupt the Debtors' operations and impair the Debtors' efforts to preserve the value of their estates and reorganize in an efficient manner.  Thus, pending the Bank Account Changes, the Debtors respectfully request that the Court authorize the Cash Management Banks to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors-in-possession, without interruption and in the ordinary course of business.  In this regard, the Cash Management Banks should be authorized to receive, process, honor, and pay any and all checks, wire transfer, credit cards, ACH payments, and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other

parties entitled to issue instructions with respect thereto.  Notwithstanding the foregoing, any check, draft, or other notification that the Debtors advise the Cash Management Banks to have been drawn, issued, or otherwise presented before the Petition Date may be honored by the Cash Management Banks only to the extent authorized by order of the Court.

37.    The Debtors further request that the Court authorize the Cash Management Banks to accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or subsequent to the Petition Date.  The Debtors also request that, to the extent a Cash Management Bank honors a prepetition check or other item drawn on any account either (a) at the direction of the Debtors, (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored or (c) as a result of a good faith error made despite implementation of reasonable item-handling procedures, such Cash Management Banks will not be deemed to be liable to the Debtors, their estates, or any party on account of such prepetition check or other item honored post-petition.  The Debtors respectfully submit that such relief is reasonable and appropriate because the Cash Management Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

38.    Moreover, the Debtors request that the Court authorize the Cash Management Banks to continue to charge the Debtors the Bank Fees (and debit the respective Bank Account for which the Bank Fee was incurred) and Bank Account Obligations, as applicable, and charge-back returned items to the Bank Accounts, whether such items are dated before, on, or subsequent to the Petition Date, in the ordinary course of business.  The Debtors further request that the Court

order that liens on any of the Bank Accounts granted to creditors will not have priority over the Bank Fees of the respective bank at which the Bank Account is located.

39.     The Debtors further request that they be authorized, but not directed, to implement such reasonable changes to the Cash Management System as the Debtors may deem necessary or appropriate, including, without limitation, the Bank Account Changes or, otherwise, closing any bank account and opening any additional bank accounts following the Petition Date (such opened accounts, the "New Accounts").  Any New Accounts that the Debtors open will be at JP Morgan or at a bank that has executed a Uniform Depository Agreement with the U.S. Trustee, or at such bank that is willing to immediately execute such an agreement.

40.     The Debtors request that the relief sought by this Motion extend to any accounts opened as a result of the Bank Account Changes or New Accounts, and that any order approving this Motion provide that the accounts opened as a result of the Bank Account Changes or New Accounts be deemed to be Bank Accounts that are similarly subject to the rights, obligations, and relief granted in such order.  The Debtors will provide the U.S. Trustee, among other parties-in-interest, with timely notice of the closing of any Bank Accounts and the opening of any New Accounts.  In furtherance of the foregoing, the Debtors also request that the relevant banks be authorized to honor the Debtors' requests to open or close (as the case may be) such Bank Account(s) or New Account(s).

## III.    The Court Should Waive Section 345(b) Bond Requirements

41.     Section 345(a) of the Bankruptcy Code authorizes a debtor-in-possession to make deposits of estate money in a manner "as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit."  11 U.S.C. § 345(a).  If a deposit is not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the

12617838-1

United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the debtor must require that the entity with which the deposit is made obtain a bond in favor of the United States that is secured by the undertaking of an adequate corporate surety.  *See* 11 U.S.C. § 345(b).

42.    This Court has discretion to waive the requirements of section 345(b) of the Bankruptcy Code "for cause."  11 U.S.C. § 345(b).  In *In re Service Merchandise Co., Inc.*, the court indicated that the existence of "cause" should be determined based upon the totality of the circumstances taking account of factors such as: (i) the sophistication of the debtor's business; (ii) the size of the debtor's business; (iii) the amount of investments involved; (iv) the ratings of the financial institutions at which the debtor's funds are held; (v) the complexity of the case; (vi) the safeguards in place within the debtor's own business to ensure the safety of funds; (vii) the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions; (viii) the benefit to the debtor; (ix) the harm, if any, to the estate; and (x) the reasonableness of the debtor's request for relief from the section 345(b) requirements in light of the overall circumstances of the case.  *See In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999); *In re Dietech Holding Corp.*, 605 B.R. 10, 17-18 (Bankr. S.D.N.Y. 2019) (same).

43.    As stated above, the Debtors submit that the Cash Management Banks are not required to post a bond or a security deposit under section 345(b) of the Bankruptcy Code on account of the Bank Accounts maintained there, because all such accounts are FDIC-insured and the Debtors will be closing their accounts at FC, Citi, CNB and HSBC and opening those primary accounts at JP Morgan. However, to the extent that a bond or security deposit is required for any of the Bank Accounts under section 345(b) of the Bankruptcy Code, the Debtors respectfully request a waiver of same because the Debtors are sophisticated entities with a complex Cash

Management System that relies on the Bank Accounts on a daily basis. In light of the regular deposits to, and disbursements from, the various Bank Accounts, it would be especially disruptive, unnecessary, and wasteful to require the posting of a bond to the extent that the balance of the Bank Accounts exceed the applicable FDIC insurance limits at a given time.

44.    In light of the above, the Debtors respectfully request that this Court exercise its discretion to waive the requirements of section 345(b) of the Bankruptcy Code to the extent that such requirements are inconsistent with the Debtors' deposit practices.  The Debtors submit that the circumstances of these Chapter 11 Cases warrant such relief.

**IV.    The Court Should Authorize the Debtors to Continue Using Their Existing Business Forms and Books and Records**

45.    To avoid disruption of the Cash Management System and unnecessary expense to their estates, the Debtors request that they be authorized, but not directed, to continue to use the Business Forms substantially in the form existing immediately before the Petition Date, without reference to their status as debtors-in-possession.  The Debtors submit that parties-in-interest will not be prejudiced by this relief.  Parties doing business with the Debtors undoubtedly will be aware of their status as debtors-in-possession and, thus, immediately changing business forms is unnecessary and would be unduly burdensome.

46.    In addition, the Debtors seek a waiver of the requirement that they open a new set of books and records as of the Petition Date.  The Debtors submit that opening a new set of books and records would create unnecessary administrative burdens and hardship and would create unnecessary administrative burdens and hardship and would cause unnecessary expense, use of resources, and delay.  With the use of computer technology, it is now easy to differentiate between prepetition and post-petition transactions.  Accordingly, the Debtors respectfully request that they be authorized, but not directed, to continue to maintain their existing business records.

47. Extensive authority supports the relief sought by this Motion. In other chapter 11 cases, courts have recognized that strict enforcement of the requirements under section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines often does not serve the purposes of a large, complex chapter 11 case. Accordingly, courts in this district and elsewhere routinely grant relief from these requirements and replace them with alternative procedures. *See, e.g., In re Delphi Behavioral Health Group, LLC, et al.*, Case No. 23-10945-PDR (Bankr. S.D. Fla. Mar. 22, 2023); *In re Vital Pharmaceuticals, Inc., et al.*, Case No. 22-17842-PDR (Bankr. S.D. Fla. Oct. 14, 2022); *In re Tamarac 10200, LLC, et al.*, Case No. 20-23346-PDR (Bankr. S.D. Fla. Dec. 31, 2020); *In re Florida Gaming Centers, Inc.*, Case No. 13-29597-RAM (Bankr. S.D. Fla. Oct. 7, 2013); *In re TLO, LLC*, Case No. 13-28053-PGH (Bankr. S.D. Fla. June 13, 2013); *In re Ruden McClosky P.A.*, Case No. 11-40603-RBR (Bankr. S.D. Fla. Dec. 5, 2011); *In re Maguire Group Holdings, Inc. et al.*, Case No. 11-39347-RAM (Bankr. S. D. Fla. Oct. 26, 2011); *In re HearUSA, Inc.*, Case No. 11-23341-EPK (Bankr. S.D. Fla. May 16, 2011); *In re Gulfstream International Group, Inc., et al.*, Case No. 10-44131-JKO (Bankr. S.D. Fla. Nov. 8, 2010); *In re Gemini Cargo Logistics, Inc.*, *et al.*, Case No. 08-18173-AJC (Bankr. S.D. Fla. June 20, 2008); *In re Levitt and Sons, LLC*, Case No. 07-19845-RBR (Bankr. S.D. Fla. Nov. 14, 2007); *In re Gemini Cargo Logistics, Inc., et al.*, Case No. 06-10870-AJC (Bankr S.D. Fla. March 17, 2006); *In re Atlas Worldwide Aviation Logistics, Inc. et al.*; Case No. 04-10792-RAM (Bankr. S.D. Fla. Feb. 5, 2004).

**V.   The Court Should Authorize the Debtors to Continue Conducting Intercompany Transactions in the Ordinary Course and Grant Administrative Priority Status to Postpetition Intercompany Claims Among the Debtors**

48. The Debtors' funds move through the Cash Management System as described above and in **Exhibit C**. At any given time, there may be Intercompany claims owing by and between Debtors and Non-Debtor Affiliates as Intercompany Transactions are made between and

among those entities in the ordinary course as part of the Cash Management System.[10]  The Debtors track all fund transfers in their accounting system and can ascertain, trace, and account for all Intercompany Transactions previously described.  The Debtors, moreover, will continue to maintain records of such Intercompany Transactions.  If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' and their estates' detriment.  The Debtors respectfully submit that the relief requested herein fairly balances the Debtors' needs to facilitate the ordinary course operation of their businesses, minimize disruption, and preserve value, on the one hand, with the interests of their stakeholders and transparency, on the other hand.  The requested relief will also ensure that the Debtors' estates will not be unduly burdened by the cost of transfers amongst the Debtors and Non-Debtor Affiliates.

49.    Because the Intercompany Transactions represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System, the Debtors respectfully request the authority to continue conducting the Intercompany Transactions in the ordinary course of business without need for further Court order and request that pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all post-petition payments between or among a Debtor and another Debtor or Non-Debtor Affiliate on account of an Intercompany Transaction be accorded administrative expense status and that such claims shall be unsecured and junior in priority to any superpriority administrative expense claims granted pursuant to any order approving Debtor-In-Possession financing and any carve-outs thereunder,

---

[10]  Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises like that of the Debtors, the Debtors submit the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require this Court's approval.  Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a post-petition basis.  Moreover, the continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their businesses as debtors-in-possession.

unless otherwise provided therein.[11] This relief will ensure that each entity receiving payments from a Debtor will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby reducing the risk that these transactions would jeopardize the recoveries available to each Debtor's respective creditors.

**Expedited Consideration and Waiver of any Applicable Stay**

50.    The Debtors respectfully request expedited consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm. Here, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of its operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an expedited basis.

51.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

---

[11] Notwithstanding the administrative expense status required for the Intercompany Transactions, all Debtors reserve the rights to dispute any Intercompany Transaction (or payment made on account of an Intercompany Transaction) on any ground, including the methodology for calculation of such transaction or payment, and to claw back or avoid such transactions and/or payments.

12617838-1

**Reservation of Rights**

52.    Nothing contained in this Motion or any order granting the relief requested in this Motion (including an administrative claim status granted on account of Intercompany Transactions), and no action taken pursuant to such relief requested or granted, is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against any of the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) an impairment or waiver of any Debtor's or any other party in interest's right to dispute any claim against, or interest in, any Debtor, its property, or its estate on any grounds; (c) a promise or requirement to pay any claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (f) an implication, admission, or finding as to (i) the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on the property of any Debtor or its estate or (ii) a waiver or limitation on any party's ability to challenge, recharacterize as equity, void, claw back, or seek other relief with respect to prepetition Intercompany Transactions or any particular payments authorized hereunder; (g) an impairment or waiver of any claims or causes of action which may exist against any entity; or (h) a waiver of any Debtor's or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

**WHEREFORE**, the Debtors respectfully request that the Court grant this Motion and enter the Order, substantially in the form attached hereto as **Exhibit A**, (a) authorizing, but not directing, the Debtors to (i) maintain their Cash Management System, (ii) honor certain prepetition and post-

petition obligations related thereto, (iii) use existing Business Forms, and (iv) perform certain

Intercompany Transactions; (b) waiving investment and deposit guidelines of Section 345 of the

U.S. Trustee Guidelines; and (c) granting and such other and further relief as the Court deems just

and proper.

Dated: December 19, 2023                              Respectfully submitted,

                                                      BERGER SINGERMAN LLP
                                                      *Proposed Counsel for the Debtors and*
                                                      *Debtors-in-Possession*
                                                      1450 Brickell Avenue, Ste. 1900
                                                      Miami, FL  33131
                                                      Telephone: (305) 755-9500
                                                      Facsimile: (305) 714-4340

                                                      By:   */s/ Paul Steven Singerman*
                                                            Paul Steven Singerman
                                                            Florida Bar No. 378860
                                                            singerman@bergersingerman.com
                                                            Jordi Guso
                                                            Florida Bar No. 863580
                                                            jguso@bergersingerman.com
                                                            Clay B. Roberts
                                                            Florida Bar No. 116058
                                                            croberts@bergersingerman.com

# **EXHIBIT A**

**(Proposed Order)**

12617838-1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br><br>BIRD GLOBAL, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11 Cases<br><br>Case No. 23-_____<br><br>(Joint Administration Pending) |

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO CONTINUE
TO (I) MAINTAIN THEIR CASH MANAGEMENT SYSTEM,
(II) HONOR CERTAIN PREPETITION AND POSTPETITION OBLIGATIONS
RELATED THERETO, (III) USE EXISTING BUSINESS FORMS, AND (IV) PERFORM
INTERCOMPANY TRANSACTIONS, AND (B) GRANTING RELATED RELIEF**

**THIS MATTER** was before this Court on December __, 2023, at ____ _.m. in Miami,

Florida ("Hearing"), upon the *Debtors' Emergency Motion for Entry of Interim and Final Orders*

*(A) Authorizing the Debtors to Continue to (I) Maintain Their Cash Management System,*

*(II) Honor Certain Prepetition and Postpetition Obligations Related Thereto, (III) Use Existing*

---

[1]  The address of the Debtors is 392 Northeast 191st Street, #20388, Miami, FL 33179.  The last four digits of the Debtors' federal tax identification numbers are: (i) Bird Global, Inc. (3155); (ii) Bird Rides, Inc. (9939); (iii) Bird US Holdco, LLC (8390); (iv) Bird US Opco, LLC (6873); and (v) Skinny Labs, Inc. (8176).

*Business Forms, and (IV) Perform Intercompany Transactions, and (B) Granting Related Relief* [ECF No. 13] (the "Motion")[2] filed by the above-captioned debtors and debtors-in-possession (the "Debtors").  The Motion seeks entry of interim and final orders (a) authorizing the Debtors to continue to (i) maintain their cash management system, (ii) honor certain prepetition and postpetition obligations related thereto, (iii) use existing business forms, and (iv) perform certain intercompany transactions, and (b) granting related relief.  The Court finds that (i) it has jurisdiction over the matters raised in the Motion under 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding under 28 U.S.C § 157(b)(2)(A), and that this Court may enter a final order consistent with Article III of the Constitution; (iii) venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409; (iv) the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; (v) notice of the Motion and the hearing were appropriate under the circumstances and no other notice need be provided; and (vi) upon review of the record before the Court, including the legal and factual bases set forth in the Motion and the First Day Declaration and argument made by counsel at the hearing, good and sufficient cause exists to grant the relief requested in the Motion.  Accordingly, it is

**ORDERED** as follows:

1.      The Motion is **GRANTED**, on an interim basis.

2.      The Debtors are authorized to continue to (a) maintain their Cash Management System substantially as described in paragraph 11 of, and on Exhibit C to, the Motion, in each case consistent with prepetition practice, (b) honor certain prepetition and postpetition obligations related thereto, (c) use existing Business Forms and books and records, and (d) continue

---

[2]  Capitalized terms used but not defined herein have the meanings given to them in the Motion.

12648460-1

Intercompany Transactions consistent with historical practice and honor prepetition and postpetition obligations related thereto.

3.    The Debtors are authorized to (a) continue to use, with the same account numbers, the Bank Accounts in existence as of the Petition Date, including those Bank Accounts identified on **Exhibit 1** attached hereto, (b) use, in their present form, all correspondence and Business Forms (including letterhead) without reference to the Debtors' status as debtors in possession, (c) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession, (d) deposit funds in and withdraw funds from the Bank Accounts by all usual means, including checks, wire transfers, and other debits, and (e) pay the Bank Fees and E-Commerce Fees, including any prepetition amounts, and any ordinary course Bank Fees and E-Commerce Fees incurred in connection with the Bank Accounts and E-Commerce Accounts, and to otherwise perform their obligations under the documents governing the Bank Accounts (collectively, the "Bank Account Agreements"), including, without limitation, to reimburse the Cash Management Banks for any checks deposited with such Cash Management Banks that have been dishonored or returned for insufficient funds, and any reimbursement or other obligations, such as overdrafts arising under the Bank Account Agreements (collectively, the "Bank Account Obligations"). Except to the extent otherwise directed by the terms of this Order, all of the provisions of the Bank Account Agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect.  The Cash Management Banks are hereby authorized, without further order of this Court, to charge and deduct from the appropriate Bank Accounts, the Bank Account Obligations that are incurred in connection therewith in the ordinary course of business, whether such items are dated prior to, on, or subsequent to the Petition Date.

4.      The Cash Management Banks are authorized to (a) continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course, and to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, and credit card payments issued and drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be and (b) without further order of this Court, charge and deduct all applicable fees (including, without limitation, the Bank Fees) from the applicable Bank Accounts consistent with historical practice, whether such fees were incurred prior to, on, or subsequent to the Petition Date.

5.      Subject to applicable bankruptcy or other law, those certain existing deposit agreements or other treasury management agreements between the Debtors and the Cash Management Banks shall continue to govern the postpetition cash management relationship between the Debtors and the Cash Management Banks, and all of the provisions of such agreements, including, without limitation, the termination and fee provisions, rights, benefits, offset rights, and remedies afforded under such agreements shall remain in full force and effect.

6.      The Debtors and the Cash Management Banks may, without further order of this Court, agree to and implement changes to the Cash Management System and procedures related thereto in the ordinary course of business, including, without limitation, the closing of Bank Accounts or the opening of New Accounts; *provided that* the Debtors will give timely notice to the U.S. Trustee, counsel to the first lien lenders under the prepetition credit facility (the "First Lien Lenders"), counsel to the administrative agent under any proposed postpetition credit facility, and counsel to any statutory committee appointed in these chapter 11 cases, of the closing of Bank Accounts, the opening of New Accounts or any other material changes to the Cash Management System.

7.    The relief granted in this Order is extended to any New Account opened by the Debtors in the ordinary course of business after the date hereof, which account shall be deemed a Bank Account, and to the bank at which such account is opened, which bank shall be deemed a Cash Management Bank.  The Debtors are authorized to open New Accounts so long as any such new account is with a bank that (a) is insured with the FDIC or the Federal Savings and Loan Insurance Corporation, (b) is designated as an authorized depository by the U.S. Trustee pursuant to the U.S. Trustee's Guidelines, and (c) agrees to be bound by the terms of this Order.  As required herein, to the extent the Debtors open a New Account, they shall provide timely notice to the U.S. Trustee, counsel to the First Lien Lenders, counsel to the administrative agent under any proposed postpetition credit facility, and counsel to any statutory committee appointed in these chapter 11 cases.

8.    The Cash Management Banks maintaining the Bank Accounts that are provided with notice of this Order shall not honor or pay any bank payments drawn on the listed Bank Accounts or otherwise issued before the Petition Date for which the Debtors specifically issue stop payment orders in accordance with the documents governing such Bank Accounts.

9.    Subject to the terms set forth herein, any bank, including the Cash Management Banks, may accept, honor and rely upon the representations of the Debtors with respect to whether any check, draft, wire, or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored or dishonored, consistent with any order of this Court and governing law, whether such checks, drafts, or wires and other withdrawals are dated prior to, on, or subsequent to the Petition Date, and shall have no duty to independently inquire as to whether such payments are authorized by an order of this Court; and no bank that honors a prepetition check or other item drawn on any account that is the subject of this Order (a) at the direction of the Debtors, (b) in a

12648460-1

good-faith belief that this Court has authorized such prepetition check or item to be honored or (c) as a result of a good faith error made despite implementation of reasonable item-handling procedures shall be deemed to be nor shall be liable to the Debtors, their estates, or any other party on account of such prepetition check or other item being honored postpetition, or otherwise deemed to be in violation of this Order.

10.    Any banks, including the Cash Management Banks, are: (a) further authorized to (i) honor the Debtors' directions with respect to the opening and closing of any Bank Account and (ii) accept and hold, or invest, the Debtors' funds in accordance with the Debtors' instructions; and (b) have no duty to independently inquire as to whether such payments are authorized by an order of this Court; *provided* that the Cash Management Banks shall not have any liability to any party for relying on the Debtors' directions or instructions regarding any of the foregoing.

11.    The Debtors are authorized to deposit funds in accordance with their established deposit practices in effect as of the Petition Date and, to the extent that such deposit practice is inconsistent with the requirements of section 345(b) of the Bankruptcy Code or the U.S. Trustee Guidelines, such requirements are waived, on an interim basis, without prejudice to the Debtors' right to seek a further waiver.

12.    The Debtors are authorized to continue to enter into and engage in the Intercompany Transactions in the ordinary course of business on a postpetition basis and settle any prepetition Intercompany Claims discovered during a postpetition intercompany true-up that are related to costs not previously posted to the balances for each entity, including funding the operations of Non-Debtor Affiliates; *provided* that the Debtors shall not be authorized to undertake any Intercompany Transactions that are not on terms materially consistent with the Debtors' operation of their business in the ordinary course during the prepetition period; *provided, further,* that any

Intercompany Transactions shall be in accordance with the terms and conditions of any debtor in possession ("DIP") facilities, including DIP Budgets, the approved use of cash collateral, and the requirements of DIP financing orders.  All postpetition payments from a Debtor to another Debtor under any postpetition Intercompany Transaction are hereby accorded administrative expense status immediately junior to the Carve-Out, Adequate Protection Liens, and Adequate Protection Superpriority Claims (each as defined in DIP financing orders).  In connection with the Intercompany Transactions, the Debtors shall continue to maintain current records with respect to all transfers of cash so that all transactions, including the Intercompany Transactions, may be readily ascertained, traced, and recorded properly on applicable intercompany accounts.  The Debtors shall make such records available upon request by the U.S. Trustee, counsel to the First Lien Lenders, the administrative agent under any proposed postpetition credit facility, and any official statutory committee appointed in these chapter 11 cases.

13.     Nothing contained in the Motion or this Order shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the Petition Date or (b) alter or impair the validity, priority, enforceability, or perfection of any interest or encumbrance on the property of any Debtor or its estate that existed as of the Petition Date.

14.     Notwithstanding anything to the contrary in this Order, any payment made, or authorization contained, hereunder, shall be subject to the requirements imposed on the Debtors under any DIP financing orders.  In the event of any inconsistency between the terms of this Order and the DIP financing orders, the terms of the DIP financing orders shall control.

15.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief (including an administrative claim status granted on account of Intercompany Transactions), nothing in this Order shall be deemed: (a) an admission as to the amount of, basis

for, or validity of any claim against any of the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) an impairment or waiver of any Debtor's or any other party in interest's right to dispute any claim against, or interest in, any Debtor, its property, or its estate on any grounds; (c) a promise or requirement to pay any claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an implication or admission that any particular claim is of a type specified or defined in the Motion, or any order granting the relief requested by the Motion; (f) an implication, admission, or finding as to (i) the validity, enforceability, or perfection of any interest or encumbrance on the property of any Debtor or its estate or (ii) a waiver or limitation on any party's ability to challenge, recharacterize as equity, void, claw back, or seek other relief with respect to prepetition Intercompany Transactions or any particular payments authorized hereunder; (g) an impairment or waiver of any claims or causes of action which may exist against any entity; or (h) a waiver of any Debtor's or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

16.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or funds transfer requests that are dishonored as a consequence of these chapter 11 cases, with respect to prepetition amounts owed where such payments are authorized by an order of this Court.

17.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized and directed to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on

the Debtors' designation of any particular check or electronic payment request as approved by this Order.

18.     The relief requested in the Motion satisfies the requirements of Bankruptcy Rule 6003(b) or are otherwise deemed waived.

19.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rules and the Bankruptcy Local Rules are satisfied by such notice.

20.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.  As soon as practicable after the entry of this Order, the Debtors shall serve this Order on the Cash Management Banks.

21.     The Debtors, including the Bank Account Debtors, are authorized to take all actions necessary or appropriate to effectuate the relief granted in this Order in accordance with the Motion.

22.     **The Court shall conduct a final hearing on the Motion on _____, 2024 at \_\_\_\_ \_.m., United States Bankruptcy Courthouse, C. Clyde Atkins United States Courthouse, 301 North Miami Avenue, Courtroom [ • ], Miami, Florida 33128**.  Information on requirements and procedures for remote attendance at the hearing may be found on the Honorable _____'s webpage on the Court's website: www.flsb.uscourts.gov. Within forty-eight (48) hours of the entry of this Interim Order, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the final hearing (the "Final Hearing Notice"), together with copies of this Interim Order, the proposed Final Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for the Creditors' Committee (if appointed);

and (d) the Internal Revenue Service. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than _____, 2024 at _____ _.m. (prevailing Eastern Time), which objections shall be served so as to be received on or before such date by: (i) the Debtors, Bird Global, Inc., *et al.*, 392 NW 191st Street, #20388, Miami, FL 33179, Attn: Chris Rankin, Chief Restructuring Officer; (ii) proposed counsel to the Debtors: Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, Attn: Paul Steven Singerman (singerman@bergersingerman.com), Jordi Guso (jguso@bergersingerman.com), and Clay Roberts (croberts@bergersingerman.com); (iii) counsel to the Senior DIP Parties and Prepetition First Lien Parties: Latham & Watkins LLP, 1271 Avenue of the Americas, New York, NY, 10020, Attn: James Ktsanes (James.Ktsanes@lw.com), John Lister (John.Lister@lw.com), and Hugh Murtagh (Hugh.Murtagh@lw.com); (iv) counsel to the Junior DIP Parties and Prepetition Second Lien Parties: Venable LLP, 100 SE 2nd Street, Suite 4400, Miami, FL 33131, Attn: Paul J. Battista (PJBattista@Venable.com); (v) the Office of the United States Trustee, 51 S.W. First Avenue, Room 1204, Miami, FL 33130; and (f) counsel to any statutory committee appointed in these chapter 11 cases.

23.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# # #

Submitted by:
Paul Steven Singerman, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Email:  singerman@bergersingerman.com

*(Attorney Singerman is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

12648460-1

# EXHIBIT 1

## (List of Bank Accounts)

| No. | Entity | Bank Name | Account Type | Last 4 Digits of Account No. |
|---|---|---|---|---|
| 1 | Bird Rides, Inc. | First Citizens | Collection | 1962 |
| 2 | Bird Rides, Inc. | First Citizens | Pass Through | 4316 |
| 3 | Bird Rides, Inc. | First Citizens | Concentration | 3036 |
| 4 | Bird Rides, Inc. | First Citizens | Disbursement | 1958 |
| 5 | Bird Rides, Inc. | First Citizens | Payroll | 1943 |
| 6 | Bird Rides, Inc. | Citi | Operating | 9115 |
| 7 | Bird Treasury Services, LLC (Non-Debtor Affiliate) | First Citizens | Treasury | 4795 |
| 8 | Skinny Labs Inc. d/b/a Spin | JP Morgan | Concentration | 1262 |
| 9 | Spin Mobility, Inc. (Non-Debtor Affiliate) | JP Morgan | Inactive | 1002 |
| 10 | Bird Rides, Inc. | First Citizens | Collateral | 8309 |
| 11 | Bird Rides, Inc. | First Citizens | Collateral | 4431 |
| 12 | Bird Rides, Inc. | First Citizens | Collateral | 0964 |
| 13 | Bird Rides, Inc. | First Citizens | Collateral | 6584 |
| 14 | Bird Rides, Inc. | First Citizens | Collateral | 6676 |
| 15 | Bird Rides, Inc. | First Citizens | Collateral | 5281 |
| 16 | Bird Rides, Inc. | First Citizens | Collateral | 8516 |
| 17 | Bird Rides, Inc. | HSBC | Collateral (Not Used) | 0463 |
| 18 | Bird Rides, Inc. | City National Bank | Collateral | 2155 |
| 19 | Bird US Opco, LLC | First Citizens | Collateral and subject to a DACA among Bird US Opco, LLC, First Citizens, and MidCap Financial Trust | 3275 |
| 20 | Skinny Labs Inc. d/b/a Spin | JP Morgan | Collateral | 2068 |

## EXHIBIT B

**(Summary of Bank Accounts)**

| No. | Entity | Bank Name | Account Type | Last 4 Digits of Account No. |
|-----|--------|-----------|--------------|------------------------------|
| 1 | Bird Rides, Inc. | First Citizens | Collection | 1962 |
| 2 | Bird Rides, Inc. | First Citizens | Pass Through | 4316 |
| 3 | Bird Rides, Inc. | First Citizens | Concentration | 3036 |
| 4 | Bird Rides, Inc. | First Citizens | Disbursement | 1958 |
| 5 | Bird Rides, Inc. | First Citizens | Payroll | 1943 |
| 6 | Bird Rides, Inc. | Citi | Operating | 9115 |
| 7 | Bird Treasury Services, LLC (Non-Debtor Affiliate) | First Citizens | Treasury | 4795 |
| 8 | Skinny Labs Inc. d/b/a Spin | JP Morgan | Concentration | 1262 |
| 9 | Spin Mobility, Inc. (Non-Debtor Affiliate) | JP Morgan | Inactive | 1002 |
| 10 | Bird Rides, Inc. | First Citizens | Collateral | 8309 |
| 11 | Bird Rides, Inc. | First Citizens | Collateral | 4431 |
| 12 | Bird Rides, Inc. | First Citizens | Collateral | 0964 |
| 13 | Bird Rides, Inc. | First Citizens | Collateral | 6584 |
| 14 | Bird Rides, Inc. | First Citizens | Collateral | 6676 |
| 15 | Bird Rides, Inc. | First Citizens | Collateral | 5281 |
| 16 | Bird Rides, Inc. | First Citizens | Collateral | 8516 |
| 17 | Bird Rides, Inc. | HSBC | Collateral (Not Used) | 0463 |
| 18 | Bird Rides, Inc. | City National Bank | Collateral | 2155 |
| 19 | Bird US Opco, LLC | First Citizens | Collateral and subject to a DACA among Bird US Opco, LLC, First Citizens, and MidCap Financial Trust | 3275 |
| 20 | Skinny Labs Inc. d/b/a Spin | JP Morgan | Collateral | 2068 |

31

## **EXHIBIT C**

**(Cash Management Diagram)**

12617838-1

Consumer Products Receipts
Consumer Rides Receipts
SG&A and 3rd Party Vendors
Bird Rides, Inc. SVB x1962 (USD)- Collections
Bird Rides, Inc. SVB x4316 (USD)-pass through
Bird Rides, Inc. SVB x3036 (USD)-Concentration
Bird Rides, Inc. CITI x9115 (USD)-Operating
Bird Treasury Services LLC SVB x4795 (USD)
Bird Rides, Inc. SVB x1958 (USD)- Disbursements
Bird Rides, Inc. SVB x1943 (USD)-Payroll
SKINNY Labs Inc. JPM x1262 (USD)- Concentration
Spin Mobility, Inc. JPM x1002 (CAD)-inactive
Collateral Accounts (Apollo, LCs)
Bird Rides, Inc. SVB x8309 (USD)
Bird Rides, Inc. SVB x4431 (USD)
Bird Rides, Inc. SVB x0964 (USD)
Bird Rides, Inc. SVB x6584 (USD)
Bird Rides, Inc. SVB x6676 (USD)
Bird Rides, Inc. SVB x5281 (USD)
Bird US Opco. LLC SVB x3275 (USD)
Bird Rides, Inc. SVB x8516 (USD)
Bird Rides, Inc. CNB x2155 (USD)
Bird Rides, Inc. HSBC x0463 (USD)
SG&A and 3rd Party Vendors
US Payroll
Collateral Accounts SPIN
SKINNY Labs Inc. JPM x2068 (USD)
United States
Legend
Receipts
Link to Another Page
Disbursements

