UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| BIRD GLOBAL, INC., *et al.*,[1] | Case No. 23-_____ |
| Debtors. | (Joint Administration Pending) |

**DEBTORS' EMERGENCY MOTION PURSUANT TO SECTIONS 105(a),
363, 1107 AND 1108 OF THE BANKRUPTCY CODE FOR AN ORDER
(A) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO
(I) MAINTAIN AND ADMINISTER CUSTOMER PROGRAMS, AND
(II) TO HONOR OR PAY CERTAIN PREPETITION OBLIGATIONS
TO THEIR CUSTOMERS IN THE ORDINARY COURSE OF BUSINESS;
AND (B) GRANTING CERTAIN RELATED RELIEF
(Emergency Hearing Requested)**

**Statement of Exigent Circumstances**

The Debtors respectfully request the Court to conduct an emergency hearing on this Motion. In the operation of their businesses, the Debtors maintain several customer programs. By this Motion, the Debtors seek authority to continue to maintain and administer customer programs and to honor or pay certain prepetition obligations to their customers in the ordinary course of business. The Debtors reasonably believe that a hearing to consider the relief requested must be held on an emergency basis as soon as the Court's calendar will permit. The Debtors respectfully request that the Court waive the provisions of Local Rule 9075-1(B) which require an affirmative statement that a bona fide effort was made in order to resolve the issues raised in this motion, as the relief requested herein is urgent in nature and does not lend itself to advance resolution.

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by

and through their proposed undersigned counsel, file this motion (the "Motion") for entry of

an order: (a) authorizing, but not directing, the Debtors (i) to maintain and administer their

---

[1] The address of the Debtors is 392 Northeast 191st Street, #20388, Miami, FL 33179. The last four digits of the Debtors' federal tax identification numbers are: (i) Bird Global, Inc. (3155); (ii) Bird Rides, Inc. (9939); (iii) Bird US Holdco, LLC (8390); (iv) Bird US Opco, LLC (6873); and (v) Skinny Labs, Inc. (8176).

customer-related programs and (ii) to honor or pay certain prepetition obligations to their customers and certain vendors who facilitate Debtor's interactions with customers, as detailed herein, in the ordinary course of business, and (b) granting certain related relief.  In support of this Motion, the Debtors rely upon the *Declaration of Christopher Rankin in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), which was filed with the Court concurrently herewith, and respectfully represent as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are sections 105(a), 363(b) and 507(a)(7) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 6003 of the Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 9013-1(F).

## Background

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code.

5.      The Debtors are operating their businesses and managing their affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      For a detailed description of the Debtors and their operations, the Debtors respectfully refer the Court and parties in interest to the First Day Declaration.[2]

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the First Day Declaration.

12651542-8

**Relief Requested**

7.   By this Motion, brought pursuant to sections 105(a), 363, and 507(a)(7) of the Bankruptcy Code, the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to honor or pay certain prepetition obligations to their customers and certain vendors who facilitate Debtor's interactions with customers in the ordinary course of business, (b) authorizing, but not directing, the Debtors to continue, renew, replace, implement new, and terminate any existing customer-related practices as they deem appropriate, in the ordinary course of business without further application to the Court, and (c) granting certain related relief.

**The Customer Programs**

8.   The Debtors are engaged in delivering electric transportation solutions for short distances.  The Debtors core vehicle-sharing business provides riders (the "Customers") with on-demand access to vehicles (e-scooters and e-bikes), enabling them to locate, unlock, and pay for short distance rides on such vehicles through a mobile application.

9.   To remain one of the leading micromobility transportation companies, the Debtors must maintain the loyalty of their Customers.  To attract new Customers and to reward and provide incentives to existing Customers, the Debtors administer, in the ordinary course of business, the practices and programs described herein (collectively, the "Customer Programs").

10.   As set forth in the First Day Declaration, Bird Global purchased Skinny Labs, Inc. and certain subsidiaries thereof ("Spin") in September 2023.  Like Bird, Spin is a micromobility company with operations throughout North America and in other countries.  As a result, some of the Customer Programs associated with Spin are still in effect.  The Debtors expect to migrate and merge the Spin Customer Programs into the existing Bird Customer Programs by the end of first quarter 2024.

12651542-8

11.     Without the ability to continue the Customer Programs and to satisfy prepetition obligations in connection therewith, the Debtors risk losing customer loyalty, goodwill, and market share, which could cause a precipitous decline in the value of their businesses at a critical juncture.  The Debtors' ability to continue their Customer Programs and honor obligations related thereto is necessary to keep the reputation of the Debtors intact, meet competitive market pressures, ensure customer satisfaction, and, ultimately, maximize value for the Debtors' estates and their stakeholders.  A summary of the Debtors' Customer Programs is set forth below.

### A.     Wallet Programs

12.     As described in more detail in the First Day Declaration, Customers transact and access the Debtors' Bird vehicles through Bird's mobile application (the "Bird App").  Through the Bird App, customers pay for trips in one of two ways: (a) on a "pay-per-ride" basis, where a rider charges the cost of the ride (for immediate use) to a credit card on file or (b) through a preloaded account balance or "wallet" (the "Bird Wallets") where the cost of the ride is redeemed from pre-purchased account or Wallet balances (the "Bird Wallet Program").  Funds in Bird Wallets may only be redeemed for rides on the Debtors' Bird vehicles.

13.     Similar to Bird App and the Bird Wallet Program, Spin customers may add value for trips using the Spin app and maintain a stored balance through a preloaded account balance or "wallet" (the "Spin Wallets") where the cost of the ride is redeemed from pre-purchased account or the Spin Wallet balance (the "Spin Wallet Program," and together with the Bird Wallet Program, the "Wallet Programs").  Funds in the Spin Wallets may only be redeemed for rides on the Debtors' Spin vehicles.  As discussed above, the Debtors intend to merge the Spin and Bird programs over time.

12651542-8

14.     The Wallet Programs represent a critical component of the Debtors' business and failure to maintain the Wallet Programs, including permitting customers to redeem rides in respect of payments made to the Bird Wallets and the Spin Wallets before the Petition Date, would likely cause significant, irreparable damage to the Debtors to the detriment of all parties in interest.

15.     As of the Petition Date, the total amount of funds received through the Wallet Programs in the United States and not yet redeemed for rides was approximately $82.6 million in respect of approximately 13.8 million Customer accounts.

16.     As noted, the Debtors believe that continuing to maintain the Wallet Programs, including honoring purchases made before the Petition Date, is critical to the Debtor's business. Moreover, the Debtors believe that customer claims arising under the Wallet Programs may be entitled to priority over other general unsecured claims pursuant to section 507(a)(7) of the Bankruptcy Code, as it is unlikely that any individual customer would have a claim in excess of the priority amount of $3,350.  Accordingly, the Debtors seek authority, but not direction, to (a) honor all Bird Wallet and Spin Wallet funds purchased before the Petition Date and (b) continue to maintain the Wallet Programs after the Petition Date, in a manner consistent with past practices.

**B.    Refund Program**

17.     Consistent with industry practice and to accommodate customers' needs, the Debtors maintain a refund program pursuant to which the Debtors grant, in the Debtors' discretion under limited circumstances, Customers a refund of amounts previously paid into the Wallet Programs (the "Refund Program").  The Refund Program assures the Debtors' customers that they will be "made whole" in certain situations, including if their payment was made in error

or as a result of fraud.  Customers may receive refunds of Bird Wallets or Spin Wallets in certain situations, including for up to 60 days after payment of such funds.

18.     The Debtors seek authority, but not direction, to honor the Refund Program with respect to purchases made before or after the Petition Date and to honor obligations related thereto in the ordinary course of business in accordance with the Debtors' existing prepetition policies and terms of service, including with respect to any obligations that arose before the Petition Date.

### C.     Rider Programs

19.     Consistent with industry practice and to accommodate customers' needs, the Debtors maintain a variety of programs that can be utilized by customers to obtain rides at a discounted rate, including (a) Ride Pass ("Ride Pass"), a prepaid product that allows customers to utilize Bird vehicles at a discounted rate for a set duration of time, (b) Bird Plus ("Bird+"), a prepaid subscription program subject to automatic renewal that allows customers to utilize Bird vehicles at a discounted rate and receive additional benefits, and (c) the Spin Pass ("Spin Pass"), a product where riders can prepay for future use of Spin vehicles at a discounted rate for a set duration of time (Ride Pass, Bird +, and Spin Pass, collectively the "Rider Programs").

20.     The Debtors believe the Rider Programs help improve and maintain customer relationships and revenue.  The Debtors estimate that there are approximately 11,542 active participants in the Rider Programs (consisting of 1,960 total Ride Pass users, 2,619 total Bird Plus users, and 6,963 Spin Pass users).  Because the Rider Programs enable customers to receive discounts and may not be redeemed for other value, they do not represent a cash liability for the Debtors.

12651542-8

21.     The Debtors seek authority, but not direction. to continue to administer the Rider Programs and to honor obligations related thereto in the ordinary course of business in accordance with the Debtors' existing prepetition policies and terms of service, including with respect to any obligations that arose before the Petition Date.

### D.     Charitable Programs

22.     The Debtors maintain certain charitable programs (the "Charitable Programs"), pursuant to which the Debtors' provide discounted rides to (a) customers that are enrolled in or eligible for a government assistance program, (b) medical professionals and healthcare workers, (c) low income individuals, students, teachers, senior citizens, and select community and non-profit groups, and (d) members of the American military and veterans.  Administering the Charitable Programs is a meaningful way for the Debtors to maintain goodwill and customer loyalty and to give back to the communities in which the Debtors operate.

23.     The Debtors believe that the positive impact on the communities they serve, coupled with customer goodwill generated by the Charitable Programs, warrants their continued sponsorship of these programs on a postpetition basis, including honoring any related outstanding obligations that arose before the Petition Date.  Indeed, customers enrolled in the Charitable Programs expect the Debtors to honor their prior commitments regarding the Charitable Programs.  Failing to do so would tarnish the Debtors' reputation and customer relationships during an already sensitive, transitional time for the Debtors' businesses.  As of the Petition Date, the Debtors estimate that approximately 31,578 customers are active or enrolled in the various Charitable Programs (14,286 at Bird and 17,292 at Spin).  The Debtors seek authority, but not direction, to continue to administer the Charitable Programs and honor all

12651542-8

prepetition obligations related thereto in the ordinary course of business, including with respect to any obligations that arose before the Petition Date.

**E.      Return and Warranty Programs**

24.      As set forth in the First Day Declaration, the Debtors previously sold vehicles for personal use through select retail and wholesale channels (the "Retail Sales").  In May 2022, the Debtors made the decision to exit the Retail Sales business to better align with consumer demand and reduce operational costs. However, consistent with industry practice and to accommodate customers' needs, the Debtors maintain return, refund, and warranty programs with respect to the now shuttered Retail Sales operation (collectively, the "Return and Warranty Programs").  The Return and Warranty Programs assure the Debtors' customers that they will be "made whole" if merchandise (including previously sold products and spare or replacement parts thereto) is inadequate, damaged or defective, incorrectly processed, or unavailable.  Customers may have defective goods repaired or replaced, depending on the defect in the product, and subject to certain conditions and time limitations.  Customers may also receive refunds subject to certain conditions.

25.      The Debtors seek authority, but not direction, to honor the Return and Warranty Programs with respect to merchandise purchased before and after the Petition Date and to honor obligations related thereto in the ordinary course of business, including with respect to any obligations that arose before the Petition Date.

## **Credit Cards and Other Payment Processors**

26.     The Debtors accept the following methods of payment from customers: (a) Visa, MasterCard, American Express, Discover, and debit cards, and (b) PayPal, Stripe and other online-only forms of payment (the "Non-Cash Payments"). To process Non-Cash Payments, the Debtors are party to certain agreements (the "Payment Processing Agreements") with payment processors (collectively, the "Payment Processing Companies"). The processing fees charged for each company vary, but are in the range of 3% to 4% (the "Processing Fees"). As of the Petition Date, the Debtors maintain a reserve balance of approximately $617,000 for Processing Fees and Chargebacks (defined below).

27.     When Customers dispute charges with a Payment Processing Company, the Debtors may be obligated to refund to such Payment Processing Company the amount of disputed charge, subject to certain adjustments (collectively, "Chargebacks" and, together with the Processing Fees, as well as other fees, fines, assessments, and obligations as may be defined in the Payment Processing Agreements, the "Processing Obligations"). Generally, Processing Obligations are debited from respective Bird and Spin bank accounts.[3] It is likely that certain Processing Obligations incurred by the Debtors immediately before the Petition Date may be in process but not have been fully debited from the Debtors' account before the Petition Date.

28.     The Debtors' continued acceptance of Non-Cash Payments is essential to the operation of the Debtors' business because the virtually all of the Debtors' sales are made using Non-Cash Payments of some form. Declining to accept Non-Cash Payments would have a severe negative effect on the Debtors' ongoing operations, the cost of which would be borne by

---

3    As further described in the *Debtors Emergency Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Continue to (I) Maintain Their Cash Management System, (II) Honor Certain Prepetition and Post-Petition Obligations Related Thereto, (III) Use Existing Business Forms, and (IV) Perform Intercompany Transactions, and (B) Granting Related Relief*, filed contemporaneously herewith, the Debtors maintain two bank accounts for the Wallet Programs, one at Citibank N.A. for Bird and one at JP Morgan, Inc. for Spin.

their estates.  To avoid disrupting these vital payment processing services, the Debtors seek authority to pay any prepetition Processing Obligations and to continue paying the Processing Obligations in the ordinary course of business pursuant to the terms of the Payment Processing Agreements, in a manner consistent with past practices.

## **Basis for Relief Requested**

29.    If the Debtors are unable to continue their Customer practices and honor the prepetition Customer Programs (including the Wallet Programs, the Refund Program, the Rider Programs, the Charitable Program and the Return and Warranty Programs), as well as the Processing Obligations (collectively with the Customer Programs, "Customer Obligations"), the Debtors risk alienating their Customers to select competing producers of other micro-mobility operators. The Debtors operate in a highly competitive sector. A significant portion of the value of the Debtors' businesses is, and will be, dependent upon the loyalty and confidence of their Customers. If the Debtors fail to honor the Customer Obligations due in the ordinary course, they will almost certainly suffer an irreparable loss of Customer support and confidence, thereby undermining their efforts to maximize value for their estates. The relief requested in this Motion will help minimize any disruption in the Debtors' business operations and preserve the value of the Debtors' estates.

30.    Section 105(a) of the Bankruptcy Code, which codifies the equitable powers of bankruptcy courts, authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  The payment and continuance of the Customer Obligations described herein should be authorized pursuant to §105(a) and the "necessity of payment" rule (now also referred to as the "doctrine of necessity").

12651542-8

31.    The "doctrine of necessity" or the "necessity of payment" rule originated in railway cases and was first articulated in *Miltenberger v. Logansport, R. Co.*, 106 U.S. 286 (1882).  The doctrine was expanded to non-railroad debtors in a decision by Judge Learned Hand in *Dudley v. Mealey*, 147F.2d 268, 271 (2d Cir. 1945), *cert. denied*, 325 U.S. 873 (1945) (holding, in a hotel reorganization case, that the court was not "helpless" to apply the rule to supply creditors of non-railroad debtors where the alternative was the cessation of operations).

32.    Today, the rationale for the "necessity of payment" rule - the maintenance of a debtor in bankruptcy cases - is "the paramount policy and goal of Chapter 11."  *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).  *See also Monte Vista Lodge v. Guardian Life Ins. Co. of America*, 384 F.2d 126 (9th Cir. 1967) (Congress has adopted the policy of promoting debtor rehabilitation through corporate reorganizations); *In re Timberhouse Post and Beam, Ltd.*, 196 B.R. 547, 550 (Bankr. D. Mont. 1996) (stating the "policy behind the Code recognizes that the debtor needs a certain degree of freedom on its road to reorganization so that it might avoid precisely those pitfalls which brought it into bankruptcy initially.") (citing *In re Johns-Manville Corp.*, 60 B.R. 612, 617 (Bankr. S.D.N.Y. 1986)); *Pension Benefit Guar. Corp. v. Sharon Steel Corp., (In re Sharon Steel Corp.)*, 159 B.R. 730, 736-37 (Bankr. W.D. Pa. 1993); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("payment by a debtor-in-possession of prepetition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed, however, where bankruptcy courts permit the payment of certain prepetition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment"); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (court approved payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11

process"); *In re Adams Apple, Inc.*, 829 F.2d 1484, 1490 (9th Cir. 1987) (court recognized allowance of "unequal treatment of prepetition debts when necessary for rehabilitation . . ."); *In re Chateauguay Corp.*, 80 B.R. 279, 287 (Bankr. S.D.N.Y. 1987) (court authorized payment of prepetition worker's compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately."); *In re Just For Feet, Inc.*, 242 B.R. 821 (Bankr. D. Del. 1999) (court found that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"). *See also* 2 Collier on Bankruptcy ¶ 105.04[5][a] (15th ed. rev. 2004).

33.    The bankruptcy court's exercise of its authority under the "doctrine of necessity" is appropriate to carry out specific statutory provisions of chapter 11, specifically sections 1107(a), 1108, and 363(b)(1) of the Bankruptcy Code, which authorize a debtor-in-possession to maintain and operate the debtor's business and use estate property outside of the ordinary course of business. Indeed, a debtor-in-possession operating a business under section 1108 of the Bankruptcy Code has a duty to protect and preserve the going concern value of an operating business, and prepetition claims may be paid if necessary to perform the debtor's duty. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) ("There are occasions when this duty can only be fulfilled by the preplan satisfaction of a prepetition claim.").  A bankruptcy court's exercise of its authority under section 105(a) of the Bankruptcy Code is also appropriate to carry out two central policies underlying chapter 11: (a) to permit the successful rehabilitation of the debtor; and (b) to preserve going concern value and maximize property available to satisfy all creditors.

12651542-8

34.     In furtherance of these policies, courts in this District and elsewhere have regularly authorized debtors to honor and pay obligations to customers arising prior to and after the filing of their chapter 11 cases in the ordinary course of business. *See, e.g., In re Vital Pharmaceuticals, Inc., et al.,* Case No. 22-17842-PDR (Bankr. S.D. Fla. Oct. 14, 2022); *It's Sugar FL I LLC, et al.*, Case No. 20-20259-RAM (Bankr. S.D. Fla. Sept. 29, 2020); *In re Toojay's Management LLC, et al.,* Case No. 20-14792-EPK (Bankr. S.D. Fla. May 22, 2020); *In re Adinath Corp., et al.*, Case No. 15-16885-LMI (Bankr. S.D. Fla. April 21, 2015); *In re Fla. Gaming Ctrs., Inc.*, Case No. 13-29597-RAM (Bankr. S.D. Fla. Aug. 26, 2013); *In re DM Indus., Ltd.*, Case No. 09-15533-LMI (Bankr. S.D. Fla. May 6, 2009); *In re E-Brands Restaurants, LLC, et al.,* Case No. 10-18282-KRM (Bankr. M.D. Fla. Aug. 20, 2010); *see also In re Delta Air Lines, Inc.,* Case No. 05-17923-PCB (Bankr. S.D.N.Y. Sept. 16, 2005); *In re Northwest Airlines Corp.,* Case No. 05-17930-ALG (Bankr. S.D.N.Y. Sept. 15, 2005); *In re Tower Auto., Inc.,* Case No. 05-10578-ALG (Bankr. S.D.N.Y. Feb. 3, 2005); *In re Footstar, Inc.,* Case No. 04-22350-ASH (Bankr. S.D.N.Y. Mar. 30, 2004); *accord In re Kaiser Aluminum Corp.,* Case No. 02-10429-PJW (Bankr. D. Del. Feb. 13, 2002); *In re Burlington Indus., Inc.,* Case No. 01-11282-PJW (Bankr. D. Del. Nov. 15, 2001).

35.     The success and viability of the Debtors' businesses is dependent upon the loyalty and confidence of their Customers.  The continued support of this constituency is absolutely essential to the survival of the Debtors' businesses, the preservation of the value of their estates, and the Debtors' ability to reorganize successfully.  Any delay in honoring or paying various Customer Obligations will severely and irreparably impair the Debtors' Customer relations at a time when the loyalty and support of its Customers (and Consumers) is extremely critical.  By contrast, honoring these prepetition obligations will require limited expenditure of estate funds

and will assist the Debtors in preserving their key customer relationships to the benefit of all stakeholders. Accordingly, to preserve the value of their estates, the Debtors must be permitted, in the Debtors' sole discretion, to continue honoring and/or paying all Customer Obligations without interruption or modification.  In addition, to provide necessary assurances to the Debtors' customers on a going-forward basis, the Debtors request authority, in their sole discretion, to continue honoring or paying all obligations to customers that arise from and after the Petition Date in the ordinary course of the Debtors' businesses.

36.    In light of the foregoing, the Debtors respectfully submit that the honoring and the payment of all Customer Obligations as requested herein is essential for the Debtors' successful reorganization, represent an exercise of the Debtors' sound business judgment, and are in the best interests of the Debtors' estates and creditors.

37.    The Debtors further request that all applicable banks and other financial institutions be authorized and directed, when requested by the Debtors in the Debtors' sole discretion, to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts to pay the Customer Obligations, whether such checks were presented prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments. The Debtors represent that each of these checks can be readily identified as relating directly to the authorized payment of the Customer Obligations.  Accordingly, the Debtors believe that checks other than those relating to authorized payments will not be honored inadvertently.

38.    Nothing contained herein is intended or shall be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or obligation to pay any claim or return any prepayment; (d) an implication or admission that any particular claim would constitute a Customer Obligation; or

(e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code.

### Request for Waiver of Stay

39.     In addition, by this Motion, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the immediate payment and honoring of the Customer Obligations is essential to avoid serious disruption to the Debtors' reorganization efforts.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the ten-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order in the form attached hereto as **Exhibit "A"** granting the relief requested herein, and for such other and further relief to the Debtors as the Court may deem proper.

Dated: December 20, 2023

Respectfully submitted,

BERGER SINGERMAN LLP
*Proposed Counsel for the Debtors and Debtors-in-Possession*
1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

By:   */s/  Paul Steven Singerman*
        Paul Steven Singerman
        Florida Bar No. 378860
        singerman@bergersingerman.com
        Jordi Guso
        Florida Bar No. 863580
        jguso@bergersingerman.com
        Robin J. Rubens

Florida Bar No. 959413
rrubens@bergersingerman.com
Clay B. Roberts
Florida Bar No. 116058
croberts@bergersingerman.com

**EXHIBIT "A"**

**(Proposed Order)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

BIRD GLOBAL, INC., *et al.*,[4]

      Debtors.

Chapter 11 Cases

Case No. 23-_____

(Joint Administration Pending)

**ORDER GRANTING DEBTORS' EMERGENCY MOTION PURSUANT TO
SECTIONS 105(a), 363, 1107 AND 1108 OF THE BANKRUPTCY CODE FOR AN
ORDER (A) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO
(I) MAINTAIN AND ADMINISTER CUSTOMER PROGRAMS, AND
(II) TO HONOR OR PAY CERTAIN PREPETITION OBLIGATIONS
TO THEIR CUSTOMERS IN THE ORDINARY COURSE OF BUSINESS;
AND (B) GRANTING CERTAIN RELATED RELIEF**

**THIS MATTER** came before the Court on December __, 2023, at _____ _.m., in Miami,

Florida, upon the *Debtors' Emergency Motion Pursuant to Sections 105(A), 363, 1107 and*

*1108 of the Bankruptcy Code for an Order (A) Authorizing, But Not Directing, the Debtors to*

*(I) Maintain and Administer Customer Programs, and (II) to Honor or Pay Certain Prepetition*

*Obligations to Their Customers in the Ordinary Course of Business; and (B) Granting Certain*

---

[4]    The address of the Debtors is 392 Northeast 191st Street, #20388, Miami, FL 33179.  The last four digits of the Debtors' federal tax identification numbers are: (i) Bird Global, Inc. (3155); (ii) Bird Rides, Inc. (9939); (iii) Bird US Holdco, LLC (8390); (iv) Bird US Opco, LLC (6873); and (v) Skinny Labs, Inc. (8176).

*Related Relief* [ECF No. ___] (the "<u>Motion</u>")[5] filed by the above-captioned debtors and debtors-in-possession (the "<u>Debtors</u>").  The Motion seeks entry of an order (a) authorizing, but not directing, the Debtors (i) to maintain and administer their customer-related programs and (ii) to honor or pay certain prepetition obligations to their customers and certain vendors who facilitate Debtor's interactions with customers, as detailed herein, in the ordinary course of business, and (b) granting certain related relief.  The Court finds that: (i) it has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and that this Court may enter a final order consistent with Article III of the Constitution; (iii) venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; (v) notice of the Motion and the hearing were appropriate under the circumstances and no other notice need be provided; and (vi) upon review of the record before the Court, including the legal and factual bases set forth in the Motion and the First Day Declaration and the statements made by counsel at the hearing, good and sufficient cause exists to grant the relief requested.  Accordingly, it is

       **ORDERED** as follows:

       1.       The Motion is **GRANTED**.

       2.       The Debtors are authorized, but not directed, to maintain and administer the Customer Programs and honor any related prepetition obligations in the ordinary course of business and consistent with past practice, as necessary and appropriate in the Debtors' business judgment.

       3.       The Debtors are authorized, but not directed, to pay any prepetition Processing Obligations and to continue paying the Processing Obligations postpetition in the ordinary course

---

[5]    Capitalized terms used but not defined herein shall have the meanings ascribed in the Motion.

of business pursuant to the terms of the Payment Processing Agreements, in a manner consistent with past practices.

4.      The Debtors are authorized to continue, renew, modify, terminate, or replace, in their discretion, their Customer Programs without further order of the Court; *provided*, that the Debtors shall notify the counsel to the first lien lenders under the prepetition credit facility of any new programs or policies for the benefit of customers that materially differs from those described in the Motion.

5.      Nothing in the Motion or this Order, nor the Debtors' payment or other treatment of Customer Obligations pursuant to this Order, shall be deemed or construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or obligation to pay any claim or return any prepayment (including any Prepayment); (d) an implication or admission that any particular claim constitutes a Customer Obligation; or (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code.

6.      Pursuant to Bankruptcy Rule 6004(g), this Order shall be immediately effective and enforceable upon entry.

#    #    #

<u>Submitted by</u>:
Paul Steven Singerman, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Email:  singerman@bergersingerman.com

*(Attorney Singerman is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

12651542-8