UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br><br>BIRD GLOBAL, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11 Cases<br><br>Case No. 23-20514-LMI<br><br>(Jointly Administered) |

**DECLARATION OF CHRISTOPHER RANKIN IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Christopher Rankin, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am an employee and the Chief Restructuring Officer ("CRO") of Bird Global, Inc., a Delaware corporation ("Bird Global"), the ultimate parent of each of the other debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") and the non-debtor affiliates (the "Non-Debtor Affiliates, together with the Debtors, "Bird" or the "Company"). I have over 28 years of general business experience focused on recapitalizations, mergers, acquisitions and restructurings. Prior to my employ by the Debtors, I was and am a Senior Principal at PointNorth Capital. PointNorth Capital is a private equity firm engaged in restructurings, recapitalizations, and take private transactions with offices located in Toronto, Canada. At PointNorth, I have extensive experience in dealing with a full range of issues and challenges that arise in corporate restructurings and business reorganizations.

2.      Since November 6, 2023, I have served as an advisor to the Debtors. I then became an employee of and transitioned to the role of CRO. I continue to serve as CRO for the

---

[1]      The address of the Debtors is 392 Northeast 191st Street, #20388, Miami, FL 33179. The last four digits of the Debtors' federal tax identification numbers are: (i) Bird Global, Inc. (3155); (ii) Bird Rides, Inc. (9939); (iii) Bird US Holdco, LLC (8390); (iv) Bird US Opco, LLC (6873); and (v) Skinny Labs, Inc. (8176).

Debtors, as debtors and debtors in possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

3.     Since my retention by the Debtors as a consultant and then as an employee, I have become familiar with the Debtors' businesses, financial affairs, debt structure, assets, contractual arrangements, operations and strategic challenges.  I have been assisting the Debtors with respect to managing liquidity, seeking additional capital, and analyzing potential strategic alternatives for the Debtors.  Accordingly, I have acquired substantial background and information regarding the Debtors that will assist me in providing effective and efficient services to the Debtors with the many issues that may arise in the context of the Debtors' Chapter 11 Cases.

4.     On the date hereof (the "Petition Date"), each of the Debtors commenced a Chapter 11 Case by filing a voluntary petition for relief in this Court under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  To minimize any adverse effects on their estates as a result of the commencement of these Chapter 11 Cases, the Debtors have filed certain motions, applications and other papers seeking various types of "first day" relief (including all attachments and exhibits thereto and any amendments, collectively, the "First Day Filings").[2]  The First Day Filings seek relief, among other things, to establish the foundation for the smooth and efficient entry into Chapter 11 and the administration of these Chapter 11 Cases.  The relief requested in the First Day Filings is paramount to the success of the efforts of the Debtors to preserve and to maximize the value of their estates.

5.     I submit this declaration ("Declaration") to provide an overview of the Debtors, their business, and the Chapter 11 Cases, as well as to support the Debtors' petitions and the First Day Filings. I have reviewed the Debtors' Chapter 11 petitions and the First Day Filings, or

---

[2]     Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Filing(s).

otherwise had the contents explained to me, and to the best of my knowledge after reasonable inquiry, believe that the relief sought in each First Day Filing: (a) is necessary to enable the Debtors to enter into, and to operate in, Chapter 11 with minimal disruption or loss of productivity or value; (b) constitutes a critical element to the Debtors' efforts to preserve value and maximize creditor and stakeholder recoveries and to achieve a successful liquidation; and (c) best serves the Debtors' estates and creditors' and stakeholders' interests.  Further, it is my belief that the relief sought in the First Day Filings is narrowly tailored and necessary to achieve the goals of these Chapter 11 Cases.  The facts set forth in each First Day Filing are incorporated herein by reference.

6.      Except as otherwise indicated, I have personal knowledge of the matters set forth herein, and all statements and facts set forth herein are based upon my personal knowledge, discussions with current and former members of the Debtors' senior management and the Debtors' professional advisors, my and our team's review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' representatives, or my opinion based upon my experience with the Debtors' operations and financial condition. In making my statements based upon my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' professionals and representatives, I have relied upon those professionals and representatives accurately recording, preparing or collecting such documentation and other information.  I am authorized to submit this Declaration on behalf of the Debtors.  I am over the age of eighteen, and if called to testify as a witness in this matter, I could and would competently testify to each of the statements and facts set forth herein.

12640569-4.doc

7.    This Declaration is divided into three parts.   Part I provides background information about the Debtors, including their past and current business operations, their corporate and capital structure, and the events leading up to the filing of these Chapter 11 Cases. Part II summarizes the Debtors' primary objectives in these Chapter 11 Cases.   Part III sets forth the relevant facts in support each of the First Day Filings.

<div align="center">

**PART I**
**BACKGROUND**

</div>

**A.    OVERVIEW OF BUSINESS OPERATIONS.**

8.    Bird is a micromobility company committed to providing affordable, environmentally friendly on-demand transportation solutions to communities across the world. Founded in 2017, the Debtors were the first enterprise to deploy shared electric scooters in the United States, providing an entirely new category for short-distance transportation relying entirely on renewable energy.   The Company partners with cities to bring lightweight, electric vehicles (such as e-scooters and e-bikes) to residents and visitors in an effort to replace car trips by providing an alternative sustainable transportation options.   Bird is the largest micromobility operator in North America by market share and is a leader in environmentally friendly electric transportation.   The Company operates in approximately 300 markets globally with over 200,000 vehicles in cities across the United States and the globe, with over 175 million rides completed on Bird vehicles as of December 2023.   Bird takes a collaborative, community-first approach to micromobility, working closely with the cities in which it operates to provide a reliable and affordable transportation option for people who live, work and visit.

9.    Bird's micromobility offerings include its core vehicle-sharing business and operations ("Sharing"), a white-label offering where partners purchase vehicles from Bird and

<div align="center">4</div>

pay service and license fees for the use of Bird's platform ("<u>Platform</u>"), and sales of Bird-designed vehicles for personal use ("<u>Retail Sales</u>").

     **a.**   <u>**Sharing Business**</u>

10.    Bird's core vehicle-sharing business and operations ("<u>Sharing</u>") provide riders with on-demand access to Bird vehicles (e-scooters and e-bikes), enabling them to locate, unlock, and pay for rides through the Company's mobile application (the "<u>Bird App</u>").  Riders can download the Bird App on both Android and iOS smartphone platforms and become an eligible rider following a brief onboarding process.  Riders can then use the Bird App to locate nearby vehicles and "unlock" a vehicle to begin a trip.  The trip is completed when the vehicle is parked in a designated area.



11.    Bird generates revenue from trips taken on its shared vehicles.  For a single ride, riders typically pay a fixed unlock fee to access the vehicle in addition to a market-level, per-minute price for each minute the vehicle is in use.  Riders generally pay for trips in one of two ways: (i) "pay-per-ride" where a rider charges the cost of the ride to a credit card on file or (ii) through a preloaded "wallet" where the cost of the trip is redeemed from the wallet balance.  Bird generates the substantial majority of its revenue from the Sharing business, with approximately $231 million in annual revenue in 2022 related to the Sharing business.

12.    The Debtors have also expanded the Sharing business to new markets in various regions around the world, including EMEA and other select markets in Canada, Australia, and

South Korea. The non-U.S. business is operated by the Non-Debtor Affiliates in local markets, which are all owned directly or indirectly by Bird Global. The Debtors have made significant investments to build the infrastructure necessary to support a global platform, including obtaining regulatory approvals and permits, building relationships with local city partners, and developing a network of Fleet Managers (defined below) to facilitate in-market operations globally. The Debtors' continued presence in these markets provides a strategic foothold to continue to scale operations, increase brand awareness, and achieve profitability.

13.    For the quarter ended September 2023, the Debtors deployed on average approximately 80,000 vehicles in a given day for Sharing operations. Deployed vehicles constitute a portion of the Debtors' total fleet and are strategically deployed depending on a variety of factors, including weather, historical demand, time of day, and day of the week. Vehicles that are not deployed include vehicles being recharged, repaired, or held in storage.

14.    The Debtors have multiple generations of Scooters currently used in their global fleet. Each generation has key innovations and updates, including improved in-market longevity.



15.     Local in-market operations for the Company's Sharing business are either managed with the support of a network of local logistic providers (the "Fleet Managers") or through the Company's in-house teams ("In-House").   Prior to the second quarter of 2020, substantially all of Bird's in-market operations were conducted In-House.   After temporarily pausing operations at the onset of COVID-19 in March 2020, the Company rapidly shifted to the Fleet Manager operating model as a way to quickly relaunch and provide safe and socially distanced transportation options for its global city partners. While the Company continues to operate certain of its operations primarily under the Fleet Manager operating model to expand into new markets and positively impact year-round unit economics, segments of Bird's business have successfully operated in-house since inception, making it a viable and profitable operating model in select cities.

16.     Fleet Managers typically manage logistics for fleets of 100 or more Bird-owned vehicles in their local markets, driving meaningful scale as Bird expands into small to mid-sized cities. There are approximately 300 Fleet Managers operating for Bird globally, with approximately 220 in the United States.  With the support of Bird's central operations team and advanced technology platform, Fleet Managers manage the day-to-day logistics responsibilities required for proper fleet management, including deploying, repairing, relocating, and charging Bird vehicles.  Through a revenue share model, Fleet Managers make money on rides taken on the vehicles in their care, creating built-in economic incentives to ensure these vehicles are properly maintained, and strategically placed to align with local demand. There are no upfront fees to Bird associated with becoming a Fleet Manager, and Fleet Managers typically utilize existing tools and resources to manage their fleet. As such, the Fleet Manager program provides economic advancement opportunities to local businesses.

17.    Bird closely monitors the usage of its vehicles ("Rides") as a key indicator of the usage and scale of the Sharing business.  The Company calculates Rides as the total number of paid and unpaid trips completed by customers of its Sharing business. Rides have decreased in 2023 as the Company has exited certain jurisdictions.  Rides are seasonal to a certain degree and the Company typically experiences higher levels of activity in the second and third quarters as a result of improved weather conditions in the Northern Hemisphere and lower levels of activity in the first and fourth quarters as weather conditions worsen.

18.    Bird keeps track of the number of Rides per deployed vehicle per day ("RPD"), which represents the rate at which its vehicles are utilized by riders.  The Company calculates RPD as the total number of Rides divided by total number of vehicles available to riders through the Sharing Business (the "Deployed Vehicles") each calendar day.  The Company calculates Deployed Vehicles on a pro-rata basis over a 24-hour period, wherein two vehicles deployed for a combined period of 24 hours equate to one Deployed Vehicle. Deployed Vehicles constitute a portion of Bird's total fleet, and the Company strategically deploys vehicles depending on a variety of factors, including weather, historical demand, time of day, and day of the week.  If a vehicle is charging, under repair, or temporarily missing, it is not considered a Deployed Vehicle.  During the winter months, Bird proactively places portions of its fleet in reserve to align with seasonal demand and preserve its asset base. As such, Deployed Vehicle volumes tend to fluctuate seasonally.

19.    Bird has experienced a decrease in Rides within its Sharing Business due to a variety of factors, including the exit from jurisdictions Bird operated in that were high volume but low profitability during 2022, and changes in availability of Deployed Vehicles in productive locations.  For the nine months ending November 30, 2023, Rides have seen a decrease of 36%

compared to the same period last year. Commensurate with the decrease in Rides, Sharing Revenue has decreased by $31 million, or 20%, for the nine months ended September 30, 2023, compared to the same period last year. Revenues outperformed Rides, as Revenue per Ride increased.

###### b. **Platform Business**

20.     Bird offers a white labeled version of its products and technology referred to as the "Platform." Through the Platform, the Company sells fleets of Bird vehicles to its Platform partners for them to operate in their local markets. Bird also receives a service and license fee for access to its systems so the vehicles can be used by riders.

21.     Bird's Platform business earns revenues through the sale of vehicles to its platform partners, as well as through per-ride service and license fees for use of Bird's proprietary software platform and tools. Rides in the Platform segment for the nine months ended September 2023 decreased 39% as compared to the prior year. Prior to its acquisition by Bird Global pursuant to the BC Share Purchase Agreement (defined herein), Bird Canada was Bird's most successful Platform partner. Prior to its acquisition, Bird Canada also made significant vehicle purchases to update its fleet, which were included in Platform revenues. Those Platform revenues attributable to the sale of vehicles to Bird Canada do not recur as Bird Canada is now a subsidiary of Bird and new vehicle additions would be considered capital investments. The Company anticipates future vehicle sales to Platform partners, though the timing and volume of such purchases is uncertain.

###### a. **Retail Sales Business**

22.     The Company previously sold Bird vehicles for personal use ("Retail Sales") through select retail and wholesale channels. In 2019, the Company launched the first Bird-

designed vehicle available for consumer purchase—the Bird One Scooter—designed and engineered for everyday use.  Since then, the Company expanded its consumer product line to include updated vehicles designs, including "stow and go" Scooters, as well as a Bird-designed electric bike.  In 2022, Retail Sales generated approximately $13.3 million in annual revenue.  In May 2022, Bird announced that it would discontinue its Retail Sales portfolio offering, simplify its business model and realign its resources to prioritize Sharing operations within its existing regions.  Bird continues to provide warranty services to its former Retail Sales customers.

**B.    CORPORATE ORGANIZATION**

     **a.    <u>The Company</u>**

23.    The Debtors are organized under the laws of the state of Delaware.  The Debtors are led by a management team with extensive experience in the ride-sharing and transportation industries as well as other key industries.

24.    Bird's corporate headquarters is in Miami, Florida with some of Bird's management team based in Canada and across the globe.  Historically, the overall operations of the Company were based in Southern California.  In 2020, the Debtors made the shift to remote-first work in an effort to mitigate the financial impact of the COVID-19 pandemic.  The Debtors do not have office or commercial spaces but lease facilities to support their operations.  In particular, the Debtors lease facilities for use as service and distribution centers in the United States, Europe, and Israel, and spaces in Southern California and Shanghai, China for use as research and development ("<u>R&D</u>") centers and warehouse facilities.  The Debtors also lease "social spaces" to provide employees with in-person collaboration opportunities.

25.    As of the Petition Date, the Company had a total of 571 employees, including 459 employees in the United States, which are responsible for engineering, R&D, sales, marketing,

operations, government partnerships, communications, finance, legal, and accounting. The Debtors do not have any internal manufacturing capabilities and instead contract with a limited number of international suppliers to manufacture vehicles and vehicle components.

       **b.**   **Public Listing of Bird Global Shares**

     26.    On May 4, 2021, Bird Global was formed as a wholly owned subsidiary of Bird Rides, Inc. ("Bird Rides") for the purpose of effectuating the transactions contemplated by the Business Combination Agreement (defined below), including a merger with a publicly listed special purpose acquisition company (SPAC) and to thereafter serve as the publicly traded parent company of Bird Rides.

     27.    On October 7, 2020, Switchback II Corporation ("Switchback"), a Cayman Islands exempted company, was formed for the purpose of effecting a business combination involving Switchback and one or more businesses. On January 12, 2021, Switchback completed an initial public offering pursuant to which certain of its securities became listed and publicly traded on the New York Stock Exchange (the "NYSE") under the symbols "SWBK.U," "SWBK," and "SWBK WS."

     28.    On May 11, 2021, Switchback entered into an agreement (the "Business Combination Agreement") with Bird Global and Bird Rides, among others, pursuant to which it was agreed that (i) Switchback would reincorporate to the State of Delaware by merging with and into Bird Global (with Bird Global surviving the merger as a publicly traded entity) (the "Domestication Merger"), and (ii) Bird Rides would merge into a wholly owned subsidiary of Bird Global (with Bird Rides surviving this subsequent merger as a wholly owned subsidiary of Bird Global) (the "Bird Rides Merger").

29.     On November 3, 2021, the Domestication Merger was completed. On November 4, 2021, the Bird Rides Merger was completed.  Upon completion of the Domestication Merger, Switchback securities ceased trading on the NYSE and securities of Bird Global began trading on the NYSE under the symbols "BRDS" and "BRDS WS."

        **c.**    **Bird Canada Acquisition and Management Changes**

30.     On December 30, 2022, and effective as of January 3, 2023, Bird Global entered into a share purchase agreement (the "BC Share Purchase Agreement") with 1393631 B.C. Unlimited Liability Company, a British Columbia unlimited liability company and indirect wholly owned subsidiary of Bird Global, Bird Canada Inc. ("Bird Canada"), and the owners of all Bird Canada shares (the "BC Sellers").  Pursuant to the BC Share Purchase Agreement, among other things, the Bird Global acquired from the BC Sellers 100% of the issued and outstanding shares of Bird Canada in exchange for the issuance by the Company to the BC Sellers of an aggregate principal amount of $27.0 million of its 12.0% Convertible Senior Secured Notes due 2027 (the "Second Lien Notes"), 728,175 shares of Bird Global's Class A common stock (the "Class A Common Stock"), and a nominal amount of cash consideration (such transaction, the "Bird Canada Acquisition").  The purpose of the Bird Canada Acquisition was to add additional profitable operations to Bird's Global platform, while consolidating Bird's North American operations.

31.     The terms of the Second Lien Notes issued in connection with the Bird Canada Acquisition are governed by that certain Note Purchase Agreement, dated as of December 30, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Note Purchase Agreement"), by and among the Bird Global, as issuer, the several purchasers from time to time party thereto (collectively, the "Second Lien Noteholders") and U.S. Bank Trust

Company, National Association, as collateral agent (the "<u>Second Lien Agent</u>").   The Note Purchase Agreement and the Second Lien Notes are described further herein.

32.     Bird Canada was Bird's most successful Platform partner.   Prior to the Bird Canada Acquisition, Bird Canada operated independently, using Bird branding, vehicles, and technology to successfully establish micromobility programs across several Canadian cities. Following the Bird Canada Acquisition, Bird Global combined with Bird Canada, with the BC Sellers primarily receiving the Second Lien Notes as consideration. The acquisition added additional profitable operations to Bird's global platform consolidated North American operations.

33.     Upon the closing of the Bird Canada Acquisition, certain management changes occurred.   Stewart Lyons, the CEO of Bird Canada, joined Bird as President.   Michael Washinushi joined Bird as Chief Financial Officer.[3]  JJ Bitove, the Chief Financial Officer and co-founder of Bird Canada, joined Bird as VP, Corporate Development and Strategy.  Each of the new members of management brought significant industry experience. In addition to the management changes, Bird also saw changes to its board of directors with the inclusion of John Bitove, Antonio Occhionero and Kevin Talbot.

**d.     Spin Acquisition**

34.     On September 19, 2023, Bird Global entered into that certain Stock Purchase Agreement (the "<u>Spin Acquisition Agreement</u>") with Skinny Labs, Inc. ("<u>Spin</u>"), acquiring 100% of the stock of Spin in exchange for agreed upon consideration of approximately $19 million before adjustments, which is comprised of (a) $10 million in cash, (b) $6 million in the form of a secured vendor take-back promissory note (the "<u>VTB Note</u>"), and (c) $3 million in hold-back

---

[3]     Mr. Washinushi currently serves as the Debtors' Interim Chief Executive Officer.

consideration comprised of $1 million in cash and $2 million of the Company's Class A Common Stock, par value $0.0001 per share (such transaction, the "Spin Acquisition"). The Spin purchase price is subject to an adjustment for any net working capital adjustments identified during the ninety (90) days immediately following the acquisition.

35.     Spin is a micromobility company with operations throughout North America. The purpose of Bird's acquisition of Spin was to gain access to new city permits, new markets, and new vehicles.

### e.     The Corporate Structure and Governance of the Debtors

36.     The Debtors are part of a corporate structure whose ultimate parent is Debtor Bird Global.[4]  Bird Global has three types of Common Stock: Class A, Class B, and Class X.  As of September 30, 2023, Bird Global had 14,183,016 and 1,381,398 shares of Class A Common Stock and Class X Common Stock, respectively, issued and outstanding. As of September 30, 2023, there were no shares of Class B Common Stock issued and outstanding.  Bird Global's Class X Common Stock is held entirely by Travis VanderZanden, the Company's founder.

37.     Bird Global's Class A Common Stock is publicly traded on the OTCQX, the highest tier of the over-the-counter (OTC) market, under the symbol "BRDS."  Bird Global was previously traded on the New York Stock Exchange ("NYSE") but was delisted on September 25, 2023, because it failed to maintain an average global market capitalization of at least $15,000,000 over a consecutive 30 trading day period.  The Company appealed the NYSE's determination to delist its shares.

38.     There are eight directors on Bird Global's Board of Directors.  The most recent addition to the board is Harvey Tepner, who is an independent director with voting rights, and is

---

[4]     Prior to the first day hearing, the Debtors will file an organizational chart of the Debtors on the Court's docket via a notice of filing.

the sole member of a Special Committee to which all restructuring transaction matters are delegated.

39.    Debtor Bird Global holds 100% of the shares of Debtor Bird Rides and non-Debtor Bird Canada Scooters, Inc.

40.    Debtor Bird Rides holds 100% of the shares in Debtor Spin and 100% of the membership interests in Debtor Bird US Holdco, LLC ("Bird Holdco").  Bird Rides holds 100% of the membership interests in non-Debtor Bird Rides Holding (US), LLC and non-Debtor Bird Treasury Holdco, LLC, 100% of the shares in non-Debtor Bird Rides International Holding, Inc. and non-Debtor Scoot Rides, Inc., and holds 100% of the equity interests in non-Debtor Bird China Limited.

41.    Bird Holdco holds 100% of the membership interests in Debtor Bird US Opco, LLC ("Bird Opco").

## C.    THE PREPETITION CAPITAL STRUCTURE OF THE DEBTORS

42.    As of the Petition Date, the Debtors were liable for approximately $108.9 million in aggregate financial debt obligations (excluding trade debt and potential rejection damages). These obligations arise under a senior secured credit facility and two note issuances.  Bird Global is an obligor under each of the funded-debt obligations as either a borrower, issuer, or guarantor. The table below summarizes the Debtors' prepetition capital structure.

| Financial Debt Obligation | Principal Outstanding |
|---|---|
| First Lien Credit Facility | $41.5 million |
| Second Lien Notes | $67.4 million |
| VTB Note | Disputed (as described herein) |

a.    <u>**First Lien Obligations – First Lien Credit Facility**</u>

43.    On April 27, 2021, Bird Opco, Bird Holdco, MidCap Financial Trust, as administrative agent (the "<u>First Lien Agent</u>"), and certain other lenders thereto (the "<u>First Lien Lenders</u>") entered into that certain Loan and Security Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "<u>First Lien Credit Agreement</u>") pursuant to which Bird could finance its future vehicle capital expenditures (the "<u>First Lien Credit Facility</u>").  The First Lien Credit Facility included a repayment mechanism tied directly to revenue generation by vehicles on lease by Bird Opco to Bird Rides under an intercompany leasing arrangement (the "<u>Scooter Lease</u>").

44.    The First Lien Credit Agreement was amended a number of times between 2021 and the filing of the Chapter 11 Cases.  The amendments that the Company negotiated to the First Lien Credit Agreement have, among other things, allowed Bird to reduce cash outlays that are variable based on revenue in favor of more predictable payment streams, increased the First Lien Lenders' commitments under the First Lien Credit Facility, and reduced the amount of reserved cash the Company is required to hold so that it could improve its liquidity position.

45.    On September 19, 2023, in connection with the Spin Acquisition, the First Lien Credit Agreement was amended and restated, in its entirety, by and among, Bird Rides, as Borrower, Bird Global, as Parent, Bird Holdco, and certain other persons from time to time party thereto, and the First Lien Agent.  The amended and restated First Lien Credit Agreement provided for, among other things, (a) an additional advance of $6 million, to be used for, among other things, the completion of the transactions contemplated under the Spin Acquisition Agreement, (b) an extension of the maturity date of the loan to July 12, 2025, (c) amendments to the monthly amortization payment amounts and (d) the extension of the senior security in favor

of the First Lien Agent to include substantially all of the assets of Bird Global, Bird Rides and certain of the Company's other material US subsidiaries.  Under the amended and restated First Lien Credit Agreement, the Scooter Lease was terminated.

46.    On November 29, 2023, Bird Rides, Bird Global, Bird Holdco, and certain other persons from time-to-time party thereto, and the First Lien Agent, entered into that certain Amendment No. 1 to the amended and restated First Lien Credit Agreement pursuant to which the Lenders extended $2,000,000 to the Company (the "First Lien Bridge Loan") and the amended and restated First Lien Credit Agreement was amended.

47.    The First Lien Credit Facility is secured by substantially all assets of the Debtors, including the Debtors' equity in certain non-Debtor affiliates.

48.    As of the Petition Date, the outstanding principal balance under the First Lien Credit Facility, inclusive of the First Lien Bridge Loan, is approximately $41.5 million.

b.    **Second Lien Obligations - Note Purchase Agreement**

49.    On December 30, 2022, in connection with the Bird Canada Acquisition, the Company entered into the Note Purchase Agreement, by and among Bird Global, as issuer, the Second Lien Noteholders from time-to-time party thereto, and the Second Lien Agent.  Pursuant to the Note Purchase Agreement, Bird Global issued and sold an aggregate principal amount of $30.1 million of its Second Lien Notes. The Second Lien Notes were issued and sold in a private placement to certain "accredited investors" conducted pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended. The terms of the Second Lien Notes are governed by the Note Purchase Agreement and the Second Lien Noteholders are entitled to convert the Second Lien Notes into shares of Class A Common Stock at any time at a conversion rate of approximately 139 shares of Class A Common Stock per $1,000 principal amount of the Second

Lien Notes, equivalent to a conversion price of approximately $7.1942 per share, subject to specified anti-dilution adjustments, including adjustments for issuance of Class A Common Stock below the conversion price.

50.    On March 17, 2023, Bird Global entered into the First Amendment to the Note Purchase Agreement with the original Second Lien Noteholders and the Second Lien Agent. Pursuant to the First Amendment to the Note Purchase Agreement, the Company issued $2.8 million of additional Second Lien Notes for cash consideration. The purpose of the agreement was to use the proceeds for general corporate purposes.

51.    On September 19, 2023, in connection with the Spin Acquisition, Bird Global entered into the Second Amendment to the Note Purchase Agreement with the original Second Lien Noteholders and the Second Lien Agent.

52.    On December 11, 2023, Bird Global entered into the Third Amendment to the Note Purchase Agreement with the original Second Lien Noteholders and the Second Lien Agent. Pursuant to the Third Amendment to the Note Purchase Agreement, the Company issued $2.2 million of additional Second Lien Notes for cash consideration.

53.    On December 18, 2023, Bird Global entered into the Fourth Amendment to the Note Purchase Agreement with the original Second Lien Noteholders and the Second Lien Agent. Pursuant to the Fourth Amendment to the Note Purchase Agreement, the Company issued $1.8 million of additional Second Lien Notes for cash consideration.

54.    The Second Lien Notes are secured by substantially all assets of the Debtors, including the Debtors' equity in certain non-Debtor affiliates.

55.    As of the Petition Date, the outstanding balance under the Note Purchase Agreement is $71 million, which is comprised of $63.8 million of principal, $3.6 million of principal issued as PIK interest, and $3.6 million of accrued interest.

56.    The First Lien Agent, the Second Lien Agent, and the Second Lien Noteholders are parties to that certain Subordination and Intercreditor Agreement, dated, December 30, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement").  The Intercreditor Agreement sets forth the relative rights and priorities between the First Lien Lenders, the First Lien Agent, the Second Lien Lenders, and the Second Lien Agent.  On March 17, 2023, the Intercreditor Agreement was amended and supplemented.  On September 19, 2023, the Intercreditor Agreement was amended and restated in its entirety and further amended on December 11, 2023.

**c.    The VTB Note**

57.    On September 19, 2023, in connection with the Company's acquisition of Spin, Bird Rides issued to Tier Mobility SE ("Tier Mobility") the VTB Note in the principal amount of $6 million. Under the Spin Acquisition Agreement and the VTB Note, Spin, as the guarantor and as a wholly owned subsidiary of Bird Rides, delivered to Tier Mobility a guarantee and security agreement secured by certain assets of Spin, certain existing and new licenses and permits, and all amounts received, or receivable, under any, or all of, the foregoing licenses and permits, and all rents, profits, and products of the foregoing. Bird Global guaranteed the Note on an unsecured basis. The principal amount of the note was to be repaid in three installments, which are or were due on October 19, 2023, December 31, 2023, and April 24, 2024, respectively, together with interest thereon. The VTB Note bears interest at the rate of 8.0% per annum from September 19, 2023, until the unpaid balance is paid in full.

58.    As of the Petition Date, the amount owing under the VTB Note is contingent on the Bird Rides and Tier Mobility settling the final working capital balance of Spin, and any amount greater than a working capital target is to be offset against the final amount owing under the VTB Note.  Presently the closing working capital shows a negative balance owed on the VTB Note of $2.2 million.

**d.    Unsecured Obligations**

59.    In the ordinary course, the Debtors incur trade debt with certain landlords, vendors, suppliers, and taxing authorities in connection with the operation of their business.  In addition, the Debtors have other potential and contingent liabilities related to, among other things, ongoing litigation, certain of which is described in this Declaration.

**D.    EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASES**

60.    The Debtors are a growth-stage enterprise and have invested significant resources to develop the Bird Platform and expand Sharing operations to new markets around the world.  Since Bird's inception, it has had difficulties generating positive cash flow despite its growth efforts and relative market share compared to its competitors.  As a result, the Debtors have incurred net losses since inception that have created liquidity challenges for the business.  The Debtors incurred approximately $235.2 million and $471.3 million in operating losses in 2021 and 2022, respectively.  The Company has incurred recurring losses and negative cash flows and has an accumulated deficit of $1.6 billion as of September 30, 2023.

61.    The Debtors' most significant in-market costs are city revenue shares, Fleet Managers who maintain, recharge and reposition scooters, and vehicle depreciation.  The Debtors' most significant overhead costs are general and administrative expenses, including

compensation and benefits, insurance, offsite storage and logistics, litigation, and software licenses and technology services.

62.     The Debtors' losses coupled with difficult capital markets conditions have caused the Company's cash balance to dwindle.  As a result, in the fourth quarter of 2022, Bird's then-management considered a restructuring or bankruptcy to deal with its difficult market position. A bankruptcy at that time was avoided through the completion of the Bird Canada Acquisition in December 2022, which: (a) raised $27 million in new capital, and (b) added the profitable Bird Canada business to the Company.  As part of the Bird Canada Acquisition, Bird Global's management team changed completely, adding a new President, CFO, and VP, Corporate Development and Strategy.

63.     Following the change in the Debtors' management, the Debtors took a number of steps to manage costs and stabilize the business.  These measures included, but are not limited to, the following: (a) cutting overhead staff and expenses by approximately $76 million annually; (b) cutting capital expenditures by $83 million annually; and (c) ceasing operations in unprofitable markets.   The Debtors have also attempted to find new capital sources. Notwithstanding these efforts, the Company faces an immediate liquidity crisis without external financing.

64.     In the months leading up to the Chapter 11 Cases, the Debtors have faced additional challenges that have negatively impacted revenues and cash flows.  Moreover, its largest competitor has taken market share, offering a newer fleet of scooters.  Post-COVID return to work changes also have reduced overall scooter rental demand.

65.     In addition, the Company's Retail Sales business was negatively impacted by recent macroeconomic trends and a decline in consumer demand for personal use vehicles.  The

Debtors made significant investments in the Retail Sales business during the COVID-19 pandemic due to heightened demand for personal use vehicles, including substantial deposits with manufacturers to secure future production of vehicles. However, the recent decline in consumer demand coupled with the rising cost of goods has significantly impacted gross margins for Retail Sales. The Debtors' inability to timely recoup investments in inventory and deposits with manufacturers has limited the Debtors' working capital. As stated above, in May 2022, the Debtors made the decision to exit the Retail Sales business to better align with consumer demand and reduce operational costs.

66.     On top of facing tightening financial constraints, the Debtors announced in November 2022 that they had discovered an error in their business systems that impacted the recognition of revenue in their financial statements for 2020 and 2021 and the quarterly periods ended March 31, 2022, and June 30, 2022. In particular, for certain customers with insufficient preloaded "wallet" balances, the Debtors' business systems recorded revenue for uncollected balances following the completion of certain rides that should not have been recorded. The error resulted in an overstatement of Sharing revenue for the impacted periods and an understatement of deferred revenue in the balance sheets as of the end of each impacted period. The Debtors promptly filed amended annual and quarterly reports for the impacted periods on November 18, 2022.

67.     The Debtors also are defendants in over 100 lawsuits, most of which relate to personal injury claims relating to riders' accidents while riding Bird scooters. Moreover, pursuant to the Debtors' permits to operate in certain cities, the Debtors are also required to indemnify those cities in connection with lawsuits brought against the cities relating to Bird

scooter use. The Debtors incur significant litigation expense each month in connection with defending and settling litigation claims.

68.     Bird's cash generated from operations are seasonal and are reliant to a large degree on the weather in each region in which Bird operates. Generally, customers ride the Debtors' vehicles more in warmer months and less in the winter. With large footprints in Europe and North America, Bird's market operating windows and incoming cash flows are higher in the second and third quarters of the year, with winter weather impacting Bird's ability to operate in those markets and generate commensurate cash inflows for parts of the first and fourth quarters. The Company is currently in its winter off-peak season during which it experiences reduced cash inflows as some markets in the Northern Hemisphere close due to winter weather, but certain fixed costs within those continue to be incurred. During the winter months, Bird proactively places a portion of their fleet in reserve to shield vehicles from inclement weather. Although the Debtors act quickly to redeploy vehicles when weather conditions improve, the Company's first quarter revenues tend to represent only 13% of annual revenues whereas cash outlays are more evenly distributed throughout the year.

69.     Since inception, the Debtors have funded most of their costs and expenditures through capital raises (both equity and debt) and rider revenue. In 2023, the Debtors faced difficulty raising capital and instead relied on cost cuts, reduced capital expenditures, and stretched vendor payments to address funding needs.

70.     As described above, on September 25, 2023, Bird Global's shares of Class A Common Stock and Warrants were subject to a delisting notice from the NYSE, and on September 29, 2023, began trading on the OTCQX, which is more volatile than the NYSE and

resulted in a continued diminution in value of Bird Global's shares further impacting the Company's ability to raise capital in the public markets.

71.     As of the Petition Date, the Debtors have approximately $3.25 million in unrestricted cash and cash equivalents which, without additional funding, will not be sufficient to meet the Debtors' obligations to fund their fixed costs during the off-peak season.  The Debtors require immediate access to $16,830,000 of cash in the form of debtor-in-possession financing, in addition to the use of cash collateral, to meet their obligations through the week ending January 12, 2024.

**PART II**
**DEBTORS' OBJECTIVES IN THESE CHAPTER 11 CASES**

72.     The primary goal of these Chapter 11 Cases is to consummate a sale of substantially all assets of the Debtors, which will maximize the value of the Debtors' estates for the benefit of their stakeholders and preserve a viable business that will continue to employ individuals, maintain contracts with vendors and service providers, and provide services to its customers.

73.     In order to facilitate a sale process and the orderly administration of these Chapter 11 Cases, a subset of the First Lien Lenders and the Second Lien Noteholders (collectively, the "DIP Lenders") have agreed to provide debtor-in-possession financing (as more fully described below) and Bird Scooter Acquisition Corp. (the "Stalking Horse Bidder"), intends to submit a stalking horse credit bid for the purchase of the assets of the Debtors, subject to higher and better bids pursuant to a section 363 sale process and bidding procedures to be approved by the Court. Thereafter, the Debtors intend to file a plan of liquidation under which a liquidating trust will be established, and a liquidating trustee will be appointed, to administer any remaining assets of the Debtors.  Absent the Stalking Horse Bidder's agreement to serve as the stalking-horse bidder,

and the DIP Lenders' agreement to provide debtor-in-possession financing in conjunction with the First Lien Lenders' consent to use cash collateral to fund the sale process and working capital needs pending a sale, the Debtors would have been forced to cease all operations, lay off their employees, and terminate all of their operations. Without the relief requested in the First Day Filings, and later, in the bidding procedures and the sale motions, immediate liquidation likely remains the Debtors' only other viable option. The bid procedures motion that the Debtors will file promptly seeks the approval of the Court to set a bid deadline for interested parties to submit bids for the Debtors' assets.

74. The First Day Filings will permit the Debtors to preserve and maximize their enterprise value during the proposed sale process for the benefit of their employees, customers, secured creditors, vendors, and other creditors and parties in interest. The Debtors' immediate objective is to stabilize their operations, preserve liquidity, and to minimize any adverse effects that these Chapter 11 Cases might otherwise have on their estates by obtaining the relief requested in the First Day Filings and to work with interested parties to obtain a sale of their business for the highest and best offer for the benefit of the above-mentioned stakeholders.

75. For these reasons, and the additional reasons discussed in the First Day Filings which are incorporated herein by reference, I respectfully submit that the various relief requested in the First Day Filings is in the best interest of the Debtors and their estates and should be approved by this Court

## PART III
## FIRST-DAY FILINGS

76. Concurrently with the filing of these Chapter 11 Cases, the Debtors are filing certain First Day Filings. The Debtors respectfully request that the Court conduct a hearing as

soon as practicable after the commencement of the Chapter 11 Cases (the "_First Day Hearing_")
to consider the First Day Filings.

77.     I have reviewed each of the First Day Filings (including the exhibits and
schedules attached thereto) and, to the best of my knowledge, I believe that the facts set forth
therein are true and correct.  Moreover, I believe that the relief sought in each of the First Day
Filings: (a) is essential to enable the Debtors to enter into, and to operate in, Chapter 11 with
minimal disruption or loss of productivity or value; (b) constitutes a critical element to the
Debtors' efforts to preserve value and maximize creditor and stakeholder recoveries; and (c) best
serves the Debtors' estates and creditors' and stakeholders' interests.  Further, it is my belief that
the relief sought in the First Day Filings is narrowly tailored and necessary to achieve the goals
of these Chapter 11 Cases, including the ability of the Debtors to preserve and to maximize value
of, as well as to avoid immediate and irreparable harm to, the Debtors' estates.

**A.     Debtors' _Ex Parte_ Motion for Joint Administration (the "_Joint Administration
Motion_").**

78.     The Debtors believe that it would be more efficient for the administration of these
cases if joint administration were authorized.  The Debtors anticipate that a significant portion of
the activity during these cases and most hearings will be substantially identical for all of the
Debtors resulting in duplicative filings repeatedly being filed should joint administration be
denied. Consequently, joint administration would reduce costs and facilitate the economical,
efficient and convenient administration of the Debtors' estates.

79.     The Debtors submit that the rights of the creditors and other stakeholders of each
of the Debtors will not be adversely affected by joint administration of these cases.  The Debtors
filed the Joint Administration Motion on an _ex parte_ basis as contemplated by Local Rule 1015-
1.

26

12640569-4.doc

80.     For the reasons set forth in the Joint Administration Motion and herein, I believe that entry of an Order approving joint administration of the Debtors' Chapter 11 Cases will be in the best interests of the Debtors, their estates and creditors.

**B.      Debtors' Application for Entry of an Order Authorizing Debtors to Employ and Retain Epiq Corporate Restructuring LLC as Notice, Claims and Solicitation Agent, Effective as of the Petition Date (the "Epiq Application").**

81.     The Debtors seek approval of their agreement with Epiq Corporate Restructuring LLC ("Epiq") and to have Epiq appointed as notice, claims and solicitation agent of the Court.  I am informed that Epiq is one of the country's leading Chapter 11 administrators, with experience in noticing, claims administration, balloting, solicitation, and facilitating other administrative aspects of Chapter 11 cases, including in healthcare-related matters.  I am further informed that Epiq has substantial experience in cases of this size and complexity, and has acted as the official notice, claims, and solicitation agent in many large bankruptcy cases pending in various districts nationwide.  As explained in the Epiq Application, the approval of the Debtors' agreement with Epiq and Epiq's appointment as claims, noticing, and solicitation agent of the Court will facilitate the orderly and efficient management of these Chapter 11 Cases.

82.     For the reasons set forth in the Epiq Application and herein, I believe that entry of an Order approving Epiq's retention will be in the best interests of the Debtors, their estates and creditors.

**C.      Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Continue to (I) Maintain Their Cash Management System, (II) Honor Certain Prepetition and Postpetition Obligations Related Thereto, (III) Use Existing Forms, and (IV) Perform Intercompany Transactions, and (B) Granting Related Relief (the "Cash Management Motion").**

83.     I understand from counsel that the the Office of the United States Trustee for the Southern District of Florida (the "United States Trustee") has established certain operating guidelines for debtors-in-possession in order to supervise the administration of Chapter 11 cases.

27

These guidelines require Chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation "debtor-in-possession," the bankruptcy case number, and the type of account. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent the inadvertent postpetition payment of prepetition claims. Except as explained in the Cash Management Motion, the Debtors seek a waiver of these requirements so that its operations are not further disrupted by the need to alter the cash management system.

84.    Prior to the commencement of these Chapter 11 Cases, and in the ordinary course of their business, the Debtors used a cash management system which permits the efficient collection, transfer, and disbursement of funds generated on a daily basis from their operations (the "Cash Management System").

85.    As of the Petition Date, the Debtors' Cash Management System is primarily comprised of eight (8) active bank accounts and eleven (11) collateral accounts, which are maintained by various Debtors at First Citizens ("FC"), Citi, City National Bank ("CNB"), JP Morgan ("JPM" or "JP Morgan") and HSBC ("Bank Accounts"). The Bank Accounts are part of a carefully constructed and highly automated Cash Management System that ensures the Debtors' ability to efficiently monitor and control their cash position. The Cash Management System also includes 13 active accounts held by various Debtors, maintained with payment processors PayPal, Inc., Stripe, Inc. and Adyen.

86.    Bird Rides maintains a master concentration account with FC as part of a cash pooling arrangement with a pass through account, collection account, disbursement account and payroll account all at FC (the "Cash Pool"). All funds in the Cash Pool are automatically concentrated in the concentration account at the end of each day, and each account in the Cash Pool has a zero-balance arrangement with the concentration account.

87.    Bird Rides also maintains an operating account with Citi to facilitate various functions, including intercompany transfers and receipt of pre-payments by customers for future rides with Bird Rides associated with Bird Rides' digital wallet program.

88.    Spin maintains a concentration account with JPM for all needs associated with Spin's business operations. Namely, this account is used for collections, disbursements, operations and payroll. Additionally, pre-payments by customers for future rides with Spin associated with Spin's digital wallet program are also deposited in this account.

89.    The Cash Management System used by the Debtors constitute ordinary, usual, and essential business practices.  These systems allow the Debtors to (a) control corporate funds centrally, (b) ensure availability of funds when necessary, and (c) reduce administrative expenses.  The Debtors' existing Bank Accounts function smoothly and permit the efficient collections and disbursements of cash for the benefit of the Debtors and all parties in interest. The Debtors' transition into Chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of these cases with the same account numbers. The Debtors further request authority to deposit funds in each of the Bank Accounts, sweep funds daily and use funds in the Bank Accounts, as applicable, to pay obligations owed to third parties and employees postpetition, subject to the same access rights and limitations existing prior to the Petition Date, including, but not limited to, check, wire, transfers, ACH, electronic

29

funds transfers and other debits and to treat the Bank Accounts for all purposes as debtors in possession accounts.

90.     I understand that the U.S. Trustee Guidelines require chapter 11 debtors to, among other things, deposit estate funds into accounts with an authorized depository that agrees to comply with the requirements of the U.S. Trustee's office. Among the banks utilized by the Debtors, JP Morgan is an authorized depository under the U.S. Trustee Guidelines in the Southern District of Florida and the Debtors will close their primary accounts at FC, Citi, CNB and HSBC in order to open new primary accounts at JP Morgan ("Bank Account Changes").

91.     Pending and except for the Bank Account Changes, the Debtors' operations require the Cash Management System to continue during the pendency of the Chapter 11 Cases. If the Debtors were required to create and implement a new cash management system, their operations would be severely disrupted, which would have an adverse impact on the Debtors' ability to reorganize. Accordingly, the Debtors submit that the maintenance of the existing Cash Management System is essential and in the best interests of all creditors and other parties in interest.

92.     Pending and aside from the implementation of the Bank Account Changes, The Debtors seek a waiver of certain operating Guidelines established by the U.S. Trustee. For example, the Debtors seek a waiver of the requirements that they: (i) close all existing bank accounts; (ii) open new debtor in possession bank accounts; (iii) establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes); (iv) maintain a separate DIP account for cash collateral; (v) obtain checks for all DIP accounts that bear the designation, "debtor in possession," the bankruptcy case number, and the type of account; and (vi) open a new set of books and records as of the Petition Date. Closing and opening new bank

accounts and books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay. With the use of computer technology, it is now easy to differentiate between pre- and post-petition transactions by date. The Debtors, in the ordinary course of their businesses, use many checks, invoices, stationery, and other business forms. By virtue of the nature and scope of the businesses in which the Debtors are engaged and the numerous other parties with whom the Debtors deal, the Debtors need to use their existing bank accounts and business forms without alteration or change. A substantial amount of time and expense would be required in order to close and open new bank accounts and print new checks and other business forms. Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect operations. Accordingly, pending and other than the Bank Account Changes, the Debtors request that they be authorized to continue to use their existing bank accounts and business forms and to maintain their existing business records.

93.     I further understand that section 345 of the Bankruptcy Code and the U.S. Trustee Guidelines established certain requirements with respect to all deposits accounts and investments of money of the estate. The Debtors understand that JP Morgan, where the Debtors will open new primary accounts, is FDIC insured and an authorized depository pursuant to 11 U.S.C. § 345(b). Pending the Bank Account Changes, the Debtors' Bank Accounts comprise an established and integrated Cash Management System that the Debtors need to maintain in order to ensure that collections and disbursements from the Bank Accounts are not disrupted. The Debtors will note, in their respective records, the date and times the Chapter 11 petitions were filed, and the records will reflect each post-petition receipt and disbursement. Therefore, a

12640569-4.doc

waiver of the section 345 deposit guidelines would not pose a risk to the Debtors' estates nor their creditors.

94.      The Debtors request further relief from the Guidelines to the extent that they require the Debtors to make all disbursements by check.   In particular, the Guidelines require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement.   Considering the complexity of the Debtors' operations, the Debtors must conduct transactions by debit, wire, or ACH payments and other similar methods, as discussed above.   In addition, the Debtors' receive a portion of their customer receipts through wire transfers.   To deny the Debtors the opportunity to conduct transactions by debit, wire or ACH payments or other similar methods would interfere with the Debtors' performance of their contracts and unnecessarily disrupt the Debtors' business operations, as well as create additional costs to the Debtors.   Therefore, the Debtors request a waiver of this requirement.

95.      The Debtors also request authority to engage in Intercompany Transactions (as defined in paragraph 24 of the Cash Management Motion) postpetition. If the Court grants this relief, the Debtors will continue recording all such Intercompany Transactions in their books and records consistent with past practice prior to the Petition Date.

96.      Further, the Debtors request authority to pay Bank Fees and E-Commerce Fees in the ordinary course as such fees, as well as Bank Account Obligations that arise in the ordinary course pre and postpetition, if any (as those terms are defined in paragraphs 18, 20 and 19 of the Cash Management Motion, respectively). The Debtors and I have been advised by counsel that the similar relief as the relief requested in the Cash Management Motion has been granted in this and other Districts.

97.     For the reasons set forth in the Cash Management Motion and herein, I believe that entry of an Order approving the Cash Management Motion will be in the best interests of the Debtors, their estates and creditors.

**D.     Debtors' Emergency Motion for Order (I) Authorizing Debtors to Pay (A) Certain Prepetition Employee Obligations and (B) Prepetition Withholding Obligations; (II) Authorizing the Debtors to Maintain Employee Benefit Programs and Other Practices, and (III) Directing Banks to Honor Related Prepetition Transfers (the "Employee Motion").**

98.     The Debtors seek the relief requested in the Employee Motion because any delay in paying employee compensation, deductions, or benefits will fundamentally harm the Debtors' relationships with their employees and irreparably impair employee morale at the very time when the dedication, confidence, and cooperation of these employees are most critical.  The Debtors face imminent risk that their operations may be severely impaired if the Debtors are not immediately granted authority to make the payments described in the Employee Motion. Workforce support for the Debtors' sale and liquidation efforts is crucial to the success of those efforts, particularly given the unique knowledge of the Workforce regarding the Debtors' operations.  At this critical early stage of these Chapter 11 Cases, the Debtors simply cannot risk the substantial disruption to their business operations that would inevitably attend any decline in work force morale attributable to the Debtors' failure to pay Workforce compensation, deductions, and benefits in the ordinary course.  Finally, to remain in a position to maintain necessary operational integrity, oversight, and quality control, the Debtors must continue their corporate policies of permitting certain Workforce personnel to incur business-related expenses and thereafter to seek reimbursement by submitting appropriate invoices or vouchers evidencing such out-of-pocket disbursements if and when incurred.

99.     As the stability of the Debtors' Workforce is essential to a successful sale and wind down process, it is critical that they be permitted to continue the ordinary course personnel

33

policies, benefits and procedures that were in effect prior to the Petition Date. The Debtors believe that the requested relief will enable them to maintain their current operations without interruption during the sale process, thereby preserving the value of the business, and, at the same time, maintaining Workforce morale. Without the relief requested, the Debtors' ability to preserve the assets of the estates for the benefit of all creditors and stakeholders will be dramatically impaired and, rather, the granting of that relief will be in the best interests of the Debtors, their estates and creditors.

100.    As of the Petition Date and as reflected on Exhibit "A" to the Employee Motion, none of the Workforce whom Debtors seek authority to pay wages or compensation owing as of the Petition Date exceeds the cap set forth in 11 U.S.C. § 507(a)(4).[5]

101.    For the reasons set forth in the Employee Motion and herein, I believe that entry of an Order approving the Employee Motion will be in the best interests of the Debtors, their estates and creditors.

**E.    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File (A) A Consolidated Creditor Matrix and (B) A Consolidated List of the Top Thirty Unsecured Creditors; and (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information for Individual Creditors and Parties in Interest (the "Administrative Matters Motion").**

102.    The Debtors seek entry of an order authorizing, but not requiring the Debtors to (i) file and maintain a consolidated creditor list and mailing matrix (the "Consolidated Creditor Matrix"), in lieu of a separate creditor list and mailing matrix for each Debtor, (ii) a consolidated list of the Debtors' top thirty (30) unsecured creditors (the "Consolidated Top 30 List"), in lieu of filing a separate list of the top twenty (20) unsecured creditors for each Debtor; and (iii) redact

---

[5]    Effective January 1, 2024, all employees who are employed by Spin will be transitioned to Bird Rides as the employing entity of record. This transition was implemented as part of integration efforts following Bird's acquisition of Spin to streamline redundancies and promote a more unified workplace for Bird and Spin employees.

certain personal identifiable information for the Debtors' individual creditors and parties in interest.

103. Authorizing the Debtors to file a Consolidated Creditor Matrix, in lieu of a separate creditor list and mailing matrix for each Debtor is warranted. The Debtors operate as an integrated business and share cash management and operational systems. Because the Debtors have thousands of creditors and other parties-in-interest, converting the Debtors' computerized information to a format compatible with the matrix requirements would be an unnecessarily burdensome and time-consuming task and would greatly increase the risk of error with respect to information already on computer systems maintained by the Debtors and their agents. Moreover, with respect to the top unsecured creditor lists, the Debtors submit that filing separate top 20 unsecured creditor lists for each Debtor—instead of one consolidated list of the Debtors' top 30 unsecured creditors—would be of limited utility and potentially duplicative to an extent, especially in comparison to the time and expense it would cost to compile separate lists when the Debtors' management are trying to facilitate a smooth transition into chapter 11.

104. Instead, the Debtors, in consultation with Epiq Corporate Restructuring, LLC, their proposed claims, noticing and solicitation agent, have prepared a single, consolidated list of the Debtors' creditors in electronic format. The Debtors are prepared to make the Creditor Matrix available in electronic form to any party-in-interest who requests (or in non-electronic form at such requesting party's sole cost and expense) in lieu of submitting a mailing matrix to the clerk of the Bankruptcy Court. I am advised by counsel that courts in this and other Districts have approved similar relief.

105. I am also advised by counsel that Bankruptcy Rule 1007(d) provides that a debtor shall file "a list containing the name, address, and claim of the creditors that hold the 20 largest

unsecured claims, excluding insiders." Because certain of the Debtors share creditors and the Debtors operate as a single business enterprise, the Debtors request authority to file a single, Consolidated Top 30 List of their 30 largest general unsecured creditors, in lieu of a separate list of the top 20 unsecured creditors of each Debtor.

106.    Further, the Debtors believe a single, consolidated list of the Debtors' 30 largest unsecured, non-insider creditors will aid the U.S. Trustee in its efforts to communicate with these creditors. Filing a single consolidated list of the 30 largest unsecured creditors in these chapter 11 cases is therefore appropriate. I am advised by counsel that courts in this and other Districts have approved similar relief.

107.    I am further advised by counsel that Section 107(c) of the Bankruptcy Code provides that the Court "for cause, may protect an individual, with respect to the following types of information to the extent the court finds that disclosure of such information would create undue risk of identity theft or other unlawful injury to the individual[:]….[a]ny means of identification…contained in a paper filed, or to be filed in a case under" the Bankruptcy Code. 11 U.S.C. § 107(c)(1)(A).

108.    The Debtors respectfully submit that it is appropriate to authorize the Debtors to redact from any pleading or paper filed or to be filed with the Court in these Chapter 11 Cases the home addresses of the Debtors' individual creditors and parties in interest because such information could be used, among other things, to perpetrate identify theft or locate survivors of domestic violence or stalk those who have otherwise taken steps to conceal their whereabouts. The Debtors propose to provide an unredacted version of the Consolidated Creditor Matrix and any other applicable filings to the Court, the U.S. Trustee, counsel to any official committee of unsecured creditors appointed in these Chapter 11 Cases (if any), and other parties in interest

upon reasonable request, subject to entry into a confidentiality agreement acceptable to the Debtors and their counsel. I am advised by counsel that courts in this and other Districts have approved similar relief.

109.    For the reasons set forth in the Administrative Matters Motion and herein, I believe that entry of an Order approving the Administrative Matters Motion will be in the best interests of the Debtors, their estates and creditors.

**F.    Debtors' Emergency Motion For Authorization to (I) Continue to Administer Insurance Policies and Related Agreements and (II) Honor Certain Obligations in Respect Thereto (the "<u>Insurance Motion</u>").**

110.    Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to continue administering the insurance policies described in the Insurance Motion (the "<u>Insurance Policies</u>") and agreements relating thereto, specifically including the *Premium Finance Agreement* with AFCO Acceptance Corporation entered into on or about July 11, 2023, and agreements related to various Surety Bonds, and the payment of certain claims, deductibles and/or premiums, in the Debtors' discretion to the extent they were past due as of the Petition Date and become due and payable during the pendency of their Chapter 11 Cases.

111.    The Debtors' Insurance Policies are essential to the preservation of the value of the Debtors' business, properties, and assets during the sale process.  I am advised by counsel that, in many cases, the insurance coverage provided by the Insurance Policies is required by diverse regulations, laws, and contracts, as well as the Office of the United States Trustee. Therefore, I believe that it is essential for the Debtors to maintain the Insurance Policies, which provide a comprehensive range of coverage for the Debtors.  Moreover, if the Insurance Policies are allowed to lapse, the Debtors could be exposed to substantial liability for any damages

resulting to persons or property of the Debtors and others, and the Debtors would have to bear the costs and expenses of defense litigation.

112.    The Debtors' continued operations, combined with the Debtors' efforts to undertake an orderly sales process, require that the Insurance Policies be maintained on an ongoing and uninterrupted basis.   In maintaining those obligations, it is crucial that the administrative fees paid to providers and the premiums paid for the Insurance Policies are continued and maintained by the Debtors.  For example, the risk that eligible claimants will not receive payments with respect to employment-related injuries may have a devastating effect on the financial well-being and morale of the Workforce, and their willingness to remain in the Debtors' employ.  Departures by individuals comprising the Workforce at this critical time may result in a severe disruption of the Debtors' business to the detriment of all parties in interest.

113.    To the extent that the Insurance Policies and related agreements may be deemed executory contracts, the Debtors do not at this time seek authority to assume these contracts. Rather, the Debtors request only authorization to continue the programs, pay certain claims in accordance with the programs, and pay such premiums and administrative expenses as may be necessary to keep the Insurance Policies in force, including payments due under the *Premium Finance Agreement* entered into on July 11, 2023 with AFCO Acceptance Corporation.

114.    I believe that the relief requested in the Insurance Motion will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption.

115.    For the reasons set forth in the Insurance Motion and herein, I believe that entry of an Order approving the Insurance Motion will be in the best interests of the Debtors, their estates and creditors.

**G.    Debtors' Emergency Motion For An Order (I) Authorizing Debtors to Pay Prepetition Claims of Critical Vendors, (II) Confirming Administrative Expense Priority Status for Outstanding Prepetition Purchase Orders, and (III) Granting Related Relief (the "Critical Vendors Motion").**

116.    Pursuant to the Critical Vendors Motion, the Debtors seek an order authorizing, but not directing, the Debtors to pay the prepetition claims of vendors that are critical to the Debtors' business operations (the "Critical Vendors"); (b) confirming the administrative expense priority status of all undisputed obligations of the Debtors arising out of outstanding prepetition purchase orders (the "Outstanding Orders"); and (c) granting related relief.

117.    In connection with their operations, the Debtors rely upon a number of Critical Vendors whose services are essential to maintaining their operations.  Without the services of the Critical Vendors, the Debtors would be unable to operate their businesses, comply with federal or local regulations, meet customer demand, or safely maintain their assets.  The Debtors seek authority to pay the prepetition claims of Critical Vendors, totaling $2,740,176.57 in the aggregate, that are critical to the Debtors' businesses.

118.    The Critical Vendors are all important to the Debtors' businesses and, accordingly, a delay in their services could cause irreparable harm to the Debtors' revenue, goodwill, and market share.  Generally, the Critical Vendors fall into five categories: (i) the Fleet Managers; (ii) technology and software services; (iii) parts suppliers; (iv) staffing agencies; and (v) arbitration and mediation services.  Each of the categories of Critical Vendors are described in further detail in the Critical Vendors Motion.

119.    Notwithstanding the efforts of the Debtors and their advisors to identify all Critical Vendors and vendors with executory contracts, they may not have identified the full scope of vendors deemed critical.  For example, the Debtors believe they have executory contracts with several Critical Vendors that would otherwise be included in the Critical Vendors

Motion but believe they can continue performance under the executory contract and expect the Critical Vendor to do the same.  However, it is possible, that some Critical Vendors will not perform absent payment of prepetition amounts owed.  Moreover, as set forth in the Critical Vendors Motion, the Debtors have attempted to estimate the amounts the Fleet Managers will earn through the Petition Date but under the Debtors' revenue sharing platform, the Debtors cannot be sure the Fleet Managers have been paid in full.  As such, the Debtors seek the authority, but not the direction, to create a reserve of $750,000 (the "Critical Vendor Reserve") to pay prepetition claims of Critical Vendors that are not identified in the Critical Vendors Motion or Fleet Managers that are owed prepetition amounts.  This amount has been approved by the DIP Lenders in the DIP Budget for the Debtors to use for this purpose to ensure the flexibility to pay the prepetition claims of certain Critical Vendors.

120.    In the ordinary course, the Debtors use one credit card (the "Critical Vendor Credit Card") to pay certain Critical Vendors because such vendors do not accept cash payments (the "Credit Card Vendors").  The Debtors estimate that there are between 75-100 transactions per month on the Critical Vendor Credit Card.  If the Debtors fail to pay the prepetition amounts owed on the Critical Vendor Credit Card, they will not be able to pay the Credit Card Vendors which would cause irreparable harm to the business.  As of the Petition Date, $285,000 is owed prepetition on the Critical Vendor Credit Card.  The Debtors seek the authority, but not the direction to pay the prepetition amounts owed on the Critical Vendor Credit Card.  This amount has been approved by the DIP Lenders in the DIP Budget.

121.    The Debtors propose conditioning, where possible, the payment of Critical Vendor Claims on obtaining from each Critical Vendor their agreement to continue supplying goods and services to the Debtors on as favorable trade terms, practices, and programs as those

40

trade terms, practices, and programs in place in the 24-months before the Petition Date (the "Customary Trade Terms") or pursuant to such other trade practices and programs that are favorable to the Debtors.

122.    The Debtors also seek limited authority, but not direction, to pay Critical Vendor Claims; *provided that*, unless otherwise agreed by the Debtors, if any Critical Vendor accepts payment pursuant to the relief requested by the Critical Vendors Motion and thereafter does not continue to provide goods or services on Customary Trade Terms: (a) such payment may be deemed to be an improper postpetition transfer on account of a prepetition claim, and therefore such payment will be immediately recoverable by the Debtors in cash upon written request; (b) upon recovery by the Debtors, any prepetition claim of such Critical Vendor will be reinstated as if the payment had not been made and the deadline for a Critical Vendor to file a reinstated claim will be the later of (i) the general bar date established by order of the Court or (ii) 30 days after the Debtors provide written notice to the Critical Vendor of the reinstatement of its claim; and (c) if the Debtors owe the Critical Vendor any postpetition amounts, the Debtors may recharacterize and apply any payment made pursuant to an order entered in connection with the Critical Vendors Motion to reduce such outstanding postpetition amounts, and such Critical Vendor must return any amounts overpaid by the Debtors, without the right of any setoffs, recoupments, claims, provisions for payment of any claims, or otherwise.

123.    As of the Petition Date, the Debtors have certain prepetition purchase orders outstanding with various third-party vendors and suppliers for goods or services requested by the Debtors that have not yet been delivered or provided to the Debtors.  These third-party vendors and suppliers may be concerned that because the Debtors' obligations under the Outstanding Orders arose before the Petition Date, such obligations will be treated as general unsecured

41

claims in the Chapter 11 Cases.   Accordingly, certain vendors and suppliers may refuse to provide goods or services to the Debtors purchased pursuant to the Outstanding Orders unless the Debtors issue substitute purchase orders postpetition or obtain an order of the Court (a) confirming that all undisputed obligations of the Debtors arising from the postpetition delivery of goods or services subject to Outstanding Orders are afforded administrative expense priority status under section 503(b) of the Bankruptcy Code and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

124.   Any delay in the shipment or delivery of goods or services could bring the Debtors' operations to a halt, harming the Debtors' businesses.   Although it is difficult to estimate the total amount due and owing under the Outstanding Orders for goods or services that are not scheduled to be delivered or provided until after the Petition Date, the Debtors submit that the total amount to be paid in connection therewith, if the relief requested herein is granted, is *de minimis* compared to the importance and necessity of the goods or services provided.

125.   For the reasons set forth in the Critical Vendors Motion and herein, I believe that entry of an Order approving the Critical Vendors Motion will be in the best interests of the Debtors, their estates and creditors.

**H.     Debtors' Emergency Motion for Order (I) Authorizing Debtors to Pay Prepetition Claims of Lien Claimants, (II) Confirming Administrative Expense Priority Status for Outstanding Prepetition Purchase Orders, and (III) Granting Related Relief (the "Lien Claimants Motion").**

126.   Pursuant to the Lien Claimants Motion, the Debtors seek an order (a) authorizing, but not directing, the Debtors to pay the prepetition claims of third party service providers that may be entitled to assert liens against the Debtors' property (the "Lien Claimants" or "Vendors"); (b) confirming the administrative expense priority status of all undisputed

42

obligations of the Debtors arising out of outstanding prepetition purchase orders for goods or services ordered prepetition but not delivered or provided prior to the filing of these cases (the "Outstanding Orders"); and (c) granting related relief.

127.    In connection with their operations, the Debtors have received goods and services from certain Vendors who may qualify as Lien Claimants, meaning they may assert claims that would entitle such Vendors to assert liens against the Debtors' property in the event of nonpayment.  The Debtors routinely engage a number of Lien Claimants, consisting of freight, warehousing, and third party logistics service providers, that, under certain non-bankruptcy laws, may be able to assert and perfect liens, including mechanic's liens, artisan's liens, materialman's liens, shipper's liens, warehouseman's liens, and other similar liens, against the Debtors' property and, in some cases, their customers' property, if the Debtors fail to pay for goods or services rendered.  In general, the Lien Claimants provide shipping, storage, and other logistics services related to the Debtors' proprietary property and equipment.  Accordingly, at any given time, the Lien Claimants may be in physical possession of parts, materials, and equipment purchased by the Debtors to be used to service and prepare the Debtors' electronic vehicles.  A list of the Lien Claimants and the amounts owed to each as of the Petition Date is attached to the Lien Claimants Motion as Exhibit "A."

128.    The Debtors must ensure that they receive timely deliveries of goods to ensure no disruption in their services to customers.  Moreover, transitioning to other Lien Claimants could take sixty (60) to ninety (90) days, causing a massive disruption in the Debtors' operations.  If the Debtors are unable to pay the Lien Claimants on account of their prepetition claims, the Debtors risk such Lien Claimants asserting liens on their property, rendering the Debtors unable

43

to provide their services to their customers and fully operate their businesses, which could be devastating to the Debtors' business.

129.    The Debtors estimate that the claims of Lien Claimants (the "Lien Claims") that have created, or could give rise to, a lien against the Debtors' property, regardless of whether the related Lien Claimants have already perfected their interests, total approximately $3,104,946.

130.    In the event that, as of the Petition Date, the Lien Claimants have outstanding invoices for goods transported or stored prior to the Petition Date, the Lien Claimants will likely argue that they have possessory liens for transportation or storage costs and may refuse to deliver or release those goods held in their possession until their invoices are paid and their liens are redeemed. The Lien Claimants may further be unwilling to release the goods in their possession to which they may be entitled to liens since this may result in their claims against the Debtors becoming unsecured.

131.    Moreover, even absent a perfected lien, a Lien Claimant's refusal to deliver the Debtors' goods and supplies would severely disrupt the Debtors' operations and cause the Debtors to lose revenue, future business, and goodwill.  The Debtors have established an excellent reputation in the industry for providing on-demand electric vehicles and must maintain this reputation in order to maintain their customer base and strengthen the value of the Debtors' business. As such, the Debtors seek authority to pay, in their sole discretion, the prepetition claims of the Lien Claimants.

132.    The Debtors propose conditioning, where possible, the payment of Lien Claims on obtaining from each Lien Claimant their agreement to continue supplying goods and services to the Debtors on as favorable trade terms, practices, and programs as those trade terms, practices, and programs in place in the 24-months before the Petition Date (the

44

"Customary Trade Terms") or pursuant to such other trade practices and programs that are favorable to the Debtors.

133.    The Debtors also seek limited authority, but not direction, to pay Lien Claims; *provided that*, unless otherwise agreed by the Debtors, if any Lien Claimant accepts payment pursuant to the relief requested by the Lien Claimants Motion and thereafter does not continue to provide goods or services on Customary Trade Terms:  (a) such payment may be deemed to be an improper postpetition transfer on account of a prepetition claim, and therefore such payment will be immediately recoverable by the Debtors in cash upon written request; (b) upon recovery by the Debtors, any prepetition claim of such Lien Claimant will be reinstated as if the payment had not been made and the deadline for a Lien Claimant to file a reinstated claim will be the later of (i) the general bar date established by order of the Court or (ii) 30 days after the Debtors provide written notice to the Lien Claimant of the reinstatement of its claim; and (c) if the Debtors owe the Lien Claimant any postpetition amounts, the Debtors may recharacterize and apply any payment made pursuant to an order entered in connection with the Lien Claimants Motion to reduce such outstanding postpetition amounts, and such Lien Claimant must return any amounts overpaid by the Debtors, without the right of any setoffs, recoupments, claims, provisions for payment of any claims, or otherwise.

134.    As of the Petition Date, the Debtors have certain prepetition purchase orders outstanding with various third-party vendors and suppliers for goods or services requested by the Debtors that have not yet been delivered or provided to the Debtors.  These third-party vendors and suppliers may be concerned that because the Debtors' obligations under the Outstanding Orders arose before the Petition Date, such obligations will be treated as general unsecured claims in the Chapter 11 Cases.  Accordingly, certain vendors and suppliers may refuse to

45

provide goods or services to the Debtors purchased pursuant to the Outstanding Orders unless the Debtors issue substitute purchase orders postpetition or obtain an order of the Court (a) confirming that all undisputed obligations of the Debtors arising from the postpetition delivery of goods or services subject to Outstanding Orders are afforded administrative expense priority status under section 503(b) of the Bankruptcy Code and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

135.   Any delay in the shipment or delivery of goods or services could significantly disrupt the Debtors' operations, harming the Debtors' business.  Although it is difficult to estimate the total amount due and owing under the Outstanding Orders for goods or services that are not scheduled to be delivered or provided until after the Petition Date, the Debtors submit that the total amount to be paid in connection therewith, if the relief requested herein is granted, is *de minimis* compared to the importance and necessity of the goods or services provided.

136.   For the reasons set forth in the Lien Claimants Motion and herein, I believe that entry of an Order approving the Lien Claimants Motion will be in the best interests of the Debtors, their estates and creditors.

**I.     Debtors' Emergency Motion Pursuant to Sections 105(A), 363, 1107 And 1108 of the Bankruptcy Code for an Order (A) Authorizing, but not Directing, the Debtors to (I) Maintain and Administer Customer Programs, and (II) to Honor or Pay Certain Prepetition Obligations to Their Customers in the Ordinary Course of Business; and (B) Granting Certain Related Relief (the "<u>Customer Programs Motion</u>").**

137.   Pursuant to the Customer Programs Motion, the Debtors seek entry of an order (a) authorizing the Debtors to honor or pay certain prepetition obligations to their customers and certain vendors who facilitate Debtor's interactions with customers in the ordinary course of business, (b) authorizing the Debtors to continue, renew, replace, implement new, and terminate

46

any existing customer-related practices as they deem appropriate, in the ordinary course of business without further application to the Court, and (c) granting certain related relief.

138.    The Debtors are engaged in delivering electric transportation solutions for short distances. The Debtors core vehicle-sharing business provides riders (the "Customers") with on-demand access to vehicles (e-scooters and e-bikes), enabling them to locate, unlock, and pay for rides through a mobile application. To remain one of the leading micromobility transportation companies, the Debtors must maintain the loyalty of their Customers. To attract new Customers and to reward and provide incentives to existing Customers, the Debtors administer, in the ordinary course of business, the practices and programs described herein (collectively, the "Customer Programs").

139.    As set forth herein, Bird Global purchased Spin in September 2023. Like Bird, Spin is a micromobility company with operations throughout North America. As a result, some of the Customer Programs associated with Spin are still in effect. The Debtors expect to migrate and merge the Spin Customer Programs into the existing Bird Customer Programs by the end of first quarter 2024.

140.    As described herein, the Debtors' Customers transact and access the Debtors' Bird vehicles through Bird's mobile application (the "Bird App"). Through the Bird App, customers pay for trips in one of two ways: (a) "pay-per-ride" where a rider charges the cost of the ride to a credit card on file or (b) through a preloaded account balance or "wallet" (the "Bird Wallets") where the cost of the ride is redeemed from pre-purchased account or Wallet balances (the "Bird Wallet Program"). Funds in Bird Wallets may only be redeemed for rides on the Debtors' Bird vehicles.

141.    Similar to Bird App and the Bird Wallet Program, Spin customers may add value for trips using the Spin app and maintain a stored balance through a preloaded account balance (the "Spin Wallets") where the cost of the ride is redeemed from pre-purchased account or the Spin Wallets (the "Spin Wallet Program," and together with the Bird Wallet Program, the "Wallet Programs").  Funds in the Spin Wallets may only be redeemed for rides on the Debtors' Spin vehicles.  As described above, the Debtors intend to merge the Spin and Bird programs over time.

142.    The Wallet Programs represent a critical component of the Debtors' business and failure to maintain the Wallet Programs, including permitting customers to redeem rides in respect of payments made to the Bird Wallets and the Spin Wallets before the Petition Date, would likely cause significant, irreparable damage to the Debtors to the detriment of all parties in interest.

143.    As of the Petition Date, the total amount of funds received through the Wallet Programs in the United States and not yet redeemed for rides was approximately $82.6 million in respect of approximately 13.8 million Customer accounts.

144.    The Debtors believe that continuing to maintain the Wallet Programs, including honoring purchases made before the Petition Date, is critical to the Debtor's business. Moreover, the Debtors believe that customer claims arising under the Wallet Programs may be entitled to priority over other general unsecured claims pursuant to section 507(a)(7) of the Bankruptcy Code, as it is unlikely that any individual customer would have a claim in excess of the priority amount of $3,350.  Accordingly, the Debtors seek authority, but not direction, to (a) honor all Bird Wallet and Spin Wallets funds purchased before the Petition Date and (b) continue

to maintain the Wallet Programs after the Petition Date, in a manner consistent with past practices.

145.    Consistent with industry practice and to accommodate customers' needs, the Debtors maintain a refund program in their discretion under limited circumstances, with respect to the Wallet Programs (the "Refund Program"). The Refund Program assures the Debtors' customers that they will be "made whole" if their payment was made in error or as a result of fraud. Customers may receive refunds of Bird Wallets for up to 60 days after payment of such funds, or Spin Wallets in certain situations.

146.    The Debtors seek authority, but not direction, to honor the Refund Program with respect to purchases made before or after the Petition Date and to honor obligations related thereto in the ordinary course of business in accordance with the Debtors' existing prepetition policies and terms of service, including with respect to any obligations that arose before the Petition Date.

147.    Consistent with industry practice and to accommodate customers' needs, the Debtors maintain a variety of programs that can be utilized by customers to obtain rides at a discounted rate, including (a) Ride Pass ("Ride Pass"), a prepaid product that allows customers to utilize Bird vehicles at a discounted rate for a set duration, (b) Bird Plus ("Bird+"), a prepaid subscription program subject to automatic renewal that allows customers to utilize Bird vehicles at a discounted rate and receive additional benefits, and (c) the Spin Pass ("Spin Pass"), a product where riders can prepay for future Spin ride discounts for a set duration of time (Ride Pass, Bird +, and Spin Pass, collectively the "Rider Programs").

148.    The Debtors believe the Rider Programs help improve and maintain customer relationships and revenue. The Debtors estimate that there are approximately 11,542 active

49

participants in the Rider Programs (consisting of 1,960 total Ride Pass users, 2,619 total Bird Plus users, 6,963 Spin Pass users). Because the Rider Programs enable customers to receive discounts and may not be redeemed for other value, they do not represent a cash liability for the Debtors.

149.    The Debtors seek authority, but not direction. to continue to administer the Rider Programs and to honor obligations related thereto in the ordinary course of business in accordance with the Debtors' existing prepetition policies and terms of service, including with respect to any obligations that arose before the Petition Date.

150.    The Debtors maintain certain charitable programs (the "Charitable Programs"), pursuant to which the Debtors' provide discounted rides to (a) customers that are enrolled in or eligible for a government assistance program, (b) medical professionals and healthcare workers, (c) low-income individuals, students, teachers, senior citizens, and select community and non-profit groups, and (d) members of the American military and veterans. Administering the Charitable Programs is a meaningful way for the Debtors to maintain goodwill and customer loyalty and to give back to the communities in which the Debtors operate.

151.    The Debtors believe that the positive impact on the communities they serve, coupled with customer goodwill generated by the Charitable Programs, warrants their continued sponsorship of these programs on a postpetition basis, including honoring any related outstanding obligations that arose before the Petition Date. Indeed, customers enrolled in the Charitable Programs expect the Debtors to honor their representations regarding the Charitable Programs. Failing to do so would tarnish the Debtors' reputation and customer relationships during an already sensitive, transitional time for the Debtors' businesses. As of the Petition Date, the Debtors estimate that approximately 31,578 customers are active or enrolled in the

various Charitable Programs (14,286 at Bird and 17,292 at Spin). The Debtors seek authority, but not direction, to continue to administer the Charitable Programs and honor all prepetition obligations related thereto in the ordinary course of business, including with respect to any obligations that arose before the Petition Date.

152.    As set forth herein, the Debtors previously sold vehicles for personal use through select retail and wholesale channels (the "Retail Sales"). In May 2022, the Debtors made the decision to exit the Retail Sales business to better align with consumer demand and reduce operational costs. However, consistent with industry practice and to accommodate customers' needs, the Debtors maintain return, refund, and warranty programs with respect to Retail Sales (collectively, the "Return and Warranty Programs"). The Return and Warranty Programs assure the Debtors' customers that they will be "made whole" if merchandise is inadequate, damaged or defective, incorrectly processed, or unavailable. Customers may have defective goods repaired or replaced, depending on the defect in the product, and subject to certain conditions and time limitations. Customers may also receive refunds subject to certain conditions.

153.    The Debtors seek authority, but not direction, to honor the Return and Warranty Programs with respect to merchandise purchased before and after the Petition Date and to honor obligations related thereto in the ordinary course of business, including with respect to any obligations that arose before the Petition Date.

154.    For the reasons set forth in the Customer Programs Motion and herein, I believe that entry of an Order approving the Customer Programs Motion will be in the best interests of the Debtors, their estates and creditors.

**J.      Debtors' Emergency Motion for Order Authorizing Debtors to Pay Prepetition Sales, Use, Trust Fund, Property, and Other Taxes and Similar Obligations (the "Tax Motion").**

155.      Pursuant to the Tax Motion, the Debtors request authority to pay certain sales and use taxes, personal property taxes, fees and licenses and other taxes and similar obligations that accrued or arose in the ordinary course of the Debtors' business prior to the Petition Date (the "Taxes and Fees"). The Debtors also request that the Court authorize the banks and other financial institutions at which the Debtors maintain disbursement accounts to receive, process, honor, and pay any and all checks drawn or electronic fund transfers requested related to payment of the Taxes and Fees.

156.      I understand that, as of the Petition Date, the Debtors owe Taxes and Fees, as follows: $386,925.21 in sales and use taxes, $403,568.02 in personal property taxes and $2.6 million in billed and accrued/unbilled fees and licenses.

157.      The Debtors must continue to pay the Taxes and Fees to continue operating in numerous jurisdictions and to avoid potential penalties and distractions during the Chapter 11 Cases. Specifically, it is my understanding that the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' business operations because governmental authorities may assert liens on the Debtors' property, assert penalties or interest on past-due taxes, or commence personal liability actions against directors, officers and other employees in connection with non-payment of Taxes and Fees, all to the detriment of the Debtors' reorganization efforts, their estates, their employees and other parties in interest.

158.      Based on the foregoing, I believe that the relief requested in the Tax Motion is in the best interest of the Debtors, their estates, and all parties in interest and should be approved.

12640569-4.doc

**K.      Debtors' Emergency Motion for Approval of Form of Notice of Commencement and Proof of Claim (the "<u>Commencement Motion</u>")**

159.    Pursuant to the Commencement Motion, the Debtors seek an Order of the Court approving the proposed form of notice of commencement of these Chapter 11 Cases and the Proof of Claim.  The Debtors wish to provide creditors notice of the commencement of these Chapter 11 Cases and the bar dates for the filing of Proofs of Claim.

160.    For the reasons set forth in the Commencement Motion and herein, I believe that entry of an Order approving the Commencement Motion will be in the best interests of the Debtors, their estates and creditors.

**L.      Debtors' *Ex Parte* Motion for Authorization to File Consolidated Chapter 11 Case Management Summary (the "<u>Consolidated Case Management Motion</u>").**

161.    I am advised that in accordance with Local Rule 2081-1(B), the debtor in possession in a Chapter 11 case is directed to file with the Court and serve all parties of record, within the earlier of three business days after relief is entered, or one business day prior to the date of the first scheduled hearing, a completed local form *Chapter 11 Case Management Summary* (the "<u>Case Management Summary</u>") providing certain information regarding the assets, liabilities and financial affairs of Chapter 11 debtors.

162.    Contemporaneously herewith, the Debtors have each filed in their respective Chapter 11 Cases, *ex parte* motions seeking joint administration of these Chapter 11 Cases. Through the Consolidated Case Management Motion, I am advised that the Debtors will request that the Court authorize them to file a consolidated Case Management Summary, reflecting the assets, liabilities and financial information of each of the Debtors.  I believe that the Debtors' request for authority to file a consolidated Case Management Summary is justified, as the filing of a separate Case Management Summary for each of the five (5) Debtors would be, in significant part, duplicative.  In brief, the filing of a consolidated Case Management Summary is

53

more efficient and will provide the Court and parties-in-interest with adequate disclosures regarding the assets and liabilities of each Debtor.

163.    I am advised by counsel that the United States Trustee does not usually oppose the relief requested by this motion.

164.    For the reasons set forth in the Consolidated Case Management and herein, I believe that entry of an Order approving the Consolidated Case Management Motion will be in the best interests of the Debtors, their estates and creditors.

**M.    Emergency Motion (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Adequate Protection to Senior Secured Lenders, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing (the "DIP Financing Motion").[6]**

165.    The Debtors are in need of an immediate infusion of liquidity to ensure sufficient working capital to operate their business and administer their estates during the Chapter 11 Cases while the Debtors pursue an orderly sale and wind down process for the remainder of their assets.  During the past several weeks, the Debtors in consultation with their advisors have undertaken an analysis of the Debtors' operations and funding needs.  From this review and analysis, it became clear that the Debtors would require an infusion of capital to allow the Debtors to operate in Chapter 11 as they work with their advisors and key stakeholders to achieve their goal of pursuing a sale of their operating businesses. The Debtors and their advisors have determined that debtor in possession financing is necessary to ensure (a) sufficient working capital to operate their business and to administer their estates; (b) the timely payment of administrative expenses to be incurred; and (c) a positive message to the market that these

---

[6] Capitalized terms used in this section of my Declaration and not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Financing Motion.

Chapter 11 cases are sufficiently funded, which is critical to address the concerns raised by the Debtors' clients, employees, vendors and other creditors.

166.    Given the Debtors' desire to avoid the cost and uncertainty of a postpetition DIP facility that would attempt to non-consensually prime their prepetition secured lenders, the Debtors concluded that, under the circumstances, acceptable third-party financing was not reasonably obtainable.  Moreover, the Debtors' prepetition secured lenders informed the Debtors that they would not consent to the priming of their liens by a third-party lender.  Nevertheless, the Debtors' management considered whether the Debtors would be able to obtain third-party financing. Recognizing their need for immediate liquidity, the Debtors' management began an arm's-length evaluation of available alternatives.

167.    Subject to the approval of the Court, the Debtors have obtained commitments for new money loans totaling $25,100,000 as follows:  (i) first, a postpetition senior secured priming and super-priority debtor-in-possession loan facility (the "DIP Credit Facility") provided by the lenders (the "Prepetition First Lien Lenders") party to the Prepetition Credit Agreement pursuant to the terms and conditions of the Interim Order and the DIP Credit Agreement, consisting of (a) new money loans up to $19,500,000 (the "New Money Senior DIP Loans") of which up to $10,778,000 shall be available upon the entry of the Interim Order after exhaustion of the New Money Junior DIP Notes (as defined below); and (b) subject to entry of the Final Order, loans under the Prepetition Credit Agreement, held by the Prepetition First Lien Lenders and rolled up into the DIP Credit Facility, in an aggregate principal amount of not less than $41,355,322.40, plus accrued and unpaid interest of not less than $2,833,148.50 and all other Prepetition First Lien Obligations (as defined herein) (such rolled-up debt, the "Roll-Up Loans" and together with the New Senior Money DIP Loans, the "Senior DIP Loans"); and (ii) a

postpetition senior secured and super priority priming note purchase agreement (the "DIP Junior Notes Facility" and together with the DIP Credit Agreement, the "DIP Facilities") junior only to the DIP Credit Facility, the First Lien Adequate Protection Obligations (as defined above), and the Prepetition First Lien Obligations, provided by certain note purchasers (the "Participating Second Lien Lenders") party to the Prepetition Note Purchase Agreement pursuant to the terms and conditions of the Interim Order and the DIP Note Purchase Agreement consisting of (a) up to $5,600,000 in new money notes (the "New Money Junior DIP Notes") of which $5,600,000 shall be available upon the entry of this Interim Order pursuant to the terms and conditions of this Interim Order and the DIP Note Purchase Agreement; and (b) certain bridge notes issued under the Prepetition Note Purchase Agreement, held by the Participating Second Lien Lenders and rolled up into the DIP Junior Notes Facility, in an aggregate principal amount of $4,000,000 plus accrued interest and fees payable with respect thereto (such rolled-up debt, the "Roll-Up Notes" and together with the New Money Junior DIP Notes, the "Junior DIP Notes" and together with the First Lien DIP Loans, the "DIP Loans").

168.    The Debtors determined, in the exercise of their business judgment, that the DIP Facilities proposed by the Prepetition First Lien Lenders and the Participating Second Lien Lenders provide the best path forward for the Debtors to maximize the value of their estates in these Chapter 11 Cases. The Debtors, with the help of their professionals, negotiated the DIP Documents with the DIP Lenders in good faith and with the assistance of their counsel and other advisors, and the Debtors believe that they have obtained financing on the best terms reasonably available.

169.    The Debtors require immediate access to $16,830,000 of cash in the form of DIP financing, in addition to the use of Cash Collateral, to meet their obligations through the week

ending January 12, 2024, and avoid irreparable harm.  Given the financial challenges and the anticipated funding needs of the Debtors during the sale process, the Debtors concluded that proceeding with the DIP Facilities is the most efficient and cost-effective way to proceed.  In my role as the Debtors' Chief Restructuring Officer, I was actively involved in the negotiation process, including engaging in good faith discussions with the proposed lenders. The proposed DIP Facilities, including the pricing, is fair and reasonable under the circumstances, is in the best interest of the Debtors' estates, will provide the Debtors with the financing required for these Chapter 11 Cases, and will add liquidity to fund the Debtors' bankruptcy cases through an orderly sales process and a plan of liquidation. Accordingly, I believe the DIP Facility and its terms are both fair and reasonable and in the best interests of the Debtors' and their estates.

170.    The continued and viable operation of the Debtors' business will not be possible absent the Court's entry of the Interim Order.  Approval of the Interim Order will ensure the uninterrupted operation of the Debtors' business, the maintenance of ordinary course relationships with vendors, clients and employees, the satisfaction of working capital needs in the ordinary course, and the consummation of the sale process.

171.    For the reasons set forth in the DIP Financing Motion and herein, I believe that entry of an Order granting the DIP Financing Motion is in the best interests of the Debtors, their estates, and creditors.

**PART IV**
**CONCLUSION**

172.    This Declaration explains the circumstances that have led to the commencement of the Chapter 11 Cases and the need for the relief requested in the First Day Filings.  For the

12640569-4.doc

reasons described herein and in the First Day Filings which are incorporated herein by reference, I believe that the prospect for achieving the objectives for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Filings.

## 28 U.S.C. § 1746 Declaration

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 20th day of December, 2023 in Miami, FL.

Christopher Rankin
Chief Restructuring Officer

59