

**ORDERED in the Southern District of Florida on December 22, 2023.**

_Corali Lopez-Castro_

**Corali Lopez-Castro, Judge**
**United States Bankruptcy Court**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| BIRD GLOBAL, INC., *et al.*,[1] | Case No. 23-20514-CLC |
| Debtors. | (Jointly Administered) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING, (B) GRANT SENIOR SECURED LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND (C) UTILIZE CASH
COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY;
(IV) SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

**THIS MATTER** came before this Court on Friday, December 22, 2023, at 9:30 a.m. in

Miami, Florida ("Hearing"), upon the motion [ECF No. 32] (the "DIP Motion") filed by the debtors

and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases

---

[1] The address of the Debtors is 392 Northeast 191st Street, #20388, Miami, FL 33179.  The last four digits of the Debtors' federal tax identification numbers are: (i) Bird Global, Inc. (3155); (ii) Bird Rides, Inc. (9939); (iii) Bird US Holdco, LLC (8390); (iv) Bird US Opco, LLC (6873); and (v) Skinny Labs, Inc. (8176).

US-DOCS\147131838.9

(the "Chapter 11 Cases") commenced on December 19, 2023 (the "Petition Date") for entry of an

interim order (this "Interim Order") and a final order under sections 105, 361, 362, 363, 364, 503,

506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the

"Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy

Procedure (as amended, the "Bankruptcy Rules"), and Rules 2002-1, 4001-1, 4001-2, 4001-3, and

9013-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of

Florida (the "Local Rules") seeking, among other things:

> (a) authorization for Bird Global, Inc., in its capacity as borrower (the "Borrower"), to obtain postpetition financing, and for each of the other Debtors, and certain of their non-Debtor affiliates, to borrow or guarantee, as applicable, unconditionally (in their capacities as guarantors, the "Guarantors" and together with the Borrower and any other obligors, the "DIP Obligors"),[2] on a joint and several basis, the Borrower's obligations in connection with debtor in possession financing (the "DIP Facilities"), to be funded by certain Prepetition Secured Lenders (as defined herein) pursuant to the DIP Credit Agreements and other DIP Documents (each as defined herein), comprising:
>
>> i. a postpetition senior secured priming and super-priority debtor-in-possession loan facility (the "DIP Credit Facility") provided by the lenders (the "Prepetition First Lien Lenders") party to the Prepetition Credit Agreement (as defined herein) pursuant to the terms and conditions of this Interim Order and the DIP Credit Agreement (as defined below), consisting of (a) new money loans up to $19,500,000 (the "New Money Senior DIP Loans") of which up to $12,925,000 shall be available upon the entry of this Interim Order after exhaustion of the New Money Junior DIP Notes (as defined herein); and (b) subject to entry of the Final Order, loans under the Prepetition Credit Agreement, held by the Prepetition First Lien Lenders and rolled up into the DIP Credit Facility, in an aggregate principal amount of not less than $41,455,322.40, plus accrued and unpaid interest of not less than $2,833,148.50 and all other Prepetition First Lien Obligations (as defined herein) (such rolled-up debt, the "Roll-Up Loans" and together with the New Senior Money DIP Loans, the "Senior DIP Loans");

---

[2]    The DIP Obligors are: (i) Debtors (a) Bird Global, Inc.; (b) Bird Rides, Inc.; (c) Bird U.S. Holdco, LLC; (d) Bird US Opco, LLC; and (e) Skinny Labs, Inc.; and (ii) non-Debtors: (a) Bird Canada Scooters, Inc; (b) Bird Treasury Holdco, LLC; (c) Scoot Rides, Inc; (d) Bird Rides International Holdings, Inc.; (e) Bird Rides Holdings (US), LLC; (f) Bird Rides Europe B.V.

    ii. a postpetition senior secured and super priority priming note purchase agreement (the "<u>DIP Junior Notes Facility</u>" and together with the DIP Credit Agreement, the "<u>DIP Facilities</u>") junior only to the DIP Credit Facility, the First Lien Adequate Protection Obligations (as defined herein), and the Prepetition First Lien Obligations, provided by certain note purchasers (the "<u>Participating Second Lien Lenders</u>") party to the Prepetition Note Purchase Agreement (as defined herein) pursuant to the terms and conditions of this Interim Order and the DIP Note Purchase Agreement (as defined below) consisting of (a) up to $5,600,000 in new money notes (the "<u>New Money Junior DIP Notes</u>") of which $5,600,000 shall be available upon the entry of this Interim Order pursuant to the terms and conditions of this Interim Order and the DIP Note Purchase Agreement (as defined herein); and (b) certain bridge notes issued under the Prepetition Note Purchase Agreement, held by the Participating Second Lien Lenders and rolled up into the DIP Junior Notes Facility, in an aggregate principal amount of $4,000,000 plus accrued interest and fees payable with respect thereto (such rolled-up debt, the "<u>Roll-Up Notes</u>" and together with the New Money Junior DIP Notes, the "<u>Junior DIP Notes</u>" and together with the First Lien DIP Loans, the "<u>DIP Loans</u>"); and

(b)      authorization for the Debtors to enter into and perform under:

    i. the *Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement* (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "<u>DIP Credit Agreement</u>," together with all agreements, documents and instruments delivered or executed in connection therewith, the "<u>Senior DIP Documents</u>") among the DIP Obligors, the Prepetition First Lien Lenders as lenders under DIP Credit Facility (collectively, in their capacities as lenders under the DIP Credit Facility, the "<u>Senior DIP Lenders</u>") and MidCap Financial Trust, as administrative agent (in such capacity, the "<u>Senior DIP Agent</u>" and together with the Senior DIP Lenders, the "<u>Senior DIP Parties</u>"), which credit agreement shall be in substantially the same form attached hereto as <u>Exhibit 3</u>, and all obligations arising thereunder including all "Borrower Obligations" as defined therein being "<u>Senior DIP Obligations</u>"; and

    ii. the *Senior Secured Priming and Superpriority Debtor-In-Possession Note Purchase Agreement* (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "<u>DIP Note Purchase Agreement</u>," together with all agreements, documents and instruments delivered or executed in connection therewith, the "<u>Junior DIP Documents</u>," and together with the Senior DIP Documents, the "<u>DIP Documents</u>") among the DIP Obligors, the Participating Second Lien Lenders (collectively, in their capacities as note purchasers under the DIP Note Purchase Agreement, the "<u>Junior DIP Lenders</u>" and together with the Senior DIP Lenders, the "<u>DIP Lenders</u>") and U.S. Bank Trust Company,

3

National Association as collateral agent for the Junior DIP Lenders (in such capacity herein, the "Junior DIP Agent," and together with (i) the Senior DIP Agent, the "DIP Agents," and (ii) the Junior DIP Lenders, the "Junior DIP Parties"; and the Junior DIP Parties together with the Senior DIP Parties, the "DIP Parties"), which agreement shall be in substantially the same form attached hereto as Exhibit 4, and all obligations arising thereunder including all "Obligations" as defined therein being "Junior DIP Obligations" and together with the Senior DIP Obligations, the "DIP Obligations"); and;

(c)     authorization for the Debtors to use the proceeds of the DIP Loans and the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), in accordance with the terms hereof, including pursuant to the DIP Budget (as defined herein) as further described herein, to (i) pay principal, fees, interest, and other obligations under the DIP Facilities, (ii) upon entry of the Final Order, to roll up and grant Senior DIP Loan status to all Prepetition First Lien Obligations, (iii) upon entry of the Final Order, to roll-up and grant Junior DIP Note status to the Roll-Up Notes, and (iv) to provide working capital for, and for other general corporate purposes of, the Debtors, including for funding the Carve Out (as defined herein) and payment of any Adequate Protection Obligations (as defined herein);

(d)     the granting of adequate protection to the Prepetition First Lien Lenders for all principal, interest, indebtedness, fees, costs, expenses and obligations of any kind, ("Prepetition First Lien Obligations" and together with the Senior DIP Obligations, the "Senior Obligations") arising under the Amended and Restated Loan Agreement among the Prepetition First Lien Lenders, the Debtors and certain non-Debtor Affiliates as Borrowers, Parent, or guarantors thereto (as applicable), and MidCap Financial Trust as Administrative Agent (the "Prepetition First Lien Agent" and together with the Prepetition First Lien Lenders, the "Prepetition First Lien Parties") dated as of September 19, 2023 (as amended, restated, amended and restated, or otherwise modified from time to time including by Amendment No. 1 thereto dated as of November 29, 2023, the "Prepetition Credit Agreement") and, all security, pledge and guaranty agreements and all other documentation executed in connection with the foregoing, including without limitation all "Transaction Documents" as defined in the Prepetition Credit Agreement (each as amended, supplemented or otherwise modified, and together with the Prepetition Credit Agreement, the "Prepetition First Lien Credit Documents"),

(e)     the granting of adequate protection to the Participating Second Lien Lenders and any non-participating note purchasers under the Prepetition Note Purchase Agreement (defined below) (collectively with the Participating Second Lien Lenders, the "Prepetition Second Lien Lenders") for all principal, interest, indebtedness, fees, costs, expenses and obligations of any kind, ("Prepetition Second Lien Obligations" and together with the Prepetition First Lien Obligations, the "Prepetition Obligations") arising under the Note Purchase Agreement among the Prepetition Second Lien Lenders, Bird Global, Inc., and U.S. Bank Trust

4

Company, National Association, as collateral agent for the Prepetition Second Lien Lenders (in such capacity herein, the "Prepetition Second Lien Agent" and together with the Prepetition Second Lien Lenders, the "Prepetition Second Lien Parties" and together with the Prepetition First Lien Parties, the "Prepetition Secured Parties"), dated as of December 30, 2022 (as amended, restated, amended and restated, or otherwise modified from time to time including the First Amendment thereto dated as of March 17, 2023, the Second Amendment thereto dated as of September 19, 2023, the Third Amendment thereto dated as of December 11, 2023, and the Fourth Amendment (the "Fourth Amendment") thereto dated as of December 18, 2023, the "Prepetition Note Purchase Agreement") and, all security, pledge and guaranty agreements and all other documentation executed in connection with the foregoing (each as amended, supplemented or otherwise modified, and together with the Prepetition Credit Agreement, the "Prepetition Second Lien Credit Documents" and together with the Prepetition First Lien Credit Documents, the "Prepetition Credit Documents");

(f)     authorization for the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, letter of credit fees, agency fees, audit fees, appraisal fees, valuation fees, administrative and collateral agents' fees, and the reasonable fees and disbursements of the DIP Parties' attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(g)     the granting of valid, enforceable, non-avoidable and fully perfected first priority liens on and security interests in all, if any, of the property, assets and other interests in property and assets of the Debtors that are not subject to a valid and perfected lien on the Petition Date (such property and assets, the "Unencumbered Assets"), except as otherwise specifically provided herein and in the applicable DIP Documents, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, including actions to recover property transferred pursuant to section 549 of the Bankruptcy Code and, upon entry of the Final Order, the proceeds of any other claims or causes of action arising or assertable under chapter 5 of the Bankruptcy Code (the "Avoidance Actions"), subject only to the Carve Out and the priority of liens set forth in paragraph 12 of this Interim Order;

(h)     the granting of valid, enforceable, non-avoidable and fully perfected first priority priming liens on and security interests in all of the property, assets and other interests in property and assets of the Debtors, except as otherwise specifically provided herein and in the applicable DIP Documents, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired

5

or created, whether existing prior to or arising after the Petition Date, that comprises the Prepetition Collateral (as defined herein), subject only to the Carve Out and the priority of liens set forth in paragraph 12 of this Interim Order, on the terms and conditions set forth herein and in the DIP Documents;

(i)    the granting of valid, enforceable, non-avoidable and fully perfected junior liens on and security interests in all of the property, assets and other interests in property and assets of the Debtors, except as otherwise specifically provided herein and in the applicable DIP Documents, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, that is subject to Permitted Liens (as defined herein) (other than the Prepetition Liens (as defined herein)), subject only to the Carve Out and the priority of liens set forth in paragraph 12 of this Interim Order, on the terms and conditions set forth herein and in the DIP Documents;

(j)    subject to the terms of this Interim Order, the granting of superpriority administrative expense claims against each of the Debtors' estates to the DIP Agents and the DIP Lenders, with respect to the DIP Obligations with the priorities set forth in paragraph 10 of this Interim Order over any and all administrative expenses of any kind or nature, subject and subordinate only to the Carve Out, on the terms and conditions set forth herein and in the DIP Documents;

(k)    the waiver of the Debtors' and the estates' rights to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c), the waiver of the "equities of the case" exception under Bankruptcy Code 552(b), and a waiver of the equitable doctrine of "marshalling", subject in each case to entry of the Final Order (but retroactive to the Petition Date);

(l)    subject to the terms of this Interim Order, authorization for the DIP Agents and the DIP Lenders to exercise remedies under the DIP Documents on the terms described herein upon the occurrence and during the continuance of a Termination Event (as defined herein);

(m)    the modification of the automatic stay imposed pursuant to Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Interim Order;

(n)    pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Court to consider entry of this Interim Order, among other things, (i) authorizing the Borrower, on an interim basis, to (x) borrow New Money Junior DIP Notes in an amount up to $5,600,000, and (y) upon exhaustion of the proceeds of such interim New Money Junior DIP Notes borrowings, borrowing New Money Senior DIP Loans in an amount up to $12,925,000 and (ii) upon entry of the Final Order, to continue to borrow from the

6

DIP Lenders in accordance with the DIP Documents, including, in subsequent draws, the New Money Senior DIP Loans in their full, authorized amount and the incurrence of the Roll-Up Loans and Roll-Up Notes as DIP Obligations; (iii) authorizing the Guarantors to guaranty the DIP Obligations, (iv) authorizing the Debtors' use of Cash Collateral, and (v) granting the adequate protection described in this Interim Order; and

(o)     that this Court schedule a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") authorizing and approving, on a final basis, among other things, the Debtors' entry into the DIP Facilities, the borrowings under the DIP Facilities, the continued use of Cash Collateral and granting adequate protection, in each case, as described in the Motion and as set forth in the DIP Documents.

The Court having considered the Motion and the exhibits thereto, the *Declaration of Christopher Rankin In Support of Chapter 11 Petitions and First Day Pleadings* [ECF No. 31] (the "First Day Declaration"), the evidence submitted or proffered and the arguments of counsel made at the Interim Hearing; and proper and sufficient notice of the Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014; and the Interim Hearing to consider the relief requested in the Motion having been held and concluded; and all objections, if any, to the relief requested in the Motion and to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, creditors and parties in interest; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:[3]

1.     *Disposition*.  The Motion is GRANTED on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent that any of

US-DOCS\147131838.9

Order that have not been withdrawn, waived or settled, and all reservation of rights included therein, are hereby denied and overruled.

2.    *Jurisdiction*.    This Court has core jurisdiction over the Chapter 11 Cases commenced on Petition Date, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    *Notice*.    Under the circumstances, the notice given by the Debtors of, and as described in, the Motion, the relief requested therein, and the Interim Hearing complies with Bankruptcy Rules 4001(b) and (c) and the Local Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

4.    *Debtors' Stipulations*.    Without prejudice to the rights of any other party, but subject to the limitations thereon contained in paragraphs 31 and 32 of this Interim Order, the Debtors represent, admit, stipulate and agree as follows:

(a)    <u>Prepetition First Lien Obligations</u>.  As of the Petition Date, the Debtors and their non-Debtor affiliates party to the Prepetition First Lien Credit Documents (the "<u>Prepetition First Lien Obligors</u>") without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition First Lien Parties under the Prepetition First Lien Credit Documents in the aggregate principal amount of loans of not less than $41,455,322.40, *plus* approximately $2,833,148.50 accrued and unpaid interest and fees thereon as of the Petition Date, *plus* all other Prepetition First Lien Obligations.  The Prepetition First Lien Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Prepetition First-Lien

---

the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Obligors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition First Lien Parties by or on behalf of any of the Prepetition First-Lien Obligors prior to the Petition Date under or in connection with any of the Prepetition First Lien Credit Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(b)    <u>Prepetition First Priority Liens</u>.  Pursuant to the Prepetition First Lien Credit Documents, the Prepetition First Lien Obligations are secured by valid, binding, perfected, non-avoidable and enforceable first priority liens on and security interests in (the "<u>Prepetition First Priority Liens</u>") the "Collateral" (as defined in the Prepetition First Lien Credit Documents) (the "<u>Prepetition Collateral</u>"), subject only to certain permitted liens as permitted under the Prepetition First Lien Credit Documents.  The Prepetition First Priority Liens (i) are valid, binding, perfected and enforceable first priority liens and security interests in the Prepetition Collateral, (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, objection, challenge, counterclaim, defense or any "claim" (as defined in the Bankruptcy Code) of any kind, (iii) as of the Petition Date are subject and/or subordinate only to certain permitted liens (if any) as permitted by the terms of the Prepetition First Lien Credit Documents, (iv) were granted to or for the benefit of the Prepetition First Lien Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making

9

of the loans and/or commitments and other financial accommodations secured thereby(iv) constitute the legal, valid and binding obligation of the "Credit Parties" (as defined in the Prepetition First Lien Credit Documents), enforceable in accordance with the terms of the applicable Prepetition First Lien Credit Documents, and (v) encumber all or substantially all of the Debtors' assets as of the Petition Date (subject to certain limited exclusions set forth in the Prepetition First Lien Documents).

(c)    <u>Prepetition Second Lien Obligations</u>.  As of the Petition Date, the Debtors and their non-Debtor affiliates party to the Prepetition Second Lien Credit Documents (the "<u>Prepetition Second Lien Obligors</u>" and together with the Prepetition First Lien Obligors, the "<u>Prepetition Obligors</u>"), without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition Second Lien Parties under the Prepetition Second Lien Credit Documents in the aggregate principal amount of notes not less than $63,850,000, *plus* approximately $7,180,000.00 accrued and unpaid interest thereon (including PIK interest) as of the Petition Date, *plus* all other Prepetition Second Lien Obligations.  The Prepetition Second Lien Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and the non-Debtor Prepetition Obligors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Second Lien Agent or Prepetition Second Lien Lenders by or on behalf of any of the Debtors or the non-Debtor Prepetition Obligors prior to the Petition Date under or in connection with any of the Prepetition Second Lien Credit Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset,

subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(d)    <u>Prepetition Second Priority Liens</u>.  Pursuant to the Prepetition Second Lien Credit Documents, the Prepetition Second Lien Obligations are secured by valid, binding, perfected and enforceable second priority liens on and security interests in the Prepetition Collateral (the "<u>Prepetition Second Priority Liens</u>" and, together with the Prepetition First Priority Liens, the "<u>Prepetition Liens</u>"), which Prepetition Second Priority Liens are subject and subordinate only to the Prepetition First Priority Liens and certain permitted liens as permitted by the terms of the Prepetition Second Lien Credit Documents.  The Prepetition Second Priority Liens (i) are valid, binding, perfected, and enforceable second priority liens and security interests in the Prepetition Collateral, (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind, (iii) as of the Petition Date are subject and/or subordinate only to the Prepetition First Priority Liens and certain permitted liens as permitted by the terms of the Prepetition Second Lien Credit Documents, and (iv) constitute the legal, valid and binding obligation of the "Note Parties" (as defined in the Prepetition Second Lien Credit Documents), enforceable in accordance with the terms of the applicable Prepetition Second Lien Credit Documents.

(e)    <u>Prepetition Intercreditor Agreement</u>.  As of the Petition Date, the Prepetition First Lien Agent and the Prepetition Second Lien Agent were party to that certain Amended and Restated Subordination and Intercreditor Agreement dated as of September 19, 2023 (as amended, supplemented, amended and restated or otherwise modified from time to time prior to the date of this Interim Order, the "<u>Prepetition Intercreditor Agreement</u>").  The Prepetition

11

Intercreditor Agreement governs the respective rights, interests, obligations, priority and positions of the Prepetition Secured Parties with respect to the Prepetition Collateral. The Prepetition Obligors, including the Debtors, have acknowledged and agreed to recognize all rights granted to the parties to the Prepetition Intercreditor Agreement.

       (f)    <u>No Challenges/Claims</u>. Subject to paragraph 32 below, no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the respective Prepetition Liens or Prepetition Obligations exist, and no portion of the respective Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors and their estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action,[4] and/or choses in action against any of the Prepetition Secured Parties, any of their respective Agents or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the Prepetition Credit Documents, the Prepetition Obligations, the Prepetition Liens, or

---

[4]    As used in this Interim Order, "causes of action" means any action, claim, cause of action, controversy demand, right, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, and license of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Closing Date (as defined herein), in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law. For the avoidance of doubt, "cause of action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction law, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non-U.S. law; (d) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of title 11 of the United States Code; (e) any state or foreign law pertaining to actual or constructive fraudulent transfer, fraudulent conveyance, and (f) any "lender liability" or equitable subordination claims or defenses.

otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.  The Prepetition Secured Parties claims in respect of the Prepetition Obligations constitute allowed, secured claims, within the meaning of sections 502 and 506 of the Bankruptcy Code, subject to the value of the Prepetition Collateral. The Debtors have waived, discharged, and released any right to challenge any of the Prepetition Secured Indebtedness, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Liens.

(g)    <u>Cash Collateral</u>.  Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral (as defined herein) existing as of the Petition Date or from time to time, and the proceeds of any of the foregoing, is the Prepetition Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "<u>Cash Collateral</u>").

5.    *Findings Regarding the DIP Facilities and Use of Cash Collateral.*

(a)    Good cause has been shown for the entry of this Interim Order.

(b)    As set forth in the First Day Declaration, the Debtors have an immediate need to obtain the DIP Facilities and to use the Cash Collateral in each case on an interim basis, in order to, among other things, (i) permit the orderly continuation of their respective businesses, (ii) maintain business relationships with their vendors, suppliers, regulators, customers and other parties, (iii) make payroll, (iv) make adequate protection payments, (v) pay the costs of the administration of the Chapter 11 Cases, including a process for the sale of the Debtors' assets,

13

and (vi) satisfy other working capital and general corporate purposes of the Debtors.  The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations to avoid irreparable harm by, among other things, preserving and maintaining the value of the Debtors' assets.  The Debtors will not have sufficient sources of working capital and financing to operate their business or maintain their properties in the ordinary course of business throughout the Chapter 11 Cases without the DIP Facilities and authorized use of Cash Collateral.

(c)      As set forth in the First Day Declaration, the Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors are unable to obtain secured credit allowable under Bankruptcy Code sections 364(c)(1), 364(c)(2) and 364(c)(3) for the purposes set forth in the DIP Documents.  Financing on a postpetition basis is not otherwise available without the Debtors granting to the DIP Agents, for the benefit of itself and the DIP Lenders, the DIP Liens (as defined herein), in each case, under the terms and conditions set forth in this Interim Order and the DIP Documents.

(d)      The terms of the DIP Facilities, the DIP Documents and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)      The DIP Facilities have been negotiated in good faith and at arm's length among the Debtors, the DIP Agents and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Facilities and the DIP Documents including, without limitation, the DIP Obligations, shall be deemed to have been

14

extended by the DIP Agents and the DIP Lenders, respectively, in good faith as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e).  The DIP Obligations and the DIP Liens (as defined herein) shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, and any liens or claims granted to the DIP Agents or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

(f)      The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  For the reasons set forth in the Motion, the First Day Declaration, and the record presented to the Court at the Interim Hearing, absent granting the relief granted by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facilities and authorization of the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Interim Order and the DIP Documents are, therefore, in the best interests of the Debtors' estates and are consistent with the Debtors' fiduciary duties.

(g)      (i) the Prepetition Second Lien Parties have consented to the terms of the DIP Facilities and entry of this Interim Order, and (ii) the Prepetition Second Priority Liens and the Second Lien Adequate Protection Liens (as defined herein) are subordinate to the Carve Out, the Permitted Liens (if any), the DIP Liens, the First Lien Adequate Protection Liens and the Prepetition First Priority Liens.

6.      *Authorization of the DIP Facilities and the DIP Documents.*

15

(a)     The Debtors are hereby expressly authorized and empowered to execute and deliver and, on such execution and delivery, perform under the DIP Documents, which are hereby approved and incorporated herein by reference.

(b)     The Borrower is authorized to borrow, and the Guarantors are authorized to guaranty and/or incur, borrowings of (i) upon entry of this Interim Order, (x) up to $5,600,000 in New Money Junior DIP Notes, and (y) up to $12,925,000 in the New Money Senior DIP Loans subject to exhaustion of the New Money Junior DIP Notes proceeds, and (ii) subject to entry of the Final Order, up to $19,500,000 in New Money Senior DIP Loans (inclusive of amounts advanced pursuant to this Interim Order), in all cases plus applicable interest, fees, indemnities and other expenses and other amounts provided for in the DIP Documents, and at all times subject to the provisions of the DIP documents, the Interim DIP Order or Final DIP Order, as applicable, and the DIP Budget.  Nothing in this paragraph 6(b) shall be construed to restrict the ability of non-Debtor Guarantors and non-Debtor DIP Obligors to guaranty and/or incur borrowings under the DIP Facilities on the same basis as Debtor Guarantors and Debtor DIP Obligors, as set forth in the DIP Documents, or otherwise impair or effect in any way the obligations of non-Debtor Guarantors and non-Debtor DIP Obligors in connection therewith.

(c)     Proceeds of the DIP Loans and Cash Collateral shall be used solely for the purposes permitted under the DIP Documents, this Interim Order and in accordance with the DIP Budget, the DIP Documents and this Interim Order.

(d)     Subject to entry of the Final Order, the Debtors are authorized to (i) roll up in full any and all Prepetition First Lien Obligations, including any accrued and unpaid interest thereon, with such Prepetition First Lien Obligations becoming Senior DIP Obligations as Senior DIP Loans; and (ii) roll up $4,000,000 in principal amount of Prepetition Second Lien Obligations,

plus accrued and unpaid interest thereon, with such Prepetition Second Lien Obligations becoming Junior DIP Obligations as Junior DIP Notes.

(e)      In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by Bankruptcy Code section 362 is hereby lifted to the extent necessary and applicable, to perform all acts and to make, execute and deliver all instruments and documents (including, without limitation, the DIP Documents), and to pay all fees, expenses, indemnities and other amounts contemplated thereby or that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facilities including, without limitation:

(i)      the execution, delivery and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement and DIP Note Purchase Agreement and any guarantees and collateral documents contemplated thereby;

(ii)      the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents (in each case in accordance with the terms of the DIP Documents and in such form as the Debtors, the DIP Agents and the Required DIP Lenders or Required Purchasers (as defined in the DIP Documents, as applicable) may agree in accordance with the DIP Documents), it being understood that no further approval of the Court shall be required for any amendments, waivers, consents or other modifications to and under the DIP Documents or the DIP Budget, except that any modifications or amendments to the DIP Documents that shorten the maturity thereof, increase the aggregate commitments thereunder or increase the rate of interest payable with respect thereto shall be on notice and subject to a hearing and Court approval, as necessary;

(iii)      the non-refundable and, upon entry of this Interim Order, irrevocable payment to each of the DIP Lenders or the DIP Agents, as applicable, of any amounts due (or that may become due) in respect of any indemnification obligations under the DIP Documents or any other amounts payable in connection with the DIP Documents, including, without limitation, the payment of all reasonable and documented fees, out of pocket expenses, and disbursements of counsel incurred by the DIP Agents and Lenders arising prior to, on, or after the Petition Date;

17

(iv)   making any payments on account of the Adequate Protection Obligations provided for in this Interim Order; and

(v)   the performance of all other acts required under or in connection with the DIP Documents.

(f)   Upon execution and delivery of the DIP Credit Agreement, DIP Note Purchase Agreement and the other DIP Documents, such DIP Documents shall constitute valid, binding and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Interim Order for all purposes during the Chapter 11 Cases, any subsequently converted Chapter 11 Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any Chapter 11 Case.  No obligation, payment, transfer or grant of security under the DIP Credit Agreement, the DIP Note Purchase Agreement, the other DIP Documents or this Interim Order shall be stayed, restrained, subordinated, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under Bankruptcy Code sections 502(d), 510, 548 or 549 or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transaction Act, or similar statute or common law), or subject to any Avoidance Action, defense, reduction, setoff, recoupment or counterclaim.

(g)   The Debtor Guarantors hereby are authorized and directed to jointly, severally and unconditionally guarantee in full all of the DIP Obligations of the Borrower and to incur any DIP Obligations and DIP Liens in connection therewith.  Nothing in this paragraph 6(g) shall be construed to restrict the ability of non-Debtor Guarantors and non-Debtor DIP Obligors to guaranty and/or incur borrowings under the DIP Facilities on the same basis as Debtor Guarantors and Debtor DIP Obligors, as set forth in the DIP Documents.

18

7.      *Roll-Up Obligations*.

(a)      Roll-Up Loans.  Upon entry of the Final Order, all outstanding Prepetition First Lien Obligations shall immediately, automatically, and irrevocably (except as to third parties pursuant to paragraph 32 hereof) be deemed to have been converted into Senior DIP Obligations and shall be entitled to all the priorities, privileges, rights, and other benefits set forth in this Interim Order and the Final Order.

(b)      Roll-Up Notes.  Upon entry of the Final Order, $4,000,000 in principal amount of Prepetition Second Lien Obligations, plus accrued and unpaid interest thereon, held by the Participating Second Lien Lenders (or their designated affiliates) shall immediately, automatically, and irrevocably (except as to third parties pursuant to paragraph 32 hereof) be deemed to have been converted into Junior DIP Obligations and shall be entitled to all the priorities, privileges, rights, and other benefits set forth in this Interim Order and the Final Order.

8.      *Budget*.

(a)      Except as otherwise provided herein or in the DIP Documents, the Debtors may only use Cash Collateral and the proceeds of the DIP Facilities to fund payments benefitted by the Carve Out and otherwise in accordance with a projected statement of sources and uses of cash for the DIP Obligors and their subsidiaries (the "Company") on a consolidated basis for the current and following 13 calendar weeks (but not any preceding weeks) attached hereto as Exhibit 1 (as may be amended, replaced, supplemented or otherwise modified in accordance with the terms of this Interim Order and the DIP Documents, the "DIP Budget") as set forth in the DIP Documents.  Three business days following the week in which the Petition Date occurs and thereafter three business days' following the end of each prior week (each, a "Reporting Date"), the Debtors shall deliver a proposed updated DIP Budget, in each case, substantially in the form

19

attached hereto as <u>Exhibit 1</u> (with only such changes thereto as the Senior DIP Agent shall each agree in its sole discretion in accordance with the DIP Documents).  Upon approval of the proposed updated DIP Budget by the Senior DIP Agent, the proposed DIP Budget shall be deemed the "DIP Budget" for all purposes under this Interim Order and the DIP Documents.  Unless and until a proposed updated DIP Budget is approved and accepted by the Senior DIP Agent, the existing DIP Budget shall remain in full force and effect and continue to govern the Debtors' compliance with the Budget Covenants (as defined below).

(b)      On each Reporting Date, the Debtors shall deliver simultaneously to the DIP Parties a variance report/reconciliation report certified by the Chief Financial Officer or Chief Restructuring Officer of the Debtors, in form reasonably acceptable to the Senior DIP Agent, setting forth the actual sources and uses of cash and the ending unrestricted cash balance of the Company for the immediately preceding week, the variance expressed both in dollar amounts and percentages (on both an aggregate and line-item basis) of sources and uses of cash and in ending unrestricted cash for such week, and all post-petition expenses of the Debtors that are accrued and unpaid as of the end of such week (including accruals of fees of Professional Persons).

(c)      The Debtors shall only incur DIP Obligations and expend Cash Collateral and other DIP Collateral (as defined herein) proceeds to make payments benefitted by the Carve Out and otherwise in accordance with the specific purposes set forth in the DIP Budget, subject to the permitted variances as set forth in the DIP Documents (collectively referred to herein as the "<u>Budget Covenants</u>").  Notwithstanding anything to the contrary set forth in this Interim Order, the DIP Budget shall not constitute a limit on the amount of any fees payable to any of the DIP Advisors (as defined herein) pursuant to paragraph 30 of this Interim Order.

US-DOCS\147131838.9

(d)    The consent of the Senior DIP Parties to the DIP Budget shall not be construed as consent to the use of any Cash Collateral or DIP Loans after the occurrence of an Event of Default (as defined in the DIP Credit Agreement) or Termination Event, regardless of whether the aggregate funds shown on the DIP Budget have been expended, other than funds necessary to satisfy the Carve Out and solely during the Notice Period (as defined herein), to fund operations in accordance with the DIP Credit Agreement and Budget, as provided in paragraph 26 of this Interim Order.

9.    *Reporting Requirements/Access to Records.*  The Debtors shall provide (a) Latham & Watkins LLP ("Latham"), as counsel to the Prepetition First Lien Parties and the Senior DIP Parties, (b) Venable LLP ("Venable") counsel to the Participating Second Lien Lenders and Junior DIP Lenders, and (c) advisors to the Committee, if one is appointed, with all reporting and other information required to be provided to the DIP Agents or DIP Lenders under the DIP Documents.  In addition to, and without limitation, whatever rights to access the DIP Agents and the DIP Lenders have under the DIP Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents and employees of the DIP Agents and the DIP Lenders to (i) have access to and inspect the Debtors' assets, (ii) examine the Debtors' books and records, and (iii) discuss the Debtors' affairs, finances and condition with the Debtors' officers and financial advisors; provided, however, that nothing in this Interim Order requires the Debtors to disclose any information that is subject of or protected by any of the Debtors' legal privileges.

10.    *DIP Superpriority Claims.*  Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed senior administrative expense claims of the DIP Agents and the DIP Lenders, against each of the Debtors' estates (the "DIP Superpriority

Claims"), without the need to file any proof of claim or request for payment of administrative expenses, with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b) and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including actions to recover property transferred pursuant to section 549 of the Bankruptcy Code and, upon entry of the Final Order, the proceeds of any other Avoidance Actions, subordinate only to the Carve Out and with the priorities set forth in (a) – (d) below:

(a)      The DIP Superpriority Claims arising under the DIP Credit Facility (the "DIP Credit Facility Superpriority Claims") shall be senior in right of payment to the First Lien Adequate Protection Superpriority Claims (as defined herein), the DIP Note Purchase Agreement Superpriority Claims (as defined herein); and the Second Lien Adequate Protection Superpriority Claims (as defined herein).

(b)      The First Lien Adequate Protection Superpriority Claims shall be junior in right of payment to the DIP Credit Facility Superpriority Claims and shall be senior in right of payment to the DIP Note Purchase Agreement Superpriority Claims and the Second Lien Adequate Protection Claims.

22

(c)      The DIP Superpriority Claims arising under the DIP Note Purchase Agreement (the "DIP Note Purchase Agreement Superpriority Claims") shall be junior in right of payment to the DIP Credit Facility Superpriority Claims and First Lien Adequate Protection Superpriority Claims, and shall be senior in right of payment to the Second Lien Adequate Protection Superpriority Claims.

(d)      The Second Lien Adequate Protection Superpriority Claims shall be junior in right of payment to the other DIP Superpriority Claims set forth above.

(e)      Except as set forth herein, or permitted by, this Interim Order, no other superpriority claims shall be granted or allowed in these chapter 11 cases.

11.      *DIP Liens*.    Pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, as security for the DIP Obligations, effective and automatically perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agents or any DIP Lender of, or over, any DIP Collateral (as defined herein), the following security interests and liens are hereby granted by the Debtors to the DIP Agents, for the benefit of the DIP Agents and the DIP Lenders (the "DIP Liens" and, all property identified in clauses (a) – (c) below, collectively, the "DIP Collateral"), which shall be subordinate only to the Carve-Out, to the extent specifically provided for herein, and otherwise subject to the terms of this Interim Order and the DIP Documents, including paragraph 12 hereto.  In addition, the DIP Obligations shall be secured by the assets of the non-Debtor DIP Obligors pursuant to and as provided in the DIP Documents, and the DIP Collateral shall include liens on all assets of the non-Debtor DIP Obligors in accordance with the applicable DIP Documents.

23

(a)    <u>Liens Priming the Prepetition Liens</u>.  Subject to the terms of this Interim Order, pursuant to Bankruptcy Code section 364(d)(1), in respect of the  each of the DIP Facilities, valid, binding, continuing, enforceable, fully perfected first priority senior priming security interests in and upon (the "<u>DIP Priming Liens</u>") all prepetition and postpetition property of the Debtors to the extent set forth in the DIP Documents, including, without limitation, the following (except to the extent constituting Excluded Assets (as defined in the DIP Documents)):   the Prepetition Collateral, Cash Collateral, any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax attributes including credits and net operating losses and offsets and refunds arising therefrom, other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action, and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, proceeds of Avoidance Actions and other causes of action, and proceeds relating thereto, rights under section 549 of the Bankruptcy Code (whether received by judgment, settlement, or otherwise), all other "Collateral" as defined in the Prepetition Credit Documents, and all other "property of the estate" (as defined in section 541 of the

24

Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, in each case wherever located, provided, however, that the DIP Liens on proceeds of Avoidance Actions (which for the avoidance of doubt, excludes Debtors' claims and causes of action under section 549 of the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing) shall be subject to entry of the Final Order.  The DIP Priming Liens shall be subordinate only to the Carve Out and the Permitted Liens (if any) and have the priorities set forth in this paragraph 12 of this Interim Order, and otherwise subject to the terms of this Interim Order and the DIP Documents.

(b)      Liens Junior to Permitted Liens.  Subject to the terms of this Interim Order and to the extent set forth in the DIP Documents, pursuant to Bankruptcy Code section 364(c)(3), with respect to each of the DIP Facilities, valid, binding, continuing, enforceable and fully-perfected security interests in and liens upon ("DIP Subordinated Liens") (i) all prepetition and postpetition property of the Debtors (other than the property described in subparagraph (a) of this paragraph 11, as to which the liens and security interests in favor of the DIP Agents will be as described in such clauses), whether now existing or hereafter acquired, that is subject to (x) valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, if any, that are senior to the liens securing the Prepetition First Lien Obligations and permitted under the Prepetition Credit Documents and/or (y) valid and unavoidable liens in existence immediately prior to the Petition Date, if any, that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) that are senior to the liens securing the Prepetition First Lien Obligations and permitted under the Prepetition Credit Documents, which security interests and liens in favor of

25

the DIP Agents and the DIP Lenders are junior only to such valid, perfected and unavoidable liens (collectively, (x) and (y), the "Permitted Liens").  The DIP Subordinated Liens shall be subordinate only to the Carve Out and the Permitted Liens and have the priorities set forth in this paragraph 12 of this Interim DIP Order, and otherwise subject to the terms of this Interim Order and the DIP Documents.

(c)     Liens on Unencumbered Assets.  Subject to the terms of this Interim Order and to the extent set forth in the DIP Documents, pursuant to Bankruptcy Code section 364(c)(2), in respect of each of the DIP Facilities, a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and lien upon (the "DIP Unencumbered Asset Liens") all Unencumbered Assets.  The DIP Unencumbered Asset Liens will have the priorities set forth in paragraph 12 of this Interim Order.

12.     *Priority of DIP Liens, Adequate Protection Liens, and Liens of Prepetition Secured Parties*.  Subject to the Carve Out, on the basis set forth herein, the DIP Liens and Adequate Protection Liens shall have the following priorities:

(a)     As to Unencumbered Assets, including, subject to entry of the Final Order, proceeds of Avoidance Actions (which for the avoidance of doubt, excludes Debtors' claims and causes of action under section 549 of the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing), whether received by judgment, settlement, or otherwise— **first**, the DIP Liens granted to the Senior DIP Parties (the "DIP Senior Liens"); **second**, the First Lien Adequate Protection Liens (as defined herein) (if any); **third**, the DIP Liens granted to the Junior DIP Parties (the "DIP Junior Liens"); and **fourth**, the Second Lien Adequate Protection Liens.

26

(b)      As to the other DIP Collateral—**first**, any Permitted Liens; **second**, the DIP Senior Liens; **third**, the First Lien Adequate Protection Liens (if any); **fourth**, the Prepetition First Priority Liens (if any); **fifth**, the DIP Junior Liens; **sixth**, the Second Lien Adequate Protection Liens; and, **seventh**, the Prepetition Second Priority Liens.

13.      *Carve Out*.

(a)      <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee for Region 3 (the "<u>U.S. Trustee</u>") under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $75,000.00 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in (iii) below); (iii) to the extent allowed, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to Bankruptcy Code sections 327, 328 or 363 (the "<u>Debtor Professionals</u>") and an official committee of unsecured creditors (the "<u>Creditors' Committee</u>") pursuant to Bankruptcy Code sections 328 or 1103 (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice and, subject to the cumulative amount set forth for such expenses in the DIP Budget for such period and reduced on a per-dollar basis on account of any retainers held by the applicable Professional Person; and (iv) Allowed Professional Fees of Professional Persons, in an aggregate amount not to exceed (a) $250,000 for the Debtor Professionals and (b) $50,000 for the Committee Professionals, incurred after the first business day following delivery of the Carve Out Trigger

27

Notice, to the extent allowed, whether by interim order, procedural order or otherwise, but excluding any "success fee" or "transaction fee" payable to the Debtors' or Creditors' Committee's investment banker or financial advisor (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by the Senior DIP Agent in accordance with the DIP Documents to the Debtors, their lead restructuring counsel, the U.S. Trustee and lead restructuring counsel to the Creditors' Committee (if appointed) providing that a Termination Event (as defined herein) has occurred and is continuing and stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)    _Carve Out Reserves_.  On a weekly basis, the Debtors shall fund into an account maintained by Berger Singerman LLP (the "Funded Reserve Account") for the benefit of Professional Persons, an amount (the "Funded Reserve Amount") equal to the sum of the total weekly fees of Debtor Professionals and Committee Professionals (in the amount set forth in the Approved Budget for each Professional Person) for the current week subject to the Approved Budget.  Funds in the Funded Reserve Account shall be allocated for the benefit of each Professional Person in the amount set forth in the Approved Budget for each Professional Person. For the avoidance of doubt, the DIP Lenders shall have no obligation to fund aggregate fees and expenses in excess of (i) the amounts set forth in the Approved Budget or (ii) the amount of the DIP Facilities. The Debtors shall use funds held in the Funded Reserve Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the local bankruptcy rules of the Bankruptcy Court, and any interim or final orders of the Bankruptcy Court; provided that no Allowed Professional Fees shall be paid from the Funded Reserve Account in excess of the applicable line items in the

28

Approved Budget. Notwithstanding the occurrence of an Event of Default or conditions to borrowing, on the day on which a Carve Out Trigger Notice is delivered (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Facilities and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to deposit in the Funded Reserve Account an amount equal to the then unpaid amounts of (A) the Allowed Professional Fees of Debtor Professionals (subject to the DIP Budget and reduced for retainers held by such Professional Person as set forth in clause (iii) of the definition of Carve Out above), (B) the Allowed Professional Fees of the Committee Professionals (subject to the DIP Budget and reduced for retainers held by such Professional Person as set forth in clause (iii) of the definition of Carve Out above), and (C) the obligations accrued as of the Termination Declaration Date with respect to clauses (i) and (ii) of the definition of Carve Out set forth in paragraph 13(a) (the "Additional Carve Out Obligations").  The Debtors shall deposit such amounts in the Funded Reserve Account in trust to pay such then unpaid Allowed Professional Fees and Additional Carve Out Obligations (the "Pre-Carve Out Trigger Notice Reserve") prior to the use of such reserve to pay any other claims.  On the Termination Declaration Date, after funding the Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to the use of such reserve to pay any other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above in paragraph 13(a) (the "Pre-Carve Out Amounts"), but

US-DOCS\147131838.9

not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until the Pre-Carve Out Amounts are paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to the terms of this Interim Order (including, without limitation, paragraph 14 hereof), to pay any other amounts (if owing) benefitted by the Carve Out and then to the applicable agent to be applied to the Senior DIP Obligations, Junior DIP Obligations, Adequate Protection Obligations, and Prepetition Secured Obligations (collectively, the "Obligations") according to the priorities set forth in paragraphs 10 and 12 of this Interim Order.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to the terms of this Interim Order (including, without limitation, paragraph 14 hereof), to the applicable agent to be applied to the Obligations according to the priorities set forth in paragraphs 10 and 12 of this Interim Order.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 13, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 13, prior to making any payments to any agent for the benefit of the DIP Parties or Prepetition Secured Parties, as applicable.  Funds transferred to the Funded Reserve Account shall not be subject to any liens or claims granted to the DIP Lenders herein or any liens or claims granted as adequate protection, shall not constitute DIP Collateral, and shall not constitute cash collateral or assets of the Debtors' estates; provided, that, notwithstanding anything to the contrary herein or in the DIP Documents, the DIP Collateral shall include the Debtors' reversionary interest in funds held in the Funded

30

Reserve Account and such reversionary interest shall be treated as DIP Collateral and subject to the DIP Liens and the DIP Superpriority Claims.

(c)    <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Agents, DIP Lenders or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agents, the DIP Lenders or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(d)    <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out under the DIP Facilities shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code and applicable law.

14.    *DIP Intercreditor Provisions*

(a)    <u>Standstill</u>.

(i)    Until the Senior Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have been indefeasibly paid in full, in cash, and all commitments under the Senior DIP Documents and Prepetition First Lien Credit Documents have been terminated, and all other "Borrower Obligations" under the DIP Credit

31

Facility and Prepetition First Lien Credit Agreement have been satisfied (the "Discharge of Senior Obligations"), the Junior DIP Parties and Prepetition Second Lien Parties, will not:

1. exercise or seek to exercise any rights or remedies with respect to any DIP Collateral or take any action against any DIP Obligor (including taking any Enforcement Action (as defined below) with respect to DIP Collateral); *provided* that (1) the Junior DIP Agent may take Enforcement Actions with respect to the DIP Collateral after the passage of a period of one hundred and fifty (150) days (the "Standstill Period") after the earlier of (x) the DIP Term Loan Maturity Date (as defined in the DIP Credit Agreement) and (y) the date on which the Junior DIP Agent provides written notice to the Senior DIP Agent stating that the Junior DIP Agent has declared all of the Junior DIP Obligations to be immediately due and payable (such earlier date, the "Standstill Commencement Date") and (2) in no event shall the Junior DIP Parties or Prepetition Second Lien Parties exercise any rights or remedies with respect to the DIP Collateral on account of the Junior DIP Obligations or Prepetition Second Lien Obligations (including Second Lien Adequate Protection Liens or Second Lien Adequate Protection Superpriority Claims) if, notwithstanding the expiration of the Standstill Period, the Senior DIP Agent or any other Senior DIP Party shall have commenced prior to the expiration of the Standstill Period and be diligently pursuing in good faith any Enforcement Action with respect to all or any material portion of the DIP Collateral;

2. on and after the Standstill Commencement Date (but prior to the termination of the Standstill Period), contest, protest, or object to any Enforcement Action by the Senior DIP Agent or any other Senior DIP Party, or purport to direct the Senior DIP Agent or any other Senior DIP Party to take any Enforcement Actions or take any other action under the DIP Documents, in each case, with respect to the DIP Collateral; and

3. prior to the termination of the Standstill Period, object to the forbearance by the Senior DIP Agent or any other Senior DIP Party from taking any Enforcement Action with respect to the DIP Collateral.

(ii) Notwithstanding the foregoing, the Junior DIP Parties and Prepetition Second Lien Parties may:

1. take Enforcement Actions with respect to the DIP Collateral after the termination of the Standstill Period to the extent permitted by subparagraph 14(a)(i)(1) above;

2. take any action not adverse to the Senior DIP Parties and Prepetition First Lien Parties in order to preserve or protect their rights in the DIP Collateral;

US-DOCS\147131838.9

3.    bid for or purchase DIP Collateral in cash or, subject to paragraph 35 of this Interim Order, by credit bid, at any public foreclosure or sale, on such DIP Collateral in accordance with the terms of the DIP Documents and this Interim Order or join (but not exercise any control with respect to) any judicial foreclosure proceeding or other judicial lien enforcement proceeding with respect to the DIP Collateral initiated by the Senior DIP Agent to the extent that any such action could not reasonably be expected to restrain, hinder, limit, delay for any material period or otherwise interfere with the Enforcement Action by Senior DIP Agent;

4.    file a claim, proof of claim or statement of interest, credit bid their debt in accordance with this Interim Order and make any arguments, pleadings and motions that do not violate the terms of this Interim Order and that are not inconsistent with this Interim Order;

5.    take any action (not adverse to the priority status of the liens on the DIP Collateral securing the Senior DIP Obligations or Prepetition First Lien Obligations or the rights of Senior DIP Agent or Prepetition First Lien Agent) in order to create, prove, perfect, file, protect or preserve, its lien in and to the DIP Collateral;

6.    file any necessary responsive or defensive pleadings or appeal in opposition to any motion, claim, adversary proceeding, or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of Junior DIP Parties or Prepetition Second Lien Parties, including any claims secured by the DIP Collateral, if any; or

7.    vote on any chapter 11 plan, make other filings and make any arguments, pleadings and motions (including in support of or opposition to, as applicable, the confirmation or approval of any chapter 11 plan) that are, in each case, consistent with and not otherwise prohibited by, the terms of this Interim Order, with respect to the Junior DIP Obligations and Prepetition Second Lien Obligations, as applicable, and the DIP Collateral, provided, that no such filings, arguments, pleadings, motions or chapter 11 plans shall propose to treat any claims or security interests of the DIP Parties in a manner inconsistent with this Interim Order or the Final Order.

(iii)    On and after the Standstill Commencement Date, until the Discharge of Senior Obligations has occurred, but subject to the terms of this Interim Order, the Senior DIP Agent shall have the exclusive right to take Enforcement Actions with respect to the DIP Collateral.  Subject to the terms of this Interim Order, in connection with any such Enforcement Action, the Senior DIP Agent or any other DIP Party may enforce the provisions of the DIP

33

Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion.

(iv)    For purposes of this paragraph 14, "Enforcement Action" means, with respect to the DIP Obligations or the Prepetition Secured Obligations, the exercise of any rights and remedies with respect to any DIP Collateral securing such obligations or the commencement or prosecution of enforcement of any of the rights and remedies under, as applicable, the DIP Documents, the Prepetition First Lien Credit Documents, or applicable law, including, without limitation, the exercise of any rights of set-off or recoupment, and the exercise of any rights or remedies of a secured creditor under the Uniform Commercial Code (the "UCC") of any applicable jurisdiction or under this Interim Order.

(v)    So long as the Discharge of Senior Obligations has not occurred, all DIP Collateral or proceeds thereof received in connection with the sale or other disposition of, or collection or realization on, such DIP Collateral upon the exercise of remedies by the Senior DIP Agent, the Senior DIP Parties, or the Prepetition First Lien Secured Parties and all other cash payments or distributions made by the Debtors shall be applied first by the Senior DIP Agent to the Senior Obligations and then, upon the Discharge of Senior Obligations, by the Junior DIP Agent, according to the priorities set forth in paragraphs 10 and 12, after giving effect to the Carve Out. Upon the Discharge of the Senior Obligations, the Senior DIP Agent shall promptly deliver to the Junior DIP Agent any remaining DIP Collateral and remaining proceeds of DIP Collateral held by it in the same form as received, with any necessary endorsements (as determined by the Junior DIP Agent) to be applied by the Junior DIP Agent to the DIP Junior Term Loan Obligations and the Second Lien Adequate Protection Obligations in accordance with this Interim Order.

34

(b)    <u>Bailee for Perfection</u>.  Each of the DIP Agents, the Prepetition First Lien Agent and the Prepetition Second Lien Agent agree to hold or control that part of the DIP Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon under the UCC, or other applicable law as bailee and as a non-fiduciary agent for the Junior DIP Agent, the Senior DIP Agent, the Prepetition First Lien Agent and the Prepetition Second Lien Agent, as applicable (such bailment and agency being intended, among other things, to satisfy the requirements of Sections 8-301(a)(2), 9-313(c), 9-104, 9-105, 9-106, and 9-107 of the UCC), solely for the purpose of perfecting the security interest granted under any of the DIP Documents, as applicable, and the Senior DIP Agent, the Junior DIP Agent, the Prepetition First Lien Agents and the Prepetition Second Lien Agent hereby appoint each other agent to act as its non-fiduciary agent for such purposes and each such agent accepts such appointment.  Subject to entry of the Final Order, notwithstanding the roll-up of the Prepetition Secured Obligations, and to the maximum extent permitted by applicable law, all Prepetition Credit Documents that provide collateral support for the Prepetition Secured Obligations shall be deemed to provide collateral support for the DIP Obligations and such Prepetition Credit Documents shall be deemed modified or amended as may be required to effect the foregoing.

(c)    Notwithstanding anything to the contrary set forth in this Interim Order, prior to the Discharge of Senior Obligations, each Debtor and other Obligor will not make, and the Junior DIP Lenders and Prepetition Second Lien Lenders will not accept, any cash payment of principal or interest in respect of the Junior DIP Obligations or Prepetition Second Lien Obligations.  The foregoing is intended to constitute a "subordination agreement" within the meaning of Bankruptcy Code section 510(a)).  Any payment received by any Junior DIP Party in violation of this paragraph

14(c) shall be segregated and forthwith paid over to the Senior DIP Agent for application to the Senior DIP Obligations.

15. *Limitation on Charging Expenses Against Collateral.*  Subject to entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral, the DIP Agents, the DIP Lenders or the Prepetition Secured Parties pursuant to Bankruptcy Code sections 506(c) or 105(a), or any similar principle of law or equity, without the prior written consent of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agents, the DIP Lenders or the Prepetition Secured Parties.

16. *No Marshaling/Application of Proceeds.*  Subject to entry of the Final Order, the DIP Agents and the Prepetition Agents shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition Collateral, as applicable, in accordance with the provisions of the Interim Order or Final Order, as applicable, the DIP Documents, the Prepetition Intercreditor Agreement and the Prepetition Credit Documents, as applicable, and in no event shall the DIP Agents, the DIP Lenders or any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral.

17. *Equities of the Case.*  Subject to entry of the Final Order, (i) the Prepetition Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b) and (ii) the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to

such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral.

18.    *Use of Cash Collateral*.  The Debtors are hereby authorized to use all Cash Collateral solely in accordance with this Interim Order, the DIP Documents and the DIP Budget including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the date of the Final Hearing.  Except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral absent further order of the Court.  Notwithstanding anything to the contrary in this Interim Order, under no circumstances shall the DIP Budget constitute a limit on the fees and expenses incurred by the DIP Lenders, the DIP Agents or the DIP Professionals (as defined herein).

19.    *Adequate Protection for the Prepetition First Lien Parties*.  Subject only to the Carve Out and the terms of this Interim Order, pursuant to Bankruptcy Code sections 361, 363(e), and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition diminution in value of such interests, resulting from the imposition of the DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' sale, lease or use of the Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay and/or any other reason for which adequate protection may be granted under the Bankruptcy Code (all such diminution,  "Diminution in Value"), the Prepetition First Lien Agents, for the benefit of themselves and the Prepetition First Lien Lenders, are hereby granted the following (collectively, the "First Lien Adequate Protection Obligations"):

US-DOCS\147131838.9

(a)      First Lien Adequate Protection Liens.  As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in, and liens on, as of the date of this Interim Order (the "First Lien Adequate Protection Liens"), without the necessity of the execution by the Debtors or non-Debtor Obligors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, all DIP Collateral.  Subject to the terms of this Interim Order, the First Lien Adequate Protection Liens shall have the priorities set forth in paragraph 12 of this Interim Order.

(b)      First Lien Adequate Protection Superpriority Claim.  As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), an allowed administrative expense claim in the Chapter 11 Cases to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such Chapter 11 Cases, except the Carve Out and subject to the priorities set forth herein (the "First Lien Adequate Protection Superpriority Claims").  The First Lien Adequate Protection Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including actions to recover property transferred pursuant to section 549 of the Bankruptcy Code, but excluding Avoidance Actions, but including, subject to entry of the Final Order, the proceeds of Avoidance Actions).  The First Lien Adequate Protection Superpriority Claims shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry

of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114, subject to the priorities set forth in paragraph 10 of this Interim Order.

(c)    Fees and Expenses.  As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, reasonable and documented fees and expenses (the "First Lien Adequate Protection Fees"), whether incurred before or after the Petition Date, of the Prepetition First Lien Agents and the Prepetition First Lien Lenders, including, without limitation, the reasonable and documented fees and expenses of Latham and local counsel in the Southern District of Florida.  Statements of any such fees and expenses incurred after the Petition Date shall be provided by the applicable professional to counsel to the Debtors, the U.S. Trustee, the Junior DIP Agent and the Creditors' Committee (if appointed).  The invoices for such fees and expenses shall not be required to comply with any particular format, may be in summary form only and may include redactions necessary to maintain privilege.  Recipients of the invoices shall have 10 days after receipt to notify counsel of any objections to the reasonableness of the fees and expenses incurred.  If no objection is raised with counsel on or before the expiration of the ten-day review period, such invoice shall be paid without further order of the Court and shall not be subject to any further review, challenge or disgorgement.  If any objection is raised as to reasonableness of fees or expenses, the undisputed amounts shall be paid immediately and any disputed amounts shall be subject to further order of this Court.  For the avoidance of doubt, the provision of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine.  Notwithstanding anything to the contrary in this Interim Order, it shall be a condition of the Interim DIP Draw that prior to the Interim DIP Draw, the Borrower shall have paid any accrued and outstanding First Lien Adequate Protection Fees, notwithstanding any applicable review period for such First Lien Adequate Protection Fees.

US-DOCS\147131838.9

(d)    <u>First Lien Accrued Adequate Protection Payments</u>.    To the extent that any Prepetition First Lien Obligations remain outstanding and to the extent not rolled up into the DIP Credit Facility, then as further adequate protection, the Prepetition First Lien Agent, on behalf of the Prepetition First Lien Lenders, shall receive, upon entry of this Interim Order, monthly adequate protection payments (the "<u>First Lien Accrued Adequate Protection Payments</u>") payable in cash, as and when due under the applicable Prepetition First Lien Credit Documents, equal to the interest at the contractual default rate that would otherwise be owed to the Prepetition First Lien Lenders under the Prepetition First Lien Credit Agreement during such monthly period in respect of those remaining Prepetition First Lien Obligations, until such time as the full Prepetition First Lien Obligations Amount is paid in full, in cash.

(e)    <u>Information Rights</u>.    The Debtors shall promptly provide the Prepetition First Lien Agent with all required financial reporting and other periodic reporting that is required to be provided to the DIP Agents or the DIP Lenders under the DIP Documents.

20.    *Adequate Protection for the Prepetition Second Lien Lenders*.    Subject to the Carve Out and the terms of this Interim Order, pursuant to Bankruptcy Code sections 361, 363(e) and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition Diminution in Value of such interests, resulting from the imposition of the DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' sale, lease or use of the Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay and/or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition Second Lien Lenders are hereby granted the following obligations (collectively, the

"Second Lien Adequate Protection Obligations" and, together with the First Lien Adequate Protection Obligations, the "Adequate Protection Obligations"):

(a)        Second Lien Adequate Protection Liens.  As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable and effective and automatically perfected postpetition security interests in, and liens on, as of the date of this Interim Order (the "Second Lien Adequate Protection Liens" and, together with the First Lien Adequate Protection Liens, the "Adequate Protection Liens"), without the necessity of the execution by the Debtors or non-Debtor Obligors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, all DIP Collateral.  The Second Lien Adequate Protection Liens shall have the priorities set forth in paragraph 12 of this Interim Order.

(b)        Second Lien Adequate Protection Superpriority Claim.  As further adequate protection, to the extent provided by Bankruptcy Code sections 503(b) and 507(b), an allowed administrative expense claim in the Chapter 11 Cases ahead of and senior to any and all other administrative expense claims in such Chapter 11 Cases to the extent of any postpetition Diminution in Value, except the Carve Out, and subject to the priorities set forth herein (the "Second Lien Adequate Protection Superpriority Claim" and, together with the First Lien Adequate Protection Superpriority Claim, the "Adequate Protection Superpriority Claims").  The Second Lien Adequate Protection Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including actions to recover property transferred pursuant to section 549 of the Bankruptcy Code excluding Avoidance Actions, but including, subject to entry of the Final Order, the proceeds of Avoidance Actions).  The Second Lien Adequate Protection Superpriority Claims shall have priority over all

administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114, subject to the priorities set forth in paragraph 10 of this Interim Order.

(c)    <u>Fees and Expenses</u>.  As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, reasonable and documented fees and expenses (the "<u>Second Lien Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, of the Prepetition Second Lien Agent, the Participating Second Lien Lenders and counsel to the Prepetition Second Lien Agent and Participating Second Lien Lenders, including, without limitation, the reasonable and documented fees and expenses of Maslon LLP and local counsel in the Southern District of Florida as counsel to the Prepetition Second Lien Agent and Venable as counsel to the Participating Second Lien Lenders.  Statements of any such fees and expenses incurred subsequent to the Petition Date shall be provided by the applicable professional to counsel to the Debtors, the U.S. Trustee, the Senior DIP Agent, the Junior DIP Agent and any Creditors' Committee (if appointed).  The invoices for such fees and expenses shall not be required to comply with any particular format, may be in summary form only and may include redactions necessary to maintain privilege.  Recipients of the invoices shall have 10 days after receipt to notify counsel of any objections to the reasonableness of the fees and expenses incurred.  If no objection is raised with counsel on or before the expiration of the ten-day review period, such invoice shall be paid without further order of the Court and shall not be subject to any further review, challenge or disgorgement.  If any objection is raised as to reasonableness of fees or expenses, the undisputed amounts shall be paid immediately and any disputed amounts shall be subject to further order of

42

this Court.  For the avoidance doubt, the provision of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine.  Notwithstanding anything to the contrary in this Interim Order, it shall be a condition of the Interim DIP Draw that prior to the Interim DIP Draw, the Borrower shall have paid any accrued and outstanding Second Lien Adequate Protection Fees, notwithstanding any applicable review period for such Second Lien Adequate Protection Fees.

(d)    _Information Rights_.  The Debtors shall promptly provide the Prepetition Second Lien Agent with all required financial reporting and other periodic reporting that is required to be provided to the DIP Agents or the DIP Lenders under the DIP Documents, including this Interim Order.

21.    _Section 507(b) Reservation_.  Subject in all respects to the terms of the Prepetition Intercreditor Agreement, nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties, that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any diminution in value of their respective interests in the Prepetition Collateral (including the Cash Collateral); provided, however, that any such additional section 507(b) claims shall be subject to the same relative priority as such party's Adequate Protection Obligations, as provided in this Interim Order.

22.    _Restrictions on Disposition of Material Assets Outside the Ordinary Course of Business_.  Except as expressly permitted under the DIP Documents, and with respect to a sale of

43

the Debtors' assets in accordance with the Milestones (as defined herein) and on terms and conditions reasonably acceptable to the DIP Agents, the Debtors shall not use, sell or lease any material assets outside the ordinary course of business, or seek authority of this Court to the extent required by Bankruptcy Code section 363, without obtaining the prior written consent of the DIP Agents, prior to the date on which the Debtors seek the Court's authority for such use, sale or lease.  Subject to the Carve Out and the Permitted Liens (if any), in the event of any such sale, lease, transfer, license or other disposition of property of the Debtors that constitutes DIP Collateral outside the ordinary course of business (to the extent permitted by the DIP Documents and this Interim Order), subject to the terms of the DIP Documents and this Interim Order (including, without limitation, paragraph 14 hereof), the Debtors are authorized and shall promptly pay, without further notice or order of this Court, such amount (if any) of net cash proceeds resulting therefrom no later than the business day following receipt of such proceeds, to the Senior DIP Agent to be applied according to the priorities set forth in DIP Documents.  Subject to the Carve Out and the Permitted Liens (if any), in the event of any casualty, condemnation or similar event with respect to property that constitutes DIP Collateral, subject to the terms of the DIP Documents and this Interim Order (including, without limitation, paragraph 14 hereof), the Debtors are authorized and shall promptly pay, without further notice or order of this Court, the required amount of any insurance proceeds, condemnation award or similar payment (excluding any amounts on account of any D&O policies) no later than the second business day following receipt of payment by the Debtors, to the Senior DIP Agent to be applied according to the priorities set forth in paragraphs 10 and 12 of this Interim Order, unless (in accordance with applicable DIP Documents and this Interim Order) the DIP Agents consent, in writing, to the funds being reinvested by the Debtors.

44

23.     *Insurance.* At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date. Upon entry of this Interim Order, the DIP Agents shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and lender's loss payees on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

24.     *Reservation of Rights of the DIP Agents, DIP Lenders and Prepetition Secured Parties.*  Except as otherwise expressly set forth in this Interim Order (including, without limitation, paragraph 14 hereof), the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, subject in all respects to the terms of the Prepetition Intercreditor Agreement, as applicable: (a) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right of the Prepetition First Lien Parties, but not the Prepetition Second Lien Parties, to seek additional adequate protection; (b) any of the rights of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties to (i) request modification of the automatic stay of Bankruptcy Code section 362, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7 or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Chapter 11 Cases, or (iii) seek to propose, subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan or plans; or (c) any other rights, claims or privileges (whether legal, equitable or otherwise) of any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties.  The delay in or failure of the DIP Agents, the DIP Lenders and/or

45

the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Agents', the DIP Lenders' or the Prepetition Second Lien Parties' rights and remedies.

25.    *Termination Event*.  The occurrence of any of the following shall constitute a "Termination Event": (a) the occurrence of an Event of Default (as defined in the DIP Credit Facility), including the failure by the Debtors to comply with any of the milestones set forth at Exhibit 2 hereto including the Permit Reporting Covenant and Permit Continuance Covenant specified therein (the "Milestones"), to the extent not waived or subject to a forbearance or similar agreement with the applicable lenders; (b) the Debtors' failure to comply in any material respect with any provision of this Interim Order unless waived by the applicable lenders; or (c) the occurrence of the Maturity Date (as defined in the DIP Credit Agreement).

26.    *Remedies Upon a Termination Event.*  The Debtors shall immediately provide notice to counsel to the DIP Agents, the DIP Lenders, the Prepetition First Lien Agent, and the Prepetition Second Lien Agent (with a copy to counsel to the Creditors' Committee (if appointed)), of the occurrence of any Termination Event, at which time (i.e., the time of the occurrence of the Termination Event) the Debtors' ability to use Cash Collateral hereunder shall terminate (subject to the proviso at the end of this paragraph 26), the DIP Obligations shall become due and payable and any commitments under the DIP Facilities shall terminate.  Upon the occurrence of a Termination Event and following the giving of not less than five business days' advance written notice (which may be by email) (the "Notice Period") by the Senior DIP Agent, or if the Discharge of Senior Obligations has occurred, by the Junior DIP Agent (the "Enforcement Notice"), to counsel to the Debtors, applicable DIP Agents and DIP Lenders, applicable Prepetition Agents, the U.S. Trustee and counsel to the Creditors' Committee (if

46

appointed), (a) subject to the terms of this Interim Order (including, without limitation, paragraph 14 hereof), and the Prepetition Intercreditor Agreement, the Senior DIP Parties and the Prepetition First Lien Parties may exercise any rights and remedies against the DIP Collateral available to them under this Interim Order, the DIP Documents, the Prepetition First Lien Credit Documents and applicable non-bankruptcy law, including but not limited to terminating all commitments to extend credit under the DIP Facilities, in each case subject to the Carve Out and Permitted Liens (if any) and (b) subject to the Prepetition Intercreditor Agreement and the terms of this Interim Order, the DIP Junior Term Loan Lenders and Prepetition Second Lien Parties may terminate all commitments to extend credit under the DIP Facilities and exercise any rights and remedies to satisfy the Prepetition Second Lien Obligations, the Second Lien Adequate Protection Liens, the Second Lien Adequate Protection Superpriority Claims and any other Second Lien Adequate Protection Obligations, in each case subject to priorities set forth in paragraphs 10 and 12 of this Interim Order.  The automatic stay pursuant to Bankruptcy Code section 362 shall be terminated automatically with respect to the DIP Parties and the Prepetition Secured Parties at the end of the Notice Period, without further notice or order of the Court, unless the DIP Agents and the Prepetition First Lien Agent, or if the Discharge of Senior Obligations has occurred, the Junior DIP Agent, elect otherwise in a written notice to the Debtors, which may be by email.  Upon termination of the automatic stay, subject to the terms of this Interim Order, the DIP Documents, and the Prepetition Intercreditor Agreement, the DIP Parties and the Prepetition Secured Parties shall be permitted to exercise all rights and remedies set forth herein and in the DIP Documents, as applicable, and as otherwise available at law against the DIP Collateral, without any further order of or application or motion to the Court, and without restriction or restraint imposed by any stay under Bankruptcy Code sections 362 or 105, or otherwise, against the enforcement of the

US-DOCS\147131838.9

liens and security interests in the DIP Collateral or the Prepetition Collateral, or the pursuit of any other rights and remedies granted to such parties pursuant to the DIP Documents, the Prepetition First Lien Credit Documents or the Prepetition Second Lien Credit Documents; provided that during the Notice Period the Debtors may use the proceeds of the DIP Facilities (to the extent drawn prior to the occurrence of a Termination Event or in accordance with paragraph 13 of this Interim Order) or Cash Collateral only to fund (i) expenses critically necessary to preserve the value of the Debtors' business and the DIP Collateral, including, without limitation, payroll obligations, in all cases in accordance with the DIP Credit Agreement and the DIP Budget and (ii) the Carve Out Reserves; provided further that during the Notice Period, the Debtors, the DIP Agents, the DIP Lenders and the Prepetition Secured Parties consent to a hearing on an expedited basis to consider whether a Termination Event has occurred; provided further, that if a hearing to consider the foregoing is requested to be heard before the end of the Notice Period but is scheduled for a later date by the Court, the Notice Period shall be automatically extended to the date of such hearing, but in no event later than five business days after delivery of the Enforcement Notice; provided further that any allowed fees and expenses incurred by the Debtors or the Creditors' Committee (if appointed) during the Notice Period shall permanently reduce the Post-Carve Out Trigger Notice Cap.

27.    *No Waiver for Failure to Seek Relief*.  The failure or delay of the DIP Agents, the DIP Lenders or any of the Prepetition Secured Parties to exercise their respective rights and remedies under this Interim Order, the DIP Documents, the Prepetition Credit Documents or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise.

48

28.    *Perfection of the DIP Liens and Adequate Protection Liens.*

(a)    Subject to the limitations in paragraph 29(a) of this Interim Order, the DIP Agents and the Prepetition Agents are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder. Whether or not the DIP Agents or the Prepetition Agents shall, in their sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, such liens and security interests shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Interim Order), at the time and on the date of entry of this Interim Order.  Upon the request of the DIP Agents and the Prepetition Agents, each of the Prepetition First Lien Lenders, the Prepetition Second Lien Lenders and the Debtors, without any further consent of any party, is authorized to take, execute, deliver and file such instruments (in the case of the Prepetition Secured Lenders, without representation or warranty of any kind) to enable the DIP Agents and the Prepetition Agents to further validate, perfect, preserve and enforce the DIP Liens and the applicable Adequate Protection Liens, respectively.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP Agents or the applicable Prepetition Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing

49

and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)      Effective upon entry of the Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Thereupon, any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment, and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or this Interim Order.

29.      *Preservation of Rights Granted Under this Interim Order*.

(a)      All of the protections and rights of the Junior DIP Agent and the Prepetition Second Lien Agent with respect to the Junior DIP Lenders and the Prepetition Second Lien Lenders under their respective governing documents shall remain in full force and effect.

(b)      Except as set forth in paragraph 14 of this Interim Order, unless and until the DIP Obligations, Prepetition First Lien Obligations and First Lien Adequate Protection Obligations are indefeasibly paid in full, in cash or in kind, as applicable, and all commitments to extend credit under the DIP Facilities are terminated, the Prepetition Second Lien Lenders shall, in each case solely to the extent provided for in the Prepetition Credit Documents, the Prepetition Intercreditor Agreement and applicable law: (i) take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Second Lien Credit Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral;

50

and (ii) be restricted from exercising any rights and remedies or taking any other actions in respect of the DIP Collateral to the extent provided by the this Interim Order, the DIP Documents, the Prepetition Intercreditor Agreement and applicable law.

(c)    Subject to the Carve Out and the Permitted Liens (if any), other than as set forth in this Interim Order, the DIP Priming Liens shall not be made subject to and/or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and the DIP Priming Liens shall not be subject or junior to and/or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(d)    Subject to the Carve Out and the Permitted Liens (if any) and the DIP Priming Liens, other than as set forth in this Interim Order, the First Lien Adequate Protection Liens and the Prepetition First Priority Liens shall not be made subject to and/or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and the First Lien Adequate Protection Liens and the Prepetition First Priority Liens shall not be subject or junior to and/or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(e)    Subject to the Carve Out, the Permitted Liens (if any), the DIP Liens, the First Lien Adequate Protection Liens and the Prepetition First Priority Liens, other than as set forth in this Interim Order, the Second Lien Adequate Protection Liens shall not be made subject to and/or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and the Second Lien Adequate Protection Liens shall not be subject to and/or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

51

(f)        In the event this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, any liens or claims granted to the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein, and the Prepetition Secured Parties shall be entitled to the protections afforded in Bankruptcy Code section 363(m) with respect to all uses of the Prepetition Collateral (including the Cash Collateral) and all Adequate Protection Obligations.

(g)        Subject to the Carve Out, unless and until all DIP Obligations, Prepetition First Lien Obligations, Prepetition Second Lien Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash or in kind, as applicable, and all commitments to extend credit under the DIP Facilities are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (i) except as permitted under the DIP Documents and with the prior written consent of the Required DIP Lenders, (x) any modification, stay, vacatur or amendment of this Interim Order, (y) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a) or 507(b)) in any of the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, the Prepetition First Lien Obligations, and the Prepetition Second Lien Obligations (or the liens and security interests securing such claims and obligations), or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents, any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the

52

Adequate Protection Liens, the Prepetition First Priority Liens or the Prepetition Second Priority Liens, as the case may be; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to Bankruptcy Code section 546(h) (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Chapter 11 Cases; (vi) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases.

(h)     Notwithstanding any order dismissing any of the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and any other administrative claims granted pursuant to this Interim Order, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order and the DIP Documents until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash or in kind, as applicable, and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims and the other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on all parties in interest; and (y) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(i)     Except as otherwise ordered by the Court and as expressly provided in this Interim Order, and the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and all other rights and remedies

US-DOCS\147131838.9

of the DIP Agents, the DIP Lenders, the Prepetition Agents and the Prepetition Secured Lenders granted by the provisions of this Interim Order and the DIP Documents shall survive, shall maintain their priority as provided in this Interim Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to Bankruptcy Code section 363(b) or (iii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered or in any superseding chapter 7 cases under the Bankruptcy Code.

30.    *Expenses and Indemnification.*

(a)    All (i) reasonable and documented out-of-pocket fees and expenses incurred by professionals or consultants retained by the DIP Agents and the DIP Lenders, including (a) Latham and local counsel in the Southern District of Florida, as counsel to the Senior DIP Parties and the Prepetition First Lien Parties, (b) Covington and Burling LLP and local counsel in the Southern District of Florida, as counsel to the Junior DIP Agent; and (c) Venable LLP as counsel to the Junior DIP Lenders and the Participating Second Lien Lenders, (collectively, the "DIP Professionals"), incurred in connection with the Chapter 11 Cases (in any capacity) and the DIP Facilities, whether or not the DIP Facilities are successfully consummated, and (ii) reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other

54

charges of DIP Professionals) of the DIP Agents and the DIP Lenders, for enforcement costs and documentary taxes associated with the DIP Facilities and the transactions contemplated thereby, are to be paid by the Debtors in accordance with the procedures described in paragraphs 19(c) and 20(c) hereof.  All fees and expenses described above shall be payable by the Debtors (whether accrued or incurred prior to, on or after the Petition Date) within ten calendar days after the delivery of invoices (which invoices shall not be required to comply with any particular format and may be in summary form only and may be in redacted form to protect privileged and confidential information) to the Debtors, the U.S. Trustee and the Creditors' Committee (if appointed), without the necessity of filing motions or fee applications and such fees and expenses shall not be subject to any further review, challenge or disgorgement following the expiration of the review and objection process described in paragraphs 19(c) and 20(c) hereof.

(b)    As set forth in the DIP Documents, the Debtors will, jointly and severally, indemnify the DIP Agents, the DIP Lenders and their respective affiliates, successors and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons and members of each of the foregoing (each an "Indemnified Person"), and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including but not limited to reasonable and documented legal fees and expenses) and liabilities arising out of or relating to the execution or delivery of the DIP Credit Agreement, DIP Note Purchase Agreement and other DIP Documents, transactions contemplated hereby and thereby and any actual or proposed use of the proceeds of any loans made under the DIP Facilities in accordance with the terms of the DIP Credit Agreement; provided that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the actual fraud, gross negligence or willful misconduct of

such person (or their related persons). No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in an final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's actual fraud, gross negligence or willful misconduct, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages.

(c)     Notwithstanding anything to the contrary in this Interim Order, it shall be a condition of the Interim DIP Draw that prior to the Interim DIP Draw, the Borrower shall have paid any accrued and outstanding fees and expenses of the DIP Professionals notwithstanding any applicable review period for the invoices of such DIP Professionals set forth in this Interim Order.

31.     *Limitation on Use of DIP Facilities Proceeds, DIP Collateral and Cash Collateral*

(a)     Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facilities, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve Out may be used: (a) to investigate (except as expressly provided herein), initiate, prosecute, join or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense or other litigation of any type (i) against any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties (in each case, in their capacities as such) or seeking relief that would impair the rights and remedies of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties (in each case, in their capacities as such) under the DIP Documents, this Interim Order or the Prepetition Credit Documents to the extent permitted or provided hereunder, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Creditors'

US-DOCS\147131838.9

Committee (if appointed) in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief that would impair the ability of any of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral, as provided for herein, or seeking affirmative relief against any of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties related to the DIP Obligations, or the Prepetition Secured Obligations, (ii) seeking to invalidate, set aside, avoid, recharacterize or subordinate, in whole or in part, the DIP Obligations, the DIP Superpriority Claims, or the DIP Agents' and the DIP Lenders' liens or security interests in the DIP Collateral or the Prepetition Collateral, or the Prepetition Secured Obligations, or the Prepetition Secured Parties' liens or security interests in the Prepetition Collateral or (iii) for monetary, injunctive or other affirmative relief against the DIP Agents, the DIP Lenders or the Prepetition Secured Parties (in each case, in their capacities as such), or their respective liens on or security interests in the DIP Collateral or the Prepetition Collateral or the DIP Superpriority Claims, that would impair the ability of any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties to assert or enforce any lien, claim, right or security interest or to realize or recover on the DIP Obligations or the Prepetition Secured Obligations to the extent permitted or provided hereunder; (b) for objecting to or challenging in any way the legality, validity, priority, perfection or enforceability of the claims, liens or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations, or by or on behalf of the DIP Agents and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions (as defined

herein) related to the DIP Liens, the DIP Superpriority Claims, the DIP Obligations, the Prepetition Liens or the Prepetition Secured Obligations; (d) to prevent, hinder, or otherwise delay the DIP Agent's, DIP Secured Parties', or Prepetition Secured Parties' assertion, enforcement, or realization on the DIP Collateral or Prepetition Collateral in accordance with this Interim Order, the DIP Documents, and/or the Prepetition Documents once an Event of Default has occurred and is continuing, except as expressly permitted by paragraph 26 hereof; (e) to pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of the Court (which may, for the avoidance of doubt, be this order or the Final Order, and (ii) permitted by the DIP Documents; (e) to seek to modify the rights granted to the DIP Agent, any of the other DIP Secured Parties or any of the Prepetition Secured Parties under the DIP Documents or the Prepetition Documents; or (f) for prosecuting an objection to, contesting in any manner or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of: (x) any of the DIP Liens, the DIP Superpriority Claims, or any other rights or interests of the DIP Agents or the DIP Lenders related to the DIP Obligations or the DIP Liens, or (y) any of the Prepetition Liens, Prepetition Secured Obligations or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Second Lien Obligations; provided that no more than $75,000.00 of the proceeds of the DIP Facilities, the DIP Collateral or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Creditors' Committee, if appointed, to investigate the foregoing matters with respect to the

US-DOCS\147131838.9

Prepetition Liens or the Prepetition Secured Obligations within the Challenge Period (as defined herein) (the "Challenge Budget").

32.    *Effect of Stipulations on Third Parties*.

(a)    The Debtors' acknowledgments, stipulations, admissions, waivers and releases set forth in this Interim Order shall be binding on the Debtors, their respective representatives, successors and assigns upon entry of this Interim Order.  The acknowledgments, stipulations, admissions, waivers and releases contained in this Interim Order shall also be binding upon the Debtors' estates and all other parties in interest, including the Creditors' Committee (if appointed), or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), unless (a) such party has obtained requisite standing and has duly filed an adversary proceeding or contested matter (1) challenging the validity, perfection, priority, extent or enforceability of the Prepetition Liens, or the Prepetition Secured Obligations (including, without limitation, the Prepetition Secured Obligations converted into DIP Obligations pursuant to this Interim Order and pursuant to the Final Order) or (2) otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Collateral, the Prepetition Liens or the Prepetition Secured Obligations by no later than  the date that is the earlier of (i) 75 days after the entry of this Interim Order, or, (ii) solely with respect to any Claims and Defenses asserted by a Creditors' Committee, 60 days after formation of the Creditors' Committee (the "Challenge Period"); provided that in the event that, prior to the expiration of the Challenge Period, (x) these Chapter 11 Cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these Chapter 11 Cases, then, in each such case, the Challenge Period shall be extended solely with respect to any Trustee, to the date that is

59

sixty (60) days after the occurrence of either of the events described in the foregoing clauses (x) and (y); and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding or contested matter.  If no such adversary proceeding or contested matter is filed prior to the expiration of the Challenge Period, without further order of this Court: (x) the Prepetition Secured Obligations shall constitute allowed claims, not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in these Chapter 11 Cases and any subsequent chapter 7 cases, if any; (y) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority specified in paragraphs 4(b) and 4(d), not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment or recovery; and (z) the Prepetition Secured Obligations, the Prepetition Liens on the Prepetition Collateral and the Prepetition Secured Parties (solely in their capacities as such) shall not be subject to any other or further challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period).  If any such adversary proceeding is timely filed prior to the expiration of the Challenge Period, (a) the stipulations and admissions contained in this Interim Order shall nonetheless remain binding and preclusive on the Creditors' Committee

60

(if appointed) and any other party in these Chapter 11 Cases, including any Trustee, except as to any stipulations or admissions that are challenged in such adversary proceeding or contested matter and (b) any Claims and Defenses not brought in such adversary proceeding or contested matter shall be forever barred; provided that, if and to the extent any challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such stipulation also shall be binding on the Debtors' estates and all parties in interest.

(b)      Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any Creditors' Committee (if appointed), standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition Credit Documents, the Prepetition Liens or the Prepetition Secured Obligations.

33.      *Release*.  Subject to the rights and limitations set forth in paragraphs 31 and 32 of this Interim Order, each of the Debtors and the Debtors' estates, each on its own behalf and on behalf of each of its predecessors, their successors and assigns shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Agents, the DIP Lenders, the Prepetition Secured Parties (in each case, in their capacities as such) and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and

obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof solely with respect to or relating to the DIP Liens, the DIP Superpriority Claims, the DIP Obligations, the Prepetition Liens and the Prepetition Secured Obligations, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties.

34.    *Intercreditor Agreements.*  The rights of the Prepetition Secured Parties shall at all times remain subject to the Prepetition Intercreditor Agreement.

35.    *Credit Bidding*.

(a)    Subject to paragraph 14 of this Interim Order, the Senior DIP Agent and Prepetition First Lien Agent, or any assignee or designee of the Senior DIP Agent and Prepetition First Lien Agent shall have the unqualified right to credit bid up to the full amount of the Senior DIP Loans and Prepetition First Lien Loans in the sale of any of the Debtors' assets, including pursuant to (x) Bankruptcy Code section 363, (y) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129 or (z) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725.

62

(b)    Subject to paragraph 14 of this Interim Order and subject to such credit bid providing for the Discharge of Senior Obligations (unless waived in writing by the Senior DIP Agent) and the rights and protections of the Junior DIP Agent relative to the Junior DIP Lenders, including as provided in any applicable Sales Procedures Order, the Junior DIP Lenders shall have the unqualified right to credit bid up to the full amount of the Junior DIP Loans in the sale of any of the Debtors' assets, including pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129 or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725.

(c)    Subject to the Discharge of Senior Obligations, and the indefeasible payment in full in cash of the DIP Obligations and the Prepetition First Lien Obligations, and subject to the Prepetition Intercreditor Agreement and the rights and protections of the Prepetition Second Lien Agent relative to the Prepetition Second Lien Lenders, including as provided in any applicable Sales Procedures Order, the Prepetition Second Lien Lenders shall have the unqualified right to credit bid up to the full amount of the Prepetition Second Lien Obligations in the sale of any of the Debtors' assets, including, but not limited to, pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129 or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725.

(d)    For avoidance of doubt, unless (x) agreed to in writing by the Senior DIP Agent, or (y) the proposed sale, plan or reorganization or plan of reorganization will result in the Discharge of the Senior Obligations, no Junior DIP Parties or Prepetition Second Lien Parties may credit bid any portion of its Junior DIP Obligations or Prepetition Second Lien Obligations until the Discharge of Senior Obligations has occurred.  The DIP Agents, the Prepetition First Lien Agent and/or the Prepetition Second Lien Agent (in accordance with the DIP Documents and this

63

Interim Order), and/or their respective secured lenders as the case may be shall have the absolute right to assign, sell or otherwise dispose of their respective rights to credit bid in connection with any credit bid by or on behalf any acquisition entity or joint venture formed in connection with such bid.

36.     *Interim Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern.

37.     *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, any Creditors' Committee appointed in these Chapter 11 Cases and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104 or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties, provided that, notwithstanding anything to the contrary herein, the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

38.     *Limitation of Liability*.  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral or exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Documents or the Prepetition Credit Documents, the DIP Agents, the DIP Lenders and the Prepetition Secured Parties (in each case, solely in their

capacities as such) shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute), nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors. Furthermore, nothing in this Interim Order, the DIP Documents or the Prepetition Credit Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents, the DIP Lenders or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their direct or indirect subsidiaries.

39.     *No Requirement to File Claim for DIP Obligations or Prepetition Secured Obligations.* Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the DIP Agents nor the Prepetition Agents, nor any DIP Lender nor Prepetition Secured Party shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations or Prepetition Secured Obligations, all of which shall be due and payable in accordance with the DIP Documents and Prepetition Credit Documents, as applicable, without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Documents and Prepetition Credit Documents or of any

65

indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Agents', Prepetition Agents', or any Prepetition Lender or DIP Lender's rights, remedies, powers, or privileges under any of the DIP Documents, Prepetition Credit Documents, this Interim Order, or applicable law. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in interest or their respective successors-in-interest.

40.      *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.   Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

41.      *Final Hearing*.  The Final Hearing shall be held on January 16, 2024 at 10:00 a.m. prevailing Eastern Time at the **United States Bankruptcy Courthouse, C. Clyde Atkins United States Courthouse, 301 North Miami Avenue, Courtroom 7, Miami, Florida 33128**.  Any objections or responses to the entry of this Interim Order  must be filed on or before 4:00 p.m. prevailing Eastern Time, on January 9, 2024, and shall be served on: (a) the Debtors, Bird Global, Inc., *et al*., 392 NW 191st Street, #20388, Miami, FL 33179, Attn: Chris Rankin, Chief Restructuring Officer; (b) proposed counsel to the Debtors: Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, Attn: Paul Steven Singerman (singerman@bergersingerman.com), Jordi Guso (jguso@bergersingerman.com), Robin J. Rubens (rrubens@bergersingerman.com) and Clay Roberts (croberts@bergersingerman.com); (c) counsel to the Senior DIP Parties and Prepetition First Lien Parties: Latham & Watkins LLP,

1271 Avenue of the Americas, New York, NY, 10020, Attn: James Ktsanes (James.Ktsanes@lw.com), John Lister (John.Lister@lw.com), and Hugh Murtagh (Hugh.Murtagh@lw.com); (d) counsel to the Junior DIP Agent: Covington & Burling LLP, the New York Times Building, 620 Eighth Avenue, New York, NY 10018, Attn: Ronald A. Hewitt (rhewitt@cov.com); (e) counsel to the Prepetition Second Lien Agent: Maslon LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402, Attn: Clark T. Whitmore (clark.whitmore@maslon.com); (f) counsel to the Junior DIP Lenders and Participating Second Lien Parties: Venable LLP, 100 SE 2nd Street, Suite 4400, Miami, FL 33131, Attn: Paul J. Battista (PJBattista@Venable.com); (g) the Office of the United States Trustee, 51 S.W. First Avenue, Room 1204, Miami, FL 33130; and (h) counsel to any statutory committee appointed in these chapter 11 cases.

# # #

US-DOCS\147131838.9

<u>Submitted by</u>:
Paul Steven Singerman, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Email:  singerman@bergersingerman.com

*(Attorney Singerman is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

US-DOCS\147131838.9

**<u>Exhibit 1</u>**

**DIP Budget**

$ in 000's

| Post Petition Week # | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 Weeks Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 12/22/23 | 12/29/23 | 1/5/24 | 1/12/24 | 1/19/24 | 1/26/24 | 2/2/24 | 2/9/24 | 2/16/24 | 2/23/24 | 3/1/24 | 3/8/24 | 3/15/24 | 3/22/24 | |
| F+A | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | |
| Net Cash Receipts | $ 201 | $ 1,260 | $ 1,019 | $ 1,368 | $ 1,624 | $ 1,295 | $ 1,354 | $ 1,563 | $ 1,796 | $ 2,301 | $ 1,737 | $ 1,873 | $ 2,157 | $ 2,485 | $ 21,993 |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| Third Party Spend (COS + OpEx) | (1,735) | (2,847) | (1,054) | (1,064) | (1,439) | (831) | (891) | (878) | (903) | (965) | (725) | (731) | (433) | (716) | (15,212) |
| Payroll & Benefits | - | (1,992) | (218) | (307) | (869) | (589) | (869) | (329) | (869) | (612) | (869) | (407) | (889) | (407) | (9,197) |
| FM Platform Payouts | - | (254) | (322) | (346) | (342) | (338) | (340) | (374) | (407) | (501) | (463) | (482) | (531) | (514) | (5,212) |
| Non-Debtor Funding | (558) | (2,960) | (1,441) | 3 | (194) | (754) | (571) | (102) | 128 | (786) | 157 | (23) | 279 | (626) | (7,449) |
| Total Operating Disbursements | (2,293) | (8,043) | (3,035) | (1,713) | (2,844) | (2,513) | (2,670) | (1,683) | (2,051) | (2,864) | (1,900) | (1,644) | (1,555) | (2,263) | (37,070) |
| Operating Cash Flow | $ (2,092) | $ (6,783) | $ (2,016) | $ (345) | $ (1,220) | $ (1,218) | $ (1,316) | $ (119) | $ (296) | $ (563) | $ (164) | $ 229 | $ 603 | $ 222 | $ (15,077) |
| **Non-Operational Spend** | | | | | | | | | | | | | | | |
| Capex | | (288) | (50) | - | (83) | (377) | - | (100) | (27) | (50) | | | | | (966) |
| Total Non-Operating Disbursements | | (288) | (50) | - | (83) | (377) | - | (100) | (27) | (50) | | | | | (966) |
| **First Day Relief Payments** | | | | | | | | | | | | | | | |
| Critical Vendor Motion | (500) | (1,640) | (150) | (150) | (150) | (150) | | | | | | | | - | (2,740) |
| Utilities Deposit | | (110) | | | | | | | | | | | | | (110) |
| Warehouse / Freight Motion | - | (1,552) | (1,552) | | | | | | | | | | | | (3,105) |
| Total First Day Relief Payments | (500) | (3,193) | (1,812) | (150) | (150) | (150) | | | | | | | | | (5,955) |
| **Restructuring Disbursements** | | | | | | | | | | | | | | | |
| Advisor Fees | | (508) | (232) | (232) | (232) | (232) | (282) | (314) | (314) | (254) | (194) | (187) | (187) | (187) | (3,353) |
| U.S. Trustee Fees | | | | | | | (50) | | | | | | | | (50) |
| Total Restructuring Disbursements | - | (508) | (232) | (232) | (232) | (232) | (332) | (314) | (314) | (254) | (194) | (187) | (187) | (187) | (3,403) |
| Debt Service, Interest & Fees | | | - | (400) | | | - | (451) | | | - | | (453) | | (1,304) |
| Net Cash Flow (Before DIP) | $ (2,592) | $ (10,752) | $ (4,109) | $ (1,127) | $ (1,695) | $ (1,977) | $ (1,647) | $ (534) | $ (1,086) | $ (867) | $ (358) | $ 42 | $ (37) | $ 35 | $ (26,705) |
| **Beginning Cash Balance** | $ 6,490 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 6,490 |
| Net Cash Flow (Before DIP) | (2,592) | (10,752) | (4,109) | (1,127) | (1,695) | (1,977) | (1,647) | (534) | (1,088) | (867) | (358) | 42 | (37) | 35 | (26,705) |
| DIP Facility Draw/(Paydown) | 842 | 10,752 | 4,109 | 1,127 | 1,695 | 1,977 | 1,647 | 534 | 1,088 | 867 | 358 | 42 | (37) | (35) | 24,955 |
| Ending Cash Balance | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 | $ 4,740 |
| **Restricted Cash** | | | | | | | | | | | | | | | |
| Restricted LCs | (2,580) | (2,580) | (2,580) | (2,580) | (2,580) | (2,580) | (2,580) | (2,580) | (2,580) | (2,580) | (2,580) | (2,580) | (2,580) | (2,580) | (2,580) |
| Non-Current LCs | | | | | | | | | | | | | | | |
| Reserve and Inaccessible | (660) | (660) | (660) | (660) | (660) | (660) | (660) | (660) | (660) | (660) | (660) | (660) | (660) | (660) | (660) |
| Available Cash | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 |

**Exhibit 2**

**Milestones**

| Milestone | Hardwired | Conditional |
|---|---|---|
| Petition Date (P) | December 20, 2023 | |
| First-Day Hearing | December 22, 2023 | +3 Business Days (BD) from P |
| Entry of Interim DIP Order | December 22, 2023 | +3 BD from P |
| Company shall have (a) communicated with all relevant regulatory/governmental bodies representing 90% of Company's sharing revenues ("Agencies") to apprise them of the Restructuring (as defined in the RSA) and to request assurances that such bodies will consent to the continued operation of the Company's business by the NewCo Entity (as defined in the RSA) in such bodies' jurisdictions on substantially the same terms as currently apply, including through consent to assignment, novation, or other means of continuing all material permits, licenses, contracts, and similar agreements (collectively, "Permits"), and (b) delivered an initial report (the "Permitting Report") of results of such communications, in form and substance acceptable to the Senior DIP Agent in its sole discretion* | January 10, 2024 | +22 Calendar Days (CD) from P |
| Second-Day Hearing | January 23, 2024 | +28 CD from P |
| Entry of Final DIP Order | January 25, 2024 | +2 BD from Second-Day Hearing |
| Entry of Sale Procedures Order | January 25, 2024 | +2 BD from Second-Day Hearing |
| Occurrence of Bid & Cure/Assignment Objection Deadline | February 26, 2024 (Feb. 24 = Sat.) | +30 CD from Sale Procedures |
| Auction (if needed) | March 4, 2024 | +5 BD from Bid Deadline |
| Sale Hearing | March 11, 2024 | +5 BD from Auction |
| Closing | March 18, 2024 | +5 BD from Sale Hearing |

*Permit Reporting Covenant.  After delivery of the initial Permitting Report, the Debtors shall deliver an updated Permitting Report each week together with the Variance Report.

*Permit Continuance Covenant.  At no time shall Agencies representing more than 10% of the Company's 2023 Sharing Revenues as internally reported by the Company, pro forma for the Spin acquisition on a normalized run-rate basis, have revoked or adversely modified, or stated an intention to revoke or adversely modify, Permits.

## Exhibit 3

**DIP Credit Agreement**

**SENIOR SECURED PRIMING AND SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT**

Dated as of December 22, 2023

by and among

BIRD RIDES, INC.,
as Debtor, Debtor-in-Possession and Borrower,

BIRD GLOBAL, INC.,
as Debtor, Debtor-in-Possession and Parent,

BIRD US HOLDCO, LLC,
as Debtor, Debtor-in-Possession and Holdco Guarantor,

THE OTHER PERSONS PARTY HERETO THAT ARE DESIGNATED AS CREDIT PARTIES,
as Debtors and Debtors-in-Possession,

THE PERSONS FROM TIME TO TIME PARTY HERETO,
as Lenders,

and

MIDCAP FINANCIAL TRUST,
as Administrative Agent

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................................................. 2

    SECTION 1.01   Certain Defined Terms .................................................. 2
    SECTION 1.02   Other Interpretative Matters ........................................ 26
    SECTION 1.03   Canadian References .................................................... 26

ARTICLE II TERMS OF THE LOANS ............................................................................ 26

    SECTION 2.01   Loans .......................................................................... 26
    SECTION 2.02   Rollup ........................................................................ 27
    SECTION 2.03   Making of Loans; Repayment of Loans ..................... 27
    SECTION 2.04   Interest and Fees ........................................................ 28
    SECTION 2.05   Records of Loans ........................................................ 28
    SECTION 2.06   Grant of Lien; Super Priority Nature of Obligations and Lenders' Liens ........ 29
    SECTION 2.07   Guaranty .................................................................... 29
    SECTION 2.08   Contribution .............................................................. 29
    SECTION 2.09   Authorization; Other Agreement ............................... 29
    SECTION 2.10   Guaranty Absolute and Unconditional ...................... 30
    SECTION 2.11   Waivers ...................................................................... 30
    SECTION 2.12   Reliance ..................................................................... 31

ARTICLE III [RESERVED] ............................................................................................. 31

ARTICLE IV SETTLEMENT PROCEDURES AND PAYMENT PROVISIONS ............ 31

    SECTION 4.01   Priority of Payments .................................................. 31
    SECTION 4.02   Payments and Computations, Etc. .............................. 33

ARTICLE V INCREASED COSTS; FUNDING LOSSES; TAXES; ILLEGALITY ............ 33

    SECTION 5.01   Increased Costs .......................................................... 33
    SECTION 5.02   [Reserved] .................................................................. 34
    SECTION 5.03   Taxes ......................................................................... 34

ARTICLE VI CONDITIONS TO EFFECTIVENESS AND CREDIT EXTENSIONS ........... 38

    SECTION 6.01   Conditions Precedent to Effectiveness of this Agreement ............... 38
    SECTION 6.02   Conditions Precedent to Each Credit Extension ................. 39

ARTICLE VII REPRESENTATIONS AND WARRANTIES ............................................ 40

    SECTION 7.01   Representations and Warranties of the Credit Parties ............. 40

ARTICLE VIII COVENANTS ......................................................................................... 44

    SECTION 8.01   Affirmative Covenants of the Credit Parties ............. 44
    SECTION 8.02   Negative Covenants of the Credit Parties .................. 51

ARTICLE IX [RESERVED] ............................................................................................. 53

# TABLE OF CONTENTS
(continued)

Page

ARTICLE X EVENTS OF DEFAULT ................................................................................ 53

    SECTION 10.01  Events of Default................................................................ 53
    SECTION 10.02  Remedies .......................................................................... 58
    SECTION 10.03  Rights Not Exclusive ....................................................... 59

ARTICLE XI THE ADMINISTRATIVE AGENT .......................................................... 59

    SECTION 11.01  Appointment and Authorization ....................................... 59
    SECTION 11.02  The Administrative Agent and Affiliates ........................ 59
    SECTION 11.03  Action by the Administrative Agent.................................. 60
    SECTION 11.04  Consultation with Experts ................................................ 60
    SECTION 11.05  Liability of the Administrative Agent ............................... 60
    SECTION 11.06  Indemnification................................................................. 60
    SECTION 11.07  Right to Request and Act on Instructions ........................ 61
    SECTION 11.08  Credit Decision................................................................. 61
    SECTION 11.09  Collateral Matters............................................................. 61
    SECTION 11.10  Agency for Perfection....................................................... 61
    SECTION 11.11  Notice of Default .............................................................. 62
    SECTION 11.12  Assignment by the Administrative Agent; Resignation of the
                     Administrative Agent; Successor the Administrative Agent............................ 62
    SECTION 11.13  Payment and Sharing of Payment .................................... 63
    SECTION 11.14  Loan Payments ................................................................. 63
    SECTION 11.15  Return of Payments .......................................................... 63
    SECTION 11.16  Sharing of Payments......................................................... 63
    SECTION 11.17  Right to Perform, Preserve, and Protect .......................... 64

ARTICLE XII [RESERVED]............................................................................................ 64

ARTICLE XIII INDEMNIFICATION .............................................................................. 64

    SECTION 13.01  Indemnities by the Borrower ........................................... 64

ARTICLE XIV MISCELLANEOUS ................................................................................ 65

    SECTION 14.01  Amendments, Etc. ............................................................ 65
    SECTION 14.02  Notices, Etc...................................................................... 66
    SECTION 14.03  Assignability; Addition of Lenders ................................. 66
    SECTION 14.04  Costs and Expenses .......................................................... 68
    SECTION 14.05  Invoices for Indemnified Amounts .................................. 69
    SECTION 14.06  Confidentiality.................................................................. 69
    SECTION 14.07  GOVERNING LAW ........................................................ 70
    SECTION 14.08  Execution in Counterparts ............................................... 70
    SECTION 14.09  Integration; Binding Effect; Survival of Termination ..... 70
    SECTION 14.10  CONSENT TO JURISDICTION ..................................... 70
    SECTION 14.11  WAIVER OF JURY TRIAL ............................................ 71
    SECTION 14.12  Ratable Payments ............................................................. 71
    SECTION 14.13  Limitation of Liability ..................................................... 71

**TABLE OF CONTENTS**
(continued)

SECTION 14.14  Intent of the Parties ........................................................................... 72
SECTION 14.15  USA Patriot Act ............................................................................... 72
SECTION 14.16  Right of Setoff ................................................................................. 72
SECTION 14.17  Severability ...................................................................................... 72
SECTION 14.18  Mutual Negotiations ........................................................................ 73
SECTION 14.19  Captions and Cross References ........................................................ 73
SECTION 14.20  Parties Including Trustees; Bankruptcy Court Proceedings ............ 73
SECTION 14.21  Inconsistency ................................................................................... 73
SECTION 14.22  Pre-Petition Lender Consent ............................................................ 73
SECTION 14.23  Lender Consent to Credit Bid .......................................................... 74

SCHEDULES

SCHEDULE I    –    DIP Term Loan Commitments
SCHEDULE II   –    [Reserved]
SCHEDULE III  –    [Reserved]
SCHEDULE IV   –    [Reserved]
SCHEDULE V    –    Notice Addresses

EXHIBITS

EXHIBIT A         –      Form of Loan Request
EXHIBIT B         –      [Reserved]
EXHIBIT C         –      Form of Assignment and Acceptance Agreement
EXHIBIT D         –      [Reserved]
EXHIBIT E         –      [Reserved]
EXHIBIT F         –      [Reserved]
EXHIBIT G         –      U.S. Tax Compliance Certificates
EXHIBIT H         –      [Reserved]
EXHIBIT I         –      Interim Order
EXHIBIT J         –      Closing Checklist

This SENIOR SECURED PRIMING AND SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT (including all exhibits and schedules hereto, as amended, restated, supplemented or otherwise modified from time to time, this "Agreement") is entered into as of December 22, 2023, by and among the following parties:

    (i)        Bird Rides, Inc., as debtor and debtor-in-possession (the "Borrower");

    (ii)       Bird Global, Inc., as debtor and debtor-in-possession (the "Parent");

    (iii)     the other Persons party hereto that are designated as Credit Parties, as debtors and debtors-in-possession;

    (iv)     the several financial institutions from time to time party hereto (including any financial institutions party to this Agreement as a "Pre-Petition Lender") as Lenders; and

    (v)      MidCap Financial Trust ("MidCap"), as Administrative Agent for the Lenders from time to time party hereto.

PRELIMINARY STATEMENTS

WHEREAS, on December 20, 2023 ("Petition Date"), certain of the Credit Parties filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court;

WHEREAS, from and after the Petition Date, the Credit Parties are continuing to operate their business and manage their properties as debtors in possession under Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Credit Parties have requested, and the Lenders have agreed to make available to the Borrower, a $19,500,000 DIP term loan facility subject to the terms and conditions set forth in this Agreement, the proceeds of which facility and sub-facility will be used in accordance with Section 8.01(g) hereof; provided that until the Final Order shall have been entered by the Bankruptcy Court, no loans or advances under the DIP term loan facility shall be made or issued, other than DIP term loans not to exceed the amount permitted by the Interim Order;

WHEREAS, the Borrower, the Persons named therein as credit parties, MidCap, as administrative agent, and the financial institutions party thereto as lenders are parties to that certain Amended and Restated Loan Agreement dated as of September 19, 2023 (as amended or otherwise modified on or prior to the Petition Date, the "Pre-Petition Credit Agreement");

WHEREAS, the Borrower desires to secure all of its Borrower Obligations under the Transaction Documents by granting to Administrative Agent, for the benefit of the Secured Parties, a security interest in and lien upon substantially all of its property, as provided herein and in the DIP Orders;

WHEREAS, Parent that directly owns all of the Equity Interests of the Borrower, is willing to guaranty all of the Borrower Obligations and to pledge to Administrative Agent, for the benefit of the Secured Parties, all of the Equity Interests of the Borrower and substantially all of its other property to secure the Borrower Obligations, as provided herein and in the DIP Orders; and

WHEREAS, subject to the terms hereof, certain Subsidiaries of Parent are willing to guaranty all of the Borrower Obligations and grant to Administrative Agent, for the benefit of the Secured Parties, a security interest in and lien upon substantially all of its property, as provided herein and in the DIP Orders.

In consideration of the mutual agreements, provisions and covenants contained herein, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Acquisition" means the acquisition (whether by means of a merger, consolidation or otherwise) of all of the Equity Interests of any Person or all or substantially all of the assets of (or any division or business line of) any Person.

"Administrative Agent" means MidCap, in its capacity as contractual representative for the Lenders, and any successor thereto in such capacity appointed pursuant to Article XI or Section 14.03(f).

"Administrative Agent Fee" means a fee as set forth in the Fee Letter between the Borrower and the Administrative Agent, due in accordance with the terms thereof, and paid in accordance with the Priority of Payments.

"Adverse Claim" means any ownership interest or claim, mortgage, deed of trust, pledge, lien, security interest, hypothecation, charge or other encumbrance or security arrangement of any nature whatsoever, whether voluntarily or involuntarily given, including, but not limited to, any conditional sale or title retention arrangement, and any assignment, deposit arrangement or lease intended as, or having the effect of, security and any filed financing statement or other notice of any of the foregoing (whether or not a lien or other encumbrance is created or exists at the time of the filing); it being understood that any of the foregoing in favor of, or assigned to, the Administrative Agent (for the benefit of the Secured Parties) shall not constitute an Adverse Claim.

"Advisors" has the meaning set forth in Section 14.06(c).

"Affected Person" means the Administrative Agent and each Lender.

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person.  For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote 25% or more of the securities having ordinary voting power for the election of directors or managers of such Person or (y) to direct or cause the direction of the management and policies of such Person, in either case whether by ownership of securities, contract, proxy or otherwise.

"Affiliate Transaction" means any transaction or series of transactions, including any transaction or series of transactions in which the Parent or any of its Subsidiaries acts to, directly or indirectly, make any payment to, or sell, lease, transfer, or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions,

2

contract, agreement, understanding, loan, advance, or guarantee with, or for the benefit of, any Affiliate of Parent or its Subsidiaries.

"Aggregate Rollup Bridge Commitment" means the combined Rollup Bridge Commitments of the Lenders.

"Aggregate Rollup Amendment No. 1 Commitment" means the combined Rollup Amendment No. 1 Commitments of the Lenders.

"Agreement" has the meaning set forth in the preamble to this Agreement.

"Anti-Terrorism Laws" means any Applicable Law relating to terrorism financing, trade sanctions programs and embargoes, import/export licensing, money laundering or bribery, and any regulation, order, or directive promulgated, issued or enforced pursuant to such Applicable Laws, all as amended, supplemented or replaced from time to time.

"Applicable Law" means, with respect to any Person, (x) all provisions of law, statute, treaty, constitution, ordinance, rule, regulation, ordinance, requirement, restriction, permit, executive order, certificate, decision, directive or order of any Governmental Authority applicable to such Person or any of its property and (y) all judgments, injunctions, orders, writs, decrees and awards of all courts and arbitrators in proceedings or actions in which such Person is a party or by which any of its property is bound. For the avoidance of doubt, FATCA shall constitute an "Applicable Law" for all purposes of this Agreement.

"Applicable Margin" means, with respect to the DIP Term Loans, the Rollup Amendment No. 1 Loans and the Rollup Bridge Loans, 15% per annum.

"Approved Budget" means, (i) initially and until such time as Administrative Agent shall have provided the Borrower with written confirmation that a Cash Forecast delivered in accordance with Section 8.01(c)(v) in form and substance satisfactory to it, the Initial Approved Budget and (ii) upon the Administrative Agent providing the Borrower with written confirmation that a Cash Forecast delivered in accordance with Section 8.01(c)(v) is in form and substance satisfactory to it, then such Cash Forecast; provided that if the Administrative Agent does not provide written confirmation that any Cash Forecast is in form and substance satisfactory to them, then the Approved Budget shall be the last delivered Cash Forecast that constituted the Approved Budget hereunder.

"Asset Purchase Agreement" means that certain Asset Purchase Agreement dated as December 22, 2023, by and among Bird Global, Inc., certain Subsidiaries of Bird Global, Inc. and Bird Scooter Acquisition Corp.

"Assignment and Acceptance Agreement" means an assignment and acceptance agreement entered into by a Lender, an Eligible Assignee and the Administrative Agent, and, if required, the Credit Parties, pursuant to which such Eligible Assignee may become a party to this Agreement, in substantially the form of Exhibit C hereto.

"Attorney Costs" means and includes all fees, costs, expenses and disbursements of any law firm or other external counsel but excludes disbursements of internal counsel.

"Bankruptcy Code" means the United States Bankruptcy Reform Act of 1978 (11 U.S.C. § 101, et seq.), as amended from time to time.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Florida.

"<u>Base Rate</u>" means the per annum rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate," with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate; <u>provided</u>, <u>however</u>, that the Administrative Agent may, upon prior written notice to Borrower, choose a reasonably comparable index or source to use as the basis for the Base Rate.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F.R. § 1010.230.

"<u>Bid Procedures Motion</u>" has the meaning set forth in Section 8.01(aa).

"<u>Bid Procedures Order</u>" has the meaning set forth in Section 8.01(aa).

"<u>Board of Directors</u>" means the board of directors of the Parent or any duly authorized committee or subcommittee of such board of directors.

"<u>Borrower</u>" has the meaning set forth in the <u>preamble</u> to this Agreement.

"<u>Borrower Indemnified Amounts</u>" has the meaning set forth in Section 13.01(a).

"<u>Borrower Indemnified Party</u>" has the meaning set forth in Section 13.01(a).

"<u>Borrower Obligations</u>" means all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due) of the Borrower to any Lender, Borrower Indemnified Party and/or any Affected Person, arising under or in connection with this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, and shall include, without limitation, the principal amount of the Loans, all Interest on the Loans, all Fees and all other amounts due or to become due from the Borrower under the Transaction Documents (whether in respect of fees, costs, expenses, indemnifications or otherwise).

"<u>Bridge Loans</u>" has the meaning assigned to such term is in the Pre-Petition Loan Agreement

"<u>Budget Testing Period</u>" has the meaning assigned to such term in <u>Section 8.01(c)(v)</u>.

"<u>Business Combination Event</u>" has the meaning assigned to such term in <u>Section 8.02(b)</u>.

"<u>Business Day</u>" means any day (other than a Saturday or Sunday) on which banks are not authorized or required to close in New York City, New York or San Francisco, California.

"<u>Capitalized Lease Obligations</u>" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"<u>Carve-Out</u>" shall have the meaning set forth in the DIP Orders.

"<u>Cash Collateral</u>" shall have the meaning set forth in the DIP Orders.

"<u>Cash Equivalents</u>" means:

(1)       U.S. dollars, Canadian dollars, pounds sterling or euros;

(2)     marketable direct obligations issued by any state of the United States or the District of Columbia or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and having one of the two highest ratings obtainable from either S&P Global Ratings, a division of S&P Global Inc. or its affiliates ("S&P"), or Moody's Investors Service, Inc. or its affiliates ("Moody's");

(3)     commercial paper, maturing not more than one year after the date of issue rated P-1 by Moody's or A-1 by S&P;

(4)     certificates of deposit maturing not more than one year after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000;

(5)     repurchase agreements having maturities of not more than 90 days from the date of acquisition which are entered into with major money center banks included in the commercial banking institutions described in clause (4) above and which are secured by readily marketable direct obligations of the United States or any agency thereof;

(6)     money market accounts maintained with mutual funds having assets in excess of $2,500,000,000, which assets are primarily comprised of Cash Equivalents described in another clause of this definition;

(7)     marketable tax exempt securities rated A-1 or higher by Moody's or A or higher by S&P, in each case, maturing within one year from the date of acquisition thereof; and (h) in the case of any Foreign Subsidiary, cash and cash equivalents that are substantially equivalent in such jurisdiction to those described in clauses (a) through (g) above in respect of each country that is a member of the Organization for Economic Co-operation and Development.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (1) above.

"Certificate of Beneficial Ownership" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"CFC" means any Person that is a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change in Control" means the occurrence of any of the following:

(a)     Parent ceases to own, directly or indirectly, 100% of the issued and outstanding equity interests of the Borrower;

(b)     The Borrower ceases to own, directly or indirectly, 100% of the issued and outstanding equity interests of the HoldCo Guarantor;

(c)     The Holdco Guarantor ceases to own, directly, 100% of the issued and outstanding equity interests of the Bird OpCo,

5

in each case free and clear of all Liens other than non-voluntary Liens arising under applicable statutes, Liens in favor of the Administrative Agent and Liens in favor of the Note Collateral Agent securing obligations under the Note Purchase Agreement and the Second Lien DIP Loan Agreement; or

(d)     (i) any Person (other than a Permitted Holder) or (ii) Persons (other than one or more Permitted Holders) constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), become the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Exchange Act), directly or indirectly, of Equity Interests representing more than forty percent (40%) of the aggregate ordinary Voting Stock of Parent and the percentage of aggregate ordinary Voting Stock so held is greater than the percentage of the aggregate ordinary Voting Stock represented by the Equity Interests of Parent beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders; unless, in the case of this clause (2), the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the Board of Directors.

"Change in Law" means the occurrence, after the Effective Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to the agreements reached by the Basel Committee on Banking Supervision in "Basel III: A Global Regulatory Framework for More Resilient Banks and Banking Systems" (as amended, supplemented or otherwise modified or replaced from time to time), shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Chapter 11 Cases" means the Chapter 11 cases filed on December 20, 2023, by certain of the Credit Parties by voluntary petitions with the Bankruptcy Court.

"Code" means the Internal Revenue Code of 1986, as amended, reformed or otherwise modified from time to time.

"Collateral" means all property, now existing or hereafter acquired, mortgaged or pledged to, or purported to be subjected to a Lien in favor of, Administrative Agent, for the benefit of Administrative Agent and Lenders, pursuant to the Transaction Documents, but excluding any property or assets excluded pursuant to the Transaction Documents.  Without limiting the generality of the foregoing, "Collateral" shall include all rights under section 506(c) of the Bankruptcy Code (solely upon entry of the Final Order), all "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible or mixed, and all rents, products, substitutions, accessions, profits, replacements and cash and non-cash proceeds of all of the foregoing.

"Commitment" means, with respect to any Lender, its DIP Term Loan Commitment, Aggregate Rollup Bridge Commitment and Aggregate Rollup Amendment No. 1 Commitment, as such amount may be modified in connection with any subsequent assignment pursuant to Section 14.03, and as such aggregate amount is reduced by any applicable Loan funded in respect of such Commitment by such Lender hereunder.  If the context so requires, "Commitment" also refers to a Lender's obligation to make Loans hereunder in accordance with this Agreement, as the context so requires.

"Commitment Termination Date" means March 18, 2024.

"Common Stock" means the Class A Common Stock, $0.0001 par value per share, of the Parent, or such other securities or other property into or for which such stock is exchanged or converted, or which such stock represents the right to receive, in connection with any reclassification, share exchange, business combination transaction or similar event.

"Contingent Obligations" means, with respect to any Person, any obligation of such Person guaranteeing or intending to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, and (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business. The amount of any Person's obligation under any Contingent Obligation shall be determined in accordance with GAAP.

"Contractual Obligations" means, as to any Person, any provision of any security (whether in the nature of Equity Interests or otherwise) issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement (other than a Transaction Document) to which such Person is a party or by which it or any of its property is bound or to which any of its property is subject.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.

"Covered Taxes" has the meaning set forth in Section 5.01(a)(ii).

"Credit Bid Transaction" has the meaning set forth in Section 14.22.

"Credit Extension" means the making of a Loan.

"Credit Parties" means the Parent, the Borrower and each of the Parent's subsidiaries which is a Guarantor.

"DIP Orders" means the Interim Order and the Final Order, as applicable, based on which such order is then in effect.

"DIP Term Lender" means each Lender with a DIP Term Loan Commitment (or if the DIP Term Loan Commitments has been funded, who holds DIP Term Loans).

"DIP Term Loans" means any Loan made pursuant to Section 2.01(c).

"DIP Term Loan Commitment" has the meaning assigned to such term in Section 2.01(c).

"DIP Term Loan Maturity Date" means the earliest to occur of: (a) the Commitment Termination Date; (b) the occurrence of the date that is 30 days after the entry of the Interim Order if as of such date, the Final Order shall not have been entered, (c) the Termination Declaration Date, (d) the date of the consummation of the sale of all or substantially all of the assets or Equity Interests of the Credit Parties pursuant to Section 363 of the Bankruptcy Code, and (e) the date all Borrower Obligations are indefeasibly paid in full in cash and this Credit Agreement and the other Transaction Documents are terminated.

"DIP Term Note" means a promissory note of the Borrower payable to a Lender in form and substance reasonably satisfactory to the Administrative Agent, evidencing Indebtedness of the Borrower under the DIP Term Loan Commitment of such Lender.

"Disposition" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers, leases, licenses (as licensor) or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person. For purposes of clarification, "Disposition" shall include (a) the sale or other disposition for value of any contracts, (b) any disposition of property through a "plan of division" under the Delaware Limited Liability Company Act or any comparable transaction under any similar law, (c) the early termination or modification of any contract resulting in the receipt by any Credit Party of a cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts due through the date of termination or modification) or (d) any sale of merchant accounts (or any rights thereto (including any rights to any residual payment stream with respect thereto)) by any Credit Party.

"Disqualified Equity Interests" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale, in each case, so long as any rights of the holders thereof upon the occurrence of such change of control or asset sale event is subject to the prior repayment in full of the Borrower Obligations), (b) is redeemable at the option of the holder thereof, in whole or in part, (c) provides for the obligation (not deferrable at the sole option of the issuer) to make scheduled payments of dividends or distributions in cash, or (d) is convertible into or exchangeable for (i) Indebtedness or (ii) any other Equity Interests that would constitute Disqualified Equity Interests, in each case of clauses (a) through (d), prior to the date that is six months after the date referenced in clause (a) of the definition of "DIP Term Loan Maturity Date"; provided that if such Equity Interest is issued pursuant to a plan for the benefit of employees of any Credit Party or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by a Credit Party in order to satisfy applicable statutory or regulatory obligations.

"Dollars" and "$" each mean the lawful currency of the United States of America.

"Effective Date" means the date on which all conditions set forth in Section 6.01 are satisfied or waived by the Administrative Agent and all Lenders.

"Eligible Assignee" means (a) any Lender or any of its Affiliates, (b) any Person managed by a Lender or any of its Affiliates and (c) any other financial or other institution.

"Equity Interests" of any person shall mean any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however

designated) equity or ownership of such person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any rule or regulation issued thereunder.

"ERISA Affiliate" means, with respect to any Person, any corporation, trade or business which together with the Person is a member of a controlled group of corporations or a controlled group of trades or businesses and would be deemed a "single employer" within the meaning of Sections 414(b), (c), (m) of the Code or Section 4001(b) of ERISA.

"Event of Default" has the meaning set forth in Section 10.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to an Affected Person or required to be withheld or deducted from a payment to an Affected Person: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Affected Person being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in the Loans or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires an interest in a Loan or its Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 5.03, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Affected Person's failure to comply with Section 5.03(d) and (d) any Taxes imposed pursuant to FATCA.

"Existing Amendment No. 1 Lenders" means those Lenders holding Existing Amendment No. 1 Loans under the Pre-Petition Loan Agreement.

"Existing Amendment No. 1 Loans" has the meaning assigned to such term in the Pre-Petition Loan Agreement.

"Existing Bridge Loan Lenders" means those Lenders holding Bridge Loans under the Pre-Petition Loan Agreement.

"Fair Market Value" means, with respect to any asset or property, the price that could be negotiated in an arm's-length, free-market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction (as determined in good faith by Parent).

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, any applicable intergovernmental agreement entered into between the United States and any other Governmental Authority in connection with the implementation of the foregoing and any fiscal or regulatory legislation, rules or official practices adopted pursuant to any such intergovernmental agreement.

"Federal Funds Rate" means, for any day, the rate of interest per annum (rounded upwards, if necessary, to the nearest whole multiple of 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided, however, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day, and (b) if no such rate is so published on such next preceding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"Fee Letter" has the meaning set forth in Section 2.04(b).

"Fees" has the meaning set forth in Section 2.04(b).

"Final Order" means an order of the Bankruptcy Court with respect to the Credit Parties after a final hearing, in form and substance acceptable to the Administrative Agent and the Required DIP Lenders in their sole discretion, which order is in effect and not stayed, together with all extensions, supplements modifications and amendments thereto, in each case in form and substance acceptable to the Administrative Agent and the Required DIP Lenders, in their sole discretion, which, among other things, provides that the relief requested in the motions seeking approval of the Transaction Documents and the Interim Order and Final Order and granted on an interim basis in the Interim Order is granted on a final basis (including any additional relief required by the Bankruptcy Court or agreed to by the Administrative Agent) and provides for the roll-up of the Pre-Petition Obligations as contemplated herein, all on a final basis.

"Financial Officer" of any Person means, the chief executive officer, the chief financial officer, the chief accounting officer, the principal accounting officer, the controller, the treasurer or the assistant treasurer of such Person.

"Foreign Lender" has the meaning set forth in Section 5.03(d)(i).

"Foreign Subsidiary" means a Subsidiary that is not incorporated, formed or organized under the laws of the United States or any state thereof.

"Foreign Subsidiary Holding Company" means any direct or indirect Subsidiary of any Credit Party, all or substantially all of the assets of which consist of, directly or indirectly, the Equity Interests in one or more CFCs and any of such CFCs' Subsidiaries, and/or debt or accounts receivable owed by CFCs and/or such CFC's Subsidiaries or are treated as owed by any such Subsidiaries for U.S. federal income tax purposes.

"GAAP" means generally accepted accounting principles in the United States of America, consistently applied.

"Government Approval" means, with respect to any Person, all permits, approvals, licenses, and/or requirements of any applicable governmental authority, if any, necessary for the operation of such Person's business.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guaranteed Obligations" has the meaning set forth in Section 2.07.

"Guarantors" means each Subsidiary of Parent (other than the Borrower) which has unconditionally guaranteed the Borrower Obligations; provided that solely for purposes of determining the permissibility of any action under Section 8.02, Bird Canada Scooters, Inc., shall be deemed to not be a Guarantor (notwithstanding any guarantee it may provide of the Borrower Obligations or grant of a Lien on all or any portion of its assets).

"Guaranty" means, with respect to any Person, any obligation of such Person guarantying or in effect guarantying any Debt, liability or obligation of any other Person in any manner, whether directly or indirectly, including any such liability arising by virtue of partnership agreements, including any agreement to indemnify or hold harmless any other Person, any performance bond or other suretyship arrangement and any other form of assurance against loss, except endorsement of negotiable or other instruments for deposit or collection in the ordinary course of business.

"Hedging Agreement" means any interest rate, foreign currency, commodity or equity swap, collar, cap, floor or forward rate agreement, or other agreement or arrangement designed to protect against fluctuations in interest rates or currency, commodity or equity values (including any option with respect to any of the foregoing and any combination of the foregoing agreements or arrangements), and any confirmation executed in connection with any such agreement or arrangement.

"Holdco Guarantor" means Bird US Holdco, LLC, a Delaware limited liability company.

"Indebtedness" means, with respect to any Person, without duplication: (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services to the extent constituting liabilities under GAAP (other than (i) trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than 120 days after the date such payable was due and other trade payables or other accounts payable agreed in writing between the Borrower and the Administrative Agent, acting reasonably and (ii) any earn-out, purchase price adjustment or similar obligation until such obligation is required to be reflected on the balance sheet of such Person in accordance with GAAP); (c) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all Capitalized Lease Obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (g) all obligations and liabilities, calculated on a basis satisfactory to the Administrative Agent and in accordance with accepted practice, of such Person under Hedging Agreements; (h) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; (i) all Contingent Obligations; (j) all Disqualified Equity Interests; and (k) all obligations referred to in clauses (a) through (j) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

11

"<u>Indemnified Taxes</u>" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Credit Parties under any Transaction Document and (b) to the extent not otherwise described in <u>clause (a)</u> above, Other Taxes.

"<u>Insolvency Proceeding</u>" means (a) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors or (b) any general assignment for the benefit of creditors of a Person, composition, marshaling of assets for creditors of a Person, or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors, in each of <u>clauses</u> <u>(a)</u> and <u>(b)</u> undertaken under U.S. Federal, state or foreign law, including the Bankruptcy Code.

"<u>Intended Tax Treatment</u>" has the meaning set forth in Section 14.14.

"<u>Interest</u>" means, for any day during any Interest Period (or portion thereof), the amount of interest accrued on the Loans during such Interest Period (or portion thereof) in accordance with <u>Section 2.04(a)</u>.

"<u>Interest Period</u>" means each calendar month, <u>provided</u> that the last Interest Period shall end on (but exclude) the Final Payout Date.

"<u>Interest Rate</u>" means, for any day in any Interest Period, the sum of (a) the Applicable Margin *plus* (b) for any day on which an Event of Default has occurred and is continuing, an additional default rate of interest equal to 2.00% per annum; <u>provided</u>, <u>however</u>, that no provision of this Agreement shall require the payment or permit the collection of Interest in excess of the maximum permitted by Applicable Law.

"<u>Interim Order</u>" means the order of the Bankruptcy Court with respect to the Credit Parties, in substantially the form of Exhibit I hereto, with such extensions, amendments, modifications or supplements acceptable to the Administrative Agent and the Required DIP Lenders in their sole discretion, which order is in effect and not stayed.

"<u>Interim Period Outside Date</u>" has the meaning assigned to such term in the Interim Order.

"<u>Investment</u>" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of (a) loans (including guarantees of Indebtedness), advances, or capital contributions (excluding accounts receivable, credit card and debit card receivables, trade credit and advances, or other payments made to customers, dealers, suppliers, contractors, and distributors, and payroll, commission, travel, and similar advances to officers, directors, managers, employees, consultants, and independent contractors) and (b) purchases or other acquisitions for consideration of Indebtedness, Equity Interests, or other securities issued by any other such Person. The amount of any Investment outstanding at any time shall be the amount actually invested in such Investment (determined, in the case of any Investment made with assets of Parent or any Subsidiary, based on the Fair Market Value of the assets invested and without taking into account subsequent increases or decreases in value), reduced by any dividend, distribution, interest payment, return of capital, repayment, or other amount received in cash by Parent or a Subsidiary in respect of such Investment and shall be net of any Investment by such Person in Parent or any Subsidiary.

"<u>Investment Company Act</u>" means the Investment Company Act of 1940, as amended or otherwise modified from time to time.

"<u>IRS</u>" has the meaning set forth in <u>Section 5.03(d)(i)</u>.

"Junior Financing" means any Indebtedness (other than any permitted intercompany Indebtedness owing to the Credit Parties) that is (i) subordinated in right of payment to the Borrower Obligations, (ii) secured by a Lien that is junior in priority to the Lien securing the Borrower Obligations or (iii) unsecured Indebtedness for borrowed money.

"KEIP" has the meaning assigned to such term in Section 8.02(h).

"Lenders" means each Person that is or becomes a party to this Agreement in the capacity of a "Lender" (including, for the avoidance of doubt, any Pre-Petition Lender).

"Lien" means any lien, mortgage, security interest, tax lien, pledge, encumbrance, or conditional sale or title retention arrangement, or any other interest in property designed to secure the repayment of indebtedness, whether arising by agreement or under common law, any statute or other law, contract, or otherwise.

"Liquidity" means, as of any date of determination, the amount of unrestricted cash and Cash Equivalents of the Borrower or any other Credit Party that is in deposit accounts or in securities accounts, or any combination thereof, which deposit accounts and securities accounts are subject to account control agreements and are maintained by a branch office of the applicable bank or securities intermediary located within the United States of America.

"Loan" means any loan made or deemed made by any Lender hereunder, including, without limitation, each DIP Term Loan and, following the Roll-Up Effective Time, the Rollup Loans.

"Loan Commitment" means, at any time of determination prior to the termination of all Commitments hereunder, the aggregate Commitments of all Lenders at such time.

"Loan Commitment Percentage" means, at any time of determination prior to the termination of all Commitments hereunder, with respect to any Lender, a fraction (expressed as a percentage), the numerator of which is its applicable Commitment at such time and the denominator of which is the aggregate applicable Commitments of all Lenders at such time. For the avoidance of doubt, the Loan Commitment Percentage with respect to any Lender to which all or a portion of any funded Loans is assigned but to which no portion of an unfunded Commitment is assigned shall be 0%.

"Loan Request" means a letter in substantially the form of Exhibit A hereto executed and delivered by the Borrower to the Administrative Agent and the Lenders pursuant to Section 2.03(a).

"Material Adverse Effect" means relative to any Person (provided that if no particular Person is specified, "Material Adverse Effect" shall be deemed to be relative to each of the Credit Parties individually) with respect to any event or circumstance, a material adverse effect on any of the following:

> (a)    the assets, operations, business or financial condition of Parent and its Subsidiaries, taken as a whole;

> (b)    the ability of the Credit Parties to perform their obligations (taken as a whole) under this Agreement or any other Transaction Document to which it is a party;

> (c)    the validity or enforceability of this Agreement or any other Transaction Document;

(d)    the perfection, enforceability or priority of the Administrative Agent's security interest in a material portion of the Collateral; or

(e)    the rights and remedies of the Administrative Agent or the Lenders under the Transaction Documents taken as a whole or associated with their respective interest in the Collateral.

"Material Indebtedness" means Indebtedness (other than the Loans) of the Credit Parties and their Subsidiaries in an aggregate principal amount exceeding $2.0 million. Notwithstanding the foregoing, the Note Purchase Agreement, the Second Lien DIP Agreement, the Second Lien DIP Documents and the Note Documents shall at all times be deemed Material Indebtedness hereunder. For purposes of determining the amount of Material Indebtedness at any time, (a) undrawn and committed amounts shall be included, and (b) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Month" means each calendar month.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Credit Party, any of their Subsidiaries or any of their respective ERISA Affiliates (other than one considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code) is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"Note Collateral Agent" has the meaning set forth in the definition of "Note Purchase Agreement".

"Note Documents" mean the Note Purchase Agreement, any Guarantee (as defined in the Note Purchase Agreement), and the other Note Documents (as defined in the Note Purchase Agreement).

"Note Purchase Agreement" means the Note Purchase Agreement, dated as of December 30, 2022, by and among Parent, as issuer, the purchasers from time to time party thereto, and U.S. Bank National Association, as collateral agent (the "Note Collateral Agent") as amended, supplemented or otherwise modified or replaced from time to time in accordance with the Pre-Petition Intercreditor Agreement or with the consent of the Administrative Agent.

"Notes" means the notes issued by Parent under the Note Purchase Agreement.

"OFAC" means the U.S. Department of Treasury's Office of Foreign Assets Control.

"OFAC Lists" means, collectively, the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) and/or any other list of terrorists or other restricted Persons maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable executive orders.

"Other Connection Taxes" means, with respect to any Affected Person, Taxes imposed as a result of a present or former connection between such Affected Person and the jurisdiction imposing such Tax (other than connections arising from such Affected Person having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Transaction Document, or sold or assigned an interest in any Loan or Transaction Document).

"Other Taxes" means any and all present or future stamp, court, documentary, intangible, recording, filing or similar Taxes arising from any payment made hereunder or from the execution, delivery, filing, recording or enforcement of, or otherwise in respect of, this Agreement, the other Transaction Documents and the other documents or agreements to be delivered hereunder or thereunder, except for any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Parent" has the meaning set forth in the preamble to this Agreement..

"Participant" has the meaning set forth in Section 14.03(d).

"Participant Register" has the meaning set forth in Section 14.03(e).

"PATRIOT Act" has the meaning set forth in Section 14.15.

"Payment Date" means the DIP Term Loan Maturity Date.

"PBGC" means the Pension Benefit Guaranty Corporation, or any successor thereto.

"Pension Plan" means a pension plan as defined in Section 3(2) of ERISA that is subject to Title IV of ERISA (other than a Multiemployer Plan) that is maintained or contributed to by a Credit Party or any of their respective Subsidiaries or ERISA Affiliates or with respect to which any Credit Party or any Subsidiary may have any liability, contingent or otherwise.

"Permitted Disposition" means:

(1)     licensing, on a non-exclusive basis, intellectual property rights in the ordinary course of business;

(2)     leasing or subleasing assets in the ordinary course of business;

(3)     (i) the lapse of registered intellectual property of Parent and its Subsidiaries to the extent not economically desirable in the conduct of their business or (ii) the abandonment of intellectual property rights in the ordinary course of business so long as, (A) with respect to copyrights, such copyrights are not material revenue generating copyrights, and (B) such lapse is not materially adverse to the interests of the Secured Parties;

(4)     any involuntary loss, damage or destruction of property;

(5)     any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(6)     transfers of assets from Parent or any other Credit Party to Parent or another Credit Party;

(7)     the termination or expiration of any contract in accordance with its terms or any settlement, release, waiver or surrender of contractual rights or other litigation claims in the ordinary course of business;

(8)     use or transfer of money or Cash Equivalents in the ordinary course of business and in a manner that is not prohibited by the terms of this Agreement, the other Transaction Documents or the DIP Orders;

(9)     the granting of Permitted Liens and the making of Permitted Investments and Permitted Restricted Payments;

(10)    Disposition of accounts receivable in the ordinary course of business or bankruptcy in connection with the collection or compromise thereof;

(11)    [reserved];

(12)    any surrender or waiver of contractual rights or the settlement, release or surrender of contractual rights or litigation claims (including in tort) in the ordinary course of business; and

(13)    the Disposition of obsolete, worn out or surplus property or property (including leasehold property interests) that is no longer economically practical in its business or commercially desirable to maintain or no longer used or useful equipment in the ordinary course of business.

"Permitted Expenses" means reasonable legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and other reasonable out of pocket expenses of the Administrative Agent in connection with the Chapter 11 Cases, this Agreement, the Transaction Documents, and all documents related thereto, and all costs and expenses of the Administrative Agent (including reasonable, documented attorney expenses in accordance herewith) in connection with the enforcement of remedies under the Transaction Documents to be reimbursed on a current basis by the Credit Parties from the proceeds of Loans hereunder.

"Permitted Holders" means (i) each of the Persons owning Voting Stock of the Parent or Notes on the Effective Date, (ii) each of the Persons owning Voting Stock of Bird Canada Inc. as of December 19, 2022, and (iii) those individuals acting from time to time as officers, directors, managers, employees or members, or in any similar capacity, for any entity referred to in clause (i) above, together with, in the case of clause (iii), any entities owned or controlled by any such individuals, independently or together with one or more entities referred to above.

"Permitted Indebtedness" means:

(1)    the Indebtedness owing to Lenders under this Agreement and the other Transaction Documents;

(2)    Indebtedness arising under (i) the Note Purchase Agreement in an aggregate principal amount not to exceed $79,000,000 and (ii) the Second Lien DIP Loan Agreement;

(3)    Indebtedness of Bird Canada Inc. existing January 3, 2023;

(4)    Indebtedness existing on the Effective Date (other than Indebtedness described in clauses (1) through (3) above) (provided that Indebtedness with an outstanding principal amount in excess of $1,000,000 shall only be permitted under this clause (5) if set forth on Schedule 8.02(c) hereto);

(5)    [reserved];

(6)    Permitted Intercompany Investments;

(7)    Indebtedness incurred in the ordinary course of business under performance, surety, statutory, and appeal bonds;

(8)    Indebtedness owed to any Person providing property, casualty, liability, environmental or other insurance to the Credit Parties, so long as the amount of such Indebtedness is not in excess of the

amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the period in which such Indebtedness is incurred and such Indebtedness is outstanding only during such period;

(9)      [reserved];

(10)     Indebtedness incurred in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards or other similar cash management services, in each case, incurred in the ordinary course of business;

(11)     [reserved];

(12)     [reserved];

(13)     Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts;

(14)     [reserved];

(15)     to the extent constituting Indebtedness, operating leases incurred in the ordinary course of business;

(16)     letters of credit incurred in the ordinary course of business with cities and pursuant to import/export duties incurred in the ordinary course of business;

(17)     so long as no Default or Event of Default has occurred and is continuing or would result therefrom, other Indebtedness in an aggregate principal amount not to exceed $5.0 million at any time outstanding;

(18)     the VTB Note (as defined in the Spin Stock Purchase Agreement); and

(19)     Indebtedness under the Pre-Petition Loan Agreement.

"Permitted Intercompany Investments" means Investments made by (a) a Credit Party to or in another Credit Party, (b) a Subsidiary that is not a Credit Party to or in another Subsidiary that is not a Credit Party, (c) a Subsidiary that is not a Credit Party to or in a Credit Party, so long as, in the case of a loan or advance, the Indebtedness is subordinated to the Borrower Obligations to the satisfaction of the Administrative Agent, and (d) a Credit Party to or in a Subsidiary that is not a Credit Party so long as (i) the aggregate amount of all such Investments made by the Credit Parties to or in Subsidiaries that are not Credit Parties does not exceed $400,000 at any time outstanding and (ii) no Default or Event of Default has occurred and is continuing either before or after giving effect to such Investment.

"Permitted Investments" means:

(1)     Investments in cash and Cash Equivalents;

(2)     Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

(3)     advances made in connection with purchases of goods or services in the ordinary course of business;

(4)     Investments received in settlement of amounts due to any Credit Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Credit Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an account debtor or upon the foreclosure or enforcement of any Lien in favor of a Credit Party or its Subsidiaries;

(5)     Investments existing on the Effective Date;

(6)     Permitted Intercompany Investments;

(7)     [reserved];

(8)     [reserved];

(9)     loans or advances to directors and employees of any Credit Party or any of its Subsidiaries made in the ordinary course of business; provided that the aggregate amount of such loans and advances outstanding at any time shall not exceed $100,000;

(10)    [reserved];

(11)    Investments consisting of guarantees or other contingent obligations permitted under Section 8.02(c);

(12)    any Investments held by Bird Canada Inc. on January 3, 2023;

(13)    so long as no Default or Event of Default has occurred and is continuing or would result therefrom, other Investments in an aggregate amount not to exceed $100,000 at any time outstanding; and

(14)    any Investment contemplated by the transactions pursuant to the Spin Stock Purchase Agreement.

"Permitted Liens" means, with respect to any Person:

(1)     Liens securing the Borrower Obligations under this Agreement or the Pre-Petition Transaction Documents;

(2)     Liens in favor of the Note Collateral Agent (for the benefit of the Secured Parties as defined in the Note Purchase Agreement) and the Second Lien DIP Loan Agreement (for the benefit of the Note Parties as defined in the Second Lien DIP Loan Agreement), which Liens shall be subject to the Pre-Petition Intercreditor Agreement.

(3)     Liens for Taxes, assessments and governmental charges or levies not yet due or payable or the payment of which is not required under Section 8.01(p);

(4)     Liens imposed by law, such as carriers', warehousemen's, mechanics', worker's, materialmen's, construction and other similar Liens arising in the ordinary course of business and securing obligations (other than Indebtedness for borrowed money) that are not overdue by more than 60 days or are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(5)     Liens existing on the Effective Date; *provided* that any such Lien shall only secure the Indebtedness, and encumber the assets, that it secures on the Effective Date;

(6)     [reserved];

(7)     deposits and pledges of cash securing (i) obligations incurred in respect of workers' compensation, unemployment insurance, social security or other forms of governmental insurance or benefits, (ii) the performance of bids, tenders, leases, contracts (other than for the payment of money) permits, licenses or statutory obligations or (iii) obligations on surety or appeal bonds or letters of credit, but only to the extent such deposits or pledges are made or letters of credit are made or otherwise arise or issued in the ordinary course of business and secure obligations not past due;

(8)     easements, rights of way, servitudes, zoning, building or similar restrictions and similar encumbrances on real property and exceptions, imperfections and irregularities in the title thereto that do not (i) secure obligations for the payment of money or (ii) materially impair the value of such property or its use by any Credit Party or any of its Subsidiaries in the normal conduct of such Person's business;

(9)     Liens of landlords and mortgagees of landlords (i) arising by statute or under any Lease or related Contractual Obligation entered into in the ordinary course of business, (ii) on fixtures and movable tangible property located on the real property leased or subleased from such landlord, or (iii) for amounts not yet due or that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves or other appropriate provisions are maintained on the books of such Person in accordance with GAAP;

(10)    the title and interest of (i) a lessor or sublessor in and to personal property leased or subleased (other than through a capital lease) extending only to such personal property, or (ii) a licensor or sublicensor in or to the property subject to any license or sublicense or concession agreement permitted by this Agreement extending only to such property;

(11)    non-exclusive licenses of intellectual property rights in the ordinary course of business;

(12)    any encumbrances or restrictions (including put and call agreements) with respect to any Equity Interests constituting a Permitted Investment as required pursuant to the terms of the shareholder, joint venture or other agreement governing such Permitted Investment as in effect on the Effective Date;

(13)    judgment liens (other than for the payment of taxes, assessments or other governmental charges) securing judgments and other proceedings not constituting an Event of Default under Section 10.01(s);

(14)    rights of set-off or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business;

(15)    Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Indebtedness;

(16)    [reserved];

(17)    Liens securing Permitted Indebtedness under <u>clause (2)</u>, <u>clause (10)</u> and <u>clause (19)</u> of the definition of "Permitted Indebtedness," including Liens securing cash management services and Hedging Agreements secured under the documentation governing such Indebtedness, so long as any such Liens are subject to the Pre-Petition Intercreditor Agreement;

(18)    UCC or PPSA financing statements filed (or similar filings under applicable law) solely as a precautionary measure in connection with operating leases;

(19)    in connection with the sale or transfer of any assets in a transaction not prohibited hereunder, customary rights and restrictions contained in agreements relating to such sale or transfer pending the completion thereof;

(20)    receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(21)    Liens in the nature of the right of setoff in favor of counterparties to contractual agreements not otherwise prohibited hereunder with the Parent or any of its Subsidiaries in the ordinary course of business;

(22)    Liens on cash pledged to secure obligations in respect of letters of credit incurred in the ordinary course of business with cities and pursuant to import/export duties incurred in the ordinary course of business;

(23)    Liens arising out of consignment or similar arrangements for the sale of goods in the ordinary course of business;

(24)    Liens on goods in favor of customs and revenues authorities imposed by applicable law arising in the ordinary course of business in connection with the importation of such goods;

(25)    Liens arising by operation of law under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(26)    Liens on securities that are the subject of repurchase agreements constituting Cash Equivalents;

(27)    Liens in favor of banking institutions arising as a matter of law or under general terms and conditions encumbering deposits (including the right of set off) and which are within the general parameters customary in the banking industry; and

(28)    the VTB Security (as defined in the Spin Stock Purchase Agreement).

(29)    other Liens which do not secure Indebtedness for borrowed money or letters of credit and as to which the aggregate amount of the obligations secured thereby does not exceed $1.0 million at any time outstanding.

"<u>Permitted Restricted Payments</u>" means any of the following Restricted Payments made by:

(a)    any Credit Party to another Credit Party;

(b)     any Subsidiary of Parent to Parent (and any necessary Restricted Payments to another Subsidiary in order to ultimately make such Restricted Payment to Parent);

(c)     Parent and any of its Subsidiaries to pay dividends or make other distributions in the form of common Equity Interests; and

(d)     the redemption, repurchase, retirement or other acquisition of any Equity Interests or Junior Financing of any Credit Party, in exchange for, or out of the proceeds of the substantially concurrent sale of, Equity Interests (other than any Disqualified Equity Interests) of Parent.

"Permitted Variance" means, a negative variance in the aggregate amount of unrestricted cash and Cash Equivalents of the Credit Parties and their Subsidiaries set forth each Approved Budget for any Budget Testing Period (calculated as of the close of business of the Borrower on the last Business Day of each Budget Testing Period) of the greater of (x) $500,000 and (y) 10% of such budgeted amount; provided, that, the negative variance may not exceed $1,000,000 for any Budget Testing Period.

"Person" means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity, or any Governmental Authority.

"Petition Date" has the meaning assigned to such term in the Recitals.

"Post-Petition" means the time period beginning immediately upon the filing of the Chapter 11 Cases and ending upon the closing of the Chapter 11 Cases.

"Potential Event of Default" means an event that but for notice or lapse of time or both would constitute an Event of Default.

"PPSA" means the Personal Property Security Act (Ontario) (and other equivalent personal property security legislation in any other applicable Canadian province or territory) and the regulations thereunder, as from time to time in effect; provided that, if attachment, perfection or priority of the Collateral Agent's security interest in any Collateral is governed by the personal property security laws of any jurisdiction in Canada other than Ontario, with respect to such Collateral, PPSA shall mean those personal property security laws in such other jurisdiction of Canada (including the Civil Code of Quebec and the regulations thereunder, in the case of Quebec) for the purposes of the provisions hereof relating to such attachment, perfection or priority and for the definitions related to such provisions.

"Pre-Petition Agent" means the "Administrative Agent" as defined in the Pre-Petition Loan Agreement.

"Pre-Petition Amendment No. 1 Obligations" means all interest, fees and principal owning with respect to the "Existing Amendment No. 1 Loans" as such term is defined in the Pre-Petition Loan Agreement.

"Pre-Petition Bridge Obligations" means all interest, fees and principal owning with respect to the "Bridge Loans" as such term is defined in the Pre-Petition Loan Agreement.

"Pre-Petition Indebtedness" means any and all Indebtedness of the Credit Parties incurred prior to the Petition Date and outstanding as of the Petition Date.

"<u>Pre-Petition Intercreditor Agreement</u>" means that certain Amended and Restated Subordination and Intercreditor Agreement dated as of December 11, 2023, by and among the Pre-Petition Agent, the Note Collateral Agent, the Borrower and the other Persons party thereto.

"<u>Pre-Petition Lenders</u>" means the "Lenders" as defined in the Pre-Petition Loan Agreement.

"<u>Pre-Petition Loan Agreement</u>" has the meaning assigned to such term in the Recitals.

"<u>Pre-Petition Obligations</u>" means, collectively, all Pre-Petition Amendment No. 1 Obligations, all Pre-Petition Bridge Obligations and all Pre-Petition Other Obligations.

"<u>Pre-Petition Other Obligations</u>" means all "Borrower Obligations" outstanding under (and as defined in) the Pre-Petition Loan Agreement, in each case other than any Pre-Petition Amendment No. 1 Obligations and Pre-Petition Bridge Obligations.

"<u>Pre-Petition Payments</u>" means any payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Pre-Petition Indebtedness or other obligations or claims (including trade payables and payments in respect of reclamation and/or Section 503(b)(9) claims) of the Credit Parties.

"<u>Pre-Petition Prior Liens</u>" shall have the meaning set forth in the DIP Orders.

"<u>Pre-Petition Secured Parties</u>" means the "Secured Parties" as defined in the Pre-Petition Loan Agreement.

"<u>Pre-Petition Transaction Documents</u>" means the "Transaction Documents" as defined in the Pre-Petition Loan Agreement.

"<u>Prior Lender</u>" means each "Lender" as defined in the Pre-Petition Loan Agreement as of the Petition Date.

"<u>Priority of Payments</u>" has the meaning set forth in <u>Section 4.01</u>.

"<u>Qualified Purchaser</u>" means a Person satisfactory to the Required DIP Lenders.

"<u>Register</u>" has the meaning set forth in <u>Section 14.03(b)</u>.

"<u>Reportable Event</u>" means any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Pension Plan (other than a Pension Plan maintained by an ERISA Affiliate which is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code).

"<u>Representatives</u>" has the meaning set forth in <u>Section 14.06(c)</u>.

"<u>Required DIP Lenders</u>" means Lenders holding in excess of fifty percent (50%) of the sum of the then aggregate outstanding principal balance of the Loans.

"<u>Requirement of Law</u>" means, with respect to any Person, the common law and any federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case whether or not having the force of

law and that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserves" means reserves established by the Administrative Agent to ensure the payment of the Carve-Out and other professional expenses and any other reserves established by the Administrative Agent in accordance with the DIP Orders.

"Responsible Officer" of any Person means, any Financial Officer, the chief restructuring officer, the chief operating officer, general counsel or other similar officer of such Person.

"Restricted" shall mean, when referring to cash or Cash Equivalents of Parent or any of its Subsidiaries, that such cash or Cash Equivalents (i) appear (or would be required to appear) as "restricted" as required by GAAP on a consolidated balance sheet of Parent, (ii) are subject to any Lien in favor of any Person other than the Administrative Agent for the benefit of the Secured Parties or (iii) are not otherwise generally available for use by Parent or its Subsidiaries.

"Restricted Investment" means an Investment other than a Permitted Investment.

"Restricted Payment" means the Parent or any Subsidiary of the Parent acting to:

(1)     declare or pay any dividend or make any payment or distribution on account of the Parent's or any of its Subsidiaries' Equity Interests, including any payment made in connection with any merger, amalgamation, or consolidation involving the Parent (other than (A) dividends or distributions by the Parent payable solely in Equity Interests of the Parent or (B) dividends or distributions by a Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Subsidiary other than a wholly owned Subsidiary, the Parent or a Subsidiary receives at least its *pro rata* share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities);

(2)     purchase, redeem, defease, or otherwise acquire or retire for value any Equity Interests of the Parent or any direct or indirect parent of the Parent, including in connection with any merger, amalgamation, or consolidation;

(3)     make any principal payment on, or redeem, repurchase, defease, or otherwise acquire or retire for value, in each case, prior to any scheduled repayment, sinking fund payment, or maturity, any Subordinated Indebtedness of any Credit Party or any Subsidiary (other than the payment, redemption, repurchase, defeasance, acquisition, or retirement of Indebtedness permitted under clause (7) of the definition of "Permitted Indebtedness"; or

(4)     make any Restricted Investment.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement dated as of December 19, 2023, by and among the Pre-Petition Agent, the Pre-Petition Lenders, the Second Lien Agent (as defined therein", the Second Lien Lenders (as defined therein) and the other Persons party thereto.

"Roll-Up Effective Time" means the moment in time immediately following of the entry of the Final Order by the Bankruptcy Court approving the roll-up of certain of the Pre-Petition Obligations as contemplated therein and herein.

"Rollup Amendment No. 1 Lender" means any Lender holding Rollup Amendment No. 1 Loans.

"Rollup Amendment No. 1 Loans" has the meaning assigned to such term in Section 2.02(a).

"Rollup Bridge Lender" means any Lender holdings Rollup Bridge Loans.

"Rollup Bridge Loans" has the meaning assigned to such term in Section 2.02(b).

"Rollup Loans" means, collectively, the Rollup Amendment No. 1 Loans and the Rollup Bridge Loans.

"Sanctioned Country" means a country subject to a sanctions program maintained under any Anti-Terrorism Law, including any such country identified on the list maintained by OFAC and available at: http://www.treasury.gov/resource-center/sanctions/Programs/ Pages/Programs.aspx, or as otherwise published from time to time.

"Sanctioned Person" means (a) a person named on the list of "Specially Designated Nationals" or "Blocked Persons" maintained by OFAC available at: http://www.treasury.gov/ resource-center/sanctions/SDN-List/Pages/default.aspx, or as otherwise published from time to time, (b) (i) an agency of the government of a Sanctioned Country, (ii) an organization controlled by a Sanctioned Country or (iii) a person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC, or (c) any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person, group, regime, entity or thing, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any Anti-Terrorism Law.

"Second Lien DIP Agent" means U.S. Bank Trust Company, National Association, in its capacity as collateral agent under the Second Lien DIP Loan Documents.

"Second Lien DIP Lenders" means the DIP Notes Purchasers (as defined in the Second Lien DIP Loan Agreement).

"Second Lien DIP Loan Agreement" means Senior Secured Priming and Super-Priority Debtor-In-Possession Note Purchase Agreement dated as of December 22, 2023, by and among Bird Global, Inc., the Second Lien DIP Agent, the Second Lien DIP Lenders and the other Persons party thereto.

"Second Lien DIP Loans" means the Notes (as defined in the Second Lien DIP Loan Agreement).

"Second Lien DIP Loan Documents" has the meaning assigned to the term Note Documents in the Second Lien DIP Loan Agreement.

"Secured Parties" means each Lender, each Borrower Indemnified Party and each Affected Person.

"Securities Act" means the Securities Act of 1933, as amended or otherwise modified from time to time.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"Spin Stock Purchase Agreement" means that certain Stock Purchase Agreement dated as of September 19, 2023 between Bird Global, Inc., a Delaware corporation, Bird Rides, Inc., a Delaware corporation, Skinny Labs, Inc., a Delaware corporation (d/b/a "SPIN") and Tier Mobility SE.

"Subordinated Indebtedness" means any Indebtedness which is, by its terms, expressly subordinated in right of payment to the Borrower Obligations.

"Subsidiary" means, as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock of each class or other interests having ordinary voting power (other than stock or other interests having such power only by reason of the happening of a contingency) to elect a majority of the Board of Directors or other managers of such entity are at the time owned, or management of which is otherwise controlled: (a) by such Person, (b) by one or more Subsidiaries of such Person or (c) by such Person and one or more Subsidiaries of such Person.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority and all interest, penalties, additions to tax and any similar liabilities with respect thereto.

"Termination Declaration Date" has the meaning assigned to such term in Section 10.02.

"Termination Event" shall have the meaning set forth in the DIP Orders.

"Transaction Documents" means this Agreement, the DIP Orders, the Restructuring Support Agreement, the Fee Letters, the Pre-Petition Intercreditor Agreement, and all other agreements executed and delivered under or in connection with this Agreement, in each case as the same may be amended, supplemented or otherwise modified from time to time in accordance with this Agreement. For the avoidance of doubt, the Transaction Documents shall not include the Investment Agreement dated on or about December 19, 2022, among Bird Global, Inc., Travis Vanderzanden, and Bird Canada Inc.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Tax Compliance Certificate" has the meaning set forth in Section 5.03(d)(1)(C).

"UCC" means the Uniform Commercial Code as from time to time in effect in the applicable jurisdiction.

"Volcker Rule" means Section 13 of the U.S. Bank Holding Company Act of 1956, as amended, and the applicable rules and regulations thereunder.

"Voting Stock" shall mean, with respect to any person, such person's Equity Interests having the right to vote for the election of directors of such person under ordinary circumstances.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02   Other Interpretative Matters.  All terms used in Article 9 of the UCC in the State of New York and not specifically defined herein, are used herein as defined in such Article 9.  For purposes of this Agreement, the other Transaction Documents and all such certificates and other documents, unless the context otherwise requires: (a) references to any amount as on deposit or outstanding on any particular date means such amount at the close of business on such day; (b) the words "hereof," "herein" and "hereunder" and words of similar import refer to such agreement (or the certificate or other document in which they are used) as a whole and not to any particular provision of such agreement (or such certificate or document); (c) unless otherwise expressly indicated, all references to any Article, Section, Schedule, Exhibit, or Annex are references to Articles, Sections, Schedules, Exhibits, and Annexes in or to such agreement (or the certificate or other document in which the reference is made), and references to any paragraph, subsection, clause, or other subdivision within any Section or definition refer to such paragraph, subsection, clause, or other subdivision of such Section or definition; (d) the term "including" means "including without limitation"; (e) references to any Applicable Law refer to that Applicable Law as amended from time to time and include any successor Applicable Law; (f) references to any agreement refer to that agreement as from time to time amended, restated or supplemented or as the terms of such agreement are waived or modified in accordance with its terms; (g) references to any Person include that Person's permitted successors and assigns; (h) headings are for purposes of reference only and shall not otherwise affect the meaning or interpretation of any provision hereof; (i) unless otherwise provided, in the calculation of time from a specified date to a later specified date, the term "from" means "from and including", and the terms "to" and "until" each means "to but excluding"; (j) terms in one gender include the parallel terms in the neuter and opposite gender; and (k) the term "or" is not exclusive.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

SECTION 1.03   Canadian References.  Any term defined in this Agreement by reference to the UCC shall also have any extended, alternative or analogous meaning given to such term in the PPSA and under other Canadian laws (including, without limitation, the Securities Transfer Act, 2006 (Ontario), the Bills of Exchange Act (Canada) and the Depository Bills and Notes Act (Canada)), in all cases for the extension, preservation or betterment of the security and rights of the Secured Parties, (ii) all references in this Agreement to a financing statement, continuation statement, amendment or termination statement shall be deemed to refer also to the analogous documents used under the PPSA, including, without limitation, where applicable, financing change statements and (iii) all references to federal or state securities law of the United States shall be deemed to refer also to analogous federal, provincial and territorial securities laws in Canada.

## ARTICLE II

## TERMS OF THE LOANS

SECTION 2.01   Loans.

(a)      [Reserved].

(b)      [Reserved].

(c)     Upon a request by the Borrower pursuant to Section 2.03, and on the terms and subject to the conditions hereinafter set forth, each applicable DIP Term Lender shall, ratably in accordance with its respective Loan Commitment Percentage (such amount, as the same may be reduced or increased from time to time in accordance with this Agreement, being referred to herein as such DIP Term Lender's "**DIP Term Loan Commitment**"), severally and not jointly, make DIP Term Loans in the aggregate amount of up $19,500,000, to the Borrower from time to time during the period from the Effective Date to the Commitment Termination Date; provided, that, up to $[ ● ] shall be available upon entry into the Interim Order with the remaining DIP Term Loan Commitment becoming available upon the entry into the Final Order.  Under no circumstances shall any DIP Term Lender be obligated to make any such DIP Term Loan if, after giving effect to such DIP Term Loan, the aggregate principal amount of all DIP Term Loans extended pursuant to this Article II exceeds the DIP Term Loan Commitment or such DIP Term Lender's share of such DIP Term Loan exceeds such DIP Term Lender's DIP Term Loan Commitment as of such date.  To the fullest extent consistent with applicable laws and regulations, all DIP Term Loans made under this Section 2.01(c) shall constitute a single tranche and be fungible with each other.  The Credit Parties acknowledge and agree that neither the Borrower, Bird OpCo nor any other Credit Party has any defense, counterclaim or setoff with respect to the payment thereof.

(d)     The Borrower shall not have any right to reborrow any portion of the Loan that is repaid or prepaid from time to time.

SECTION 2.02    Rollup. Effective upon the occurrence of the Roll-Up Effective Time, without any further action by any party to this Loan Agreement, the Bankruptcy Court or any other Person, to the extent set forth in the Final Order:

(a)     all Pre-Petition Amendment No. 1 Obligations owing to the Secured Parties at the Roll-Up Effective Time shall be rolled-up into and constitute Borrower Obligations hereunder and shall be deemed loans made hereunder (such amounts, collectively, the "Rollup Amendment No. 1 Loans") and shall constitute a portion of the outstanding amount of the Borrower Obligations owing to the Secured Parties hereunder.  The amount of Rollup Amendment No. 1 Loans owing to each Lender under the Pre-Petition Loan Agreement is referred to herein as such Lender's "Rollup Amendment No. 1 Commitment"; and

(b)     all Pre-Petition Bridge Obligations owing to each Secured Party at the Roll-Up Effective Time shall be rolled-up into and constitute Borrower Obligations hereunder and shall be deemed loans made hereunder (such amounts, collectively, the "Rollup Bridge Loans") and shall constitute a portion of the outstanding amount of the Borrower Obligations owing to the Secured Parties hereunder.  The amount of Rollup Bridge Loans owing to each Lender under the Pre-Petition Loan Agreement is referred to herein as such Lender's "Rollup Bridge Commitment".

SECTION 2.03    Making of Loans; Repayment of Loans.

(a)     On the terms and subject to the conditions hereinafter set forth, each DIP Term Loan hereunder shall be made on a Business Day upon the Borrower's prior written request to the Administrative Agent (who shall promptly provide to each DIP Term Lender) in the form of a Loan Request attached hereto as Exhibit A.  Each such request for a DIP Term Loan shall be made no later than 2:00 p.m. (New York City time) on the date that is two (2) Business Days prior to the date such requested DIP Term Loan is to be made (it being understood that any such request made after such time shall be deemed to have been made on the following Business Day) and shall specify the amount of the DIP Term Loan(s) requested (which shall be in an amount not less than $500,000 and shall be an integral multiple of $100,000 in excess thereof, or shall be in such lower amount as requested by the Borrower and agreed to by the Administrative Agent in its sole discretion).  On the date of each Loan specified in the applicable Loan Request, the DIP

27

Term Lenders shall, upon satisfaction of the applicable conditions set forth in <u>Article VI</u> and pursuant to the other conditions set forth in this <u>Article II</u>, make available to the Borrower in same day funds an aggregate amount equal to the amount of such DIP Term Loans requested. All DIP Term Loan proceeds shall be used for working capital and general corporate purposes of Parent or any of its Subsidiaries, in each case in accordance with the Initial Approved Budget.

(b)　　Each DIP Term Lender's obligation shall be several, such that the failure of any DIP Term Lender to make available to the Borrower any funds in connection with any DIP Term Loan shall not relieve any other DIP Term Lender of its obligation, if any, hereunder to make funds available on the date such DIP Term Loans are requested (it being understood that no DIP Term Lender shall be responsible for the failure of any other DIP Term Lender to make funds available to the Borrower in connection with any DIP Term Loan hereunder).

(c)　　The outstanding principal amount of all applicable DIP Term Loans shall become immediately due and payable in full on the DIP Term Loan Maturity Date. The Borrower may also repay the Loans in accordance with the terms of <u>Section 2.03(e)</u>.

(d)　　[Reserved].

(e)　　The Borrower may from time to time, with at least two (2) Business Days prior delivery to the Administrative Agent of written notice, prepay the Loans in whole or in part, without premium or penalty; <u>provided</u>, <u>however</u>, that each such prepayment shall be in an amount equal to $100,000 or a higher integral multiple of $25,000 and shall be accompanied by any accrued and unpaid Interest on the amount prepaid and any applicable Fees. Principal payments shall continue in accordance with the Priority of Payments, except that notwithstanding the Priority of Payments, at the direction of the Borrower, optional payments by the Borrower may be applied first to the DIP Term Loans, second to the Rollup Amendment No. 1 Loans and third to the Rollup Bridge Loans. The Administrative Agent shall distribute to the Lenders (ratably, based on the amount then due and owing) any amounts received in respect of an optional prepayment in accordance with this <u>Section 2.03(e)</u>.

SECTION 2.04　　<u>Interest and Fees</u>.

(a)　　The DIP Term Loans and, upon the Rollup Effective Time, the Rollup Loans, shall accrue Interest on each day at the then applicable Interest Rate. The Borrower shall pay all Interest accrued during each Interest Period on tenth day of each calendar month (or if such date is not a Business Day, then on the next succeeding Business Day); provided that a portion of Interest equal to 9% per annum in respect of the DIP Term Loans and the Rollup Loans shall be paid in kind on the tenth day of each calendar month (or if such day is not a Business Day, on the next succeeding Business Day) by adding the amount thereof to the principal balance of the DIP Term Loans or Rollup Loans (as applicable) and from and after such time such amounts shall constitute principal for all amounts hereunder. Interest shall be paid in accordance with the Priority of Payments.

(b)　　The Borrower shall pay to each DIP Term Lender and the Administrative Agent certain fees (collectively, the "<u>Fees</u>") in the amounts set forth in the fee letter agreements among the Borrower, the Lenders, and the Administrative Agent (each as amended, restated, supplemented or otherwise modified from time to time, a "<u>Fee Letter</u>").

SECTION 2.05　　<u>Records of Loans</u>. Each Lender shall record in its records the date and amount of the Loans made by such Lender hereunder, the Interest Rate with respect thereto, the Interest accrued thereon, and each repayment and payment thereof. Subject to <u>Section 14.03(b)</u>, such records shall be *prima facie* evidence of the existence and amount of the obligations recorded therein. The failure to so record any

such information or any error in so recording any such information shall not, however, limit or otherwise affect the obligations of the Borrower hereunder or under the other Transaction Documents to repay to each Lender the Loans, together with all Interest accruing thereon, and all other Borrower Obligations.

SECTION 2.06    Grant of Lien; Super Priority Nature of Obligations and Lenders' Liens.

(a)    Grant of Lien.  Each Credit Party, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Borrower Obligations, hereby mortgages, pledges and hypothecates to the Administrative Agent for the benefit of the Secured Parties, and grants to the Administrative Agent, for the benefit of the Secured Parties, a Lien on and security interest in, all of its right, title and interest in, to and under the Collateral of such Credit Party, all as further provided in the DIP Orders.

(b)    Superpriority Claims.  Each Credit Party hereby covenants, represents and warrants that, upon entry of the Interim Order (and the Final Order, as applicable), the Borrower Obligations will have superpriority administrative expense status as expressly set forth in the DIP Orders.

SECTION 2.07    Guaranty.  To induce the Lenders to make the Loans and each other Secured Party to make credit available to or for the benefit of the Borrower, each Guarantor hereby, jointly and severally, absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment when due, whether at stated maturity or earlier, by reason of acceleration, mandatory prepayment or otherwise in accordance with any Transaction Document or the DIP Orders, of all the Borrower Obligations of the Borrower and the other Credit Parties whether existing on the date hereof or hereinafter incurred or created (the "**Guaranteed Obligations**").  This guaranty by each Guarantor hereunder constitutes a guaranty of payment and not of collection.

SECTION 2.08    Contribution.  To the extent that a Guarantor shall be required hereunder to pay any portion of any Guaranteed Obligation exceeding the greater of (a) the amount of the value actually received by such Guarantor and its Subsidiaries from the Loans and other Borrower Obligations and (b) the amount such Guarantor would otherwise have paid if such Guarantor had paid the aggregate amount of the Guaranteed Obligations (excluding the amount thereof repaid by such Guarantor that received the benefit of the funds advanced that constituted Guaranteed Borrower Obligations) in the same proportion as such Guarantor's net worth on the date enforcement is sought hereunder bears to the aggregate net worth of all Credit Parties on such date, then such Guarantor shall be reimbursed by such other Credit Parties for the amount of such excess, pro rata, based on the respective net worth of such other Credit Parties on such date.

SECTION 2.09    Authorization; Other Agreement.  The Secured Parties are hereby authorized, without notice to or demand upon any Guarantor and without discharging or otherwise affecting the obligations of any Guarantor hereunder and without incurring any liability hereunder, from time to time, to do each of the following:

(a)    (i) subject to compliance, if applicable, with Section 14.01, modify, amend, supplement or otherwise change, (ii) accelerate or otherwise change the time of payment or (iii) waive or otherwise consent to noncompliance with, any Guaranteed Obligation or any Transaction Document;

(b)    apply to the Guaranteed Obligations any sums by whomever paid or however realized to any Guaranteed Obligation in such order as provided in the Transaction Documents;

(c)    refund at any time any payment received by any Secured Party in respect of any Guaranteed Obligation;

(d)    sell, exchange, enforce, waive, substitute, liquidate, terminate, release, abandon, fail to perfect, subordinate, accept, substitute, surrender, exchange, affect, impair or otherwise alter or release any Collateral for any Guaranteed Obligation or any other guaranty therefor in any manner, (ii) receive, take and hold additional Collateral to secure any Guaranteed Obligation, (iii) add, release or substitute any one or more other Credit Parties, makers or endorsers of any Guaranteed Obligation or any part thereof and (iv) otherwise deal in any manner with the Borrower, maker or endorser of any Guaranteed Obligation or any part thereof; and

(e)    settle, release, compromise, collect or otherwise liquidate the Guaranteed Obligations.

SECTION 2.10    <u>Guaranty Absolute and Unconditional</u>.    Each Guarantor hereby waives and agrees not to assert any defense, whether arising in connection with or in respect of any of the following or otherwise, and hereby agrees that its guaranty obligations under this Agreement are irrevocable, absolute and unconditional and shall not be discharged as a result of or otherwise affected by any of the following (which may not be pleaded and evidence of which may not be introduced in any proceeding with respect to this Agreement, in each case except as otherwise agreed in writing by the Administrative Agent):

(a)    the invalidity or unenforceability of any obligation of the Borrower or any other Credit Party under any Transaction Document or any other agreement or instrument relating thereto (including any amendment, consent or waiver thereto), or any security for, or other guaranty of, any Guaranteed Obligation or any part thereof, or the lack of perfection or continuing perfection or failure of priority of any security for the Guaranteed Obligations or any part thereof;

(b)    the absence of (i) any attempt to collect any Guaranteed Obligation or any part thereof from the Borrower or any Guarantor or other action to enforce the same or (ii) any action to enforce any Transaction Document or any Lien thereunder;

(c)    the failure by any Person to take any steps to perfect and maintain any Lien on, or to preserve any rights with respect to, any Collateral;

(d)    any workout, insolvency, bankruptcy proceeding, reorganization, arrangement, liquidation or dissolution by or against the Borrower or any Guarantor or any of the Borrower's or any Guarantor's other Subsidiaries or any procedure, agreement, order, stipulation, election, action or omission thereunder, including any discharge or disallowance of, or bar or stay against collecting, any Guaranteed Obligation (or any interest thereon) in or as a result of any such proceeding;

(e)    any foreclosure, whether or not through judicial sale, and any other sale or other disposition of any Collateral or any election following the occurrence of an Event of Default by any Secured Party to proceed separately against any Collateral in accordance with such Secured Party's rights under any applicable Requirement of Law; or

(f)    any other defense, setoff, counterclaim or any other circumstance that might otherwise constitute a legal or equitable discharge of the Borrower or a Guarantor or any other Subsidiary of a Borrower or any Guarantor, in each case other than the payment in full of the Guaranteed Obligations.

SECTION 2.11    <u>Waivers</u>.    Each Credit Party hereby unconditionally and irrevocably waives and agrees not to assert any claim, defense, setoff or counterclaim based on diligence, promptness, presentment, requirements for any demand or notice hereunder including any of the following:  (a) any demand for payment or performance and protest and notice of protest; (b) any notice of acceptance; (c) any presentment, demand, protest or further notice or other requirements of any kind with respect to any Guaranteed

Obligation (including any accrued but unpaid interest thereon) becoming immediately due and payable; and (d) any other notice in respect of any Guaranteed Obligation or any part thereof, and any defense arising by reason of any disability or other defense of the Credit Parties.  Each Credit Party further unconditionally and irrevocably agrees not to (x) enforce or otherwise exercise any right of subrogation or any right of reimbursement or contribution or similar right against the Borrower or any other Credit Party by reason of any Transaction Document or any payment made thereunder or (y) assert any claim, defense, setoff or counterclaim it may have against any other Credit Party or set off any of its obligations to such other Credit Party against obligations of such Credit Party to such Credit Party.  No obligation of any Credit Party hereunder shall be discharged other than by complete performance.

SECTION 2.12    Reliance.  Each Credit Party hereby assumes responsibility for keeping itself informed of the financial condition of each other Credit Party and any other guarantor, maker or endorser of any Guaranteed Obligation or any part thereof, and of all other circumstances bearing upon the risk of nonpayment of any Guaranteed Obligation or any part thereof that diligent inquiry would reveal, and each Credit Party hereby agrees that no Secured Party shall have any duty to advise any Credit Party of information known to it regarding such condition or any such circumstances.  In the event any Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any Credit Party, such Secured Party shall be under no obligation to (a) undertake any investigation not a part of its regular business routine, (b) disclose any information that such Secured Party, pursuant to accepted or reasonable commercial finance or banking practices, wishes to maintain confidential or (c) make any future disclosures of such information or any other information to any Credit Party.

<h1 align="center">ARTICLE III</h1>

<h1 align="center">[RESERVED]</h1>

<h1 align="center">ARTICLE IV</h1>

<h2 align="center">SETTLEMENT PROCEDURES AND PAYMENT PROVISIONS</h2>

SECTION 4.01    Priority of Payments.

(a)    On each Payment Date, the Borrower shall pay to the Administrative Agent on such Payment Date in the following order of priority and on any other date that the Administrative Agent receives any payment or any proceeds of the Collateral, the Administrative Agent shall apply such amounts in accordance with the below (the "Priority of Payments"):

(i)    first, to the Administrative Agent, Lenders and Borrower Indemnified Parties on a pro rata basis, all accrued and unpaid expenses, costs, or indemnification amounts;

(ii)    second, to payment of Attorney Costs of Lenders payable or reimbursable by the Borrower under this Agreement;

(iii)    third, to the Administrative Agent, the Administrative Agent Fee, to the extent due and unpaid;

(iv)    fourth, to the Administrative Agent for distribution to the DIP Term Lenders (ratably, based on the amount then due and owing), all accrued and unpaid Interest due to each such DIP Term Lender for the immediately preceding Interest Period, plus, if applicable, the amount of any such Interest payable for any prior Interest Period to the extent such amount has not been

31

distributed to each such DIP Term Lender, and any interest accrued pursuant to Section 4.02(b), to the extent unpaid, in each case, unless such interest is permitted to be paid in kind hereunder;

(v)    fifth, to the Administrative Agent for distribution to the DIP Term Lenders (ratably, based on the amount then due and owing), to the outstanding principal amount of the DIP Term Loans;

(vi)    sixth, to the Administrative Agent for distribution to the Rollup Amendment No. 1 Lenders (ratably, based on the amount then due and owing), all accrued and unpaid Interest due to each such Rollup Amendment No. 1 Lender for the immediately preceding Interest Period, plus, if applicable, the amount of any such Interest payable for any prior Interest Period to the extent such amount has not been distributed to each such Rollup Amendment No. 1 Lender, and any interest accrued pursuant to Section 4.02(b), to the extent unpaid, in each case, unless such interest is permitted to be paid in kind hereunder;

(vii)    Seventh, to the Administrative Agent for distribution to the Rollup Amendment No. 1 Lenders (ratably, based on the amount then due and owing), to the outstanding principal amount of the Rollup Amendment No. 1 Loans;

(viii)    Eighth, to the Administrative Agent for distribution to the Rollup Bridge Lenders (ratably, based on the amount then due and owing), all accrued and unpaid Interest due to each such Existing Bridge Loan Lender for the immediately preceding Interest Period, plus, if applicable, the amount of any such Interest payable for any prior Interest Period to the extent such amount has not been distributed to each such Rollup Bridge Lender, and any interest accrued pursuant to Section 4.02(b), to the extent unpaid, in each case, unless such interest is permitted to be paid in kind hereunder;

(ix)    Ninth, to the Administrative Agent for distribution to the Rollup Bridge Lenders (ratably, based on the amount then due and owing), to the outstanding principal amount of the Rollup Bridge Loans;

(x)    Tenth, to the Administrative Agent for the distribution to the Lenders (ratably based on the amounts then due and owing) any other amounts owing with respect to each of the DIP Term Loans, Rollup Amendment No. 1 Loans and Rollup Bridge Loans, in each case to the extent constituting Borrower Obligations; and

(xi)    Eleventh, the balance, if any, to be paid at the direction of the Borrower.

(b)    Notwithstanding anything to the contrary set forth in this Section 4.01, the Administrative Agent shall have no obligation to distribute or pay any amount under this Section 4.01 except to the extent actually received by the Administrative Agent or available to the Administrative Agent. All payments or distributions to be made by any Credit Party and any other Person to the Administrative Agent or the Lenders (or their respective related Affected Persons and the Borrower Indemnified Parties), shall be paid or distributed to the applicable party to which such amounts are owed.

(c)    If and to the extent the Administrative Agent, any Lender, any Affected Person or any Borrower Indemnified Party shall be required for any reason to pay over to any Person (including any Credit Party or any trustee, receiver, custodian or similar official in any Insolvency Proceeding) any amount received on its behalf hereunder, such amount shall be deemed not to have been so received but rather to have been retained by the Borrower and, accordingly, the Administrative Agent, such Lender, such Affected

Person or such Borrower Indemnified Party, as the case may be, shall have a claim against the Borrower for such amount.

SECTION 4.02    Payments and Computations, Etc.

(a)    All amounts payable to the Administrative Agent, any Lender, any Affected Person or any Borrower Indemnified Party hereunder shall be paid no later than 2:00 p.m. (New York City time) on the day when due in same day funds to the applicable party to which such amounts are due.

(b)    [Reserved.]

(c)    All computations of Interest, Fees and other amounts hereunder shall be made on the basis of a year of 360 days for the actual number of days (including the first but excluding the last day) elapsed.  Whenever any payment or deposit to be made hereunder shall be due on a day other than a Business Day, such payment or deposit shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of such payment or deposit.

(d)    All payments (including prepayments) to be made by each Credit Party on account of principal, interest, fees and other amounts required hereunder shall be made without set-off, recoupment, counterclaim or deduction of any kind, shall, except as otherwise expressly provided herein, be made to the Administrative Agent (for the ratable account of the Persons entitled thereto) at the address for payment specified in the signature page hereof in relation to the Administrative Agent (or such other address as the Administrative Agent may from time to time specify), including payments utilizing the ACH system, and shall be made in U.S. dollars and by wire transfer in immediately available funds (which shall be the exclusive means of payment hereunder).

**ARTICLE V**

**INCREASED COSTS; FUNDING LOSSES; TAXES; ILLEGALITY**

SECTION 5.01    Increased Costs.

(a)    Increased Costs Generally.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, liquidity, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Affected Person;

(ii)    subject any Affected Person to any Taxes (except to the extent such Taxes are (A) Indemnified Taxes for which relief is sought under Section 5.03, (B) Taxes described in clause (b) through (d) of the definition of  Excluded Taxes or (C) Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes; the Taxes described in this parenthetical, "Covered Taxes") on its loans, loan principal, letters of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Affected Person any other condition, cost or expense (other than Taxes) (A) affecting the Collateral, this Agreement, any other Transaction Document, any Loan or any participation therein or (B) affecting its obligations or rights to make Loans;

and the result of any of the foregoing shall be to increase the cost to such Affected Person of (A) acting as the Administrative Agent or a Lender hereunder, (B) funding or maintaining any Loan or (C) maintaining its obligation to fund or maintain any Loan, or to reduce the amount of any sum received or receivable by such Affected Person hereunder, then, upon request of such Affected Person, the Borrower shall pay to such Affected Person such additional amount or amounts as will compensate such Affected Person for such additional costs incurred or reduction suffered.

(b)    Capital Adequacy.  If any Lender shall reasonably determine that any Change in Law regarding capital adequacy, or the compliance by any Lender or any Person controlling such Lender with any request, guideline or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency adopted or otherwise taking effect after the Effective Date, has or would have the effect of reducing the rate of return on such Lender's or such controlling Person's capital as a consequence of such Lender's obligations hereunder to a level below that which such Lender or such controlling Person could have achieved but for such Change in Law or compliance (taking into consideration such Lender's or such controlling Person's policies with respect to capital adequacy) then from time to time, upon demand by such Lender (which demand shall be accompanied by a certificate setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail, a copy of which shall be furnished to the Administrative Agent), the Borrower shall promptly pay to such Lender such additional amount as will compensate such Lender or such controlling Person for such reduction, so long as such amounts have accrued on or after the day which is two hundred seventy (270) days prior to the date on which such Lender first made demand therefor.

(c)    [Reserved].

(d)    Certificates for Reimbursement.  A certificate of an Affected Person setting forth the amount or amounts necessary to compensate such Affected Person or its holding company, as the case may be, as specified in clause (a), (b) or (c) of this Section and delivered to the Borrower, shall be conclusive absent manifest error. The Borrower shall, subject to the priorities of payment set forth in Section 4.01, pay such Affected Person the amount shown as due on any such certificate on the first Payment Date occurring after the Borrower's receipt of such certificate; provided, that any such certificate shall state the basis upon which such amount has been calculated and certify that such Affected Person's method of allocation is not inconsistent with its method of allocation used for other trade receivable securitization facilities or debt facilities which are subject to similar provisions for which reimbursement is being sought.

(e)    Delay in Requests.  Failure or delay on the part of any Affected Person to demand compensation pursuant to this Section shall not constitute a waiver of such Affected Person's right to demand such compensation; provided, that the Borrower shall not be required to compensate a Lender pursuant to this Section 5.01 for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided, further, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180 day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 5.02    [Reserved].

SECTION 5.03    Taxes.

(a)    Payments Free of Taxes.  All payments of principal and interest on the Loans and all other amounts payable hereunder shall be made free and clear of and without deduction for Taxes, except as required by Applicable Law. If any Applicable Law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by

the applicable withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and if any such withholding or deduction is in respect of any Indemnified Taxes, then the Borrower or other Credit Party shall pay such additional amount or amounts as is necessary to ensure that the net amount actually received by the applicable Affected Person will equal the full amount such Affected Person would have received had no such withholding or deduction of Indemnified Taxes been required (including, without limitation, such withholdings and deductions applicable to additional sums payable under this Section 5.03).  After payment of any Tax by the Borrower to a Governmental Authority pursuant to this Section 5.03, the Borrower shall promptly forward to the Administrative Agent the original or a certified copy of an official receipt, a copy of the return reporting such payment, or other documentation satisfactory to the Administrative Agent evidencing such payment to such authority.

(b)    Payment of Other Taxes by the Borrower.  The Borrower shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or, at the option of the Administrative Agent, timely reimburse the Administrative Agent for the payment of, any Other Taxes.

(c)    Indemnification by the Borrower.    The Borrower shall indemnify the Administrative Agent and the Lenders, within ten (10) days after demand thereof, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 5.03) payable or paid by the Administrative Agent or any Lender or required to be withheld or deducted from a payment to the Administrative Agent or any Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes and Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate in reasonable detail as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    Status of Lenders.  Any Lender that is entitled to an exemption from or reduction of withholding tax with respect to payments made under any Transaction Document shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 5.03(d)(i), 5.03(d)(ii) and 5.03(f) below) shall not be required if in such Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)    Each Lender that is not a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income tax purposes and is a party hereto on the Effective Date or purports to become an assignee of an interest pursuant to Section 14.03 after the Effective Date (unless such Lender was already a Lender hereunder immediately prior to such assignment) (each such Lender a "Foreign Lender") shall, to the extent permitted by Applicable Law, execute and deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender

under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) whichever of the following is applicable: (A) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party, (x) with respect to payments of interest under any Transaction Document, two (2) properly completed and executed copies of United States Internal Revenue Service ("IRS") Forms W-8BEN or W-8BEN-E (or successor form) establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Transaction Documents, two (2) properly completed and executed copies of IRS Forms W-8BEN or W-8BEN-E (or successor form) establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "business profits" or "other income" article of such tax treaty; (B) two (2) executed copies of Form W-8ECI (or successor form); (C) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) two (2) executed copies of IRS Forms W-8BEN or W-8BEN-E (or successor form); (D) to the extent a Foreign Lender is not the beneficial owner, two (2) executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E (or successor form), a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9 (or successor form), and/or other certification documents from each beneficial owner, as applicable; provided, that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner; or (E) other applicable forms, certificates or documents prescribed by the IRS. Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.  In addition, to the extent permitted by Applicable Law, such forms shall be delivered by each Foreign Lender upon the obsolescence or invalidity of any form previously delivered by such Foreign Lender.  Each Foreign Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose).

(ii)    Each Lender that is a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income tax purposes and is a party hereto on the Effective Date or purports to become an assignee of an interest pursuant to Section 14.03 after the Effective Date (unless such Lender was already a Lender hereunder immediately prior to such assignment) shall provide to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), a properly completed and executed copy of IRS Form W-9 or any successor form certifying as to such Lender's entitlement to an exemption from U.S. backup withholding and, to the extent permitted by Applicable Law, other applicable forms, certificates or documents prescribed by the IRS or reasonably requested by the Borrower or Administrative Agent.  Each such Lender shall promptly notify the Borrower at any time it determines that any certificate previously delivered to the Borrower (or any other form of certification adopted by the U.S. governmental authorities for such purposes) is no longer valid.

(iii)    Any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the

recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. Federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower or Administrative Agent to determine the withholding or deduction required to be made.

(iv)    The Administrative Agent shall deliver to the Borrower , on or prior to the date on which it becomes a party to this Agreement, a duly completed IRS Form W-9, with the effect that the Borrower may make payments to the Administrative Agent, to the extent such payments are received by the Administrative Agent as an intermediary, without deduction or withholding of any Taxes imposed by the United States (and the Administrative Agent will serve as a U.S. withholding agent (and complete associated reporting responsibilities) with respect to Chapter 3 and Chapter 4 withholding on amounts paid to the Administrative Agent in respect of the Loans (or any other amounts payable hereunder).

(e)    Treatment of Certain Refunds.  If any Lender determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Taxes as to which it has been indemnified by the Borrower or other Credit Party pursuant to this Section 5.3 (including by the payment of additional amounts pursuant to this Section 5.3), then it shall promptly pay an amount equal to such refund to the Borrower or other Credit Party, net of all reasonable out-of-pocket expenses of such Lender or of the Administrative Agent with respect thereto, including any Taxes; provided, however, that the Borrower or other Credit Party, upon the written request of such Lender or the Administrative Agent, agrees to repay any amount paid over to the Borrower or other Credit Party to such Lender or to the Administrative Agent (plus any related penalties, interest or other charges imposed by the relevant Governmental Authority) in the event such Lender or the Administrative Agent is required, for any reason, to disgorge or otherwise repay such refund.  Notwithstanding anything to the contrary in this Section 5.3, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 5.3(e) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 5.3 shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(f)    Documentation Required by FATCA.  If a payment made to an Affected Person under any Transaction Document would be subject to U.S. federal withholding tax imposed by FATCA if such Affected Person were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Affected Person shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Applicable Law and at such time or times reasonably requested by the Borrower or Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Affected Person has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (f), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(g)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable

to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 14.03(e) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Transaction Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Transaction Document or otherwise payable by the Administrative Agent to such Lender from any other source against any amount due to the Administrative Agent under this paragraph (g).

(h)     Survival. Each party's obligations under Section 5.03(a) through (g) shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, and the repayment, satisfaction or discharge of all Borrower Obligations hereunder.

# ARTICLE VI

## CONDITIONS TO EFFECTIVENESS AND CREDIT EXTENSIONS

SECTION 6.01   Conditions Precedent to Effectiveness of this Agreement. This Agreement shall be effective on the date (the "Effective Date") on which the conditions precedent are satisfied:

(a)     Transaction Documents. The Administrative Agent shall have received on or before the Effective Date all of the agreements, documents, instruments and other items set forth on the closing checklist attached hereto as Exhibit J other than those that are specified therein as permitted to be delivered after the Effective Date, each in form and substance reasonably satisfactory to the Administrative Agent.

(b)     Fees. The Credit Parties shall have executed and delivered the Fee Letters to the Administrative Agent and the Lenders.

(c)     No Litigation. There shall not exist any order, injunction or decree of any Governmental Authority restraining or prohibiting the funding of the Loans hereunder.

(d)     Debtor-in-Possession. Each of (i) Bird Global, Inc., (ii) Bird Rides, Inc., (iii) Bird US Holdco, LLC, (iv) Bird US Opco, LLC, and (v) Skinny Labs, Inc. shall be a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

(e)     Interim Order. The Bankruptcy Court shall have entered the Interim Order, and such Interim Order shall be in full force and effect and shall not have been stayed, vacated, reversed, amended or otherwise modified without the prior written consent of the Administrative Agent and the Required DIP Lenders in their sole discretion.

(f)     No Other Relief. No motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder shall have been filed in the Bankruptcy Court by any Credit Party without the prior written consent of the Administrative Agent in its sole discretion.

(g)    Cash Management Order.  The Bankruptcy Court shall have entered a cash management order in form and substance reasonably acceptable to the Administrative Agent no later than two (2) Business Days after the Petition Date, and such order shall be in full force and effect and shall not have been stayed, vacated, reversed, amended or otherwise modified without the prior written consent of the Administrative Agent in its sole discretion.

(h)    Payment of Pre-Petition Interest and Fees.  The Administrative Agent shall have received evidence reasonably satisfactory to the Administrative Agent that the Credit Parties have paid in full all pre-petition interest and pre-petition fees that have accrued pursuant to the Pre-Petition Transaction Documents but remain unpaid and for which payment thereof is provided for in the Approved Budget.

(i)    Initial Approved Budget.  The Administrative Agent and Lenders shall have received the initial 13-week cash flow budget, attached as Exhibit A to the Interim Order, setting forth, on a weekly and a line-item basis, in each case as required by the Interim Order (i) projected cash receipts and (ii) projected disbursements and the amount of ordinary course operating expenses, bankruptcy-related expenses under the Chapter 11 Cases (including professional fees of the Credit Parties with respect thereto), capital expenditures, asset sales, and estimated fees and expenses of the Administrative Agent (including fees and expenses of its legal counsel and financial advisors), estimated fees and expenses of the Pre-Petition Agent and Pre-Petition Lenders (including fees and expenses of their legal counsel and financial advisors), estimated fees and expenses of the members of any statutory committee and any professionals engaged by any such statutory committee) and any other fees and expenses relating to this Agreement or the other Transaction Documents), in each case for each week from the first day of the week in which the Petition Date occurs through the last day of the week that is 13 weeks thereafter, to be attached to the Interim Order which shall be in form and substance satisfactory to the Agent and Required DIP Lenders (the "**Initial Approved Budget**").

(j)    DIP Order Conditions.  All other conditions to borrowing in the Interim Order shall have been satisfied.

(k)    Second Lien DIP Loan Agreement.  The Borrower shall have executed and delivered the Second Lien DIP Loan Agreement and provided a copy of such agreement to the Administrative Agent.

(l)    Asset Purchase Agreement.  The Administrative Agent shall have received an executed copy of the Asset Purchase Agreement in form and substance satisfactory to the Required DIP Lenders.

(m)    Restructuring Support Agreement.  The Administrative Agent shall have received Restructuring Support Agreement in form and substance satisfactory to the Required DIP Lenders.

SECTION 6.02    Conditions Precedent to Each Credit Extension.  Each Credit Extension hereunder on or after the Effective Date shall be subject to the conditions precedent that:

(a)    the Borrower shall have delivered to the Administrative Agent a Loan Request for such Loan in accordance with Section 2.03(a).

(b)    the conditions precedent to such Credit Extension specified in Section 2.03 shall be satisfied;

39

(c)     on the date of such Credit Extension the following statements shall be true and correct (and upon the occurrence of such Credit Extension, the Credit Parties shall be deemed to have represented and warranted that such statements are then true and correct):

(i)     any representation or warranty by any Credit Party contained herein or in any other Transaction Document is untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such earlier date), and Administrative Agent or Required DIP Lenders have determined not to make such DIP Term Loan as a result of the fact that such representation or warranty is untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein);

(ii)     the Borrower will use the proceeds of the Credit Extension solely in accordance with Section 2.03(a) of this Agreement; and

(iii)     no Default or Event of Default has occurred and is continuing or would result immediately after giving effect to any DIP Term Loan.

(d)     (i) if such date is on or after the Interim Period Outside Date, the Bankruptcy Court shall not have entered the Final Order, (ii) if the Interim Order has expired, the Bankruptcy Court shall not have entered the Final Order, (iii) the Interim Order or the Final Order, as the case may be, shall have been vacated, stayed, reversed, modified or amended without the Administrative Agent's and Required DIP Lenders' consent or shall otherwise not be in full force and effect or (iv) the Interim Order or the Final Order, as the case may be, in any respect shall be the subject of a stay pending either appeal or a motion for reconsideration thereof.

(e)     for any DIP Term Loan to be made prior to the entry of the Final Order, the outstanding principal amount of the DIP Term Loans (after giving effect to the amount of the requested DIP Term Loan) will not exceed the amount permitted by the Interim Order.

(f)     the proceeds of any requested DIP Term Loan shall be necessary to be drawn in order to comply with the Approved Budget.

(g)     no less than $5,600,000 shall have been advanced to the Borrower pursuant to the Second Lien DIP Loan Agreement.

## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES

SECTION 7.01   Representations and Warranties of the Credit Parties.  On the Effective Date and on each date on which representations and warranties are required to be made hereunder, the Credit Parties party hereto represent and warrant to the Administrative Agent and each Lender:

(a)     Organization and Good Standing.  Parent and each of its Subsidiaries is an entity duly organized and validly existing and in good standing under the laws of the jurisdiction of its organization and has full power and authority under its organizational documents and under the laws of the jurisdiction of its organization to own its properties and to conduct its business as such properties are currently owned and such business is presently conducted.

40

(b)     Due Qualification.  Parent and each of its Subsidiaries is duly qualified to do business as a limited liability company and has obtained all necessary licenses and approvals in all jurisdictions in which the conduct of its business requires such qualification, licenses or approvals, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(c)     Power and Authority; Due Authorization.  Each Credit Party (i) has all necessary limited liability company power and authority to (A) execute and deliver this Agreement and the other Transaction Documents to which it is a party, (B) perform its obligations under this Agreement and the other Transaction Documents to which it is a party and (C) grant a security interest in the Collateral to the Administrative Agent on the terms and subject to the conditions herein provided and (ii) has duly authorized by all necessary limited liability company action such grant and the execution, delivery and performance of, and the consummation of the transactions provided for in, this Agreement and the other Transaction Documents to which it is a party.

(d)     Binding Obligations.  This Agreement and each of the other Transaction Documents to which each Credit Party is a party, when executed and delivered by such Credit Party and each other party thereto, will constitute legal, valid and binding obligations of such Credit Party, enforceable against such Credit Party in accordance with their respective terms, except (i) as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) as such enforceability may be limited by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(e)     No Conflict or Violation.  The execution, delivery and performance of, and the consummation of the transactions contemplated by, this Agreement and the other Transaction Documents to which each Credit Party is a party, and the fulfillment of the terms hereof and thereof, will not (i) conflict with, result in any breach of any of the terms or provisions of, or constitute (with or without notice or lapse of time or both) a default under its organizational documents, any Government Approval, or any indenture, sale agreement, credit agreement, loan agreement, security agreement, mortgage, deed of trust, or other agreement or instrument to which such Credit Party is a party or by which it or any of its properties is bound, (ii) result in the creation or imposition of any Adverse Claim upon any of the Collateral pursuant to the terms of any such indenture, credit agreement, loan agreement, security agreement, mortgage, deed of trust, or other agreement or instrument other than this Agreement and the other Transaction Documents or (iii) conflict with or violate any Applicable Law, except in the case of each of the foregoing clauses (i) through (iii) to the extent that any such conflict, breach, default, Adverse Claim or violation, as applicable, could not reasonably be expected to have a Material Adverse Effect.

(f)     Litigation and Other Proceedings.  (i) There is no action, suit, proceeding or investigation pending or, to the knowledge of the Credit Parties, threatened in writing, against Parent or any of its Subsidiaries before any Governmental Authority and (ii) none of the Parent or any of its Subsidiaries is subject to any order, judgment, decree, injunction, stipulation or consent order of or with any Governmental Authority that, in the case of either of the foregoing clauses (i) and (ii), (A) asserts the invalidity or unenforceability of this Agreement, any other Transaction Document or any Pre-Petition Transaction Document, (B) seeks to prevent the grant of a security interest in any of the Collateral by any Credit Party to the Administrative Agent, the ownership or acquisition by any Credit Party of any Collateral, or the consummation of any of the transactions contemplated by this Agreement, any other Transaction Document or any Pre-Petition Transaction Document, (C) other than to the extent disclosed to the Administrative Agent on or prior to the Effective Date, seeks any determination or ruling that could materially and adversely affect the performance by any of the Credit Parties of its obligations under this Agreement, any other Transaction Document or any Pre-Petition Transaction Document or (D) other than to the extent disclosed to the Administrative Agent on or prior to the Effective Date, individually or in the

41

aggregate for all such actions, suits, proceedings and investigations could reasonably be expected to have a Material Adverse Effect.

(g)    Government Approvals.  Except where the failure to obtain or make such authorization, consent, order, approval or action could not reasonably be expected to have a Material Adverse Effect, all authorizations, consents, orders and approvals of, or other actions by, any Governmental Authority that are required to be obtained by the Credit Parties in connection with the operation of its scooters, including, without limitation, any applicable Government Approvals (including the entry by the Bankruptcy Court of the Interim Order (or the Final Order) when applicable), the grant of a security interest to the Administrative Agent under the Pre-Petition Transaction Documents or the due execution, delivery and performance by the Credit Parties of this Agreement or any other Transaction Document to which they are a party and the consummation by the Credit Parties of the transactions contemplated by this Agreement and the other Transaction Documents to which they are a party have been obtained or made and are in full force and effect.

(h)    Margin Regulations.  The Credit Parties are not engaged, principally or as one of their important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meanings of Regulations T, U and X of the Board of Governors of the Federal Reserve System). No part of the proceeds of the Loans made to any Credit Party will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U, or X of the Board of Governors of the Federal Reserve System.

(i)    [reserved].

(j)    [reserved].

(k)    Investment Company Act; Volcker Rule.  None of the Credit Parties (i) is, and is not controlled by, an "investment company" registered or required to be registered under the Investment Company Act and (ii) is a "covered fund" under the Volcker Rule.

(l)    [reserved].

(m)    Accuracy of Information.  All written information (including Loan Requests, certificates, reports, statements, and other documents) (other than forward looking information and information of a general economic nature or general industry nature) furnished to the Administrative Agent or any Lender by or on behalf of a Credit Party pursuant to any provision of this Agreement or any other Transaction Document, or in connection with or pursuant to any amendment or modification of, or waiver under this Agreement or any other Transaction Document, is at the time the same are so furnished (or as of any earlier date or later date (in the case of any certifications in any Loan Request to be made on the date the related Credit Extension is made) specified therein), when taken as a whole, true and correct in all material respects on the date the same are furnished to the Administrative Agent or such Lender (or, in the case of any certifications in any Loan Request to be made on the date the related Credit Extension is made, on the date such Credit Extension is made), and does not contain any material misstatement of fact or omit to state a material fact or any fact necessary to make the statements contained therein not misleading in light of the circumstances in which such statements are made. Any forward looking information and information of a general economic nature prepared by or on behalf of the Credit Parties or any of their respective representatives and that have been made available to the Administrative Agent or any Lender in connection with the Transaction Documents have been prepared in good faith based upon assumptions believed by such Credit Party to be reasonable (it being understood that such forward looking information are as to future events and are not to be viewed as facts, such forward looking information is subject to

significant uncertainties and contingencies and that actual results during the period or periods covered by any such forward looking information may differ significantly from the projected results, and that no assurance can be given that the projected results will be realized) as of the date such forward looking information is furnished to the Administrative Agent or such Lender.

(n)    Anti-Money Laundering/International Trade Law Compliance.  None of the Credit Parties and, to the knowledge of the Credit Parties, none of their Affiliates (i) is in violation of any Anti-Terrorism Law, (ii) engages in or conspires to engage in any transaction that violates or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, (iii) is a Sanctioned Person, or is controlled by a Sanctioned Person, (iv) is acting or will act for or on behalf of a Sanctioned Person, (v) is associated with, or will become associated with, a Sanctioned Person or (vi) is providing, or will provide, material, financial or technical support or other services to or in support of acts of terrorism of a Sanctioned Person.  No Credit Party nor, to the knowledge of any Credit Party, any of their Affiliates or agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement, (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person, or (B) deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law.

(o)    [Reserved].

(p)    [Reserved].

(q)    [Reserved].

(r)    Compliance with Law.  Parent and its Subsidiaries have complied with all Applicable Laws to which each of them may be subject, except where any such failure to comply with Applicable Laws could not reasonably be expected to have a Material Adverse Effect.

(s)    Bulk Sales Act.  No transaction contemplated by this Agreement requires compliance by it with any bulk sales act or similar law.

(t)    Taxes.  Except as disclosed to the Administrative Agent prior to the Effective Date, the Credit Parties have (i) timely filed all material tax returns (federal, state and local) required to be filed by them, (ii) paid, or caused to be paid, all material taxes, assessments and other governmental charges, if any, other than taxes, assessments and other governmental charges being contested in good faith by appropriate proceedings and as to which adequate reserves have been provided in accordance with GAAP, and (iii) paid all fees and expenses required to be paid by it in connection with the conduct of its business, the maintenance of its existence and its qualification to do business in each state in which it is required to so qualify, except with respect to this clause (iii), where any such failure to pay such fees and expenses could not reasonably be expected to have a Material Adverse Effect.

(u)    No Default. No Default or Event of Default exists or would result from the incurring of any Borrower Obligations by any Credit Party or the grant or perfection of Administrative Agent's Liens on the Collateral, except for Defaults and Events of Default occasioned by the filing of the Chapter 11 Cases and Defaults and Events of Default resulting from obligations with respect to which the Bankruptcy Code prohibits the Credit Parties from complying or permits the Credit Parties not to comply. No Credit Party and no Subsidiary of any Credit Party is in default under or with respect to any Contractual Obligation in any respect which, individually or together with all such defaults, would reasonably be expected to have a Material Adverse Effect, except for Defaults and Events of Default resulting from

obligations with respect to which the Bankruptcy Code prohibits the Credit Parties from complying or permits the Credit Parties not to comply.

        (v)     <u>Bankruptcy Matters</u>.

        (i)     The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice, to the extent given or required to be given prior to the date hereof, was given for (x) the motions seeking approval of the Transaction Documents and the Interim Order and Final Order, (y) the hearings for the approval of the Interim Order, and (z) the hearings for the approval of the Final Order.

        (ii)     From and after the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Borrower Obligations will constitute allowed administrative expenses in the Chapter 11 Cases having priority over all administrative expenses and unsecured claims against the Credit Parties as set forth in the DIP Orders.

        (iii)     From and after the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Borrower Obligations will be secured by a valid and perfected first priority lien on all of the Collateral, subject, as to priority only, to the Carve-Out and the Pre-Petition Prior Liens, as set forth in the DIP Orders.

        (iv)     The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended without the Administrative Agent's and Required DIP Lenders' consent in their sole discretion.

        (w)     <u>Other Transaction Documents</u>.  Each representation and warranty made by the Credit Parties under each other Transaction Document to which it is a party is true and correct in all material respects as of the date when made.

## ARTICLE VIII

## COVENANTS

     SECTION 8.01   <u>Affirmative Covenants of the Credit Parties</u>.  At all times from the Effective Date until the Final Payout Date:

        (a)     <u>Payment of Principal and Interest</u>.  The Borrower shall duly and punctually pay Interest, Fees, principal of the Loans, and all other amounts payable by the Borrower hereunder in accordance with the terms of this Agreement.

        (b)     <u>Existence</u>.  Parent shall, and shall cause each of its Subsidiaries to, keep in full force and effect its existence and rights as a duly organized entity under applicable law, and shall obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, the other Transaction Documents and the Collateral, except where failure to maintain such qualification could not reasonably be expected to have a Material Adverse Effect.

(c)     Financial Reporting.  Parent shall furnish to the Administrative Agent:

(i)     [reserved];

(ii)     Quarterly Reporting.  within forty-five (45) days after the end of each fiscal quarter of each fiscal year of Parent, commencing with the fiscal quarter ending December 31, 2023, a consolidated balance sheet of Parent and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations and cash flows for such fiscal quarter and for the portion of the fiscal quarter then ended and setting forth in comparative form the figures for such fiscal quarter and the annual budget for the related fiscal year, and, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail (together with, in all cases, customary management discussion and analysis) and certified by a responsible officer of Parent as fairly presenting in all material respects the financial position, results of operations and cash flows of Parent and its Subsidiaries on a consolidated basis in accordance with GAAP, subject only to year-end audit adjustments and the absence of footnotes;

(iii)     Monthly Reporting.  within thirty (30) days after the end of each of the first two months of each fiscal quarter of Parent, commencing with the month ending November 30, 2023, a consolidated balance sheet of Parent and its Subsidiaries as at the end of such month, and the related consolidated statements of income or operations and cash flows for such month, all in reasonable detail and certified by a responsible officer of Parent as fairly presenting in all material respects the financial position, results of operations and cash flows of Parent and its Subsidiaries on a consolidated basis in accordance with GAAP, subject only to year-end audit adjustments and the absence of footnotes;

(iv)     Compliance Certificate.  concurrently with the financial statements referred to in the foregoing clauses (i) – (iii), a fully and properly completed certificate in the form of Exhibit H (a "Compliance Certificate"), certified on behalf of the Parent by a Responsible Officer of Parent, in each instance, as of the last day of the period covered by such financial statements;

(v)     Liquidity.  on each Wednesday following the Effective Date (commencing with December 22, 2023, each such weekly period, a "Budget Testing Period") (each such Wednesday, a "Liquidity Reporting Date"), a thirteen (13) week cash flow forecast on a consolidated basis of the Credit Parties and their Subsidiaries (each, a "Cash Forecast") (commencing with the week in which such cash flow forecast is delivered to the Administrative Agent), which shall (i) be in form and detail reasonably satisfactory to the Administrative Agent, (ii) reflect the Credit Parties' good faith projection of all weekly cash receipts and disbursements in connection with the operation of their business for the relevant thirteen-week period, (iii) include a summary of description of variance for cash receipts and disbursements as compared to the Cash Forecast delivered on the preceding Liquidity Reporting Date and (iv) include the calculation of Liquidity as of the immediately preceding Friday;

(vi)     Other Information.  Such other non-privileged information (including non-financial information) as the Administrative Agent or any DIP Term Lender may from time to time reasonably request to the extent such information is not otherwise already provided to the Administrative Agent or DIP Term Lenders pursuant to a report or covenant set forth herein.

(d)     Notices.  Each Credit Party party hereto (or the Parent on its behalf) will notify the Administrative Agent and each Lender in writing of any of the following events promptly upon (but in no event later than three (3) Business Days after) a Financial Officer learns of the occurrence thereof, with

such notice describing the same, and if applicable, the steps being taken by the Person(s) affected with respect thereto; provided, that notice delivered by any Credit Party (notwithstanding the requirement below as to delivery from the Borrower or officer thereof) as to a given event shall be deemed to satisfy such requirement:

(i)    Notice of Events of Default.  Any Event of Default or Potential Event of Default that has occurred and is continuing.

(ii)    Representations and Warranties.  The failure of any representation or warranty made or deemed to be made by any of the Credit Parties under this Agreement or any other Transaction Document to be true and correct in any material respect when made.

(iii)    Litigation.    The institution of any litigation, arbitration proceeding, or governmental proceeding with respect to any Credit Party, provided that notice is only required to the extent such litigation, arbitration proceeding, or governmental proceeding could reasonably be expected to have a Material Adverse Effect if adversely determined, or is a governmental proceeding involving a monetary claim to the extent the claimed amount is $500,000 or more.

(iv)    [reserved].

(v)    Change in Accountants or Accounting Policy.  Any change in (A) the external accountants of any Credit Party or (B) any material accounting policy of any Credit Party that is relevant to the transactions contemplated by this Agreement or any other Transaction Document.

(vi)    Note Documents.  The (x) occurrence of any Default or Event of Default under the Note Documents (each as defined therein), (y) notice of any material amendment to any Note Document and (z) any material notice, waiver, consent, modification, amendment or other material information delivered to the Note Agent or the Purchasers (as defined in the Note Purchase Agreement).

(vii)    DIP Reports.  As soon as available, but not later than the date such reports or certificates are required to be delivered pursuant to the terms of the DIP Orders, copies of all other reports and certificates required to be delivered by the Credit Parties pursuant to the terms of the DIP Orders.

(viii)    Second Lien DIP Loan Documents.  The (x) occurrence of any Default or Event of Default under the Second Lien DIP Loan Agreement (each as defined therein), (y) notice of any material amendment to any Second Lien DIP Loan Document and (z) any material notice, waiver, consent, modification, amendment or other material information delivered to the Second Lien DIP Agent or the Second Lien DIP Lenders.

(e)    Compliance with Laws.  Parent shall, and shall cause each of its Subsidiaries to, comply with all Applicable Laws to which they may be subject if the failure to comply could reasonably be expected to have a Material Adverse Effect.

(f)    Furnishing of Information and Inspection of Records.  The Credit Parties party hereto will (and will cause the other Credit Parties to), at the Credit Parties' expense, (i) permit the Administrative Agent and each Lender or their respective agents or representatives to (A) examine and make copies of and abstracts from all books and records relating to the Collateral, (B) visit the offices and properties of the Credit Parties for the purpose of examining such books and records and (C) discuss matters relating to the Collateral or the Credit Parties' performance hereunder or under the other Transaction

Documents with any of the senior management of the Credit Parties having knowledge of such matters, (ii) without limiting the provisions of clause (i) above, at the Credit Parties' expense, permit certified public accountants or other auditors acceptable to the Administrative Agent to conduct a review of its books and records with respect to the Collateral; provided, that neither the Administrative Agent nor any accountants or auditors engaged by the Administrative Agent shall be entitled to take copies, extracts, or photos of any information that contains trade secrets, is subject to legal privilege, or is otherwise of strategic importance to the business of the Parent and its Subsidiaries, in each case, as determined by the Borrower acting reasonably and in good faith and (iii) cause each of its officers, directors, employees, attorneys and advisors to fully cooperate with the Administrative Agent in regards to any inspection, examination, audit or records request made by the Administrative Agent or any of its Affiliates.

(g)    Use of Proceeds.  The Borrower shall use the proceeds of the Loans and the proceeds of the Collateral solely for (i) working capital (excluding capital expenditures) to the extent set forth in, and in accordance with, the Approved Budget, (ii) maintenance capital expenditures to the extent set forth in, and in accordance with, the Approved Budget, (iii) payment of costs of administration of the Chapter 11 Cases to the extent set forth in, and in accordance with, the Approved Budget, (iv) Permitted Expenses, (v) the unpaid fees, costs, and disbursements of professionals in the Chapter 11 Cases as set forth in the definition of the term "Carve-Out" in the DIP Order, (vi) such Pre-Petition Obligations as the Administrative Agent consents to and the Bankruptcy Court approves, in each case in a manner consistent with the terms and conditions contained herein and in the DIP Orders, and to the extent set forth, and in accordance with, the Approved Budget, or as otherwise expressly permitted under this Agreement and (vii) the roll-up of the Pre-Petition Obligations upon entry of the Final Order as contemplated herein and in the DIP Orders.

(h)    [Reserved]

(i)    [Reserved].

(j)    Books and Records.  The Borrower shall maintain and implement (or cause the Parent to maintain and implement) administrative and operating procedures, and keep and maintain (or cause the Parent to keep and maintain) all documents, books and records and other information reasonably necessary or advisable in connection with the operation of its business.

(k)    Security Interest, Etc.  The Credit Parties will (and will cause the Parent and the other Credit Parties to), at their expense, take all action necessary to establish and maintain a valid and enforceable first priority perfected security interest in the Collateral, in each case free and clear of any Adverse Claim except for Liens permitted to exist under this Agreement or the other Transaction Documents, in favor of the Administrative Agent (on behalf of the Secured Parties), including taking such action to perfect, protect or more fully evidence the security interest of the Administrative Agent (on behalf of the Secured Parties) as the Administrative Agent or any Secured Party may reasonably request, in each case consistent with the terms of this Agreement and the other Transaction Documents.  In order to evidence the security interests of the Administrative Agent under this Agreement, the Credit Parties party hereto shall (and shall cause the other Credit Parties to), from time to time take such action, or execute and deliver such instruments as may be necessary (including, without limitation, such actions as are reasonably requested by the Administrative Agent) to maintain and perfect, as a first-priority interest, the Administrative Agent's security interest in the Collateral.  The Credit Parties party hereto shall (and shall cause the other Credit Parties to), from time to time and within the time limits established by law, prepare and present to the Administrative Agent for the Administrative Agent's authorization and approval, all financing statements, amendments, continuations or initial financing statements in lieu of a continuation statement, or other filings necessary to continue, maintain and perfect the Administrative Agent's security interest as a first-priority interest.  The Administrative Agent's approval of such filings shall authorize the Credit Parties to

47

file such financing statements under the UCC without the signature of the Credit Parties or the Administrative Agent where allowed by Applicable Law. Notwithstanding anything else in the Transaction Documents to the contrary, the Credit Parties shall not have any authority to file a termination, partial termination, release, partial release, or any amendment that deletes the name of a debtor or excludes collateral of any such financing statements filed in connection with the Transaction Documents, without the prior written consent of the Administrative Agent.

(l)     Certain Agreements.  Without the prior written consent of the Administrative Agent and the Lenders, the Credit Parties will not (and will not permit the Parent or the other Credit Parties to) (x) amend, modify, waive, revoke or terminate any Transaction Document or any provision of their organizational documents, or (y) exercise any remedies in respect of the Transaction Documents.

(m)     [reserved].

(n)     [reserved].

(o)     Change in Name or Jurisdiction of Origination, etc.

(i)     The Credit Parties shall not (nor shall they allow any other Credit Party to) take any action to change their jurisdiction of organization.

(ii)     The Credit Parties will not (nor will they allow any other Credit Party to) change their respective name, location, identity or corporate structure unless (w) such Credit Party provides the Administrative Agent and Lenders at least thirty (30) days prior notice thereof, (x) such Credit Party, at its own expense, shall have taken all action necessary to perfect or maintain the perfection of the security interest under this Agreement (including, without limitation, the filing of all financing statements and the taking of such other action as the Administrative Agent may request in connection with such change or relocation), (y) the Administrative Agent and the Lenders have consented thereto in writing, and (z) if requested by the Administrative Agent, such Credit Party shall cause to be delivered to the Administrative Agent, an opinion, in form and substance satisfactory to the Administrative Agent as to such UCC perfection and priority matters as the Administrative Agent may request at such time.

(p)     Taxes.  Parent will, and will cause each of its Subsidiaries to, (i) timely file all material tax returns (foreign, federal, state and local) required to be filed by it and (ii) pay, or cause to be paid, all material taxes, assessments and other governmental charges, if any, other than taxes, assessments and other governmental charges being contested in good faith by appropriate proceedings and as to which adequate reserves have been provided in accordance with GAAP.

(q)     [Reserved].

(r)     Compliance with Anti-Terrorism Laws.  The Administrative Agent hereby notifies the Credit Parties that pursuant to the requirements of Anti-Terrorism Laws, and the Administrative Agent's policies and practices, the Administrative Agent is required to obtain, verify and record certain information and documentation that identifies the Credit Parties and their respective principals, which information includes the name and address of each Credit Party and its principals and such other information that will allow Agent to identify such party in accordance with Anti-Terrorism Laws. No Credit Party will, directly or indirectly, knowingly enter into any contract with any Sanctioned Person or any Person listed on the OFAC Lists. Each Credit Party shall immediately notify the Administrative Agent if such Credit Party has actual knowledge that any Credit Party or any of their respective Affiliates or agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement is or becomes a

Sanctioned Person or (i) is convicted on, (ii) pleads nolo contendere to, (iii) is indicted on, or (iv) is arraigned and held over on charges involving money laundering or predicate crimes to money laundering. No Credit Party will, directly or indirectly, (i) conduct any business or engage in any transaction or dealing with any Sanctioned Person, including, without limitation, the making or receiving of any contribution of funds, goods or services to or for the benefit of any Sanctioned Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law, or (iii) engage in or conspire to engage in any transaction that violates or attempts to violate any of the prohibitions set forth in Executive Order No. 13224 or other Anti-Terrorism Law.

(s)    [reserved]

(t)    <u>Certificate of Title Acts</u>.  Bird OpCo will not operate and will not permit the Parent or any of its Subsidiaries to operate any of the scooters owned or operated by it in a jurisdiction in which the scooters may or are required to be registered under any certificate of title act or similar law, statute, or regulation.

(u)    <u>Insurance</u>.  The Parent will keep the Parent's and its Subsidiaries' business and the Collateral insured for risks and in amounts standard for companies in the Parent's and its Subsidiaries' industry and location and as the Administrative Agent may reasonably request. Insurance policies shall be in a form, with companies, and in amounts that are reasonably satisfactory to the Administrative Agent. All property policies shall have a lender's loss payable endorsement showing the Administrative Agent (for the ratable benefit of the Secured Parties) as lender loss payee and shall waive subrogation against the Administrative Agent, and all liability policies shall show, or have endorsements showing, the Administrative Agent (for the ratable benefit of the Secured Parties), as additional insured. Within no less than thirty (30) days after the Effective Date and at all times thereafter, the Administrative Agent shall be named as lender loss payee and/or additional insured with respect to any such insurance providing coverage in respect of any Collateral, and each provider of any such insurance shall agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to the Administrative Agent, that it will give the Administrative Agent 30 days (and 10 days for nonpayment of premium) prior written notice before any such policy or policies shall be canceled. At the reasonable request of the Administrative Agent, the Parent shall deliver to the Administrative Agent certified copies of policies and evidence of all premium payments. Subject to the Intercreditor Agreement, proceeds payable under any policy shall, at the option of the Administrative Agent, be payable to the Administrative Agent, for the ratable benefit of the Secured Parties, on account of the then-outstanding Borrower Obligations. If the Parent or any of its Subsidiaries fails to obtain insurance as required under this <u>Section 8.01(u)</u> or to pay any amount or furnish any required proof of payment to third persons, the Administrative Agent may make (but has no obligation to do so), at the Parent's expense, all or part of such payment or obtain such insurance policies required in this <u>Section 8.01(u)</u>, and take any action under the policies the Administrative Agent deems prudent.

(v)    <u>[reserved]</u>.

(w)    <u>Budget Testing</u>.  Subject to the terms and conditions set forth below, no Credit Party shall, nor shall it permit any of its Subsidiaries to, from and after the Effective Date, make any payment or otherwise disburse any funds or fail to collect revenues or funds in an amount, in each case, in a manner such that the unrestricted cash and Cash Equivalents of the Credit Parties and their Subsidiaries is less than the amount set forth in each Approved Budget for any Budget Testing Period, subject to the Permitted Variance; provided that this provision shall disregard non-recurring one-time receipts and/or disbursements.

The Administrative Agent and Lenders (i) may assume that the Credit Parties will comply with the Approved Budget to the extent required by this clause (s) and shall have no duty to monitor such compliance and (ii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to the Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to Administrative Agent and Lenders are estimates only, and the Credit Parties remain obligated to pay any and all Borrower Obligations in accordance with the terms of the Transaction Documents. Nothing in the Approved Budget shall constitute an amendment or other modification of this Agreement or any of such restrictions or other lending limits set forth therein.

(x)    Bankruptcy Court Filings. As soon as practicable in advance of filing with the Bankruptcy Court, the Credit Parties shall provide the Administrative Agent with copies of (i) the motion seeking approval of and proposed forms of the Interim Order and the Final Order, which motion shall be in form and substance reasonably satisfactory to the Administrative Agent, and which orders shall be in form and substance satisfactory to the Administrative Agent and the Required DIP Lenders in their sole discretion, (ii) the Bid Procedures Motion, which motion shall be in form and substance reasonably satisfactory to the Administrative Agent, and the proposed form of the Bid Procedures Order, which order shall be in form and substance satisfactory to Administrative Agent in its sole discretion, (iii) all other proposed orders and pleadings related to the financing contemplated hereunder, which orders and pleadings shall be in form and substance satisfactory to the Administrative Agent, (iv) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan or disclosure statement shall comply with the requirements set forth herein), which plan of reorganization or liquidation and any related disclosure statement shall be in form and substance satisfactory to Administrative Agent and the Required DIP Lenders, (v) any motion, and proposed form of order, seeking to extend or otherwise modify the Credit Parties' exclusive periods set forth in section 1121 of the Bankruptcy Code, which motion and proposed order shall be in form and substance satisfactory to Administrative Agent, (vi) any motion, other than the Bid Procedures Motion, seeking approval of any sale of any Credit Party's assets, which motion shall be in form and substance acceptable to the Administrative Agent and any proposed form of a bidding procedures order and sale order, which orders shall be in form and substance satisfactory to the Administrative Agent and the Required DIP Lenders in their respective sole discretion and (vii) any motion and proposed form of order filed with the Bankruptcy Court relating to the assumption, rejection, modification or amendment of any employment agreement, or the assumption, rejection, modification or amendment of any material contract, each of which motions and orders must be in form and substance satisfactory to the Administrative Agent in its sole respective sole discretion.

(y)    Bankruptcy Covenants. Notwithstanding anything in the Transaction Documents to the contrary, the Credit Parties shall comply with all covenants, terms and conditions and otherwise perform all obligations set forth in the DIP Orders.

(z)    Chapter 11 Cases. In connection with the Chapter 11 Cases, the Credit Parties shall give the proper notice for (i) the motions seeking approval of the Transaction Documents and the Interim Order and Final Order, (ii) the hearings for the approval of the Interim Order, (iii) the hearings for the approval of the Final Order, (iv) the motions seeking approval of the sale of all or substantially all of the assets or the Equity Interests of the Credit Parties and (v) the hearings for the approval of the sale of all or substantially all of the assets or the Equity Interests of the Credit Parties. The Credit Parties shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(aa)    Sales Process Timeline. The Credit Parties shall timely comply with the sale process milestones set forth in the DIP Orders and shall incorporate such milestones into a bidding procedures motion and order, each of which shall be in form and substance acceptable to the Administrative Agent (the "Bid Procedures Motion" and "Bid Procedures Order", respectively). Promptly upon receipt by

any Credit Party, such Credit Party shall deliver to the Administrative Agent copies of all written indications of interest in the sale (by proposal, letter of intent or otherwise), term sheets, asset purchase agreements and other documents from prospective bidders, other interested parties or their representatives, and such other information and documents as the Administrative Agent may from time to time request.

(bb)    Payment of Borrower Obligations. To the extent permitted by the DIP Orders, each Credit Party shall, and shall cause each of its Subsidiaries to, pay or discharge before they become delinquent (a) all material Post-Petition claims, taxes, assessments, charges and levies imposed by any Governmental Authority and (b) all other lawful Post-Petition claims, in each case, that if unpaid would, by the operation of applicable Requirements of Law, become a Lien upon any property of any Credit Party, except, in each case, for those whose amount or validity is being contested in good faith by proper proceedings diligently conducted and for which adequate reserves are maintained on the books of the Credit Parties in accordance with GAAP.

SECTION 8.02    Negative Covenants of the Credit Parties.  At all times from the Effective Date until the Final Payout Date, each Credit Party party hereto shall not (and shall not permit any other Credit Party to), unless the Required DIP Lenders shall otherwise consent in writing:

(a)    Fundamental Changes; Dispositions.

(i)    Wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, including by means of a "plan of division" under the Delaware Limited Liability Company Act or any comparable transaction under any similar law, or permit any of its Subsidiaries to do any of the foregoing; provided, however, that, to the extent permitted by the DIP Orders and consistent with the Approved Budget, any wholly owned Subsidiary of any Credit Party may be merged into such Credit Party or another wholly owned Subsidiary of such Credit Party, or any Credit Party may consolidate or amalgamate with another wholly owned Subsidiary of such Credit Party, so long as (A) no other provision of this Agreement or the DIP Orders would be violated thereby, (B) such Credit Party gives the Administrative Agent at least 30 days' prior written notice of such merger, consolidation or amalgamation accompanied by true, correct and complete copies of all material agreements, documents and instruments relating to such merger, consolidation or amalgamation, including the certificate or certificates of merger or amalgamation or other documents to be filed with each appropriate Secretary of State or equivalent authority (with a copy as filed promptly after such filing), (C) no Default or Event of Default shall have occurred and be continuing either before or after giving effect to such transaction, (D) the Lenders' rights in any Collateral, including the existence, perfection and priority of any Lien thereon, are not adversely affected by such merger, consolidation or amalgamation and (E) the surviving or amalgamated Subsidiary, if any, if not already a Credit Party, delivers a guaranty and a pledge and security agreement, in each case, satisfactory to the Administrative Agent, which is in full force and effect on the date of and immediately after giving effect to such merger, consolidation or amalgamation, and in the case of any amalgamation, together with (w) an officer's certificate from an authorized officer of the surviving or amalgamated Subsidiary, (x) resolutions of the board of directors (or equivalent governing body) of the surviving or amalgamated Subsidiary, (y) an opinion letter from counsel to such surviving or amalgamated Subsidiary opining as to such matters as the Administrative Agent may reasonably request and (z) such lien filings as the Administrative Agent may reasonably request, and (F) in the case of any such merger or consolidation involving Parent or the Borrower, Parent or the Borrower, as applicable, shall be the continuing or surviving entity.

(ii)    Make any Disposition, whether in one transaction or a series of related transactions, of all or any part of its business, property or assets, whether now owned or hereafter acquired (or agree to do any of the foregoing) (including issuances of Equity Interests by

51

Subsidiaries that do not result in a Change in Control and Dispositions of interests in Subsidiaries), or permit any of its Subsidiaries to do any of the foregoing; *provided, however*, that any Credit Party and its Subsidiaries may make Permitted Dispositions to the extent permitted by the DIP Orders and the Approved Budget.

(b)     Mergers or Acquisitions. The Parent shall not consolidate with or merge with or into, or (directly, or indirectly through one or more of the Parent's Subsidiaries) sell, lease, or otherwise transfer, in one transaction or a series of transactions, all or substantially all of the assets of the Parent and its Subsidiaries, taken as a whole, to another Person (a "**Business Combination Event**"), unless: (a) the resulting, surviving, or transferee Person is the Parent, (b) immediately after giving effect to such Business Combination Event, no Default or Event of Default will have occurred and be continuing and (c) such Business Combination Event is permitted by the DIP Orders.

(c)     Debt.  The Parent shall not, and shall not permit any of its Subsidiaries to, create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to, or permit any of its Subsidiaries to create, incur, assume, guarantee or suffer to exist or otherwise become or remain liable with respect to, any Indebtedness (including, for certainty, any Indebtedness incurred on a contingent basis) other than Permitted Indebtedness to the extent permitted by the DIP Orders and consistent with the Approved Budget.

(d)     Liens.  The Parent shall not, and shall not permit any of its Subsidiaries to, incur any Lien (other than Permitted Liens to the extent permitted by the DIP Orders and consistent with the Approved Budget).

(e)     Restricted Payments. The Parent shall not, and shall not permit any of its Subsidiaries to, make or effect or permit any of its Subsidiaries to make or effect any Restricted Payment other than, to the extent permitted by the DIP Orders and consistent with the Approved Budget, Permitted Restricted Payments.

(f)     Transactions with Affiliates.  Parent shall not, and shall not permit any of its Subsidiaries to enter into, renew, extend or be a party to, or permit any of its Subsidiaries to enter into, renew, extend or be a party to, any Affiliate Transaction, other than, to the extent permitted by the DIP Orders and the Approved Budget, (i) any transactions solely between or among Parent and/or any of its Subsidiaries which are Credit Parties (or an entity that becomes a Credit Party as a result of such transaction) or (ii) any transactions with any Lender in such Lender's position as a Lender, unless such transaction is on terms that are no less favorable to the Parent or the relevant Subsidiary than those that could have been obtained in a comparable transaction by the Parent or such Subsidiary with an unrelated Person on an arm's-length basis (as determined in good faith by the Parent), and, to the extent permitted by the DIP Orders and the Approved Budget:

(i)     with respect to any such transaction or series of related transactions involving aggregate consideration in excess of $1.0 million, the transaction has been approved by a resolution adopted by a majority of the disinterested members of the Board of Directors.

(g)     Hedging Agreements. Parent shall not, and shall not permit any of its Subsidiaries to, enter into any Hedging Agreement other than, to the extent permitted by the DIP Orders and the Approved Budget, Hedging Agreements entered into in the ordinary course of business for hedging actual foreign exchange requirements in the following six months and actual interest rate or foreign exchange exposure in connection with financing agreements and not for speculative purposes.

(h)    KEIP Plan. No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, enter into any key employee incentive or retention plan, or other similar plan or agreement (any such agreement, a "KEIP") unless such KEIP has been approved in writing by the Required DIP Lenders.

(i)    Chapter 11 Claims. None of the Credit Parties will, and none will permit any of its Subsidiaries to, incur, create, assume, suffer to exist or permit (other than those existing, and disclosed to the Administrative Agent, on the date hereof) any administrative expense, unsecured claim, or other super-priority claim or lien (except for the Carve-Out and Pre-Petition Prior Liens to the extent such liens had priority over the liens granted under the Pre-Petition Loan Agreement) that are pari passu with or senior to the administrative expenses or the claims of the Secured Parties against the Credit Parties hereunder, or apply to the Bankruptcy Court for authority to do so.

(j)    Critical Vendor and Other Payments. None of the Credit Parties shall, and none will permit any of its Subsidiaries to, make (i) any pre-petition "critical vendor" payments or other payments on account of any creditor's pre-petition unsecured claims, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, except, in each case, in amounts and on terms and conditions that are permitted by the Approved Budget and by the DIP Orders.

## ARTICLE IX

## [RESERVED]

## ARTICLE X

## EVENTS OF DEFAULT

SECTION 10.01    Events of Default.  If any of the following events (each an "Event of Default") shall occur:

(a)    the Borrower fails to pay (i) any amount on the DIP Term Loan Maturity Date, or (ii) any Interest or any other amount due and payable under this Agreement (other than the amounts specified in clause (i) hereof);

(b)    [reserved];

(c)    Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits the Credit Parties from complying or permits the Credit Parties not to comply, any the Parent or any of its Subsidiaries shall fail to pay when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) any principal, interest or other amount payable in respect of any Post-Petition Material Indebtedness, and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness without waiver or consent prior to the Administrative Agent delivering notice of a reservation of rights or other potential action in respect thereof, or any other default under any agreement or instrument relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable grace or cure period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem,

purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

(d)    [reserved];

(e)    [reserved];

(f)    [reserved];

(g)    [reserved];

(h)    [reserved];

(i)    any Credit Party shall fail to perform or observe any other material term, covenant or agreement under this Agreement or any other Transaction Document (other than with respect to the events listed in subsections (a) through (h) above or the event listed in subsection (v) below), and such failure, solely to the extent capable of cure, shall continue for three (3) days following the earlier of (x) the actual knowledge of any Responsible Officer of any Credit Party of such failure and (y) the Administrative Agent's written notice to any Credit Party of such failure;

(j)    any representation or warranty made or deemed made by any Credit Party (or any of their respective officers) under or in connection with this Agreement or any other Transaction Document or any information or report delivered by any Credit Party pursuant to this Agreement or any other Transaction Document, shall prove to have been incorrect or untrue in any material respect when made or deemed made or delivered, which, solely to the extent capable of cure, remains unremedied for thirty (30) days following the earlier of (x) any Credit Party's actual knowledge of such breach and (y) the Administrative Agent's written notice to any Credit Party of such breach;

(k)    any security interest granted pursuant to the Pre-Petition Transaction Documents or any other Transaction Document shall for any reason cease to create, or for any reason cease to be, a valid and enforceable first priority perfected security interest in favor of the Borrower or the Administrative Agent with respect to the Collateral, free and clear of any Adverse Claim (other than Permitted Liens);

(l)    [reserved];

(m)    a Change in Control shall occur;

(n)    either (i) the Internal Revenue Service shall file notice of a lien (other than Permitted Liens) pursuant to Section 6323 of the Code with regard to any assets of any Credit Party or (ii) the PBGC shall, or shall indicate its intention to, file notice of a lien pursuant to Section 303(k) or 4068 of ERISA with regard to any of the assets of any Credit Party;

(o)    (i) the occurrence of a Reportable Event; (ii) the adoption of an amendment to a Pension Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code; (iii) the existence with respect to any Multiemployer Plan of an "accumulated funding deficiency" (as defined in Section 431 of the Code or Section 304 of ERISA), whether or not waived; (iv) the failure to satisfy the minimum funding standard under Section 412 of the Code with respect to any Pension Plan (v) the incurrence of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or the withdrawal or partial withdrawal of any Credit Party or any of their respective Subsidiaries or ERISA Affiliates from any Multiemployer Plan; (vi) the receipt by any Credit Party or any of their respective ERISA Affiliates  from  the PBGC or any plan administrator of any notice relating to the intention to

terminate any Pension Plan or Multiemployer Plan or to appoint a trustee to administer any Pension Plan or Multiemployer Plan; (vii) the receipt by any Credit Party or any of their respective Subsidiaries or ERISA Affiliates of any notice concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Title IV of ERISA; (viii) the occurrence of a prohibited transaction with respect to any Credit Party or any of their respective Subsidiaries or ERISA Affiliates (pursuant to Section 4975 of the Code); or (ix) the occurrence or existence of any other similar event or condition with respect to a Pension Plan or a Multiemployer Plan, with respect to each of clause (i) through (ix), either individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(p)      a Material Adverse Effect shall occur with respect to any Credit Party;

(q)      any Credit Party shall (i) be required to register as an "investment company" within the meaning of the Investment Company Act or (ii) become a "covered fund" within the meaning of the Volcker Rule;

(r)      any material provision of this Agreement or any other Transaction Document shall cease to be in full force and effect or any Credit Party (or any of their respective Affiliates) shall so state in writing;

(s)      one or more Post-Petition judgments or decrees shall be entered against any Credit Party involving in the aggregate a liability (not paid or to the extent not covered by a reputable and solvent insurance company) and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of forty-five (45) consecutive days, and the aggregate amount of all such judgments equals or exceeds $1,000,000;

(t)      any Transaction Document covering a material portion of the Collateral for any reason (other than pursuant to the terms thereof) ceases to create a valid and perfected Lien on, and security interest in, any material portion of the Collateral covered thereby with respect to the Loans, subject to Permitted Liens, except to the extent that any such perfection or priority is not required pursuant to the Transaction Documents or results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Transaction Documents;

(u)      [Reserved]

(v)      any of the Credit Parties shall fail to comply with any of the covenants (and the timeframes for compliance therewith) set forth in 8.01(c), 8.01(d)(i), 8.01(u), 8.01(w), 8.01(x), 8.01(y), 8.01(z), 8.01(aa), 8.01(bb), Section 8.02 or Article IX; provided, that, any breach of Section 8.01(w) may be cured if within five (5) Business Days of the last day of the applicable Budget Testing Period for which such breach arose, one or more Second Lien DIP Lenders advance additional Second Lien DIP Loans or other funds in a manner (and on terms) satisfactory to the Required DIP Lenders in an amount equal to the amount by which the unrestricted cash and Cash Equivalents of the Credit Parties and their Subsidiaries was less than the amount set forth in each Approved Budget for such applicable Budget Testing Period;

(w)      Parent shall (i) fail to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of the Notes issued under the Note Purchase Agreement or the Second Lien DIP Loans under the Second Lien DIP Loan Agreement, (ii) fail to observe or perform any other agreement or condition under the Note Documents, or any other event occurs, the effect of which failure or other event is to cause, or to permit the holder or holders of the Notes or the Note Collateral Agent to cause, with the giving of notice if required, the Borrower Obligations (as defined in the Note Purchase Agreement) to become due and payable

(automatically or otherwise) prior to their stated maturity, or (iii) fail to observe or perform any other agreement or condition under the Second Lien DIP Documents, or any other event occurs, the effect of which failure or other event is to cause, or to permit the holder or holders of the Second Lien DIP Loans or the Second Lien DIP Agent to cause, with the giving of notice if required, the Borrower Obligations (as defined in the Second Lien DIP Loan Agreement) to become due and payable (automatically or otherwise) prior to their stated maturity; in each case, regardless of whether any such failure or default is remedied or waived;

(x)      The holders of all or any part of the Indebtedness arising under the Note Purchase Agreement  shall be granted adequate protection other than as consented to by the Administrative Agent and as set forth in the DIP Orders;

(y)      <u>Bankruptcy Defaults</u>.  The occurrence of any of the following in the Chapter 11 Cases:

(i)      the payment by the Credit Parties of expenses (A) in excess of the amounts permitted by Section 8.01(w), or (B) otherwise in violation of the terms and conditions of Section 8.01(w);

(ii)      obtaining after the Petition Date credit or incurring Indebtedness that is (i) secured by a security interest, mortgage or other lien on all or any portion of Collateral which is equal or senior to any security interest, mortgage or other lien of the Administrative Agent, or (ii) entitled to priority administrative status which is equal or senior to that granted to the Administrative Agent in the DIP Orders, unless used to indefeasibly repay the Borrower Obligations in full in cash;

(iii)      the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by the Credit Parties in the Chapter 11 Cases, or the entry of an order (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code from any Person other than the Lenders not otherwise permitted by this Agreement, or (B) to authorize any Person to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (C) except as provided in the DIP Orders, to use Cash Collateral without the Administrative Agent's prior written consent under Section 363(c) of the Bankruptcy Code or (D) except as provided in the DIP Orders, to grant any lien other than Permitted Liens upon or affecting any Collateral;

(iv)      the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(v)      any failure by the Credit Parties to make adequate protection payments or other payments to the Pre-Petition Agent or Pre-Petition Secured Parties as set forth in the DIP Orders when due;

(vi)      any failure by the Credit Parties to perform, in any respect and subject to any applicable cure periods, any of the terms, provisions, conditions, covenants, or obligations under any DIP Order or a Termination Event under any DIP Order shall occur;

(vii)      the entry of an order which has not been withdrawn, dismissed or reversed (a) appointing an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner or other responsible person with expanded powers in the Chapter 11 Cases, (b) granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any

creditor to execute upon or enforce a lien on or security interest in any Collateral in excess of $25,000 or (ii) with respect to any lien of or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority, (in each case with a value in excess of $250,000), (c) amending, supplementing, staying, reversing, vacating or otherwise modifying any of the Interim Order, the Final Order, this Agreement or any other Transaction Document, or Administrative Agent's, any Secured Party's, Pre-Petition Agent's or Pre-Petition Secured Parties' rights, benefits, privileges or remedies under the Interim Order, the Final Order, this Agreement, any other Transaction Document or any Pre-Petition Transaction Document or (d) approving a sale of any assets of any Credit Party pursuant to section 363 of the Bankruptcy Code or approving bidding procedures therefor other than in each case as required in the DIP Orders;

(viii)    Credit Parties consolidating or combining with any other Person except pursuant to a confirmed plan of reorganization with the prior written consent of the Administrative Agent and Required DIP Lenders;

(ix)    reversal, vacatur, or modification (without the express prior written consent of the Administrative Agent and the Required DIP Lenders, in their sole discretion) of any DIP Order or any provision thereof, or reversal, vacatur, or modification (without the express prior written consent of the Pre-Petition Agent and the Required Lenders (under and as defined in the Pre-Petition Loan Agreement) in their sole discretion) of any provision of any DIP Order directly and adversely affecting the rights of the Pre-Petition Secured Parties;

(x)    the challenge by the Credit Parties (or the support by the Credit Parties of the challenge by any other Person) to the Administrative Agent's, any Secured Party's, the Pre-Petition Agent's, or any Pre-Petition Secured Party's claim or the validity, extent, perfection, priority or characterization of any obligations incurred or liens granted under or in connection with the Pre-Petition Loan Agreement;

(xi)    the challenge by the Credit Parties (or the support by the Credit Parties of the challenge by any other Person) to (a) disallow in whole or in part the claim of the Pre-Petition Agent or the Pre-Petition Secured Parties under the Pre-Petition Loan Agreement or the claim of the Administrative Agent or any Secured Party in respect of Borrower Obligations or to challenge the validity, perfection and enforceability of any of the liens in favor of any of them, or (b) equitably subordinate or re-characterize in whole or in part the claim of the Administrative Agent or any Secured Party in respect of the Borrower Obligations or the Pre-Petition Agent or any Pre-Petition Secured Party in respect of the Pre-Petition Indebtedness, or in each case the entry of an order by the Bankruptcy Court granting the relief described above;

(xii)    the filing of a lawsuit, adversary proceeding, claim or counterclaim related to the Credit Parties or Collateral or pre-petition collateral against the Administrative Agent, any Secured Party, Pre-Petition Agent, or any Pre-Petition Secured Party by the Credit Parties;

(xiii)    the application by the Credit Parties for authority to make any Pre-Petition Payment not contemplated by the Approved Budget without the Administrative Agent's prior written consent;

(xiv)    the entry of an order in the Chapter 11 Cases avoiding or requiring disgorgement of any portion of the Pre-Petition Obligations;

(xv)    the use, remittance or the application of Collateral or proceeds of Collateral in contravention of the terms of the Transaction Documents or the DIP Orders;

(xvi)    the entry of an order in the Chapter 11 Cases authorizing procedures for interim compensation of professionals that is not in form and substance customary for the Southern District of Florida or otherwise not in form and substance acceptable to the Administrative Agent;

(xvii)    without the prior written consent of the Administrative Agent and the Required DIP Lenders, the Credit Parties incur, create, assume, suffer to exist or permit any superpriority claim in the Chapter 11 Cases that is pari passu with or senior to the claims of the Secured Parties and Administrative Agent, other than the Carve-Out;

(xviii)    the Bankruptcy Court enters an order (a) resulting in the marshaling of any Collateral, or (b) precluding the attachment of liens to Post-Petition property based on the "equities of the case" under Section 552(b) of the Bankruptcy Code;

(xix)    the Credit Parties requesting or seeking authority for or entry of an order that approves or provides authority to take any other action or actions adverse to the Administrative Agent or any Secured Party or its rights and remedies under the Transaction Documents or its interest in the Collateral;

(xx)    the termination or modification of the Borrower's exclusivity as to the proposal of any plan or reorganization or liquidation; or

(xxi)    the change of venue of any of the Chapter 11 Cases from the Bankruptcy Court to any other court without the prior written consent of the Administrative Agent;

then, and in any such event, the Administrative Agent may (or, at the direction of the Lenders shall) by notice to the Borrower declare (y) the DIP Term Loan Maturity Date with respect to all or any portion of the Loans to have occurred and (z) all or any portion of the Borrower Obligations to be immediately due and payable; provided, that automatically upon the occurrence of any event (without any requirement for the giving of notice) described in subsection (l) of this Section 10.01, the DIP Term Loan Maturity Date shall occur and all Borrower Obligations shall be immediately due and payable. Upon any such declaration or designation or upon such automatic termination, the Administrative Agent and the other Secured Parties shall have, in addition to the rights and remedies which they may have under this Agreement and the other Transaction Documents, all other rights and remedies provided after default under the UCC and under other Applicable Law, which rights and remedies shall be cumulative. Any proceeds from liquidation of the Collateral shall be applied in the order of priority set forth in Section 4.01.

SECTION 10.02  Remedies. Upon the occurrence and during the continuance of any Event of Default, upon written notice thereof by Administrative Agent (which such notice shall be made to Borrower, the official committee(s) of creditors of the Credit Parties and the United States Trustee for the Southern District of Florida and shall be referred to herein as a "Termination Declaration" and the date which is the earliest to occur of any such Termination Declaration (excluding the notice period) being herein referred to as the "Termination Declaration Date"), Administrative Agent may, and shall at the request of the Required DIP Lenders, in each case provided such Event(s) of Default are not cured by the Credit Parties pursuant to the terms of this Agreement:

(a)    declare all or any portion of any one or more of the Commitments of each Lender to make Loans to be suspended or terminated, whereupon all or such portion of such Commitments shall forthwith be suspended or terminated;

(b)    declare all or any portion of the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any

other Transaction Document to be immediately due and payable; without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Credit Party; and/or

(c)     subject to the terms of the Interim Order or Final Order, as applicable, exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Transaction Documents or applicable law; provided, however, Agent shall not credit bid any portion of the Borrower Obligations without the consent of the Required DIP Lenders.

(d)     In addition, five (5) Business Days following the Termination Declaration Date (such 5 Business Day period, the "Remedies Notice Period"), absent the Credit Parties curing all such existing Events of Default during such Remedies Notice Period, the Administrative Agent shall have automatic relief from the automatic stay and may foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the Borrower Obligations, occupy the Credit Parties' premises to sell or otherwise dispose of the Collateral or otherwise exercise remedies against the Collateral permitted by applicable nonbankruptcy law.  During the Remedies Notice Period, the Credit Parties and any statutory committee shall be entitled to an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred.  Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing, the automatic stay, as to the Lenders and the Administrative Agent, shall automatically terminate at the end of the Remedies Notice Period, without further notice or order.  During the Remedies Notice Period, the Credit Parties may not use the proceeds of Loans hereunder, or other Collateral proceeds except to the limited extent permitted by the DIP Orders.

SECTION 10.03  Rights Not Exclusive.  The rights provided for in this Agreement and the other Transaction Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

## ARTICLE XI

## THE ADMINISTRATIVE AGENT

SECTION 11.01  Appointment and Authorization.  Each Lender hereby irrevocably appoints and authorizes the Administrative Agent to enter into each of the Transaction Documents to which it is a party (other than this Agreement) on its behalf and to take such actions as the Administrative Agent on its behalf and to exercise such powers under the Transaction Documents as are delegated to the Administrative Agent by the terms thereof, together with all such powers as are reasonably incidental thereto.  Subject to the terms of Section 14.01 and to the terms of the other Transaction Documents, the Administrative Agent is authorized and empowered to amend, modify, or waive any provisions of this Agreement or the other Transaction Documents on behalf of Lenders.  Except for Sections 11.09, 11.12, and 11.14 the provisions of this Article XI are solely for the benefit of the Administrative Agent and Lenders and neither the Borrower nor any other Credit Party shall have any rights as a third party beneficiary of any of the provisions hereof.  In performing its functions and duties under this Agreement, the Administrative Agent shall act solely as agent of Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for the Borrower or any other Credit Party.  The Administrative Agent may perform any of its duties hereunder, or under the Transaction Documents, by or through its agents, servicers, trustees, investment managers or employees.

SECTION 11.02  The Administrative Agent and Affiliates.  The Administrative Agent shall have the same rights and powers under the Transaction Documents as any other Lender and may exercise or refrain from exercising the same as though it were not the Administrative Agent, and the Administrative

Agent and its Affiliates may lend money to, invest in and generally engage in any kind of business with each Credit Party or Affiliate of any Credit Party as if it were not the Administrative Agent hereunder.

SECTION 11.03  Action by the Administrative Agent.  The duties of the Administrative Agent shall be mechanical and administrative in nature.  The Administrative Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender.  Nothing in this Agreement or any of the Transaction Documents is intended to or shall be construed to impose upon the Administrative Agent any obligations in respect of this Agreement or any of the Transaction Documents except as expressly set forth herein or therein.

SECTION 11.04  Consultation with Experts.  The Administrative Agent may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

SECTION 11.05  Liability of the Administrative Agent.  Neither the Administrative Agent nor any of its directors, officers, agents, trustees, investment managers, servicers or employees shall be liable to any Lender for any action taken or not taken by it in connection with the Transaction Documents, except that the Administrative Agent shall be liable with respect to its specific duties set forth hereunder but only to the extent of its own gross negligence or willful misconduct in the discharge thereof as determined by a final non-appealable judgment of a court of competent jurisdiction.  Neither the Administrative Agent nor any of its directors, officers, agents, trustees, investment managers, servicers or employees shall be responsible for or have any duty to ascertain, inquire into or verify (a) any statement, warranty or representation made in connection with any Transaction Document or any borrowing hereunder; (b) the performance or observance of any of the covenants or agreements specified in any Transaction Document; (c) the satisfaction of any condition specified in any Transaction Document; (d) the validity, effectiveness, sufficiency or genuineness of any Transaction Document, any Lien purported to be created or perfected thereby or any other instrument or writing furnished in connection therewith; (e) the existence or non-existence of any Event of Default or Potential Event of Default; or (f) the financial condition of any Credit Party.  The Administrative Agent shall not incur any liability by acting in reliance upon any notice, consent, certificate, statement, or other writing (which may be a bank wire, facsimile or electronic transmission or similar writing) believed by it to be genuine or to be signed by the proper party or parties.  The Administrative Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount to which they are determined to be entitled (and such other Lenders hereby agree to return to such Lender any such erroneous payments received by them).

SECTION 11.06  Indemnification.  Each Lender shall, in accordance with its pro rata share of the total unfunded Commitment and funded Loans hereunder, indemnify the Administrative Agent (to the extent not reimbursed by the Borrower) upon demand against any cost, expense (including counsel fees and disbursements), claim, demand, action, loss or liability (except such as result from the Administrative Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction) that the Administrative Agent may suffer or incur in connection with the Transaction Documents or any action taken or omitted by the Administrative Agent hereunder or thereunder.  If any indemnity furnished to the Administrative Agent for any purpose shall, in the opinion of the Administrative Agent, be insufficient or become impaired, the Administrative Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against even if so directed by the Lenders until such additional indemnity is furnished.

SECTION 11.07  Right to Request and Act on Instructions.  The Administrative Agent may at any time request instructions from Required DIP Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the Transaction Documents the Administrative Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, the Administrative Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Person for refraining from any action or withholding any approval under any of the Transaction Documents until it shall have received such instructions from the Required DIP Lenders or all or such other portion of the DIP Term Lenders as shall be prescribed by this Agreement. Without limiting the foregoing, no DIP Term Lender shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting under this Agreement or any of the other Transaction Documents in accordance with the instructions of the Required DIP Lenders (or all or such other portion of the DIP Term Lenders as shall be prescribed by this Agreement) and, notwithstanding the instructions of the Required DIP Lenders (or such other applicable portion of the DIP Term Lenders), the Administrative Agent shall have no obligation to take any action if it believes, in good faith, that such action would violate Applicable Law or exposes the Administrative Agent to any liability for which it has not received satisfactory indemnification in accordance with the provisions of Section 11.06.

SECTION 11.08  Credit Decision.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the Transaction Documents.

SECTION 11.09  Collateral Matters.  The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by the Administrative Agent under any Transaction Document (a) upon termination of the Loans and payment in full of all Borrower Obligations; or (b) constituting property sold or disposed of as part of or in connection with any disposition permitted under any Transaction Document, including pursuant to Section 8.01(s) (it being understood and agreed that the Administrative Agent may conclusively rely without further inquiry on a certificate of a Responsible Officer as to the sale or other disposition of property being made in full compliance with the provisions of the Transaction Documents).  Upon request by the Administrative Agent at any time, Lenders will confirm the Administrative Agent's authority to release particular types or items of Collateral pursuant to this Section 11.09.

SECTION 11.10  Agency for Perfection.  The Administrative Agent and each Lender hereby appoint each other Lender as agent for the purpose of perfecting the Administrative Agent's security interest in assets which, in accordance with the Uniform Commercial Code in any applicable jurisdiction, can be perfected by possession or control.  Should any Lender (other than the Administrative Agent) obtain possession or control of any such assets, such Lender shall notify the Administrative Agent thereof, and, promptly upon the Administrative Agent's request therefor, shall deliver such assets to the Administrative Agent or in accordance with the Administrative Agent's instructions or transfer control to the Administrative Agent in accordance with the Administrative Agent's instructions.  Each Lender agrees that it will not have any right individually to enforce or seek to enforce any security interest hereunder or to realize upon any Collateral for the Loans unless instructed to do so by the Administrative Agent (or consented to by the Administrative Agent), it being understood and agreed that such rights and remedies may be exercised only by the Administrative Agent.

SECTION 11.11  <u>Notice of Default</u>.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Potential Event of Default or Event of Default except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of Lenders, unless the Administrative Agent shall have received written notice from a Lender or a Credit Party referring to this Agreement, describing such Potential Event Default or Event of Default and stating that such notice is a "notice of default".  The Administrative Agent will notify each Lender of its receipt of any such notice.  The Administrative Agent shall take such action with respect to such Potential Event of Default or Event of Default as may be requested by the Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) in accordance with the terms hereof.  Unless and until the Administrative Agent has received any such request, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Potential Event Default or Event of Default as it shall deem advisable or in the best interests of Lenders.

SECTION 11.12  <u>Assignment by the Administrative Agent; Resignation of the Administrative Agent; Successor the Administrative Agent</u>.

(a)  The Administrative Agent may at any time assign its rights, powers, privileges and duties hereunder to (i) another Lender, or (ii) any Person to whom the Administrative Agent, in its capacity as a Lender, has assigned (or will assign, in conjunction with such assignment of agency rights hereunder) 50% or more of its Loans, in each case without the consent of the Lenders or the Borrower.  Following any such assignment, the Administrative Agent shall give notice to the Lenders and the Borrower.   An assignment by the Administrative Agent pursuant to this subsection (a) shall not be deemed a resignation by the Administrative Agent for purposes of subsection (b) below.

(b)  Without limiting the rights of the Administrative Agent to designate an assignee pursuant to subsection (a) above, the Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required DIP Lenders shall have the right to appoint a successor the Administrative Agent.  If no such successor shall have been so appointed by the Required DIP Lenders and shall have accepted such appointment within ten (10) Business Days after the retiring the Administrative Agent gives notice of its resignation, then the retiring the Administrative Agent may on behalf of the Required DIP Lenders, appoint a successor the Administrative Agent; <u>provided</u>, <u>however</u>, that if the Administrative Agent shall notify the Borrower and the Required DIP Lenders that no Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice from the Administrative Agent that no Person has accepted such appointment and, from and following delivery of such notice, (i) the retiring the Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Transaction Documents, and (ii) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required DIP Lenders appoint a successor the Administrative Agent as provided for above in this paragraph.

(c)  Upon (i) an assignment permitted by subsection (a) above, or (ii) the acceptance of a successor's appointment as the Administrative Agent pursuant to subsection (b) above, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) the Administrative Agent, and the retiring the Administrative Agent shall be discharged from all of its duties and obligations hereunder and under the other Transaction Documents (if not already discharged therefrom as provided above in this paragraph).  The fees payable by the Borrower to a successor the Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring the Administrative Agent's resignation hereunder and under the other Transaction Documents, the provisions of this Article and <u>Section 11.12</u> shall continue in effect for the benefit of such retiring the Administrative Agent and its sub-agents in respect of any actions

taken or omitted to be taken by any of them while the retiring the Administrative Agent was acting or was continuing to act as the Administrative Agent.

SECTION 11.13  Payment and Sharing of Payment.

(a)     On the date of any Credit Extension, the Administrative Agent, on behalf of Lenders, may elect to advance to the Borrower the full amount of the Loan to be made on such date prior to receiving funds from Lenders, in reliance upon each Lender's commitment to make its Loan Commitment Percentage of the applicable Loan to the Borrower in a timely manner on such date.  If the Administrative Agent elects to advance the applicable Loan to the Borrower in such manner, the Administrative Agent shall be entitled to receive all interest that accrues on the date of any such Credit Extension on each Lender's Loan Commitment Percentage of the applicable Loan unless the Administrative Agent receives such Lender's Loan Commitment Percentage of the applicable Loan before 3:00 p.m. (Eastern time) on the date of any such Credit Extension.

(b)     It is understood that for purposes of advances to the Borrower made pursuant to this Section 11.13, the Administrative Agent will be using the funds of the Administrative Agent, and pending settlement, all interest accruing on such advances shall be payable to the Administrative Agent.

(c)     The provisions of this Section 11.13 shall be deemed to be binding upon the Administrative Agent and Lenders notwithstanding the occurrence of any Potential Event of Default or Event of Default, or any insolvency or bankruptcy proceeding pertaining to the Borrower or any other Credit Party.

SECTION 11.14  Loan Payments.  Payments of principal, interest and fees in respect of the Loans will be settled on the date of receipt if received by the Administrative Agent on the last Business Day of a month or on the Business Day immediately following the date of receipt if received on any day other than the last Business Day of a month.

SECTION 11.15  Return of Payments.

(a)     If the Administrative Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by the Administrative Agent from the Borrower and such related payment is not received by the Administrative Agent, then the Administrative Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind, together with interest accruing on a daily basis at the Federal Funds Rate.

(b)     If the Administrative Agent determines at any time that any amount received by the Administrative Agent under this Agreement must be returned to the Borrower or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Transaction Document, the Administrative Agent will not be required to distribute any portion thereof to any Lender.  In addition, each Lender will repay to the Administrative Agent on demand any portion of such amount that the Administrative Agent has distributed to such Lender, together with interest at such rate, if any, as the Administrative Agent is required to pay to the Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

SECTION 11.16  Sharing of Payments.  If any Lender shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of the Loans (other than pursuant to the terms of Section 5.03(e)) in excess of its pro rata share of the total funded Loans hereunder of payments entitled pursuant to the other provisions of this Section 11.16, such Lender shall purchase from

the other Lenders such participations in extensions of credit made by such other Lenders (without recourse, representation or warranty) as shall be necessary to cause such purchasing Lender to share the excess payment or other recovery ratably with each of them; provided, however, that if all or any portion of the excess payment or other recovery is thereafter required to be returned or otherwise recovered from such purchasing Lender, such portion of such purchase shall be rescinded and each Lender which has sold a participation to the purchasing Lender shall repay to the purchasing Lender the purchase price to the ratable extent of such return or recovery, without interest.  The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section 11.16 may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to Section 14.16) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation).  If under any applicable bankruptcy, insolvency or other similar law, any Lender receives a secured claim in lieu of a setoff to which this Section 11.16 applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders entitled under this Section 11.16 to share in the benefits of any recovery on such secured claim.

SECTION 11.17  Right to Perform, Preserve, and Protect.  If any Credit Party fails to perform any obligation hereunder or under any other Transaction Document, the Administrative Agent itself may, but shall not be obligated to, cause such obligation to be performed at the Borrower's expense.  The Administrative Agent is further authorized by the Borrower and the Lenders to make expenditures from time to time which the Administrative Agent, in its reasonable business judgment, deems necessary or desirable to (a) preserve or protect the business conducted by the Borrower, the Collateral, or any portion thereof, and/or (b) enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Borrower Obligations.  The Borrower hereby agrees to reimburse the Administrative Agent on demand for any and all costs, liabilities and obligations incurred by the Administrative Agent pursuant to this Section 11.17.  Each Lender hereby agrees to indemnify the Administrative Agent upon demand for any and all costs, liabilities and obligations incurred by the Administrative Agent pursuant to this Section 11.17, in accordance with the provisions of Section 11.06.

# ARTICLE XII

# [RESERVED]

# ARTICLE XIII

# INDEMNIFICATION

SECTION 13.01  Indemnities by the Borrower.

(a)    Without limiting any other rights that the Administrative Agent, the Lenders, the Affected Persons and their respective assigns, officers, directors, agents and employees (each, a "Borrower Indemnified Party") may have hereunder or under Applicable Law, the Borrower hereby agrees to indemnify each Borrower Indemnified Party from and against any and all claims, losses and liabilities (including Attorney Costs (excluding the allocated costs of in house counsel and limited to not more than one firm of counsel for all such Borrower Indemnified Parties, taken as a whole, and, if necessary, a single local firm of counsel in each appropriate jurisdiction for all such Borrower Indemnified Parties, taken as a whole (and, in the case of an actual or perceived conflict of interest, of another firm of counsel for such affected Borrower Indemnified Party)) (all of the foregoing being collectively referred to as "Borrower Indemnified Amounts") arising out of or resulting from this Agreement, any other Transaction Document or any Pre-Petition Transaction Document or the use of proceeds of the Loans or the security interest in respect of any of the Collateral; excluding, however, (i) Borrower Indemnified Amounts to the extent a final non-appealable judgment of a court of competent jurisdiction holds that such Borrower Indemnified

Amounts resulted solely from the fraud, gross negligence or willful misconduct by the Borrower Indemnified Party seeking indemnification and (ii) Borrower Indemnified Amounts to the extent arising from a claim, action, litigation, investigation, or other proceeding that does not arise from any act or omission by any Credit Party or any officer, partner, director, trustee, employee, or agent of any Credit Party and that is brought by any Borrower Indemnified Party against another Borrower Indemnified Party (other than any such claim, action, litigation, investigation, or other proceeding brought against the Administrative Agent in its capacity as such).

(b)     [Reserved].

(c)     If for any reason the foregoing indemnification is unavailable to any Borrower Indemnified Party or insufficient to hold it harmless, then the Borrower shall contribute to such Borrower Indemnified Party the amount paid or payable by such Borrower Indemnified Party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative economic interests of the Borrower and its Affiliates on the one hand and such Borrower Indemnified Party on the other hand in the matters contemplated by this Agreement as well as the relative fault of the Borrower and its Affiliates and such Borrower Indemnified Party with respect to such loss, claim, damage or liability and any other relevant equitable considerations.  The reimbursement, indemnity and contribution obligations of the Borrower under this Section shall be in addition to any liability which the Borrower may otherwise have, shall extend upon the same terms and conditions to each Borrower Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Borrower and the Borrower Indemnified Parties.

(d)     Any indemnification or contribution under this Section shall survive the termination of this Agreement.  For the avoidance of doubt, the indemnity provided pursuant to this Section 13.01 and Section 14.04 shall not apply to claims for Indemnified Taxes or Excluded Taxes.

## ARTICLE XIV

## MISCELLANEOUS

SECTION 14.01  Amendments, Etc.

(a)     No provision of this Agreement or any other Transaction Document may be amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by Borrower and the Required DIP Lenders (and, if any amendment, waiver or other modification would either increase a Lender's Commitment, by such Lender and (y) the rights or duties of Administrative Agent are affected thereby, by Administrative Agent); *provided* that no such amendment, waiver or other modification shall, unless signed by all Lenders directly affected thereby, (i) reduce the principal of, rate of interest (excluding, for the avoidance of doubt, any amendment, waiver or other modification to Article IX or the defined terms used therein, which shall be subject to the approval of Required DIP Lenders) on or any fees or prepayment premium with respect to any Loan or forgive any principal, interest or fees or prepayment premium with respect to any Loan (*provided* that this clause (i) shall not apply to the waiver of default interest); (ii) postpone or waive the date fixed for any payment of principal of any Loan or of interest on any Loan or any fees or prepayment premium hereunder or for any termination of any commitment; (iii) change the definition of the term Required DIP Lenders or the percentage of Lenders which shall be required for Lenders to take any action hereunder; (iv) release, or subordinate Administrative Agent's lien in respect of, all or substantially all of the Collateral, authorize any Credit Party to sell or otherwise dispose of all or substantially all of the Collateral, or release any Guarantor from all or any portion of its obligations under the Guaranty or any similar Transaction Document, except as otherwise may be provided in this Agreement or the other Transaction Documents (including, without

limitation, in connection with any disposition permitted hereunder); (v) amend, waive or otherwise modify either of Section 4.01(a), Section 11.16, this Section 14.01, Section 14.03 or the definitions of the terms used in such Sections insofar as the definitions affect the substance of such Sections; (vi) consent to the assignment, delegation or other transfer by any Credit Party of any of its rights and obligations under any Transaction Document or release any Credit Party of its payment obligations under any Transaction Document, except pursuant to a merger, consolidation or other transaction permitted pursuant to this Agreement (it being understood and agreed that all Lenders shall be deemed directly affected by an amendment, waiver or other modification of the type described in the preceding clauses (iii), (iv), (v) and (vi)), or (vii) change any provision in respect of any Credit Party or its Affiliates acquiring any interest in any of the Borrower Obligations.

(b)     Notwithstanding the foregoing in this Section 14.01, Administrative Agent and the Borrower may amend or modify this Agreement and any other Transaction Document to (i) cure any factual or typographical error, omission, defect or inconsistency therein if such amendment, modification or supplement does not adversely affect any Lender or (ii) grant a new Lien, for the benefit of the Lenders, extend an existing Lien over additional property, for the benefit of the Lenders, or join additional Persons as Credit Parties. In addition, the Transaction Documents and related documents executed by the Credit Parties in connection with this Agreement may be in a form reasonably determined by Administrative Agent and may be, together with this Agreement, amended and waived with the consent of Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender solely to the extent such amendment or waiver is required in order (i) to comply with local law or (ii) to cause such Transaction Document or other document to be consistent with this Agreement and the other Transaction Documents.

SECTION 14.02  Notices, Etc.  All notices and other communications hereunder shall, unless otherwise stated herein, be in writing (which shall include facsimile and email communication) and faxed, emailed or delivered, to each party hereto, at its address set forth under its name on Schedule V hereto or at such other address, facsimile number or email address as shall be designated by such party in a written notice to the other parties hereto.  Notices and communications by facsimile or email shall be effective when sent receipt confirmed by electronic or other means (such as by the "return receipt requested" function, as available, return electronic mail or other acknowledgement), and notices and communications sent by other means shall be effective when received.

SECTION 14.03  Assignability; Addition of Lenders.

(a)     Assignment by Lenders.  Each Lender may assign to any Eligible Assignee or to any other Lender all or a portion of its rights and obligations under this Agreement (including, but not limited to, (A) all or a portion of its unfunded Commitment hereunder without the necessity of transferring any portion of any Loan funded by such Lender or other obligations owed to it hereunder, or (B) all or a portion of any Loan funded by such Lender or other obligations owed to it hereunder without the necessity of transferring any portion of its unfunded Commitment hereunder); provided, however, that

(i)     except for an assignment by a Lender to either an Affiliate of such Lender or any other Lender, each such assignment shall require the prior written consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed); provided, that such consent shall be deemed to be given if the Borrower does not respond within five (5) Business Days of a request for consent; and provided, further, that such consent shall not be required if an Event of Default has occurred and is continuing;

(ii)     each such assignment shall be of a constant, and not a varying, percentage of all rights and obligations under this Agreement; and

(iii)      the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Acceptance Agreement.

Upon such execution, delivery, acceptance and recording from and after the effective date specified in such Assignment and Acceptance Agreement, (x) the assignee thereunder shall be a party to this Agreement, and to the extent that rights and obligations under this Agreement have been assigned to it pursuant to such Assignment and Acceptance Agreement, have the rights and obligations of a Lender hereunder and (y) the assigning Lender shall, to the extent that rights and obligations have been assigned by it pursuant to such Assignment and Acceptance Agreement, relinquish such rights and be released from such obligations under this Agreement (and, in the case of an Assignment and Acceptance Agreement covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(b)      Register.  The Administrative Agent shall, acting solely for this purpose as an agent of the Borrower, maintain at its address referred to on Schedule V of this Agreement (or such other address of the Administrative Agent notified by the Administrative Agent to the other parties hereto) a copy of each Assignment and Acceptance Agreement delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders, the Commitment of each Lender and the aggregate outstanding principal amount (and stated interest) of the Loans of each Lender from time to time (the "Register").  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Credit Parties, the Administrative Agent, and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms of this Agreement as a Lender under this Agreement for all purposes of this Agreement.  The Register shall be available for inspection by the Credit Parties or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(c)      Procedure.    Upon its receipt of an Assignment and Acceptance Agreement executed and delivered by an assigning Lender and an Eligible Assignee or assignee Lender, the Administrative Agent shall, if such Assignment and Acceptance Agreement has been duly completed, (i) accept such Assignment and Acceptance Agreement, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Credit Parties.

(d)      Participations.    Each Lender may sell participations to one or more Eligible Assignees (each, a "Participant") in or to all or a portion of its rights and/or obligations under this Agreement (including, without limitation, all or a portion of its Commitment or the interests in the Loans owned by it); provided, however, that

(i)      such Lender's obligations under this Agreement (including, without limitation, its Commitment to the Borrower hereunder) shall remain unchanged, and

(ii)      such Lender shall remain solely responsible to the other parties to this Agreement for the performance of such obligations.

The Administrative Agent, the Lenders, and the Credit Parties shall have the right to continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  The Credit Parties agree that each Participant shall be entitled to the benefits of Sections 5.01 and 5.03 (subject to the requirements and limitations therein, including the requirements under Section 5.03(f) (it being understood that the documentation required under Section 5.03(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided, that such Participant shall not be entitled to receive any greater payment under Section 5.01 or 5.03, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a

67

greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(e)    Participant Register.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Credit Parties, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any this Agreement) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)    Assignments by Administrative Agent.  This Agreement and the rights and obligations of the Administrative Agent herein shall be assignable by the Administrative Agent and its successors and assigns; provided, that in the case of an assignment to a Person that is not an Affiliate of the Administrative Agent or a Lender, so long as no Event of Default has occurred and is continuing, such assignment shall require the Credit Parties' consent (not to be unreasonably withheld, conditioned or delayed).

(g)    Assignments by the Credit Parties.  The Credit Parties may not assign any of their respective rights or obligations hereunder or any interest herein without the prior written consent of the Administrative Agent and each Lender (such consent to be provided or withheld in the sole discretion of such Person).

(h)    Pledge to Secure Obligations of Lender.  Notwithstanding anything to the contrary set forth herein, any Lender or any of their respective Affiliates may at any time pledge or grant a security interest in all or any portion of its interest in, to and under this Agreement and any other Transaction Document to secure obligations of such Lender to any Person providing any extension of credit or financial arrangement to or for the account of such Lender or any of its Affiliates and any agent, trustee, or representative of such Person (without notice to or the consent of the Credit Parties, any other Lender, or the Administrative Agent); provided, that no such pledge shall relieve such Lender of its obligations under this Agreement or substitute any such pledgee for such Lender as a party hereto.

SECTION 14.04  Costs and Expenses.  In addition to the rights of indemnification granted under Section 13.01 hereof, the Credit Parties agree to pay on demand all reasonable and documented out-of-pocket costs and expenses in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Transaction Documents (together with all amendments, restatements, supplements, consents and waivers, if any, from time to time hereto and thereto) and any costs incurred in connection with the Chapter 11 Cases, including, without limitation, (i) the reasonable and documented out-of-pocket Attorney Costs for the Administrative Agent and the Lenders and any of their respective Affiliates with respect thereto and with respect to advising the Administrative Agent and the Lenders and their respective Affiliates as to their rights and remedies under this Agreement and the other Transaction Documents and (ii) reasonable and documented out-of-pocket accountants', auditors' and consultants' fees and expenses for the Administrative Agent and the Lenders and any of their respective Affiliates incurred in connection with the administration and maintenance of this Agreement or advising the Administrative Agent or any Lender  as to their rights and remedies under this Agreement or as to any

actual or reasonably claimed breach of this Agreement or any other Transaction Document. In addition, the Borrower agrees to pay on demand all reasonable and documented out-of-pocket costs and expenses (including reasonable and documented Attorney Costs), of the Administrative Agent and the Lenders and their respective Affiliates, incurred in connection with the enforcement of any of their respective rights or remedies under the provisions of this Agreement and the other Transaction Documents.

SECTION 14.05  Invoices for Indemnified Amounts.  To the extent invoiced to the Borrower at least seven (7) Business Days prior to a Payment Date, any indemnification amounts under this Agreement shall be paid pursuant to the Priority of Payments on such Payment Date (it being agreed and understood, for the avoidance of doubt, that if any such amount is invoiced less than seven (7) Business Days prior to a Payment Date, such amount shall be paid on the next Payment Date).

SECTION 14.06  Confidentiality.

(a)      [reserved].

(b)      Each of the Administrative Agent and each Lender, severally and with respect to itself only, agrees to hold in confidence, and not disclose to any Person, any confidential and proprietary information concerning the Credit Parties and their respective Affiliates and their businesses or the terms of this Agreement (including any fees payable in connection with this Agreement or the other Transaction Documents), except as the Credit Parties may have consented to in writing prior to any proposed disclosure; provided, however, that it may disclose such information (i) to its Advisors and Representatives, (ii) to its assignees and Participants and potential assignees and Participants and their respective counsel if they agree in writing to hold it confidential, (iii) to the extent such information has become available to the public other than as a result of a disclosure by or through it or its Representatives or Advisors, (iv) at the request of a bank examiner or other regulatory authority or in connection with an examination of any of the Administrative Agent or any Lender or their respective Affiliates or (v) to the extent it should be (A) required by Applicable Law, or in connection with any legal or regulatory proceeding or (B) requested by any Governmental Authority to disclose such information; provided, that in the case of clause (v) above, the Administrative Agent and each Lender will use reasonable efforts to maintain confidentiality and will (unless otherwise prohibited by Applicable Law) notify the Credit Parties of its making any such disclosure as promptly as reasonably practicable thereafter. Each of the Administrative Agent and each Lender, severally and with respect to itself only, agrees to be responsible for any breach of this Section by its Representatives and Advisors and agrees that its Representatives and Advisors will be advised by it of the confidential nature of such information and shall agree to comply with this Section.

(c)      As used in this Section, (i) "Advisors" means, with respect to any Person, such Person's accountants, attorneys and other confidential advisors and (ii) "Representatives" means, with respect to any Person, such Person's Affiliates, Subsidiaries, directors, managers, officers, employees, members, investors, financing sources, insurers, professional advisors, representatives and agents; provided, that such Persons shall not be deemed to Representatives of a Person unless (and solely to the extent that) confidential information is furnished to such Person.

(d)      Notwithstanding the foregoing, to the extent not inconsistent with applicable securities laws, each party hereto (and each of its employees, representatives or other agents) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure (as defined in Section 1.6011-4 of the Treasury Regulations) of the transactions contemplated by the Transaction Documents and all materials of any kind (including opinions or other tax analyses) that are provided to such Person relating to such tax treatment and tax structure.

SECTION 14.07 <u>GOVERNING LAW</u>.    TO THE EXTENT NOT GOVERNED BY THE PROVISIONS OF THE BANKRUPTCY CODE, THIS AGREEMENT, INCLUDING THE RIGHTS AND DUTIES OF THE PARTIES HERETO, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, BUT WITHOUT REGARD TO ANY OTHER CONFLICTS OF LAW PROVISIONS THEREOF, EXCEPT TO THE EXTENT THAT THE PERFECTION, THE EFFECT OF PERFECTION OR PRIORITY OF THE INTERESTS OF ADMINISTRATIVE AGENT OR ANY LENDER IN THE COLLATERAL IS GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK).

SECTION 14.08 <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.   Execution of any such counterpart may be by means of (a) an electronic signature) that complies with the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, or any other relevant and applicable electronic signatures law; (b) an original manual signature; or (c) a faxed, scanned, or photocopied manual signature. Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature. The Administrative Agent reserves the right, in its sole discretion, to accept, deny, or condition acceptance of any electronic signature on this Agreement or other Transaction Document. The foregoing shall apply to each other Transaction Document, and any notice delivered hereunder or thereunder, *mutatis mutandis*.

SECTION 14.09 <u>Integration; Binding Effect; Survival of Termination</u>.  This Agreement and the other Transaction Documents contain the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof superseding all prior oral or written understandings. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Agreement shall create and constitute the continuing obligations of the parties hereto in accordance with its terms and shall remain in full force and effect until the Final Payout Date; <u>provided</u>, <u>however</u>, that the provisions of <u>Sections</u> 5.01, 5.02, 5.03, Article XI, 13.01, 13.02, 14.04, 14.05, 14.06, 14.09, 14.11 and 14.13 shall survive any termination of this Agreement.

SECTION 14.10 <u>CONSENT TO JURISDICTION</u>.

(a)    EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO (I) WITH RESPECT TO THE CREDIT PARTIES, THE EXCLUSIVE JURISDICTION, AND (II) WITH RESPECT TO EACH OF THE OTHER PARTIES HERETO, THE NON-EXCLUSIVE JURISDICTION, IN EACH CASE, IF THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXERCISE JURISDICTION, OF ANY NEW YORK STATE OR FEDERAL COURT SITTING IN NEW YORK CITY, NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT, AND EACH PARTY HERETO HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING (I) IF BROUGHT BY THE CREDIT PARTIES OR ANY AFFILIATE THEREOF, SHALL BE HEARD AND DETERMINED, AND (II) IF BROUGHT BY ANY OTHER PARTY TO THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT, MAY BE HEARD AND DETERMINED, IN EACH CASE, IN SUCH NEW YORK STATE COURT OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. NOTHING IN THIS <u>SECTION 14.10</u> SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT OR ANY OTHER CREDIT PARTY TO BRING ANY ACTION OR PROCEEDING AGAINST ANY CREDIT PARTY OR ANY OF THEIR RESPECTIVE PROPERTY IN THE COURTS OF OTHER JURISDICTIONS.  EACH CREDIT PARTY

HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING.  THE PARTIES HERETO AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(b)    EACH OF THE CREDIT PARTIES CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES OF SUCH PROCESS TO IT AT ITS ADDRESS SPECIFIED IN SECTION 14.02.  NOTHING IN THIS SECTION 14.10 SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT OR ANY OTHER CREDIT PARTY TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

SECTION 14.11 WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT.

SECTION 14.12 Ratable Payments.  If any Lender, whether by setoff or otherwise, has payment made to it with respect to any Borrower Obligations in a greater proportion than that received by any other Lender entitled to receive a ratable share of such Borrower Obligations, such Lender agrees, promptly upon demand, to purchase for cash without recourse or warranty a portion of such Borrower Obligations held by the other Lenders so that after such purchase each Lender will hold its ratable proportion of such Borrower Obligations; provided, that if all or any portion of such excess amount is thereafter recovered from such Lender, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

SECTION 14.13 Limitation of Liability.

(a)    Except as provided in paragraph 32 of the Interim Order, no claim may be made by the Borrower or any Affiliate thereof or any other Person against any Lender, the Administrative Agent, or their respective Affiliates, members, directors, officers, employees, incorporators, attorneys or agents for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any other Transaction Document, or any act, omission or event occurring in connection herewith or therewith; and each of the Credit Parties hereby waives, releases, and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor. None of the Lenders, the Administrative Agent, and their respective Affiliates shall have any liability to the Borrower or any Affiliate thereof or any other Person asserting claims on behalf of or in right of the Borrower or any Affiliate thereof in connection with or as a result of this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, except to the extent that any losses, claims, damages, liabilities or expenses incurred by the Credit Parties or any Affiliate thereof result from the breach of contract, gross negligence or willful misconduct of such Lender or the Administrative Agent or any of their respective Affiliates in performing its duties and obligations hereunder and under the other Transaction Documents to which it is a party.

(b)    No claim may be made by the Administrative Agent, any Lender, or any Affiliate thereof or any other Person against any Credit Party, or their respective Affiliates, members, directors, officers, employees, incorporators, attorneys or agents for any special, indirect, consequential or punitive

damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any other Transaction Document, or any act, omission or event occurring in connection herewith or therewith; and each of the Administrative Agent and each Lender hereby waives, releases, and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor. None of the Credit Parties, and their respective Affiliates shall have any liability to the Administrative Agent, any Lender or any Affiliate thereof or any other Person asserting claims on behalf of or in right of the Borrower or any Affiliate thereof in connection with or as a result of this Agreement or any other Transaction Document or the transactions contemplated hereby or thereby, except to the extent that any losses, claims, damages, liabilities or expenses incurred by the Administrative Agent, such Lender, or any Affiliate thereof result from the breach of contract, gross negligence or willful misconduct of such Credit Party or Affiliate in performing its duties and obligations hereunder and under the other Transaction Documents to which it is a party.

(c)    The obligations of the Administrative Agent, each Lender and each Credit Party under this Agreement and each of the Transaction Documents are solely the corporate obligations of such Person. No recourse shall be had for any obligation or claim arising out of or based upon this Agreement or any other Transaction Document against any member, director, officer, employee or incorporator of any such Person.

SECTION 14.14  Intent of the Parties.  The Borrower has structured this Agreement with the intention that the Loans and the obligations of the Borrower hereunder will be treated under United States federal, and applicable state, local and foreign tax law as debt (the "Intended Tax Treatment").  The Borrower, the Lenders, and the Administrative Agent agree to file no tax return, or take any action, inconsistent with the Intended Tax Treatment unless required by law. Each assignee and each Participant acquiring an interest in a Credit Extension, by its acceptance of such assignment or participation, agrees to comply with the immediately preceding sentence.

SECTION 14.15  USA Patriot Act.  Each of the Administrative Agent and each of the Lenders hereby notifies the Credit Parties that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "PATRIOT Act"), the Administrative Agent and the Lenders may be required to obtain, verify and record information that identifies the Credit Parties and the Parent, which information includes the name, address, tax identification number and other information regarding the Credit Parties and the Parent that will allow the Administrative Agent and the Lenders to identify the Credit Parties and the Parent in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act. Each of the Credit Parties agrees to provide the Administrative Agent and each Lender, from time to time, with all documentation and other information required by bank regulatory authorities under "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act.

SECTION 14.16  Right of Setoff.  Each Lender is hereby authorized (in addition to any other rights it may have), at any time during the continuance of an Event of Default, to setoff, appropriate and apply (without presentment, demand, protest or other notice which are hereby expressly waived) any deposits and any other indebtedness held or owing by such Lender  (including by any branches or agencies of such Lender) to, or for the account of, the Borrower against amounts owing by the Borrower hereunder (even if contingent or unmatured); provided, that such Lender shall notify the Borrower promptly following such setoff.

SECTION 14.17  Severability.  Any provisions of this Agreement which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such

prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 14.18  Mutual Negotiations.  This Agreement and the other Transaction Documents are the product of mutual negotiations by the parties thereto and their counsel, and no party shall be deemed the draftsperson of this Agreement or any other Transaction Document or any provision hereof or thereof or to have provided the same.  Accordingly, in the event of any inconsistency or ambiguity of any provision of this Agreement or any other Transaction Document, such inconsistency or ambiguity shall not be interpreted against any party because of such party's involvement in the drafting thereof.

SECTION 14.19  Captions and Cross References.  The various captions (including the table of contents) in this Agreement are provided solely for convenience of reference and shall not affect the meaning or interpretation of any provision of this Agreement.  Unless otherwise indicated, references in this Agreement to any Section, Schedule or Exhibit are to such Section Schedule or Exhibit to this Agreement, as the case may be, and references in any Section, subsection, or clause to any subsection, clause or subclause are to such subsection, clause or subclause of such Section, subsection or clause.

SECTION 14.20  Parties Including Trustees; Bankruptcy Court Proceedings.  This Agreement, the other Transaction Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Transaction Document shall be binding upon the Credit Parties, the estate of each Credit Party, and any trustee, other estate representative or any successor in interest of each Credit Party in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code.  This Agreement and the other Transaction Documents shall be binding upon, and inure to the benefit of, the successors of the Administrative Agent and the Secured Parties and their respective assigns, transferees and endorsees.  The Liens created by this Agreement and the other Transaction Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Cases or any other bankruptcy case of the Credit Parties to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Administrative Agent file financing statements or otherwise perfect its Liens under applicable law.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the Credit Parties, the Administrative Agent and Secured Parties with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Transaction Documents.

SECTION 14.21  Inconsistency.  In the event of any inconsistency between the terms and conditions of this Agreement and of the DIP Orders, the provisions of the DIP Orders shall govern and control.

SECTION 14.22  Pre-Petition Lender Consent.  Each Pre-Petition Lender signatory hereto hereby irrevocably (x) consents, in their capacity as a Pre-Petition Lender, to the terms of this Agreement and the other Transaction Documents and the entry of the Interim Order and the Final Order, (y) authorizes and directs the Administrative Agent to, in a manner determined by the Administrative Agent, credit bid all or any portion of the Pre-Petition Obligations in connection with any proposed sale of all or any portion of the assets of any or all of the Credit Parties (a "Credit Bid Transaction") and (z) in connection with any Credit Bid Transaction, consents to the assignment and delegation to a Qualified Purchaser of such rights and obligations under the Pre-Petition Loan Agreement, the other Pre-Petition Transaction Documents, this Agreement and the other Transaction Documents, in each case as the Administrative Agent determines in order to consummate such Credit Bid Transaction (and each such Pre-Petition Lender shall execute and deliver such documents as the Administrative Agent reasonably requests to evidence such assignment and delegation).

SECTION 14.23 <u>Lender Consent to Credit Bid</u>.  Each Lender hereby irrevocably (x) authorizes and directs the Administrative Agent to, in a manner determined by the Administrative Agent, credit bid all or any portion of the Borrower Obligations in connection with any Credit Bid Transaction and (y) in connection with any Credit Bid Transaction, consents to the assignment and delegation to a Qualified Purchaser of such rights and obligations under this Agreement and the other Transaction Documents, in each case as the Administrative Agent determines in order to consummate such Credit Bid Transaction (and each such Lender shall execute and deliver such documents as the Administrative Agent reasonably requests to evidence such assignment and delegation).

[Signature Pages Follow].

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BIRD US OPCO, LLC, as a Credit Party

By:_____
Name:
Title:


BIRD US HOLDCO, LLC, as a Credit Party


By:_____
Name:
Title:

BIRD GLOBAL, INC., as a Credit Party


By:_____
Name:
Title:

BIRD RIDES, INC., as the Borrower


By:_____
Name:
Title:

SKINNY LABS, INC., as a Credit Party


By:_____
Name:
Title:

MIDCAP FINANCIAL TRUST ,
as Administrative Agent

By:     Apollo Capital Management, L.P.,
        its investment manager

By:     Apollo Capital Management, GP, LLC,
        its general partner


By:_____
Name:
Title:



MIDCAP FINANCIAL TRUST ,
as a Lender

By:     Apollo Capital Management, L.P.,
        its investment manager

By:     Apollo Capital Management, GP, LLC,
        its general partner


By:_____
Name:
Title:

[*Signature Page to Senior Secured Priming and Superpriority Debtor-In-Possession Loan Agreement*]

MIDCAP FINANCIAL INVESTMENT CORPORATION
(formerly known as Apollo Investment Corporation),
as a Lender


By:_____
Name: Kristin Hester
Title: Chief Legal Officer

**SCHEDULE I**

**DIP Term Loan Commitments**

| Lender | Loans |
|---|---|
| MidCap Financial Trust | $13,000,000 |
| MidCap Financial Investment Corporation | $6,500,000 |

**SCHEDULE II**

[Reserved]

**SCHEDULE III**

[Reserved]

**SCHEDULE IV**

**Notice Addresses**

| Borrower and Parent | if to Parent, to:<br><br>Bird Global, Inc.<br>392 NE 191st Street, #20388<br>Miami, FL. 33179<br>Attn: John Bitove<br>with a copy (which shall not constitute notice) to:<br>Attn:  Michael Washinushi<br>Email: michael.washinushi@bird.co<br>Telephone No.: (866) 205-2442<br><br>(b)    if to the Borrower, to:<br>Bird Rides, Inc.<br>392 NE 191st Street, #20388<br>Miami, FL. 33179<br>Attn: John Bitove<br><br>with a copy (which shall not constitute notice) to:<br><br>Attn:  Michael Washinushi<br>Email: michael.washinushi@bird.co<br>Telephone No.: (866) 205-2442 |
|---|---|
| Administrative Agent | MidCap Financial Trust<br>c/o MidCap Financial Services, LLC, as servicer<br>7255 Woodmont Avenue, Suite 300<br>Bethesda, Maryland 20814<br>Attn:  Account Manager for Bird transaction<br>Facsimile:  301-941-1450<br>Email:  notices@midcapfinancial.com<br><br>With a copy to:<br><br>MidCap Financial Trust<br>c/o MidCap Financial Services, LLC, as servicer<br>7255 Woodmont Avenue, Suite 300<br>Bethesda, Maryland 20814<br>Attn:  General Counsel<br>Facsimile:  301-941-1450<br>Email:  legalnotices@midcapfinancial.com |

**SCHEDULE V**

[Reserved]

**SCHEDULE VI**

**[reserved]**

## **Exhibit 4**

**DIP Note Purchase Agreement**

*EXECUTION VERSION*

**SENIOR SECURED PRIMING AND SUPER-PRIORITY DEBTOR-IN-POSSESSION NOTE PURCHASE AGREEMENT**

by and among

BIRD GLOBAL, INC.,
as Debtor, Debtor-in Possession and Issuer

THE SEVERAL PURCHASERS FROM TIME TO TIME PARTY HERETO

AND

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
as Junior DIP Collateral Agent

Dated as of December 22, 2023

## TABLE OF CONTENTS

**Page**

1. DEFINITIONS AND OTHER TERMS ...................................................................1

    1.1    Terms .........................................................................................................1
    1.2    Section References ....................................................................................2
    1.3    Divisions ...................................................................................................2
    1.4    Definitions ................................................................................................2

2. NOTES AND TERMS OF PAYMENT .................................................................26

    2.1    Issuance of Notes ....................................................................................26
    2.2    Payment of Interest on the Notes ............................................................28
    2.3    Purchasers' Expenses ..............................................................................28
    2.4    Junior DIP Collateral Agent Fees ....................**Error! Bookmark not defined.**
    2.5    Taxes; Increased Costs ............................................................................29
    2.6    Notes .......................................................................................................29

3. CONDITIONS OF NOTES ..................................................................................29

    3.1    Conditions Precedent to Closing .............................................................29
    3.2    Covenant to Deliver ................................................................................31

4. CREATION OF SECURITY INTEREST ..............................................................31

    4.1    Grant of Security Interest .........................................................................31
    4.2    Representations, Warranties and Covenants ............................................31
    4.3    Registration in Nominee Name ................................................................32
    4.4    Voting Rights; Dividends and Interest .....................................................32
    4.5    Other Collateral ......................................................................................33
    4.6    Release of Issuer Pledged Collateral .......................................................33

5. REPRESENTATIONS AND WARRANTIES OF THE ISSUER ...................................34

    5.1    Organization and Good Standing .............................................................34
    5.2    Due Qualification ....................................................................................34
    5.3    Power and Authority; Due Authorization .................................................34
    5.4    Binding Obligations ................................................................................34
    5.5    No Conflict or Violation .........................................................................34
    5.6    Litigation and Other Proceedings ...........................................................35
    5.7    Government Approvals ............................................................................35
    5.8    [reserved] ................................................................................................35
    5.9    Offices; Legal Name ...............................................................................35
    5.10   Investment Company Act .........................................................................35
    5.11   Accuracy of Information ..........................................................................36
    5.12   Anti-Money Laundering/International Trade Law Compliance ..................36

| | | |
|---|---|---|
| 5.13 | Perfection Representations | 36 |
| 5.14 | Compliance with Applicable Laws | 36 |
| 5.15 | Taxes | 37 |
| 5.16 | No Broker's Fees | 37 |
| 5.17 | No General Solicitation | 37 |
| 5.18 | No Default | 37 |
| 5.19 | Bankruptcy Matters | 37 |

**6.    REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS** ......38

| | | |
|---|---|---|
| 6.1 | Organization and Good Standing | 38 |
| 6.2 | Power and Authority; Due Authorization | 38 |
| 6.3 | Binding Obligations | 38 |
| 6.4 | No Conflict or Violation | 38 |
| 6.5 | Litigation and Other Proceedings | 39 |
| 6.6 | Government Approvals | 39 |
| 6.7 | Evaluation of Risks | 39 |
| 6.8 | No Legal, Investment, or Tax Advice from the Issuer | 39 |
| 6.9 | Investment Purpose | 40 |
| 6.10 | Accredited Investor | 40 |
| 6.11 | Reliance on Exemptions | 40 |
| 6.12 | No Governmental Review | 40 |
| 6.13 | Information | 41 |
| 6.14 | Not an Affiliate | 41 |
| 6.15 | No Prior Short Sales | 41 |
| 6.16 | General Solicitation | 41 |
| 6.17 | ERISA | 41 |

**7.    AFFIRMATIVE COVENANTS** ......42

| | | |
|---|---|---|
| 7.1 | Financial Reporting; Notices | 42 |
| 7.2 | Security Interest, Etc. | 43 |
| 7.3 | Taxes | 43 |
| 7.4 | Insurance | 43 |
| 7.5 | Use of Proceeds | 44 |
| 7.6 | Budget Testing | 44 |
| 7.7 | Bankruptcy Court Filings | 44 |
| 7.8 | Bankruptcy Covenants | 45 |
| 7.9 | Chapter 11 Cases | 45 |
| 7.10 | Sales Process Timeline | 45 |
| 7.11 | Payment of Issuer Obligations | 46 |

**8.    NEGATIVE COVENANTS** ......46

| | | |
|---|---|---|
| 8.1 | Fundamental Changes; Dispositions | 46 |
| 8.2 | Mergers or Acquisitions | 47 |
| 8.3 | Incurrence of Indebtedness and Issuance of Preferred Stock | 47 |

| 8.4 | Incurrence of Liens | 47 |
| 8.5 | Restricted Payments | 48 |
| 8.6 | Transactions with Affiliates | 48 |
| 8.7 | Anti-Layering | 48 |
| 8.8 | Hedging Agreements | 48 |
| 8.9 | KEIP Plan | 48 |
| 8.10 | Chapter 11 Claims | 48 |
| 8.11 | Critical Vendor and Other Payments | 49 |

9. EVENTS OF DEFAULT .................................................................. 49

| 9.1 | Payment Default | 49 |
| 9.2 | [reserved] | 49 |
| 9.3 | Other Default | 49 |
| 9.4 | Cross-Default | 49 |
| 9.5 | [reserved] | 50 |
| 9.6 | Note Documents | 50 |
| 9.7 | Collateral | 50 |
| 9.8 | Judgments | 50 |
| 9.9 | Material Adverse Effect | 50 |
| 9.10 | Change of Control | 50 |
| 9.11 | Certain Grants | 50 |
| 9.12 | Bankruptcy Defaults | 50 |

10. RIGHTS AND REMEDIES ................................................................ 53

| 10.1 | Rights and Remedies | 53 |
| 10.2 | Power of Attorney | 56 |
| 10.3 | Protective Payments | 57 |
| 10.4 | Application of Payments and Proceeds | 57 |
| 10.5 | Liability for Collateral | 58 |
| 10.6 | No Waiver; Remedies Cumulative | 58 |
| 10.7 | Demand Waiver | 58 |
| 10.8 | Setoff and Sharing of Payments | 58 |

11. NOTICES ................................................................................... 59

12. CHOICE OF LAW; VENUE; JURY TRIAL WAIVER ....................... 60

| 12.1 | Waiver of Jury Trial | 60 |
| 12.2 | Governing Law and Jurisdiction | 61 |
| 12.3 | Submission to Jurisdiction | 61 |
| 12.4 | Service of Process | 61 |
| 12.5 | Non-Exclusive Jurisdiction | 61 |

13. GENERAL PROVISIONS ................................................................ 61

| 13.1 | Successors and Assigns | 61 |

12640916-7

13.2    Indemnification; Waivers ................................................................62
13.3    Severability of Provisions ...............................................................63
13.4    Correction of Note Documents .......................................................63
13.5    Amendments in Writing; Integration ..............................................63
13.6    Counterparts ....................................................................................65
13.7    Survival ...........................................................................................66
13.8    Confidentiality ................................................................................66
13.9    Public Announcement .....................................................................67
13.10   Junior DIP Collateral Agent and Purchaser Agreement .................67
13.11   Time of Essence ..............................................................................67
13.12   Several Obligations .........................................................................67
13.13   Termination Prior to Maturity Date; Survival ................................67
13.14   Withholding .....................................................................................67
13.15   Parties Including Trustees; Bankruptcy Court Proceedings ...........67
13.16   Inconsistency ...................................................................................68
13.17   Pre-Petition Purchaser Consent ......................................................68
13.18   Consent to Credit Bid .....................................................................69

**EXHIBITS**

A       Description of Collateral
B       Form of Note
C       Junior DIP Collateral Agent Terms
D       Taxes; Increased Costs
E       Interim Order
F       Closing Checklist

**SCHEDULES**

2.1-A   DIP Note Purchasers
2.1-B   Bridge Note Purchasers
2.1-C   Other Note Purchasers

**THIS SENIOR SECURED PRIMING AND SUPER-PRIORITY DEBTOR-IN-POSSESSION NOTE PURCHASE AGREEMENT** (including all exhibits and schedules hereto, as the same may be amended, supplemented, or otherwise modified, this "**Agreement**"), dated as of December 22, 2023 (the "**Closing Date**"), is entered into by and among the "Purchasers" (as defined below) signatory hereto, Bird Global, Inc., a Delaware corporation (the "**Issuer**"), and U.S. Bank Trust Company, National Association, as collateral agent (in such capacity, together with its successors and assigns in such capacity, the "**Junior DIP Collateral Agent**"), provides the terms on which the DIP Note Purchasers, on the date hereof, shall purchase the Notes (as defined below) as set forth herein.

WHEREAS, on December 20, 2023 ("**Petition Date**"), certain of the Note Parties filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court;

WHEREAS, from and after the Petition Date, the Note Parties are continuing to operate their business and manage their properties as debtors in possession under Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Issuer has requested, and the DIP Note Purchasers have agreed to purchase from the Issuer, $5,600,000 DIP notes subject to the terms and conditions set forth in this Agreement, the proceeds of which will be used in accordance with Section 7.5 hereof;

WHEREAS, the Issuer, the Persons named therein as credit parties, the Pre-Petition Financing Agent (defined herein), as administrative agent, and the financial institutions party thereto as lenders are parties to that certain Amended and Restated Loan Agreement dated as of September 19, 2023 (as amended or otherwise modified on or prior to the Petition Date, the "**Pre-Petition Financing Credit Agreement**");

WHEREAS, on the Closing Date (defined herein), the Issuer, the Persons named therein as credit parties, the DIP Financing Agent (defined herein), as administrative agent, and the financial institutions party thereto as lenders are entering into to that certain Senior Secured Priming and Super-Priority Debtor-In-Possession Loan Agreement (as amended or otherwise modified, the "**DIP Financing Credit Agreement**"); and

WHEREAS, the Note Parties desire to secure all of the Obligations under the Note Documents by granting to the Junior DIP Collateral Agent, for the benefit of the DIP Note Purchasers, guarantees and security interests in and liens upon property, as provided herein, in the other Note Documents, and in the DIP Orders.

The parties agree as follows:

1.    **DEFINITIONS AND OTHER TERMS**

**1.1    Terms**. Capitalized terms used herein shall have the meanings set forth in Section 1.4 to the extent defined therein. All other capitalized terms used but not defined herein shall have the meaning given to such terms in the Code. Any accounting term used but not defined herein shall be construed in accordance with GAAP, and all calculations shall be made in accordance with GAAP. The term "financial statements" shall include the accompanying notes and schedules. Notwithstanding anything to the contrary contained herein, for purposes of determining compliance with any covenant all obligations of any Person that are or would have been treated as operating leases for purposes of GAAP prior to the effectiveness of ASC 842 (or

1

any other ASC having a similar result or effect) (and related interpretations) shall continue to be accounted for as operating leases (whether or not such operating lease obligations were in effect on such date), notwithstanding the fact that such obligations are required in accordance with ASC 842 or otherwise (on a prospective or retroactive basis or otherwise) to be treated as capital lease obligations in the financial statements.

    **1.2    Section References**. Any section, subsection, schedule, or exhibit references are to the sections, subsections, schedules, or exhibits of this Agreement unless otherwise specified.

    **1.3    Divisions**. For all purposes under the Note Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation, or liability of any Person becomes the asset, right, obligation, or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person; and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

    **1.4    Definitions**. The following terms are defined in the sections or subsections referenced opposite such terms:

| | |
|---|---|
| "**Agreement**" | Preamble |
| "**Bid Procedures Motion**" | Section 7.10 |
| "**Bid Procedures Order**" | Section 7.10 |
| "**Budget Testing Period**" | Section 7.6 |
| "**Business Combination Event**" | Section 8.2 |
| "**Claims**" | Section 13.2(a) |
| "**Closing**" | Section 2.1(a)(iii) |
| "**Closing Date**" | Preamble |
| "**Junior DIP Collateral Agent**" | Preamble |
| "**Communications**" | Section 11 |
| "**Credit Bid Transaction**" | |
| "**Default Rate**" | Section 2.2(b) |
| "**Event of Default**" | Section 9 |
| "**Indemnified Person**" | Section 13.2(a) |
| "**Issuer**" | Preamble |
| "**KEIP**" | Section 8.9 |
| "**NI 45-106**" | Section 6.11 |
| "**PIK Interest**" | Section 2.2(d) |
| "**Purchasers' Representative**" | Section 13.5(d) |
| "**Purchaser Transfer**" | Section 13.1 |
| "**Register**" | Section 13.1 |
| "**Representation Letter**" | Section 6.11 |
| "**Successor Corporation**" | Section 8.2 |
| "**Termination Declaration Date**" | Section 10.1 |

In addition to the terms defined elsewhere in this Agreement, the following terms have the following meanings:

"**Acquisition**" means the acquisition (whether by means of a merger, consolidation or otherwise) of all of the Equity Interests of any Person or all or substantially all of the assets of (or any division or business line of) any Person.

"**Acquisition Purchase Price**" means, with respect to any Acquisition, an amount equal to the sum of (a) the aggregate consideration, whether cash, property or securities (including the fair market value of any Equity Interests of any Note Party or any of its Subsidiaries issued in connection with such Acquisition), paid or delivered by a Note Party or any of its Subsidiaries (whether as initial consideration or through the payment or disposition of deferred consideration, including in the form of seller financing, royalty payments, payments allocated towards non-compete covenants, payments to principals for consulting services or other similar payments) in connection with such Acquisition, plus (b) the aggregate amount of liabilities of the acquired business (net of current assets of the acquired business) that would be reflected on a balance sheet (if such were to be prepared) of the Parent and its Subsidiaries after giving effect to such Acquisition, plus (c) the aggregate amount of all transaction fees, costs and expenses incurred by the Parent or any of its Subsidiaries in connection with such Acquisition.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person. For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote 25% or more of the securities having ordinary voting power for the election of directors or managers of such Person or (y) to direct or cause the direction of the management and policies of such Person, in either case whether by ownership of securities, contract, proxy or otherwise.

"**Affiliate Transaction**" means any transaction or series of transactions, including any transaction or series of transactions in which the Issuer or any of its Subsidiaries acts to, directly or indirectly, make any payment to, or sell, lease, transfer, or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance, or guarantee with, or for the benefit of, any Affiliate of the Issuer or its Subsidiaries.

"**Anti-Terrorism Law**" means any Applicable Law relating to terrorism financing, trade sanctions programs, and embargoes, import/export licensing, money laundering, or bribery and any regulation, order, or directive promulgated, issued or enforced pursuant to such Applicable Laws, all as amended, supplemented or replaced from time to time.

"**Applicable Law**" means, with respect to any Person, (x) all provisions of law, statute, treaty, constitution, ordinance, rule, regulation, requirement, restriction, permit, executive order, certificate, decision, directive, or order of any Governmental Authority applicable to such Person or any of its property and (y) all judgments, injunctions, orders, writs, decrees, and awards of all courts and arbitrators in proceedings or actions in which such Person is a party or by which any of its property is bound.

"**Approved Budget**" means, (i) initially and until such time as the Purchasers' Representative shall have provided the Issuer with written confirmation that a Cash Forecast delivered in accordance with the DIP Financing Agreement in form and substance satisfactory to it, the Initial Approved Budget and (ii) upon the Purchasers' Representative providing the Issuer with written confirmation that a Cash Forecast was delivered to them in form and substance satisfactory to it, then such Cash Forecast; provided that if the Purchasers' Representative does not provide written confirmation that any Cash Forecast is in form and substance satisfactory to them, then the Approved Budget shall be the last delivered Cash Forecast that constituted the Approved Budget hereunder.

"**ASC**" means an Accounting Standards Codification issued by the Financial Accounting Standards Board.

"**Asset Purchase Agreement**" means that certain Asset Purchase Agreement dated as of the Petition Date by and among Bird Global, Inc., certain Subsidiaries of Bird Global, Inc. and Bird Scooter Acquisition Corp.

"**Authorized Denomination**" means, with respect to a Note, a principal amount thereof equal to $1,000 or any integral multiple of $1.00 in excess thereof.

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Florida.

"**Bird Canada Share Purchase Agreement**" means that certain Share Purchase Agreement, dated as of January 3, 2023, by and among 1393631 B.C. Unlimited Liability Company, Bird Canada Inc., certain of the Purchasers and/or certain of their Affiliates, and the sellers' representative named therein, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

"**Bird Rides**" means Bird Rides, Inc., a Delaware corporation and direct, wholly owned subsidiary of the Issuer.

"**Board of Directors**" means the board of directors of the Issuer or any duly authorized committee or subcommittee of such board of directors.

"**Bridge Note Purchasers**" means purchasers of the Bridge Notes pursuant to the Pre-Petition Note Purchase Agreement, as set forth in Schedule 2.1-B.

"**Bridge Notes**" has the meaning set forth in the Pre-Petition Note Purchase Agreement.

"**Business Day**" means a day other than a Saturday, Sunday, or other day on which banking institutions are authorized or required by law or regulation to close in the State of New York or, with respect to any payments to be made under this Agreement or any other Note Document, the place of payment.

"**Capitalized Lease**" means, with respect to any Person, any lease of (or other arrangement conveying the right to use) real or personal property by such Person as lessee that is required under GAAP to be capitalized on the balance sheet of such Person.

"**Capitalized Lease Obligations**" means, with respect to any Person, obligations of such Person and its Subsidiaries under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"**Capital Stock**" means:

(1)     in the case of a corporation or company, corporate stock or share capital;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights, or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person (it being understood and agreed, for the avoidance of doubt, that "cash-settled phantom appreciation programs" in connection with employee benefits that do not require a dividend or distribution shall not constitute Capital Stock).

"**Carve-Out**" shall have the meaning set forth in the DIP Orders.

"**Cash Collateral**" shall have the meaning set forth in the DIP Orders.

"**Cash Consideration**" means consideration paid by the DIP Note Purchasers for the purchase of Notes in immediately available funds.

"**Cash Equivalents**" means:

(1)     U.S. dollars or Canadian dollars, pounds sterling or euros;

(2)     marketable direct obligations issued by any state of the United States or the District of Columbia or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and having one of the two highest ratings obtainable from either S&P Global Ratings, a division of S&P Global Inc. or its affiliates ("S&P"), or Moody's Investors Service, Inc. or its affiliates ("Moody's");

(3)     commercial paper, maturing not more than one year after the date of issue rated P-1 by Moody's or A-1 by S&P;

(4)     certificates of deposit maturing not more than one year after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the

5

Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000;

(5)     repurchase agreements having maturities of not more than 90 days from the date of acquisition which are entered into with major money center banks included in the commercial banking institutions described in clause (4) above and which are secured by readily marketable direct obligations of the United States or any agency thereof;

(6)     money market accounts maintained with mutual funds having assets in excess of $2,500,000,000, which assets are primarily comprised of Cash Equivalents described in another clause of this definition;

(7)     marketable tax exempt securities rated A-1 or higher by Moody's or A or higher by S&P, in each case, maturing within one year from the date of acquisition thereof; and (h) in the case of any Foreign Subsidiary, cash and cash equivalents that are substantially equivalent in such jurisdiction to those described in clauses (a) through (g) above in respect of each country that is a member of the Organization for Economic Co-operation and Development.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (1) above.

"**Cash Forecast**" shall have the meaning set forth in the DIP Financing Credit Agreement.

"**Cash Management Services**" means any of the following to the extent not constituting a line of credit (other than an overnight draft facility): automated clearing house transactions, treasury and/or cash management services, including, without limitation, treasury, depository, overdraft, credit, purchasing or debit card, non-card e-payables services, electronic funds transfer, treasury management services (including controlled disbursement services, overdraft automatic clearinghouse fund transfer services, return items, and interstate depository network services), other demand deposit or operating account relationships, foreign exchange facilities, and merchant services.

"**Change of Control**" means the occurrence of any of the following:

(1)

(i)     the Issuer ceases to own, directly or indirectly, 100% of the issued and outstanding Equity Interests of Bird Rides;

(ii)     Bird Rides ceases to own, directly or indirectly, 100% of the issued and outstanding Equity Interests of the Bird US Holdco, LLC;

(iii)     Bird US Holdco, LLC ceases to own, directly or indirectly, 100% of the issued and outstanding Equity Interests of Bird US Opco, LLC,

in each case free and clear of all Liens other than non-voluntary Liens arising under applicable statutes, Liens in favor of the Junior DIP Collateral Agent and, in the case of (ii) or (iii), Liens in favor of the Senior Financing Agents; or

(2)        (i) any Person (other than a Permitted Holder) or (ii) Persons (other than one or more Permitted Holders) constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act), become the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Exchange Act), directly or indirectly, of Equity Interests representing more than forty percent (40%) of the aggregate ordinary Voting Stock of Issuer and the percentage of aggregate ordinary Voting Stock so held is greater than the percentage of the aggregate ordinary Voting Stock represented by the Equity Interests of Issuer beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders; unless, in the case of this clause (2), the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the Board of Directors.

"**Chapter 11 Cases**" means the Chapter 11 cases filed on December 20, 2023, by certain of the Note Parties by voluntary petitions with the Bankruptcy Court.

"**Code**" means the Uniform Commercial Code, as the same may, from time to time, be enacted and in effect in the State of New York; *provided* that, to the extent that the Code is used to define any term herein or in any Note Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; *provided, further*, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, or priority of, or remedies with respect to, the Junior DIP Collateral Agent's Lien on any Collateral is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of New York, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies and for purposes of definitions relating to such provisions.

"**Collateral**" means any and all properties, rights, and assets of the Issuer or any of its Subsidiaries subject to a Lien under the Note Documents in favor of the Junior DIP Collateral Agent, on behalf of the Secured Parties, to secure the Obligations. Without limiting the generality of the foregoing, "Collateral" shall include all rights under section 506(c) of the Bankruptcy Code (solely upon entry of the Final Order), all "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible or mixed, and all rents, products, substitutions, accessions, profits, replacements and cash and non-cash proceeds of all of the foregoing.

"**Common Stock**" means the Class A common stock, par value $0.0001 per share, of the Issuer.

"**Contingent Indemnity Obligations**" means any Obligation constituting a contingent, unliquidated indemnification obligation of any Note Party, in each case, to the extent (a) such obligation has not accrued and is not yet due and payable and (b) no claim has been made or is reasonably anticipated to be made with respect thereto.

"**Contingent Obligation**" means, with respect to any Person, any obligation of such Person guaranteeing or intending to guarantee any Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, and (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business. The amount of any Person's obligation under any Contingent Obligation shall be determined in accordance with GAAP.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Default**" means any Event of Default or any event, occurrence or circumstance that, after notice or passage of time, or both, would be, an Event of Default.

"**DIP Financing Agent**" means MidCap Financial Trust, in its capacity as administrative agent under the DIP Financing Debt Documents, or any successor administrative agent permitted by the terms thereof.

"**DIP Financing Credit Agreement**" has the meaning set forth in the recitals.

"**DIP Financing Debt**" means the "Borrower Obligations" (under and as defined in the DIP Financing Credit Agreement).

"**DIP Financing Debt Documents**" means, collectively, the DIP Financing Credit Agreement and the other agreements, guaranties, instruments, and documents delivered in connection with the DIP Financing Debt, in each case, as amended, restated, supplemented, modified, extended, restructured, renewed, refinanced, increased, replaced, or refunded in whole or in part from time to time and whether by the same or any other agent, lender, or investor or group of lenders or investors.

"**DIP Financing Lenders**" means the "Lenders" (under and as defined in the DIP Financing Credit Agreement).

"**DIP Note Purchasers**" means the purchasers of the Notes set forth in Schedule 2.1-A.

"**DIP Orders**" means the Interim Order and the Final Order, as applicable, based on which such order is then in effect.

"**Disposition**" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers, leases, licenses (as licensor) or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person. For purposes of clarification, "Disposition" shall include (a) the sale or other disposition for value of any contracts, (b) any disposition of property through a "plan of division" under the Delaware Limited Liability Company Act or any comparable transaction under any similar law, (c) the early termination or modification of any contract resulting in the receipt by any Note Party of a cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts due through the date of termination or modification) or (d) any sale of merchant accounts (or any rights thereto (including any rights to any residual payment stream with respect thereto)) by any Note Party.

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale, in each case, so long as any rights of the holders thereof upon the occurrence of such change of control or asset sale event is subject to the prior repayment in full of the Obligations), (b) is redeemable at the option of the holder thereof, in whole or in part, (c) provides for the obligation (not deferrable at the sole option of the issuer) to make scheduled payments of dividends or distributions in cash, or (d) is convertible into or exchangeable for (i) Indebtedness or (ii) any other Equity Interests that would constitute Disqualified Equity Interests, in each case of clauses (a) through (d), prior to the date that is six months after the date referenced in clause (a) of the definition of "Maturity Date"; provided that if such Equity Interest is issued pursuant to a plan for the benefit of employees of any Note Party or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by a Note Party in order to satisfy applicable statutory or regulatory obligations.

"**Equity Interests**" means Capital Stock and all warrants, options, or other rights to acquire Capital Stock (but excluding any Capital Stock that arises only by reason of the happening of a contingency or any debt security that is convertible into, or exchangeable for, Capital Stock).

"**ERISA**" means the U.S. Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Exchange Act**" means the U.S. Securities and Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"**Fair Market Value**" means, with respect to any asset or property, the price that could be negotiated in an arm's-length, free-market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction (as determined in good faith by the Issuer).

9

"**Fee Letter**" means the fee letter agreement dated the date hereof between the Issuer and the Junior DIP Collateral Agent.

"**Final Order**" means an order of the Bankruptcy Court with respect to the Note Parties after a final hearing, in form and substance acceptable to the Required Purchasers in their sole discretion (and to the extent affecting the rights, duties, benefits, privileges, protections, indemnities or immunities of the Junior DIP Collateral Agent, the Junior DIP Collateral Agent), which order is in effect and not stayed, together with all extensions, supplements modifications and amendments thereto, in each case in form and substance acceptable to the Required Purchasers (and to the extent affecting the rights, duties, benefits, privileges, protections, indemnities or immunities of the Junior DIP Collateral Agent, the Junior DIP Collateral Agent), in their sole discretion, which, among other things, provides that the relief requested in the motions seeking approval of the Note Documents and the Interim Order and Final Order and granted on an interim basis in the Interim Order is granted on a final basis (including any additional relief required by the Bankruptcy Court or agreed to by the Required Purchasers) and provides for the roll-up of the Pre-Petition Obligations as contemplated herein, all on a final basis.

"**Foreign Subsidiary**" means any Subsidiary that is not a Person incorporated or organized under the laws of the United States, any state of the United States, or the District of Colombia or the federal laws of Canada or any province or territory of Canada.

"**GAAP**" means generally accepted accounting principles in the United States of America, including those set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other Person as may be approved by a significant segment of the accounting profession in the United States, which are applicable to the circumstances as of the date of determination.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Guarantee**" means the Guarantee Agreement and any other guarantee of all or any part of the Obligations, as the same may from time to time be amended, restated, supplemented, or otherwise modified from time to time.

"**Guarantee Agreement**" means that certain Guarantee, dated as of the date hereof, by the Issuer, the Parent and the other Note Parties party thereto in favor of the Junior DIP Collateral Agent and the Secured Parties.

"**Guarantor**" means any Person party to the Note Documents as of the date hereof (or from time to time) providing a Guarantee in favor of the Junior DIP Collateral Agent for the ratable benefit of the Secured Parties.

12640916-7

"**Hedging Agreement**" means any interest rate, foreign currency, commodity or equity swap, collar, cap, floor or forward rate agreement, or other agreement or arrangement designed to protect against fluctuations in interest rates or currency, commodity or equity values (including any option with respect to any of the foregoing and any combination of the foregoing agreements or arrangements), and any confirmation executed in connection with any such agreement or arrangement.

"**Indebtedness**" means, with respect to any Person, without duplication: (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services to the extent constituting liabilities under GAAP (other than (i) trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than 120 days after the date such payable was due and other trade payables or other accounts payable agreed in writing between the Issuer and the Purchaser Representative and (ii) any earn-out, purchase price adjustment or similar obligation until such obligation is required to be reflected on the balance sheet of such Person in accordance with GAAP); (c) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all Capitalized Lease Obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (g) all obligations and liabilities, calculated on a basis satisfactory to the Junior DIP Collateral Agent and in accordance with accepted practice, of such Person under Hedging Agreements; (h) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; (i) all Contingent Obligations; (j) all Disqualified Equity Interests; and (k) all obligations referred to in clauses (a) through (j) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

"**Insolvency Proceeding**" means (a) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors or (b) any general assignment for the benefit of creditors of a Person, composition, marshaling of assets for creditors of a Person, or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors, in each of clauses (a) and (b) undertaken under U.S. Federal, state or foreign law, including the Bankruptcy Code.

"**Interest Payment Date**" means the last Business Day of each calendar month and the Maturity Date.

"**Interim Order**" means the order of the Bankruptcy Court with respect to the Note Parties, in substantially the form of Exhibit E hereto, with such extensions, amendments, modifications or supplements acceptable to the Required Purchasers in their sole discretion (and to the extent affecting the rights, duties, benefits, privileges, protections, indemnities or immunities of the Junior DIP Collateral Agent, the Junior DIP Collateral Agent), which order is in effect and not stayed.

"**Interim Period Outside Date**" has the meaning assigned to such term in the Interim Order.

"**Internal Revenue Code**" means the U.S. Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"**Investment**" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of (a) loans (including guarantees of Indebtedness), advances, or capital contributions (excluding accounts receivable, credit card and debit card receivables, trade credit and advances, or other payments made to customers, dealers, suppliers, contractors, and distributors, and payroll, commission, travel, and similar advances to officers, directors, managers, employees, consultants, and independent contractors) and (b) purchases or other acquisitions for consideration of Indebtedness, Equity Interests, or other securities issued by any other such Person. The amount of any Investment outstanding at any time shall be the amount actually invested in such Investment (determined, in the case of any Investment made with assets of the Issuer or any Subsidiary, based on the Fair Market Value of the assets invested and without taking into account subsequent increases or decreases in value), reduced by any dividend, distribution, interest payment, return of capital, repayment, or other amount received in cash by the Issuer or a Subsidiary in respect of such Investment and shall be net of any Investment by such Person in the Issuer or any Subsidiary.

"**IRS**" means the U.S. Internal Revenue Service.

"**Issuer Pledged Collateral**" means all of the Issuer's right, title and interest in, to and under:

(a)     (i) the Equity Interests in the capital of Bird Rides owned by the Issuer on the date hereof, (ii) any other Equity Interests in the capital of Bird Rides obtained in the future by the Issuer and (iii) the certificates or other instruments representing all such Equity Interests (if any);

(b)     subject to Section 2.5, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other Proceeds (as defined in the Code) received in respect of, the securities referred to in clause (a) above;

(c)     subject to Section 2.5, all rights and privileges of the Issuer with respect to the securities and other property referred to in clauses (a) and (b) above; and

(d)     all Proceeds (as defined in the Code) of any of the foregoing.

12640916-7

"**Issuer Pledged Securities**" means any promissory notes, stock certificates, unit certificates, limited liability membership certificates or other securities (to the extent certificated) now or hereafter included in the Issuer Pledged Collateral.

"**Junior Financing**" means any Indebtedness (other than any permitted intercompany Indebtedness owing to the Note Parties) that is (i) subordinated in right of payment to the Obligations, (ii) secured by a Lien that is junior in priority to the Lien securing the Obligations or (iii) unsecured Indebtedness for borrowed money.

"**Lease**" means any lease, sublease or license of, or other agreement granting an exclusive or non-exclusive possessory interest in, real property to which any Note Party or any of its Subsidiaries is a party as lessor, lessee, sublessor, sublessee, licensor or licensee.

"**Lien**" means, means any ownership interest or claim, mortgage, deed of trust, pledge, lien, security interest, hypothecation, charge or other encumbrance or security arrangement of any nature whatsoever, whether voluntarily or involuntarily given, including, but not limited to, any conditional sale or title retention arrangement, any Capitalized Lease, any assignment, deposit arrangement or lease intended as, or having the effect of, security and any filed financing statement or other notice of any of the foregoing (whether or not a lien or other encumbrance is created or exists at the time of the filing).

"**Material Adverse Effect**" means relative to any Person (provided that if no particular Person is specified, "Material Adverse Effect" shall be deemed to be relative to the Note Parties individually) with respect to any event or circumstance, taking into account the DIP Orders, a material adverse effect on any of the following:

(1)    the assets, operations, business or financial condition of the Note Parties and their Subsidiaries, taken as a whole;

(2)    the ability of the Issuer or any Guarantor to perform its obligations (taken as a whole) under this Agreement, or any of the other Note Documents;

(3)    the validity or enforceability of this Agreement or any other Note Document;

(4)    the perfection, enforceability or priority of the security interest in a material portion of the Collateral; or

(5)    the rights and remedies of the DIP Note Purchasers or the Junior DIP Collateral Agent under the Note Documents taken as a whole or associated with their respective interest in the Collateral.

"**Material Indebtedness**" means Indebtedness (other than the Obligations) of the Note Parties in an aggregate principal amount exceeding $2.0 million. Notwithstanding the foregoing, the Senior Financing Credit Agreements shall at all times be deemed Material Indebtedness hereunder. For purposes of determining the amount of Material Indebtedness at any time, (a) undrawn and committed amounts shall be included, and (b) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

13

"**Maturity Date**" means the earliest to occur of: (a) March 18, 2024; provided that if as of the foregoing date a plan of reorganization in the Chapter 11 Cases that is reasonably satisfactory to the Required Purchasers shall have been solicited, but not yet approved, then such date shall be automatically (and without any further action of any party hereto), extended to May 18, 2024; (b) the occurrence of the date that is 30 days after the entry of the Interim Order if as of such date, the Final Order shall not have been entered, (c) the Termination Declaration Date, (d) the date of the consummation of the sale of all or substantially all of the assets or Equity Interests of the Note Parties pursuant to Section 363 of the Bankruptcy Code, and (e) the date all Obligations are indefeasibly paid in full in cash and this Agreement and the other Note Documents are terminated.

"**Net Cash Proceeds**" means, with respect to, any issuance or incurrence of any Indebtedness, any Disposition by the Issuer and its Subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of the Issuer and its Subsidiaries, in connection therewith after deducting therefrom only (a) reasonable expenses related thereto incurred or payable by the Issuer or any such Subsidiary in connection therewith, (b) taxes paid or to be paid in connection therewith (after taking into account any tax credits or deductions and any tax sharing arrangements), in each case, to the extent, but only to the extent, that the amounts so deducted are (i) actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of the Issuer or any of its Subsidiaries and (ii) properly attributable to such transaction or to the asset that is the subject thereof and (c) in the case of any Disposition, the amount of any reasonable reserves established by the Issuer in accordance with GAAP against (i) any liabilities under any indemnification obligations associated with such Disposition or (ii) any other liabilities retained by the Issuer or any of its Subsidiaries associated with the properties or assets sold in such Disposition.

"**Note Documents**" means collectively, this Agreement, the Notes, the Guarantees, the Security Documents, the DIP Orders and the Restructuring Support Agreement, all as amended, restated, supplemented, or otherwise modified from time to time in accordance with this Agreement.

"**Note Parties**" means the Issuer and the Guarantors and "Note Party" means any one of them.

"**Notes**" means the Secured DIP Promissory Notes issued by the Issuer on the Closing Date, subject to and in accordance with this Agreement.

"**NYSE**" means The New York Stock Exchange.

"**Obligations**" means all present and future indebtedness, reimbursement obligations, and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due) of the Issuer to any DIP Note Purchaser or the Junior DIP Collateral Agent arising under or in connection with this Agreement or any other Note Document or the transactions contemplated hereby or thereby, and shall include, without limitation, any debts, principal, interest, Purchasers' Expenses, Junior DIP Collateral Agent Expenses, indemnification expenses, and any other amounts the Issuer owes the Junior DIP Collateral Agent or the DIP Note Purchasers.

"**OFAC**" means the U.S. Department of Treasury Office of Foreign Assets Control.

"**Operating Documents**" are, for any Person, such Person's formation documents, as certified by the Secretary of State (or equivalent agency) of such Person's jurisdiction of organization on a date that is no earlier than thirty (30) days prior to the Closing Date, and, (a) if such Person is a corporation, its bylaws in current form, (b) if such Person is a limited liability company, its limited liability company agreement (or similar agreement), and (c) if such Person is a partnership, its partnership agreement (or similar agreement), each of the foregoing with all current amendments or modifications thereto.

"**Other Note Purchasers**" means purchasers of the Other Notes pursuant to the Pre-Petition Note Purchase Agreement set forth in Schedule 2.1-C.

"**Other Notes**" means "Notes" as defined in the Pre-Petition Note Purchase Agreement, other than Bridge Notes.

"**Permitted Business**" means any business conducted by the Issuer or any of the Subsidiaries (including Bird Canada Inc.) on the date hereof and any business that, in the good faith determination of the Board of Directors, is similar or reasonably related, ancillary, supplemental, or complementary thereto or a reasonable extension, development, or expansion thereof.

"**Permitted Disposition**" means:

(1)     licensing, on a non-exclusive basis, intellectual property rights in the ordinary course of business;

(2)     leasing or subleasing assets in the ordinary course of business;

(3)     (i) the lapse of registered intellectual property of the Issuer and its Subsidiaries to the extent not economically desirable in the conduct of their business or (ii) the abandonment of intellectual property rights in the ordinary course of business so long as, (A) with respect to copyrights, such copyrights are not material revenue generating copyrights, and (B) such lapse is not materially adverse to the interests of the Secured Parties;

(4)     any involuntary loss, damage or destruction of property;

(5)     any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(6)     transfers of assets from the Issuer or any of its wholly owned Subsidiaries to the Issuer or any other of its wholly owned Subsidiaries;

(7)     the termination or expiration of any contract in accordance with its terms or any settlement, release, waiver or surrender of contractual rights or other litigation claims in the ordinary course of business;

(8)     use or transfer of money or Cash Equivalents in the ordinary course of business and in a manner that is not prohibited by the terms of this Agreement, the other Note Documents or the DIP Orders;

(9)     the granting of Permitted Liens and the making of Permitted Investments and Permitted Restricted Payments;

(10)    Disposition of accounts receivable in the ordinary course of business or bankruptcy in connection with the collection or compromise thereof;

(11)    Disposition of any assets of, or Equity Interest issued by, the Note Parties pursuant to the Asset Purchase Agreement;

(12)    any surrender or waiver of contractual rights or the settlement, release or surrender of contractual rights or litigation claims (including in tort) in the ordinary course of business; and

(13)    the Disposition of obsolete, worn out or surplus property or property (including leasehold property interests) that is no longer economically practical in its business or commercially desirable to maintain or no longer used or useful equipment in the ordinary course of business.

"**Permitted Expenses**" means reasonable legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and other reasonable out of pocket expenses of the Junior DIP Collateral Agent in connection with the Chapter 11 Cases, this Agreement, the Note Documents, and all documents related thereto, and all costs and expenses of the Junior DIP Collateral Agent (including reasonable, documented attorney fees, expenses and disbursements in accordance herewith) in connection with the enforcement of remedies under the Note Documents to be reimbursed on a current basis by the Note Parties from the proceeds of Notes hereunder.

"**Permitted Holders**" means (i) each of the Persons owning Voting Stock of the Issuer on the Closing Date, (ii) each of the Persons owning Voting Stock of Bird Canada Inc. immediately prior to the January 3, 2023 and (iii) those individuals acting from time to time as officers, directors, managers, employees or members, or in any similar capacity, for any entity referred to in clause (i) above, together with, in the case of clause (iii), any entities owned or controlled by any such individuals, independently or together with one or more entities referred to above.

"**Permitted Indebtedness**" means:

(1)     the Indebtedness owing to Purchasers under this Agreement and the other Note Documents;

(2)     Indebtedness arising under the Pre-Petition Financing Credit Agreement;

(3)     Indebtedness of Bird Canada Inc. existing on January 3, 2023;

(4)     Indebtedness existing on the Closing Date;

16

(5)     Indebtedness arising under the DIP Financing Credit Agreement;

(6)     Permitted Intercompany Investments;

(7)     Indebtedness incurred in the ordinary course of business under performance, surety, statutory, and appeal bonds;

(8)     Indebtedness owed to any Person providing property, casualty, liability, environmental or other insurance to the Note Parties, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the period in which such Indebtedness is incurred and such Indebtedness is outstanding only during such period;

(9)     Indebtedness arising under the Pre-Petition Note Documents;

(10)     Indebtedness incurred in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards or other similar Cash Management Services, in each case, incurred in the ordinary course of business;

(11)     [reserved];

(12)     [reserved];

(13)     Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts;

(14)     [reserved];

(15)     to the extent constituting Indebtedness, operating leases incurred in the ordinary course of business;

(16)     letters of credit incurred in the ordinary course of business with cities and pursuant to import/export duties incurred in the ordinary course of business;

(17)     the VTB Note (as defined in the Spin Stock Purchase Agreement); and

(18)     so long as no Default or Event of Default has occurred and is continuing or would result therefrom, other Indebtedness in an aggregate principal amount not to exceed $5.0 million at any time outstanding.

"**Permitted Intercompany Investments**" means Investments made by (a) a Note Party to or in another Note Party, (b) a Subsidiary that is not a Note Party to or in another Subsidiary that is not a Note Party, (c) a Subsidiary that is not a Note Party to or in a Note Party, so long as, in the case of a loan or advance, the Indebtedness is subordinated to the satisfaction of the Junior DIP Collateral Agent, and (d) a Note Party to or in a Subsidiary that is not a Note Party so long as (i) the aggregate amount of all such Investments made by the Note Parties to or in Subsidiaries that

are not Note Parties does not exceed $400,000 at any time outstanding and (ii) no Default or Event of Default has occurred and is continuing either before or after giving effect to such Investment.

"**Permitted Investments**" means:

(1)     Investments in cash and Cash Equivalents;

(2)     Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

(3)     advances made in connection with purchases of goods or services in the ordinary course of business;

(4)     Investments received in settlement of amounts due to any Note Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Note Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Note Party or its Subsidiaries;

(5)     Investments existing on the Closing Date;

(6)     Permitted Intercompany Investments;

(7)     [reserved];

(8)     [reserved];

(9)     loans or advances to directors and employees of any Note Party or any of its Subsidiaries made in the ordinary course of business; provided that the aggregate amount of such loans and advances outstanding at any time shall not exceed $100,000;

(10)    [reserved];

(11)    Investments consisting of guarantees or other contingent obligations permitted under Section 8.3;

(12)    any Investments held by Bird Canada Inc. on January 3, 2023;

(13)    any Investment contemplated by the transactions pursuant to the Spin Stock Purchase Agreement; and

(14)    so long as no Default or Event of Default has occurred and is continuing or would result therefrom, other Investments in an aggregate amount not to exceed $250,000 at any time outstanding.

"**Permitted Liens**" means, with respect to any Person:

(1)     Liens securing the Obligations;

(2)    Liens for Taxes, assessments and governmental charges or levies not yet due or payable or the payment of which is not required under Section 7.3;

(3)    Liens imposed by law, such as carriers', warehousemen's, mechanics', worker's, materialmen's, construction and other similar Liens arising in the ordinary course of business and securing obligations (other than Indebtedness for borrowed money) that are not overdue by more than 60 days or are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(4)    Liens existing on the Closing Date; *provided* that any such Lien shall only secure the Indebtedness, and encumber the assets, that it secures on the Closing Date;

(5)    [reserved];

(6)    deposits and pledges of cash securing (i) obligations incurred in respect of workers' compensation, unemployment insurance, social security or other forms of governmental insurance or benefits, (ii) the performance of bids, tenders, leases, contracts (other than for the payment of money) permits, licenses or statutory obligations or (iii) obligations on surety or appeal bonds or letters of credit, but only to the extent such deposits or pledges are made or letters of credit are made or otherwise arise or issued in the ordinary course of business and secure obligations not past due;

(7)    easements, rights of way, servitudes, zoning, building or similar restrictions and similar encumbrances on real property and exceptions, imperfections and irregularities in the title thereto that do not (i) secure obligations for the payment of money or (ii) materially impair the value of such property or its use by any Note Party or any of its Subsidiaries in the normal conduct of such Person's business;

(8)    Liens of landlords and mortgagees of landlords (i) arising by statute or under any Lease or related Contractual Obligation entered into in the ordinary course of business, (ii) on fixtures and movable tangible property located on the real property leased or subleased from such landlord, or (iii) for amounts not yet due or that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves or other appropriate provisions are maintained on the books of such Person in accordance with GAAP;

(9)    the title and interest of (i) a lessor or sublessor in and to personal property leased or subleased (other than through a Capitalized Lease) extending only to such personal property, or (ii) a licensor or sublicensor in or to the property subject to any license or sublicense or concession agreement permitted by this Agreement extending only to such property;

(10)    non-exclusive licenses of intellectual property rights in the ordinary course of business;

  
(11)   any encumbrances or restrictions (including put and call agreements) with respect to any Equity Interests constituting a Permitted Investment as required pursuant to the terms of the shareholder, joint venture or other agreement governing such Permitted Investment as in effect on the Closing Date;

(12)   judgment liens (other than for the payment of taxes, assessments or other governmental charges) securing judgments and other proceedings not constituting an Event of Default under Section 9.8;

(13)   rights of set-off or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business;

(14)   Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Indebtedness;

(15)   [reserved];

(16)   Liens securing Permitted Indebtedness under clause (2), clause (9), clause (5) and clause (10) of the definition of "Permitted Indebtedness," including Liens securing Cash Management Services secured under the documentation governing such Indebtedness, so long as any such Liens are subject to the Pre-Petition Intercreditor Agreement;

(17)   UCC or PPSA financing statements filed (or similar filings under applicable law) solely as a precautionary measure in connection with operating leases;

(18)   in connection with the sale or transfer of any assets in a transaction not prohibited hereunder, customary rights and restrictions contained in agreements relating to such sale or transfer pending the completion thereof;

(19)   receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(20)   Liens in the nature of the right of setoff in favor of counterparties to contractual agreements not otherwise prohibited hereunder with the Parent or any of its Subsidiaries in the ordinary course of business;

(21)   Liens on cash pledged to secure obligations in respect of letters of credit incurred in the ordinary course of business with cities and pursuant to import/export duties incurred in the ordinary course of business;

(22)   Liens arising out of consignment or similar arrangements for the sale of goods in the ordinary course of business;

12640916-7

Case 23-20514-CLC    Doc 66    Filed 12/22/23    Page 186 of 354

(23)    Liens on goods in favor of customs and revenues authorities imposed by applicable law arising in the ordinary course of business in connection with the importation of such goods;

(24)    Liens arising by operation of law under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(25)    Liens on securities that are the subject of repurchase agreements constituting Cash Equivalents;

(26)    Liens in favor of banking institutions arising as a matter of law or under general terms and conditions encumbering deposits (including the right of set off) and which are within the general parameters customary in the banking industry;

(27)    the VTB Security (as defined in the Spin Stock Purchase Agreement); and

(28)    other Liens which do not secure Indebtedness for borrowed money or letters of credit and as to which the aggregate amount of the obligations secured thereby does not exceed $1.0 million at any time outstanding.

"**Permitted Restricted Payments**" means any of the following Restricted Payments made by:

(a)    any Note Party to another Note Party;

(b)    any Subsidiary of the Issuer to the Issuer (and any necessary Restricted Payments to another Subsidiary in order to ultimately make such Restricted Payment to the Issuer);

(c)    the Issuer and any of its Subsidiaries to pay dividends or make other distributions in the form of common Equity Interests; and

(d)    the redemption, repurchase, retirement or other acquisition of any Equity Interests or Junior Financing of any Note Party, in exchange for, or out of the proceeds of the substantially concurrent sale of, Equity Interests (other than any Disqualified Equity Interests) of the Issuer.

"**Permitted Variance**" means, a negative variance in the aggregate amount of unrestricted cash and Cash Equivalents of the Credit Parties and their Subsidiaries set forth in an Approved Budget for any Budget Testing Period (calculated as of the close of business of the Issuer on the last Business Day of each Budget Testing Period) of the greater of (x) $500,000 and (y) 10% of such budgeted amount; provided, that, the negative variance may not exceed $1,000,000 for any Budget Testing Period.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity, or Government Authority.

12640916-7

"**Petition Date**" has the meaning set forth in the recitals.

"**Post-Petition**" means the time period beginning immediately upon the filing of the Chapter 11 Cases and ending upon the closing of the Chapter 11 Cases.

"**Preferred Stock**" means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding up.

"**Pre-Petition Collateral Agent**" means U.S. Bank Trust Company, National Association, in its capacity as collateral agent under the Pre-Petition Note Documents, or any successor collateral agent permitted by the terms thereto.

"**Pre-Petition Financing Agent**" means MidCap Financial Trust, in its capacity as administrative agent under the Pre-Petition Financing Debt Documents, or any successor administrative agent permitted by the terms thereof.

"**Pre-Petition Financing Credit Agreement**" has the meaning set forth in the recitals.

"**Pre-Petition Financing Debt**" means the "Borrower Obligations" (under and as defined in the Pre-Petition Financing Credit Agreement).

"**Pre-Petition Financing Debt Documents**" means, collectively, the Pre-Petition Financing Credit Agreement, the Pre-Petition Intercreditor Agreement and the other agreements, guaranties, instruments, and documents delivered in connection with the Pre-Petition Financing Debt, in each case, as amended, restated, supplemented, modified, extended, restructured, renewed, refinanced, increased, replaced, or refunded in whole or in part from time to time and whether by the same or any other agent, lender, or investor or group of lenders or investors.

"**Pre-Petition Financing Lenders**" means the "Lenders" (under and as defined in the Pre-Petition Financing Credit Agreement).

"**Pre-Petition Indebtedness**" means any and all Indebtedness of the Note Parties incurred prior to the Petition Date and outstanding as of the Petition Date.

"**Pre-Petition Intercreditor Agreement**" means that certain Amended and Restated Subordination and Intercreditor Agreement dated as of December 11, 2023, by and among the Pre-Petition Financing Agent, the Pre-Petition Collateral Agent, the Issuer and the other Persons party thereto.

"**Pre-Petition Note Documents**" means the "Note Documents" as defined in the Pre-Petition Note Purchase Agreement.

"**Pre-Petition Note Purchase Agreement**" means the Note Purchase Agreement dated as of December 30, 2022 among the Issuer, each of the note purchasers party thereto and the Pre-Petition Collateral Agent, as amended, supplemented or otherwise modified.

"**Pre-Petition Obligations**" means all Obligations outstanding under (and as defined in) the Pre-Petition Note Purchase Agreement with respect to the Bridge Notes.

"**Pre-Petition Payments**" means any payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Pre-Petition Indebtedness or other obligations or claims (including trade payables and payments in respect of reclamation and/or Section 503(b)(9) claims) of the Note Parties.

"**Pre-Petition Prior Liens**" shall have the meaning set forth in the DIP Orders.

"**Pre-Petition Secured Parties**" means the Secured Parties as defined in the Pre-Petition Note Purchase Agreement.

"**Purchasers**" means (a) the DIP Note Purchasers, (b) the Bridge Note Purchasers, (c) the Other Note Purchasers and (d) such other Persons, if any, that may from time to time become a party hereto as a purchaser pursuant to the terms of this Agreement (including, for the avoidance of doubt, any Pre-Petition Secured Party).

"**Purchasers' Expenses**" are (a) all reasonable audit fees and expenses, costs, and expenses (including reasonable attorneys' fees and expenses (whether generated in house or by outside counsel), as well as appraisal fees, fees incurred on account of lien searches, inspection fees, and filing fees) for preparing, amending, negotiating and administering the Note Documents, and (b) all fees and expenses (including attorneys' fees and expenses, as well as appraisal fees, fees incurred on account of lien searches, inspection fees, and filing fees) for defending and enforcing the Note Documents (including, without limitation, those incurred in connection with appeals or Insolvency Proceedings) or otherwise incurred by the Pre-Petition Collateral Agent, the Junior DIP Collateral Agent and/or the DIP Note Purchasers in connection with the Note Documents.

"**Qualified Purchaser**" means a Person satisfactory to the Required Purchasers.

"**Required Purchasers**" means DIP Note Purchasers holding more than 50% in aggregate principal amount of the Notes (including, for the avoidance of doubt, any PIK Interest paid with respect thereto).

"**Restricted Investment**" means an Investment other than a Permitted Investment.

"**Restricted Payment**" means the Issuer or any Subsidiary acting to:

(1)    declare or pay any dividend or make any payment or distribution on account of the Issuer's or any of its Subsidiaries' Equity Interests, including any payment made in connection with any merger, amalgamation, or consolidation involving the Issuer (other than (A) dividends or distributions by the Issuer payable solely in Equity Interests of the Issuer or (B) dividends or distributions by a Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Subsidiary other than a wholly owned Subsidiary, the Issuer or a Subsidiary receives at least its *pro rata* share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities);

23

(2)     purchase, redeem, defease, or otherwise acquire or retire for value any Equity Interests of the Issuer or any direct or indirect parent of the Issuer, including in connection with any merger, amalgamation, or consolidation;

(3)     make any principal payment on, or redeem, repurchase, defease, or otherwise acquire or retire for value, in each case, prior to any scheduled repayment, sinking fund payment, or maturity, any Subordinated Indebtedness of the Issuer or any Guarantor (other than the payment, redemption, repurchase, defeasance, acquisition, or retirement of (A) Subordinated Indebtedness of the Issuer or any Guarantor in anticipation of satisfying a sinking fund obligation, principal installment, or final maturity, in each case, due within one year of the date of such payment, redemption, repurchase, defeasance, acquisition, or retirement and (B) Indebtedness permitted under clause (7) of the definition of "Permitted Indebtedness"); or

(4)     make any Restricted Investment.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement dated as of December 19, 2023, by and among the Pre-Petition Financing Agent, the Pre-Petition Financing Lenders, the Purchasers and the other Persons party thereto.

"**Roll-Up Effective Time**" means the moment in time immediately following of the entry of the Final Order by the Bankruptcy Court approving the roll-up of certain of the Pre-Petition Obligations as contemplated therein and herein.

"**Sanctioned Country**" means a country subject to a sanctions program maintained under any Anti-Terrorism Law, including any such country identified on the list maintained by OFAC and available at http://www.treasury.gov/resource-center/sanctions/Programs/ Pages/Programs.aspx, or as otherwise published from time to time.

"**Sanctioned Person**" means (a) a person named on the list of "Specially Designated Nationals" or "Blocked Persons" maintained by OFAC available at http://www.treasury.gov/ resource-center/sanctions/SDN-List/Pages/default.aspx, or as otherwise published from time to time, (b) (i) an agency of the government of a Sanctioned Country, (ii) an organization controlled by a Sanctioned Country, or (iii) a person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC, or (c) any individual person, group, regime, entity, or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned, or debarred person, group, regime, entity, or thing, or subject to any limitations or prohibitions (including, but not limited, to the blocking of property or rejection of transactions), under any Anti-Terrorism Law.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Security Agreement**" means that certain Pledge and Collateral Agreement dated as of the date hereof among the Issuer, the Parent and the other Note Parties thereto and the Junior DIP Collateral Agent.

"**Security Documents**" means the Security Agreement and any other security agreements, pledge agreements, mortgages, charges, control agreements, any note, notes, or guarantees executed by the Issuer or any other Person, any agreements creating or perfecting rights in the Collateral and other collateral securing any of the Obligations, and any other present or future agreement entered into by the Issuer, any Guarantor, or any other Person for the benefit of the DIP Note Purchasers and Junior DIP Collateral Agent.

"**Secured Parties**" means the Junior DIP Collateral Agent, the DIP Note Purchasers and, after the occurrence of the Roll-Up Effective Time, the Bridge Note Purchasers.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Senior Financing Agents**" means the Pre-Petition Financing Agent and the DIP Financing Agent.

"**Senior Financing Credit Agreements**" means the Pre-Petition Financing Credit Agreement and the DIP Financing Credit Agreement.

"**Senior Financing Debts**" means the Pre-Petition Financing Debt and the DIP Financing Debt.

"**Senior Financing Lenders**" means the Pre-Petition Financing Lenders and the DIP Financing Lenders.

"**Spin Stock Purchase Agreement**" means that certain Stock Purchase Agreement dated as of September 19, 2023 between Bird Global, Inc., a Delaware corporation, Bird Rides, Inc., a Delaware corporation, Skinny Labs, Inc., a Delaware corporation (d/b/a "SPIN") and Tier Mobility SE.

"**Subordinated Indebtedness**" means (a) with respect to the Issuer, any Indebtedness of the Issuer which is, by its terms, expressly subordinated in right of payment to the Notes, and (b) with respect to any Guarantor, any Indebtedness of such Guarantor which is, by its terms, expressly subordinated in right of payment to its Guarantee.

"**Subsidiary**" means, with respect to any Person, any Person (a) of which more than 50% of the voting power of the Voting Stock or other Capital Stock is owned or controlled, directly or indirectly, by such Person or through one or more intermediaries (b) of which shares of stock of each class or other interests having ordinary voting power (other than stock or other interests having such power only by reason of the happening of a contingency) to elect a majority of the Board of Directors or other managers of such entity are at the time owned, or management of which is otherwise controlled: (i) by such Person, (ii) by one or more Subsidiaries of such Person or (iii) by such Person and one or more Subsidiaries of such Person. Where such term is used without a referent Person, such term shall be deemed to mean a Subsidiary of the Issuer, unless the context otherwise requires.

"**Termination Event**" shall have the meaning set forth in the DIP Orders.

"**Transactions**" means the issuance of Notes contemplated by this Agreement on the Closing Date.

"**U.S. dollars**" and "**$**" each mean lawful money of the United States.

"**Voting Agreement**" means that certain Voting Agreement, dated as of December 30, 2022, among the Issuer, certain of the Purchasers and/or certain of their Affiliates, and the other parties thereto, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

"**Voting Stock**" means, with respect to any Person, such Person's Capital Stock having the right to vote for the election of directors of such Person under ordinary circumstances.

## 2.    NOTES AND TERMS OF PAYMENT

### 2.1    Issuance of Notes.

(a)    Purchase and Sale of Notes.

(i)    Subject to the terms and conditions of this Agreement, on the Closing Date, the Issuer shall issue and sell to each applicable DIP Note Purchaser, and each applicable DIP Note Purchaser shall severally purchase and acquire from the Issuer, for the Cash Consideration specified in Schedule 2.1-A, Notes in an aggregate principal amount of $5,600,000.

(ii)    The Issuer and each DIP Note Purchaser agrees that Schedule 2.1-A hereto sets forth, with respect to each DIP Note Purchaser, the aggregate principal amount of Notes to be issued and sold by the Issuer to such DIP Note Purchaser and the Cash Consideration to be paid or delivered by such DIP Note Purchaser for the Notes. The closing of the purchase and sale of the Notes to the DIP Note Purchasers (the "**Closing**") shall occur on the Closing Date.

(iii)    On the Closing Date, (1) each applicable DIP Note Purchaser shall cause a wire transfer to be made in same day funds to an account of the Issuer designated in writing by the Issuer to the DIP Note Purchasers in an amount specified opposite such DIP Note Purchasers name on Schedule 2.1-A hereto and (2) the Issuer shall deliver to each DIP Note Purchaser the principal amount of Notes specified for Cash Consideration on Schedule 2.1-1 hereto.

(b)    Repayment; Principal and Interest Adjustments. The Issuer shall make monthly payments of interest only on each Interest Payment Date, commencing on January 31, 2024, and continuing on each Interest Payment Date thereafter to and including the Maturity Date. All outstanding principal and accrued and unpaid interest with respect to the Notes shall be due and payable in full on the Maturity Date.

(c)    Open-Market Purchases. The Issuer or its Affiliates may at any time and from time to time purchase Notes in the open market, through privately negotiated transactions with third parties, pursuant to one or more tender or exchange offers, or otherwise, upon such terms, and at such prices, as well as with such consideration, as the Issuer or any such Affiliates may determine or otherwise.

(d)    <u>Priority of Payments</u>.

(i)    Until the payment or redemption in full of the Notes and the Bridge Notes, the payment of the Other Notes shall be postponed and subordinated to the payment or redemption in full of the Notes and the Bridge Notes, and no payments of or other distributions whatsoever on account of the Other Notes shall be made by the Issuer or any other party until the Notes and the Bridge Notes are paid or redeemed in full.  So long as the Notes and the Bridge Notes remain outstanding, interest payable in respect of the Other Notes and the Bridge Notes shall accrue as PIK Interest.

(ii)    Until all of the Notes and the Bridge Notes are paid or redeemed in full, the holders of any Other Notes shall not be entitled to receive cash payments or distributions of any kind in respect of the Other Notes (including, without limitation, payments of principal, interest other than PIK Interest, and dividends).  Without limiting the foregoing, as between the holders of the Notes and the Bridge Notes, on the one hand, and the holders of any Other Notes, on the other hand, the holders of the Notes and the Bridge Notes shall be entitled to priority payments of Net Cash Proceeds from any Disposition prior to payment of any Net Cash Proceeds from any Disposition to the holders of any Other Notes; it being understood and agreed among the Purchasers that no Net Cash Proceeds from any Disposition shall be paid to the  holders of the Other Notes unless and until all of the Notes and the Bridge Notes have been paid or redeemed in full.

(iii)    No holder of an Other Note shall be entitled to require the Issuer to purchase or redeem all or any part of such Other Notes prior to the payment or redemption in full of all of the Notes and the Bridge Notes, and the Issuer shall not purchase or redeem any of such Other Notes unless and until all of the Notes and the Bridge Notes have been paid or redeemed in full.

(iv)    On the Closing Date, Issuer shall pay to each DIP Note Purchaser a deferred fee equal to three percent (3.0%) of the Cash Consideration paid by each such DIP Note Purchaser in respect of the Notes purchased by it, which fee shall be capitalized to the outstanding principal amount of the Notes issued to such DIP Note Purchaser pursuant to this Agreement.

(v)    Notwithstanding the foregoing, the full amount of the Indebtedness evidenced by the Notes, the Bridge Notes and the Other Notes may be simultaneously credit bid in connection with the Credit Bid Transaction without preference or priority in accordance with the provisions of this Agreement.

(e)    <u>Rollup</u>.

Effective upon the occurrence of the Roll-Up Effective Time, without any further action by any party to this Agreement, the Bankruptcy Court or any other Person, to the extent set forth in the Final Order, all Pre-Petition Obligations owing to each Bridge Note Purchaser at the Roll-Up Effective Time shall be rolled-up into and constitute Obligations hereunder and shall constitute a portion of the outstanding amount of the Obligations owing to the DIP Note Purchasers hereunder. At any time upon the occurrence of the Roll-Up Effective Time, the Issuer shall, upon request from any DIP Note Purchaser, deliver a replacement Note, substantially in the form of

Exhibit B hereof, to such DIP Note Purchaser evidencing the total outstanding principal amount under the Notes and the Bridge Notes held by such DIP Note Purchaser. Following the Roll-Up Effective Time, references to the DIP Note Purchasers in this Agreement shall include the Bridge Note Purchasers.

   **2.2    Payment of Interest on the Notes**.

         (a)    <u>Interest Rate</u>. Subject to <u>Section 2.2(b)</u>, the principal amount outstanding under the Notes (including, for the avoidance of doubt, any PIK Interest paid with respect thereto) shall accrue interest at a *per annum* rate equal to 18.0%, which interest shall be payable monthly in arrears in accordance with <u>Sections 2.1(b)</u> and <u>2.2(d)</u>. Such interest shall accrue commencing on, and including, the Closing Date and shall accrue on the principal amount outstanding under such Notes to, but excluding, the day on which such Notes are paid in full (or any payment is made hereunder).

         (b)    <u>Default Rate</u>. Immediately upon the occurrence and during the continuance of an Event of Default, all Obligations shall accrue interest at a *per annum* rate equal to 24.0% (the "**Default Rate**"). Payment or acceptance of the increased interest rate provided in this <u>Section 2.2(b)</u> is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the DIP Note Purchasers.

         (c)    <u>360-Day Year</u>. Interest shall be computed on the basis of a 360-day year for the actual number of days elapsed.

         (d)    <u>Payments</u>. Except as otherwise expressly provided herein, all payments by the Issuer under the Note Documents shall be made to the respective DIP Note Purchaser to which such payments are owed in immediately available funds on the date specified herein. Unless otherwise provided, interest is payable on each Interest Payment Date. Payments of principal and/or interest received after 12:00 noon Eastern time are considered received at the opening of business on the next Business Day. When a payment is due on a day that is not a Business Day, the payment is due the next Business Day and additional fees or interest, as applicable, shall continue to accrue until paid. All payments to be made by Issuer hereunder or under any other Note Document, including payments of principal and interest, and all fees, expenses, indemnities and reimbursements, shall be made without set-off, recoupment or counterclaim, in lawful money of the United States and in immediately available funds. Notwithstanding the foregoing, all interest on the principal amount outstanding under the Notes payable pursuant to this <u>Section 2.2</u> shall be paid as paid-in-kind interest, and shall be added to the aggregate principal amount of the Note on the date such interest would otherwise be due hereunder (the amount of any such paid-in-kind interest being "**PIK Interest**").

   **2.3    Purchasers' Expenses**. The Issuer shall pay to the DIP Note Purchasers all Purchasers' Expenses (including reasonable attorneys' fees and expenses for documentation and negotiation of this Agreement) incurred through and after the Closing Date, when due.

**2.4    Junior DIP Collateral Agent Fees**. The Issuer shall pay all fees payable to the Junior DIP Collateral Agent as set forth in the Fee Letter at the times and in the amounts specified therein (such fees being referred to herein collectively as the "**Collateral Agent Fees**"). The Collateral Agent Fees are in addition to reimbursement of the Collateral Agent Expenses in accordance with Exhibit C. The Collateral Agent Fees shall be fully earned when due and shall not be refundable for any reason whatsoever.[1]

**2.5    Taxes; Increased Costs**. The Issuer, the Junior DIP Collateral Agent, and the DIP Note Purchasers each hereby agree to the terms and conditions set forth on Exhibit D attached hereto.

**2.6    Notes**. The Notes shall be substantially in the form attached as Exhibit B hereto, and the terms of this Agreement shall be incorporated by reference into the Notes as if set forth therein; *provided* that, in the event of any conflict between the terms of this Agreement and the Notes, the terms of this Agreement shall control. The Issuer irrevocably authorizes each DIP Note Purchaser to make or cause to be made, on or about the Closing Date, or at the time of receipt of any payment of principal on such Purchaser's Note, an appropriate notation on such DIP Note Purchaser's Note (the "**Purchaser's Note Record**") reflecting the purchase of such Notes or (as the case may be) the receipt of such payment. The outstanding amount of the Notes set forth on such DIP Note Purchaser's Note Record shall be, absent manifest error, prima facie evidence of the principal amount thereof owing and unpaid to such DIP Note Purchaser, but the failure to record, or any error in so recording, any such amount on such DIP Note Purchaser's Note Record shall not limit or otherwise affect the obligations of Issuer under any Note or any other Note Document to make payments of principal of or interest on, any Note when due. Upon receipt of an affidavit of an officer of a DIP Note Purchaser as to the loss, theft, destruction, or mutilation of its Note, the Issuer shall issue, in lieu thereof, a replacement Note in the same principal amount thereof and of like tenor.

## 3.    <u>CONDITIONS OF NOTES</u>

**3.1    Conditions Precedent to Closing**. The effectiveness of this Agreement and Closing are subject to the condition precedent that each DIP Note Purchaser shall have received, in form and substance satisfactory to such DIP Note Purchaser, such documents, and completion of such other matters, as each DIP Note Purchaser may reasonably deem necessary or appropriate, including, without limitation:

(a)    all of the agreements, documents, instruments and other items set forth on the closing checklist attached hereto as Exhibit F other than those that are specified therein as permitted to be delivered after the Closing Date, each in form and substance reasonably satisfactory to such DIP Note Purchaser;

---

[1] Note to USBank: Fees owed to the Pre-Petition Collateral Agent will continue to be governed by the Pre-Petition Note Purchase Agreement and the fee letter executed in connection with the same.

12640916-7

(b)      to the extent requested by the DIP Note Purchasers or Junior DIP Collateral Agent, a properly completed and duly executed IRS Form W-9 (or other applicable tax form) from Issuer and all other documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations;

(c)      the representations and warranties in <u>Section 5</u> hereof shall be true, accurate and complete in all material respects on the Closing Date; *provided, however*, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; *provided, further* that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date;

(d)      no Event of Default or an event that with the passage of time could result in an Event of Default shall exist;

(e)      payment of the fees, Purchasers' Expenses, Junior DIP Collateral Agent Expenses and Junior DIP Collateral Agent Fees then due as specified in <u>Section 2.4</u> hereof;

(f)      substantially simultaneously with the effectiveness of this Agreement, the Issuer shall have executed the DIP Financing Credit Agreement;

(g)      substantially simultaneously with the effectiveness of this Agreement, the Issuer shall have executed the Restructuring Support Agreement in form and substance satisfactory to the Purchasers;

(h)      there shall not exist any order, injunction or decree of any Governmental Authority restraining or prohibiting the issuance of Notes hereunder;

(i)      each of (i) Bird Global, Inc., (ii) Bird Rides, Inc., (iii) Bird US Holdco, LLC, (iv) Bird US Opco, LLC, and (v) Skinny Labs, Inc. shall be a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code;

(j)      the Bankruptcy Court shall have entered the Interim Order, and such Interim Order shall be in full force and effect and shall not have been stayed, vacated, reversed, amended or otherwise modified without the prior written consent of the Required Purchasers in their sole discretion;

(k)      no motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder shall have been filed in the Bankruptcy Court by any Note Party without the prior written consent of the Required Purchasers in their sole discretion;

(l)      the Bankruptcy Court shall have entered a cash management order in form and substance reasonably acceptable to the Required Purchasers no later than two (2) Business Days after the Petition Date, and such order shall be in full force and effect and shall not have been stayed, vacated, reversed, amended or otherwise modified without the prior written consent of the Required Purchasers in their sole discretion;

12640916-7

(m)      the initial 13-week cash flow budget, attached as Exhibit A to the Interim Order, setting forth, on a weekly and a line-item basis, in each case as required by the Interim Order (i) projected cash receipts and (ii) projected disbursements and the amount of ordinary course operating expenses, bankruptcy-related expenses under the Chapter 11 Cases (including professional fees of the Note Parties with respect thereto), capital expenditures, asset sales, and estimated fees and expenses of the DIP Note Purchasers (including fees and expenses of its their counsel and financial advisors), estimated fees and expenses of the members of any statutory committee and any professionals engaged by any such statutory committee) and any other fees and expenses relating to this Agreement or the other Note Documents), in each case for each week from the first day of the week in which the Petition Date occurs through the last day of the week that is 13 weeks thereafter, to be attached to the Interim Order which shall be in form and substance satisfactory to the Agent and Required DIP Lenders (the "**Initial Approved Budget**"); and

(n)      all other conditions to borrowing in the Interim Order shall have been satisfied.

**3.2      Covenant to Deliver**. The Issuer agrees to deliver to the DIP Note Purchasers each item required to be delivered to the DIP Note Purchasers under this Agreement as a condition precedent to the purchase of Notes. The Issuer expressly agrees that any purchase of Notes made prior to the receipt by any DIP Note Purchaser of any such item shall not constitute a waiver by any DIP Note Purchaser of the Issuer's obligation to deliver such item, and any such Note in the absence of a required item shall be made in each Purchaser's sole discretion.

## 4.      CREATION OF SECURITY INTEREST

**4.1      Grant of Security Interest**. The Issuer hereby grants to the Junior DIP Collateral Agent, for the ratable benefit of the Secured Parties, to secure the payment and performance in full of all of the Obligations, a continuing security interest in, and pledges to the Junior DIP Collateral Agent, for the ratable benefit of the Secured Parties, the Issuer Pledged Collateral. The Junior DIP Collateral Agent's Lien on the Issuer Pledged Collateral shall continue until the Obligations (other than inchoate indemnity obligations) are repaid.

**4.2      Representations, Warranties and Covenants**. The Issuer represents, warrants and covenants to and with the Junior DIP Collateral Agent, for the benefit of the Secured Parties, that:

(a)      Exhibit A hereto includes a true and complete list of all the Issuer Pledged Collateral and the percentage of the issued and outstanding units of each class of the Equity Interests of the issuer thereof represented by the Issuer Pledged Collateral owned by the Issuer;

(b)      (i) the Issuer Pledged Collateral has been duly and validly authorized and issued by the issuer thereof and (ii) the Issuer Pledged Collateral (if applicable) is fully paid and nonassessable;

(c)      except for the security interests granted hereunder and under any other Note Documents, the Issuer (i) is and will continue to be the direct owner, beneficially and of record, of the Issuer Pledged Collateral, (ii) holds the same free and clear of all Liens, other

31

than Permitted Liens, (iii) will make no further assignment, pledge, hypothecation or transfer of, or create or permit to exist any security interest in or other Lien on, the Issuer Pledged Collateral, other than Permitted Liens, and (iv) will use commercially reasonable efforts to defend its title or interest thereto or therein against any and all Liens (other than Permitted Liens), however arising, of all Persons whomsoever;

(d)     except for restrictions and limitations imposed or permitted by the Note Documents, contracts and agreements permitted by the Note Purchase Agreement, or securities laws generally, the Issuer Pledged Collateral is and will continue to be freely transferable and assignable, and none of the Issuer Pledged Collateral is or will be subject to any option, right of first refusal, shareholders agreement or organizational document provisions of any nature that would prohibit, impair, delay or otherwise affect the pledge of such Issuer Pledged Collateral hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Junior DIP Collateral Agent of rights and remedies hereunder;

(e)     the Issuer has the organizational power and authority to pledge the Issuer Pledged Collateral pledged by it hereunder in the manner hereby done or contemplated;

(f)     by virtue of the execution and delivery by the Issuer of this Agreement, and subject to the rights set forth in the Pre-Petition Intercreditor Agreement, when any Issuer Pledged Securities are delivered to the Junior DIP Collateral Agent in accordance with this Agreement, the Junior DIP Collateral Agent will obtain a legal, valid and perfected lien upon and security interest in such Issuer Pledged Securities, free of any adverse claims (except Permitted Liens), under the UCC to the extent such lien and security interest may be created and perfected under the UCC, as security for the payment and performance of the Obligations; and

(g)     subject to the terms of this Agreement and the Pre-Petition Intercreditor Agreement, and to the extent permitted by applicable law, the Issuer hereby agrees that upon the occurrence and during the continuance of an Event of Default, it will comply with the instructions of the Junior DIP Collateral Agent with respect to the Equity Interests that constitute Issuer Pledged Collateral hereunder that are not certificated without further consent by the applicable owner or holder of such Equity Interests.

**4.3     Registration in Nominee Name**. If an Event of Default shall have occurred and is continuing, the Junior DIP Collateral Agent (at the direction of the Required Purchasers), on behalf of the Secured Parties, shall have the right (in its sole and absolute discretion) to hold and have the Issuer Pledged Securities registered in its own name as pledgee or in the name of its nominee (as pledgee or as sub-agent), and the Issuer will promptly give to the Junior DIP Collateral Agent copies of any notices or other written communications received by it with respect to Issuer Pledged Securities registered in the name of the Issuer. Upon the occurrence and during the continuance of an Event of Default notice to the Issuer, the Junior DIP Collateral Agent shall at all times have the right to exchange the certificates representing Issuer Pledged Securities for certificates of smaller or larger denominations for any reasonable purpose consistent with this Agreement.

**4.4     Voting Rights; Dividends and Interest**.

(a)    Unless and until an Event of Default shall have occurred:

(i)    the Issuer shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Issuer Pledged Securities or any part thereof for any purpose consistent with the terms of this Agreement and the other Note Documents;

(ii)    the Junior DIP Collateral Agent shall promptly execute and deliver to the Issuer, or cause to be promptly executed and delivered to the Issuer, all such proxies, powers of attorney and other instruments as the Issuer may reasonably request for the purpose of enabling the Issuer to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to clause (a)(i) of this Section 4.4; and

(iii)    the Issuer shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Issuer Pledged Securities to the extent and only to the extent that such dividends, interest, principal and other distributions are not prohibited by, and are otherwise paid or distributed in accordance with, the terms and conditions of this Agreement and the other Note Documents and Applicable Laws; *provided* that any non-cash dividends, interest, principal or other distributions that would constitute Issuer Pledged Collateral, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests in the issuer of any Issuer Pledged Securities or received in exchange for Issuer Pledged Securities or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Issuer Pledged Collateral and, if received by the Issuer, shall be held for the benefit of the Junior DIP Collateral Agent and the other Secured Parties.

4.5    **Other Collateral**. The Notes and related Guarantees will be secured from time to time by other collateral, pledged by the Guarantors under the other Note Documents.

4.6    **Release of Issuer Pledged Collateral**. Upon payment in full of the Obligations (other than inchoate indemnity obligations), including by reason of a successful Credit Bid Transaction in accordance with this Agreement, the Junior DIP Collateral Agent's Lien on all the Issuer Pledged Collateral shall terminate and be released automatically without further action of any Person, and all rights therein shall revert to the Issuer, subject to the terms of the Credit Bid Transaction and the Asset Purchase Agreement. Upon any sale or other transfer of any Issuer Pledged Collateral in a transaction permitted under and in accordance with the terms of this Agreement, or upon the effectiveness of any written consent to the release of the Liens granted hereby on any Issuer Pledged Collateral, the Junior DIP Collateral Agent's Lien on such Issuer Pledged Collateral shall be automatically released, and all rights therein shall revert to the Issuer. In connection with any of the foregoing terminations or releases, at the request of the Issuer and at the sole cost and expense of the Issuer, the Junior DIP Collateral Agent shall promptly execute and deliver to, and authorize the filing by, the Issuer of all financing statement amendments or termination statements and similar documents that the Issuer shall reasonably request to evidence

such termination or release, and the Junior DIP Collateral Agent shall promptly deliver to the Issuer all applicable Issuer Pledged Collateral in its possession.

5.    **REPRESENTATIONS AND WARRANTIES OF THE ISSUER**

The Issuer represents and warrants to the DIP Note Purchasers and the Junior DIP Collateral Agent that, as of the date hereof:

**5.1    Organization and Good Standing**. The Issuer and each of its Subsidiaries is an entity duly organized and validly existing and in good standing under the laws of the jurisdiction of its organization and has full power and authority under its organizational documents and under the laws of the jurisdiction of its organization to own its properties and to conduct its business as such properties are currently owned and such business is presently conducted.

**5.2    Due Qualification**. The Issuer and each of its Subsidiaries is duly qualified to do business, and has obtained all necessary licenses and approvals, in all jurisdictions in which the conduct of its business requires such qualification, licenses, or approvals, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect on the ability of the Issuer or such Subsidiaries to perform its obligations (taken as a whole) under this Agreement or any other Note Document to which it is a party or the validity or enforceability of this Agreement or any other Note Document.

**5.3    Power and Authority; Due Authorization**. The Issuer (a) has all necessary power and authority to (i) execute and deliver this Agreement and the other Note Documents to which it is a party, (ii) perform its obligations under this Agreement and the other Note Documents to which it is a party, and (iii) grant a security interest in the Collateral to the Junior DIP Collateral Agent on the terms and subject to the conditions herein provided, and (b) has duly authorized by all necessary corporation action such grant and the execution, delivery, and performance of, and the consummation of the transactions provided for in, this Agreement and the other Note Documents to which it is a party.

**5.4    Binding Obligations**. This Agreement and each of the other Note Documents to which the Issuer is a party, when executed and delivered by the Issuer and each other party thereto (and, with respect to the Notes, when issued against payment of the Cash Consideration therefor), will constitute legal, valid, and binding obligations of the Issuer, enforceable against the Issuer in accordance with their respective terms, except (i) as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or other similar laws affecting the enforcement of creditors' rights generally and (ii) as such enforceability may be limited by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

**5.5    No Conflict or Violation**. The execution, delivery, and performance of, and the consummation of the transactions contemplated by, this Agreement and the other Note Documents to which the Issuer is a party, and the fulfillment of the terms hereof and thereof, will not (a) conflict with, result in any breach of any of the terms or provisions of, or constitute (with or without notice or lapse of time or both) a default under its organizational documents, any Government Approval, or any indenture, sale agreement, credit agreement, loan agreement, security agreement,

mortgage, deed of trust, or other agreement or instrument to which the Issuer is a party or by which it or any of its properties are bound, (b) result in the creation or imposition of any Lien upon any of the Collateral pursuant to the terms of any such indenture, sale agreement, credit agreement, loan agreement, security agreement, mortgage, deed of trust, or other agreement or instrument (other than this Agreement and the other Note Documents), or (c) conflict with or violate any Applicable Law, except, in the case of each of the foregoing clauses (a) through (c), to the extent that any such conflict, breach, default, Lien, or violation, as applicable, would not reasonably be expected to have a Material Adverse Effect.

      **5.6    Litigation and Other Proceedings**. (a) There is no action, suit, proceeding, or investigation pending or, to the knowledge of the Issuer, threatened in writing, against the Issuer or any of its Subsidiaries before any Governmental Authority and (b) the Issuer is not subject to any order, judgment, decree, injunction, stipulation, or consent order of or with any Governmental Authority that, in the case of either of the foregoing clauses (a) and (b), (i) asserts the invalidity or unenforceability of this Agreement, any other Note Document or any Pre-Petition Note Document, (ii) seeks to prevent the grant of a security interest in any of the Collateral by the Issuer to the Junior DIP Collateral Agent or the consummation of any of the transactions contemplated by this Agreement, any other Note Document or any Pre-Petition Note Document, (iii) seeks any determination or ruling that could materially and adversely affect the performance by the Issuer of its obligations under this Agreement, any other Note Document or any Pre-Petition Note Document, or (iv) individually or in the aggregate for all such actions, suits, proceedings, and investigations would reasonably be expected to have a Material Adverse Effect.

      **5.7    Government Approvals**. Except where the failure to obtain or make such authorization, consent, order, approval, or action would not reasonably be expected to have a Material Adverse Effect, all authorizations, consents, orders, and approvals of, or other actions by, any Governmental Authority (including the entry by the Bankruptcy Court of the Interim Order (or the Final Order) when applicable) that are required to be obtained by the Issuer in connection with the grant of a security interest to the Junior DIP Collateral Agent hereunder or the due execution, delivery, and performance by the Issuer of this Agreement or any other Note Document to which it is a party and the consummation by the Issuer of the transactions contemplated by this Agreement and the other Note Documents to which it is a party have been obtained or made and are in full force and effect, except for such authorizations, consents, orders, approvals, or actions (a) as have been obtained or made, or (b) as may be required under applicable state securities laws in connection with the issuance and sale of the Notes.

      **5.8    [reserved]**.

      **5.9    Offices; Legal Name**. The Issuer's sole jurisdiction of organization is the State of Delaware and such jurisdiction has not changed within four months prior to the date of this Agreement. The chief executive office of the Issuer is 392 NE 191st Street, #20388, Miami, Florida. The legal name of the Issuer is Bird Global, Inc.

      **5.10    Investment Company Act**. The Issuer is not, and is not controlled by, an "investment company" registered or required to be registered under the U.S. Investment Company Act of 1940, as amended.

**5.11    Accuracy of Information**. All written information (other than any projections, forward-looking information, and information of a general economic nature or general industry nature) furnished to the DIP Note Purchasers by or on behalf of the Issuer pursuant to any provision of this Agreement or any other Note Document, or in connection with or pursuant to any amendment or modification of, or waiver under this Agreement or any other Note Document, is at the time the same are so furnished (or as of any earlier date or later date specified therein), is at the time the same was so furnished (or as of any earlier date specified therein), when taken as a whole, true and correct in all material respects on the date the same was furnished to the DIP Note Purchasers, and does not contain any material misstatement of fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances in which such statements were made.

**5.12    Anti-Money Laundering/International Trade Law Compliance**. Neither the Issuer nor, to the knowledge of the Issuer, any of its Affiliates, (a) is in violation of any Anti-Terrorism Law, (b) engages in or conspires to engage in any transaction that violates or attempts to violate any of the prohibitions set forth in any Anti-Terrorism Law, (c) is a Sanctioned Person, or is controlled by a Sanctioned Person, (d) is acting for or on behalf of a Sanctioned Person, (e) is associated with a Sanctioned Person, or (vi) is providing material, financial, or technical support or other services to or in support of acts of terrorism of a Sanctioned Person. Neither the Issuer nor, to the knowledge of the Issuer, any of its Affiliates or agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement, (i) conducts any business or engages in making or receiving any contribution of funds, goods, or services to or for the benefit of any Sanctioned Person or (ii) deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to Executive Order No. 13224, any similar executive order, or other Anti-Terrorism Law.

**5.13    Perfection Representations**.

(a)    This Agreement creates a valid and continuing security interest in the Issuer's right, title, and interest in, to, and under the Issuer Pledged Collateral which, (i) upon the filing of any required financing statements, will constitute a perfected security interest and (ii) will be free of all Liens, other than Permitted Liens.

(b)    The Issuer owns and has good and marketable title to the Issuer Pledged Collateral free and clear of any Lien, other than Permitted Liens.

(c)    Other than the security interest granted to the Junior DIP Collateral Agent pursuant to this Agreement, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Issuer Pledged Collateral except as permitted by this Agreement and the other Note Documents. The Issuer is not aware of any judgment lien, ERISA lien, or tax lien filings against the Issuer that are not permitted by this Agreement and the other Note Documents.

**5.14    Compliance with Applicable Laws**. The Issuer has complied with all Applicable Laws to which it may be subject, except where any such failure to comply with Applicable Laws would not reasonably be expected to have a Material Adverse Effect.

**5.15    Taxes**. Except as disclosed to the Purchasers prior to the Closing Date, the Issuer has (a) timely filed all material tax returns (federal, state, and local) required to be filed by it, (b) paid, or caused to be paid, all material taxes, assessments, and other governmental charges, if any, other than taxes, assessments, and other governmental charges being contested in good faith, and (c) paid all fees and expenses required to be paid by it in connection with the maintenance of its existence, and its qualification as a foreign corporation authorized to do business in each state in which it is required to so qualify, except with respect to this underline clause (c), where any such failure to pay such fees and expenses would not reasonably be expected to have a Material Adverse Effect.

**5.16    No Broker's Fees**. Except as set forth in or contemplated by the Bird Canada Share Purchase Agreement, the Issuer is not a party to any contract, agreement, or understanding with any Person that would give rise to a valid claim against them or the DIP Note Purchasers for a brokerage commission, finder's fee, or like payment in connection with the Note Documents and the transactions contemplated thereby.

**5.17    No General Solicitation**. Neither the Issuer nor any of its affiliates (as defined in Rule 501(b) of Regulation D promulgated under the Securities Act), or any Person acting on its or their behalf, has engaged directly or indirectly in any form of general solicitation or general advertising (within the meaning of Rule 502(c) of Regulation D) in connection with the offering, issuance, and sale of the Notes in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act.

**5.18    No Default**. No Default or Event of Default exists or would result from the incurring of any Obligations by any Note Party or the grant or perfection of the Junior DIP Collateral Agent's Liens on the Collateral, except for Defaults and Events of Default occasioned by the filing of the Chapter 11 Cases and Defaults and Events of Default resulting from obligations with respect to which the Bankruptcy Code prohibits the Note Parties from complying or permits the Note Parties not to comply.  No Note Party and no Subsidiary of any Note Party is in default under or with respect to any Contractual Obligation in any respect which, individually or together with all such defaults, would reasonably be expected to have a Material Adverse Effect, except for Defaults and Events of Default resulting from obligations with respect to which the Bankruptcy Code prohibits the Note Parties from complying or permits the Note Parties not to comply.

**5.19    Bankruptcy Matters**.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice, to the extent given or required to be given prior to the date hereof, was given for (x) the motions seeking approval of the Note Documents and the Interim Order and Final Order, (y) the hearings for the approval of the Interim Order, and (z) the hearings for the approval of the Final Order.

(b)    From and after the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expenses in the Chapter 11 Cases having priority over all administrative expenses and unsecured claims against the Note Parties as set forth in the DIP Orders.

(c)     From and after the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected lien on all of the Collateral, subordinated only as set forth in the DIP Orders.

(d)     The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended without the Required Purchasers' consent in their sole discretion.

## 6.    <u>REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS</u>

Each Purchaser, severally and not jointly, represents and warrants to the Issuer as of the Closing Date and as of the date such Person becomes a Purchaser, as follows:

**6.1    Organization and Good Standing**. Such Purchaser is an entity duly organized and validly existing and in good standing under the laws of the jurisdiction of its organization and has full power and authority under its organizational documents and under the laws of the jurisdiction of its organization to enter into this Agreement and perform its obligations hereunder.

**6.2    Power and Authority; Due Authorization**. Such Purchaser (a) has all necessary power and authority to (i) execute and deliver this Agreement and the other Note Documents to which it is a party and (ii) perform its obligations under this Agreement and the other Note Documents to which it is a party and (b) has duly authorized by all necessary organizational action the execution, delivery, and performance of, and the consummation of the transactions provided for in, this Agreement and the other Note Documents to which it is a party.

**6.3    Binding Obligations**. This Agreement and each of the other Note Documents to which such Purchaser is a party, when executed and delivered by such Purchaser and each other party thereto (and, with respect to the Notes, when issued against payment of the Purchase Consideration therefor), will constitute legal, valid, and binding obligations of such Purchaser, enforceable against such Purchaser in accordance with their respective terms, except (i) as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or other similar laws affecting the enforcement of creditors' rights generally and (ii) as such enforceability may be limited by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

**6.4    No Conflict or Violation**. The execution, delivery, and performance of, and the consummation of the transactions contemplated by, this Agreement and the other Note Documents to which such Purchaser is a party will not (a) conflict with, result in any breach of any of the terms or provisions of, or constitute (with or without notice or lapse of time or both) a default under its organizational documents or any indenture, sale agreement, credit agreement, loan agreement, security agreement, mortgage, deed of trust, or other agreement or instrument to which such Purchaser is a party or by which it or any of its properties is bound, (b) result in the creation or imposition of any Lien upon any of the Collateral pursuant to the terms of any such indenture, sale agreement, credit agreement, loan agreement, security agreement, mortgage, deed of trust, or other agreement or instrument (other than this Agreement and the other Note Documents), or (c) conflict with or violate any Applicable Law, except, in the case of each of the foregoing <u>clauses (a)</u> through

(c), to the extent that any such conflict, breach, default, Lien, or violation, as applicable, would not reasonably be expected to have a material adverse effect on the ability of such Purchaser to perform its obligations (taken as a whole) under this Agreement or any other Note Document to which it is a party or the validity or enforceability of this Agreement or any other Note Document.

      **6.5**     **Litigation and Other Proceedings**. Except for the Chapter 11 Cases, (a) there is no action, suit, proceeding, or investigation pending or, to the knowledge of such Purchaser, threatened in writing, against such Purchaser before any Governmental Authority and (b) such Purchaser is not subject to any order, judgment, decree, injunction, stipulation, or consent order of or with any Governmental Authority that, in the case of either of the foregoing clauses (a) and (b), (i) asserts the invalidity or unenforceability of this Agreement or any other Note Document, (ii) seeks to prevent the consummation of any of the transactions contemplated by this Agreement or any other Note Document, (iii) seeks any determination or ruling that could materially and adversely affect the performance by such Purchaser of its obligations under this Agreement or any other Note Document, or (iv) individually or in the aggregate for all such actions, suits, proceedings, and investigations would reasonably be expected to have a material adverse effect on the ability of such Purchaser to perform its obligations (taken as a whole) under this Agreement or any other Note Document to which it is a party or the validity or enforceability of this Agreement or any other Note Document.

      **6.6**     **Government Approvals**. Except where the failure to obtain or make such authorization, consent, order, approval, or action would not reasonably be expected to have a material adverse effect on the ability of such Purchaser to perform its obligations (taken as a whole) under this Agreement or any other Note Document to which it is a party or the validity or enforceability of this Agreement or any other Note Document, all authorizations, consents, orders, and approvals of, or other actions by, any Governmental Authority that are required to be obtained by such Purchaser in connection with the due execution, delivery, and performance by such Purchaser of this Agreement or any other Note Document to which it is a party and the consummation by such Purchaser of the transactions contemplated by this Agreement and the other Note Documents to which it is a party have been obtained or made and are in full force and effect, except for such authorizations, consents, orders, approvals, or actions (a) as have been obtained or made, (b) as may be required under applicable state securities laws in connection with the issuance and sale of the Notes, or (c) to perfect the Junior DIP Collateral Agent's security interests granted hereby and any financing statements related thereto.

      **6.7**     **Evaluation of Risks**. Such DIP Note Purchaser has such knowledge and experience in financial, tax, and business matters as to be capable of evaluating the merits and risks of, and bearing the economic risks entailed by, an investment in the Notes of protecting its interests in connection with the transactions contemplated hereby. Such DIP Note Purchaser acknowledges and agrees that its investment in the Issuer involves a high degree of risk, and that such DIP Note Purchaser may lose all or a part of its investment.

      **6.8**     **No Legal, Investment, or Tax Advice from the Issuer**. Such DIP Note Purchaser acknowledges that it had the opportunity to review the Note Documents and the transactions contemplated by the Note Documents with its own legal counsel and investment and tax advisors. Such DIP Note Purchaser is relying solely on such counsel and advisors and not on any statements or representations of the Issuer or any of the Issuer's representatives or agents for legal, tax,

investment or other advice with respect to such DIP Note Purchaser's acquisition of the Notes hereunder, the transactions contemplated by this Agreement and the other Note Documents, or the laws of any jurisdiction.

**6.9      Investment Purpose**. Such Purchaser is acquiring the Notes for its own account, for investment purposes, and not with a view towards, or for resale in connection with, the public sale or distribution thereof, in violation of the Securities Act or any applicable state securities laws. Such Purchaser agrees not to sell, hypothecate, or otherwise transfer the Notes except pursuant to a registration statement in which the resale of such securities is registered under the Securities Act and in a manner in compliance with all applicable federal and state securities laws, rules, and regulations, or unless, in the opinion of counsel satisfactory to the Issuer, an exemption from such registration is available. Such Purchaser does not presently have any agreement or understanding, directly or indirectly, with any Person to sell or distribute any of the Notes. Such Purchaser is acquiring the Notes hereunder in the ordinary course of its business.

**6.10      Accredited Investor**. Such DIP Purchaser is an institutional "accredited investor" as that term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

**6.11      Reliance on Exemptions**. Such DIP Note Purchaser understands that the Notes are being offered and sold to it in reliance on specific exemptions from the registration requirements of U.S. federal and state securities laws and are characterized as "restricted securities" under the U.S. federal securities laws. Such DIP Note Purchaser is purchasing the Notes as principal for its own account, not for the benefit of any other person, for investment only and not with a view to the resale or distribution of all or any of the Notes. If such DIP Note Purchaser is resident in a jurisdiction of Canada, it is an "accredited investor," as such term is defined in National Instrument 45-106 *Prospectus Exemptions* ("**NI 45-106**") or, where applicable, section 73.3 (1) of the *Securities Act* (Ontario), it was not created and is not being used solely to purchase or hold securities as an accredited investor as described in paragraph (m) of the definition of "accredited investor" in NI 45-106 and has concurrently executed and delivered an accredited investor representation letter certifying its status as an accredited investor (the "**Representation Letter**") and specifically represents and warrants that one or more of the categories set forth in the Representation Letter correctly, and in all respects, describes such DIP Note Purchaser, and will describe such DIP Note Purchaser as at the Closing Date and such DIP Note Purchaser has so indicated by initialling next to the category in such Representation Letter which so describes it. Such DIP Note Purchaser understands that the Issuer is relying in part upon the truth and accuracy of, and such DIP Note Purchaser's compliance with, the representations, warranties, agreements, acknowledgments, and understandings of such DIP Note Purchaser set forth herein and in the other Note Documents in order to determine the availability of such exemptions and the eligibility of such DIP Note Purchaser to acquire the Notes.

**6.12      No Governmental Review**. Such DIP Note Purchaser understands that no U.S. federal or state agency or any other Governmental Authority has passed on or made any recommendation or endorsement of the Notes or the fairness or suitability of an investment in the Notes, nor have such authorities passed upon or endorsed the merits of the offering of the Notes. In addition, such DIP Note Purchaser acknowledges that: (a) there are restrictions on such DIP Note Purchaser's ability to resell the Notes and it is the responsibility of such DIP Note Purchaser to find out what those restrictions are and to comply with them before selling the Notes; (b) if such

DIP Note Purchaser is located in Canada, the Issuer has advised such DIP Note Purchaser that the Issuer is relying on an exemption from the requirements to provide such DIP Note Purchaser with a prospectus under the *Securities Act* (Ontario) and other applicable securities laws of each other province and territory of Canada, as applicable, and, as a consequence of acquiring securities pursuant to this exemption, certain protections, rights and remedies provided by the *Securities Act* (Ontario) and any other applicable securities laws of each other province and territory of Canada, including statutory rights of rescission or damages, will not be available to such DIP Note Purchaser; and (c) any certificates representing the Notes that are purchased by any Canadian Purchasers will be endorsed with a legend stating that such securities will be subject to restrictions on resale in accordance with applicable Canadian securities legislation.

6.13    **Information**. Such DIP Note Purchaser and its advisors (including its counsel), if any, have been furnished with all materials relating to the business, finances, and operations of the Issuer and information such DIP Note Purchaser deemed material to making an informed investment decision. Such DIP Note Purchaser and its advisors (including its counsel), if any, have been afforded the opportunity to ask questions of the Issuer and its management and have received answers to such questions and conducted and completed their own independent due diligence. Based on the information such DIP Note Purchaser has deemed appropriate, it has independently made its own analysis and decision to invest in the Notes and to enter into the Note Documents. Such DIP Note Purchaser acknowledges and agrees that the Issuer has not made to such DIP Note Purchaser, and such DIP Note Purchaser acknowledges and agrees it has not relied upon, any representations and warranties of the Issuer, its employees, or any third party other than the representations and warranties of the Issuer contained in this Agreement.

6.14    **Not an Affiliate**. Except as disclosed publicly in the Chapter 11 Cases, such DIP Note Purchaser is not an officer, director, or a person that, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the Issuer or any "affiliate" of the Issuer (as that term is defined in Rule 405 promulgated under the Securities Act).

6.15    **No Prior Short Sales**. At no time prior to the date of this Agreement has such DIP Note Purchaser, any of its Affiliates, or any of their respective directors, officers, or any entity managed or controlled by such DIP Note Purchaser or any of its Affiliates, engaged in or effected, in any manner whatsoever, directly or indirectly, for its own principal account, any (i) "short sale" (as such term is defined in Rule 200 of Regulation SHO of the Exchange Act) of the Common Stock or (ii) hedging transaction, which establishes a net short position with respect to the Common Stock that remains in effect as of the date of this Agreement.

6.16    **General Solicitation**. Such DIP Note Purchaser is not purchasing or acquiring the Notes as a result of, and neither such DIP Note Purchaser nor any of its Affiliates, nor any person acting on its or their behalf, has engaged or will engage in, any form of general solicitation or general advertising (within the meaning of Regulation D promulgated under the Securities Act) in connection with any offer or sale of the Notes.

6.17    **ERISA**. Such DIP Note Purchaser is not, and is not acquiring or holding the Notes for or on behalf of, or with the assets of, an entity deemed to hold "plan assets" within the meaning of Section 3(42) of ERISA and (b) neither the execution of this Agreement or any other Note

Document nor the undertaking of any of the transactions contemplated hereunder or thereunder will give rise to a non-exempt prohibited transaction within the meaning of Section 406 of ERISA or Section 4975 of the Internal Revenue Code or a violation of any applicable similar law.

## 7.    **AFFIRMATIVE COVENANTS**

So long as any Obligations (other than inchoate indemnification obligations) remain outstanding:

### 7.1    **Financial Reporting; Notices**.

The Issuer shall deliver to the DIP Note Purchasers:

(a)    within three Business Days after delivering any reporting, notice, waiver, consent, modification, amendment or material information to the Senior Finance Agents or the Senior Financing Lenders, a copy of such document;

(b)    within three (3) days after the same are sent or received) copies of all material correspondence, reports, documents and other filings with any Governmental Authority that could reasonably be expected to have a material adverse effect on any of the Governmental Approvals material to Issuer's business or that otherwise could reasonably be expected to have a Material Adverse Change;

(c)    at least ten (10) days' prior to Issuer's creation of a new Subsidiary;

(d)    at least twenty (20) days' prior to Issuer's or Subsidiaries (A) changing its respective jurisdiction of organization, (B) changing its organizational structure or type, (C) changing its respective legal name, or (D) changing any organizational number(s) (if any) assigned by its respective jurisdiction of organization;

(e)    promptly (and in any event within three (3) Business Days) upon Issuer becoming aware of the existence of any Default or Event of Default, notice of such occurrence, which such notice shall include a reasonably detailed description of such Event of Default or event which, with the giving of notice or passage of time, or both, would constitute an Event of Default, and Issuer's proposal regarding how to cure such Event of Default or event;

(f)    within one Business Day, the (x) occurrence of any Default or Event of Default under the Pre-Petition Financing Debt Documents (each as defined therein), (y) notice of any material amendment to any Pre-Petition Financing Debt Document and (z) any material notice, waiver, consent, modification, amendment or other material information delivered to the Pre-Petition Financing Agent or the Lenders (as defined in the Pre-Petition Financing Credit Agreement);

(g)    as soon as available, but not later than the date such reports or certificates are required to be delivered pursuant to the terms of the DIP Orders, copies of all other reports and certificates required to be delivered by the Note Parties pursuant to the terms of the DIP Orders;

(h)        within one Business Day, the (x) occurrence of any Default or Event of Default under the DIP Financing Debt Documents (each as defined therein), (y) notice of any material amendment to any DIP Financing Debt Document and (z) any material notice, waiver, consent, modification, amendment or other material information delivered to the DIP Financing Agent or the Lenders (as defined in the DIP Financing Credit Agreement); and

(i)        prompt written notice of any material litigation or governmental proceedings pending or threatened (in writing) against Issuer or any of its Subsidiaries.

7.2     **Security Interest, Etc.** The Issuer shall take all action reasonably necessary to establish and maintain a perfected security interest in the Collateral, in each case, free and clear of any Lien except for Liens permitted to exist under this Agreement or the other Note Documents, in favor of the Junior DIP Collateral Agent (on behalf of the Secured Parties), including taking such action to perfect or more fully evidence the security interest of the Junior DIP Collateral Agent (on behalf of the Secured Parties) as the Junior DIP Collateral Agent or any Secured Party may reasonably request, in each case, consistent with the terms of this Agreement or the other Note Documents. In order to evidence the security interests of the Junior DIP Collateral Agent under this Agreement, the Issuer shall, from time to time, take such action or execute and deliver such instruments as may be reasonably necessary to maintain and perfect, as a security interest, the Junior DIP Collateral Agent's security interest in the Collateral. The Junior DIP Collateral Agent's approval of such instruments shall authorize the Issuer to make any necessary filings under the Code without the signature of the Issuer or the Junior DIP Collateral Agent where allowed by Applicable Law.

7.3     **Taxes**. The Issuer will timely file, and require each of its Subsidiaries to timely file (or obtain timely extensions therefor), all required material tax returns, and timely pay, and require each of its Subsidiaries to timely pay, all material foreign, federal, state, and local taxes, assessments, and other governmental charges owed by Issuer or its Subsidiaries, except to the extent failing to do so would not constitute a breach of the representation in Section 5.15 hereof; deliver to the DIP Note Purchasers, on reasonable demand, appropriate certificates attesting to such payments; and pay all amounts necessary to fund all present pension, profit sharing and deferred compensation plans in accordance with the terms of such plans.

7.4     **Insurance**. The Issuer will keep the Issuer's and its Subsidiaries' business and the Collateral insured for risks and in amounts standard for companies in Issuer's and its Subsidiaries' industry and location and as the Required Purchasers may reasonably request. Insurance policies shall be in a form, with companies, and in amounts that are reasonably satisfactory to the DIP Note Purchasers. All property policies shall have a lender's loss payable endorsement showing the Junior DIP Collateral Agent (for the ratable benefit of the Secured Parties) as lender loss payee and shall waive subrogation against the Junior DIP Collateral Agent, and all liability policies shall show, or have endorsements showing, the Junior DIP Collateral Agent (for the ratable benefit of the Secured Parties), as additional insured. Subject to Section 2.4, the Junior DIP Collateral Agent shall be named as lender loss payee and/or additional insured with respect to any such insurance providing coverage in respect of any Collateral, and each provider of any such insurance shall agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to the DIP Note Purchasers, that it will give the Junior DIP Collateral Agent 30 days

43

(and 10 days for nonpayment of premium) prior written notice before any such policy or policies shall be canceled. At the reasonable request of the Required Purchasers, the Issuer shall deliver to the DIP Note Purchasers certified copies of policies and evidence of all premium payments. Subject to the Pre-Petition Intercreditor Agreement, proceeds payable under any policy shall, at the option of the Required Purchasers, be payable to the Junior DIP Collateral Agent, for the ratable benefit of the Secured Parties, on account of the then-outstanding Obligations. If the Issuer or any of its Subsidiaries fails to obtain insurance as required under this Section 7.4 or to pay any amount or furnish any required proof of payment to third persons, the Junior DIP Collateral Agent may make (but has no obligation to do so), at the Issuer's expense, all or part of such payment or obtain such insurance policies required in this Section 7.4, and take any action under the policies the Junior DIP Collateral Agent (at the direction of the Required Purchasers) deems prudent.

7.5    **Use of Proceeds**. The Issuer shall use the proceeds from the issuance of the Notes solely in accordance with the Approved Budget and the DIP Orders.

7.6    **Budget Testing**.

Subject to the terms and conditions set forth below, no Note Party shall, nor shall it permit any of its Subsidiaries to make any payment or otherwise disburse any funds or fail to collect revenues or funds in an amount, in each case, in a manner such that the unrestricted cash and Cash Equivalents of the Note Parties and their Subsidiaries is less than the amount set forth in each Approved Budget for any Budget Testing Period, subject to the Permitted Variance; provided that this provision shall disregard non-recurring one-time receipts and disbursements.

The DIP Note Purchasers (i) may assume that the Note Parties will comply with the Approved Budget to the extent required by this clause (s) and shall have no duty to monitor such compliance and (ii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to the Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to the Secured Parties are estimates only, and the Note Parties remain obligated to pay any and all Obligations in accordance with the terms of the Note Documents. Nothing in the Approved Budget shall constitute an amendment or other modification of this Agreement or any of such restrictions or other lending limits set forth therein.

7.7    **Bankruptcy Court Filings**.

As soon as practicable in advance of filing with the Bankruptcy Court, the Note Parties shall provide each DIP Note Purchaser with copies of (i) the motion seeking approval of and proposed forms of the Interim Order and the Final Order, which motion shall be in form and substance reasonably satisfactory to the Purchasers' Representative, and which orders shall be in form and substance satisfactory to the Required Purchasers in their sole discretion, (ii) the Bid Procedures Motion, which motion shall be in form and substance reasonably satisfactory to the Required Purchasers, and the proposed form of the Bid Procedures Order, which order shall be in form and substance satisfactory to Purchasers' Representative in its sole discretion (and to the extent affecting the rights, duties, benefits, privileges, protections, indemnities or immunities of the Junior DIP Collateral Agent, the Junior DIP Collateral Agent), (iii) all other proposed orders and pleadings related to the financing contemplated hereunder, which orders and pleadings shall

44

be in form and substance satisfactory to the Purchasers' Representative, (iv) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan or disclosure statement shall comply with the requirements set forth herein), which plan of reorganization or liquidation and any related disclosure statement shall be in form and substance satisfactory to the Required Purchasers (and to the extent affecting the rights, duties, benefits, privileges, protections, indemnities or immunities of the Junior DIP Collateral Agent, the Junior DIP Collateral Agent), (v) any motion, and proposed form of order, seeking to extend or otherwise modify the Note Parties' exclusive periods set forth in section 1121 of the Bankruptcy Code, which motion and proposed order shall be in form and substance satisfactory to the Purchasers' Representative, (vi) any motion, other than the Bid Procedures Motion, seeking approval of any sale of any Note Party's assets, which motion shall be in form and substance acceptable to the Purchasers' Representative and any proposed form of a bidding procedures order and sale order, which orders shall be in form and substance satisfactory to the Required Purchasers (and to the extent affecting the rights, duties, benefits, privileges, protections, indemnities or immunities of the Junior DIP Collateral Agent, the Junior DIP Collateral Agent) in their respective sole discretion and (vii) any motion and proposed form of order filed with the Bankruptcy Court relating to the assumption, rejection, modification or amendment of any employment agreement, or the assumption, rejection, modification or amendment of any material contract, each of which motions and orders must be in form and substance satisfactory to the Purchasers' Representative in its sole respective sole discretion.

### 7.8    Bankruptcy Covenants.

Notwithstanding anything in the Note Documents to the contrary, the Note Parties shall comply with all covenants, terms and conditions and otherwise perform all obligations set forth in the DIP Orders.

### 7.9    Chapter 11 Cases.

In connection with the Chapter 11 Cases, the Note Parties shall give the proper notice for (i) the motions seeking approval of the Note Documents and the Interim Order and Final Order, (ii) the hearings for the approval of the Interim Order, (iii) the hearings for the approval of the Final Order, (iv) the motions seeking approval of the sale of all or substantially all of the assets or the Equity Interests of the Note Parties and (v) the hearings for the approval of the sale of all or substantially all of the assets or the Equity Interests of the Note Parties.  The Note Parties shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

### 7.10    Sales Process Timeline.

The Note Parties shall timely comply with the sale process milestones set forth in the DIP Orders and shall incorporate such milestones into a bidding procedures motion and order, each of which shall be in form and substance acceptable to the Purchasers' Representative (the "**Bid Procedures Motion**" and "**Bid Procedures Order**", respectively).  Promptly upon receipt by any Note Party, such Note Party shall deliver to each DIP Note Purchaser copies of all written indications of interest in the sale (by proposal, letter of intent or otherwise), term sheets, asset purchase agreements and other documents from prospective bidders, other interested parties or

their representatives, and such other information and documents as any DIP Note Purchaser may from time to time request.

**7.11    Payment of Issuer Obligations.**

To the extent permitted by the DIP Orders, each Note Party shall, and shall cause each of its Subsidiaries to, pay or discharge before they become delinquent (a) all material Post-Petition claims, taxes, assessments, charges and levies imposed by any Governmental Authority and (b) all other lawful Post-Petition claims, in each case, that if unpaid would, by the operation of applicable Requirements of Law, become a Lien upon any property of any Note Party, except, in each case, for those whose amount or validity is being contested in good faith by proper proceedings diligently conducted and for which adequate reserves are maintained on the books of the Note Parties in accordance with GAAP.

## 8.    <u>NEGATIVE COVENANTS</u>

So long as any principal of or interest on the Notes or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations), each Note Party shall not, unless the Required Purchasers shall otherwise consent in writing:

**8.1    Fundamental Changes; Dispositions.**

(a)    Wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, including by means of a "plan of division" under the Delaware Limited Liability Company Act or any comparable transaction under any similar law, or permit any of its Subsidiaries to do any of the foregoing; *provided, however,* that, to the extent permitted by the DIP Orders and consistent with the Approved Budget, any wholly owned Subsidiary of any Note Party may be merged into such Note Party or another wholly owned Subsidiary of such Note Party, or any Note Party may consolidate or amalgamate with another wholly owned Subsidiary of such Note Party, so long as (A) no other provision of this Agreement or the DIP Orders would be violated thereby, (B) such Note Party gives the Junior DIP Collateral Agent at least 30 days' prior written notice of such merger, consolidation or amalgamation accompanied by true, correct and complete copies of all material agreements, documents and instruments relating to such merger, consolidation or amalgamation, including the certificate or certificates of merger or amalgamation or other documents to be filed with each appropriate Secretary of State or equivalent authority (with a copy as filed promptly after such filing), (C) no Default or Event of Default shall have occurred and be continuing either before or after giving effect to such transaction, (D) the DIP Note Purchaser's rights in any Collateral, including the existence, perfection and priority of any Lien thereon, are not adversely affected by such merger, consolidation or amalgamation and (E) the surviving or amalgamated Subsidiary, if any, if not already a Note Party, delivers a guaranty and a pledge and security agreement, in each case, satisfactory to the Junior DIP Collateral Agent (at the direction of the Required Purchasers), which is in full force and effect on the date of and immediately after giving effect to such merger, consolidation or amalgamation, and in the case of any amalgamation, together with (w) an officer's certificate from an authorized officer of the surviving or amalgamated Subsidiary, (x) resolutions of the board of directors (or equivalent governing

12640916-7

body) of the surviving or amalgamated Subsidiary, (y) an opinion letter from counsel to such surviving or amalgamated Subsidiary opining as to such matters as the Junior DIP Collateral Agent (at the direction of the Required Purchasers) may reasonably request and (z) such lien filings as the Junior DIP Collateral Agents (at the direction of the Required Purchasers) may reasonably request, and (F) in the case of any such merger or consolidation involving the Issuer, the Issuer shall be the continuing or surviving entity.

       (b)    Make any Disposition, whether in one transaction or a series of related transactions, of all or any part of its business, property or assets, whether now owned or hereafter acquired (or agree to do any of the foregoing) (including issuances of Equity Interests by Subsidiaries that do not result in a Change of Control and Dispositions of interests in Subsidiaries), or permit any of its Subsidiaries to do any of the foregoing; *provided, however*, that any Note Party and its Subsidiaries may make Permitted Dispositions to the extent permitted by the DIP Orders and the Approved Budget.

       **8.2**    **Mergers or Acquisitions**. The Issuer shall not consolidate with or merge with or into, or (directly, or indirectly through one or more of the Issuer's Subsidiaries) sell, lease, or otherwise transfer, in one transaction or a series of transactions, all or substantially all of the assets of the Issuer and its Subsidiaries, taken as a whole, to another Person (a "**Business Combination Event**"), unless: (a) the resulting, surviving, or transferee Person either (x) is the Issuer or (y) if not the Issuer, is a corporation (the "**Successor Corporation**") duly organized and existing under the laws of the United States of America, any state thereof, or the District of Columbia that expressly assumes all of the Issuer's obligations under this Agreement and the other Note Documents; (b) immediately after giving effect to such Business Combination Event, no Default or Event of Default will have occurred and be continuing; and (c) such Business Combination Event is permitted by the DIP Orders; *provided* that the Issuer and its Subsidiaries may undertake any merger, consolidation, or other similar transaction involving any Subsidiaries of the Issuer for *bona fide* tax planning purposes so long as such merger, consolidation, or other transaction does not have any adverse effect (other than *de minimis* adverse effects) on the DIP Note Purchasers. At the effective time of any Business Combination Event that complies with this <u>Section 8.2</u>, the Successor Corporation (if not the Issuer) will succeed to, and may exercise every right and power of, the Issuer under this Agreement and the other Note Documents with the same effect as if such Successor Corporation had been named as the Issuer in this Agreement and the other Note Documents, and, the predecessor Issuer will be discharged from its obligations under this Agreement and the other Note Documents.

       **8.3**    **Incurrence of Indebtedness and Issuance of Preferred Stock**.The Issuer shall not, and shall not permit any of its Subsidiaries to, create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to, or permit any of its Subsidiaries to create, incur, assume, guarantee or suffer to exist or otherwise become or remain liable with respect to, any Indebtedness (including, for certainty, any Indebtedness incurred on a contingent basis) other than Permitted Indebtedness to the extent permitted by the DIP Orders and consistent with the Approved Budget.

       **8.4**    **Incurrence of Liens**. The Issuer shall not, and shall not permit any of the Guarantors to, incur any Lien (other than Permitted Liens to the extent permitted by the DIP Orders and consistent with the Approved Budget) on any asset or property of the Issuer or such Guarantor.

**8.5    Restricted Payments**. The Issuer shall not, and shall not permit any of its Subsidiaries to, make or effect or permit any of its Subsidiaries to make or effect any Restricted Payment other than, to the extent permitted by the DIP Orders and consistent with the Approved Budget, Permitted Restricted Payments.

**8.6    Transactions with Affiliates**. The Issuer shall not, and shall not permit any of its Subsidiaries to enter into, renew, extend or be a party to, or permit any of its Subsidiaries to enter into, renew, extend or be a party to, any Affiliate Transaction, other than, to the extent permitted by the DIP Orders and the Approved Budget, (i) any transactions solely between or among the Issuer and/or any of its Subsidiaries (or an entity that becomes a Subsidiary as a result of such transaction), (ii) any transactions with any DIP Note Purchaser in such DIP Note Purchaser's position as a holder of Notes, or (iii) any transactions in connection with the transactions contemplated by the Bird Canada Share Purchase Agreement, unless such transaction is on terms that are no less favorable to the Issuer or the relevant Subsidiary than those that could have been obtained in a comparable transaction by the Issuer or such Subsidiary with an unrelated Person on an arm's-length basis (as determined in good faith by the Issuer) and, to the extent permitted by the DIP Orders and the Approved Budget:

(1)    with respect to any such transaction or series of related transactions involving aggregate consideration in excess of $1.0 million, the transaction has been approved by a resolution adopted by a majority of the disinterested members of the Board of Directors.

**8.7    Anti-Layering**. For so long as the Notes are secured by a Lien with a junior priority to the Lien securing the Senior Financing Debts, the Issuer will not create, incur, assume, or suffer to exist any Indebtedness that is contractually subordinated or junior in right of payment to the Senior Financing Debts and senior in right of payment to the Notes. No such Indebtedness will be considered to be contractually subordinated or junior in right of payment to the Senior Financing Debts by virtue of being unsecured or by virtue of being secured on a junior-priority basis.

**8.8    Hedging Agreements**. The Issuer shall not, and shall not permit any of its Subsidiaries to, enter into any Hedging Agreement other than, to the extent permitted by the DIP Orders and the Approved Budget, Hedging Agreements entered into in the ordinary course of business for hedging actual foreign exchange requirements in the following six months and actual interest rate or foreign exchange exposure in connection with financing agreements and not for speculative purposes.

**8.9    KEIP Plan**.

No Note Party shall, and no Note Party shall permit any of its Subsidiaries to, enter into any key employee incentive or retention plan, or other similar plan or agreement (any such agreement, a "**KEIP**"), unless such KEIP has been approved in writing by the Required Purchasers.

**8.10    Chapter 11 Claims**.

None of the Note Parties will, and none will permit any of its Subsidiaries to, incur, create, assume, suffer to exist or permit (other than those existing, and disclosed to the DIP Note

Purchasers, on the date hereof) any administrative expense, unsecured claim, or other super-priority claim or lien (except for the Carve-Out and Prepetition Prior Liens to the extent such liens had priority over the liens granted under the Pre-Petition Financing Credit Agreement) that are pari passu with or senior to the administrative expenses or the claims of the Secured Parties against the Note Parties hereunder, or apply to the Bankruptcy Court for authority to do so.

**8.11    Critical Vendor and Other Payments**.

None of the Note Parties shall, and none will permit any of its Subsidiaries to, make (i) any pre-petition "critical vendor" payments or other payments on account of any creditor's pre-petition unsecured claims, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except, in each case, in amounts and on terms and conditions that are permitted by the Approved Budget and by the DIP Orders.

## 9.    EVENTS OF DEFAULT

Any one of the following shall constitute an event of default (an "**Event of Default**") under this Agreement:

**9.1    Payment Default**. The Issuer or any other Note Party shall fail to pay, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), (i) any interest on, any Note or any fee, indemnity or other amount payable under this Agreement (other than any portion thereof constituting principal of the Notes) or any other Note Document, or (ii) all or any portion of the principal of the Notes.

**9.2    [reserved]**.

**9.3    Other Default**. The Issuer or any other Note Party fails to perform or comply with any term, covenant or agreement contained in any Note Document to be performed or observed by it and such failure, if capable of being remedied, shall remain unremedied for 5 days after the earlier of actual knowledge by any Note Party of such failure and the date written notice of such default shall have been given by any DIP Note Purchaser to such Note Party.

**9.4    Cross-Default**. Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits the Note Parties from complying or permits the Note Parties not to comply, the Issuer or any of its Subsidiaries shall fail to pay when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) any principal, interest or other amount payable in respect of any Material Indebtedness, and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or any other default under any agreement or instrument relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable grace or cure period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment),

redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof.

**9.5    [reserved]**.

**9.6    Note Documents.** Any material provision of any Note Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Note Party intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by any Note Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Note Party shall deny in writing that it has any liability or obligation purported to be created under any material Note Document.

**9.7    Collateral**. Any Note Document or Pre-Petition Note Document covering a material portion of the Collateral for any reason (other than pursuant to the terms thereof) ceases to create a valid and perfected Lien on, and security interest in, any material portion of the Collateral covered thereby with respect to the Notes, subject to Permitted Liens, except to the extent that any such perfection or priority is not required pursuant to the Note Documents or results from the failure of the Junior DIP Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Note Documents.

**9.8    Judgments**. One or more final, non-appealable Post-Petition monetary judgments, orders or awards (or any settlement of any litigation or other proceeding that, if breached, could result in a judgment, order or award) for the payment of money exceeding $1.0 million in the aggregate (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has been notified and has not denied coverage) shall be rendered against the Issuer or any of its Subsidiaries and remain unsatisfied and (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement or (ii) there shall be a period of 30 consecutive days after entry thereof during which (A) a stay of enforcement thereof is not be in effect or (B) the same is not vacated, discharged, stayed or bonded.

**9.9    Material Adverse Effect**. A Material Adverse Effect shall occur with respect to any Note Party.

**9.10    Change of Control**. A "Change of Control" as defined in the Senior Finance Agreements occurs.

**9.11    Certain Grants**.

The holders of all or any part of the Indebtedness arising under the Senior Financing Credit Agreements shall be granted adequate protection other than as consented to by the DIP Note Purchasers or as set forth in the DIP Orders.

**9.12    Bankruptcy Defaults**.

The occurrence of any of the following in the Chapter 11 Cases:

(a)      the payment by the Note Parties of expenses (A) in excess of the amounts permitted by Section 7.6, or (B) otherwise in violation of the terms and conditions of Section 7.6;

(ii)      obtaining after the Petition Date credit or incurring Indebtedness that is (i) secured by a security interest, mortgage or other lien on all or any portion of Collateral which is equal or senior to any security interest, mortgage or other lien of the Junior DIP Collateral Agent, or (ii) entitled to priority administrative status which is equal or senior to that granted to the Junior DIP Collateral Agent in the DIP Orders, unless used to indefeasibly repay the Obligations in full in cash;

(iii)      the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by the Note Parties in the Chapter 11 Cases, or the entry of an order (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code from any Person other than the DIP Note Purchasers not otherwise permitted by this Agreement, or (B) to authorize any Person to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (C) except as provided in the DIP Orders, to use Cash Collateral without the Purchasers Representatives' prior written consent under section 363(c) of the Bankruptcy Code or (D) except as provided in the DIP Orders, to grant any lien other than Permitted Liens upon or affecting any Collateral;

(iv)      the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(v)      any failure by the Note Parties to make adequate protection payments or other payments to the Pre-Petition Collateral Agent or Pre-Petition Secured Parties as set forth in the DIP Orders when due;

(vi)      any failure by the Credit Parties to perform, in any respect and subject to any applicable cure periods, any of the terms, provisions, conditions, covenants, or obligations under any DIP Order or a Termination Event under any DIP Order shall occur;

(vii)      the entry of an order which has not been withdrawn, dismissed or reversed (a) appointing an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner or other responsible person with expanded powers in the Chapter 11 Cases, (b) granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral in excess of $25,000 or (ii) with respect to any lien of or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority, (in each case with a value in excess of $250,000), (c) amending, supplementing, staying, reversing, vacating or otherwise modifying any of the Interim Order, the Final Order, this Agreement or any other Note Document, or any Secured Party's, Pre-Petition Collateral Agent's or Pre-Petition Secured Parties' rights, benefits, privileges or remedies under the  Interim Order, the Final Order, this Agreement, any other Note Document or any Pre-Petition Note Document or (d) approving a sale of any assets of any Note Party pursuant to section 363 of the Bankruptcy Code or approving bidding procedures therefor other than in each case as required in the DIP Orders;

(viii)    Note Parties consolidating or combining with any other Person except pursuant to a confirmed plan of reorganization with the prior written consent of the Required Purchasers;

(ix)    reversal, vacatur, or modification (without the express prior written consent of the Required Purchasers in their sole discretion) of any DIP Order or any provision thereof, or reversal, vacatur, or modification (without the express prior written consent of the Required Purchasers (under and as defined in the Pre-Petition Note Purchase Agreement) in their sole discretion) of any provision of any DIP Order directly and adversely affecting the rights of the Pre-Petition Secured Parties;

(x)    the challenge by the Note Parties (or the support by the Note Parties of the challenge by any other Person) to any Secured Party's, or any Pre-Petition Secured Party's, claim or the validity, extent, perfection, priority or characterization of any obligations incurred or liens granted under or in connection with the Pre-Petition Note Purchase Agreement;

(xi)    the challenge by the Note Parties (or the support by the Note Parties of the challenge by any other Person) to (a) disallow in whole or in part the claim of the Pre-Petition Secured Parties under the Pre-Petition Note Purchase Agreement or the claim of any Secured Party in respect of Obligations or to challenge the validity, perfection and enforceability of any of the liens in favor of any of them, or (b) equitably subordinate or re-characterize in whole or in part the claim of any Secured Party in respect of the Obligations or any Pre-Petition Secured Party in respect of the Pre-Petition Indebtedness, or in each case the entry of an order by the Bankruptcy Court granting the relief described above;

(xii)    the filing of a lawsuit, adversary proceeding, claim or counterclaim related to the Note Parties or Collateral or pre-petition collateral against any Secured Party or any Pre-Petition Secured Party by the Note Parties;

(xiii)    the application by the Note Parties for authority to make any Pre-Petition Payment not contemplated by the Approved Budget without the Required Purchasers' prior written consent;

(xiv)    the entry of an order in the Chapter 11 Cases avoiding or requiring disgorgement of any portion of the Pre-Petition Obligations;

(xv)    the use, remittance or the application of Collateral or proceeds of Collateral in contravention of the terms of the Note Documents or the DIP Orders;

(xvi)    the entry of an order in the Chapter 11 Cases authorizing procedures for interim compensation of professionals that is not in form and substance customary for the Southern District of Florida or otherwise not in form and substance acceptable to the Purchasers' Representative;

(xvii)    without the prior written consent of the Required Purchasers, the Note Parties incur, create, assume, suffer to exist or permit any superpriority claim in the Chapter 11 Cases that is pari passu with or senior to the claims of the Secured Parties, other than the Carve-Out;

(xviii)    the Bankruptcy Court enters an order (a) resulting in the marshaling of any Collateral, or (b) precluding the attachment of liens to Post-Petition property based on the "equities of the case" under Section 552(b) of the Bankruptcy Code;

12640916-7

(xix)    the Note Parties requesting or seeking authority for or entry of an order that approves or provides authority to take any other action or actions adverse to any Secured Party or its rights and remedies under the Note Documents or its interest in the Collateral;

(xx)    the termination or modification of the Issuer's exclusivity as to the proposal of any plan or reorganization or liquidation; or

(xxi)    the change of venue of any of the Chapter 11 Cases from the Bankruptcy Court to any other court without the prior written consent of the Required Purchasers.

## 10.    RIGHTS AND REMEDIES

### 10.1    Rights and Remedies.

(a)    Upon the occurrence and during the continuance of any Event of Default, upon written notice thereof by the Required Purchasers (which such notice shall be made to the Issuer, the official committee(s) of creditors of the Note Parties and the United States Trustee for the Southern District of Florida and shall be referred to herein as a "Termination Declaration" and the date which is the earliest to occur of any such Termination Declaration (excluding the notice period) being herein referred to as the "**Termination Declaration Date**"), the Required Purchasers may, provided such Event(s) of Default are not cured by the Note Parties pursuant to the terms of this Agreement:

(i)    [reserved];

(ii)    declare all or any portion of the unpaid principal amount of all outstanding Notes, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Note Document to be immediately due and payable; without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Note Party; and/or

(iii)    subject to the terms of the Interim Order or Final Order, as applicable, direct the Junior DIP Collateral Agent to exercise all rights and remedies available to it and the DIP Note Purchasers under the Notes Documents or applicable law; provided, however, the Junior DIP Collateral Agent (or its designee) shall not credit bid any portion of the Obligations without the consent of the Purchasers' Representative.

In addition, five (5) Business Days following the Termination Declaration Date (such 5 Business Day period, the "**Remedies Notice Period**"), absent the Note Parties curing all such existing Events of Default during such Remedies Notice Period, the Junior DIP Collateral Agent shall have automatic relief from the automatic stay and may foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the Obligations, occupy the Note Parties' premises to sell or otherwise dispose of the Collateral or otherwise exercise remedies against the Collateral permitted by applicable non-bankruptcy law.  During the Remedies Notice Period, the Note Parties and any statutory committee shall be entitled to an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred.  Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing, the automatic stay, as to the DIP Note Purchasers and

the Junior DIP Collateral Agent, shall automatically terminate at the end of the Remedies Notice Period, without further notice or order.  During the Remedies Notice Period, the Note Parties may not use the proceeds of Loans hereunder, or other Collateral proceeds except to the limited extent permitted by the DIP Orders.

(b)    Subject to Section 10.1(a) above and subject to the terms of the DIP Orders, upon the occurrence and during the continuance of an Event of Default, the Required Purchasers may, without notice or demand, do any or all of the following:

(i)    direct the Junior DIP Collateral Agent to foreclose upon and/or sell or otherwise liquidate the Collateral;

(ii)    direct the Junior DIP Collateral Agent to make a demand for payment upon any Guarantor pursuant to the Guarantee delivered by such Guarantor;

(iii)    direct Junior DIP Collateral Agent to apply to the Obligations any (A) balances and deposits of Issuer that Junior DIP Collateral Agent or any DIP Note Purchaser holds or controls, (B) any amount held or controlled by Junior DIP Collateral Agent or any DIP Note Purchaser owing to or for the credit or the account of Issuer; and/or

(iv)    commence and prosecute an Insolvency Proceeding or consent to the Issuer commencing any Insolvency Proceeding.

(c)    Subject to Section 10.1(a) and subject to the terms of the DIP Orders, upon the occurrence and during the continuance of an Event of Default, the Junior DIP Collateral Agent shall have the right to, subject to the written direction of the Required Purchasers made in accordance with Exhibit C hereto, without notice or demand, do any or all of the following:

(i)    settle or adjust disputes and claims directly with Account Debtors for amounts on terms and in any order that Junior DIP Collateral Agent considers advisable, notify any Person owing Issuer money of Junior DIP Collateral Agent's security interest in such funds, and verify the amount of such account;

(ii)    make any payments and do any acts it considers necessary or reasonable to protect the Collateral and/or its Liens in the Collateral (held for the ratable benefit of the Secured Parties). Issuer shall assemble the Collateral if Junior DIP Collateral Agent requests and make it available at such location as Junior DIP Collateral Agent reasonably designates. Junior DIP Collateral Agent (or its designee) may enter premises where the Collateral is located, take and maintain possession of any part of the Collateral, and pay, purchase, contest, or compromise any Lien which appears to be prior or superior to its security interest and pay all expenses incurred. Issuer grants Junior DIP Collateral Agent a license to enter and occupy any of its premises, without charge, to exercise any of Junior DIP Collateral Agent's rights or remedies;

54

(iii)    ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, and/or advertise for sale, any of the Collateral. Junior DIP Collateral Agent is hereby granted a non-exclusive, royalty-free license or other right to use, without charge, Issuer's and each of its Subsidiaries' labels, patents, copyrights, mask works, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any similar property as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Junior DIP Collateral Agent's exercise of its rights under this <u>Section 10.1</u>, Issuer's and each of its Subsidiaries' rights under all licenses and all franchise agreements inure to Junior DIP Collateral Agent, for the benefit of the DIP Note Purchasers;

(iv)    place a "hold" on any Collateral Account maintained with Junior DIP Collateral Agent or any DIP Note Purchaser or otherwise in respect of which a Control Agreement has been delivered in favor of Junior DIP Collateral Agent (for the ratable benefit of the Secured Parties) and/or deliver a notice of exclusive control, any entitlement order, or other directions or instructions pursuant to any Control Agreement or similar agreements providing control of any Collateral;

(v)    demand and receive possession or copies of the Issuer's or any of its Subsidiaries' books and records;

(vi)    appoint a receiver to seize, manage, and realize any of the Collateral, and such receiver shall have any right and authority as any competent court will grant or authorize in accordance with any Applicable Law, including any power or authority to manage the business of the Issuer or any Guarantor;

(vii)    sell or otherwise dispose of all or any part of the Issuer Pledged Collateral at a public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Junior DIP Collateral Agent (at the direction of the Required Purchasers) shall deem appropriate; and

(viii)    subject to clauses <u>(a)</u> and <u>(b)</u> of this <u>Section 10.1</u>, exercise all rights and remedies available to the Junior DIP Collateral Agent and each DIP Note Purchaser under the Note Documents or at law or equity, including all remedies provided under the Code (including disposal of the Collateral pursuant to the terms thereof).

The Junior DIP Collateral Agent shall be authorized at any sale of securities (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to Persons who will represent and agree that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale the Junior DIP Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. The Junior DIP Collateral Agent shall give the Issuer no less than ten (10) days' prior written notice of the Junior DIP Collateral Agent's intention to make any sale of Collateral. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Junior DIP Collateral Agent may fix and state in the notice

(if any) of such sale. At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Junior DIP Collateral Agent (at the direction of the Required Purchasers) may (in their sole and absolute discretion) determine. The Junior DIP Collateral Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given. The Junior DIP Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Junior DIP Collateral Agent until the sale price is paid by the purchaser or purchasers thereof, but the Junior DIP Collateral Agent and the other Secured Parties shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice. At any public (or, to the extent permitted by law, private) sale made pursuant to this Agreement, any Secured Party may bid for or purchase, free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of the Issuer (all said rights being also hereby waived and released to the extent permitted by law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to such Secured Party from the Note Party as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to the Note Party therefor. As an alternative to exercising the power of sale herein conferred upon it, the Junior DIP Collateral Agent (at the direction of the Required Purchasers) may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. Any sale pursuant to the provisions of this Section 10.01 shall be deemed to in accordance with any requirements under the Code.

      **10.2    Power of Attorney**. Issuer hereby irrevocably appoints Junior DIP Collateral Agent as its lawful attorney-in-fact, exercisable upon the occurrence and during the continuance of an Event of Default and subject to a written direction from the Required Purchasers in accordance with Exhibit C, to: (a) endorse Issuer's or any of its Subsidiaries' name on any checks or other forms of payment or security; (b) sign Issuer's or any of its Subsidiaries' name on any invoice or bill of lading for any Account or drafts against Account Debtors; (c) settle and adjust disputes and claims about the Accounts of Issuer directly with the applicable Account Debtors, for amounts and on terms Junior DIP Collateral Agent determines reasonable; (d) make, settle, and adjust all claims under Issuer's insurance policies; (e) pay, contest or settle any Lien, charge, encumbrance, security interest, and adverse claim in or to the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; and (f) transfer the Collateral into the name of Junior DIP Collateral Agent or a third party as the Code or any applicable law permits (including by filing assignment agreements with the United States Patent and Trademark Office, United States Copyright Office or equivalent in any jurisdiction outside of the United States). Issuer hereby appoints Junior DIP Collateral Agent as its lawful attorney-in-fact to sign Issuer's or any of its Subsidiaries' name on any documents necessary to perfect or continue the perfection of Junior DIP Collateral Agent's security interest in the Collateral regardless of whether an Event of Default has occurred until all Obligations (other than inchoate indemnity obligations) have been satisfied in full and Purchasers are under no further obligation

to purchase Notes hereunder. Junior DIP Collateral Agent's foregoing appointment as Issuer's or any of its Subsidiaries' attorney in fact, and all of Junior DIP Collateral Agent's rights and powers, coupled with an interest, are irrevocable until all Obligations (other than inchoate indemnity obligations) have been fully repaid and performed and the Purchasers' obligation to purchase the Notes terminates.

  **10.3 Protective Payments**. If Issuer or any of its Subsidiaries fail to obtain the insurance called for by <u>Section 7.4</u> or fails to pay any premium thereon or fails to pay any other amount which Issuer or any of its Subsidiaries is obligated to pay under this Agreement or any other Note Document, Junior DIP Collateral Agent may, subject to a written direction from the Required Purchasers in accordance with Exhibit C (but shall not be obligated to) obtain such insurance or make such payment, and all amounts so paid by Junior DIP Collateral Agent are Purchasers' Expenses and immediately due and payable, bearing interest at the Default Rate, and secured by the Collateral.

  **10.4 Application of Payments and Proceeds**. Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of an Event of Default, (a) the Issuer irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by the Junior DIP Collateral Agent or the DIP Note Purchasers from or on behalf of the Issuer or any of its Subsidiaries of all or any part of the Obligations, and, as between the Issuer, on the one hand, and the Junior DIP Collateral Agent and DIP Note Purchasers, on the other, the Junior DIP Collateral Agent and the DIP Note Purchasers shall have the continuing and exclusive right to apply and to reapply any and all payments received against the Obligations in such manner as the Junior DIP Collateral Agent or the DIP Note Purchasers may deem advisable notwithstanding any previous application by the Junior DIP Collateral Agent or the Purchasers, and (b) subject to the provisions of <u>Section 2.1(d)</u>, the proceeds of any sale of, or other realization upon, all or any part of the Collateral shall be applied by the Junior DIP Collateral Agent: *first*, to any Junior DIP Collateral Agent fees and expenses (including, any fees, expenses and disbursements of counsel); *second*, to accrued and unpaid interest on the Obligations (including any interest that, but for the provisions of the Bankruptcy Code, would have accrued on such amounts); *third*, to the principal amount of the Obligations outstanding; and *fourth*, to any other Obligations owing to the Junior DIP Collateral Agent or any DIP Note Purchaser under the Note Documents. Any balance remaining shall be delivered to the Issuer or to whomever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct. In carrying out the foregoing, (x) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category, and (y) each of the Persons entitled to receive a payment in any particular category shall receive an amount equal to its *pro rata* share of amounts available to be applied pursuant thereto for such category. Any reference in this Agreement to an allocation between or sharing by the DIP Note Purchasers of any right, interest, or obligation "ratably," "proportionally," or in similar terms shall refer to the Purchasers' *pro rata* share unless expressly provided otherwise. Each DIP Note Purchaser shall promptly remit to the other DIP Note Purchasers such sums as may be necessary to ensure the ratable repayment of each DIP Note Purchaser's *pro rata* share of the Notes and the ratable distribution of interest, fees, and reimbursements paid or made by the Issuer. Notwithstanding the foregoing, a DIP Note Purchaser receiving a scheduled payment shall not be responsible for determining whether the other DIP Note Purchasers also received their scheduled payment on such date; *provided, however*, if it is later determined that a DIP Note Purchaser

12640916-7

received more than its *pro rata* share of scheduled payments made on any date or dates, then such Purchaser shall remit to the other DIP Note Purchasers such sums as may be necessary to ensure the ratable payment of such scheduled payments. If any payment or distribution of any kind or character, whether in cash, properties, or securities, shall be received by a DIP Note Purchaser in excess of its *pro rata* share, then the portion of such payment or distribution in excess of such DIP Note Purchaser's *pro rata* share shall be received and held by such DIP Note Purchaser in trust for and shall be promptly paid over to the other DIP Note Purchasers (in accordance with their respective *pro rata* shares) for application to the payments of amounts due on such other DIP Note Purchasers' claims. To the extent any payment for the account of the Issuer is required to be returned as a voidable transfer or otherwise, the DIP Note Purchasers shall contribute to one another as is necessary to ensure that such return of payment is on a *pro rata* basis. If any DIP Note Purchaser shall obtain possession of any Collateral, it shall hold such Collateral for itself and as agent and bailee for the Secured Parties for purposes of perfecting the Junior DIP Collateral Agent's security interest therein (held for the ratable benefit of the Secured Parties).

**10.5    Liability for Collateral**. So long as the Junior DIP Collateral Agent complies with reasonable practices regarding the safekeeping of the Collateral in the possession or under the control of the Junior DIP Collateral Agent, the Junior DIP Collateral Agent shall not be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage to the Collateral; (c) any diminution in the value of the Collateral; or (d) any act or default of any carrier, warehouseman, bailee, or other Person. The Issuer bears all risk of loss, damage, or destruction of the Collateral.

**10.6    No Waiver; Remedies Cumulative**. Failure by the Junior DIP Collateral Agent or any DIP Note Purchaser, at any time or times, to require strict performance by the Issuer of any provision of this Agreement or any other Note Document shall not waive, affect, or diminish any right of the Junior DIP Collateral Agent or any DIP Note Purchaser thereafter to demand strict performance and compliance herewith or therewith. No waiver hereunder shall be effective unless signed by the Junior DIP Collateral Agent and the Required Purchasers, and then is only effective for the specific instance and purpose for which it is given. The rights and remedies of the Junior DIP Collateral Agent and the DIP Note Purchasers under this Agreement and the other Note Documents are cumulative. The Junior DIP Collateral Agent and the DIP Note Purchasers have all rights and remedies provided under the Code, any Applicable Law, by law, or in equity. The exercise by the Junior DIP Collateral Agent or any DIP Note Purchaser of one right or remedy is not an election, and any DIP Note Purchaser's waiver of any Event of Default is not a continuing waiver. The Junior DIP Collateral Agent's or any Purchaser's delay in exercising any remedy is not a waiver, election, or acquiescence.

**10.7    Demand Waiver**. Issuer waives, to the fullest extent permitted by law, demand, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees held by Junior DIP Collateral Agent or any DIP Note Purchaser on which Issuer or any Subsidiary is liable.

**10.8    Setoff and Sharing of Payments**. In addition to any rights now or hereafter granted under any Applicable Law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, each DIP Note Purchaser is hereby authorized

at any time or from time to time upon the direction of the Required Purchasers, without notice to Issuer or any other Person, any such notice being hereby expressly waived, to setoff and to appropriate and to apply any and all balances held by it at any of its offices for the account of Issuer (regardless of whether such balances are then due to Issuer) and any other properties or assets at any time held or owing by that DIP Note Purchaser or that holder to or for the credit or for the account of Issuer against and on account of any of the Obligations that are not paid when due. Any DIP Note Purchaser exercising a right of setoff or otherwise receiving any payment on account of the Obligations in excess of its Pro Rata Share thereof shall purchase for cash (and the other DIP Note Purchasers or holders shall sell) such participations in each such other DIP Note Purchaser's or holder's Pro Rata Share of the Obligations as would be necessary to cause such DIP Note Purchaser to share the amount so offset or otherwise received with each other Purchaser or holder in accordance with their respective Pro Rata Shares of the Obligations. Issuer agrees, to the fullest extent permitted by law, that (a) any DIP Note Purchaser may exercise its right to offset with respect to amounts in excess of its Pro Rata Share of the Obligations and may purchase participations in accordance with the preceding sentence and (b) any DIP Note Purchaser so purchasing a participation in the Notes made or other Obligations held by other Purchasers or holders may exercise all rights of offset, bankers' liens, counterclaims or similar rights with respect to such participation as fully as if such DIP Note Purchaser or holder were a direct holder of the Notes and the other Obligations in the amount of such participation. Notwithstanding the foregoing, if all or any portion of the offset amount or payment otherwise received is thereafter recovered from the Purchaser that has exercised the right of offset, the purchase of participations by that DIP Note Purchaser shall be rescinded and the purchase price restored without interest.

## 11.    **NOTICES**

Other than as specifically provided herein, all notices, consents, approvals, requests, demands, or other communication (collectively, "**Communications**") by any party to this Agreement or any other Note Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by email; (c) one Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger; all of which shall be addressed to the party to be notified and sent to the address or email address indicated below (and, if delivered pursuant to clause (a), (c), or (d) above, together with a copy of such Communications by email). Any of the Junior DIP Collateral Agent, any Purchaser or the Issuer may change its mailing address or email address by giving the other party written notice thereof in accordance with the terms of this Section 11.

If to the Issuer:           Bird Global, Inc.
                            392 NE 191st Street #20388
                            Miami, Florida 33179
                            Attn: General Counsel; Chief Financial Officer
                            Email: clint@bird.co; joe.prodan@bird.co


with a copy (which shall

<table>
<tr><td>not constitute notice) to:</td><td>Jordi Guso, Esq.<br>Berger Singerman<br>1450 Brickell Avenue<br>Suite 1900<br>Miami, FL 33131<br>Email: jguso@bergersingerman.com</td></tr>
</table>

If to the Junior DIP Collateral Agent: U.S. Bank Trust Company, National Association
EP-MN-WS3C
West Side Flats St. Paul
60 Livingston Ave.
St. Paul, MN 55107
Attn: Bird Global Notes Administrator
Email: brandon.bonfig@usbank.com

with a copy (which shall
not constitute notice) to:      Covington & Burling LLP
The New York Times Building
620 Eighth Ave.
New York, NY 10018
Attn: Ronald A. Hewitt
Email: rhewitt@cov.com

If to any Purchaser, to it at its address or email address as set forth in Schedule 2.1-A, Schedule 2.1-B, or Schedule 2.1-C, as applicable.

## 12.    CHOICE OF LAW; VENUE; JURY TRIAL WAIVER

**12.1    Waiver of Jury Trial**. EACH OF THE ISSUER, THE JUNIOR DIP COLLATERAL AGENT, AND EACH PURCHASER UNCONDITIONALLY WAIVES ANY AND ALL RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE OTHER NOTE DOCUMENTS, ANY OF THE INDEBTEDNESS SECURED HEREBY, ANY DEALINGS AMONG THE ISSUER, THE JUNIOR DIP COLLATERAL AGENT, AND/OR ANY PURCHASER RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED AMONG THE ISSUER, THE JUNIOR DIP COLLATERAL AGENT, AND/OR ANY PURCHASER. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT. THIS WAIVER IS IRREVOCABLE. THIS WAIVER MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING. THIS WAIVER ALSO SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT, ANY OTHER NOTE DOCUMENTS, OR ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY RELATED TRANSACTION.

**12.2    Governing Law and Jurisdiction**. THIS AGREEMENT, THE OTHER NOTE DOCUMENTS, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE, REGARDLESS OF THE LOCATION OF THE COLLATERAL; *PROVIDED, HOWEVER*, THAT IF THE LAWS OF ANY JURISDICTION OTHER THAN NEW YORK SHALL GOVERN IN REGARD TO THE VALIDITY, PERFECTION, OR EFFECT OF PERFECTION OF ANY LIEN OR IN REGARD TO PROCEDURAL MATTERS AFFECTING ENFORCEMENT OF ANY LIENS IN COLLATERAL, SUCH LAWS OF SUCH OTHER JURISDICTIONS SHALL CONTINUE TO APPLY TO THAT EXTENT.

**12.3    Submission to Jurisdiction**. Each Party hereto hereby irrevocably submits to the jurisdiction of the Bankruptcy Court or, if the Bankruptcy Court does not have or does not exercise jurisdiction, then any legal action or proceeding with respect to the Note Documents shall be brought exclusively in the courts of the State of New York located in the City of New York, Borough of Manhattan, or of the United States of America for the Southern District of New York and, by execution and delivery of this Agreement, the Issuer hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. Notwithstanding the foregoing, Junior DIP Collateral Agent and Purchasers shall have the right to bring any action or proceeding against Issuer (or any property of Issuer) in the court of any other jurisdiction Junior DIP Collateral Agent or Purchasers deem necessary or appropriate in order to realize on the Collateral or other security for the Obligations. The parties hereto hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of *forum non conveniens*, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

**12.4    Service of Process**. The Issuer irrevocably waives personal service of any and all legal process, summons, notices, and other documents and other service of process of any kind and consents to such service in any suit, action or proceeding brought in the United States of America with respect to or otherwise arising out of or in connection with any Note Document by any means permitted by Applicable Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of the Issuer specified herein (and shall be effective when such mailing shall be effective, as provided therein). The Issuer agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**12.5    Non-Exclusive Jurisdiction**. Nothing contained in this <u>Section 12</u> shall affect the right of the Junior DIP Collateral Agent, or the Purchasers to serve process in any other manner permitted by Applicable Law or commence legal proceedings or otherwise proceed against the Issuer in any other jurisdiction.

**13.    <u>GENERAL PROVISIONS</u>**

**13.1    Successors and Assigns**. This Agreement binds and is for the benefit of the successors and permitted assigns of each party. The Issuer may not transfer, pledge, or assign this Agreement or any other Note Document or any of its rights or obligations hereunder or under any

other Note Document without the prior written consent of the Required Purchasers (which may be granted or withheld in the Required Purchasers' discretion, subject to <u>Section 13.5</u>). The DIP Note Purchasers may not sell, transfer, assign, or pledge any Notes or all or any part of the DIP Note Purchasers' obligations, rights, and benefits under this Agreement and the other Note Documents (any such sale, transfer, assignment, or pledge, a "**Purchaser Transfer**") without the prior written consent of the Issuer (such consent not to be unreasonably withheld, conditioned, or delayed); *provided* that such consent shall not be required for a Purchaser Transfer to (i) a Person who at such time is an existing Purchaser, (ii) to an Affiliate of such transferring DIP Note Purchaser, or (iii) to any other Person at any time during which an Event of Default has occurred and is continuing. The Issuer and the Junior DIP Collateral Agent shall be entitled to continue to deal solely and directly with such DIP Note Purchaser in connection with the interests so assigned until the Required Purchasers shall have received and accepted an effective assignment agreement in form satisfactory to the Required Purchasers executed, delivered and fully completed by the applicable parties thereto (with a copy to the Junior DIP Collateral Agent), and shall have received such other information regarding such assignee as the Required Purchasers reasonably shall require. Each transferee of Notes will be deemed to have made the representations and warranties of a DIP Note Purchaser hereunder, with effect as of the date of transfer. The Issuer shall maintain at one of its offices in the United States a register for the recordation of the names and addresses of the DIP Note Purchasers and principal amounts (and stated interest) of the Notes owing to each DIP Note Purchaser pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Issuer, the Junior DIP Collateral Agent, and the DIP Note Purchasers shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a DIP Note Purchaser hereunder for all purposes of this Agreement and the other Note Documents. The Register shall be available for inspection by any DIP Note Purchaser and the Junior DIP Collateral Agent at any reasonable time and from time to time upon reasonable prior notice. Notwithstanding any other language to the contrary contained herein or in any other Note Documents, as of any particular date, the Junior DIP Collateral Agent shall be entitled to rely conclusively upon the Register (including without limitation in connection with any determination as to which DIP Note Purchasers constitute the Required Purchasers under this Agreement). For the avoidance of doubt, the Junior DIP Collateral Agent (in its capacity as the Junior DIP Collateral Agent) shall have no responsibility for maintaining the Register. If the Issuer fails to provide the Junior DIP Collateral Agent with the Register upon the Junior DIP Collateral Agent's request thereof, the Junior DIP Collateral Agent shall be entitled to rely conclusively upon information provided by any Purchaser as to the unpaid principal, interest and other amounts due and owing to such DIP Note Purchaser.

**13.2    Indemnification; Waivers**.

(a)    <u>Indemnification by the Issuer</u>. The Issuer agrees to indemnify, reimburse, defend, and hold the Junior DIP Collateral Agent and its directors, officers, employees, consultants, agents, attorneys, or any other Person affiliated with or representing the Junior DIP Collateral Agent (each, an "**Indemnified Person**") harmless against: (i) all liabilities, obligations, demands, and claims asserted by any other party in connection with, related to, following, or arising from, out of, or under the transactions contemplated by the Note Documents, whether in contract, tort, or otherwise (collectively, "**Claims**"); and (ii) all Purchasers' Expenses and other losses and expenses incurred, or paid by Indemnified Person in connection with, related to, following, or arising from, out of, or under, the transactions contemplated by the Note Documents

(including reasonable attorneys' fees and expenses and, if necessary or appropriate, one local counsel in each reasonably necessary and materially relevant jurisdiction for the Indemnified Persons as a whole), except, in each case, for Claims and/or losses directly caused by such Indemnified Person's gross negligence, fraud, or willful misconduct, in each case, as determined by a court of competent jurisdiction by final and non-appealable judgment. The Issuer hereby further agrees to indemnify, reimburse, defend, and hold each Indemnified Person harmless from and against any and all liabilities, obligations, demands, claims, losses, damages, penalties, actions, judgments, suits, costs, expenses, and disbursements of any kind or nature whatsoever (including the fees and disbursements of one counsel for and, if necessary or appropriate, one local counsel in each reasonably necessary and materially relevant jurisdiction for the Indemnified Persons, taken as a whole) in connection with any investigative, response, remedial, administrative, or judicial matter or proceeding, whether or not such Indemnified Person shall be designated a party thereto and including any such proceeding initiated by or on behalf of the Issuer or its stockholders, except for liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses, and disbursements directly caused by such Indemnified Person's gross negligence, fraud, or willful misconduct, in each case, as determined by a court of competent jurisdiction by final and non-appealable judgment. This Section 13.2(a) shall not apply with respect to taxes, assessments, or other governmental charges other than any taxes, assessments, and other governmental charges that represent Claims arising from any non-tax claim.

(b)    Waiver of Consequential Damages. To the fullest extent permitted by Applicable Law, no party hereto shall assert, and each party hereto hereby waives, any claim against any Indemnified Person or any other party hereto, on any theory of liability, for special, indirect, consequential, or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Note Document, or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, or the use of the proceeds thereof. No Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Note Documents or the transactions contemplated hereby or thereby.

**13.3    Severability of Provisions**. Each provision of this Agreement is severable from every other provision in determining the enforceability of any provision.

**13.4    Correction of Note Documents**. The Required Purchasers may correct patent errors and fill in any blanks in this Agreement and the other Note Documents consistent with the agreement of the parties.

**13.5    Amendments in Writing; Integration.**

(a)    No amendment, waiver, modification, or termination of any provision of this Agreement or any other Note Document, no approval or consent hereunder or thereunder, or any consent to any departure by the Issuer or any of its Subsidiaries herefrom or therefrom, shall in any event be effective unless the same shall be in writing and signed by the Issuer, the Junior DIP Collateral Agent, and the Required Purchasers; *provided* that:

(i)        no such amendment, waiver, or other modification that would have the effect of increasing or reducing the amount outstanding under the Notes held by a DIP Note Purchaser shall be effective as to such DIP Note Purchaser without such Purchaser's written consent;

(ii)       no such amendment, waiver, or modification that would affect the rights, duties, benefits, privileges, protections, indemnities or immunities of the Junior DIP Collateral Agent shall be effective without the Junior DIP Collateral Agent's written consent or signature;

(iii)      no such amendment, waiver, or other modification shall, unless signed by all the DIP Note Purchasers directly affected thereby and: (A) reduce the principal of, rate of interest on, or any fees with respect to the Notes or forgive any principal, or fees, or interest (other than default interest) with respect to the Notes; (B) postpone the date fixed for, or waive, any payment of principal of any Note or of interest on any Note (other than default interest); (C) change the definition of the term "Required Purchasers" or the percentage of DIP Note Purchasers that shall be required for the Purchasers to take any action hereunder; (D) release all or substantially all of or any material portion of the Collateral, authorize the Issuer to sell or otherwise dispose of all or substantially all of or any material portion of the Collateral, or release any Guarantor of all or any portion of the Obligations or its Guarantee obligations with respect thereto, except, in each case with respect to this clause (D), as otherwise may be expressly permitted under this Agreement or the other Note Documents (including in connection with any disposition permitted hereunder); (E) amend, waive, or otherwise modify this Section 13.5 or the definitions of the terms used in this Section 13.5 insofar as the definitions affect the substance of this Section 13.5; (F) consent to the assignment, delegation, or other transfer by the Issuer of any of its rights and obligations under any Note Document or release the Issuer of its payment obligations under any Note Document, except, in each case with respect to this clause (F), pursuant to a merger or consolidation permitted pursuant to this Agreement; (G) amend any of the provisions of Section 10.4 that provide for the DIP Note Purchasers to receive their pro rata share of any fees, payments, setoffs, or proceeds of Collateral hereunder; or (H) subordinate the Liens granted in favor of Junior DIP Collateral Agent securing the Obligations; (I) amend any of the provisions of Section 13.5; and

(iv)      it is hereby understood and agreed that all DIP Note Purchasers shall be deemed directly affected by an amendment, waiver or other modification of the type described in the preceding clauses (C), (D), (E), (F), (G) and (H) of the immediately preceding sentence.

(b)       Other than as expressly provided for in Section 13.5(a)(i)-(iii), the Required Purchasers may from time to time designate covenants or other terms in this Agreement less restrictive on the Issuer or its Subsidiaries by notification to a representative of the Issuer. The Required Purchasers (or the Purchasers' Representative on their behalf) may from time to time consent to the creation and issuance of additional notes having the same terms and conditions as the Notes in all respects (or in all respects except for the issue date,

64

issue price, the initial Interest Payment Date (if applicable) and the payment of interest accruing prior to the issue date of the additional notes), and any limitation on the aggregate principal amount of the Notes in this Indenture or any of the Notes shall, upon such consent, be deemed to be amended accordingly.

(c)      For so long as the Voting Agreement is in effect and the Investors (as defined in the Voting Agreement) have appointed any Investor Designees (as defined in the Voting Agreement) who are members of the Board of Directors, the approval of a written consent signed on behalf of each of the directors (including such Investor Designees) or the approval of a resolution of the Board of Directors including such Investor Designees at a properly constituted meeting of the Board of Directors shall be deemed to be an approval (or consent or waiver, as the case may be) of the Required Purchasers of any event, occurrence, transaction or state of affairs which would otherwise be in conflict or breach of any of the covenants in <u>Section 7</u> or <u>Section 8</u> of this Agreement, to the extent expressly approved by the Board of Directors in such resolution(s).

(d)      Each of the Purchasers hereby irrevocably appoints John Bitove to act on its behalf as representative (the "**Purchasers' Representative**") hereunder and under the other Note Documents and authorizes the Purchasers' Representative to take any actions on its behalf and to exercise such powers as are delegated to the Required Purchasers by the terms hereof or thereof from time to time, but shall not be obligated to exercise such discretion. The Person serving as the Purchasers' Representative hereunder shall have the same rights and powers in its capacity as a Purchaser as any other Purchaser and may exercise the same as though it were not the Purchasers' Representative, and the term "Purchaser" or "Purchasers" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Purchasers' Representative hereunder in its individual capacity. The Purchasers' Representative shall not have any duties or obligations except those expressly set forth herein, and its duties hereunder shall be administrative in nature. The Purchasers' Representative shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing and shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby. The Purchasers' Representative shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Purchasers. The Purchasers' Representative may at any time give notice of its resignation to the Purchasers and the Issuer.  Upon receipt of any such notice of resignation, the Required Purchasers shall have the right to appoint a successor.

(e)      This Agreement and the Note Documents represent the entire agreement about this subject matter and supersede prior negotiations or agreements with respect to such subject matter. All prior agreements, understandings, representations, warranties, and negotiations between the parties about the subject matter of this Agreement and the Note Documents merge into this Agreement and the Note Documents.

**13.6    Counterparts**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together, constitute one Agreement. Delivery of an executed counterpart of a signature page of this Agreement by facsimile, portable document format (.pdf), or other electronic transmission will be as effective as delivery of a manually executed counterpart hereof.

65

Unless otherwise provided herein or in any other related document, the words "execute," "execution," "signed," and "signature" and words of similar import used in or related to any document to be signed in connection with this Agreement, any other Note Document, any other related document, or any of the transactions contemplated hereby (including amendments, waivers, consents, and other modifications) shall be deemed to include electronic signatures and the keeping of records in electronic form, each of which shall be of the same legal effect, validity, or enforceability as a manually executed signature in ink or the use of a paper-based recordkeeping system, as applicable, to the fullest extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, and any other similar state laws based on the Uniform Electronic Transactions Act. Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any faxed, scanned, or photocopied manual signature, or other electronic signature, of any other party and shall have no duty to investigate, confirm, or otherwise verify the validity or authenticity thereof.

   **13.7    Survival**. All covenants, representations, and warranties made in this Agreement will continue in full force and effect until this Agreement has terminated pursuant to its terms and all Obligations (other than inchoate indemnity obligations) have been satisfied. The obligation of the Issuer in Section 13.2 to indemnify the Junior DIP Collateral Agent, the confidentiality provisions in Section 13.8, and the provisions of Section 13.12 shall survive the termination of the Note Documents and the payment in full of the Obligations hereunder.

   **13.8    Confidentiality**. In handling any confidential information of Issuer, each of the Purchasers and Junior DIP Collateral Agent shall exercise the same degree of care that it exercises for their own proprietary information, but disclosure of information may be made: (a) subject to the terms and conditions of this Agreement, to the Purchasers' and Junior DIP Collateral Agent's Subsidiaries or Affiliates, or in connection with a Purchaser's own financing or securitization transactions and upon the occurrence of a default, event of default or similar occurrence with respect to such financing or securitization transaction; (b) to prospective transferees (other than those identified in (a) above) or purchasers of any interest in the Notes (provided, however, the Purchasers and Junior DIP Collateral Agent shall, except upon the occurrence and during the continuance of an Event of Default, obtain such prospective transferee's or purchaser's agreement to the terms of this provision or to similar confidentiality terms); (c) as required by law, rule, regulation, regulatory or self-regulatory authority, subpoena, or other order; (d) to Purchasers' or Junior DIP Collateral Agent's regulators or as otherwise required in connection with an examination or audit; (e) as Junior DIP Collateral Agent or the Required Purchasers may reasonably considers appropriate in exercising remedies under the Note Documents; and (f) to third party service providers of the Purchasers and/or Junior DIP Collateral Agent so long as such service providers have executed a confidentiality agreement or have agreed to similar confidentiality terms with the Purchasers and/or Junior DIP Collateral Agent, as applicable, with terms no less restrictive than those contained herein. Confidential information does not include information that either: (i) is in the public domain or in the Purchasers' and/or Junior DIP Collateral Agent's possession when disclosed to the Purchasers and/or Junior DIP Collateral Agent, or becomes part of the public domain after disclosure to the Purchasers and/or Junior DIP Collateral Agent through no breach of this provision by the Purchasers or the Junior DIP Collateral Agent; or (ii) is disclosed to the Purchasers and/or Junior DIP Collateral Agent by a third party, if the Purchasers and/or Junior DIP Collateral Agent does not know that the third party is prohibited

from disclosing the information. Junior DIP Collateral Agent and the Purchasers may use confidential information for any purpose, including, without limitation, for the development of client databases, reporting purposes, and market analysis so long as the Junior DIP Collateral Agent and the Purchasers do not disclose the identity of Issuer or the identity of any person associated with Issuer. The provisions of the immediately preceding sentence shall survive the termination of this Agreement. The agreements provided under this Section 13.8 supersede all prior agreements, understanding, representations, warranties, and negotiations between the parties about the subject matter of this Section 13.8.

13.9    **Public Announcement**. Issuer hereby agrees that Junior DIP Collateral Agent and each Purchaser, after consultation with Issuer, may make a public announcement of the transactions contemplated by this Agreement, and may publicize the same in marketing materials, newspapers and other publications, and otherwise, and in connection therewith may use Issuer's name, tradenames and logos. Notwithstanding the foregoing, such consultation with Issuer shall not be required for any disclosures by Junior DIP Collateral Agent and the Purchasers may also make disclosures to the SEC or other governmental agency and any other public disclosure with investors, other governmental agencies or other related persons.

13.10    **Junior DIP Collateral Agent and Purchaser Agreement**. The Junior DIP Collateral Agent and the Purchasers hereby agree to the terms and conditions set forth on Exhibit C attached hereto. The Issuer acknowledges and agrees to the terms and conditions set forth on Exhibit C attached hereto.

13.11    **Time of Essence**. Time is of the essence for the performance of Obligations under this Agreement.

13.12    **Several Obligations**. All of the obligations and liabilities of the Purchasers under this Agreement are several and not joint or joint and several.

13.13    **Termination Prior to Maturity Date; Survival**. All covenants, representations and warranties made in this Agreement continue in full force until this Agreement has terminated pursuant to its terms and all Obligations have been satisfied. So long as Issuer has satisfied the Obligations (other than inchoate indemnity obligations and any other obligations which, by their terms, are to survive the termination of this Agreement and for which no claim has been made) in accordance with the terms of this Agreement, this Agreement may be terminated prior to the Maturity Date by Issuer, effective five (5) Business Days after written notice of termination is given to the Junior DIP Collateral Agent and the DIP Note Purchasers.

13.14    **Withholding**. In the event that the Issuer is required to remit any amounts to a taxing authority on account of taxes required to be deducted or withheld in respect of the Notes, the Issuer shall be entitled to withhold from or offset any such amounts against any amounts or value payable to such DIP Note Purchaser. The provisions of this Section 13.14 shall survive the performance or termination of this Agreement. For the avoidance of doubt, the provisions of this Section 13.14 shall not limit any obligation of the Issuer with respect to Indemnified Taxes set forth in Exhibit D.

13.15    **Parties Including Trustees; Bankruptcy Court Proceedings**.

12640916-7

This Agreement, the other Note Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Note Document shall be binding upon the Note Parties, the estate of each Note Party, and any trustee, other estate representative or any successor in interest of each Note Party in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code. This Agreement and the other Note Documents shall be binding upon, and inure to the benefit of, the successors of the Secured Parties and their respective assigns, transferees and endorsees. The Liens created by this Agreement and the other Note Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Cases or any other bankruptcy case of the Note Parties to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Junior DIP Collateral Agent file financing statements or otherwise perfect its Liens under applicable law. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the Note Parties and Secured Parties with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Note Documents, provided that notwithstanding anything herein to the contrary, the Pre-Petition Collateral Agent shall be a third party beneficiary with respect to the provisions herein applicable to it. .

**13.16  Inconsistency**.

In the event of any inconsistency between the terms and conditions of this Agreement and of the DIP Orders, the provisions of the DIP Orders shall govern and control.

**13.17  Pre-Petition Purchaser Consent to Credit Bid and Direction to Pre-Petition Collateral Agent**.

Each Purchaser signatory hereto hereby irrevocably (x) consents, in their capacity as a Purchaser under the Pre-Petition Note Purchase Agreement, to the terms of this Agreement and the other Note Documents and the entry of the Interim Order and the Final Order, (y) authorizes and directs the Purchasers' Representative to, in a manner determined by the Purchasers' Representative, credit bid all of the Pre-Petition Obligations in connection with any proposed sale (including pursuant to the Asset Purchase Agreement) of all or any portion of the assets of any or all of the Note Parties (a "**Credit Bid Transaction**") and (z) in connection with any Credit Bid Transaction, consents to the assignment and delegation to a Qualified Purchaser of such rights and obligations under the Pre-Petition Note Purchase Agreement, the other Pre-Petition Note Documents, this Agreement and the other Note Documents, in each case as the Purchasers' Representative determines in order to consummate such Credit Bid Transaction (and each such Purchaser shall execute and deliver such documents as the Purchasers' Representative reasonably requests to evidence such assignment and delegation). Each Purchaser, in their capacity as a Purchaser under the Pre-Petition Note Purchase Agreement, further authorizes and directs the Pre-Petition Collateral Agent to (i) consent to the Credit Bid Transaction and the release of the Collateral in connection therewith, and (ii) execute and deliver any documents required or reasonably requested by the Issuer, the Required Purchasers (as defined in the Pre-Petition Collateral Agreement) or the Purchasers' Representative in connection with the consummation of Credit Bid Transaction. Each Purchaser, in their capacity as a Purchaser under the Pre-Petition Note Purchase Agreement, acknowledges and agrees that the rights, benefits, privileges,

protections, indemnities and immunities of the Pre-Petition Note Purchase Agreement shall apply to Pre-Petition Collateral Agent acting under this Agreement as if set forth herein, *mutatis mutandis*.  For the avoidance of doubt, the Pre-Petition Collateral Agent shall have no duty or responsibility, or have any liability with respect to, the creation of any acquisition vehicle, the assignment and delegation of rights and obligations under the Pre-Petition Note Purchase Agreement or any credit bid in connection with the Credit Bid Transaction, and is authorized to require protective language satisfactory to it in any order related to the Credit Bid Transaction. Each Purchaser under the Pre-Petition Note Purchase Agreement acknowledges that if the Obligations evidenced by the Other Notes and the Bridge Notes are credit bid successfully that the Pre-Petition Collateral Agent shall have no further duties under the Pre-Petition Note Purchase Agreement or this Agreement, including without limitation no duties in connection with the distribution of equity interests in any buyer entity used in connection with the Credit Bid.

### 13.18  Purchaser Consent to Credit Bid.

Each Purchaser hereby irrevocably (x) authorizes and directs the Purchasers' Representative to, in a manner determined by the Purchasers' Representative, credit bid all or any portion of the Obligations in connection with any Credit Bid Transaction and (y) in connection with any Credit Bid Transaction, consents to the assignment and delegation to a Qualified Purchaser of such rights and obligations under this Agreement and the other Note Documents, in each case as the Purchasers' Representative determines in order to consummate such Credit Bid Transaction (and each such Purchaser shall execute and deliver such documents as the Purchasers' Representative reasonably requests to evidence such assignment and delegation). For the avoidance of doubt, the Collateral Agent shall have no duty or responsibility, or have any liability with respect to, the creation of any acquisition vehicle, the assignment and delegation of rights and obligations under this Agreement or any credit bid in connection with the Credit Bid Transaction and is authorized to require protective language satisfactory to it in any order related to the Credit Bid Transaction. Each Purchaser under this Agreement acknowledges that if the Obligations evidenced by the Notes are credit bid successfully then the Junior DIP Collateral Agent shall have no further duties under this Agreement, including without limitation no duties in connection with the distribution of equity interests in any buyer entity used in connection with the Credit Bid.

[*Signature Pages Follow*]

12640916-7

 **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Closing Date.

**ISSUER:**

**BIRD GLOBAL, INC.**

By: _____

Name:  **Michael Washinushi**

Title:  **CEO**

*[Signature Page to Note Purchase Agreement]*



**PURCHASER:**

**ALATE I LP, by its general partner, ALATE I GP INC.**

By: _____
      Name: Jay Jiang
      Title: Authorized Signatory

By: _____
      Name: Jeannette Wiltse
      Title: Authorized Signatory

*[Signature Page to Senior Secured Priming and Super-Priority Debtor-In-Possession Note Purchase Agreement]*

**PURCHASER:**

**MKB PARTNERS FUND II, LIMITED PARTNERSHIP, by its general partner, MKB PARTNERS FUND II GP INC.**

By: _____

Name: Antonio Occhionero

Title: Authorized Signatory

**MKB PARTNERS FUND II INTERNATIONAL, LIMITED PARTNERSHIP, by its general partner, MKB PARTNERS FUND II GP INC.**

By: _____

Name: Antonio Occhionero

Title: Authorized Signatory

[*Signature Page to Senior Secured Priming and Super-Priority Debtor-In-Possession Note Purchase Agreement*]

**PURCHASER:**

**RELAY VENTURES FUND III L.P, by its general partner, RELAY VENTURES FUND III GP INC.**

By: _Kevin Talbot_

Name: Kevin Talbot

Title: Director

By: _Jeannette Wiltse_

Name: Jeannette Wiltse

Title: Director

**RELAY VENTURES PARALLEL FUND III L.P., by its general partner, RELAY VENTURES FUND III GP INC.**

By: _Kevin Talbot_

Name: Kevin Talbot

Title: Director

By: _Jeannette Wiltse_

Name: Jeannette Wiltse

Title: Director

**RELAY VENTURES COMPASS LP, by its general partner, RELAY VENTURES COMPASS GP INC.**

By: _Kevin Talbot_

Name: Kevin Talbot

Title: Director

By: _Jeannette Wiltse_

Name: Jeannette Wiltse

Title: Director

[*Signature Page to Senior Secured Priming and Super-Priority Debtor-In-Possession Note Purchase Agreement*]

**PURCHASER:**

**RELAY VENTURES COMPASS II LP, by its general partner, RELAY VENTURES COMPASS GP INC.**

By: _Kevin Talbot_____
      Name: Kevin Talbot
      Title: Director

By: _Jeannette Wiltse_____
      Name: Jeannette Wiltse
      Title: Director

**PURCHASER:**

**OBELYSK TRANSPORT L.P., by its general
partner, OBELYSK TRANSPORT GP INC.**

By: _John Bitove_____

      Name: John Bitove
      Title: President

**MAPLE BEACH COMPASS LP, by its
general partner, OBELYSK US CORP.**

By: _John Bitove_____

      Name: John Bitove
      Title: Authorized Signatory

**MAPLE BEACH INVESTMENT LLC**

By: _John Bitove_____

      Name: John Bitove
      Title: Authorized Signatory

[*Signature Page to Senior Secured Priming and Super-Priority Debtor-In-Possession
Note Purchase Agreement*]

**PURCHASER:**

**HVLKV, LLC**

By: _____

      Name: Kerry Vickar
      Title: Manager

*[Signature Page to Senior Secured Priming and Super-Priority Debtor-In-Possession Note Purchase Agreement]*

**PURCHASER:**

**MATTHEW EPP**

**PURCHASER:**


**BENNETT CHURCH HILL CAPITAL INC.**

By: _____

     Name: Carl Bennett
     Title: Managing Director

**PURCHASER:**

**GESTION HOLDROB INC.**

By:  *Benoit Robert*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
     Name: Benoit Robert
     Title: President

[*Signature Page to Senior Secured Priming and Super-Priority Debtor-In-Possession Note Purchase Agreement*]

**EXHIBIT A**

<u>**Description of Collateral**</u>

| Holder | Issuer | Class of Stock | Stock Certificate No. | No. of Shares | Percentage of Total Owned | Percentage of Issuer's Stock Pledged |
|---|---|---|---|---|---|---|
| Bird Global, Inc.[1] | Bird Rides, Inc. | Common Stock | N/A | One | 100% | 100% |
| Bird Global, Inc.[2] | 1393631 B.C. Unlimited Liability Company | Common Shares | C-1 | One | 100% | 100% |

_____

**Notes:**
1. Second priority
2. Second priority

**EXHIBIT B**

**[FORM OF DIP NOTE]**

THE OFFER AND SALE OF THE NOTES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND SUCH NOTES AND SHARES MAY NOT BE OFFERED, SOLD, PLEDGED, HEDGED, OR OTHERWISE TRANSFERRED, EXCEPT (X) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND A CURRENT PROSPECTUS, (Y) IN ACCORDANCE WITH RULE 144 UNDER THE SECURITIES ACT, OR (Z) PURSUANT TO ANOTHER APPLICABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT.

THE NOTES REPRESENTED HEREBY ARE GOVERNED BY THE PROVISIONS OF A SUBORDINATED SECURED AND SUPER PRIORITY DEBTOR-IN-POSSESSION NOTE PURCHASE AGREEMENT, DATED AS OF DECEMBER 22, 2023 (THE "AGREEMENT"), BY AND AMONG BIRD GLOBAL, INC., AS ISSUER, THE PURCHASERS NAMED THEREIN, AND U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, AS JUNIOR DIP COLLATERAL AGENT. BY ACCEPTING ANY NOTE REPRESENTED HEREBY, THE HOLDER THEREOF WILL BE DEEMED TO AGREE TO BE BOUND BY THE TERMS OF THE AGREEMENT AS A PURCHASER.

THE INDEBTEDNESS EVIDENCED BY THIS NOTE IS SUBJECT TO THE SUBORDINATION AND INTERCREDITOR PROVISIONS SET FORTH IN THE DIP ORDERS (AS DEFINED IN THE AGREEMENT).

THIS NOTE IS ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") FOR U.S. FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF OID, ISSUE DATE, AND YIELD TO MATURITY WITH RESPECT TO THIS NOTE MAY BE OBTAINED BY WRITING TO THE ISSUER AT THE FOLLOWING ADDRESS: 392 NE 191ST STREET #20388, MIAMI, FLORIDA 33179; ATTENTION: CHIEF FINANCIAL OFFICER; EMAIL: BEN.LU@BIRD.CO.

## Secured DIP Promissory Note

No. [  ]                                                                  U.S. $[      ]

      Bird Global, Inc., a Delaware corporation (herein called the "**Issuer**"), which term includes any successor corporation under the Agreement referred to on the reverse hereof, for value received, hereby promises to pay to [_____], or registered assigns, the principal sum of [_____] UNITED STATES DOLLARS (U.S. $[_____]) (which amount may from time to time be increased or decreased by adjustments made on the records of the Issuer in accordance with the Agreement) on the Maturity Date (as defined in the Agreement). The Issuer will pay all outstanding principal of any Note and accrued and unpaid interest thereon as provided in the Agreement.

      Reference is made to the further provisions of this Note set forth on the reverse hereof. Such further provisions shall for all purposes have the same effect as though fully set forth at this place. Capitalized terms used but not defined herein shall have such meanings as are ascribed to such terms in the Agreement. In the case of any conflict between this Note and the Agreement, the provisions of the Agreement shall control.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the Issuer has caused this instrument to be duly executed.

BIRD GLOBAL, INC.

Dated: _____          By: _____
                                              Name:
                                              Title:

**[FORM OF REVERSE OF NOTE]**

**BIRD GLOBAL, INC.**

**Secured DIP Promissory Note**

This Note is one of a duly authorized issue of Notes of the Issuer, designated as its Secured Promissory Notes (the "**Notes**"), initially limited in aggregate principal amount to $[_____], all issued under and pursuant to a Note Purchase Agreement, dated as of December 22, 2023 (including all exhibits and schedules hereto, as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "**Agreement**"), by and among the Issuer, the Purchasers named therein, and U.S. Bank Trust Company, National Association, as Junior DIP Collateral Agent, to which Agreement and all agreements supplemental thereto reference is hereby made for a description of the rights, limitations of rights, obligations, duties, and immunities thereunder of the Issuer and the Purchasers of the Notes.

Except as provided for in the Agreement, the principal amount on this Note shall be payable, when and if due, only against surrender therefor, while payments of interest on this Note shall be made in accordance with the Agreement.

1. <u>Interest</u>. Interest will accrue on this Note at a rate of 18.0% per annum, payable as set forth in the Agreement.

2. <u>Redemption</u>. The Notes will be subject to Redemption as provided in the Agreement.

3. <u>Acceleration of Maturity</u>. The Agreement contains provisions for acceleration of the maturity of the unpaid principal amount of this Note upon the happening of certain stated events upon the terms and conditions specified therein.

4. <u>Denominations</u>. The Notes are issuable only in registered form in minimum denominations of $1,000 and any integral multiple of $1.00 in excess thereof, as provided in the Agreement and subject to certain limitations therein set forth.

5. <u>Transfer</u>. This Note is assignable or transferable, in whole or in part, solely to the extent such assignment or transfer is permitted pursuant to the terms of the Agreement.

THIS NOTE, AND ANY CLAIM, CONTROVERSY, OR DISPUTE ARISING UNDER OR RELATED TO THIS NOTE, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

## EXHIBIT C

## Junior DIP Collateral Agent Terms

**1.     Appointment of Junior DIP Collateral Agent**.

(a)     Each Purchaser hereby appoints U.S. Bank Trust Company, National Association (together with any successor Junior DIP Collateral Agent pursuant to Section 7 of this Exhibit C) as Junior DIP Collateral Agent under the Note Documents and authorizes the Junior DIP Collateral Agent to (i) take such action on its behalf and to exercise such rights, powers, and remedies and perform such duties as are expressly delegated to the Junior DIP Collateral Agent under the Note Documents and (ii) exercise such powers as are reasonably incidental thereto. Except for Section 8 and the first sentence of Section 7 of this Exhibit C, the provisions of this Exhibit C are solely for the benefit of the Junior DIP Collateral Agent and the Purchasers, and the Issuer shall not have rights as a third-party beneficiary of any of such provisions.

(b)     Without limiting the generality of clause (a) above, the Junior DIP Collateral Agent is hereby authorized to (i) hold security interests in the Collateral for the ratable benefit of the Purchasers and otherwise act as collateral agent for the Secured Parties for purposes of the perfection of all Liens created by the Note Documents and all other purposes stated therein, (ii) take, at the direction of the Required Purchasers, such action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Note Documents, and (iii) except as may be otherwise specified in any Note Document, exercise, at the direction of the Required Purchasers, all remedies given to the Junior DIP Collateral Agent and the Purchasers with respect to the Issuer and/or the Collateral, whether under the Note Documents, Applicable Law, or otherwise. The Junior DIP Collateral Agent may, upon any term or condition it specifies, perform any and all of its duties and exercise its rights and powers hereunder or under any other Note Document by or through any one or more sub-agents appointed by the Junior DIP Collateral Agent. The Junior DIP Collateral Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective directors, officers, employees, agents, trustees, representatives, attorneys, accountants, or other advisors or consultants (each, a "**Related Party**"). The exculpatory, indemnification, and other provisions of this Exhibit C shall apply to any such sub-agent and to the Related Parties of the Junior DIP Collateral Agent and any such sub-agent. The Junior DIP Collateral Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Junior DIP Collateral Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

(c)     Each Purchaser hereby irrevocably appoints, designates, authorizes, and directs the Junior DIP Collateral Agent to enter into the Intercreditor Agreement on its behalf and to take action on its behalf pursuant to the provisions thereof as directed by the Required Purchasers. Each Purchaser further agrees to be bound by the terms and conditions of the Intercreditor Agreement.

(d)      Under the Note Documents, the Junior DIP Collateral Agent (i) is acting solely on behalf of the Purchasers, with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Junior DIP Collateral Agent," the terms "agent," "Junior DIP Collateral Agent," and "collateral agent" and similar terms in any Note Document to refer to the Junior DIP Collateral Agent, which terms are used for title purposes only, are not intended to connote any fiduciary or other implied (or express) obligations arising under any agency doctrine of any Applicable Law, and are intended to create or reflect only an administrative relationship between contracting parties, (ii) is not assuming any obligation under any Note Document other than as expressly set forth therein or any role as agent, fiduciary, or trustee of or for any Purchaser or any other Person, and (iii) shall have no implied functions, responsibilities, duties, obligations, or other liabilities under any Note Document, and each Purchaser, by accepting the benefits of the Note Documents, hereby waives and agrees not to assert any claim against the Junior DIP Collateral Agent based on the roles, duties, and legal relationships expressly disclaimed in clauses (i) through (iii) above. Except as expressly set forth in the Note Documents, the Junior DIP Collateral Agent shall not have any duty to disclose, and shall not be liable for failure to disclose, any information relating to the Issuer or any of its Subsidiaries that is communicated to or obtained by U.S. Bank Trust Company, National Association or any of its Affiliates in any capacity.

**2.      Binding Effect; Reliance on Instructions from Required Purchasers.**

(a)      Each Purchaser, by accepting the benefits of the Note Documents, agrees that (i) any action taken by the Junior DIP Collateral Agent, the Required Purchasers (or, if expressly required in any Note Document, a greater proportion of the Purchasers) or the Purchasers' Representative in accordance with the provisions of the Note Documents, (ii) any action taken by the Junior DIP Collateral Agent in reliance upon the instructions of the Purchasers' Representative or the Required Purchasers (or, where so required, such greater proportion), and (iii) the exercise by the Junior DIP Collateral Agent, the Purchasers' Representative or the Required Purchasers (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Purchasers.

(b)      If the Junior DIP Collateral Agent shall request instructions from the Required Purchasers or all affected Purchasers with respect to any act or action (including failure to act) in connection with any Note Document, then the Junior DIP Collateral Agent shall be entitled to refrain from such act or taking such action unless and until the Junior DIP Collateral Agent shall have received instructions from the Required Purchasers or all affected Purchasers, as the case may be, and the Junior DIP Collateral Agent shall not incur liability to any Person by reason of so refraining. The Junior DIP Collateral Agent shall be fully justified in failing or refusing to take any action under any Note Document (i) if such action would, in the opinion of the Junior DIP Collateral Agent, be contrary to any Applicable Law or any Note Document, (ii) if such action would, in the opinion of the Junior DIP Collateral Agent, expose the Junior DIP Collateral Agent to any potential liability under any Applicable Law, or (iii) if the Junior DIP Collateral Agent shall not first be indemnified to its satisfaction against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Without limiting

the foregoing, no Purchaser shall have any right of action whatsoever against the Junior DIP Collateral Agent as a result of the Junior DIP Collateral Agent acting or refraining from acting under any Note Document in accordance with the instructions of the Required Purchasers or all affected Purchasers, as applicable.

**3.** **Junior DIP Collateral Agent's Reliance, Etc.** The Junior DIP Collateral Agent may, without incurring any liability hereunder, (a) consult with any of its Related Parties and, whether or not selected by it, any other legal counsel, advisors, accountants, and other experts (including legal counsel and advisors to, and accountants and experts engaged by, the Issuer), and take or omit to take any action in accordance with the advice of any such legal counsel, advisors, accountants, and other experts, and (b) rely and act upon any document and information (including those transmitted by electronic transmission) and any telephone message or conversation or other oral statement, in each case, believed by it to be genuine and to have been transmitted, signed, or otherwise authenticated by the appropriate parties. None of the Junior DIP Collateral Agent or any of its Related Parties shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Note Document, and each Purchaser and the Issuer hereby waives and shall not assert (and the Issuer shall cause its Subsidiaries to waive and agree not to assert) any right, claim, or cause of action based thereon, except to the extent of liabilities resulting from the gross negligence or willful misconduct of the Junior DIP Collateral Agent or, as the case may be, such Related Party (in each case, as determined in a final, non-appealable judgment of a court of competent jurisdiction) in connection with the duties of the Junior DIP Collateral Agent expressly set forth herein. Without limiting the foregoing, the Junior DIP Collateral Agent: (i) shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of the Purchasers' Representative or the Required Purchasers or for the actions or omissions of any of its Related Parties, except to the extent that a court of competent jurisdiction determines in a final non-appealable judgment that the Junior DIP Collateral Agent acted with gross negligence or willful misconduct in the selection of such Related Party; (ii) shall not be responsible to any Purchaser or other Person for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency, or value of, or the attachment, perfection, or priority of any Lien created or purported to be created under or in connection with, any Note Document; (iii) makes no warranty or representation, and shall not be responsible, to any Purchaser or other Person for any statement, document, information, representation, or warranty made or furnished by or on behalf of the Issuer or any Related Party of the Issuer in connection with any Note Document or any transaction contemplated therein or any other document or information with respect to the Issuer, whether or not transmitted or (except for documents expressly required under any Note Document to be transmitted to the Purchasers) omitted to be transmitted by the Junior DIP Collateral Agent, including as to completeness, accuracy, scope, or adequacy thereof, or for the scope, nature, or results of any due diligence performed by the Junior DIP Collateral Agent in connection with the Note Documents; and (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Note Document, whether any condition set forth in any Note Document is satisfied or waived, as to the financial condition of the Issuer or as to the existence or continuation or possible occurrence or continuation of any Event of Default, and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from either the Issuer, the Purchasers' Representative or the Required Purchasers describing such Event of Default that is clearly labeled "notice of default"; and, for each of the items set forth in clauses (i) through (iv) above, each Purchaser and the Issuer hereby waives and agrees not to assert, and the Issuer shall cause its Subsidiaries to waive and

agree not to assert, any right, claim, or cause of action it might have against the Junior DIP Collateral Agent based thereon.

        **4.**        **Junior DIP Collateral Agent Individually**. The Junior DIP Collateral Agent and its Affiliates may make loans and other extensions of credit to, acquire stock and stock equivalents of, and engage in any kind of business with the Issuer as though it were not acting as the Junior DIP Collateral Agent and may receive separate fees and other payments therefor. To the extent the Junior DIP Collateral Agent or any of its Affiliates becomes a Purchaser hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Purchaser, and the terms "Purchaser," "Required Purchaser," and any similar terms shall, except where otherwise expressly provided in any Note Document, include, without limitation, the Junior DIP Collateral Agent or such Affiliate, as the case may be, in its individual capacity as Purchaser, or as one of the Required Purchasers.

        **5.**        **Purchaser Credit Decision**. Each Purchaser acknowledges that it has, independently and without reliance upon the Junior DIP Collateral Agent, any other Purchaser, or any of their Affiliates or upon any document solely or in part because such document was transmitted by the Junior DIP Collateral Agent or any of its Related Parties, conducted its own independent investigation of the financial condition and affairs of the Issuer and has made and will continue to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Note Document or with respect to any transaction contemplated in any Note Document, in each case, based on such documents and information as it shall deem appropriate. The Junior DIP Collateral Agent shall not have any duty or responsibility to provide any Purchaser with any credit or other information concerning the business, prospects, operations, financial and other condition, or creditworthiness of the Issuer that may come into the possession of the Junior DIP Collateral Agent or any of its Related Parties.

        **6.**        **Indemnification**. Each Purchaser agrees to reimburse the Junior DIP Collateral Agent and each of its Related Parties (to the extent not reimbursed by the Issuer as required under the Note Documents (including pursuant to Section 13.2 of the Agreement)) promptly upon demand for its *pro rata* share, based on the principal amount of the outstanding Notes held by each of the Purchasers at such time (its "**Pro Rata Share**"), of any out-of-pocket costs and expenses (including, without limitation, fees, charges, and disbursements of financial, legal, and other advisors and any taxes or insurance paid in the name of, or on behalf of, the Issuer) incurred by the Junior DIP Collateral Agent or any of its Related Parties in connection with the preparation, syndication, execution, delivery, administration, modification, amendment, consent, waiver, or enforcement of, or the taking of any other action (whether through negotiations, through any work-out, bankruptcy, restructuring, or other legal or other proceeding (including, without limitation, preparation for and/or response to any subpoena or request for document production relating thereto) or otherwise) in respect of, or legal advice with respect to, its rights or responsibilities under, any Note Document (such costs and expenses, collectively, "**Junior DIP Collateral Agent Expenses**"). Each Purchaser further agrees to indemnify the Junior DIP Collateral Agent and each of its Related Parties (to the extent not reimbursed by the Issuer as required under the Note Documents (including pursuant to Section 13.2 of the Agreement)), ratably according to its Pro Rata Share, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, fees, charges, and disbursements of financial, legal, and other advisors), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Junior DIP Collateral Agent or any of its

Related Parties in any matter relating to or arising out of, in connection with, or as a result of any Note Document or any other act, event, or transaction related, contemplated in, or attendant to any such document, or, in each case, any action taken or omitted to be taken by the Junior DIP Collateral Agent or any of its Related Parties under or with respect to the foregoing; *provided* that no Purchaser shall be liable to the Junior DIP Collateral Agent or any of its Related Parties under this Section 6 of this Exhibit C to the extent such liability has resulted from the gross negligence or willful misconduct of the Junior DIP Collateral Agent or, as the case may be, such Related Party, in each case, as determined by a final non-appealable judgment of a court of competent jurisdiction. To the extent required by any Applicable Law, the Junior DIP Collateral Agent may withhold from any payment to any Purchaser under a Note Document an amount equal to any applicable withholding tax. The Junior DIP Collateral Agent may offset against any payment to any Purchaser under a Note Document any applicable withholding tax that was required to be withheld from any prior payment to such Purchaser but which was not so withheld, as well as any other amounts for which the Junior DIP Collateral Agent is entitled to indemnification from such Purchaser under the immediately preceding sentence of this Section 6 of this Exhibit C.

7.      **Successor Junior DIP Collateral Agent**. The Junior DIP Collateral Agent may resign at any time by delivering notice of such resignation to the Purchasers and the Issuer, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective, in accordance with the terms of this Section 7 of this Exhibit C. The Required Purchasers may deliver notice of removal to the Junior DIP Collateral Agent, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective, in accordance with the terms of this Section 7 of this Exhibit C. Upon receipt of any such notice of resignation or removal, the Required Purchasers shall have the right to appoint a successor Junior DIP Collateral Agent. If, after 30 days after the date of the retiring Junior DIP Collateral Agent's notice of resignation, no successor Junior DIP Collateral Agent has been appointed by the Required Purchasers and has accepted such appointment, then the retiring Junior DIP Collateral Agent may, on behalf of the Purchasers, appoint a successor Junior DIP Collateral Agent from among the Purchasers. If no such successor Junior DIP Collateral Agent shall have been appointed by the Required Purchasers and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Purchasers) (the "**Resignation Effective Date**"), then such resignation shall nonetheless become effective in accordance with such notice on the Resignation Effective Date. Effective immediately upon its resignation, (a) the retiring Junior DIP Collateral Agent shall be discharged from its duties and obligations under the Note Documents (except that in the case of any collateral security held by the Junior DIP Collateral Agent on behalf of the Purchasers under any of the Note Documents, the retiring Junior DIP Collateral Agent shall continue to hold such collateral security, as bailee, until such time as a successor Junior DIP Collateral Agent is appointed), (b) the Purchasers shall assume and perform all of the duties of the Junior DIP Collateral Agent until a successor Junior DIP Collateral Agent shall have accepted a valid appointment hereunder, (c) the retiring Junior DIP Collateral Agent and its Related Parties shall no longer have the benefit of any provision of any Note Document other than with respect to any actions taken or omitted to be taken while such retiring Junior DIP Collateral Agent was, or because such Junior DIP Collateral Agent had been, validly acting as Junior DIP Collateral Agent under the Note Documents, and (d) subject to its rights under Section 2(b) of this Exhibit C, the retiring Junior DIP Collateral Agent shall take such action as may be reasonably necessary to assign to the successor Junior DIP Collateral Agent its rights as Junior DIP Collateral Agent under the Note Documents. Effective immediately upon its acceptance of a

valid appointment as Junior DIP Collateral Agent, a successor Junior DIP Collateral Agent shall succeed to, and become vested with, all the rights, powers, privileges, and duties of the retiring Junior DIP Collateral Agent under the Note Documents (other than any rights to indemnity payments owed to the retiring Junior DIP Collateral Agent). After the retiring Junior DIP Collateral Agent's resignation or removal hereunder, the provisions of this Exhibit C and Article 12 and Section 13.2 of the Agreement shall continue in effect for the benefit of such retiring Junior DIP Collateral Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Junior DIP Collateral Agent was acting as Junior DIP Collateral Agent.

8.    **Release and Sale of Collateral**.

(a)    Each Purchaser hereby consents to the release or sale (as applicable) and hereby directs the Junior DIP Collateral Agent, at the sole cost and expense of the Issuer, to release (or in the case of clause (ii) below, release or subordinate) the following:

(i)    any Guarantor if all of the stock of such Subsidiary owned directly or indirectly by the Issuer is sold or transferred in a transaction permitted under the Note Documents (including pursuant to a valid waiver or consent), to the extent that, after giving effect to such transaction, such Subsidiary would not be required to guaranty any Obligations pursuant to any Note Document; and

(ii)    any Lien held by the Junior DIP Collateral Agent for the benefit of the Secured Parties against any Collateral that is sold or otherwise disposed of by Issuer in a transaction permitted by the Note Documents (including pursuant to a valid waiver or consent);

*provided* that the Issuer shall have provided to the Junior DIP Collateral Agent a certificate stating that such transaction is permitted under the Note Documents (and each Purchaser hereby authorizes and directs the Junior DIP Collateral Agent to conclusively rely on such certificate in performing its obligations under this clause (a)).

(b)    Each Purchaser hereby consents and directs the Junior DIP Collateral Agent, at the sole cost and expense of the Issuer, to consent to the Credit Bid Transaction, the release of the Collateral in connection with any such Credit Bid Transaction and to execute and deliver any documents required or as may be reasonably requested by the Issuer, the Required Purchasers or the Purchasers' Representative in connection with the Consummation of the Credit Bid Transaction.

(c)    Upon request by the Junior DIP Collateral Agent at any time, the Required Purchasers will promptly confirm in writing (which shall not be unreasonably delayed) the Junior DIP Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guarantee pursuant to this Section 8.

9.    **Exculpatory Provisions**.

(a)    The Junior DIP Collateral Agent shall not have any duties or obligations except those expressly set forth in the Agreement, including this Exhibit C, and in the other Note Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Junior DIP Collateral Agent shall not:

(i)    be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(ii)    have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Agreement, including this Exhibit C, or by the other Note Documents that the Junior DIP Collateral Agent is required to exercise as directed in writing by the Purchasers' Representative or the Required Purchasers (or such other number or percentage of the Purchasers as shall be expressly provided for in this Agreement or in the other Note Documents), and in all cases the Junior DIP Collateral Agent shall be fully justified in failing or refusing to act hereunder or under any other Note Documents unless it shall (a) receive written instructions from the Purchasers' Representative or the Required Purchasers (or such other number or percentage of the Purchasers as shall be expressly provided for herein or in the other Note Documents) specifying the action to be taken and (b) be indemnified to its satisfaction by the Purchasers against any and all liability and expenses that may be incurred by it by reason of taking or continuing to take any such action; *provided* that the Junior DIP Collateral Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to any applicable Note Document or Applicable Law;

(iii)    except as expressly set forth herein and in the other applicable Note Documents, (x) have any duty to disclose or (y) be liable for the failure to disclose, any information relating to the Issuer or any of its Affiliates that is communicated to or obtained by the Junior DIP Collateral Agent or any of its Affiliates in any capacity; or

(iv)    be liable for any apportionment or distribution of payments made by it in good faith and, if any such apportionment or distribution is subsequently determined to have been made in error, the sole recourse of any Purchaser to whom payment was due but not made shall be to recover from other Purchasers any payment in excess of the amount to which they are determined to be entitled (and such other Purchasers hereby agree to return to such Purchaser any such erroneous payments received by them).

(b)    The Junior DIP Collateral Agent shall not be liable for any action taken or not taken by it: (i) with the consent of, or at the request of, the Purchasers' Representative or the Required Purchasers (or such other number or percentage of the Purchasers as shall be necessary, or as the Junior DIP Collateral Agent shall believe in good faith shall be necessary, under the circumstances, as provided for herein or in the other Note Documents); *provided* that no action, or any omission to act, taken by the Junior DIP Collateral Agent at the direction of the Purchasers' Representative or the Required Purchasers (or such other number or percentage of the Purchasers as shall be expressly provided for herein or in the other Note Documents) shall constitute gross negligence or willful misconduct, including, without limitation, Section 6 of this Exhibit C; or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by a final and non-appealable judgment. The Junior DIP Collateral Agent shall be entitled to request written instructions, or clarification of any instruction or request, from the Purchasers' Representative or the Required Purchasers (or, if the

relevant Note Document stipulates the matter is a decision for any other Purchaser or group of Purchasers, from that Purchaser or group of Purchasers) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority, or discretion, and the Junior DIP Collateral Agent may without any liability hereunder or under any other Note Document refrain from acting unless and until it receives those written instructions or that clarification. In the absence of such written instructions, the Junior DIP Collateral Agent may act (or refrain from acting) as it considers to be in the best interests of the Purchasers. The instructions as aforesaid and any action taken or failure to act pursuant thereto by the Junior DIP Collateral Agent shall be binding on all of the Purchasers.

(c)    The Junior DIP Collateral Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty, or representation made in or in connection with the Agreement or any other Note Document, (ii) the contents of any certificate, report, or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements, or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness, or genuineness of this Agreement, any other Note Document or any other agreement, instrument, or document, (v) the satisfaction of any condition set forth herein, other than to confirm receipt of items expressly required to be delivered to the Junior DIP Collateral Agent, (vi) the existence, value, perfection, or priority of any collateral security or the financial or other condition of the Issuer, any Guarantor, or any other obligor or guarantor, or (vii) any failure by the Issuer or Guarantor or any other Person (other than itself) to perform any of its obligations hereunder or under any other Note Document or the performance or observance of any covenants, agreements, or other terms or conditions set forth herein or therein.

(d)    The Junior DIP Collateral Agent shall not be obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations, or responsibilities or the exercise of any right, power, authority, or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

(e)    The Junior DIP Collateral Agent shall not be responsible for any unsuitability, inadequacy, expiration, or unfitness of any security interest created hereunder or pursuant to any other Note Document, nor shall it be obligated to make any investigation into, and shall be entitled to assume, the adequacy and fitness of any security interest created hereunder or pursuant to any other Note Document.

(f)    The Junior DIP Collateral Agent shall not be responsible or liable for any failure or delay in the performance of its obligations hereunder or any other Note Document arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, epidemics, pandemics, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss, or malfunctions of utilities, communications, or computer (software and hardware) services or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(g)    The Junior DIP Collateral Agent shall not be responsible for or have a duty

to ascertain or inquire into any representation or warranty regarding the existence, value, or collectability of the Collateral, the existence, priority, or perfection of the Junior DIP Collateral Agent's Liens thereon, or any certificate prepared by any party in connection therewith, nor shall the Junior DIP Collateral Agent have any duty to, and shall not be responsible or liable to the Purchasers for any failure to, monitor, maintain, or preserve any portion of the Collateral, any security interests of the Junior DIP Collateral Agent therein, or any filings, registrations, or recordings made with respect thereto. The Junior DIP Collateral Agent shall not have any obligation whatsoever to any Purchaser or any other person to investigate, confirm, or assure that the Collateral exists or is owned by the Issuer or is insured or has been encumbered, or that the liens and security interests granted to the Junior DIP Collateral Agent pursuant hereto or any of the other Note Documents or otherwise have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority.

## EXHIBIT D

### Taxes; Increased Costs

1.      **Defined Terms**.  For purposes of this Exhibit D:

(a)      "**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise taxes or branch profits taxes.

(b)      "**Excluded Taxes**" means any of the following taxes imposed on or with respect to a Purchaser or required to be withheld or deducted from a payment to a Purchaser, (i) taxes imposed on or measured by net income (however denominated), franchise taxes, and branch profits taxes, in each case, (A) imposed as a result of such Purchaser being organized under the laws of, or having its principal office or, in the case of any Purchaser, its applicable lending office located in, the jurisdiction imposing such tax (or any political subdivision thereof) or (B) that are Other Connection Taxes, (ii) in the case of a Purchaser, U.S. federal withholding taxes imposed on amounts payable to or for the account of such Purchaser with respect to an applicable interest in a Note pursuant to a law in effect on the date on which (A) such Purchaser acquires such interest in the Note or (B) such Purchaser changes its lending office, except in each case to the extent that, pursuant to Section 2 or Section 4 of this Exhibit D, amounts with respect to such taxes were payable either to such Purchaser's assignor immediately before such Purchaser became a party hereto or to such Purchaser immediately before it changed its lending office, (iii) taxes attributable to such Purchaser's failure to comply with Section 6 of this Exhibit D and (iv) any taxes imposed under FATCA.

(c)      "**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any applicable fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Internal Revenue Code.

(d)      "**Foreign Purchaser**" means a Purchaser that is not a U.S. Person.

(e)      "**Indemnified Taxes**" means (i) taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Issuer under any Note Document and (ii) to the extent not otherwise described in clause (i), Other Taxes.

(f)      "**Other Connection Taxes**" means, with respect to any Purchaser, taxes imposed as a result of a present or former connection between such Purchaser and the jurisdiction imposing such tax (other than connections arising from such Purchaser having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Note Document, or sold or assigned an interest in any Note or other Note

Document).

(g)    "**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Note Document, except any such taxes that are Other Connection Taxes imposed with respect to an assignment.

(h)    "**U.S. Person**" means any Person that is a "United States person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

(i)    "**Withholding Agent**" means the Issuer and the Junior DIP Collateral Agent, as applicable.

(j)    The term "**applicable law**" includes FATCA, and the term "Note Document" does not include the Voting Agreement or the Bird Canada Share Purchase Agreement.

**2.    Payments Free of Taxes**.  Any and all payments by or on account of any obligation of the Issuer under any Note Document shall be made without deduction or withholding for any taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such tax is an Indemnified Tax, then the sum payable by the Issuer shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2 or Section 4 of this Exhibit D) the applicable Purchaser receives an amount equal to the sum it would have received had no such deduction or withholding of Indemnified Taxes been made.

**3.    Payment of Other Taxes by Issuer**.  The Issuer shall timely pay to the relevant Governmental Authority in accordance with applicable law any Other Taxes.

**4.    Indemnification by Issuer**.  The Issuer shall indemnify each Purchaser for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under Section 2 or this Section 4 of this Exhibit D) payable or paid by such Purchaser or required to be withheld or deducted from a payment to such Purchaser and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Issuer by a Purchaser shall be conclusive absent manifest error.

**5.    Evidence of Payments**.  As soon as commercially practicable after any payment of taxes by the Issuer to a Governmental Authority pursuant to the provisions of this Exhibit D,

the Issuer shall deliver to the applicable Purchaser the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to such Purchaser.

**6.    Status of Purchasers**.

(a)    Any Purchaser that is entitled to an exemption from or reduction of withholding tax with respect to payments made under any Note Document shall deliver to the Issuer, at the time or times reasonably requested by the Issuer, such properly completed and executed documentation reasonably requested by the Issuer as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Purchaser, if reasonably requested by the Issuer, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Issuer as will enable the Issuer to determine whether or not such Purchaser is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 6(b)(i), 6(b)(ii) and 6(b)(iv) of this Exhibit D) shall not be required if in the Purchaser's reasonable judgment such completion, execution or submission would subject such Purchaser to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Purchaser.

(b)    Without limiting the generality of the foregoing, in the event that Issuer is a U.S. Person,

(i)    any Purchaser that is a U.S. Person shall deliver to the Issuer on or prior to the date on which such Purchaser becomes a Purchaser under this Agreement (and from time to time thereafter upon the reasonable request of the Issuer), executed copies of IRS Form W-9 certifying that such Purchaser is exempt from U.S. federal backup withholding tax;

(ii)    any Foreign Purchaser shall, to the extent it is legally entitled to do so, deliver to the Issuer (in such number of copies as shall be requested by the Issuer) on or prior to the date on which such Foreign Purchaser becomes a Purchaser under this Agreement (and from time to time thereafter upon the reasonable request of the Issuer), whichever of the following is applicable:

A.    in the case of a Foreign Purchaser claiming the benefits of an income tax treaty to which the United States is a party, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the applicable article(s) of such tax treaty;

B.    executed copies of IRS Form W-8ECI;

C.    in the case of a Foreign Purchaser claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate in form and

substance reasonably acceptable to the Issuer, to the effect that such Foreign Purchaser is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of the Issuer within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" related to the Issuer as described in Section 881(c)(3)(C) of the Internal Revenue Code (a "**U.S. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

D.    to the extent a Foreign Purchaser is not the beneficial owner, executed copies of IRS Form W- 8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate in form and substance reasonably acceptable to the Issuer, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Purchaser is a partnership and one or more direct or indirect partners of such Foreign Purchaser are claiming the portfolio interest exemption, such Foreign Purchaser may provide a U.S. Tax Compliance Certificate in form and substance reasonably acceptable to the Issuer on behalf of each such direct and indirect partner;

(iii)    any Foreign Purchaser shall, to the extent it is legally entitled to do so, deliver to the Issuer (in such number of copies as shall be requested by the Issuer) on or prior to the date on which such Foreign Purchaser becomes a Purchaser under this Agreement (and from time to time thereafter upon the reasonable request of the Issuer), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Issuer to determine the withholding or deduction required to be made; and

(iv)    if a payment made to a Purchaser under any Note Document would be subject to U.S. federal withholding tax imposed by FATCA if such Purchaser were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Purchaser shall deliver to the Issuer at the time or times prescribed by law and at such time or times reasonably requested by the Issuer such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Issuer as may be necessary for the Issuer to comply with its obligations under FATCA and to determine that such Purchaser has complied with such Purchaser's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (iv), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(c)     Each Purchaser agrees that if any form or certification it previously delivered to the Issuer expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Issuer in writing of its legal inability to do so.

**7.     Treatment of Certain Refunds**.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any taxes as to which it has been indemnified pursuant to the provisions of this Exhibit D (including by the payment of additional amounts pursuant to the provisions of this Exhibit D), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under the provisions of this Exhibit D with respect to the taxes giving rise to such refund), net of all out-of-pocket expenses (including taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 7 (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 7, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 7 the payment of which would place the indemnified party in a less favorable net after-tax position than the indemnified party would have been in if the tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such tax had never been paid.  This Section 7 shall not be construed to require any indemnified party to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the indemnifying party or any other Person.

**8.     Survival**.  Each party's obligations under the provisions of this Exhibit D shall survive the resignation or replacement of the Junior DIP Collateral Agent or any assignment of rights by, or the replacement of, a Purchaser and the repayment, satisfaction or discharge of all obligations under any Note Document.

**EXHIBIT E**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| BIRD GLOBAL, INC., *et al.*,[1] | Case No. 23-20514-CLC |
| Debtors. | (Jointly Administered) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING, (B) GRANT SENIOR SECURED LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND (C) UTILIZE CASH
COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY;
(IV) SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

**THIS MATTER** came before this Court on Friday, December 22, 2023, at 9:30 a.m. in

Miami, Florida ("Hearing"), upon the motion [ECF No. 32] (the "DIP Motion") filed by the debtors

and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases

---

[1]    The address of the Debtors is 392 Northeast 191st Street, #20388, Miami, FL 33179.  The last four digits of the
Debtors' federal tax identification numbers are: (i) Bird Global, Inc. (3155); (ii) Bird Rides, Inc. (9939); (iii) Bird
US Holdco, LLC (8390); (iv) Bird US Opco, LLC (6873); and (v) Skinny Labs, Inc. (8176).

US-DOCS\147131838.9

(the "<u>Chapter 11 Cases</u>") commenced on December 19, 2023 (the "<u>Petition Date</u>") for entry of an interim order (this "<u>Interim Order</u>") and a final order under sections 105, 361, 362, 363, 364, 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "<u>Bankruptcy Rules</u>"), and Rules 2002-1, 4001-1, 4001-2, 4001-3, and 9013-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Florida (the "<u>Local Rules</u>") seeking, among other things:

(a)     authorization for Bird Global, Inc., in its capacity as borrower (the "<u>Borrower</u>"), to obtain postpetition financing, and for each of the other Debtors, and certain of their non-Debtor affiliates, to borrow or guarantee, as applicable, unconditionally (in their capacities as guarantors, the "<u>Guarantors</u>" and together with the Borrower and any other obligors, the "<u>DIP Obligors</u>"),[2] on a joint and several basis, the Borrower's obligations in connection with debtor in possession financing (the "<u>DIP Facilities</u>"), to be funded by certain Prepetition Secured Lenders (as defined herein) pursuant to the DIP Credit Agreements and other DIP Documents (each as defined herein), comprising:

i.     a postpetition senior secured priming and super-priority debtor-in-possession loan facility (the "<u>DIP Credit Facility</u>") provided by the lenders (the "<u>Prepetition First Lien Lenders</u>") party to the Prepetition Credit Agreement (as defined herein) pursuant to the terms and conditions of this Interim Order and the DIP Credit Agreement (as defined below), consisting of (a) new money loans up to $19,500,000 (the "<u>New Money Senior DIP Loans</u>") of which up to $12,925,000 shall be available upon the entry of this Interim Order after exhaustion of the New Money Junior DIP Notes (as defined herein); and (b) subject to entry of the Final Order, loans under the Prepetition Credit Agreement, held by the Prepetition First Lien Lenders and rolled up into the DIP Credit Facility, in an aggregate principal amount of not less than $41,455,322.40, plus accrued and unpaid interest of not less than $2,833,148.50 and all other Prepetition First Lien Obligations (as defined herein) (such rolled-up debt, the "<u>Roll-Up Loans</u>" and together with the New Senior Money DIP Loans, the "<u>Senior DIP Loans</u>");

---

[2]     The DIP Obligors are: (i) Debtors (a) Bird Global, Inc.; (b) Bird Rides, Inc.; (c) Bird U.S. Holdco, LLC; (d) Bird US Opco, LLC; and (e) Skinny Labs, Inc.; and (ii) non-Debtors: (a) Bird Canada Scooters, Inc; (b) Bird Treasury Holdco, LLC; (c) Scoot Rides, Inc; (d) Bird Rides International Holdings, Inc.; (e) Bird Rides Holdings (US), LLC; (f) Bird Rides Europe B.V.

2

    ii.   a postpetition senior secured and super priority priming note purchase agreement (the "<u>DIP Junior Notes Facility</u>" and together with the DIP Credit Agreement, the "<u>DIP Facilities</u>") junior only to the DIP Credit Facility, the First Lien Adequate Protection Obligations (as defined herein), and the Prepetition First Lien Obligations, provided by certain note purchasers (the "<u>Participating Second Lien Lenders</u>") party to the Prepetition Note Purchase Agreement (as defined herein) pursuant to the terms and conditions of this Interim Order and the DIP Note Purchase Agreement (as defined below) consisting of (a) up to $5,600,000 in new money notes (the "<u>New Money Junior DIP Notes</u>") of which $5,600,000 shall be available upon the entry of this Interim Order pursuant to the terms and conditions of this Interim Order and the DIP Note Purchase Agreement (as defined herein); and (b) certain bridge notes issued under the Prepetition Note Purchase Agreement, held by the Participating Second Lien Lenders and rolled up into the DIP Junior Notes Facility, in an aggregate principal amount of $4,000,000 plus accrued interest and fees payable with respect thereto (such rolled-up debt, the "<u>Roll-Up Notes</u>" and together with the New Money Junior DIP Notes, the "<u>Junior DIP Notes</u>" and together with the First Lien DIP Loans, the "<u>DIP Loans</u>"); and

(b)    authorization for the Debtors to enter into and perform under:

    i.   the *Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement* (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "<u>DIP Credit Agreement</u>," together with all agreements, documents and instruments delivered or executed in connection therewith, the "<u>Senior DIP Documents</u>") among the DIP Obligors, the Prepetition First Lien Lenders as lenders under DIP Credit Facility (collectively, in their capacities as lenders under the DIP Credit Facility, the "<u>Senior DIP Lenders</u>") and MidCap Financial Trust, as administrative agent (in such capacity, the "<u>Senior DIP Agent</u>" and together with the Senior DIP Lenders, the "<u>Senior DIP Parties</u>"), which credit agreement shall be in substantially the same form attached hereto as <u>Exhibit 3</u>, and all obligations arising thereunder including all "Borrower Obligations" as defined therein being "<u>Senior DIP Obligations</u>"; and

    ii.   the *Senior Secured Priming and Superpriority Debtor-In-Possession Note Purchase Agreement* (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "<u>DIP Note Purchase Agreement</u>," together with all agreements, documents and instruments delivered or executed in connection therewith, the "<u>Junior DIP Documents</u>," and together with the Senior DIP Documents, the "<u>DIP Documents</u>") among the DIP Obligors, the Participating Second Lien Lenders (collectively, in their capacities as note purchasers under the DIP Note Purchase Agreement, the "<u>Junior DIP Lenders</u>" and together with the Senior DIP Lenders, the "<u>DIP Lenders</u>") and U.S. Bank Trust Company,

National Association as collateral agent for the Junior DIP Lenders (in such capacity herein, the "Junior DIP Agent," and together with (i) the Senior DIP Agent, the "DIP Agents," and (ii) the Junior DIP Lenders, the "Junior DIP Parties"; and the Junior DIP Parties together with the Senior DIP Parties, the "DIP Parties"), which agreement shall be in substantially the same form attached hereto as Exhibit 4, and all obligations arising thereunder including all "Obligations" as defined therein being "Junior DIP Obligations" and together with the Senior DIP Obligations, the "DIP Obligations"); and;

(c)     authorization for the Debtors to use the proceeds of the DIP Loans and the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), in accordance with the terms hereof, including pursuant to the DIP Budget (as defined herein) as further described herein, to (i) pay principal, fees, interest, and other obligations under the DIP Facilities, (ii) upon entry of the Final Order, to roll up and grant Senior DIP Loan status to all Prepetition First Lien Obligations, (iii) upon entry of the Final Order, to roll-up and grant Junior DIP Note status to the Roll-Up Notes, and (iv) to provide working capital for, and for other general corporate purposes of, the Debtors, including for funding the Carve Out (as defined herein) and payment of any Adequate Protection Obligations (as defined herein);

(d)     the granting of adequate protection to the Prepetition First Lien Lenders for all principal, interest, indebtedness, fees, costs, expenses and obligations of any kind, ("Prepetition First Lien Obligations" and together with the Senior DIP Obligations, the "Senior Obligations") arising under the Amended and Restated Loan Agreement among the Prepetition First Lien Lenders, the Debtors and certain non-Debtor Affiliates as Borrowers, Parent, or guarantors thereto (as applicable), and MidCap Financial Trust as Administrative Agent (the "Prepetition First Lien Agent" and together with the Prepetition First Lien Lenders, the "Prepetition First Lien Parties") dated as of September 19, 2023 (as amended, restated, amended and restated, or otherwise modified from time to time including by Amendment No. 1 thereto dated as of November 29, 2023, the "Prepetition Credit Agreement") and, all security, pledge and guaranty agreements and all other documentation executed in connection with the foregoing, including without limitation all "Transaction Documents" as defined in the Prepetition Credit Agreement (each as amended, supplemented or otherwise modified, and together with the Prepetition Credit Agreement, the "Prepetition First Lien Credit Documents"),

(e)     the granting of adequate protection to the Participating Second Lien Lenders and any non-participating note purchasers under the Prepetition Note Purchase Agreement (defined below) (collectively with the Participating Second Lien Lenders, the "Prepetition Second Lien Lenders") for all principal, interest, indebtedness, fees, costs, expenses and obligations of any kind, ("Prepetition Second Lien Obligations" and together with the Prepetition First Lien Obligations, the "Prepetition Obligations") arising under the Note Purchase Agreement among the Prepetition Second Lien Lenders, Bird Global, Inc., and U.S. Bank Trust

4

Company, National Association, as collateral agent for the Prepetition Second Lien Lenders (in such capacity herein, the "<u>Prepetition Second Lien Agent</u>" and together with the Prepetition Second Lien Lenders, the "<u>Prepetition Second Lien Parties</u>" and together with the Prepetition First Lien Parties, the "<u>Prepetition Secured Parties</u>"), dated as of December 30, 2022 (as amended, restated, amended and restated, or otherwise modified from time to time including the First Amendment thereto dated as of March 17, 2023, the Second Amendment thereto dated as of September 19, 2023, the Third Amendment thereto dated as of December 11, 2023, and the Fourth Amendment (the "Fourth Amendment") thereto dated as of December 18, 2023, the "<u>Prepetition Note Purchase Agreement</u>") and, all security, pledge and guaranty agreements and all other documentation executed in connection with the foregoing (each as amended, supplemented or otherwise modified, and together with the Prepetition Credit Agreement, the "<u>Prepetition Second Lien Credit Documents</u>" and together with the Prepetition First Lien Credit Documents, the "<u>Prepetition Credit Documents</u>");

(f)     authorization for the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, letter of credit fees, agency fees, audit fees, appraisal fees, valuation fees, administrative and collateral agents' fees, and the reasonable fees and disbursements of the DIP Parties' attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(g)     the granting of valid, enforceable, non-avoidable and fully perfected first priority liens on and security interests in all, if any, of the property, assets and other interests in property and assets of the Debtors that are not subject to a valid and perfected lien on the Petition Date (such property and assets, the "<u>Unencumbered Assets</u>"), except as otherwise specifically provided herein and in the applicable DIP Documents, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, including actions to recover property transferred pursuant to section 549 of the Bankruptcy Code and, upon entry of the Final Order, the proceeds of any other claims or causes of action arising or assertable under chapter 5 of the Bankruptcy Code (the "<u>Avoidance Actions</u>"), subject only to the Carve Out and the priority of liens set forth in paragraph 12 of this Interim Order;

(h)     the granting of valid, enforceable, non-avoidable and fully perfected first priority priming liens on and security interests in all of the property, assets and other interests in property and assets of the Debtors, except as otherwise specifically provided herein and in the applicable DIP Documents, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired

5

or created, whether existing prior to or arising after the Petition Date, that comprises the Prepetition Collateral (as defined herein), subject only to the Carve Out and the priority of liens set forth in paragraph 12 of this Interim Order, on the terms and conditions set forth herein and in the DIP Documents;

(i)     the granting of valid, enforceable, non-avoidable and fully perfected junior liens on and security interests in all of the property, assets and other interests in property and assets of the Debtors, except as otherwise specifically provided herein and in the applicable DIP Documents, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, that is subject to Permitted Liens (as defined herein) (other than the Prepetition Liens (as defined herein)), subject only to the Carve Out and the priority of liens set forth in paragraph 12 of this Interim Order, on the terms and conditions set forth herein and in the DIP Documents;

(j)     subject to the terms of this Interim Order, the granting of superpriority administrative expense claims against each of the Debtors' estates to the DIP Agents and the DIP Lenders, with respect to the DIP Obligations with the priorities set forth in paragraph 10 of this Interim Order over any and all administrative expenses of any kind or nature, subject and subordinate only to the Carve Out, on the terms and conditions set forth herein and in the DIP Documents;

(k)     the waiver of the Debtors' and the estates' rights to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c), the waiver of the "equities of the case" exception under Bankruptcy Code 552(b), and a waiver of the equitable doctrine of "marshalling", subject in each case to entry of the Final Order (but retroactive to the Petition Date);

(l)     subject to the terms of this Interim Order, authorization for the DIP Agents and the DIP Lenders to exercise remedies under the DIP Documents on the terms described herein upon the occurrence and during the continuance of a Termination Event (as defined herein);

(m)     the modification of the automatic stay imposed pursuant to Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Interim Order;

(n)     pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Court to consider entry of this Interim Order, among other things, (i) authorizing the Borrower, on an interim basis, to (x) borrow New Money Junior DIP Notes in an amount up to $5,600,000, and (y) upon exhaustion of the proceeds of such interim New Money Junior DIP Notes borrowings, borrowing New Money Senior DIP Loans in an amount up to $12,925,000 and (ii) upon entry of the Final Order, to continue to borrow from the

6

DIP Lenders in accordance with the DIP Documents, including, in subsequent draws, the New Money Senior DIP Loans in their full, authorized amount and the incurrence of the Roll-Up Loans and Roll-Up Notes as DIP Obligations; (iii) authorizing the Guarantors to guaranty the DIP Obligations, (iv) authorizing the Debtors' use of Cash Collateral, and (v) granting the adequate protection described in this Interim Order; and

(o)    that this Court schedule a final hearing (the "<u>Final Hearing</u>") to consider entry of a final order (the "<u>Final Order</u>") authorizing and approving, on a final basis, among other things, the Debtors' entry into the DIP Facilities, the borrowings under the DIP Facilities, the continued use of Cash Collateral and granting adequate protection, in each case, as described in the Motion and as set forth in the DIP Documents.

The Court having considered the Motion and the exhibits thereto, the *Declaration of Christopher Rankin In Support of Chapter 11 Petitions and First Day Pleadings* [ECF No. 31] (the "<u>First Day Declaration</u>"), the evidence submitted or proffered and the arguments of counsel made at the Interim Hearing; and proper and sufficient notice of the Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014; and the Interim Hearing to consider the relief requested in the Motion having been held and concluded; and all objections, if any, to the relief requested in the Motion and to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, creditors and parties in interest; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:[3]

1.    *Disposition*.  The Motion is GRANTED on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent that any of

US-DOCS\147131838.9

Order that have not been withdrawn, waived or settled, and all reservation of rights included therein, are hereby denied and overruled.

2.      *Jurisdiction*.    This Court has core jurisdiction over the Chapter 11 Cases commenced on Petition Date, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      *Notice*.    Under the circumstances, the notice given by the Debtors of, and as described in, the Motion, the relief requested therein, and the Interim Hearing complies with Bankruptcy Rules 4001(b) and (c) and the Local Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

4.      *Debtors' Stipulations*.    Without prejudice to the rights of any other party, but subject to the limitations thereon contained in paragraphs 31 and 32 of this Interim Order, the Debtors represent, admit, stipulate and agree as follows:

(a)      Prepetition First Lien Obligations.    As of the Petition Date, the Debtors and their non-Debtor affiliates party to the Prepetition First Lien Credit Documents (the "Prepetition First Lien Obligors") without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition First Lien Parties under the Prepetition First Lien Credit Documents in the aggregate principal amount of loans of not less than $41,455,322.40, *plus* approximately $2,833,148.50 accrued and unpaid interest and fees thereon as of the Petition Date, *plus* all other Prepetition First Lien Obligations.  The Prepetition First Lien Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Prepetition First-Lien

---

the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

8

Obligors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition First Lien Parties by or on behalf of any of the Prepetition First-Lien Obligors prior to the Petition Date under or in connection with any of the Prepetition First Lien Credit Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(b)    <u>Prepetition First Priority Liens</u>.  Pursuant to the Prepetition First Lien Credit Documents, the Prepetition First Lien Obligations are secured by valid, binding, perfected, non-avoidable and enforceable first priority liens on and security interests in (the "<u>Prepetition First Priority Liens</u>") the "Collateral" (as defined in the Prepetition First Lien Credit Documents) (the "<u>Prepetition Collateral</u>"), subject only to certain permitted liens as permitted under the Prepetition First Lien Credit Documents.  The Prepetition First Priority Liens (i) are valid, binding, perfected and enforceable first priority liens and security interests in the Prepetition Collateral, (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, objection, challenge, counterclaim, defense or any "claim" (as defined in the Bankruptcy Code) of any kind, (iii) as of the Petition Date are subject and/or subordinate only to certain permitted liens (if any) as permitted by the terms of the Prepetition First Lien Credit Documents, (iv) were granted to or for the benefit of the Prepetition First Lien Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making

9

of the loans and/or commitments and other financial accommodations secured thereby(iv) constitute the legal, valid and binding obligation of the "Credit Parties" (as defined in the Prepetition First Lien Credit Documents), enforceable in accordance with the terms of the applicable Prepetition First Lien Credit Documents, and (v) encumber all or substantially all of the Debtors' assets as of the Petition Date (subject to certain limited exclusions set forth in the Prepetition First Lien Documents).

(c) _Prepetition Second Lien Obligations_. As of the Petition Date, the Debtors and their non-Debtor affiliates party to the Prepetition Second Lien Credit Documents (the "Prepetition Second Lien Obligors" and together with the Prepetition First Lien Obligors, the "Prepetition Obligors"), without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Prepetition Second Lien Parties under the Prepetition Second Lien Credit Documents in the aggregate principal amount of notes not less than $63,850,000, _plus_ approximately $7,180,000.00 accrued and unpaid interest thereon (including PIK interest) as of the Petition Date, _plus_ all other Prepetition Second Lien Obligations. The Prepetition Second Lien Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and the non-Debtor Prepetition Obligors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise. No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Second Lien Agent or Prepetition Second Lien Lenders by or on behalf of any of the Debtors or the non-Debtor Prepetition Obligors prior to the Petition Date under or in connection with any of the Prepetition Second Lien Credit Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset,

10

subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(d)    <u>Prepetition Second Priority Liens</u>.  Pursuant to the Prepetition Second Lien Credit Documents, the Prepetition Second Lien Obligations are secured by valid, binding, perfected and enforceable second priority liens on and security interests in the Prepetition Collateral (the "<u>Prepetition Second Priority Liens</u>" and, together with the Prepetition First Priority Liens, the "<u>Prepetition Liens</u>"), which Prepetition Second Priority Liens are subject and subordinate only to the Prepetition First Priority Liens and certain permitted liens as permitted by the terms of the Prepetition Second Lien Credit Documents.  The Prepetition Second Priority Liens (i) are valid, binding, perfected, and enforceable second priority liens and security interests in the Prepetition Collateral, (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind, (iii) as of the Petition Date are subject and/or subordinate only to the Prepetition First Priority Liens and certain permitted liens as permitted by the terms of the Prepetition Second Lien Credit Documents, and (iv) constitute the legal, valid and binding obligation of the "Note Parties" (as defined in the Prepetition Second Lien Credit Documents), enforceable in accordance with the terms of the applicable Prepetition Second Lien Credit Documents.

(e)    <u>Prepetition Intercreditor Agreement</u>.  As of the Petition Date, the Prepetition First Lien Agent and the Prepetition Second Lien Agent were party to that certain Amended and Restated Subordination and Intercreditor Agreement dated as of September 19, 2023 (as amended, supplemented, amended and restated or otherwise modified from time to time prior to the date of this Interim Order, the "<u>Prepetition Intercreditor Agreement</u>").  The Prepetition

11

Intercreditor Agreement governs the respective rights, interests, obligations, priority and positions of the Prepetition Secured Parties with respect to the Prepetition Collateral.  The Prepetition Obligors, including the Debtors, have acknowledged and agreed to recognize all rights granted to the parties to the Prepetition Intercreditor Agreement.

(f)     No Challenges/Claims.  Subject to paragraph 32 below, no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the respective Prepetition Liens or Prepetition Obligations exist, and no portion of the respective Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  The Debtors and their estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action,[4] and/or choses in action against any of the Prepetition Secured Parties, any of their respective Agents or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the Prepetition Credit Documents, the Prepetition Obligations, the Prepetition Liens, or

---

[4]     As used in this Interim Order, "causes of action" means any action, claim, cause of action, controversy demand, right, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, and license of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Closing Date (as defined herein), in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law.  For the avoidance of doubt, "cause of action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction law, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non-U.S. law; (d) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of title 11 of the United States Code; (e) any state or foreign law pertaining to actual or constructive fraudulent transfer, fraudulent conveyance, and (f) any "lender liability" or equitable subordination claims or defenses.

12

otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.  The Prepetition Secured Parties claims in respect of the Prepetition Obligations constitute allowed, secured claims, within the meaning of sections 502 and 506 of the Bankruptcy Code, subject to the value of the Prepetition Collateral. The Debtors have waived, discharged, and released any right to challenge any of the Prepetition Secured Indebtedness, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Liens.

(g)    Cash Collateral.  Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral (as defined herein) existing as of the Petition Date or from time to time, and the proceeds of any of the foregoing, is the Prepetition Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

5.    *Findings Regarding the DIP Facilities and Use of Cash Collateral.*

(a)    Good cause has been shown for the entry of this Interim Order.

(b)    As set forth in the First Day Declaration, the Debtors have an immediate need to obtain the DIP Facilities and to use the Cash Collateral in each case on an interim basis, in order to, among other things, (i) permit the orderly continuation of their respective businesses, (ii) maintain business relationships with their vendors, suppliers, regulators, customers and other parties, (iii) make payroll, (iv) make adequate protection payments, (v) pay the costs of the administration of the Chapter 11 Cases, including a process for the sale of the Debtors' assets,

13

and (vi) satisfy other working capital and general corporate purposes of the Debtors. The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations to avoid irreparable harm by, among other things, preserving and maintaining the value of the Debtors' assets. The Debtors will not have sufficient sources of working capital and financing to operate their business or maintain their properties in the ordinary course of business throughout the Chapter 11 Cases without the DIP Facilities and authorized use of Cash Collateral.

(c)      As set forth in the First Day Declaration, the Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors are unable to obtain secured credit allowable under Bankruptcy Code sections 364(c)(1), 364(c)(2) and 364(c)(3) for the purposes set forth in the DIP Documents. Financing on a postpetition basis is not otherwise available without the Debtors granting to the DIP Agents, for the benefit of itself and the DIP Lenders, the DIP Liens (as defined herein), in each case, under the terms and conditions set forth in this Interim Order and the DIP Documents.

(d)      The terms of the DIP Facilities, the DIP Documents and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)      The DIP Facilities have been negotiated in good faith and at arm's length among the Debtors, the DIP Agents and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Facilities and the DIP Documents including, without limitation, the DIP Obligations, shall be deemed to have been

14

extended by the DIP Agents and the DIP Lenders, respectively, in good faith as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e).  The DIP Obligations and the DIP Liens (as defined herein) shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, and any liens or claims granted to the DIP Agents or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

(f)    The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  For the reasons set forth in the Motion, the First Day Declaration, and the record presented to the Court at the Interim Hearing, absent granting the relief granted by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facilities and authorization of the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Interim Order and the DIP Documents are, therefore, in the best interests of the Debtors' estates and are consistent with the Debtors' fiduciary duties.

(g)    (i) the Prepetition Second Lien Parties have consented to the terms of the DIP Facilities and entry of this Interim Order, and (ii) the Prepetition Second Priority Liens and the Second Lien Adequate Protection Liens (as defined herein) are subordinate to the Carve Out, the Permitted Liens (if any), the DIP Liens, the First Lien Adequate Protection Liens and the Prepetition First Priority Liens.

6.    *Authorization of the DIP Facilities and the DIP Documents.*

(a)    The Debtors are hereby expressly authorized and empowered to execute and deliver and, on such execution and delivery, perform under the DIP Documents, which are hereby approved and incorporated herein by reference.

(b)    The Borrower is authorized to borrow, and the Guarantors are authorized to guaranty and/or incur, borrowings of (i) upon entry of this Interim Order, (x) up to $5,600,000 in New Money Junior DIP Notes, and (y) up to $12,925,000 in the New Money Senior DIP Loans subject to exhaustion of the New Money Junior DIP Notes proceeds, and (ii) subject to entry of the Final Order, up to $19,500,000 in New Money Senior DIP Loans (inclusive of amounts advanced pursuant to this Interim Order), in all cases plus applicable interest, fees, indemnities and other expenses and other amounts provided for in the DIP Documents, and at all times subject to the provisions of the DIP documents, the Interim DIP Order or Final DIP Order, as applicable, and the DIP Budget.  Nothing in this paragraph 6(b) shall be construed to restrict the ability of non-Debtor Guarantors and non-Debtor DIP Obligors to guaranty and/or incur borrowings under the DIP Facilities on the same basis as Debtor Guarantors and Debtor DIP Obligors, as set forth in the DIP Documents, or otherwise impair or effect in any way the obligations of non-Debtor Guarantors and non-Debtor DIP Obligors in connection therewith.

(c)    Proceeds of the DIP Loans and Cash Collateral shall be used solely for the purposes permitted under the DIP Documents, this Interim Order and in accordance with the DIP Budget, the DIP Documents and this Interim Order.

(d)    Subject to entry of the Final Order, the Debtors are authorized to (i) roll up in full any and all Prepetition First Lien Obligations, including any accrued and unpaid interest thereon, with such Prepetition First Lien Obligations becoming Senior DIP Obligations as Senior DIP Loans; and (ii) roll up $4,000,000 in principal amount of Prepetition Second Lien Obligations,

16

plus accrued and unpaid interest thereon, with such Prepetition Second Lien Obligations becoming Junior DIP Obligations as Junior DIP Notes.

(e)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by Bankruptcy Code section 362 is hereby lifted to the extent necessary and applicable, to perform all acts and to make, execute and deliver all instruments and documents (including, without limitation, the DIP Documents), and to pay all fees, expenses, indemnities and other amounts contemplated thereby or that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facilities including, without limitation:

(i)    the execution, delivery and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement and DIP Note Purchase Agreement and any guarantees and collateral documents contemplated thereby;

(ii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents (in each case in accordance with the terms of the DIP Documents and in such form as the Debtors, the DIP Agents and the Required DIP Lenders or Required Purchasers (as defined in the DIP Documents, as applicable) may agree in accordance with the DIP Documents), it being understood that no further approval of the Court shall be required for any amendments, waivers, consents or other modifications to and under the DIP Documents or the DIP Budget, except that any modifications or amendments to the DIP Documents that shorten the maturity thereof, increase the aggregate commitments thereunder or increase the rate of interest payable with respect thereto shall be on notice and subject to a hearing and Court approval, as necessary;

(iii)    the non-refundable and, upon entry of this Interim Order, irrevocable payment to each of the DIP Lenders or the DIP Agents, as applicable, of any amounts due (or that may become due) in respect of any indemnification obligations under the DIP Documents or any other amounts payable in connection with the DIP Documents, including, without limitation, the payment of all reasonable and documented fees, out of pocket expenses, and disbursements of counsel incurred by the DIP Agents and Lenders arising prior to, on, or after the Petition Date;

17

(iv)    making any payments on account of the Adequate Protection Obligations provided for in this Interim Order; and

(v)    the performance of all other acts required under or in connection with the DIP Documents.

(f)    Upon execution and delivery of the DIP Credit Agreement, DIP Note Purchase Agreement and the other DIP Documents, such DIP Documents shall constitute valid, binding and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Interim Order for all purposes during the Chapter 11 Cases, any subsequently converted Chapter 11 Case of any Debtor to a case under chapter 7 of the Bankruptcy Code or after the dismissal of any Chapter 11 Case.  No obligation, payment, transfer or grant of security under the DIP Credit Agreement, the DIP Note Purchase Agreement, the other DIP Documents or this Interim Order shall be stayed, restrained, subordinated, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under Bankruptcy Code sections 502(d), 510, 548 or 549 or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transaction Act, or similar statute or common law), or subject to any Avoidance Action, defense, reduction, setoff, recoupment or counterclaim.

(g)    The Debtor Guarantors hereby are authorized and directed to jointly, severally and unconditionally guarantee in full all of the DIP Obligations of the Borrower and to incur any DIP Obligations and DIP Liens in connection therewith.  Nothing in this paragraph 6(g) shall be construed to restrict the ability of non-Debtor Guarantors and non-Debtor DIP Obligors to guaranty and/or incur borrowings under the DIP Facilities on the same basis as Debtor Guarantors and Debtor DIP Obligors, as set forth in the DIP Documents.

18

7.      *Roll-Up Obligations*.

(a)      <u>Roll-Up Loans</u>.  Upon entry of the Final Order, all outstanding Prepetition First Lien Obligations shall immediately, automatically, and irrevocably (except as to third parties pursuant to paragraph 32 hereof) be deemed to have been converted into Senior DIP Obligations and shall be entitled to all the priorities, privileges, rights, and other benefits set forth in this Interim Order and the Final Order.

(b)      <u>Roll-Up Notes</u>.  Upon entry of the Final Order, $4,000,000 in principal amount of Prepetition Second Lien Obligations, plus accrued and unpaid interest thereon, held by the Participating Second Lien Lenders (or their designated affiliates) shall immediately, automatically, and irrevocably (except as to third parties pursuant to paragraph 32 hereof) be deemed to have been converted into Junior DIP Obligations and shall be entitled to all the priorities, privileges, rights, and other benefits set forth in this Interim Order and the Final Order.

8.      *Budget*.

(a)      Except as otherwise provided herein or in the DIP Documents, the Debtors may only use Cash Collateral and the proceeds of the DIP Facilities to fund payments benefitted by the Carve Out and otherwise in accordance with a projected statement of sources and uses of cash for the DIP Obligors and their subsidiaries (the "<u>Company</u>") on a consolidated basis for the current and following 13 calendar weeks (but not any preceding weeks) attached hereto as <u>Exhibit 1</u> (as may be amended, replaced, supplemented or otherwise modified in accordance with the terms of this Interim Order and the DIP Documents, the "<u>DIP Budget</u>") as set forth in the DIP Documents.  Three business days following the week in which the Petition Date occurs and thereafter three business days' following the end of each prior week (each, a "<u>Reporting Date</u>"), the Debtors shall deliver a proposed updated DIP Budget, in each case, substantially in the form

19

attached hereto as <u>Exhibit 1</u> (with only such changes thereto as the Senior DIP Agent shall each agree in its sole discretion in accordance with the DIP Documents). Upon approval of the proposed updated DIP Budget by the Senior DIP Agent, the proposed DIP Budget shall be deemed the "DIP Budget" for all purposes under this Interim Order and the DIP Documents. Unless and until a proposed updated DIP Budget is approved and accepted by the Senior DIP Agent, the existing DIP Budget shall remain in full force and effect and continue to govern the Debtors' compliance with the Budget Covenants (as defined below).

(b)    On each Reporting Date, the Debtors shall deliver simultaneously to the DIP Parties a variance report/reconciliation report certified by the Chief Financial Officer or Chief Restructuring Officer of the Debtors, in form reasonably acceptable to the Senior DIP Agent, setting forth the actual sources and uses of cash and the ending unrestricted cash balance of the Company for the immediately preceding week, the variance expressed both in dollar amounts and percentages (on both an aggregate and line-item basis) of sources and uses of cash and in ending unrestricted cash for such week, and all post-petition expenses of the Debtors that are accrued and unpaid as of the end of such week (including accruals of fees of Professional Persons).

(c)    The Debtors shall only incur DIP Obligations and expend Cash Collateral and other DIP Collateral (as defined herein) proceeds to make payments benefitted by the Carve Out and otherwise in accordance with the specific purposes set forth in the DIP Budget, subject to the permitted variances as set forth in the DIP Documents (collectively referred to herein as the "<u>Budget Covenants</u>"). Notwithstanding anything to the contrary set forth in this Interim Order, the DIP Budget shall not constitute a limit on the amount of any fees payable to any of the DIP Advisors (as defined herein) pursuant to paragraph 30 of this Interim Order.

(d)      The consent of the Senior DIP Parties to the DIP Budget shall not be construed as consent to the use of any Cash Collateral or DIP Loans after the occurrence of an Event of Default (as defined in the DIP Credit Agreement) or Termination Event, regardless of whether the aggregate funds shown on the DIP Budget have been expended, other than funds necessary to satisfy the Carve Out and solely during the Notice Period (as defined herein), to fund operations in accordance with the DIP Credit Agreement and Budget, as provided in paragraph 26 of this Interim Order.

9.      *Reporting Requirements/Access to Records*.  The Debtors shall provide (a) Latham & Watkins LLP ("Latham"), as counsel to the Prepetition First Lien Parties and the Senior DIP Parties, (b) Venable LLP ("Venable") counsel to the Participating Second Lien Lenders and Junior DIP Lenders, and (c) advisors to the Committee, if one is appointed, with all reporting and other information required to be provided to the DIP Agents or DIP Lenders under the DIP Documents.  In addition to, and without limitation, whatever rights to access the DIP Agents and the DIP Lenders have under the DIP Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents and employees of the DIP Agents and the DIP Lenders to (i) have access to and inspect the Debtors' assets, (ii) examine the Debtors' books and records, and (iii) discuss the Debtors' affairs, finances and condition with the Debtors' officers and financial advisors; provided, however, that nothing in this Interim Order requires the Debtors to disclose any information that is subject of or protected by any of the Debtors' legal privileges.

10.      *DIP Superpriority Claims*.  Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed senior administrative expense claims of the DIP Agents and the DIP Lenders, against each of the Debtors' estates (the "DIP Superpriority

Claims"), without the need to file any proof of claim or request for payment of administrative expenses, with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b) and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including actions to recover property transferred pursuant to section 549 of the Bankruptcy Code and, upon entry of the Final Order, the proceeds of any other Avoidance Actions, subordinate only to the Carve Out and with the priorities set forth in (a) – (d) below:

(a)        The DIP Superpriority Claims arising under the DIP Credit Facility (the "DIP Credit Facility Superpriority Claims") shall be senior in right of payment to the First Lien Adequate Protection Superpriority Claims (as defined herein), the DIP Note Purchase Agreement Superpriority Claims (as defined herein); and the Second Lien Adequate Protection Superpriority Claims (as defined herein).

(b)        The First Lien Adequate Protection Superpriority Claims shall be junior in right of payment to the DIP Credit Facility Superpriority Claims and shall be senior in right of payment to the DIP Note Purchase Agreement Superpriority Claims and the Second Lien Adequate Protection Claims.

(c)         The DIP Superpriority Claims arising under the DIP Note Purchase Agreement (the "DIP Note Purchase Agreement Superpriority Claims") shall be junior in right of payment to the DIP Credit Facility Superpriority Claims and First Lien Adequate Protection Superpriority Claims, and shall be senior in right of payment to the Second Lien Adequate Protection Superpriority Claims.

(d)         The Second Lien Adequate Protection Superpriority Claims shall be junior in right of payment to the other DIP Superpriority Claims set forth above.

(e)         Except as set forth herein, or permitted by, this Interim Order, no other superpriority claims shall be granted or allowed in these chapter 11 cases.

11.     *DIP Liens*.    Pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, as security for the DIP Obligations, effective and automatically perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agents or any DIP Lender of, or over, any DIP Collateral (as defined herein), the following security interests and liens are hereby granted by the Debtors to the DIP Agents, for the benefit of the DIP Agents and the DIP Lenders (the "DIP Liens" and, all property identified in clauses (a) – (c) below, collectively, the "DIP Collateral"), which shall be subordinate only to the Carve-Out, to the extent specifically provided for herein, and otherwise subject to the terms of this Interim Order and the DIP Documents, including paragraph 12 hereto.  In addition, the DIP Obligations shall be secured by the assets of the non-Debtor DIP Obligors pursuant to and as provided in the DIP Documents, and the DIP Collateral shall include liens on all assets of the non-Debtor DIP Obligors in accordance with the applicable DIP Documents.

23

(a)      <u>Liens Priming the Prepetition Liens</u>.  Subject to the terms of this Interim Order, pursuant to Bankruptcy Code section 364(d)(1), in respect of the  each of the DIP Facilities, valid, binding, continuing, enforceable, fully perfected first priority senior priming security interests in and upon (the "<u>DIP Priming Liens</u>") all prepetition and postpetition property of the Debtors to the extent set forth in the DIP Documents, including, without limitation, the following (except to the extent constituting Excluded Assets (as defined in the DIP Documents)):   the Prepetition Collateral, Cash Collateral, any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax attributes including credits and net operating losses and offsets and refunds arising therefrom, other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action, and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, proceeds of Avoidance Actions and other causes of action, and proceeds relating thereto, rights under section 549 of the Bankruptcy Code (whether received by judgment, settlement, or otherwise), all other "Collateral" as defined in the Prepetition Credit Documents, and all other "property of the estate" (as defined in section 541 of the

Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, in each case wherever located, underlined provided, underlined however, that the DIP Liens on proceeds of Avoidance Actions (which for the avoidance of doubt, excludes Debtors' claims and causes of action under section 549 of the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing) shall be subject to entry of the Final Order.  The DIP Priming Liens shall be subordinate only to the Carve Out and the Permitted Liens (if any) and have the priorities set forth in this paragraph 12 of this Interim Order, and otherwise subject to the terms of this Interim Order and the DIP Documents.

(b)    Liens Junior to Permitted Liens.  Subject to the terms of this Interim Order and to the extent set forth in the DIP Documents, pursuant to Bankruptcy Code section 364(c)(3), with respect to each of the DIP Facilities, valid, binding, continuing, enforceable and fully-perfected security interests in and liens upon ("DIP Subordinated Liens") (i) all prepetition and postpetition property of the Debtors (other than the property described in subparagraph (a) of this paragraph 11, as to which the liens and security interests in favor of the DIP Agents will be as described in such clauses), whether now existing or hereafter acquired, that is subject to (x) valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, if any, that are senior to the liens securing the Prepetition First Lien Obligations and permitted under the Prepetition Credit Documents and/or (y) valid and unavoidable liens in existence immediately prior to the Petition Date, if any, that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) that are senior to the liens securing the Prepetition First Lien Obligations and permitted under the Prepetition Credit Documents, which security interests and liens in favor of

25

the DIP Agents and the DIP Lenders are junior only to such valid, perfected and unavoidable liens (collectively, (x) and (y), the "Permitted Liens").  The DIP Subordinated Liens shall be subordinate only to the Carve Out and the Permitted Liens and have the priorities set forth in this paragraph 12 of this Interim DIP Order, and otherwise subject to the terms of this Interim Order and the DIP Documents.

(c)     Liens on Unencumbered Assets.  Subject to the terms of this Interim Order and to the extent set forth in the DIP Documents, pursuant to Bankruptcy Code section 364(c)(2), in respect of each of the DIP Facilities, a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and lien upon (the "DIP Unencumbered Asset Liens") all Unencumbered Assets.  The DIP Unencumbered Asset Liens will have the priorities set forth in paragraph 12 of this Interim Order.

12.     *Priority of DIP Liens, Adequate Protection Liens, and Liens of Prepetition Secured Parties*.  Subject to the Carve Out, on the basis set forth herein, the DIP Liens and Adequate Protection Liens shall have the following priorities:

(a)     As to Unencumbered Assets, including, subject to entry of the Final Order, proceeds of Avoidance Actions (which for the avoidance of doubt, excludes Debtors' claims and causes of action under section 549 of the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing), whether received by judgment, settlement, or otherwise— **first**, the DIP Liens granted to the Senior DIP Parties (the "DIP Senior Liens"); **second**, the First Lien Adequate Protection Liens (as defined herein) (if any); **third**, the DIP Liens granted to the Junior DIP Parties (the "DIP Junior Liens"); and **fourth**, the Second Lien Adequate Protection Liens.

US-DOCS\147131838.9

(b)      As to the other DIP Collateral—**first**, any Permitted Liens; **second**, the DIP Senior Liens; **third**, the First Lien Adequate Protection Liens (if any); **fourth**, the Prepetition First Priority Liens (if any); **fifth**, the DIP Junior Liens; **sixth**, the Second Lien Adequate Protection Liens; and, **seventh**, the Prepetition Second Priority Liens.

13.      *Carve Out*.

(a)      <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee for Region 3 (the "<u>U.S. Trustee</u>") under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $75,000.00 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in (iii) below); (iii) to the extent allowed, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to Bankruptcy Code sections 327, 328 or 363 (the "<u>Debtor Professionals</u>") and an official committee of unsecured creditors (the "<u>Creditors' Committee</u>") pursuant to Bankruptcy Code sections 328 or 1103 (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice and, subject to the cumulative amount set forth for such expenses in the DIP Budget for such period and reduced on a per-dollar basis on account of any retainers held by the applicable Professional Person; and (iv) Allowed Professional Fees of Professional Persons, in an aggregate amount not to exceed (a) $250,000 for the Debtor Professionals and (b) $50,000 for the Committee Professionals, incurred after the first business day following delivery of the Carve Out Trigger

27

Notice, to the extent allowed, whether by interim order, procedural order or otherwise, but excluding any "success fee" or "transaction fee" payable to the Debtors' or Creditors' Committee's investment banker or financial advisor (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by the Senior DIP Agent in accordance with the DIP Documents to the Debtors, their lead restructuring counsel, the U.S. Trustee and lead restructuring counsel to the Creditors' Committee (if appointed) providing that a Termination Event (as defined herein) has occurred and is continuing and stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)    Carve Out Reserves.  On a weekly basis, the Debtors shall fund into an account maintained by Berger Singerman LLP (the "Funded Reserve Account") for the benefit of Professional Persons, an amount (the "Funded Reserve Amount") equal to the sum of the total weekly fees of Debtor Professionals and Committee Professionals (in the amount set forth in the Approved Budget for each Professional Person) for the current week subject to the Approved Budget.  Funds in the Funded Reserve Account shall be allocated for the benefit of each Professional Person in the amount set forth in the Approved Budget for each Professional Person. For the avoidance of doubt, the DIP Lenders shall have no obligation to fund aggregate fees and expenses in excess of (i) the amounts set forth in the Approved Budget or (ii) the amount of the DIP Facilities. The Debtors shall use funds held in the Funded Reserve Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the local bankruptcy rules of the Bankruptcy Court, and any interim or final orders of the Bankruptcy Court; provided that no Allowed Professional Fees shall be paid from the Funded Reserve Account in excess of the applicable line items in the

28

Approved Budget. Notwithstanding the occurrence of an Event of Default or conditions to borrowing, on the day on which a Carve Out Trigger Notice is delivered (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Facilities and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to deposit in the Funded Reserve Account an amount equal to the then unpaid amounts of (A) the Allowed Professional Fees of Debtor Professionals (subject to the DIP Budget and reduced for retainers held by such Professional Person as set forth in clause (iii) of the definition of Carve Out above), (B) the Allowed Professional Fees of the Committee Professionals (subject to the DIP Budget and reduced for retainers held by such Professional Person as set forth in clause (iii) of the definition of Carve Out above), and (C) the obligations accrued as of the Termination Declaration Date with respect to clauses (i) and (ii) of the definition of Carve Out set forth in paragraph 13(a) (the "Additional Carve Out Obligations"). The Debtors shall deposit such amounts in the Funded Reserve Account in trust to pay such then unpaid Allowed Professional Fees and Additional Carve Out Obligations (the "Pre-Carve Out Trigger Notice Reserve") prior to the use of such reserve to pay any other claims. On the Termination Declaration Date, after funding the Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to the use of such reserve to pay any other claims. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above in paragraph 13(a) (the "Pre-Carve Out Amounts"), but

29

not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until the Pre-Carve Out Amounts are paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to the terms of this Interim Order (including, without limitation, paragraph 14 hereof), to pay any other amounts (if owing) benefitted by the Carve Out and then to the applicable agent to be applied to the Senior DIP Obligations, Junior DIP Obligations, Adequate Protection Obligations, and Prepetition Secured Obligations (collectively, the "Obligations") according to the priorities set forth in paragraphs 10 and 12 of this Interim Order.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to the terms of this Interim Order (including, without limitation, paragraph 14 hereof), to the applicable agent to be applied to the Obligations according to the priorities set forth in paragraphs 10 and 12 of this Interim Order.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 13, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 13, prior to making any payments to any agent for the benefit of the DIP Parties or Prepetition Secured Parties, as applicable.  Funds transferred to the Funded Reserve Account shall not be subject to any liens or claims granted to the DIP Lenders herein or any liens or claims granted as adequate protection, shall not constitute DIP Collateral, and shall not constitute cash collateral or assets of the Debtors' estates; provided, that, notwithstanding anything to the contrary herein or in the DIP Documents, the DIP Collateral shall include the Debtors' reversionary interest in funds held in the Funded

Reserve Account and such reversionary interest shall be treated as DIP Collateral and subject to the DIP Liens and the DIP Superpriority Claims.

(c)    <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Agents, DIP Lenders or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agents, the DIP Lenders or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(d)    <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out under the DIP Facilities shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code and applicable law.

14.    *DIP Intercreditor Provisions*

(a)    <u>Standstill</u>.

(i)    Until the Senior Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have been indefeasibly paid in full, in cash, and all commitments under the Senior DIP Documents and Prepetition First Lien Credit Documents have been terminated, and all other "Borrower Obligations" under the DIP Credit

31

Facility and Prepetition First Lien Credit Agreement have been satisfied (the "Discharge of Senior Obligations"), the Junior DIP Parties and Prepetition Second Lien Parties, will not:

1.    exercise or seek to exercise any rights or remedies with respect to any DIP Collateral or take any action against any DIP Obligor (including taking any Enforcement Action (as defined below) with respect to DIP Collateral); *provided* that (1) the Junior DIP Agent may take Enforcement Actions with respect to the DIP Collateral after the passage of a period of one hundred and fifty (150) days (the "Standstill Period") after the earlier of (x) the DIP Term Loan Maturity Date (as defined in the DIP Credit Agreement) and (y) the date on which the Junior DIP Agent provides written notice to the Senior DIP Agent stating that the Junior DIP Agent has declared all of the Junior DIP Obligations to be immediately due and payable (such earlier date, the "Standstill Commencement Date") and (2) in no event shall the Junior DIP Parties or Prepetition Second Lien Parties exercise any rights or remedies with respect to the DIP Collateral on account of the Junior DIP Obligations or Prepetition Second Lien Obligations (including Second Lien Adequate Protection Liens or Second Lien Adequate Protection Superpriority Claims) if, notwithstanding the expiration of the Standstill Period, the Senior DIP Agent or any other Senior DIP Party shall have commenced prior to the expiration of the Standstill Period and be diligently pursuing in good faith any Enforcement Action with respect to all or any material portion of the DIP Collateral;

2.    on and after the Standstill Commencement Date (but prior to the termination of the Standstill Period), contest, protest, or object to any Enforcement Action by the Senior DIP Agent or any other Senior DIP Party, or purport to direct the Senior DIP Agent or any other Senior DIP Party to take any Enforcement Actions or take any other action under the DIP Documents, in each case, with respect to the DIP Collateral; and

3.    prior to the termination of the Standstill Period, object to the forbearance by the Senior DIP Agent or any other Senior DIP Party from taking any Enforcement Action with respect to the DIP Collateral.

(ii)    Notwithstanding the foregoing, the Junior DIP Parties and Prepetition Second Lien Parties may:

1.    take Enforcement Actions with respect to the DIP Collateral after the termination of the Standstill Period to the extent permitted by subparagraph 14(a)(i)(1) above;

2.    take any action not adverse to the Senior DIP Parties and Prepetition First Lien Parties in order to preserve or protect their rights in the DIP Collateral;

32

3.      bid for or purchase DIP Collateral in cash or, subject to paragraph 35 of this Interim Order, by credit bid, at any public foreclosure or sale, on such DIP Collateral in accordance with the terms of the DIP Documents and this Interim Order or join (but not exercise any control with respect to) any judicial foreclosure proceeding or other judicial lien enforcement proceeding with respect to the DIP Collateral initiated by the Senior DIP Agent to the extent that any such action could not reasonably be expected to restrain, hinder, limit, delay for any material period or otherwise interfere with the Enforcement Action by Senior DIP Agent;

4.      file a claim, proof of claim or statement of interest, credit bid their debt in accordance with this Interim Order and make any arguments, pleadings and motions that do not violate the terms of this Interim Order and that are not inconsistent with this Interim Order;

5.      take any action (not adverse to the priority status of the liens on the DIP Collateral securing the Senior DIP Obligations or Prepetition First Lien Obligations or the rights of Senior DIP Agent or Prepetition First Lien Agent) in order to create, prove, perfect, file, protect or preserve, its lien in and to the DIP Collateral;

6.      file any necessary responsive or defensive pleadings or appeal in opposition to any motion, claim, adversary proceeding, or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of Junior DIP Parties or Prepetition Second Lien Parties, including any claims secured by the DIP Collateral, if any; or

7.      vote on any chapter 11 plan, make other filings and make any arguments, pleadings and motions (including in support of or opposition to, as applicable, the confirmation or approval of any chapter 11 plan) that are, in each case, consistent with and not otherwise prohibited by, the terms of this Interim Order, with respect to the Junior DIP Obligations and Prepetition Second Lien Obligations, as applicable, and the DIP Collateral, _provided_, that no such filings, arguments, pleadings, motions or chapter 11 plans shall propose to treat any claims or security interests of the DIP Parties in a manner inconsistent with this Interim Order or the Final Order.

(iii)      On and after the Standstill Commencement Date, until the Discharge of Senior Obligations has occurred, but subject to the terms of this Interim Order, the Senior DIP Agent shall have the exclusive right to take Enforcement Actions with respect to the DIP Collateral.  Subject to the terms of this Interim Order, in connection with any such Enforcement Action, the Senior DIP Agent or any other DIP Party may enforce the provisions of the DIP

33

Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion.

(iv)    For purposes of this paragraph 14, "Enforcement Action" means, with respect to the DIP Obligations or the Prepetition Secured Obligations, the exercise of any rights and remedies with respect to any DIP Collateral securing such obligations or the commencement or prosecution of enforcement of any of the rights and remedies under, as applicable, the DIP Documents, the Prepetition First Lien Credit Documents, or applicable law, including, without limitation, the exercise of any rights of set-off or recoupment, and the exercise of any rights or remedies of a secured creditor under the Uniform Commercial Code (the "UCC") of any applicable jurisdiction or under this Interim Order.

(v)    So long as the Discharge of Senior Obligations has not occurred, all DIP Collateral or proceeds thereof received in connection with the sale or other disposition of, or collection or realization on, such DIP Collateral upon the exercise of remedies by the Senior DIP Agent, the Senior DIP Parties, or the Prepetition First Lien Secured Parties and all other cash payments or distributions made by the Debtors shall be applied first by the Senior DIP Agent to the Senior Obligations and then, upon the Discharge of Senior Obligations, by the Junior DIP Agent, according to the priorities set forth in paragraphs 10 and 12, after giving effect to the Carve Out.  Upon the Discharge of the Senior Obligations, the Senior DIP Agent shall promptly deliver to the Junior DIP Agent any remaining DIP Collateral and remaining proceeds of DIP Collateral held by it in the same form as received, with any necessary endorsements (as determined by the Junior DIP Agent) to be applied by the Junior DIP Agent to the DIP Junior Term Loan Obligations and the Second Lien Adequate Protection Obligations in accordance with this Interim Order.

US-DOCS\147131838.9

(b)    <u>Bailee for Perfection</u>.  Each of the DIP Agents, the Prepetition First Lien Agent and the Prepetition Second Lien Agent agree to hold or control that part of the DIP Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon under the UCC, or other applicable law as bailee and as a non-fiduciary agent for the Junior DIP Agent, the Senior DIP Agent, the Prepetition First Lien Agent and the Prepetition Second Lien Agent, as applicable (such bailment and agency being intended, among other things, to satisfy the requirements of Sections 8-301(a)(2), 9-313(c), 9-104, 9-105, 9-106, and 9-107 of the UCC), solely for the purpose of perfecting the security interest granted under any of the DIP Documents, as applicable, and the Senior DIP Agent, the Junior DIP Agent, the Prepetition First Lien Agents and the Prepetition Second Lien Agent hereby appoint each other agent to act as its non-fiduciary agent for such purposes and each such agent accepts such appointment.  Subject to entry of the Final Order, notwithstanding the roll-up of the Prepetition Secured Obligations, and to the maximum extent permitted by applicable law, all Prepetition Credit Documents that provide collateral support for the Prepetition Secured Obligations shall be deemed to provide collateral support for the DIP Obligations and such Prepetition Credit Documents shall be deemed modified or amended as may be required to effect the foregoing.

(c)    Notwithstanding anything to the contrary set forth in this Interim Order, prior to the Discharge of Senior Obligations, each Debtor and other Obligor will not make, and the Junior DIP Lenders and Prepetition Second Lien Lenders will not accept, any cash payment of principal or interest in respect of the Junior DIP Obligations or Prepetition Second Lien Obligations.  The foregoing is intended to constitute a "subordination agreement" within the meaning of Bankruptcy Code section 510(a)).  Any payment received by any Junior DIP Party in violation of this paragraph

14(c) shall be segregated and forthwith paid over to the Senior DIP Agent for application to the Senior DIP Obligations.

15. *Limitation on Charging Expenses Against Collateral.* Subject to entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral, the DIP Agents, the DIP Lenders or the Prepetition Secured Parties pursuant to Bankruptcy Code sections 506(c) or 105(a), or any similar principle of law or equity, without the prior written consent of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agents, the DIP Lenders or the Prepetition Secured Parties.

16. *No Marshaling/Application of Proceeds.* Subject to entry of the Final Order, the DIP Agents and the Prepetition Agents shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition Collateral, as applicable, in accordance with the provisions of the Interim Order or Final Order, as applicable, the DIP Documents, the Prepetition Intercreditor Agreement and the Prepetition Credit Documents, as applicable, and in no event shall the DIP Agents, the DIP Lenders or any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral.

17. *Equities of the Case.* Subject to entry of the Final Order, (i) the Prepetition Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b) and (ii) the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to

36

such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral.

18.    *Use of Cash Collateral*.  The Debtors are hereby authorized to use all Cash Collateral solely in accordance with this Interim Order, the DIP Documents and the DIP Budget including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the date of the Final Hearing.  Except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral absent further order of the Court.  Notwithstanding anything to the contrary in this Interim Order, under no circumstances shall the DIP Budget constitute a limit on the fees and expenses incurred by the DIP Lenders, the DIP Agents or the DIP Professionals (as defined herein).

19.    *Adequate Protection for the Prepetition First Lien Parties*.  Subject only to the Carve Out and the terms of this Interim Order, pursuant to Bankruptcy Code sections 361, 363(e), and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition diminution in value of such interests, resulting from the imposition of the DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' sale, lease or use of the Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay and/or any other reason for which adequate protection may be granted under the Bankruptcy Code (all such diminution,  "Diminution in Value"), the Prepetition First Lien Agents, for the benefit of themselves and the Prepetition First Lien Lenders, are hereby granted the following (collectively, the "First Lien Adequate Protection Obligations"):

(a)    First Lien Adequate Protection Liens.  As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in, and liens on, as of the date of this Interim Order (the "First Lien Adequate Protection Liens"), without the necessity of the execution by the Debtors or non-Debtor Obligors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, all DIP Collateral.  Subject to the terms of this Interim Order, the First Lien Adequate Protection Liens shall have the priorities set forth in paragraph 12 of this Interim Order.

(b)    First Lien Adequate Protection Superpriority Claim.  As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), an allowed administrative expense claim in the Chapter 11 Cases to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such Chapter 11 Cases, except the Carve Out and subject to the priorities set forth herein (the "First Lien Adequate Protection Superpriority Claims").  The First Lien Adequate Protection Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including actions to recover property transferred pursuant to section 549 of the Bankruptcy Code, but excluding Avoidance Actions, but including, subject to entry of the Final Order, the proceeds of Avoidance Actions).  The First Lien Adequate Protection Superpriority Claims shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry

38

of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114, subject to the priorities set forth in paragraph 10 of this Interim Order.

(c)    <u>Fees and Expenses</u>.  As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, reasonable and documented fees and expenses (the "<u>First Lien Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, of the Prepetition First Lien Agents and the Prepetition First Lien Lenders, including, without limitation, the reasonable and documented fees and expenses of Latham and local counsel in the Southern District of Florida.  Statements of any such fees and expenses incurred after the Petition Date shall be provided by the applicable professional to counsel to the Debtors, the U.S. Trustee, the Junior DIP Agent and the Creditors' Committee (if appointed).  The invoices for such fees and expenses shall not be required to comply with any particular format, may be in summary form only and may include redactions necessary to maintain privilege.  Recipients of the invoices shall have 10 days after receipt to notify counsel of any objections to the reasonableness of the fees and expenses incurred.  If no objection is raised with counsel on or before the expiration of the ten-day review period, such invoice shall be paid without further order of the Court and shall not be subject to any further review, challenge or disgorgement.  If any objection is raised as to reasonableness of fees or expenses, the undisputed amounts shall be paid immediately and any disputed amounts shall be subject to further order of this Court.  For the avoidance of doubt, the provision of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine.  Notwithstanding anything to the contrary in this Interim Order, it shall be a condition of the Interim DIP Draw that prior to the Interim DIP Draw, the Borrower shall have paid any accrued and outstanding First Lien Adequate Protection Fees, notwithstanding any applicable review period for such First Lien Adequate Protection Fees.

39

(d)    <u>First Lien Accrued Adequate Protection Payments</u>.    To the extent that any Prepetition First Lien Obligations remain outstanding and to the extent not rolled up into the DIP Credit Facility, then as further adequate protection, the Prepetition First Lien Agent, on behalf of the Prepetition First Lien Lenders, shall receive, upon entry of this Interim Order, monthly adequate protection payments (the "<u>First Lien Accrued Adequate Protection Payments</u>") payable in cash, as and when due under the applicable Prepetition First Lien Credit Documents, equal to the interest at the contractual default rate that would otherwise be owed to the Prepetition First Lien Lenders under the Prepetition First Lien Credit Agreement during such monthly period in respect of those remaining Prepetition First Lien Obligations, until such time as the full Prepetition First Lien Obligations Amount is paid in full, in cash.

(e)    <u>Information Rights</u>.    The Debtors shall promptly provide the Prepetition First Lien Agent with all required financial reporting and other periodic reporting that is required to be provided to the DIP Agents or the DIP Lenders under the DIP Documents.

20.    *Adequate Protection for the Prepetition Second Lien Lenders*.    Subject to the Carve Out and the terms of this Interim Order, pursuant to Bankruptcy Code sections 361, 363(e) and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition Diminution in Value of such interests, resulting from the imposition of the DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' sale, lease or use of the Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay and/or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition Second Lien Lenders are hereby granted the following obligations (collectively, the

40

"Second Lien Adequate Protection Obligations" and, together with the First Lien Adequate Protection Obligations, the "Adequate Protection Obligations"):

(a)    Second Lien Adequate Protection Liens.  As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable and effective and automatically perfected postpetition security interests in, and liens on, as of the date of this Interim Order (the "Second Lien Adequate Protection Liens" and, together with the First Lien Adequate Protection Liens, the "Adequate Protection Liens"), without the necessity of the execution by the Debtors or non-Debtor Obligors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, all DIP Collateral.  The Second Lien Adequate Protection Liens shall have the priorities set forth in paragraph 12 of this Interim Order.

(b)    Second Lien Adequate Protection Superpriority Claim.  As further adequate protection, to the extent provided by Bankruptcy Code sections 503(b) and 507(b), an allowed administrative expense claim in the Chapter 11 Cases ahead of and senior to any and all other administrative expense claims in such Chapter 11 Cases to the extent of any postpetition Diminution in Value, except the Carve Out, and subject to the priorities set forth herein (the "Second Lien Adequate Protection Superpriority Claim" and, together with the First Lien Adequate Protection Superpriority Claim, the "Adequate Protection Superpriority Claims").  The Second Lien Adequate Protection Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including actions to recover property transferred pursuant to section 549 of the Bankruptcy Code excluding Avoidance Actions, but including, subject to entry of the Final Order, the proceeds of Avoidance Actions).  The Second Lien Adequate Protection Superpriority Claims shall have priority over all

41

administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114, subject to the priorities set forth in paragraph 10 of this Interim Order.

(c)    Fees and Expenses.  As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, reasonable and documented fees and expenses (the "Second Lien Adequate Protection Fees"), whether incurred before or after the Petition Date, of the Prepetition Second Lien Agent, the Participating Second Lien Lenders and counsel to the Prepetition Second Lien Agent and Participating Second Lien Lenders, including, without limitation, the reasonable and documented fees and expenses of Maslon LLP and local counsel in the Southern District of Florida as counsel to the Prepetition Second Lien Agent and Venable as counsel to the Participating Second Lien Lenders.  Statements of any such fees and expenses incurred subsequent to the Petition Date shall be provided by the applicable professional to counsel to the Debtors, the U.S. Trustee, the Senior DIP Agent, the Junior DIP Agent and any Creditors' Committee (if appointed).  The invoices for such fees and expenses shall not be required to comply with any particular format, may be in summary form only and may include redactions necessary to maintain privilege.  Recipients of the invoices shall have 10 days after receipt to notify counsel of any objections to the reasonableness of the fees and expenses incurred.  If no objection is raised with counsel on or before the expiration of the ten-day review period, such invoice shall be paid without further order of the Court and shall not be subject to any further review, challenge or disgorgement.  If any objection is raised as to reasonableness of fees or expenses, the undisputed amounts shall be paid immediately and any disputed amounts shall be subject to further order of

this Court. For the avoidance doubt, the provision of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine. Notwithstanding anything to the contrary in this Interim Order, it shall be a condition of the Interim DIP Draw that prior to the Interim DIP Draw, the Borrower shall have paid any accrued and outstanding Second Lien Adequate Protection Fees, notwithstanding any applicable review period for such Second Lien Adequate Protection Fees.

(d)    <u>Information Rights</u>.  The Debtors shall promptly provide the Prepetition Second Lien Agent with all required financial reporting and other periodic reporting that is required to be provided to the DIP Agents or the DIP Lenders under the DIP Documents, including this Interim Order.

21.    *Section 507(b) Reservation*.  Subject in all respects to the terms of the Prepetition Intercreditor Agreement, nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties, that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any diminution in value of their respective interests in the Prepetition Collateral (including the Cash Collateral); provided, however, that any such additional section 507(b) claims shall be subject to the same relative priority as such party's Adequate Protection Obligations, as provided in this Interim Order.

22.    *Restrictions on Disposition of Material Assets Outside the Ordinary Course of Business*.  Except as expressly permitted under the DIP Documents, and with respect to a sale of

43

the Debtors' assets in accordance with the Milestones (as defined herein) and on terms and conditions reasonably acceptable to the DIP Agents, the Debtors shall not use, sell or lease any material assets outside the ordinary course of business, or seek authority of this Court to the extent required by Bankruptcy Code section 363, without obtaining the prior written consent of the DIP Agents, prior to the date on which the Debtors seek the Court's authority for such use, sale or lease.  Subject to the Carve Out and the Permitted Liens (if any), in the event of any such sale, lease, transfer, license or other disposition of property of the Debtors that constitutes DIP Collateral outside the ordinary course of business (to the extent permitted by the DIP Documents and this Interim Order), subject to the terms of the DIP Documents and this Interim Order (including, without limitation, paragraph 14 hereof), the Debtors are authorized and shall promptly pay, without further notice or order of this Court, such amount (if any) of net cash proceeds resulting therefrom no later than the business day following receipt of such proceeds, to the Senior DIP Agent to be applied according to the priorities set forth in DIP Documents.  Subject to the Carve Out and the Permitted Liens (if any), in the event of any casualty, condemnation or similar event with respect to property that constitutes DIP Collateral, subject to the terms of the DIP Documents and this Interim Order (including, without limitation, paragraph 14 hereof), the Debtors are authorized and shall promptly pay, without further notice or order of this Court, the required amount of any insurance proceeds, condemnation award or similar payment (excluding any amounts on account of any D&O policies) no later than the second business day following receipt of payment by the Debtors, to the Senior DIP Agent to be applied according to the priorities set forth in paragraphs 10 and 12 of this Interim Order, unless (in accordance with applicable DIP Documents and this Interim Order) the DIP Agents consent, in writing, to the funds being reinvested by the Debtors.

44

23.     *Insurance.* At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date. Upon entry of this Interim Order, the DIP Agents shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and lender's loss payees on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

24.     *Reservation of Rights of the DIP Agents, DIP Lenders and Prepetition Secured Parties*.  Except as otherwise expressly set forth in this Interim Order (including, without limitation, paragraph 14 hereof), the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, subject in all respects to the terms of the Prepetition Intercreditor Agreement, as applicable: (a) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right of the Prepetition First Lien Parties, but not the Prepetition Second Lien Parties, to seek additional adequate protection; (b) any of the rights of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties to (i) request modification of the automatic stay of Bankruptcy Code section 362, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7 or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Chapter 11 Cases, or (iii) seek to propose, subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan or plans; or (c) any other rights, claims or privileges (whether legal, equitable or otherwise) of any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties.  The delay in or failure of the DIP Agents, the DIP Lenders and/or

the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Agents', the DIP Lenders' or the Prepetition Second Lien Parties' rights and remedies.

25.  *Termination Event*.  The occurrence of any of the following shall constitute a "Termination Event": (a) the occurrence of an Event of Default (as defined in the DIP Credit Facility), including the failure by the Debtors to comply with any of the milestones set forth at Exhibit 2 hereto including the Permit Reporting Covenant and Permit Continuance Covenant specified therein (the "Milestones"), to the extent not waived or subject to a forbearance or similar agreement with the applicable lenders; (b) the Debtors' failure to comply in any material respect with any provision of this Interim Order unless waived by the applicable lenders; or (c) the occurrence of the Maturity Date (as defined in the DIP Credit Agreement).

26.  *Remedies Upon a Termination Event.*  The Debtors shall immediately provide notice to counsel to the DIP Agents, the DIP Lenders, the Prepetition First Lien Agent, and the Prepetition Second Lien Agent (with a copy to counsel to the Creditors' Committee (if appointed)), of the occurrence of any Termination Event, at which time (i.e., the time of the occurrence of the Termination Event) the Debtors' ability to use Cash Collateral hereunder shall terminate (subject to the proviso at the end of this paragraph 26), the DIP Obligations shall become due and payable and any commitments under the DIP Facilities shall terminate.  Upon the occurrence of a Termination Event and following the giving of not less than five business days' advance written notice (which may be by email) (the "Notice Period") by the Senior DIP Agent, or if the Discharge of Senior Obligations has occurred, by the Junior DIP Agent (the "Enforcement Notice"), to counsel to the Debtors, applicable DIP Agents and DIP Lenders, applicable Prepetition Agents, the U.S. Trustee and counsel to the Creditors' Committee (if

appointed), (a) subject to the terms of this Interim Order (including, without limitation, paragraph 14 hereof), and the Prepetition Intercreditor Agreement, the Senior DIP Parties and the Prepetition First Lien Parties may exercise any rights and remedies against the DIP Collateral available to them under this Interim Order, the DIP Documents, the Prepetition First Lien Credit Documents and applicable non-bankruptcy law, including but not limited to terminating all commitments to extend credit under the DIP Facilities, in each case subject to the Carve Out and Permitted Liens (if any) and (b) subject to the Prepetition Intercreditor Agreement and the terms of this Interim Order, the DIP Junior Term Loan Lenders and Prepetition Second Lien Parties may terminate all commitments to extend credit under the DIP Facilities and exercise any rights and remedies to satisfy the Prepetition Second Lien Obligations, the Second Lien Adequate Protection Liens, the Second Lien Adequate Protection Superpriority Claims and any other Second Lien Adequate Protection Obligations, in each case subject to priorities set forth in paragraphs 10 and 12 of this Interim Order.  The automatic stay pursuant to Bankruptcy Code section 362 shall be terminated automatically with respect to the DIP Parties and the Prepetition Secured Parties at the end of the Notice Period, without further notice or order of the Court, unless the DIP Agents and the Prepetition First Lien Agent, or if the Discharge of Senior Obligations has occurred, the Junior DIP Agent, elect otherwise in a written notice to the Debtors, which may be by email.  Upon termination of the automatic stay, subject to the terms of this Interim Order, the DIP Documents, and the Prepetition Intercreditor Agreement, the DIP Parties and the Prepetition Secured Parties shall be permitted to exercise all rights and remedies set forth herein and in the DIP Documents, as applicable, and as otherwise available at law against the DIP Collateral, without any further order of or application or motion to the Court, and without restriction or restraint imposed by any stay under Bankruptcy Code sections 362 or 105, or otherwise, against the enforcement of the

47

liens and security interests in the DIP Collateral or the Prepetition Collateral, or the pursuit of any other rights and remedies granted to such parties pursuant to the DIP Documents, the Prepetition First Lien Credit Documents or the Prepetition Second Lien Credit Documents; <u>provided</u> that during the Notice Period the Debtors may use the proceeds of the DIP Facilities (to the extent drawn prior to the occurrence of a Termination Event or in accordance with paragraph 13 of this Interim Order) or Cash Collateral only to fund (i) expenses critically necessary to preserve the value of the Debtors' business and the DIP Collateral, including, without limitation, payroll obligations, in all cases in accordance with the DIP Credit Agreement and the DIP Budget and (ii) the Carve Out Reserves; <u>provided</u> <u>further</u> that during the Notice Period, the Debtors, the DIP Agents, the DIP Lenders and the Prepetition Secured Parties consent to a hearing on an expedited basis to consider whether a Termination Event has occurred; <u>provided</u> <u>further</u>, that if a hearing to consider the foregoing is requested to be heard before the end of the Notice Period but is scheduled for a later date by the Court, the Notice Period shall be automatically extended to the date of such hearing, but in no event later than five business days after delivery of the Enforcement Notice; <u>provided</u> <u>further</u> that any allowed fees and expenses incurred by the Debtors or the Creditors' Committee (if appointed) during the Notice Period shall permanently reduce the Post-Carve Out Trigger Notice Cap.

27.    *No Waiver for Failure to Seek Relief*.  The failure or delay of the DIP Agents, the DIP Lenders or any of the Prepetition Secured Parties to exercise their respective rights and remedies under this Interim Order, the DIP Documents, the Prepetition Credit Documents or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise.

28.    *Perfection of the DIP Liens and Adequate Protection Liens.*

(a)    Subject to the limitations in paragraph 29(a) of this Interim Order, the DIP Agents and the Prepetition Agents are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder. Whether or not the DIP Agents or the Prepetition Agents shall, in their sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, such liens and security interests shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Interim Order), at the time and on the date of entry of this Interim Order.  Upon the request of the DIP Agents and the Prepetition Agents, each of the Prepetition First Lien Lenders, the Prepetition Second Lien Lenders and the Debtors, without any further consent of any party, is authorized to take, execute, deliver and file such instruments (in the case of the Prepetition Secured Lenders, without representation or warranty of any kind) to enable the DIP Agents and the Prepetition Agents to further validate, perfect, preserve and enforce the DIP Liens and the applicable Adequate Protection Liens, respectively.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP Agents or the applicable Prepetition Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing

49

and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)    Effective upon entry of the Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Thereupon, any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment, and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or this Interim Order.

29.    *Preservation of Rights Granted Under this Interim Order*.

(a)    All of the protections and rights of the Junior DIP Agent and the Prepetition Second Lien Agent with respect to the Junior DIP Lenders and the Prepetition Second Lien Lenders under their respective governing documents shall remain in full force and effect.

(b)    Except as set forth in paragraph 14 of this Interim Order, unless and until the DIP Obligations, Prepetition First Lien Obligations and First Lien Adequate Protection Obligations are indefeasibly paid in full, in cash or in kind, as applicable, and all commitments to extend credit under the DIP Facilities are terminated, the Prepetition Second Lien Lenders shall, in each case solely to the extent provided for in the Prepetition Credit Documents, the Prepetition Intercreditor Agreement and applicable law: (i) take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Second Lien Credit Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral;

50

and (ii) be restricted from exercising any rights and remedies or taking any other actions in respect of the DIP Collateral to the extent provided by the this Interim Order, the DIP Documents, the Prepetition Intercreditor Agreement and applicable law.

(c)     Subject to the Carve Out and the Permitted Liens (if any), other than as set forth in this Interim Order, the DIP Priming Liens shall not be made subject to and/or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and the DIP Priming Liens shall not be subject or junior to and/or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(d)     Subject to the Carve Out and the Permitted Liens (if any) and the DIP Priming Liens, other than as set forth in this Interim Order, the First Lien Adequate Protection Liens and the Prepetition First Priority Liens shall not be made subject to and/or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and the First Lien Adequate Protection Liens and the Prepetition First Priority Liens shall not be subject or junior to and/or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(e)     Subject to the Carve Out, the Permitted Liens (if any), the DIP Liens, the First Lien Adequate Protection Liens and the Prepetition First Priority Liens, other than as set forth in this Interim Order, the Second Lien Adequate Protection Liens shall not be made subject to and/or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and the Second Lien Adequate Protection Liens shall not be subject to and/or *pari passu* with any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

51

(f)     In the event this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, any liens or claims granted to the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein, and the Prepetition Secured Parties shall be entitled to the protections afforded in Bankruptcy Code section 363(m) with respect to all uses of the Prepetition Collateral (including the Cash Collateral) and all Adequate Protection Obligations.

(g)     Subject to the Carve Out, unless and until all DIP Obligations, Prepetition First Lien Obligations, Prepetition Second Lien Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash or in kind, as applicable, and all commitments to extend credit under the DIP Facilities are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (i) except as permitted under the DIP Documents and with the prior written consent of the Required DIP Lenders, (x) any modification, stay, vacatur or amendment of this Interim Order, (y) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a) or 507(b)) in any of the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, the Prepetition First Lien Obligations, and the Prepetition Second Lien Obligations (or the liens and security interests securing such claims and obligations), or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents, any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the

52

Adequate Protection Liens, the Prepetition First Priority Liens or the Prepetition Second Priority Liens, as the case may be; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to Bankruptcy Code section 546(h) (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Chapter 11 Cases; (vi) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases.

(h)     Notwithstanding any order dismissing any of the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and any other administrative claims granted pursuant to this Interim Order, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order and the DIP Documents until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash or in kind, as applicable, and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims and the other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on all parties in interest; and (y) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(i)     Except as otherwise ordered by the Court and as expressly provided in this Interim Order, and the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and all other rights and remedies

53

of the DIP Agents, the DIP Lenders, the Prepetition Agents and the Prepetition Secured Lenders granted by the provisions of this Interim Order and the DIP Documents shall survive, shall maintain their priority as provided in this Interim Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to Bankruptcy Code section 363(b) or (iii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered or in any superseding chapter 7 cases under the Bankruptcy Code.

30.     *Expenses and Indemnification.*

(a)      All (i) reasonable and documented out-of-pocket fees and expenses incurred by professionals or consultants retained by the DIP Agents and the DIP Lenders, including (a) Latham and local counsel in the Southern District of Florida, as counsel to the Senior DIP Parties and the Prepetition First Lien Parties, (b) Covington and Burling LLP and local counsel in the Southern District of Florida, as counsel to the Junior DIP Agent; and (c) Venable LLP as counsel to the Junior DIP Lenders and the Participating Second Lien Lenders, (collectively, the "DIP Professionals"), incurred in connection with the Chapter 11 Cases (in any capacity) and the DIP Facilities, whether or not the DIP Facilities are successfully consummated, and (ii) reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other

charges of DIP Professionals) of the DIP Agents and the DIP Lenders, for enforcement costs and documentary taxes associated with the DIP Facilities and the transactions contemplated thereby, are to be paid by the Debtors in accordance with the procedures described in paragraphs 19(c) and 20(c) hereof.  All fees and expenses described above shall be payable by the Debtors (whether accrued or incurred prior to, on or after the Petition Date) within ten calendar days after the delivery of invoices (which invoices shall not be required to comply with any particular format and may be in summary form only and may be in redacted form to protect privileged and confidential information) to the Debtors, the U.S. Trustee and the Creditors' Committee (if appointed), without the necessity of filing motions or fee applications and such fees and expenses shall not be subject to any further review, challenge or disgorgement following the expiration of the review and objection process described in paragraphs 19(c) and 20(c) hereof.

(b)     As set forth in the DIP Documents, the Debtors will, jointly and severally, indemnify the DIP Agents, the DIP Lenders and their respective affiliates, successors and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons and members of each of the foregoing (each an "Indemnified Person"), and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including but not limited to reasonable and documented legal fees and expenses) and liabilities arising out of or relating to the execution or delivery of the DIP Credit Agreement, DIP Note Purchase Agreement and other DIP Documents, transactions contemplated hereby and thereby and any actual or proposed use of the proceeds of any loans made under the DIP Facilities in accordance with the terms of the DIP Credit Agreement; provided that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the actual fraud, gross negligence or willful misconduct of

55

such person (or their related persons).  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in an final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's actual fraud, gross negligence or willful misconduct, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages.

(c)     Notwithstanding anything to the contrary in this Interim Order, it shall be a condition of the Interim DIP Draw that prior to the Interim DIP Draw, the Borrower shall have paid any accrued and outstanding fees and expenses of the DIP Professionals notwithstanding any applicable review period for the invoices of such DIP Professionals set forth in this Interim Order.

31.     *Limitation on Use of DIP Facilities Proceeds, DIP Collateral and Cash Collateral*

(a)     Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facilities, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve Out may be used: (a) to investigate (except as expressly provided herein), initiate, prosecute, join or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense or other litigation of any type (i) against any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties (in each case, in their capacities as such) or seeking relief that would impair the rights and remedies of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties (in each case, in their capacities as such) under the DIP Documents, this Interim Order or the Prepetition Credit Documents to the extent permitted or provided hereunder, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Creditors'

Committee (if appointed) in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief that would impair the ability of any of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral, as provided for herein, or seeking affirmative relief against any of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties related to the DIP Obligations, or the Prepetition Secured Obligations, (ii) seeking to invalidate, set aside, avoid, recharacterize or subordinate, in whole or in part, the DIP Obligations, the DIP Superpriority Claims, or the DIP Agents' and the DIP Lenders' liens or security interests in the DIP Collateral or the Prepetition Collateral, or the Prepetition Secured Obligations, or the Prepetition Secured Parties' liens or security interests in the Prepetition Collateral or (iii) for monetary, injunctive or other affirmative relief against the DIP Agents, the DIP Lenders or the Prepetition Secured Parties (in each case, in their capacities as such), or their respective liens on or security interests in the DIP Collateral or the Prepetition Collateral or the DIP Superpriority Claims, that would impair the ability of any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties to assert or enforce any lien, claim, right or security interest or to realize or recover on the DIP Obligations or the Prepetition Secured Obligations to the extent permitted or provided hereunder; (b) for objecting to or challenging in any way the legality, validity, priority, perfection or enforceability of the claims, liens or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations, or by or on behalf of the DIP Agents and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions (as defined

herein) related to the DIP Liens, the DIP Superpriority Claims, the DIP Obligations, the Prepetition Liens or the Prepetition Secured Obligations; (d) to prevent, hinder, or otherwise delay the DIP Agent's, DIP Secured Parties', or Prepetition Secured Parties' assertion, enforcement, or realization on the DIP Collateral or Prepetition Collateral in accordance with this Interim Order, the DIP Documents, and/or the Prepetition Documents once an Event of Default has occurred and is continuing, except as expressly permitted by paragraph 26 hereof; (e) to pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of the Court (which may, for the avoidance of doubt, be this order or the Final Order, and (ii) permitted by the DIP Documents; (e) to seek to modify the rights granted to the DIP Agent, any of the other DIP Secured Parties or any of the Prepetition Secured Parties under the DIP Documents or the Prepetition Documents; or (f) for prosecuting an objection to, contesting in any manner or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of: (x) any of the DIP Liens, the DIP Superpriority Claims, or any other rights or interests of the DIP Agents or the DIP Lenders related to the DIP Obligations or the DIP Liens, or (y) any of the Prepetition Liens, Prepetition Secured Obligations or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Second Lien Obligations; provided that no more than $75,000.00 of the proceeds of the DIP Facilities, the DIP Collateral or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Creditors' Committee, if appointed, to investigate the foregoing matters with respect to the

58

Prepetition Liens or the Prepetition Secured Obligations within the Challenge Period (as defined herein) (the "Challenge Budget").

32.    *Effect of Stipulations on Third Parties.*

(a)    The Debtors' acknowledgments, stipulations, admissions, waivers and releases set forth in this Interim Order shall be binding on the Debtors, their respective representatives, successors and assigns upon entry of this Interim Order.  The acknowledgments, stipulations, admissions, waivers and releases contained in this Interim Order shall also be binding upon the Debtors' estates and all other parties in interest, including the Creditors' Committee (if appointed), or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), unless (a) such party has obtained requisite standing and has duly filed an adversary proceeding or contested matter (1) challenging the validity, perfection, priority, extent or enforceability of the Prepetition Liens, or the Prepetition Secured Obligations (including, without limitation, the Prepetition Secured Obligations converted into DIP Obligations pursuant to this Interim Order and pursuant to the Final Order) or (2) otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Collateral, the Prepetition Liens or the Prepetition Secured Obligations by no later than  the date that is the earlier of (i) 75 days after the entry of this Interim Order, or, (ii) solely with respect to any Claims and Defenses asserted by a Creditors' Committee, 60 days after formation of the Creditors' Committee (the "Challenge Period"); provided that in the event that, prior to the expiration of the Challenge Period, (x) these Chapter 11 Cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these Chapter 11 Cases, then, in each such case, the Challenge Period shall be extended solely with respect to any Trustee, to the date that is

sixty (60) days after the occurrence of either of the events described in the foregoing clauses (x) and (y); and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding or contested matter.  If no such adversary proceeding or contested matter is filed prior to the expiration of the Challenge Period, without further order of this Court: (x) the Prepetition Secured Obligations shall constitute allowed claims, not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in these Chapter 11 Cases and any subsequent chapter 7 cases, if any; (y) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority specified in paragraphs 4(b) and 4(d), not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment or recovery; and (z) the Prepetition Secured Obligations, the Prepetition Liens on the Prepetition Collateral and the Prepetition Secured Parties (solely in their capacities as such) shall not be subject to any other or further challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period).  If any such adversary proceeding is timely filed prior to the expiration of the Challenge Period, (a) the stipulations and admissions contained in this Interim Order shall nonetheless remain binding and preclusive on the Creditors' Committee

60

(if appointed) and any other party in these Chapter 11 Cases, including any Trustee, except as to any stipulations or admissions that are challenged in such adversary proceeding or contested matter and (b) any Claims and Defenses not brought in such adversary proceeding or contested matter shall be forever barred; underline provided that, if and to the extent any challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such stipulation also shall be binding on the Debtors' estates and all parties in interest.

(b)     Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any Creditors' Committee (if appointed), standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition Credit Documents, the Prepetition Liens or the Prepetition Secured Obligations.

33.     *Release*.  Subject to the rights and limitations set forth in paragraphs 31 and 32 of this Interim Order, each of the Debtors and the Debtors' estates, each on its own behalf and on behalf of each of its predecessors, their successors and assigns shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Agents, the DIP Lenders, the Prepetition Secured Parties (in each case, in their capacities as such) and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and

obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof solely with respect to or relating to the DIP Liens, the DIP Superpriority Claims, the DIP Obligations, the Prepetition Liens and the Prepetition Secured Obligations, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties.

34.      *Intercreditor Agreements.*  The rights of the Prepetition Secured Parties shall at all times remain subject to the Prepetition Intercreditor Agreement.

35.      *Credit Bidding*.

(a)      Subject to paragraph 14 of this Interim Order, the Senior DIP Agent and Prepetition First Lien Agent, or any assignee or designee of the Senior DIP Agent and Prepetition First Lien Agent shall have the unqualified right to credit bid up to the full amount of the Senior DIP Loans and Prepetition First Lien Loans in the sale of any of the Debtors' assets, including pursuant to (x) Bankruptcy Code section 363, (y) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129 or (z) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725.

US-DOCS\147131838.9

(b)     Subject to paragraph 14 of this Interim Order and subject to such credit bid providing for the Discharge of Senior Obligations (unless waived in writing by the Senior DIP Agent) and the rights and protections of the Junior DIP Agent relative to the Junior DIP Lenders, including as provided in any applicable Sales Procedures Order, the Junior DIP Lenders shall have the unqualified right to credit bid up to the full amount of the Junior DIP Loans in the sale of any of the Debtors' assets, including pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129 or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725.

(c)     Subject to the Discharge of Senior Obligations, and the indefeasible payment in full in cash of the DIP Obligations and the Prepetition First Lien Obligations, and subject to the Prepetition Intercreditor Agreement and the rights and protections of the Prepetition Second Lien Agent relative to the Prepetition Second Lien Lenders, including as provided in any applicable Sales Procedures Order, the Prepetition Second Lien Lenders shall have the unqualified right to credit bid up to the full amount of the Prepetition Second Lien Obligations in the sale of any of the Debtors' assets, including, but not limited to, pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129 or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725.

(d)     For avoidance of doubt, unless (x) agreed to in writing by the Senior DIP Agent, or (y) the proposed sale, plan or reorganization or plan of reorganization will result in the Discharge of the Senior Obligations, no Junior DIP Parties or Prepetition Second Lien Parties may credit bid any portion of its Junior DIP Obligations or Prepetition Second Lien Obligations until the Discharge of Senior Obligations has occurred.  The DIP Agents, the Prepetition First Lien Agent and/or the Prepetition Second Lien Agent (in accordance with the DIP Documents and this

Interim Order), and/or their respective secured lenders as the case may be shall have the absolute right to assign, sell or otherwise dispose of their respective rights to credit bid in connection with any credit bid by or on behalf any acquisition entity or joint venture formed in connection with such bid.

36.     *Interim Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern.

37.     *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, any Creditors' Committee appointed in these Chapter 11 Cases and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104 or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties, provided that, notwithstanding anything to the contrary herein, the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

38.     *Limitation of Liability*.  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral or exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Documents or the Prepetition Credit Documents, the DIP Agents, the DIP Lenders and the Prepetition Secured Parties (in each case, solely in their

capacities as such) shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute), nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.  Furthermore, nothing in this Interim Order, the DIP Documents or the Prepetition Credit Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents, the DIP Lenders or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their direct or indirect subsidiaries.

39. *No Requirement to File Claim for DIP Obligations or Prepetition Secured Obligations.*  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the DIP Agents nor the Prepetition Agents, nor any DIP Lender nor Prepetition Secured Party shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations or Prepetition Secured Obligations, all of which shall be due and payable in accordance with the DIP Documents and Prepetition Credit Documents, as applicable, without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Documents and Prepetition Credit Documents or of any

indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Agents', Prepetition Agents', or any Prepetition Lender or DIP Lender's rights, remedies, powers, or privileges under any of the DIP Documents, Prepetition Credit Documents, this Interim Order, or applicable law. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in interest or their respective successors-in-interest.

40.    *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.   Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

41.    *Final Hearing*.  The Final Hearing shall be held on January [ ], 2024 at [__]:[__][a.m. / p.m.] prevailing Eastern Time at the **United States Bankruptcy Courthouse, C. Clyde Atkins United States Courthouse, 301 North Miami Avenue, Courtroom 7, Miami, Florida 33128**.  Any objections or responses to the entry of this Interim Order  must be filed on or before 4:00 p.m. prevailing Eastern Time, on January [__], 2024, and shall be served on: (a) the Debtors, Bird Global, Inc., *et al*., 392 NW 191st Street, #20388, Miami, FL 33179, Attn: Chris Rankin, Chief Restructuring Officer; (b) proposed counsel to the Debtors: Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, Attn: Paul Steven Singerman (singerman@bergersingerman.com), Jordi Guso (jguso@bergersingerman.com), Robin J. Rubens (rrubens@bergersingerman.com) and Clay Roberts (croberts@bergersingerman.com); (c) counsel to the Senior DIP Parties and Prepetition First Lien Parties: Latham & Watkins LLP,

1271 Avenue of the Americas, New York, NY, 10020, Attn: James Ktsanes (James.Ktsanes@lw.com), John Lister (John.Lister@lw.com), and Hugh Murtagh (Hugh.Murtagh@lw.com); (d) counsel to the Junior DIP Agent: Covington & Burling LLP, the New York Times Building, 620 Eighth Avenue, New York, NY 10018, Attn: Ronald A. Hewitt (rhewitt@cov.com); (e) counsel to the Prepetition Second Lien Agent: Maslon LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402, Attn: Clark T. Whitmore (clark.whitmore@maslon.com); (f) counsel to the Junior DIP Lenders and Participating Second Lien Parties: Venable LLP, 100 SE 2nd Street, Suite 4400, Miami, FL 33131, Attn: Paul J. Battista (PJBattista@Venable.com); (g) the Office of the United States Trustee, 51 S.W. First Avenue, Room 1204, Miami, FL 33130; and (h) counsel to any statutory committee appointed in these chapter 11 cases.

# # #

Submitted by:
Paul Steven Singerman, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Email:  singerman@bergersingerman.com

*(Attorney Singerman is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

**Exhibit 1**

**DIP Budget**

**Exhibit 2**

**Milestones**

| Milestone | Hardwired | Conditional |
|---|---|---|
| Petition Date (P) | December 19, 2023 | |
| First-Day Hearing | December 22, 2023 | +3 Business Days (BD) from P |
| Entry of Interim DIP Order | December 22, 2023 | +3 BD from P |
| Company shall have (a) communicated with all relevant regulatory/governmental bodies representing 90% of Company's sharing revenues ("Agencies") to apprise them of the Restructuring (as defined in the RSA) and to request assurances that such bodies will consent to the continued operation of the Company's business by the NewCo Entity (as defined in the RSA) in such bodies' jurisdictions on substantially the same terms as currently apply, including through consent to assignment, novation, or other means of continuing all material permits, licenses, contracts, and similar agreements (collectively, "Permits"), and (b) delivered an initial report (the "Permitting Report") of results of such communications, in form and substance acceptable to the Senior DIP Agent in its sole discretion* | January 10, 2024 | +22 Calendar Days (CD) from P |
| Second-Day Hearing | January 23, 2024 | +28 CD from P |
| Entry of Final DIP Order | January 25, 2024 | +2 BD from Second-Day Hearing |
| Entry of Sale Procedures Order | January 25, 2024 | +2 BD from Second-Day Hearing |
| Occurrence of Bid & Cure/Assignment Objection Deadline | February 26, 2024 (Feb. 24 = Sat.) | +30 CD from Sale Procedures |
| Auction (if needed) | March 4, 2024 | +5 BD from Bid Deadline |
| Sale Hearing | March 11, 2024 | +5 BD from Auction |
| Closing | March 18, 2024 | +5 BD from Sale Hearing |

*Permit Reporting Covenant.  After delivery of the initial Permitting Report, the Debtors shall deliver an updated Permitting Report each week together with the Variance Report.

*Permit Continuance Covenant.  At no time shall Agencies representing more than 10% of the Company's 2023 Sharing Revenues as internally reported by the Company, pro forma for the Spin acquisition on a normalized run-rate basis, have revoked or adversely modified, or stated an intention to revoke or adversely modify, Permits.

## **Exhibit 3**

**DIP Credit Agreement**

**<u>Exhibit 4</u>**

**DIP Note Purchase Agreement**

**EXHIBIT E**

**Exhibit 1**

**DIP Budget**

## Exhibit 2

## Milestones

| Milestone | Hardwired | Conditional |
|---|---|---|
| Petition Date (P) | December 19, 2023 | |
| First-Day Hearing | December 22, 2023 | +3 Business Days (BD) from P |
| Entry of Interim DIP Order | December 22, 2023 | +3 BD from P |
| Company shall have (a) communicated with all relevant regulatory/governmental bodies representing 90% of Company's sharing revenues ("Agencies") to apprise them of the Restructuring (as defined in the RSA) and to request assurances that such bodies will consent to the continued operation of the Company's business by the NewCo Entity (as defined in the RSA) in such bodies' jurisdictions on substantially the same terms as currently apply, including through consent to assignment, novation, or other means of continuing all material permits, licenses, contracts, and similar agreements (collectively, "Permits"), and (b) delivered an initial report (the "Permitting Report") of results of such communications, in form and substance acceptable to the Senior DIP Agent in its sole discretion* | January 10, 2024 | +22 Calendar Days (CD) from P |
| Second-Day Hearing | January 23, 2024 | +28 CD from P |
| Entry of Final DIP Order | January 25, 2024 | +2 BD from Second-Day Hearing |
| Entry of Sale Procedures Order | January 25, 2024 | +2 BD from Second-Day Hearing |
| Occurrence of Bid & Cure/Assignment Objection Deadline | February 26, 2024 (Feb. 24 = Sat.) | +30 CD from Sale Procedures |
| Auction (if needed) | March 4, 2024 | +5 BD from Bid Deadline |
| Sale Hearing | March 11, 2024 | +5 BD from Auction |
| Closing | March 18, 2024 | +5 BD from Sale Hearing |

*Permit Reporting Covenant. After delivery of the initial Permitting Report, the Debtors shall deliver an updated Permitting Report each week together with the Variance Report.

*Permit Continuance Covenant. At no time shall Agencies representing more than 10% of the Company's 2023 Sharing Revenues as internally reported by the Company, pro forma for the Spin acquisition on a normalized run-rate basis, have revoked or adversely modified, or stated an intention to revoke or adversely modify, Permits.

**<u>Exhibit 3</u>**

**DIP Credit Agreement**

**<u>Exhibit 4</u>**

**DIP Note Purchase Agreement**

**EXHIBIT F**

**CLOSING CHECKLIST**

SENIOR SECURED PRIMING AND SUPER-PRIORITY DEBTOR-IN-POSSESSION NOTE PURCHASE AGREEMENT

by and among

**BIRD GLOBAL, INC.,**
as Debtor, Debtor-in-Possession and Issuer,

THE SEVERAL PURCHASERS FROM TIME TO TIME PARTY HERETO

and

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
as Junior Dip Collateral Agent

**CLOSING DATE: December 22, 2023**

62018549-v8

## LIST OF ABBREVIATIONS

| ABBREVIATION | FULL NAME |
|---|---|
| Issuer | Bird Global, Inc., a Delaware corporation |
| ***Guarantors, Grantors and Debtors-in-Possession*** | |
| Guarantor | Issuer; Bird Rides, Inc.; Bird US Holdco, LLC; Bird US Opco, LLC; Bird Treasury Holdco, LLC; Scoot Rides, Inc.; Bird Rides Holding (US), LLC; and Skinny Labs, Inc. |
| Canadian Guarantor | Bird Canada Scooters Inc. |
| Grantors | Issuer; Bird Rides, Inc.; Bird US Holdco, LLC; Bird US Opco, LLC; Bird Treasury Holdco, LLC; Scoot Rides, Inc.; Bird Rides Holding (US), LLC; and Skinny Labs, Inc. |
| Canadian Grantor | Bird Canada Scooters Inc. |
| Debtors-in-Possession | Issuer; Bird Rides, Inc.; Bird US Holdco, LLC; Bird US Opco, LLC; Skinny Labs, Inc. |
| ***Agents and Purchasers*** | |
| Junior DIP Collateral Agent | U.S. Bank Trust Company, National Association |
| Senior DIP Agent | MidCap Financial Trust |
| DIP Note Purchasers | The several DIP Note Purchasers from time to time party to the Note Purchase Agreement |
| Purchasers | The several Purchasers from time to time party to the Note Purchase Agreement |
| ***Attorneys*** | |
| VEN | Venable LLP, as counsel to the Purchasers |
| BS | Berger Singerman LLP, as counsel to the Note Parties |
| COV/MAS | Covington & Burling, LLP and Maslon, LLP as counsel to the Junior Dip Collateral Agent |

**Definitions**: Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Senior Secured Priming and Super-Priority Debtor-in-Possession Note Purchase Agreement, dated December 22, 2023 (as amended, restated, supplemented, or otherwise modified, the "Note Purchase Agreement"), by and among, *inter alios*, Issuer, the Purchasers from time to time party thereto, and the Junior Dip Collateral Agent.

62018549-v8

| No. | Document/Action | Responsible Party | Signatories |
|---|---|---|---|
| **1.** | | | |
| **1.** | **Senior Secured Priming and Super-Priming Debtor-in-Possession Note Agreement** | VEN | ☐ Junior Dip Collateral Agent<br>☐ Issuer<br>☐ Purchasers |
| **A.** | *Exhibits to the Note Purchase Agreement* | --- | --- |
| | A: Description of Collateral | VEN | --- |
| | B: Form of Note | VEN | --- |
| | C: Junior Dip Collateral Agent Terms | VEN | --- |
| | D: Taxes; Increased Costs | VEN | --- |
| | E: Interim Order | VEN | --- |
| | F: Closing Checklist | VEN | --- |
| **B.** | *Schedules to Note Agreement* | --- | --- |
| | Schedule 2.1-A – DIP Note Purchasers | VEN | --- |
| | Schedule 2.1-B – Bridge Note Purchasers | VEN | --- |
| | Schedule 2.1-C – Other Note Purchasers | VEN | --- |
| **2.** | **Pledge and Collateral Agreement** | VEN | ☐ Grantors<br>☐ Junior Dip Collateral Agent |
| **A.** | *Schedules to the Pledge and Collateral Agreement* | --- | --- |
| | I: Pledged Equity Interests; Pledged Debt Securities | BS | --- |
| | II: Intellectual Property | BS | --- |
| | III: Grantor Information | BS | --- |
| **B.** | *Exhibits to the Pledge and Collateral Agreement* | --- | --- |
| | I: Form of Copyright Security Agreement | VEN | --- |
| | II: Form of Patent Security Agreement | VEN | --- |

62018549-v8

| No. | Document/Action | Responsible Party | Signatories |
|---|---|---|---|
| | III: Form of Trademark Security Agreement | VEN | --- |
| 3. | **Canadian Pledge and Collateral Agreement** | VEN | ☐ Junior Dip Collateral Agent<br>☐ Canadian Grantor |
| **A.** | ***Schedules to the Pledge and Collateral Agreement*** | --- | --- |
| | I: Pledged Equity Interests; Pledged Debt Securities | BS | --- |
| | II: Intellectual Property | BS | --- |
| | III: Grantor Information | BS | --- |
| **B.** | ***Exhibits to the Pledge and Collateral Agreement*** | --- | --- |
| | I: Form of Copyright Security Agreement | VEN | --- |
| | II: Form of Patent Security Agreement | VEN | --- |
| | III: Form of Trademark Security Agreement | VEN | --- |
| | III: Form of Industrial Design Security Agreement | VEN | --- |
| 11. | **Guarantee** | VEN | ☐ Guarantor Note Parties<br>☐ Junior Dip Collateral Agent |
| 12. | **Canadian Guarantee** | VEN | ☐ Junior Dip Collateral Agent<br>☐ Non-Debtor Note Party |
| **A.** | ***Exhibit to the Guarantee*** | --- | --- |
| | I: Joinder Agreement | VEN | --- |
| 13. | **Junior Dip Collateral Agent Fee Letter** | COV/MAS | ☐ Issuer |
| 14. | **Note for Maple Beach Investment LP** | VEN | ☐ Issuer |
| 15. | **Note for Relay Ventures Compass II LP** | VEN | ☐ Issuer |
| 16. | **Note for MKB Partners Fund II LP** | VEN | ☐ Issuer |
| 17. | **Note for MKB Partners Fund II International LP** | VEN | ☐ Issuer |
| 18. | **Note for Bennett Church Hill Capital Inc.** | VEN | ☐ Issuer |

62018549-v8

| No. | Document/Action | Responsible Party | Signatories |
|---|---|---|---|
| **19.** | **Trademark Security Agreement** | VEN | ☐ Junior Dip Collateral Agent<br>☐ Scoot Rides, Inc. |
| **20.** | **Patent Security Agreement** | VEN | ☐ Junior Dip Collateral Agent<br>☐ Scoot Rides, Inc. |
| **21.** | **Executed Copy of the DIP Financing Credit Agreement** | LW/BS | ☐ Senior Dip Agent<br>☐ Bird US Opco, LLC<br>☐ Bird US Holdco, LLC<br>☐ Issuer<br>☐ Bird Rides, Inc.<br>☐ Skinny Labs, Inc. |
| **22.** | **Executed Copy of Restructuring Support Agreement** | | ☐ Senior Dip Agent<br>☐ All Company Parties<br>☐ Purchasers<br>☐ NewCo Buyer |
| **II.** | | | |
| **1.** | IRS Form W-9 | BS | |
| **2.** | UCC-1s | VEN | --- |
| **3.** | PPSA | VEN | --- |
| **III.** | | | |
| **1.** | Cash Management Order | Bankruptcy Court | --- |
| **2.** | Initial Approved Budget | Issuer | --- |
| **3.** | Interim DIP Order Conditions Satisfied | Issuer | --- |
| **4.** | No other motions, pleadings or applications filed in the Bankruptcy Court without Required Purchaser's prior written consent | Issuer | --- |
| **5.** | Interim DIP Order | Bankruptcy Court | --- |
| **6.** | Each Debtor-in-Possession shall be a debtor or debtor-in-possession under Chapter 11 of the Bankruptcy Code | Debtors-in-Possession | --- |
| **IV.** | | | |

| No. | Document/Action | Responsible Party | Signatories |
|---|---|---|---|
| 1. | Payment of fees, Purchasers' Expenses, Junior DIP Collateral Junior Dip Collateral Agent Expenses and Junior DIP Collateral Junior Dip Collateral Agent Fees due per Section 2.4 | Issuer | --- |
| 2. | No order, injunction or decree of any Governmental Authority restraining or prohibiting the issuance of the Notes | Issuer | --- |

**Annex I – UCC-1s**

| No. | Entity Name | Jurisdiction | Secured Party | Action to be Taken | Status |
|---|---|---|---|---|---|
| 1. | Bird Rides International Holding, Inc. | Delaware | USBTCNA | UCC-1 all assets financing statement | VEN draft 12/21/23 |
| 2. | Bird Treasury Holdco, LLC | Florida | USBTCNA | UCC-1 all assets financing statement | VEN draft 12/21/23 |
| 3. | Scoot Rides, Inc. | Delaware | USBTCNA | UCC-1 all assets financing statement | VEN draft 12/21/23 |
| 4. | Bird Rides Holdings (US), LLC | Delaware | USBTCNA | UCC-1 all assets financing statement | VEN draft 12/21/23 |

9

62018549-v8

**Annex II – PPSA**

| No. | Entity Name | Jurisdiction | Secured Party | Action to be Taken | Status |
|-----|-------------|--------------|---------------|--------------------|--------|
| 1. | Bird Canada Scooters Inc. | British Columbia | USBTCNA | PPSA all assets financing statement | In process via McCarthy through L&W |

9

## SCHEDULE 2.1-A

## DIP Note Purchasers

| Purchaser Name | Purchaser Notice Information | Aggregate Principal Amount of Notes | Cash Consideration | Cash Consideration (Bridge Conversion) | Share Consideration |
|---|---|---|---|---|---|
| **Issued on the Closing Date** | | | | | |
| MKB Partners Fund II, LP | 1 Place Ville Marie, Suite 3670, Montreal, QC H3B 3P2 Attention: Antonio Occhionero | $2,952,399.31 | $ 2,952,399.31 | - | N/A |
| MKB Partners Fund II International, LP | 1 Place Ville Marie, Suite 3670, Montreal, QC H3B 3P2 Attention: Antonio Occhionero | $47,600.69 | $47,600.69 | - | N/A |
| Maple Beach Investment LLC | TD Canada Trust Tower Brookfield Place, 161 Bay Street, Suite 2300, P.O. Box 222, Toronto ON M5J 2S1 Attention:  John Bitove Email: bitove@obelysk.com | $100,000.00 | $100,000.00 | - | N/A |
| Relay Ventures Compass II LP | 446 Spadina Road, Suite 303, Toronto, ON M5P 3M2  Kevin Talbot Kevin@relayventures.com Jeannette Wiltse Jeannette@relayventures.com | $1,900,000.00 | $1,900,000.00 | - | N/A |
| **Bennett Church Hill Capital Inc.** | 3670-1 Place Ville Marie CP H3B 3P2 Montreal Québec H3B3P2 Canada  Attention: Carl Bennett Email: cec.bennett@bchci.com | $300,000 | $300,000 | - | N/A |
| **HVLKV, LLC** | 112 S Tryon Street, Suite 200 Charlotte, NC 28284 | $300,000 | $300,000 | - | N/A |

12640916-7

| | | | | |
|---|---|---|---|---|
| Attention: Kerry Vickar<br>Email:<br>kvickar@thevickargroup.com | | | $5,600,000.00 | $5,600,000.00 |
| **Total** | | | | |

**SCHEDULE 2.1-B**

**Bridge Note Purchasers**

| Purchaser Name | Purchaser Notice Information | Aggregate Principal Amount of Notes | Cash Consideration | Cash Consideration (Bridge Conversion) | Share Consideration |
|---|---|---|---|---|---|
| **MKB Partners Fund II, LP** | 1 Place Ville Marie, Suite 3670, Montreal, QC H3B 3P2 Attention: Antonio Occhionero | $1,968,266.20 | $1,968,266.20 | N/A | N/A |
| **MKB Partners Fund II International, LP** | 1 Place Ville Marie, Suite 3670, Montreal, QC H3B 3P2 Attention: Antonio Occhionero | $31,733.80 | $31,733.80 | N/A | N/A |
| **Maple Beach Investment LLC** | TD Canada Trust Tower Brookfield Place, 161 Bay Street, Suite 2300, P.O. Box 222, Toronto ON M5J 2S1 Attention: John Bitove Email: bitove@obelysk.com | $200,000.00 | $200,000.00 | N/A | N/A |
| **Relay Ventures Compass II LP** | 446 Spadina Road, Suite 303, Toronto, ON M5P 3M2 Kevin Talbot Kevin@relayventures.com Jeannette Wiltse Jeannette@relayventures.com | $1,800,000 | $1,800,000 | N/A | N/A |
| **Total** | | $4,000,000 | $4,000,000 | - | |

## SCHEDULE 2.1-C

## Other Note Purchasers[2]

| Purchaser Name | Purchaser Notice Information | Aggregate Principal Amount of Notes | Cash Consideration | Cash Consideration (Bridge Conversion) | Share Consideration |
|---|---|---|---|---|---|
| **Maple Beach Compass LP** | TD Canada Trust Tower Brookfield Place, 161 Bay Street, Suite 2300, P.O. Box 222, Toronto ON M5J 2S1<br><br>Attention:  John Bitove<br>Email:        bitove@obelysk.com | $4,100,000 | $4,100,000 | - | N/A |
| **Relay Ventures Compass LP** | 446 Spadina Road, Suite 303, Toronto, ON M5P 3M2<br><br>Kevin Talbot<br>Kevin@relayventures.com<br>Jeannette Wiltse<br>Jeannette@relayventures.com | $12,000,000 | $12,000,000 | - | N/A |
| **MKB Partners Fund II LP** | 1 Place Ville Marie, Suite 3670, Montreal, QC H3B 3P2<br><br>Attention: Antonio Occhionero | $15,219,989 | $9,842,477 | $671,808 | • 2,826,674 Series 2 Seed Preferred Shares |

[2] This Schedule does not reflect certain transfers between Purchasers.

| | | | | | |
|---|---|---|---|---|---|
| **MKB Partners Fund II International LP** | 1 Place Ville Marie, Suite 3670, Montreal, QC H3B 3P2<br><br>Attention: Antonio Occhionero | $243,587 | $157,523 | $10,752 | N/A |
| **Obelysk Transport L.P.** | TD Canada Trust Tower Brookfield Place, 161 Bay Street, Suite 2300, P.O. Box 222, Toronto ON M5J 2S1<br><br>Attention: John Bitove<br>Email: bitove@obelysk.com | $12,757,050 | - | $1,658,720 | • 1,666,667 Common Shares<br>• 4,000,000 Series 1 Seed Preferred Shares<br>• 1,000,000 Series 1 Preferred Shares - Uncalled |
| **Relay Ventures Fund III L.P.** | 446 Spadina Road, Suite 303, Toronto, ON M5P 3M2<br><br>Kevin Talbot<br>Kevin@relayventures.com<br>Jeannette Wiltse<br>Jeannette@relayventures.com | $10,106,134 | - | $1,314,038 | • 1,320,333 Common Shares<br>• 3,168,800 Series 1 Seed Preferred Shares<br>• 792,200 Series 1 Preferred Shares - Uncalled |
| **Relay Ventures Parallel Fund III, L.P.** | 446 Spadina Road, Suite 303, Toronto, ON M5P 3M2<br><br>Kevin Talbot<br>Kevin@relayventures.com<br>Jeannette Wiltse<br>Jeannette@relayventures.com | $737,357 | - | $95,874 | • 96,333 Common Shares<br>• 231,200 Series 1 Seed Preferred Shares<br>• 57,800 Series 1 Preferred Shares - Uncalled |

| Name | Address | | | | Shares |
|---|---|---|---|---|---|
| **Alate I LP** | 446 Spadina Road, Suite 303, Toronto, ON M5P 3M2<br><br>Courtney Cooper courtney@alatepartners.com<br>Jeannette Wiltse Jeannette@relayventures.com | $1,913,557 | - | $248,808 | • 250,000 Common Shares<br>• 600,000 Series 1 Seed Preferred Shares<br>• 150,000 Series 1 Preferred Shares - Uncalled |
| **HVLKV, LLC** | 112 S Tryon Street, Suite 200 Charlotte, NC 28284<br><br>Attention: Kerry Vickar<br>Email: kvickar@thevickargroup.com | $1,000,000 | $1,000,000 | - | N/A |
| **Bennett Church Hill Capital Inc.** | 3670-1 Place Ville Marie CP H3B 3P2 Montreal Québec H3B3P2 Canada<br><br>Attention: Carl Bennett<br>Email: cec.bennett@bchci.com | $1,500,000 | $1,500,000 | - | N/A |
| **Matthew Epp** | 107 Chevalier-de-Chaumont, Carignan, QC J3L 5S8 Canada<br><br>Attention: Matthew Epp<br>Email: investments@matthewepp.com | $150,000 | $150,000 | - | N/A |
| **Gestion Holdrob Inc.** | 414 Kindersley Ave. Mont-Royal, QC H3R 1S2 Canada<br><br>Attention: Benoit Robert Phone : 514-915-0028<br>Email: benoit.robert@evovest.com | $100,000 | $100,000 | - | N/A |
| **Total:** | | $59,827,674 | $28,850,000 | $4,000,000 | |