UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BIRD GLOBAL, INC., *et al.,*[1] | ) | Case No. 23-20514-CLC |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OBJECTION BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I)
APPROVING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH
COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE
PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING
A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") for Bird Global, Inc.

("Bird Global") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"),

by its proposed undersigned counsel, submits this objection (the "Objection") to the *Debtors'*

*Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II)*

*Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority*

*Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic*

*Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [ECF No. 32] (the "DIP

Motion").[2]  In support of this Objection, the Committee respectfully states as follows:

---

[1]     The address of the Debtors is 392 Northeast 191st Street, #20388, Miami, FL 33179. The last four digits of the Debtors' federal tax identification numbers are: (i) Bird Global, Inc. (3155); (ii) Bird Rides, Inc. (9939); (iii) Bird US Holdco, LLC (8390); (iv) Bird US Opco, LLC (6873); and (v) Skinny Labs, Inc. (8176).

[2]     Unless otherwise defined in this Objection, capitalized terms shall have the same definition as set forth in the DIP Motion.

## PRELIMINARY STATEMENT

1.        The Court should not grant the DIP Motion on a final basis because the proposed DIP Facilities do not provide sufficient funding for clearly anticipated administrative expenses, and the excessive roll-ups, expanded liens rights, and 506(c) surcharge waivers, among other benefits and protections being granted to the DIP Lenders (including the insider Participating Second Lien Lenders who negotiated with themselves as part of their loan-to-own strategy), would virtually guarantee an administratively insolvent estate and eliminate the possibility of a recovery for unsecured creditors.  To be clear, the Participating Second Lien Lenders – private equity firms managed by members of the Debtors' board of directors, including Chairman of the Board, John Bitove ("Bitove"), the billionaire founder of the NBA's Toronto Raptors – are attempting to use the DIP Facilities and these Cases generally to shed unwanted pre- and post-petition liabilities and retain control of the Debtors' business by credit bidding dubious second lien debt through a fast-track sale process that they engineered to avoid a competitive bidding process.

2.        On January 31, the Committee conducted the deposition of Christopher Rankin ("Rankin").   In his First Day Declaration, Rankin states that he has served as an advisor to the Debtors since November 6, 2023 and thereafter transitioned to the role of Chief Restructuring Officer  ("CRO").  During his deposition, Mr. Rankin disclosed his close and long relationship with Bitove.  In addition to being the Chairman of the Debtors' Board of Directors and a principal of the Participating Second Lien Lenders, Bitove owns PointNorth Capital ("PNC"), Obelysk Transport L.P. ("Obelysk"), and several other businesses.  Since 2017, Rankin has been employed by PNC and continued to receive compensation from PNC while serving as an advisor and CRO to the Debtors.  The Debtors lease their office space from Obelysk and share those offices with several Bitove entities.  Rankin has also rendered services to NordStar Capital, an entity owned by

Bitove's brother, while serving as an advisor and CRO to the Debtors. Rankin testified that five of the eight members of the Debtors' Board of Directors were represented or appointed by the Second Lien Lenders, and Bitove was Chairman of the Board. Harvey Tepner ("Tepner") was appointed as an independent director and sole member of a special committee on December 16, but he had no meaningful involvement in DIP financing negotiations. Rankin utilized his PNC email address to communicate with Bitove and the Participating Second Lien Lenders concerning the DIP Facilities and other issues pertaining to the Debtors' chapter 11 cases. Rankin acknowledged that he rarely copied Tepner on those communications.

3.      The DIP Budget leaves no money at the end of the thirteen-week period ending March 22 to pay trailing expenses or to fund a plan of liquidation. It is not clear whether the Debtors intend to convert or dismiss the case following the closing of a sale. While it is not uncommon for budgets to be "tight" or "lean" in cases, it is simply unacceptable to have a budget that leaves the estate with no money to pay administrative expenses, while insiders of the Debtors receive an unqualified right to credit bid and superpriority liens on expansive collateral. The DIP Budget does not even provide for payment of anticipated US Trustee statutory fees. Further, the Debtors cannot justify over $7 million being used for "Non-Debtor Funding" to subsidize unprofitable foreign non-debtor subsidiaries and to pay hefty salaries for Debtors' officers who reside in Canada.

4.      Based on the numerous and material deficiencies in the DIP Budget, the Court should not grant the DIP Motion on a final basis, absent increased funding and/or modification of terms that preserve and protect the rights of unsecured creditors. These modifications should include (i) eliminating 506(c), 552(b) and marshaling waivers unless and until the Prepetition Secured Parties agree to provide sufficient funding to support the chapter 11 process and the

Committee's investigation of the Prepetition Secured Parties' alleged secured claims and potential Challenges, particularly considering the insider nature of the alleged Second Lien Lenders' loans; (ii) excluding chapter 5 causes of actions and other unencumbered assets from the DIP Collateral package to preserve some of recovery for unsecured creditors; (iii) eliminating or limiting the extent of any roll-up and reducing the excessive interest rates and fees being charged by the DIP Lenders to avoid further ballooning secured debt with usurious interest rates; and (iv) limiting the use of the DIP Facilities for Non-Debtor Funding, which includes lucrative salaries for certain of the Debtors' management team.

5.      The Committee's professionals have been working tirelessly since their selection by the Committee between January 10-12.  Based on the DIP Lenders' aggressive milestones, the Committee has been forced to conduct discovery regarding the DIP Facilities on a highly expedited basis.  Discovery is ongoing and the Committee therefore reserves its right to amend, modify and/or supplement this Objection in advance of the final hearing on the DIP Motion based on facts that may be discovered regarding the DIP Facilities and related matters.

## **BACKGROUND**[3]

### A.      **Procedural History and General Background**

6.      On December 30, 2022, Debtor Bird Global acquired non-debtor Bird Canada Inc. ("Bird Canada").  In connection with the acquisition of Bird Canada, Bird Global issued the Second Lien Notes (defined herein), which are now indirectly held by certain insiders of Bird Global.  Specifically, Antonio Occhionero is a director of Bird Global and is also a Managing Partner of Mackinnon, Bennet & Company ("MKB").  MKB holds approximately $21 million of

---

[3]      The Committee reserves all of its rights, including, without limitation, Challenge rights, and none of the facts set forth herein should be construed as an admission that facts asserted by the Debtors are true or as a waiver of the Committee's rights to dispute such facts.

the Second Lien Notes.  John Bitove is the chairperson of Bird Global's board of directors and is Bird Global's VP, Corporate Development and Strategy.  He is also the founder of Obelysk and holds a position at Maple Leaf.  Obelysk holds approximately $13 million of the Second Lien Notes and Maple Leaf holds approximately $5 million of the Second Lien Notes.  Kevin Talbot is a director of Bird Global and is a Managing Partner of Relay Ventures.  Relay Ventures holds approximately $27 million of the Second Lien Notes.

7.     On September 19, 2023, Bird Global entered into that certain Stock Purchase Agreement (the "Spin Acquisition Agreement") with Skinny Labs, Inc. ("Spin"), acquiring 100% of the stock of Spin in exchange for agreed upon consideration of approximately $19 million before adjustments, which is comprised of (a) $10 million in cash, (b) $6 million in the form of a secured vendor take-back promissory note (the "VLB Note"), and (c) $3 million in hold-back consideration comprised of $1 million in cash and $2 million of the Company's Class A Common Stock, par value $0.0001 per share (such transaction, the "Spin Acquisition").

8.     On December 20, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code").  No trustee or examiner has been appointed in the Debtors' cases, and the Debtors continue to operate their businesses as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

9.     On the Petition Date, the Court entered an order directing the joint administration of the Debtors' chapter 11 cases (the "Chapter 11 Cases").

10.    Also on the Petition Date, the Debtors filed the DIP Motion [ECF No. 32].

11.    On December 29, 2023, the Debtors filed their *Expedited Motion For Entry of an Order (I) Authorizing And Approving The Debtors' Entry Into The Stalking Horse Bid Agreement*

*With The Stalking Horse Bidder, Subject To The Bidding Procedures And The Sale Hearing, (II)*

*Approving Bidding Procedures, (III) Scheduling The Bid Deadlines And The Auction, (IV)*

*Scheduling A Sale Hearing, (V) Approving The Form And Manner Of Notice Thereof, (VI)*

*Approving Contract Procedures, And (VII) Granting Related Relief* [ECF No. 96] (the "<u>Bidding</u>

<u>Procedures Motion</u>").

12.    On January 5, 2024, the Office of the United States Trustee for Region 21 (the "<u>U.S.</u>

<u>Trustee</u>"), appointed three members to the Committee pursuant to section 1102(a)(1) of the

Bankruptcy Code.  *See* ECF No. 118.[4]  The members of the Committee are: (i) Vodafone US, Inc.;

(ii) Alesia Truxell; and (iii) Lloyd's of London Syndicates 1969 & 1971.

13.    Additional information regarding the Debtors' operations, the Debtors' capital

structure, and the circumstances surrounding the commencement of these Chapter 11 Cases can

be found in the *Declaration of Christopher Rankin in Support of Chapter 11 Petitions and First*

*Day Pleadings* [ECF No. 31] (the "<u>First Day Declaration</u>").

14.    On January 19, 2024, the Debtors filed their schedule and statements.

**B.    Prepetition Secured Debt**

15.    As of the Petition Date, the Debtors allege that they were liable for approximately

$108.9 million in aggregate financial debt obligations (excluding trade debt and potential rejection

damages).  First Day Declaration, at ¶ 42.  These alleged obligations arise under a senior secured

credit facility and two note issuances.  Debtors assert that Debtor Bird Global is an obligor under

each of the funded-debt obligations as either a borrower, issuer, or guarantor.

---

[4]    On January 7, 2024, the U.S. Trustee filed an *Amended Appointment and Notice of Appointment of Committee of Bird Global, Inc.* [ECF No. 119] to correct spelling errors included in the first Notice of Appointment. The members of the Committee remained the same.

a. <u>First Lien Obligations – First Lien Credit Facility</u>

16.     On April 27, 2021, Bird Opco, Bird Holdco,[5] MidCap Financial Trust, as administrative agent (the "<u>First Lien Agent</u>"), and certain other lenders thereto (the "<u>First Lien Lenders</u>") entered into that certain Loan and Security Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "<u>First Lien Credit Agreement</u>") for the purported purpose of enabling Bird Global to finance its future vehicle capital expenditures (the "<u>First Lien Credit Facility</u>").  *See* DIP Motion, at ¶ 9; *see also* First Day Declaration at ¶ 43.  The First Lien Credit Facility included a repayment mechanism tied directly to revenue generation by vehicles on lease by Bird Opco to Bird Rides Inc. ("<u>Bird Rides</u>") under an intercompany leasing arrangement (the "<u>Scooter Lease</u>").  *Id.*

17.     The First Lien Credit Agreement was amended a number of times between 2021 and the Petition Date.  *See* DIP Motion, at ¶ 10; *see also* First Day Declaration, at ¶ 44.

18.     On September 19, 2023, in connection with the Spin Acquisition, the First Lien Credit Agreement was amended and restated, in its entirety, by and among, Bird Rides, as Borrower, Bird Global, as Parent, Bird Holdco, and certain other persons from time to time party thereto, and the First Lien Agent.  The amended and restated First Lien Credit Agreement provided for, among other things, (a) an additional advance of $6 million, to be used for, among other things, the completion of the transactions contemplated under the Spin Acquisition Agreement, (b) an extension of the maturity date of the loan to July 12, 2025, (c) amendments to the monthly amortization payment amounts, and (d) the expansion of the senior security in favor of the First

---

[5]     Debtor Bird Global owns 100% of the shares of Debtor Bird Rides and non-Debtor Bird Canada Scooters, Inc.  First Day Declaration, at ¶ 39.  Debtor Bird Rides owns 100% of the shares in Debtor Spin and 100% of the membership interest in Debtor Bird US Holdco, LLC ("<u>Bird Holdco</u>").  *Id.* at ¶ 40.  Bird Rides owns 100% of the membership interests in non-Debtor Bird Rides Holding (US), LLC and non-Debtor Bird Treasury Holdco, LLC, 100% of the shares in non-Debtor Bird Rides International Holding, Inc. and non-Debtor Scoot Rides, Inc., and owns 100% of the equity interests in non-Debtor Bird China Limited. *Id.*  Bird Holdco owns 100% of the membership interests in Debtor Bird US Opco, LLC ("<u>Bird Opco</u>").  *Id.* at ¶ 41.

Lien Agent to include substantially all of the assets of Bird Global, Bird Rides, and certain of the Company's other material United States subsidiaries.  Under the amended and restated First Lien Credit Agreement, the Scooter Lease was terminated.  *See* First Day Declaration, at ¶ 45.

19.    On November 29, 2023, Bird Rides, Bird Global, Bird Holdco, and certain other persons from time-to-time party thereto, and the First Lien Agent, entered into that certain Amendment Number 1 to the amended and restated First Lien Credit Agreement pursuant to which the Lenders extended $2,000,000 to the Company (the "First Lien Bridge Loan").  *Id.* at ¶ 46.

20.    The First Lien Credit Facility is purportedly secured by a first-priority, duly perfected and enforceable lien on substantially all assets of the Debtors, including the Debtors' equity interests in certain non-Debtor affiliates.  *See* DIP Motion, at ¶ 11; *see also* First Day Declaration at ¶ 47.

21.    As of the Petition Date, the outstanding principal balance under the First Lien Credit Facility, inclusive of the First Lien Bridge Loan, is not less than $41,455,322.40, plus accrued and unpaid interest of not less than $2,833,148.50 and all other Prepetition First Lien Obligations.  *See* DIP Motion, at ¶ 12; *see also* First Day Declaration at ¶ 48.

**b.    <u>Second Lien Obligations – Note Purchase Agreement</u>**

22.    On December 30, 2022, and effective as of January 3, 2023, Bird Global entered into a share purchase agreement (the "BC Share Purchase Agreement") with 1393631 B.C. Unlimited Liability Company, a British Columbia unlimited liability company and indirect wholly owned subsidiary of Bird Canada, and the owners of all Bird Canada shares (the "BC Sellers"). Pursuant to the BC Share Purchase Agreement, among other things, Bird Global acquired from the BC Sellers 100% of the issued and outstanding shares of Bird Canada in exchange for the issuance by the Company to the BC Sellers of an aggregate principal amount of $27.0 million of its 12.0%

Convertible Senior Secured Notes due 2027 (the "Second Lien Notes"), 728,175 shares of Bird Global's Class A common stock, and a nominal amount of cash consideration. This transaction culminated in the Bird Canada Acquisition. *See* First Day Declaration at ¶ 30.

23.     On December 30, 2022, in connection with the Bird Canada Acquisition, Bird Global, as issuer, the several purchasers from time to time party thereto (the "Second Lien Noteholders"), and U.S. Bank Trust Company, National Association, as collateral agent (the "Second Lien Agent") entered into a Note Purchase Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "Note Purchase Agreement"). *See* DIP Motion, at ¶ 13; *see also* First Day Declaration at ¶¶ 31, 49.

24.     Pursuant to the Note Purchase Agreement, Bird Global issued and sold an aggregate principal amount of $30.1 million of its Second Lien Notes. The Second Lien Notes were purportedly issued and sold in a private placement to certain "accredited investors," conducted pursuant to section 4(a)(2) of the Securities Act of 1933, as amended. The terms of the Second Lien Notes are governed by the Note Purchase Agreement. *See* DIP Motion, at ¶ 13; *see also* First Day Declaration, at ¶ 49.

25.     On March 17, 2023, Bird Global entered into the First Amendment to the Note Purchase Agreement with the original Second Lien Noteholders and the Second Lien Agent. Pursuant to the First Amendment to the Note Purchase Agreement, the Company issued $2.8 million of additional Second Lien Notes for cash consideration. *See* First Day Declaration, at ¶50.

26.     On September 19, 2023, in connection with the Spin Acquisition, Bird Global entered into the Second Amendment to the Note Purchase Agreement with the original Second Lien Noteholders and the Second Lien Agent. *See* First Day Declaration, at ¶ 51.

27.    On December 11, 2023, Bird Global entered into the Third Amendment to the Note Purchase Agreement with the original Second Lien Noteholders and the Second Lien Agent. Pursuant to the Third Amendment to the Note Purchase Agreement, the Company issued $2.2 million of additional Second Lien Notes for cash consideration (the "Initial Second Lien Bridge Note").  *See* First Day Declaration, at ¶52.  These funds were used to fund a D&O tail for the primary benefit of the insiders associated with the Participating Second Lien Lenders.

28.    On December 18, 2023, Bird Global entered into the Fourth Amendment to the Note Purchase Agreement with the original Second Lien Noteholders and the Second Lien Agent. Pursuant to the Fourth Amendment to the Note Purchase Agreement, the Company issued $1.8 million of additional Second Lien Notes for cash consideration (the "Additional Second Lien Bridge Note," together with the Initial Second Lien Bridge Note, the "Second Lien Bridge Notes"). *See* First Day Declaration, at ¶53.

29.    The Second Lien Notes are purportedly secured by liens on substantially all assets of the Debtors, including the Debtors' equity in certain non-Debtor affiliates, which liens are junior and subordinate to the liens of the First Lien Agent.  *See* DIP Motion, at ¶ 14; *see also* First Day Declaration, at ¶ 54.

30.    As of the Petition Date, the outstanding principal balance under the Note Purchase Agreement is not less than $63,850,000, plus approximately $7,180,000.00 in accrued and unpaid interest thereon (including PIK interest),[6] attorneys' fees and costs.  *See* DIP Motion, at ¶ 16; *see also* First Day Declaration, at ¶ 55.

---

[6]    The outstanding interest balance on the Note Purchase Agreement is comprised of $3.6 million of principal issued as PIK interest, and $3.6 million of accrued interest.  *See* First Day Declaration, at ¶ 55.

c.    <u>**The Intercreditor Agreement**</u>

31.    The First Lien Agent, the Second Lien Agent, and the Second Lien Noteholders are parties to that certain Subordination and Intercreditor Agreement dated December 30, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Intercreditor Agreement</u>").  The Intercreditor Agreement sets forth the relative rights and priorities between the First Lien Lenders, the First Lien Agent, the Second Lien Lenders, and the Second Lien Agent. *See* DIP Motion, at ¶15; *see also* First Day Declaration, at ¶ 56.

32.    On March 17, 2023, the Intercreditor Agreement was amended and supplemented. On September 19, 2023, the Intercreditor Agreement was amended and restated in its entirety and further amended on December 11, 2023.  First Day Declaration, at ¶ 56.

C.    **The DIP Motion**

33.    The DIP Motion was among several "first day" motions filed by the Debtors on the Petition Date.  The DIP Motion sought approval for the Debtors to obtain post-petition financing from the First Lien Lenders and certain participating Second Lien Lenders, and authorization for the use of cash collateral, and granting adequate protection, post-petition liens and superpriority claims, among other relief.  The salient terms of the DIP Facilities[7] are described herein.

34.    On December 22, 2023, the Court held a hearing on the Debtors' various first day motions and entered an order approving the DIP Motion on an interim basis (the "<u>Interim Order</u>") [ECF No. 66], including scheduling a final hearing (the "<u>Final Hearing</u>") for January 16, 2024. Thereafter, the Debtors filed the *Agreed Ex Parte Motion to Continue the Hearing on Certain Matters Scheduled for January 16, 2024 at 10:00 a.m. to January 22, 2024 at 11:00 a.m.* (the

---

[7]    The DIP Facilities are memorialized in the (i) *Senior Secured Priming And Super-Priority Debtor-In-Possession Loan Agreement*, and (ii) *Senior Secured Priming And Super-Priority Debtor-In-Possession Note Purchase Agreement*, attached to the Interim Order.

"Agreed Motion") [ECF No. 132], seeking to continue the Final Hearing on the DIP Motion and other matters pending before the Court.  The Court entered an order approving the First Agreed Motion [ECF No. 137].  By agreement among the parties, the Final Hearing has been continued to February 5, 2024 at 10:00 a.m. (et) and the committee's objection deadline has been continued to January 30, 2024 at 4:00 p.m. (et).

35.     Pursuant to the DIP Motion, the Debtors now seek final approval of debtor-in-possession financing consisting of:

> a.      a postpetition senior secured priming and super-priority debtor-in-possession loan facility (the "DIP Credit Facility") provided by the lenders (the "Prepetition First Lien Lenders") party to the Prepetition Credit Agreement, consisting of new money loans up to $19,500,000 (the "New Money Senior DIP Loans"); and

> b.      a postpetition senior secured note purchase agreement (the "DIP Junior Notes Facility" and together with the DIP Credit Agreement, the "DIP Facilities") provided by certain lenders (the "Participating Second Lien Lenders") party to the Prepetition Note Purchase Agreement, consisting of up to $5,600,000 in new money notes (the "New Money Junior DIP Notes"), of which $5,600,000 was funded pursuant to the Interim DIP Order.

36.     Notably, the DIP Facilities include a roll-up (the "Roll Up") of (i) all Prepetition First Lien Obligations, including any accrued and unpaid interest totaling $44,288,470.90 (the "Roll-Up Loans" and together with the New Money Senior DIP Loans, the "Senior DIP Loans") and (ii) a roll-up of certain bridge notes issued under the Prepetition Note Purchase Agreement, held by the Participating Second Lien Lenders, in an aggregate principal amount of $4,000,000, plus accrued interest and fees payable (such rolled-up debt, the "Roll-Up Notes" and together with the New Money Junior DIP Notes, the "Junior DIP Notes" and together with the First Lien DIP Loans, the "DIP Loans").  Interim Order, at ¶ 6(b).

37.     While at first glance, the DIP Loans total approximately $73.4 million, only $25.1 million, or 34%, of the DIP Loans are new money.  The balance is a roll-up of prepetition debt.

38.    Importantly, the $4,000,000 of the Roll-Up Notes accounts for the Second Lien Bridge Notes that the Second Lien Lenders issued prior to the Petition Date.  As noted, a substantial portion of the Second Lien Bridge Note was used to fund a D&O tail policy, for the primary benefit of the insider Participating Second Lien Lenders.

39.    The Interim Order authorizes the Debtors to draw up to $12,925,000 from the New Money Senior DIP Loans, after exhaustion of the New Money Junior DIP Notes.

40.    As security for the DIP Obligations, effective and automatically perfected on the date of the Interim Order with security interests and liens (the "DIP Liens") to the DIP Agents, for the benefit of the DIP Agents and DIP Lenders, secured by the Debtors assets (the "DIP Collateral").  *See* Interim Order, at ¶¶ 11(a)–(c).  The DIP Liens are subordinate only to the Carve-Out (defined in the DIP Motion) and subject to the terms of the Interim Order and the DIP Documents.  *Id.*  The DIP Collateral includes property, assets and other interests in property and assets of the Debtors that were not subject to a valid and perfected lien on the Petition Date (such property and assets, the "Unencumbered Assets"), including the proceeds of any other claims or causes of action arising or assertable under chapter 5 of the Bankruptcy Code (the "Avoidance Actions").  *See generally* Interim Order, at ¶¶ 6(g), 11(a)–(c).  The DIP Collateral also includes commercial tort claims, all insurance proceeds, and tax refunds and tax attributes such as net operating losses.  *Id.* at ¶¶ 11(a)–(c).

41.    The interest rates for the DIP Loans bear the following interest: (i) Senior DIP Loans: 6% cash pay; 9% PIK; and (ii) New Money DIP Notes: 18% PIK.  *See* DIP Motion at p. 6; DIP Credit Agreement, § 2.04; DIP Note Purchase Agreement, 2.04.  Additionally, there is an agency fee as to the Senior DIP Loans (the "Agency Fee") in the amount of $75,000 per year and there is an upfront fee (the "Upfront Fee") in an amount equal to 3.00% of the aggregate principal

amount of the DIP Term Loan Commitments under the DIP Credit Agreement.  *See* DIP Motion at p. 7–8; DIP Credit Agreement, § 2.04.

42.     Paragraphs 31 and 32 of the Interim Order set forth the parameters on the Committee's ability to bring a challenge to investigate the Prepetition Liens or the Prepetition Secured Obligations.  The Committee is permitted to use no more than $75,000.00 of the proceeds of the DIP Facilities, the DIP Collateral or the Prepetition Collateral, including the Cash Collateral to raise such a challenge (the "Challenge Budget").  *See* Interim Order, at ¶¶ 31–32.  As discussed *infra*, the Challenge Budget is woefully insufficient in order to allow the Committee to fulfill its duties to investigate, especially given the insider relationship among the parties.  The Committee must raise such a challenge by no later than the date that is the earlier of 75 days after the entry of this Interim Order, or, (ii) solely with respect to any Claims and Defenses asserted by a Creditors' Committee, 60 days after formation of the Creditors' Committee (the "Challenge Period").  *Id.* at ¶ 32.

43.     Paragraph 32(b) of the Interim Order notes that "[n]othing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any Creditors' Committee (if appointed), standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition Credit Documents, the Prepetition Liens or the Prepetition Secured Obligations."  *Id.* at ¶ 32(b).

44.     The Interim Order also provides that the occurrence of any of the following shall constitute a "Termination Event": (a) the occurrence of an Event of Default (as defined in the DIP Credit Facility), including the failure by the Debtors to comply with any of the milestones set forth at Exhibit 2 hereto including the Permit Reporting Covenant and Permit Continuance Covenant

specified therein (the "Milestones"),[8] to the extent not waived or subject to a forbearance or similar agreement with the applicable lenders; (b) the Debtors' failure to comply in any material respect with any provision of this Interim Order unless waived by the applicable lenders; or (c) the occurrence of the Maturity Date (as defined in the DIP Credit Agreement).

45.     Subject to entry of the Final Order, the Interim Order also waives the Debtors' rights under sections 506(c) and 552(b) of the Bankruptcy Code and provides that the DIP Agents, the DIP Lenders, or any of the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" with respect to any of the DIP Collateral or the Prepetition Collateral. Interim Order ¶¶ 15, 16, and 17.

**D.      The Bidding Procedures Motion**

46.     The Bidding Procedures Motion sought approval of the bidding procedures and the Stalking Horse Bid Agreement (as defined in the Bidding Procedures Motion) between the Debtors and Bird Scooter Acquisition Corp., a Canadian corporation, as purchaser (the "Stalking Horse Bidder"). The Stalking Horse Bid Agreement proposes a Purchase Price including a Credit Bid of $76.6 million (the entirety of the DIP Facilities), plus the aggregate amount of the Assumed Liabilities, plus Wind-Down Funding of $500,000. Bidding Procedures Motion, p. 3. The Stalking Horse Bidder is owned, in part, by the Participating Second Lien Lenders.

47.     The Court entered the order approving the Bidding Procedures Motion on January 25, 2024, with a fulsome reservation of rights for the Committee, and setting a February 23, 2024 deadline for the Committee to object to the Stalking Horse Bid and the Participating Second Lien Lenders' right to credit bid. (ECF No. 202).

---

[8]     The Milestones are outlined on Exhibit 2 annexed to the Interim Order.

## OBJECTIONS

**A.     The DIP Facility is Unduly Expensive and the DIP Motion Should Not Be Approved.**

48.     In order to obtain post-petition financing under sections 364(c) or (d) of the Bankruptcy Code, a debtor in possession must demonstrate that (i) it is unable to obtain unsecured credit under section 364(a) or (b) of the Bankruptcy Code; (ii) the proposed credit is necessary to preserve the assets of the estate; and (iii) the terms of the financing are fair, reasonable and adequate. *In re Ames Dept. Stores, Inc.,* 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990). In particular, "a proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate." *Id.* at 39; *see also In re Aqua Assocs.*, 123 B.R. 192, 195–98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."). To this end, courts should approve post-petition financing to the extent it is "in the best interests of the general creditor body." *In re Roblin Indus.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985).

49.     As noted above, the Senior DIP Loans have interest rates of 6% cash and 9% PIK, which is an increase of interest rates as compared to the Prepetition Credit Facility, which was an interest rate equal to the greater of (a) 1.00% and (b) the sum of (x) SOFR plus (y) 0.1% (10 basis points), plus a margin of 7.5%. The Junior Money DIP Notes have an 18% PIK as compared to the prepetition interest on the Note Purchase Agreement of 12%. These costs are simply too rich given that the DIP Facility only includes approximately $25.1 million in new money.

50.     The First Day Declaration is the only evidence that the Debtors submitted in support of the DIP Motion. The DIP Motion and First Day Declaration lack any analysis or data demonstrating the reasonableness of the DIP Facilities' terms. The First Day Declaration simply notes that the Debtors simply "concluded that, under the circumstances, acceptable third-party

financing was not reasonably obtainable." First Day Declaration, at ¶ 166.  The First Day Declaration mentions, in passing, that the Debtors considered whether they would be able to obtain third-party financing, but did not elaborate on what efforts, if any, they undertook to find any other financing opportunities.  *See id.* ¶¶ 166–68.  The DIP Motion does not provide any additional support as to why the DIP Facilities are the best options available for the Debtors under the circumstances and similarly does not elaborate on any prepetition efforts by the Debtors to find any alternative financing arrangements.  *See generally* DIP Motion p. 15–25.  The DIP Motion merely recites the standards for approval of DIP financing without tying the standards to these cases.  Simply stating "[g]iven the facts and circumstances of these cases and the enormous benefit to the Debtors (and their stakeholders), the Roll Up and the other terms and conditions of the DIP Facilities are fair, reasonable, and appropriate" does not provide the Committee with confidence that the Debtors exhausted, or even researched, alternative financing options.

51.    "An insider's dealings with the debtor are subject to rigorous scrutiny by the court, with the insider bearing the burden of showing the 'entire fairness' of the transaction at issue."  *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) (holding that a postpetition financing transaction between a debtor and an insider was subject to heightened scrutiny).  The Committee does not believe that the Debtors and Participating Second Lien Lenders have negotiated at arms' length or in good faith, and the proposed DIP financing arrangement does not satisfy the entire fairness standard.

**B.    The DIP Motion Should Not be Approved on a Final Basis Because the Roll Up is Not Fair or Reasonable.**

52.    Roll-up provisions are generally a disfavored form of post-petition financing because they improve the priority of a prepetition creditor without providing any additional post-petition value to the debtor's estate.  Effectively, a roll-up cross-collateralizes a portion of a

lender's prepetition debt with post-petition collateral, and grants that debt super-priority administrative expense status. That cross-collateralization and grant of a super-priority administrative claim for prepetition debt improperly circumvents the Bankruptcy Code's priorities and distribution framework. *See, e.g.*, *In re Saybrook Mfg. Co., Inc.*, 963 F.2d 1490, 1494–96 (11th Cir. 1992) (noting that post-petition cross-collateralization is an "extremely controversial form of Chapter 11 financing" before holding it was not authorized by section 364 of the Bankruptcy Code); *see also Reynolds v. Servisfirst Bank* (*In re Stanford*), 17 F.4th 116, 128 (11th Cir. 2021); *see also Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (noting that roll-up provisions "have the effect of improving the priority of a prepetition creditor"). Roll-ups are also disfavored because they improve the position of prepetition secured creditors without providing any new consideration for an already existing obligation.

53.    The Roll Up is being used by the DIP Lenders to improve their position relative to the Debtors' other creditor constituencies and to cure deficiencies in their prepetition loans. The size of the Roll Up relative to the new money component of the DIP Facility is disproportionate. The new money portion of the DIP Financing constitutes just 34% of the overall financing. The proposed roll up of the Second Lien Bridge Notes is even more egregious because the Second Lien Bridge Notes were used, almost immediately, to fund the purchase of a D&O tail policy that only benefits the insiders of the company. The Participating Second Lien Lenders are attempting to use this roll-up, which was used to fund their own protection, for their benefit at the expense of unsecured creditors. For this reason and because the Debtors and Participating Second Lien Lenders were not negotiating at arms' length or in good faith, under no circumstances should the Court approve the proposed roll-up in favor of the Participating Second Lien Lenders.

54.     The majority of the DIP Facilities are prepetition debt, and disconcertingly, the Debtors are seeking to provide both DIP Lenders with liens on unencumbered assets, such as the proceeds of Avoidance Actions, as discussed *infra*.  The proposed Roll Ups would therefore result in the DIP Lenders having substantially improved collateral positions on their prepetition claims at the expense of unsecured creditors.

**C.     The DIP Lenders Should Not be Granted Postpetition Liens on Unencumbered Assets, Including Avoidance Actions and D&O Claims.**

55.     The Interim Order at paragraphs 11 and 12 provides the DIP Lenders and the DIP Agents with the DIP Liens in a broad set of DIP Collateral, including commercial tort claims, insurance proceeds, net operating losses, and any claims or causes of action arising under chapter 5 of the Bankruptcy Code, among other potential Unencumbered Assets.  *See* Interim Order, at ¶¶ 11, 12.  The liens on commercial tort claims and insurance proceeds may encompass claims against the Debtors' directors and officers ("D&O Claims") and the proceeds under applicable insurance policies ("D&O Policies").

56.     Indisputably, avoidance actions are an important tool for providing recovery to unsecured creditors.  *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd., Partnership IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("[w]hen recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors."); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243–45 (3d Cir. 2000) (finding that a fraudulent transfer claim is not an asset of the debtor).  *Mellon Bank, N.A. v. Glick (In re Integrated Testing Prods. Corp.)*, 69 B.R. 901, 904–05 (D.N.J. 1987) (observing that avoidance actions should be pursued for the benefit of all unsecured creditors); *In re Roblin Industries*, 52 B.R. 241, 243 (Bankr. W.D.N.Y. 1985) (debtor-in-possession financing denied where debtors were required to waive avoidance actions as a condition

of the loan); *see also Official Comm. of Unsecured Creditors v. Gold Electronics Corp. (In re Gold Electronics Corp.)*, 1993 WL 408366, at *3–4 (N.D. Ill. Sept. 22, 1993) (vacating lien on preference actions).

57.     Preference actions alone under section 547 of the Bankruptcy Code may thus be a significant source of recovery for unsecured creditors (in addition to yet to be ascertained potential fraudulent transfer claims).  The Committee has not yet been able to fully review payments made by the Debtors to third parties in the 90-day period preceding the Petition Date (or one year period for insiders) in order to ascertain what, if any, preference claims exist.  Preference claims are a significant source of recovery for unsecured creditors and the Committee must preserve this potential source of recovery in this case.

58.     In order to ensure the unsecured creditors have potential sources of recovery for repayment of their claims, the Committee must ensure the preservation of Unencumbered Assets and avoidance claims.  The costs of the DIP Facilities are already high, and the DIP Lenders, (and most specifically, the insider Second Lien Lenders), should not be provided with additional benefits to the exclusion and detriment of unsecured creditors such as liens on avoidance claims.

59.     The Committee also notes that on the budget annexed to the Interim Order, there is a line item for "Non-Debtor Funding," totaling $7.449 million for the first thirteen (13) weeks of the Chapter 11 Cases.  As discussed above, the Committee has concerns about funding non-Debtors during this case without any clear benefit to the estates, and the result that use of such funds creates an administratively insolvent estate.  The Court should not approve a DIP Financing arrangement that benefits non-Debtor at the expense of the Debtors' estate.

60.     Accordingly, the DIP Collateral should be limited to the extent of the DIP Lender's prepetition collateral.  Furthermore, avoidance actions (including claims under sections 502(d),

544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code) and proceeds and property recovered therefrom should be expressly excluded from the definition of DIP Collateral in the Final Order, and that exclusion should override the collateral description in the DIP Credit Agreement.

61.    Similarly, the D&O Claims and proceeds under D&O Policies should be expressly excluded from the DIP Liens and DIP Collateral.  The Committee understands that the Debtor maintains D&O policies with up to $12 million in aggregate coverage.  The pursuit of D&O Claims, should it be determined that any exist, could be a source of significant recovery for unsecured creditors, thereby underscoring the need to preserve these claims unencumbered for the estate.

62.    The Committee's objection to the overreach on DIP Liens and DIP Collateral similarly applies to the First and Second Lien Lenders' Adequate Protection Superpriority Claims. *See* Interim Order, at ¶¶ 20.  Any order approving the DIP Motion must include corresponding changes to the DIP Liens, DIP Collateral, and the Adequate Protection Superpriority Claims.

**D.    The DIP Budget is Inadequate.**

63.    The budget (the "<u>DIP Budget</u>") annexed to the Interim Order is woefully inadequate.  If the DIP Budget stands and the DIP Financing is not increased, these cases are clearly destined for administrative insolvency.  While providing for approximately $7.5 million in non-Debtor Funding, the DIP Budget omits several significant, anticipated administrative expenses while underfunding the Committee's professionals in a way that would improperly limit the Committee's investigation of potential Challenges in these insider-driven cases.

64.    First, the DIP Budget only covers the first thirteen weeks of the cases.  Any final budget must extend beyond this DIP Budget period and should run through the projected effective

date of chapter 11 plan.  After review of the updated DIP budget model provided by the Debtors, there are a number of projected "post-13 week" expenses that must be included in the final DIP budget (the "Final Budget").  The expenses beyond the thirteen week time period are substantial. For example, there is a potential for a $250,000 U.S. Trustee fee to be paid after the thirteen weeks, substantially decreasing any cash leftover in the Debtors' estates.  The Final Budget should include all postpetition expenses through a projected plan effective date.

65.    Second, the Final Budget must eliminate unjustified non-Debtor funding.  The DIP Budget includes $7.5 million for non-Debtor funding in the first thirteen weeks of this case.  This non-Debtor funding accounts for approximately 30% of the new money DIP Financing.  To date, the Debtors have not justified this substantial expense to what appear to be highly unprofitable non-Debtor subsidiaries.

66.    Third, the Committee has reservations as to whether the DIP Budget sufficiently reserves funds for trailing administrative expenses that need to be paid after the end of the budget period and the closing of a sale of substantially all of the Debtors' assets.  The Final Budget should include a priority claim reserve that is sufficient to cover anticipated priority claims.

67.    Fourth, the Committee's professional fee line item must be doubled to enable the Committee to fully represent the interests of unsecured creditors and investigate potential Challenges  The Committee's professional fees only make up 17% of all of the fees budgeted for professionals in these cases and far less than the Prepetition Secured Parties are budgeting for themselves as they attempt to ward off any Challenge mounted by the Committee and acquire the Debtors' business via credit bid leaving nothing behind for unsecured creditors.

**E.      The Committee is Unduly Restricted by Certain Challenge Limitations**

68.      The Committee is unduly constrained by certain of the Challenge parameters set forth in the Interim Order.  Specifically, the Committee is limited to a sixty (60) day Challenge Period and an investigation budget of $75,000.  The brevity of the Challenge Period is complicated by the fact that it overlaps nearly entirely with the sale process (which is still in the very early stages with no prepetition marketing undertaken), which will require significant focus by the Committee and its professionals to safeguard the interests of unsecured creditors.  Additionally, given the insider nature of the Participating Second Lien Noteholders and Stalking Horse Bidder, the onus is on the Committee, as a fiduciary, to investigate the liens of the Second Lien Noteholders and raise challenges thereto if appropriate.

69.      Similarly, the Committee's carveout for the Challenge investigation should be increased to $125,000 to ensure that the Committee has sufficient resources to investigate and, if appropriate, assert Challenges or object to the Second Lien Lenders' proposed Credit Bid.  Additionally, the Committee's rights to seek to extend the Challenge Deadline for cause should be expressly reserved.

70.      Further, given that the Committee may need to seek standing to file certain claims or causes of action, the Committee requests that the following language be added to the Final Order:

> If the Committee files a motion seeking authority, derivatively or otherwise, to commence a challenge specifically identified in such motion on or prior to the Challenge Deadline, the Challenge Deadline for the Committee to commence such identified challenge shall be tolled through the earlier of (a) the date of the withdrawal of such motion, or (b) the date that is fourteen (14) days after the entry of a dispositive ruling on such motion.

71.      In a case like this, when the DIP Facilities involve insiders *and* the sale of substantially all of the Debtors' assets to insiders, by way of a credit bid, the Committee as

fiduciary should not be unduly restricted in the nature or scope of its investigation. The limited investigation budget deliberately forces the Committee's professionals to finance matters related to this case and harms the adversarial system characteristic of the chapter 11 process. *See In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (finding a cap on fees unacceptably limited the right of debtor's counsel to payment for bringing actions against the DIP lenders, creating an economic incentive to avoid bringing such actions in disregard of its fiduciary duties toward the estate, and therefore, refusing to approve the post-petition financing).

**F.     The Debtors' Proposed Waivers under §§ 506(c) and 522(b) are Inappropriate.**

72.     The Interim Order waives the Debtors' (and any successors) right to surcharge the DIP Collateral or the Prepetition Collateral, the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties under section 506(c) of the Bankruptcy Code. Section 506(c) provides that a debtor "may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim…" 11 U.S.C. § 506(c).

73.     The cost of a debtor's restructuring should not be borne by the unsecured creditors. *See Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) (noting that "section 506(c) is designed to prevent a windfall to the secured creditor … The rule understandably shifts to the secured party … the costs of preserving and disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy case…"); *see also Kivitz v. CIT Group/Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) (observing that the purpose of section 506(c) is to protect unsecured creditors from "bear[ing] the cost of protecting property that is not theirs.").

74.    The section 506(c) waiver is inappropriate in this case given the budget concerns and the insider nature of the DIP Facility and sale transaction.  Consequently, the Debtors' (and successors) right to surcharge collateral under section 506(c) should be preserved.

75.    Similarly, the Interim Order waives the Debtors' right to assert the "equities of the case" exception under section 552 of the Bankruptcy Code.  The "equities of the case" exception allows for the exclusion of post-petition proceeds from prepetition collateral on equitable grounds. *See In re Muma Servs.*, 322 B.R. 541, 558–59 (Bankr. D. Del. 2005) (*quoting Delbridge v. Prod. Credit Ass'n & Fed. Land Bank*, 104 B.R. 824, 826 (E.D. Mich. 1989) ("The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the [debtor in possession's] use of other assets of the estate (which normally would go to general creditors) to cause the appreciated value.").  These rights should also be preserved.

**G.    The Estates' Equitable Marshaling Rights Should be Preserved.**

76.    Paragraph 16 of the Interim Order provides that "in no event shall the DIP Agents, the DIP Lenders, or any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral".  Equitable marshaling can be an important tool for safeguarding value for an estate, as it was "developed to prevent injustice to junior creditors and to foster fair dealing, justice, and common honesty."  *Official Comm. V. Hudson United Bank (In re America's Hobby Ctr.*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998).

77.    The proposed waiver of marshaling in this case could eliminate the Debtors' ability to secure a meaningful recovery for unsecured creditors.  Accordingly, the Debtors' marshaling rights should be preserved.

**H.    Other Issues.**

78.    **Credit Bid.** Through the DIP Motion, there is a very generous unqualified right to credit bid outlined for the purportedly secured parties, including the insider Second Lien Lenders. Interim Order, at ¶ 14.  Unless the Court expressly reserves the Committee's rights, the entry of an order permitting a credit bid may be tantamount to an order approving the nature, extent, and validity of the lien claim of the party asserting a credit bid and may also prevent prosecution of any money damage claims against that party.  *See In re Radnor Holdings Corp.*, 353 B.R. 820, 846 (Bankr. D. Del. 2006); *see also In re Merit Group, Inc.*, 464 B.R. 240, 252 (Bankr. D.S.C. 2011) ("The intent of § 363(k) is to permit only those with a valid security claim in property to be sold to claim a setoff.").  Thus, in order to preserve the Committee's rights, the Final Order must include a reservation of rights for the Committee to request that the Court condition or limit the DIP Lenders' rights to credit bid for cause under section 363(k) of the Bankruptcy Code.

79.    **Milestones, Termination Events, and Maturity Date.**  Though the Committee does not currently seek to extend the Milestones, any Final Order approving the DIP Motion should expressly preserve the Committee's right to seek extensions  of the Milestones for cause in accordance with Bankruptcy Rule 9006(b)(1).

80.    **Modification of DIP Documents.**  Paragraph 6(e)(ii) of the Interim Order provides that the DIP Documents may be modified without any further approval of the Court.  Given the insider nature of the Second Lien Lenders and the extremely limiting budget, any order approving the DIP Motion should include language expressly preserving the Committee's rights to object to any material modifications of the DIP Documents and the Committee should be a consultation party for any modifications.

## CONCLUSION

81.     Based on the foregoing, the Committee respectfully requests that the Court (i) deny the DIP Motion unless the terms of the DIP Facilities and the Final Order are modified as set forth herein, and (ii) grant such further relief as is just and proper.

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

Dated:  February 1, 2024

**FOX ROTHSCHILD LLP**
One Biscayne Tower
2 S. Biscayne Boulevard, Suite 2750
Miami, FL 33131
Phone: 305/442-6543
Fax: 305/442-6541
E-mail: relgidely@foxrothschild.com

By: */s/ Robert F. Elgidely*
Robert F. Elgidely
Florida Bar No. 111856
Michael A. Sweet (admitted *Pro Hac Vice*)
Gordon E. Gouveia (admitted *Pro Hac Vice*)
relgidely@foxrothschild.com
msweet@foxrothschild.com
ggouveia@foxrothschild.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on February 1, 2024, I electronically filed the foregoing *Notice of Appearance* with the Clerk of the Court using the CM/ECF System. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means and a copy was also served via first class mail on all parties identified on the attached Service List who are not registered users of the Court's CM/ECF system.

By*: /s/ Robert F. Elgidely*
Robert F. Elgidely, Esq.