UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| BIRD GLOBAL, INC., *et al.*,[1] | Case No. 23-20514-CLC |
| Debtors. | (Jointly Administered) |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF THE DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") submit this omnibus reply (the "Reply") in support of the *Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [ECF No. 32] (the "Motion")[2] and in response to the objection by the Official Committee of Unsecured Creditors (the "Committee") to the Motion [ECF No. 238] (the "Committee Objection") and the limited objection of Lloyd's, London Syndicates Numbers 1969 and 1971 ("Lloyd's") to the Motion [ECF No. 237] (the "Lloyd's Objection," and together with the Committee Objection, the "Objections"). In support of the Reply, the Debtors respectfully represent as follows:

---

[1]    The address of the Debtors is 392 Northeast 191st Street, #20388, Miami, FL 33179. The last four digits of the Debtors' federal tax identification numbers are: (i) Bird Global, Inc. (3155); (ii) Bird Rides, Inc. (9939); (iii) Bird US Holdco, LLC (8390); (iv) Bird US Opco, LLC (6873); and (v) Skinny Labs, Inc. (8176).

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

## PRELIMINARY STATEMENT

1.     The DIP Facilities are the product of heavy negotiations among the Debtors, the First Lien Lenders, and the Second Lien Lenders. As set forth in the Declarations (as defined herein), the Debtors require immediate access to the full DIP Facilities to avoid an imminent liquidity crisis. The Debtors are currently in their lowest revenue season and require access to additional liquidity in order to continue to operate as a going concern through a sale and wind down process. Without full access to the DIP Facilities, the Debtors will run out of cash prior to the conclusion of the proposed sale, and the erosion of confidence over the Debtors' ongoing operations would be significant, irreparably harming the Debtors' estates to the detriment of the Debtors, their estates, their employees, and the unsecured creditors.

2.     Notwithstanding the Objections, there does not appear to be any meaningful dispute that: (i) the Debtors require access to additional financing under the DIP Facilities and the use of cash collateral thereunder to operate their business, fund these chapter 11 cases, and, ultimately, maximize the value of their bankruptcy estates; and (ii) there is no alternative postpetition financing available to the Debtors to accomplish those (or any other) objectives, whether on an unsecured, junior secured, or priming lien basis.

3.     Rather than challenge the foregoing, the Objections take issue with the terms of the DIP Facilities, such as the Roll Up, the waiver of the estates' surcharge rights under section 506(c) of the Bankruptcy Code, the DIP Budget, and others. The Objections ignore the fact that each of these terms are part of a larger, comprehensive bargain struck among the Debtors and the DIP Lenders that secured $25.1 million of new money financing for the Debtors. While the Debtors would have welcomed DIP Facilities on better terms, that option was not available.

4.     The Debtors acknowledge that the DIP Budget is tight. Like most financially distressed businesses, the Debtors wish they had access to a larger credit facility that provided

2

12761592-1

them greater liquidity.   The Debtors cannot, however, compel the DIP Lenders to lend more money.   The Debtors believe that it is in the best interests of their estates and all creditor constituencies to continue to operate and allow the sale process to proceed in order to preserve the possibility that the sale process will yield sufficient consideration to fund a distribution to creditors.

5.      It would not be realistic to expect this lender group (or any other) to forgo commonplace and appropriate protections for postpetition lenders of the sort contained in the DIP Facilities.  Also, contrary to the various insinuations in the Committee Objection, the DIP Facilities were subject to good faith arms' length negotiations between the Debtors, the First Lien Lenders, and the Second Lien Lenders, as made abundantly clear by the discovery propounded to the Committee in advance of the hearing.  The Committee Objection attempts to paint a narrative that the Second Lien Lenders received a better deal than is appropriate under the circumstances.  However, all of that discussion goes to the sale, not to the instant Motion before the Court.   In reality, the Debtors were running out of money and had to get financing—and fast—or risk a liquidity crisis.  Importantly, the Second Lien Lenders have already funded their portion of the DIP Facilities, $5.6 million, in good faith and in reliance on the terms of the Interim Order (as defined below). Moreover, the DIP loan by the Second Lien Lenders is first money in, last money out.  The First Lien Lenders would not have funded their portion of the DIP Facilities if the Second Lien Lenders did not make this concession.

6.      It is clear that the terms of the DIP Facilities are fair and reasonable and otherwise satisfy the requirements of the Bankruptcy Code.  The Court should grant the Motion on a final basis.

## **BACKGROUND**

### A.      **General Background**

7.      On December 20, 2023 (the "Petition Date"), the Debtors filed the Motion.

8.      On January 5, 2024, the Office of the U.S. Trustee appointed the Committee in these chapter 11 cases [ECF No. 118, and as amended at ECF No. 119].

9.      On December 22, 2023, the Court entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [ECF No. 66] (the "Interim Order") approving the Motion on an interim basis.

10.     The Debtors continue to the manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**B.      Factual Support**

11.     On the Petition Date, the Debtors filed the *Declaration of Christopher Rankin in Support of Chapter 11 Petitions and First Day Pleadings* [ECF. No. 31] (the "First Day Declaration").

12.     Contemporaneously herewith, the Debtors filed the *Declaration of Christopher Rankin in Support of DIP Financing* (the "DIP Declaration," and together with the First Day Declaration, the "Declarations").

13.     The facts in support of approval of the Final Order are set forth in the Motion and the Declarations. The First Day Declaration and the DIP Declaration are incorporated herein by reference. The Debtors reserve all rights to supplement the factual record in support of the Motion with additional testimony and evidence at the final hearing with respect to the Motion.

## REPLY

**A.      The DIP Facilities Represent an Exercise of the Debtors' Sound Business Judgment and is in the Best Interests of the Debtors' Estates and Stakeholders.**

14.      The Debtors have established, and neither Objection has challenged, that the Debtors have satisfied the standards required to access postpetition financing on a superpriority, priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.[3]   Once the requirements of section 364 of the Bankruptcy Code have been met, the debtor must show that the terms of the proposed postpetition financing are appropriate under the circumstances.  *See e.g.,* *Bland v. Farmworker Creditors*, 308 B.R. 109, 113 (S.D. Ga. 2003) ("courts require the debtor basically to show why 'super-priority' financing is a good idea.").  A debtor may meet this burden by demonstrating satisfaction of a variety of factors, including, without limitation: (i) that the proposed financing is an exercise of the debtor's sound and reasonable business judgment, (ii) that no alternative financing is available, (iii) that the proposed financing is necessary to the continued operation of the debtor's business and the preservation of the debtor's estate, (iv) that the proposed financing is in best interest of the estate and its creditors, and (v) that the financing agreement was negotiated in good faith and at arms' length between debtor and proposed lender.  *Id.* at 113-14 (citing *In re Farmland Indus., Inc.,* 294 B.R. 855, 880 (Bankr. W.D. Mo. 2003)); *see also In re W. Pac. Airlines, Inc.*, 223 B.R. 567, 572 (Bankr. D. Colo. 1997) ("the Debtor has the burden of proof on four issues: first, that the proposed financing is an exercise of sound and reasonable business judgment; second, that no alternative financing is available on any other basis; third, that the financing is in the best interests of the estate and its creditors; and, as a corollary to the first three points, that no better offers, bids, or timely proposals are before the Court.").

---

[3]      *See* Motion ¶¶ 29-37; First Day Declaration ¶¶ 165-171; DIP Declaration ¶¶ 12-16.

12761592-1

15.     The Objections provide no basis to find that entry into the DIP Facilities is not fair, reasonable, and appropriate under the circumstances.  The record demonstrates (i) that the DIP Facilities were the only available financing option as the Prepetition Secured Lenders would not consent to the priming of their liens by a third-party lender,[4] (ii) that the Debtors and DIP Lenders negotiated the terms of the DIP Facilities in good faith and at arms' length,[5] and (iii) that access to the DIP Facilities are essential for the Debtors' continued operations and the preservation of their estates.[6]  Neither Objection has come forth with evidence of an alternative financing proposal or disputed the Debtors' need to access liquidity under the DIP Facilities.

16.     The Objections also provide no basis to determine that the DIP Facilities are not in the best interests of the Debtors, their estates, and their stakeholders.  In fact, the record demonstrates the contrary: approval of the DIP Facilities will undeniably benefit the Debtors and their stakeholders.[7]  Absent access to the DIP Facilities, the Debtors would have insufficient liquidity to satisfy obligations essential to their operations during these proceedings, including, but not limited to, working capital obligations, payroll expenses, supplier and vendor invoices, professional fees, and overhead costs.[8]  Failure to secure postpetition financing would also needlessly cause a liquidity crisis that could have a detrimental interruption on the business, derail the Debtors' reorganization efforts, and endanger the Debtors' ability maximize value for all parties in interest.[9]  Barring approval of the DIP Facilities, the Debtors could also lose the confidence and cooperation of their employees and key business partners, including creditors,

---

[4]     *See* First Day Decl. ¶ 166; DIP Decl. ¶ 5.

[5]     *See* First Day Decl. ¶ 168; DIP Decl. ¶¶ 4-5.

[6]     *See* First Day Decl. ¶ 170; DIP Decl. ¶¶ 12-16.

[7]     *See* First Day Decl. ¶ 169; DIP Decl. ¶¶ 13-16.

[8]     *See* First Day Decl. ¶ 170; DIP Decl. ¶ 13.

[9]     *See* DIP Decl. ¶¶ 14-16.

vendors, and customers, and be forced to modify business operations in significant and adverse manners.[10]   In contrast, access to the DIP Facilities provides a signal to the Debtors' vendors, customers, employees and the larger market that the Debtors have the ability to meet their ordinary course obligations during the pendency of these cases and that the Debtors' secured creditors support the continued operation of the business.   Such a signal mitigates against the uncertainty caused by these proceedings.[11]   Accordingly, entry into the DIP Facilities preserve the value of the Debtors' businesses and assets and therefore benefits the Debtors as well as their stakeholders.[12]

17.     The Committee asserts that the cost of the DIP Facilities is too high, but does nothing to suggest the terms are not, in fact, market.  Under the circumstances, the Debtors submit that the expense of the DIP Facilities are worth the risks the DIP Lenders are taking.  As discussed in the Committee Objection, the Senior DIP Loans have interest rates of 6% cash and 9% payment in kind ("PIK").  The Prepetition Credit Agreement had an interest rate equal to the greater of (a) 1.00% and (b) the sum of (x) SOFR[13] plus (y) 0.1%, plus a margin of 7.5%, or approximately 12.92% cash.   As such, under the Senior DIP Loans, the Debtors have a lower cash interest payment than under the Prepetition Credit Agreement but a slightly higher overall interest rate. With respect to the Junior DIP Notes, there is an 18% PIK versus 12% PIK under the Prepetition Note Purchase Agreement. The Junior DIP Notes are not receiving any current pay of interest.

18.     Under the circumstances, the pricing of the DIP Facilities is fair and reasonable considering the Debtors' current position.  As set forth in the First Day Declaration, the Debtors are a growth-stage enterprise and have had difficulties since inception to generate positive cash

---

[10]   *See* DIP Decl. ¶¶ 14-15.

[11]   *See* DIP Decl. ¶ 15.

[12]   *See* First Day Decl. ¶ 168; DIP Decl. ¶ 16.

[13]   SOFR, or the Secured Overnight Financing Rate, was, as of February 1, 2024, 5.32%.

flow despite its efforts and relative market share.[14]  Since its inception, the Debtors have incurred recurring losses and negative cash flows and has an accumulated deficit of $1.6 billion as of September 30, 2023.[15]  Throughout 2023, the Debtors faced difficulty raising capital and instead relied on cost cuts, reduced capital expenditures, and stretched vendor payments to address funding needs.[16]  Moreover, the Debtors are not the only micromobility company that is struggling to achieve profitability.[17]  Taking all of the Debtors' headwinds into account when deciding whether to lend, the DIP Lenders are understandably seeking additional protection, including increased interest rates, in exchange for the additional risk of loaning more money to the Debtors.

19.    Finally, the Committee asserts that the Debtors and the Second Lien Lenders have not negotiated at arms' length or in good faith because the Second Lien Lenders are insiders.[18]  As the Debtors explained to the Court at the First Day Hearing, the Second Lien Lenders and the Stalking Horse Bidder are insiders of the Debtors, which is why the Debtors engaged Mr. Harvey Tepner as an independent director.[19]  Putting aside that this is a premature argument against the Second Lien Lenders' credit bid or the sale, the Committee ignores the fact that there were three—not two—parties negotiating the DIP Facilities: (1) the Debtors, (2) the First Lien Lenders, and (3) the Second Lien Lenders.  This was not the Debtors and the Second Lien Lenders negotiating amongst themselves and the First Lien Lenders standing by passively.  All three parties were active

---

[14]    *See* First Day Decl. ¶ 60.

[15]    *Id.*

[16]    *Id.* ¶ 69.

[17]    *See* Rebecca Bellan, *What the Demise of Superpedestrian Means for the E-Scooter Industry*, https://techcrunch.com/2023/12/28/what-the-demise-of-superpedestrian-means-for-the-e-scooter-industry/ (last visited February 1, 2024).

[18]    *See* Committee Obj., ¶ 51.

[19]    *See* First Day Hr'g Tr. at 23:19-24:2 (Debtors' Counsel: The second lien lenders have representatives on the board of directors of the debtors. Mindful of that, and mindful that they, the second lien lenders, comprise the owners of the proposed stalking-horse bidder entity, the debtors thoughtfully formed a special committee to deal with restructuring-related transactions, and that committee at the present time is comprised of Mr. [Harvey] Tepner.").

in the intense negotiations that resulted in the consummation of the DIP Facilities.

20.    The First Lien Lenders would not have agreed to fund the New Money Senior DIP Loans unless the Second Lien Lenders also agreed to first fund the New Money Junior DIP Notes. Furthermore, the Second Lien Lenders have already funded their portion of the DIP Facilities— $5.6 million—and as a requirement of the First Lien Lenders to fund, the Second Lien Lenders had to put money in first, and take money out last.  Moreover, as further evidence of the arms' length nature of the DIP negotiations, the Second Lien Lenders' Junior DIP Notes are fully subordinated to the Prepetition First Lien Obligations.  In other words, through the aforementioned negotiations, the First Lien Lenders retain a superior lien on the Debtors' assets on both the Senior DIP Loans and the Prepetition First Lien Obligations and only after those obligations are paid in full, can the Second Lien Lenders recover on account of their Junior DIP Notes and the Prepetition Second Lien Obligations.  That fact alone debunks any suggestion that the Second Lien Lenders somehow overreached in respect of the DIP Facilities by virtue of their insider status.  As such, it is clear that the DIP Facilities were the product of good faith, arms' length negotiations and the Committee does not put forth anything to suggest otherwise beyond bare innuendo.

**B.    The Remaining Committee Objections to the Terms of the DIP Facilities Do Not Provide Sufficient Basis to Disregard the Debtors' Judgement to Enter into the DIP Facilities.**

21.    The Committee Objection challenges certain discrete provisions of the DIP Facilities, including: (i) the Roll Up, (ii) the granting of liens on to Unencumbered Assets, including litigation claims, (iii) the DIP Budget, (iv) the proposed challenge period and investigation budget, and (v) the waivers of the estates' surcharge rights under section 506(c) of the Bankruptcy Code, the "equities of the case" doctrine, and of the Debtors' marshaling rights. Each of these objections should be overruled for the reasons set forth below.

**1.      The Roll Up is Fair and Reasonable Under the Circumstances.**

22.      The Roll Up is the product of extensive negotiations among the Debtors, the DIP

Lenders, and the Prepetition Secured Lenders, and its inclusion in the DIP Facilities represents a

sound exercise of the Debtors' business judgment.

23.      The Roll Up was the result of good-faith, prepetition negotiations among the

Debtors and the Prepetition Secured Lenders.  The Roll Up was a necessary inducement for the

Prepetition Secured Lenders to provide the Debtors with access to postpetition financing in

sufficient size and tenor and to consent to the Debtors' use of the Prepetition Secured Lenders'

Cash Collateral during the pendency of these cases.  The Prepetition Secured Lenders' willingness

to extend the Debtors' runway prior to the filing of the Chapter 11 Cases via their agreement to

provide bridge financing to the Debtors enabled the Debtors to continue operations and engage in

contingency planning around a potential filing.  As to the Prepetition Second Lien Lenders, this

portion of the Roll Up was, in effect, a "pre-DIP" facility and the Roll Up ensures that the

Prepetition Secured Lenders are not penalized for advancing funds they had no obligation to

provide outside of bankruptcy instead of forcing the Debtors into prematurely filing for chapter

11.

24.      Evaluation of a roll up requires consideration of the impact of the roll up on the

bankruptcy estate, including the potential to enhance the prepetition lender's collateral package at

the expense of unsecured creditors.  *See e.g., Bayside Capital Inc. v. TPC Group Inc.*, Adv. Pro.

No. 22-50372 (CTG), 2022 WL 2498751, at *11 (Bankr. D. Del. July 7, 2022) ("[R]olling up that

debt (and thereby granting it administrative claim status in the bankruptcy case) has relatively

little effect on other creditors.  If the value of the collateral would, in any event, go first to pay the

[prepetition noteholders][. . .]"); *see also* Hr'g Tr. at 58:1-7, *In re Tamarac 1022, LLC* ("My

concern is [. . .] what impact this roll up will have on the administrative level claim, and whether

that administrative level claim is secured by the proceeds of the avoidance actions, or would partake in the proceeds of the avoidance actions before unsecured creditors would be able to participate in those.").

25.    The Committee asserts that the Roll Up will improve the DIP Lenders' prepetition secured claims to the detriment of the Debtors' other creditor constituencies.[20]    Not so.    The Prepetition Secured Lenders, which already have liens on substantially all assets of the Debtors, are simply priming themselves through the DIP Facilities.    The Roll Up does not constitute such a disfavored "collateral grab" by the DIP Lenders.    The Prepetition Liens already encumber substantially all of the Debtors' assets – a fact to which the Debtors, after conducting due diligence, stipulated in the Interim Order.[21]    The Debtors recognize that their stipulations are not binding on other, non-Debtor parties in interest, and remain subject to Challenge under the Interim Order and the proposed Final Order.    If no such Challenge prevails, then the Prepetition Secured Parties will not have improved their collateral position at all through the Roll Up.    Indeed, at the first day hearing both the Court[22] and the United States Trustee[23] recognized that the Roll Up at issue here is benign.

26.    The Committee also asserts that cross-collateralization and the grant of a super-priority administrative claim for a prepetition debt circumvents the Bankruptcy Code's priorities and distribution framework.    This view is misguided here.    The Committee cites *In re Saybrook*

---

[20]    *See* Committee Obj., ¶ 53.

[21]    *See* Interim Order ¶¶ 4(b), 4(d).

[22]    *See* First Day Hr'g Tr. 86:3-5 (The Court: "I note there's a roll up, but we don't have the issues that would concern other parties with the roll up.").

[23]    *See* First Day Hr'g Tr. 89:6-15 (Counsel to United States Trustee: "I think Your Honor also was about to get to, if you haven't already worked through, the issue of the roll up. Certainly, we see language like that and it alarms us, but in this case it's these lenders priming themselves. There is no harm to, in our examination, to, you know, the general unsecured creditor body, the priority creditor body, employees and so forth. So no one is worse off. If anything it seems like there's a much bigger benefit here.").

*Mfg. Co., Inc.*, 963 F.2d 1490 (11th Cir. 1992), in which the Eleventh Circuit held that the granting of liens on previously unencumbered assets to secure an *undersecured* prepetition loan constituted unauthorized cross-collateralization under section 364 of the Bankruptcy Code. *Id.* at 1491, 1496. However, roll ups are not necessarily tantamount to cross-collateralization, particularly where the prepetition liens subject to the roll up attach to substantially all of the debtors' assets.  In such cases, roll ups can be construed as a repayment, from DIP proceeds, of a prepetition secured claim – a relatively common occurrence, particularly where there is an economic benefit to the estate from doing so.  *See e.g. In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 510-11 (Bankr. D. Del. 2010) ("[P]repetition secured claims can be paid off through a 'roll-up,'" and "[t]here is no per se rule against paying pre-petition secured claims outside of a plan of reorganization.").  Moreover, bankruptcy courts within the Eleventh Circuit (including after *Saybrook*) and elsewhere have approved numerous debtor-in-possession facilities featuring roll ups of prepetition debt that were justified under the circumstances.[24]  Indeed, courts in this District have observed that roll ups are not inappropriate in and of themselves.  *See* Hr'g Tr. at 97:17-23, *In re Vital Pharm., Inc.*, No. 22-17842 (PDR) (Bankr. S.D. Fla. Jan. 10, 2023) (permitting a roll up where the prepetition debt being rolled up was fully secured and noting under those circumstances that "there is little impact on unsecured creditors because the DIP lenders' prepetition claims would be paid off first anyway, to the extent that prepetition debt constitutes secured debt."); Hr'g Tr. at 68:7-11, *In re Tamarac*

---

[24]  *See e.g., In re Vital Pharm., Inc.*, No. 22-17842 (PDR) (Bankr. S.D. Fla. Jan. 12, 2023); *In re Tamarac 10200, LLC*, No. 20-23346-BKC-PDR (Bankr. S.D. Fla. Dec. 31, 2020); *In re 24 Hour Fitness Worldwide, Inc.*, No. 20-11558 (KBO) (Bankr. D. Del. Aug. 3, 2020); *In re Northeast Gas Generation, LLC*, No. 20-11597 (MFW) (Bankr. D. Del. July 17, 2020); *In re McDermott International, Inc.*, No. 20-30336 (DRJ) (Bankr. S.D. Tex. Feb. 24, 2020); *In re Bumble Bee Parent, Inc.*, No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019); *In re Sheridan Holding Company II, LLC*, No. 19-35198 (MI) (Bankr. S.D. Tex. Oct. 21, 2019); *In re Vanguard Natural Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. Apr. 30, 2019); In re Z Gallerie, LLC, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019); *In re CTI Foods, LLC*, No. 19-10497 (CSS) (Bankr. D. Del. Apr. 5, 2019); *In re Charlotte Russe Holding, Inc.*, No. 19-10210 (LSS) (Bankr. D. Del. Mar. 7, 2019); *In re The Bon-Ton Stores, Inc.*, No. 18-10248 (Bankr. D. Del. Mar. 12, 2018); *In re Ameriforge Group Inc.*, No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017); *In re Chassix Holdings, Inc.*, No. 15-10578 (Bankr. S.D.N.Y. Apr. 10, 2015); *In re Carpenter Contractors of America, Inc., d/b/a R&D Theil*, No. 10-B-42604-RBR (Bankr. S.D. Fla. Apr. 6, 2011).

12

*1022, LLC*, No. 20-23346 (PDR) (Bankr. S.D. Fla. Dec. 9, 2020) ("I don't have a problem with the rollup as a rollup [. . . .] I've been in cases where entire loans have been rolled up as well.").

27.     Finally, the Committee suggests that the ratio of rolled up debt to new money financing (*i.e.*, the "roll up ratio") is objectionable.[25]  The amount of the prepetition debt being rolled up is $48,288,470.90 (consisting of $44,288,470.90 of Roll-Up Loans and $4,000,000 of Roll-Up Notes).[26]  Against the new money DIP of $25,100,000, the ratio is less than 2-to-1, which is well within reasonable parameters.

28.     But in any event, the Debtors submit that the roll up ratio is not determinative as to the fairness or reasonableness of the Roll Up or the broader terms of the DIP Facilities.  The roll up ratio reveals little about the actual impact of the Roll Up on the Debtors' estates and stakeholders, which is a central consideration in evaluating the DIP Facilities.  *See Bland*, 308 B.R. at 113-14.  Nonetheless, the DIP Facilities' roll up ratio is far from unprecedented.  Courts in numerous recent cases have approved roll ups with ratios of this size or larger.[27]  Accordingly, to the extent relevant, the roll up ratio under the DIP Facilities does not support a conclusion that the Roll Up falls outside the bounds of reasonableness and is a provision required by the DIP Lenders if the Debtors want to obtain access to the DIP Facilities.

---

[25]    *See* Committee Obj. ¶ 53.

[26]    *See* Motion, ¶ 1(c); Interim Order, ¶ 6(d).

[27]    *See e.g.*, *In re Vital Pharm., Inc.*, No. 22-17842 (PDR) (Bankr. S.D. Fla. Jan. 12, 2023) (approving postpetition financing with a 2.35-to-1 roll-up of $235 million in prepetition loans and $100 million in new money); *In re Phoenix Servs. Topco LLC*, No. 22-10906 (MFW) (Bankr. D. Del. Nov. 2, 2022) (authorizing postpetition financing with 3-to-1 roll-up of $150 million in prepetition loans and $50 million in new money); *Strike, LLC*, No. 21-90054 (DRJ) (Bankr. S.D. Tex. Jan. 4, 2022) (authorizing postpetition financing with 3.3-to-1 roll-up of $86.6 million in prepetition loans and $26 million in new money); *In re Nine Point Energy Holdings, Inc.*, No. 21-10570 (MFW) (Bankr. D. Del. Apr. 12, 2021) (authorizing postpetition financing with 3-to-1 roll-up of $59 million in prepetition loans and $20 million in new money); *In re Tailored Brands, Inc.*, No. 20-33916 (MI) (Bankr. S.D. Tex. Sept. 2, 2020) (authorizing postpetition financing with 3.9-to-1 roll-up of $398 million in prepetition loans and $102 million in new money); *In re GNC Holdings, Inc.*, No. 20-11662 (KBO) (Bankr. D. Del. July 21, 2020) (authorizing postpetition financing with 3.8-to-1 roll-up of $375 million in prepetition loans and $100 million in new money); *In re Colt Defense LLC*, Case No. 15-11296 (LSS) (Bankr. D. Del. July 10, 2015) (authorizing postpetition financing with 5.5-to-1 roll-up of $55 million in prepetition loans and $10 million in new money).

### 2. The DIP Lenders and Prepetition Secured Lenders Can Have Recourse to the Unencumbered Assets, Including Litigation Claims.

29. The Committee challenges the Debtors' grant of liens with recourse to the proceeds of Unencumbered Assets, including Avoidance Actions and other potential litigation claims, asserting that the Court should carve those assets out from the DIP Collateral and preserve those for unsecured creditors.[28]

30. However, avoidance actions and other causes of action are estate assets that may be used in accordance with the Debtors' business judgment for the benefit of their estates – including to obtain postpetition financing or provide adequate protection. *See e.g.*, *Trans World Airlines*, 163 B.R. 964, 972 (Bankr. D. Del. 1994) ("Section 550(a) requires a benefit to the "estate," not to creditors. "Estate" is a broader term than "creditors." And there is no requirement that an avoidance action recovery be distributed (or "committed") in whole or in part to creditors."); *In re AppliedTheory Corp.*, Case No. 02-11868 (REG), 2008 WL 1869770, at *1 (Bankr. S.D.N.Y. Apr. 24, 2008) ("Of course [proceeds from avoidance actions] started out unencumbered. But those assets can thereafter be encumbered (or made available to satisfy superpriority claims), if necessary to provide adequate protection."). Here, the Debtors *do* benefit from providing these assets as a potential source of recovery because doing so was necessary to obtain the financing offered under the DIP Facilities, which is essential to the Debtors' ability to preserve their business, pay the costs of these cases, and maximize value for all stakeholders.

31. It is not unreasonable for lenders to insist on incremental collateral to support their incremental financing here—$25.1 million in new money DIP financing. And because substantially all of the Debtors' assets are encumbered by the Prepetition Liens, and accordingly, the only "incremental collateral" recovery for the DIP Lenders (or the Prepetition Secured Lenders

---

[28] *See* Committee Obj., ¶ 58.

14

on account of their adequate protection claims) are proceeds of Avoidance Actions and other litigation claims that were not subject to the Prepetition Liens.

32.    Likewise, the Prepetition Secured Lenders' recourse to litigation claims on account of their statutory entitlement to adequate protection should not be objectionable.  Such recoveries would be limited solely to those amounts necessary to compensate the Prepetition Secured Parties for *actual* diminution in the value of their interests in the Prepetition Collateral arising from the imposition of the automatic stay, the Debtors' continued use of the Prepetition Collateral, or the incurrence of DIP financing.  Notably, even if the Final DIP Order did not grant the Prepetition Secured Lenders such recourse to litigation claim proceeds, the Bankruptcy Code would provide it by operation of section 507(b) if there were otherwise a failure of adequate protection.[29] Granting such recourse as part of a consensual adequate protection package is no less appropriate.

### 3.    The DIP Budget is Tight but the Debtors Can Operate and Satisfy Administrative Expenses Through Closing.

33.    The Committee claims that the DIP Budget is inadequate to sustain the Chapter 11 Cases.  While the DIP Facilities provide the Debtors with a total of $25.1 million in new money, the Approved Budget is, admittedly, tight.  Like most financially distressed businesses, the Debtors wish they had access to a larger credit facility that provided them greater liquidity.   The Debtors cannot, however, compel the DIP Lenders to lend more money.  Rather, the Debtors are required to operate within the parameters of their existing liquidity.

34.    The Committee recklessly suggests that the Debtors should eliminate funding for non-Debtor Bird operations around the globe.  The Debtors' funding of non-Debtor operations is a matter of the Debtors' business judgment, which has been exercised here to retain the non-Debtor

---

[29]   *See* 11 U.S.C. § 507(b) (granting secured creditors who have been granted adequate protection superpriority administrative expense claims "hav[ing] priority over every other claim allowable under [section 507(a)(2)]," without limiting the source of recovery on such claim).

operations as a going concern to maximize value. The DIP Lenders were well aware that a portion of the proceeds of the DIP Facilities would go to non-Debtor funding and intended these funds to support the non-Debtor entities. Moreover, and perhaps most importantly, the collective business of the Debtors and the non-Debtors is essential to achieve a value-maximizing holistic sale of the Debtors' assets, including the equity in the non-Debtors. Choking off support to the non-Debtor operations will destroy interest in the Debtors in the middle of the Debtors' sale process. The Court should reject the Committee's request to limit or eliminate non-Debtor funding through the DIP Facilities.

35.     While the DIP Budget is constrained, the Debtors assert that the DIP Budget provides sufficient funding to proceed through the sale process.

### 4.     The Challenge Period and Investigation Budget are Sufficient for the Committee to Carry Out its Fiduciary Duties in these Cases.

36.     The Committee claims that it is overly constrained by a Challenge Period of sixty (60) days and an investigation budget of $75,000.[30] The Challenge Period currently expires on March 5, 2024.

37.     While the Committee raises concern about the Challenge Period overlapping with the sale process, in this case this is a requirement when there is a stalking horse bidder that intends to credit bid, as there is here. The Sale Objection Deadline in this case is March 1, 2024, and permitting the Committee to challenge the secured claims of the Stalking Horse Bidder after the sale has completed would be tremendously prejudicial to the sale process if the Stalking Horse Bidder is the successful bidder. As such, the Committee agreed pursuant to the Bidding Procedures Order that, subject to its ability to seek an extension for cause, that it would file an objection to the Stalking Horse Bidder's credit bid no later than February 23, 2024 at 4:00 p.m. (prevailing Eastern

---

[30]    *See* Committee Obj., ¶ 68.

time) (the "Credit Bid Objection Deadline").[31]  The Committee will need to file whatever challenge it has to the Stalking Horse Bidder's liens by the Credit Bid Objection Deadline.

38.     The Debtors submit that the investigation budget is sufficient for an investigation that effectively has less than one month to go.

> **5.     The Waivers of the Section 506(c) Surcharge Claims, the "Equities of the Case" Doctrine, and Marshaling Rights Represent a Sound Exercise of Business Judgement.**

39.     The Committee objects to the waivers of (i) the estates' surcharge rights under section 506(b) of the Bankruptcy Code, and (ii) the "equities of the case" doctrine under section 522(b) of the Bankruptcy Code.  The Committee Objection should be overruled, as the Debtors' decision to waive these estate claims constitutes an exercise of sound business judgment. Furthermore, such waivers are commonplace in the market and appropriate under the circumstances of these chapter 11 cases.

40.     *Section 506(c) Waiver*.  Section 506(c) of the Bankruptcy Code permits a debtor to recover from a secured creditor's collateral the cost of preserving or disposing of such collateral. The Supreme Court has made clear that rights under section 506(c) of the Bankruptcy Code belong to the debtor and its estate and are not available to any other party in interest.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S. Ct. 1942, 1947, 147 L. Ed. 2d 1 (2000) ("The question thus becomes whether it is a proper inference that the trustee is the only party empowered to invoke the provision.  We have little difficulty answering yes.").  As the rights under section 506(c) of the Bankruptcy Code belong to the Debtors' estates, the decision to waive such rights falls squarely within the exercise of the Debtors' business judgment.[32]

---

[31]   *See* [ECF No. 202, ¶ 44].

[32]   *See, e.g.*, *In re Vital Pharm., Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla. Jan. 12, 2023) (approving 506(c) waiver following contested hearing); *In re It'Sugar FL I LLC, et al.*, No. 20-20259-RAM (Bankr. S.D. Fla. Nov. 19, 2020) (approving 506(c) waiver); *In re Quorum Health Corp.*, No. 20- 10766 (KBO) (Bankr. D. Del. May 6,

12761592-1

41.     The primary rationale for applying section 506(c) of the Bankruptcy Code – to prevent a windfall to a secured creditor by allowing unencumbered assets to be used during the pendency of the case for the secured creditor's benefit – does not exist here.  *See e.g. In re JKJ Chevrolet, Inc.*, 26 F.3d 481, 483 (4th Cir. 1994) ("The purpose of this provision is to prevent a windfall to a secured creditor at the expense of the estate.").  The First Lien Agent and the Second Lien Agent, for the benefit of the other Prepetition Secured Lenders, hold, valid, perfected liens on substantially all of the Debtors' assets.  Either the Prepetition Secured Lenders and DIP Lenders are, and will remain, oversecured (in which case the secured parties are not the residual beneficiaries of the Debtors' efforts in administering these cases); or, they are undersecured, in which case the costs of administering the Debtors' bankruptcy proceedings, including the payment of administrative expenses, would be borne solely by the Prepetition Secured Lenders, the DIP Agent, and the Junior DIP Agent, and DIP Lenders by virtue of their agreement to extend DIP financing and permit the use of their Cash Collateral for these purposes (in accordance with the Approved Budget), as well as to fund the Carve-Out upon the occurrence of an event of default and foreclosure.

42.     Accordingly, the Prepetition Secured Lenders and DIP Lenders have already agreed to "pay the freight" of these cases; their request that they not be surcharged ***again*** is reasonable.  Bankruptcy courts, in this district and elsewhere, frequently approve 506(c) waivers as appropriate when, as here, a secured creditor has agreed to the use of its cash collateral to pay administrative expenses and to subordinate its liens to a carve out for professional fees, including the Committee's investigation fees, and other administrative expenses, as the Prepetition Secured Lenders, DIP Agent, and DIP Lenders have done.  *See, e.g., In re Vital Pharm., Inc.*, No. 22-17842-PDR (Bankr.

---

2020) (same); *In re Just One More Restaurant, Inc., et al.*, No. 9:19-bk-1947-MDM (Bankr. M.D. Fla. Feb. 26, 2020) (same).

S.D. Fla. Jan. 12, 2023); *In re It'Sugar FL I LLC, et al.*, No. 20-20259-RAM (Bankr. S.D. Fla. Nov. 19, 2020); *In re Quorum Health Corp.*, No. 20- 10766 (KBO) (Bankr. D. Del. May 6, 2020); *In re Just One More Restaurant, Inc., et al.*, No. 9:19-bk-1947-MDM (Bankr. M.D. Fla. Feb. 26, 2020).

43.    ***Section 552(b) "Equities of the Case" Waiver***.  The Committee's Objection to the "equities of the case" waiver should likewise be overruled, given that the Prepetition Secured Lenders are funding the expenses of these cases through DIP financing and consenting to the use of their cash collateral.  Under section 552(b) of the Bankruptcy Code a secured creditor's prepetition security interest in the proceeds of collateral generally extends to such proceeds acquired postpetition, however, there is a limited exception to the extent that the "equities of the case" require.  *See* 11 U.S.C. § 552(b).

44.    As noted above, the First Lien Agent and the Second Lien Agent, for the benefit of the other Prepetition Secured Lenders, have liens on substantially all of the Debtors' assets, and the administration of the Debtors' cases is being funded entirely by the Prepetition Secured Lenders' Cash Collateral and the DIP financing being provided by the DIP Lenders.  Any appreciation in the value of the Prepetition Secured Lenders' collateral from the Debtors' postpetition operations, therefore, will necessarily result from the use of the Prepetition Secured Parties' existing collateral.  Therefore, it is difficult from the Debtors' standpoint to envision any circumstance in which the "equities of the case" would warrant cutting off the Prepetition Secured Lenders' continuing interest in the proceeds of their collateral, and the Debtors acted well within the bounds of their business judgment in agreeing to waive such arguments.

45.    Like the section 506(c) waiver, waivers of the "equities of the case" exception are commonplace in favor of lenders who have agreed to fund the expenses of chapter 11 cases.  *See, e.g.*, *In re Vital Pharm., Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla. Jan. 12, 2023); *In re Tamarac*

*10200, LLC*, No. 20-23346-BKC-PDR (Bankr. S.D. Fla. Dec. 31, 2020) (approving a section 506(c) waiver coupled with a professional fee carve out and an equities of the case waiver); *In re It'Sugar FL I LLC, et al.*, No. 20-20259-RAM (Bankr. S.D. Fla. Nov. 19, 2020) (same); *In re Maguire Group Holdings, Inc.*, No. 11- 39347-BKC-RAM (Bankr. S.D. Fla. Oct. 27, 2011) (same); *In re Carpenter Contractors of America, Inc., d/b/a R&D Theil*, No. 10-B-42604-RBR (Bankr. S.D. Fla. Apr. 6, 2011) (same).

### 6.    The Waivers of Estate Marshaling Rights Are Appropriate.

46.    The Committee also opposes the waiver of the equitable doctrine of marshaling.[33] As a threshold matter, courts generally find that "unsecured creditors cannot invoke the equitable doctrine of marshaling." *See e.g. In re Advanced Mktg. Servs., Inc.*, 360 B.R. 421, 427 (Bankr. D. Del. 2007) (holding that an unsecured creditor could not direct secured lenders to satisfy their claim using different collateral because marshalling is a protection for junior secured creditors); *In re Arlco, Inc.*, 239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999) (stating that "[a]n unsecured creditor has no standing to invoke the doctrine").

47.    While it is true that courts have held that an unsecured creditors' committee may have derivative standing to invoke the doctrine of marshaling on behalf of a debtor's estate, the Debtors retained the discretion to agree to the marshaling waiver in exchange for the ample benefits they derive from the DIP Facilities. *See* Hr'g Tr. 92:22–93:11, *In re MPM Silicones, LLC et al.*, Case No. 14-22503 (Bankr. S.D.N.Y. May 27, 2014) (Docket No. 270) (approving a no-marshaling provision in a cash collateral order and commenting that "[g]enerally speaking, this is the debtor's right to negotiate or secured creditors' right to insist on"). Unsurprisingly, courts in this jurisdiction routinely approve waivers of the equitable doctrine of marshalling. *See, e.g., In re Vital Pharm., Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla. Jan. 12, 2023); *In re Tamarac 10200,*

---

[33]    *See* Committee Obj. ¶¶ 76-77.

*LLC*, No. 20-23346-BKC-PDR (Bankr. S.D. Fla. Dec. 31, 2020); *In re Liberty Power Holdings, LLC*, No. 21-13797-BKC-SMG (Bankr. S.D. Fla. May 27, 2021); *In re American Purchasing Servs., LLC*, No. 20-23495-BKC-SMG (Bankr. S.D. Fla. Dec. 16, 2020); *In re TooJay's Mgmt LLC*, No. 20-14792-BKC-EBK (Bankr. S.D. Fla. June 26, 2020); *Land Resource, LLC, et al.*; Case No. 6:08-bk-10159-ABB (same).

## C. The Lloyd's Objection Should be Overruled.

48.    Lloyd's states that the Debtors have not satisfied their self-insured retention ("SIR") obligations under their respective insurance policies which must be satisfied "*before* Underwriters becomes responsible to participate."[34] Lloyd's further states that the DIP Budget does not provide or account for the payment of any SIR obligations on a go-forward basis which violates the terms of the subject policies.[35] Lloyd's contends that the DIP Motion should be denied unless and until the DIP Budget is modified to account for the Debtors' SIR obligations.[36]

49.    But pending actions against the Debtors and other non-Debtor actions for which the Debtors owed an indemnity obligation have been stayed by the Court.[37] In that Order the Court (i) extended automatic stay to non-Debtor defendants who are the beneficiaries of indemnification obligations by one or more of the Debtors; and (ii) preliminarily enjoined the continued prosecution of 41 pending lawsuits for 180 days from the Petition Date. Accordingly, there is no present or imminent risk of entry of adverse judgments, or even the need to fund defense costs. As a result, the fact that the DIP Budget does not provide for funding of SIRs, the crux of the Limited Objection, is a non-issue.

---

[34]    Lloyd's Obj., ¶ 3 (emphasis added).

[35]    *Id.*, ¶ 4.

[36]    *Id.*

[37]    *See* Adv. Pro. No. 24-1010-CLC (Bankr. S.D. Fla.) [ECF No. 10] (Jan. 26, 2024) (order extending automatic stay and granting preliminary injunctive relief in respect of 41 pending lawsuits).

12761592-1

50.     If and to the extent post-petition SIRs become due, the Debtors have approximately $400,000 to fund such obligations regarding defense costs or settlements in the form of funds being held by recently retained special counsel whose substantive services, at least during the timeframe of the preliminary injunction, are not currently needed.

51.     Substantively, the premise of Lloyd's Objection is flawed because, among other reasons, it overlooks the well-established rule that non-debtor parties to executory contracts like the insurance policies issued by Lloyd's are, pending assumption or rejection, obligated to comply with their contractual obligations even if the Debtor insureds do not comply with theirs. *See United States Postal Service v. Dewey Freight System, Inc.,* 31 F.3d 620, 624–25 (8th Cir.1994) (after commencement of a Chapter 11 proceeding, but before rejection or assumption of executory contracts, those contracts are enforceable by, but not against, the debtor); *Pub. Serv. Co. of N.H. v. N.H. Elec. Coop., Inc. (In re Pub. Serv. Co. of N.H.),* 884 F.2d 11, 14 (1st Cir.1989) (stating that while the debtor decides whether to reject or assume, "the executory contract remains in effect and creditors are bound to honor it."); *In re Rhodes, Inc.,* 321 B.R. 80, 91 (Bankr. N.D. Ga. 2005) ("[T]he non-debtor party to an unexpired lease or other executory contract is obliged to perform it until it is assumed or rejected."); *Interstate Gas Supply, Inc. v. Wheeling Pittsburgh Steel Corp. (In re Pittsburgh-Canfield Corp.),* 283 B.R. 231, 238 (Bankr. N.D. Ohio 2002) (non-debtor party "cannot unilaterally elect to cease performance on executory contract prior to assumption or rejection"). Thus, non-payment of any pre- or post-petition SIR is not a basis upon which Lloyd's can avoid complying with their contractual obligations under the subject insurance policies, whether those obligations are pre- or post-petition. Therefore, in the absence of

22

satisfaction of the Debtors' SIR obligations, Lloyd's is nevertheless bound to provide coverage under the subject insurance policies pending assumption or rejection by the Debtor insureds.[38]

## CONCLUSION

52.     For these reasons, the Debtors respectfully request that the Court deny the Objections in their entirety and enter the Final Order in the form submitted for entry.

Dated: February 2, 2024

Respectfully submitted,

BERGER SINGERMAN LLP
*Counsel for the Debtors and*
*Debtors-in-Possession*
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

By:    */s/ Jordi Guso*
          Paul Steven Singerman
          Florida Bar No. 378860
          singerman@bergersingerman.com
          Jordi Guso
          Florida Bar No. 863580
          jguso@bergersingerman.com
          Clay B. Roberts
          Florida Bar No. 116058
          croberts@bergersingerman.com

---

[38] While unnecessary to resolve the Lloyd's Objection, the Debtors disagree with Lloyd's argument that they are relieved of their obligations to provide coverage under the insurance agreements unless and until SIR obligations are satisfied. *See Sturgill, et al. v. Beach at Mason Ltd. P'ship*, No. 1:14-cv-0784 (WOB), 2015 WL 6163787, at *2 (S.D. Ohio Oct. 20, 2015) (holding that bankruptcy clause in insurance policy required insurer to provide coverage despite non-payment of SIR) (citing cases, including *In re OES Envt'l, Inc.*, 319 B.R. 266, 269 (Bankr. M.D. Fla. 2004) (holding that insurer was "obligated to defend and indemnify the Debtor for the portion of any judgment or settlement exceeding [the SIR] irrespective of the Debtor's inability to pay the claimed retention amount.") (citation omitted)).