UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

BIRD GLOBAL, INC., *et al.*,[1]

Debtors.

Chapter 11 Cases

Case No. 23-20514-CLC

(Jointly Administered)

# AMENDED[2] DECLARATION OF CHRISTOPHER RANKIN IN SUPPORT OF DIP FINANCING

I, Christopher Rankin, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am an employee and the Chief Restructuring Officer ("CRO") of Bird Global, Inc., a Delaware corporation ("Bird Global"), the ultimate parent of each of the other debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") and the non-debtor affiliates (the "Non-Debtor Affiliates, together with the Debtors, "Bird" or the "Company"). I am authorized by each of the Debtors to submit this declaration (the "First Day Declaration") on behalf of the Debtors.

2. I submit this declaration (this "DIP Declaration") in support of the *Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [ECF No. 32] (the "Motion") and the *Debtors' Omnibus Reply in Support of the Debtors' Emergency Motion for*

---

[1] The address of the Debtors is 392 Northeast 191st Street, #20388, Miami, FL 33179. The last four digits of the Debtors' federal tax identification numbers are: (i) Bird Global, Inc. (3155); (ii) Bird Rides, Inc. (9939); (iii) Bird US Holdco, LLC (8390); (iv) Bird US Opco, LLC (6873); and (v) Skinny Labs, Inc. (8176).

[2] Amended solely to remove inadvertent drafting comment in initial filing.

12766044-1

*Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Reply") [ECF No. 245], and as a supplement to the *Declaration of Christopher Rankin in Support of Chapter 11 Petitions and First Day Filings* [ECF No. 31] filed on December 20, 2023 (the "First Day Declaration").[3]

3. Except as otherwise indicated, the statements in this DIP Declaration are based on (a) my personal knowledge, belief, or opinion; (b) information I have received from the Debtors' employees or advisors; or (c) the Debtors' records maintained in the ordinary course of their business. I am authorized by the Debtors to submit this DIP Declaration and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.[4]

### Negotiations Regarding the DIP Facilities

4. I had principal responsibility for negotiating the terms of the DIP Facilities with the Prepetition Agent and the Participating Second Lien Lenders. Those negotiations included the amount of additional financing the Debtors projected would be needed to fund the Chapter 11 Cases. Given the Debtors' capital structure, including the fact that the Debtors' assets are encumbered by liens securing approximately $44.2 million in first lien debt plus approximately $71 million in second lien debt (for a total of approximately $115 million in secured debt), there is no market for a debtor in possession financing facility to the Debtors.

5. Moreover, the Prepetition Secured Creditors would not consent to having their liens primed by additional indebtedness. Even if the Debtors could, conceivably, locate a third-

---

[3] Capitalized terms used but not defined herein have the meanings given to them in the Motion, the Reply, or the First Day Declaration.

[4] For purposes of efficiency, this DIP Declaration incorporates those portions of the First Day Declaration that relate to the Motion and the Reply.

2

12766044-1

party DIP lender willing to lend on a priming basis, the Debtors did not have the liquidity to launch a contested, priming DIP financing litigation.  The Debtors would have run out of money.

6. In the circumstances, I believe the pricing for the DIP Facilities is reasonable.

**Access to the DIP and Cash Collateral is a Necessity**

7. Since the First Day Declaration, I have continued to work tirelessly to familiarize myself with the Debtors' day-to-day operations, business affairs, financial performance, books, and records, and restructuring efforts.

8. Pursuant to Section 8.01(v) of the DIP Credit Agreement, each Wednesday the Debtors are required to deliver to the DIP Lenders a Cash Forecast reflecting the receipt and disbursements for the prior week, a variance report comparing the Debtors' actual performance to the Budget, and an updated 13-week cash forecast which becomes the Budget.  A copy of the most recent Budget is <u>Exhibit 3</u> (the "<u>Budget</u>").

9. While the DIP Facilities provide the Debtors with a total of $25 million in new money, the Approved Budget is, admittedly, tight.  Like most financially distressed business, the Debtors wish they had access to a larger credit facility that provides them greater liquidity.  The Debtors cannot, however, compel the DIP Lenders to lend more money.  They are required to operate within the parameters of their existing liquidity.  As of the date hereof, there are ongoing negotiations regarding the Budget.  The Budget may be further revised based on those ongoing negotiations between the parties.

10. The Debtors operate internationally.  The non-U.S. business is operated by the Non-Debtor Affiliates in local markets, which are all owned directly or indirectly by Bird Global.  The Approved Budget includes approximately $6.84 million allocated to "Non-Debtor Funding," which will be used to support the Non-Debtor Affiliates.  The Court-approved sale

3

process includes the sale of Bird Global's direct and indirect interests in the Non-Debtor Affiliates.  Preserving the Debtors' global operations during pendency of the sale process is intended to maximize the value of the Debtors' assets for all stakeholders.

11. Approximately $458,000 of the Non-Debtor Funding will be used to pay compensation to the Debtors' senior management team which is resident in Canada and whose wages are paid by Bird Canada Scooters, Inc.

12. Consistent with my prior statements in the First Day Declaration and based on my analysis of the Debtors' current cash position and needs, I believe that the Debtors require immediate access to capital in the form of the DIP Facilities in order to continue to operate their business postpetition and to preserve the Debtors' estates as going concerns.  In addition, as I understand it, the Prepetition Secured Parties have liens on substantially all of the Debtors' assets, including cash in accounts subject to control agreements with the Prepetition Agent.  Accordingly, the Debtors require access to Cash Collateral for the same reasons.  As the Debtors' financial forecasts and the budgets reveal, the Debtors are unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover their operating and capital costs and the projected costs of these Chapter 11 Cases absent full funding under the DIP Facilities.

13. Specifically, the Debtors require the funding available from the DIP Facilities (in addition to Cash Collateral) in order to, among other things, fund working capital, meet payroll obligations, pay suppliers, cover overhead costs, make adequate protection payments, make payments to critical vendors and shippers, and make any other payments essential for the continued management, operation, and preservation of the Debtors' business during the pendency of these Chapter 11 Cases, including payment of professional fees.  The ability to

12766044-1

make these payments when due is essential to the continued operation of the Debtors' business throughout these Chapter 11 Cases. I continue to believe that all such expenses are critical to the Debtors' business and that the Debtors' failure to make such payments will cause immediate and irreparable harm to the Debtors and their estates.

14. If the Debtors cannot access the full DIP Facilities, based on the Debtors' financial forecasts and budgets, then the Debtors will be unable to operate their business in the ordinary course through the conclusion of these Chapter 11 Cases. In turn, this would negatively impact the Debtors' revenue, jeopardize the Debtors' stakeholders' confidence in the Debtors' business, and harm the value of the Debtors' estates to the detriment of all stakeholders. Based on the Debtors' financial forecasts and budgets, the liquidity provided by the DIP Facilities should allow the Debtors to implement their business plan while they focus on these Chapter 11 Cases.

15. I therefore believe that absent continued and full access to the DIP Facilities and Cash Collateral, the Debtors could (a) face a severe interruption of their businesses; (b) lose the support of key constituencies, including the Debtors' workforce, key marketing partners, and customers; and (c) be forced to modify their operations in a significant and adverse manner (and, potentially, to shut down operations entirely). To avoid those outcomes, it is imperative that the Debtors have full access to the DIP Facilities in order to continue to signal to the Debtors' stakeholders, including their employees, marketing partners, vendors, and customers, that despite the filing, the outlook for the Debtors and their stakeholders is strong, and that they have the liquidity necessary to meet their obligations in the ordinary course until the business can emerge from the chapter 11 process. For all these reasons, I believe that full access to the DIP Facilities is a necessity.

16. In short, without full access to the DIP Facilities and Cash Collateral, the Debtors' liquidity situation will be bleak. The Debtors would likely face a liquidity crisis and run out of cash more quickly than the Budget projects and the erosion of confidence over the Debtors' ongoing operations would be significant and irreparably harm the Debtors' estates to the detriment of the Debtors, their estates, and their creditors. Accordingly, access to the full amount of credit available under the DIP Facilities preserves the value of the Debtors' businesses and would benefit the Debtors.

17. Pursuant to the Interim Order, the Debtors were authorized to borrow up to $18.5 million under the DIP Facilities, on an interim basis. As of the date hereof, the Debtors have drawn $15.6 million on the DIP Facilities; $5,600,000 under the DIP Junior Notes Facility (the full amount of the DIP Junior Notes Facility), plus $10 million under the senior DIP Credit Facility. The Debtors have closely monitored their liquidity and are prudently managing their cash needs.

## 28 U.S.C. § 1746 Declaration

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 2nd day of February 2024 in Miami, FL.

Christopher Rankin
Chief Restructuring Officer