UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re:<br><br>BIRD GLOBAL, INC., *et al.*,[1]<br><br>    Debtors. | Chapter 11 Cases<br><br>Case No. 23-20514-CLC<br><br>(Jointly Administered) |

## DISCLOSURE STATEMENT FOR DEBTORS' JOINT CHAPTER 11 PLAN OF LIQUIDATION

**BERGER SINGERMAN LLP**
Paul Steven Singerman, Esq.
Florida Bar No. 378860
Jordi Guso, Esq.
Florida Bar No. 863580
Robin J. Rubens, Esq.
Florida Bar No. 959413
Clay B. Roberts, Esq.
Florida Bar No. 116058
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
Telephone:  (305) 755-9500
Facsimile:   (305) 714-4340
Email: singerman@bergersingerman.com
        jguso@bergersingerman.com
        rrubens@bergersingerman.com
        croberts@bergersingerman.com

Dated: April 18, 2024

---

[1]    The address of the Debtors is 392 Northeast 191st Street, #20388, Miami, FL 33179.  The last four digits of the Debtors' federal tax identification numbers are: (i) Bird Global, Inc. (3155); (ii) Bird Rides, Inc. (9939); (iii) Bird US Holdco, LLC (8390); (iv) Bird US Opco, LLC (6873); and (v) Skinny Labs, Inc. (8176).

i

# DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE DEBTORS' JOINT CHAPTER 11 PLAN OF LIQUIDATION, DATED APRIL 18, 2024 (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "**PLAN**"),[2] AND IS TO BE USED SOLELY TO DETERMINE HOW TO VOTE ON THE PLAN. A COPY OF THE PLAN IS ANNEXED HERETO AS **EXHIBIT "1"**. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN **IN THEIR ENTIRETY** BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VI OF THIS DISCLOSURE STATEMENT ("**RISK FACTORS IN CONNECTION WITH THE PLAN**") BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH DOCUMENTS. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. ALTHOUGH THE DEBTORS BELIEVE AND HAVE MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX,

---

[2]    Unless otherwise defined, capitalized terms used herein shall have the meaning ascribed to such terms in the Plan.

SECURITIES OR OTHER LEGAL EFFECTS OF THE LIQUIDATION OF THE DEBTORS AS TO HOLDERS OF CLAIMS AGAINST THE DEBTORS.

AS TO ANY CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CHAPTER 11 CASES.

NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTORS, THEIR PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.    THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND (I) THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF, AND (II) THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS CONDITIONALLY AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING THE PLAN.  NO REPRESENTATIONS HAVE BEEN CONDITIONALLY AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTORS OR THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THE DISCLOSURE STATEMENT. CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN NOR DOES SUCH CONDITIONAL APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY HAVE NOT BEEN PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES.

ALTHOUGH THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA FOUND IN THE

12929356-10

BOOKS AND RECORDS OF THE DEBTORS, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF. THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS SHALL HAVE NO LIABILITY FOR THE INFORMATION IN THE DISCLOSURE STATEMENT.

PRIOR TO THE EFFECTIVE DATE, THE DEBTORS DO NOT INTEND TO UNDERTAKE A GENERAL CLAIMS OBJECTION PROCESS WITH RESPECT TO GENERAL UNSECURED CLAIMS, BUT THE DEBTORS RESERVE THE RIGHT TO OBJECT TO ANY CLAIM PRIOR TO THE EFFECTIVE DATE. ON AND AFTER THE EFFECTIVE DATE OF THE PLAN, THE LIQUIDATING TRUSTEE WILL BE VESTED WITH FULL AUTHORITY TO UNDERTAKE THE CLAIMS OBJECTION PROCESS WITH RESPECT TO ALL CLAIMS (OTHER THAN TORT CLAIMS IN CLASS 6) THAT HAVE NOT BEEN PREVIOUSLY RESOLVED BY COURT ORDER OR OTHERWISE. THE ACTUAL AMOUNTS OF THE DISTRIBUTIONS UNDER THE PLAN TO THE HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS WILL BE DETERMINED AFTER COMPLETION OF THE CLAIMS OBJECTION PROCESS TO BE UNDERTAKEN BY THE LIQUIDATING TRUSTEE. TORT CLAIMS IN CLASS 6 SHALL BE EVALUATED AND DETERMINED BY THE TORT CLAIMS ADMINISTRATOR IN ACCORDANCE WITH THE TORT CLAIM ADR PROCEDURES.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTORS AND THEIR PROFESSIONALS. ALTHOUGH THE DEBTORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE DEBTORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RESULT FOR ALL HOLDERS OF CLAIMS.  THE DEBTORS ALSO BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO ACCOMPLISH THE OBJECTIVES OF LIQUIDATION UNDER CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.   THUS, IT IS THE OPINION OF THE DEBTORS THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE LIQUIDATION OF THE DEBTORS.

IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE DEBTORS STRONGLY URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT

OR UPON THE MERITS OF THE PLAN. NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

## QUESTIONS AND ADDITIONAL INFORMATION

All Holders of Claims entitled to vote on the Plan will have the opportunity to receive copies of this Disclosure Statement, the Plan, and the exhibits annexed thereto. If you are not entitled to vote on the Plan, but would like to obtain copies of this Disclosure Statement, the Plan, or any of the other documents attached hereto or referenced herein, or if you have questions about the solicitation and voting process or the Chapter 11 Cases more generally, please visit https://dm.epiq11.com/case/bird/info, or you may contact counsel for the Debtors, c/o Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131, Attn: Paul Steven Singerman, Esq., tel. 305.714.4343, email: singerman@bergersingerman.com; Jordi Guso, Esq., tel. 305.714.4375, email: jguso@bergersingerman.com; Robin J. Rubens, Esq., tel. 305.714.4385, email: rrubens@bergersingerman.com, or Clay B. Roberts, Esq., tel. 305.714.4377, email: croberts@bergersingerman.com.

12929356-10

# TABLE OF CONTENTS

**Page**

**I. INTRODUCTION** ................................................................................................ 1

    **A.**    **Overview of Chapter 11 and the Plan Confirmation Process.** ........................ 2

    **B.**    **Debtors' Recommendation and Plan Overview.** ........................................ 3

    **C.**    **Summary of Classification and Treatment of Claims Under the Plan.** .......... 4

    **D.**    **Summary of Voting Requirements for Plan Confirmation.** ........................... 7

**II. BACKGROUND INFORMATION** .................................................................... 9

    **A.**    **Overview of Business Operations.** .......................................................... 9

    **B.**    **The Corporate Structure and Governance of the Debtors.** ...................... 12

    **C.**    **The Prepetition Capital Structure of the Debtors.** ............................... 14

**III. EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASES** ................. 16

**IV. EVENTS OCCURRING DURING DEBTORS' CHAPTER 11 CASES** ................... 17

    **A.**    **Bankruptcy Filings, Hearings, and Certain Orders of the Bankruptcy Court.** ...................................................................................... 17

    **B.**    **Motions to Assume or Reject Unexpired Leases and Executory Contracts.** .............................................................................. 19

    **C.**    **Confirmation for Authority for AIG International Group, Inc. to Pay Defense Costs.** ................................................................................ 19

    **D.**    **Order Approving Stipulation With Liberty Mutual Insurance Company.** ......................................................................................... 19

    **E.**    **Retention and Employment of Bankruptcy Professionals; Compensation  Procedures;  Ordinary Course Professionals.** ...................... 19

    **F.**    **Appointment of Creditors' Committee; Retention of Financial Advisor and Counsel** .................................................................. 20

    **G.**    **Meeting of Creditors.** ....................................................................... 20

    **H.**    **Schedules of Assets and Liabilities and Statements of Financial Affairs.** ............................................................................................. 20

    **I.**    **JUSDA Supply Chain Management Corp.** ............................................ 20

    **J.**    **Adversary Proceeding to Extend Automatic Stay to Suits Against Third Party Non-Debtor Cities.** ..................................................... 21

    **K.**    **Motions for Relief From Stay.** .......................................................... 21

    **L.**    **Debtor in Possession Financing.** ........................................................ 22

    **M.**    **Global Settlement and Plan Support Agreement Term Sheet** .................. 22

    **N.**    **Sale of the Purchased Assets.** ........................................................... 23

    **O.**    **Retained Causes of Action.** .............................................................. 23

12929356-10

## TABLE OF CONTENTS

(continued)

Page

P.  Negotiations Resulting in the Distribution to the Holders of Allowed General Unsecured Creditors (Class 5) of the Plan. ........................ 23

Q.  Negotiations Resulting in Insurance Settlement Agreement and Funding of Tort Claims Trust. ............................................................ 24

**V. THE CHAPTER 11 PLAN** ......................................................................... 26

A.  Treatment of Claims and Equity Interests Under the Plan. ....................... 26

B.  Classification of Claims and Equity Interests. ........................................... 28

C.  Voting Classes; Presumed Acceptance by Non-Voting Classes. ............... 29

D.  Voting Classes; Acceptance and Rejection. ............................................... 29

E.  Confirmation Pursuant to Section 1129(a)(1) and 1129(b) of the Bankruptcy Code. ...................................................................................... 30

F.  Treatment of Claims and Equity Interests. ................................................. 30

G.  Means for Implementation of the Plan. ...................................................... 32

H.  Tort Claims Trust. ...................................................................................... 44

I.  Insurance Settlement Agreement. ............................................................... 50

J.  Distributions. .............................................................................................. 60

K.  Procedures for Disputed Claims. ................................................................ 65

L.  Executory Contracts and Unexpired Leases. .............................................. 66

M.  Conditions Precedent to the Effective Date. .............................................. 68

N.  Effect of Confirmation; Indemnification, Release, Injunction and Related Provisions. ..................................................................................... 69

O.  Channeling Injunction. ............................................................................... 70

P.  Releases. ..................................................................................................... 72

Q.  Exculpation. ................................................................................................ 75

R.  Bar Order. ................................................................................................... 75

S.  Injunction. ................................................................................................... 76

T.  Release of Liens. ......................................................................................... 77

U.  Retention of Jurisdiction. ........................................................................... 78

V.  Miscellaneous Provisions. .......................................................................... 79

**VI. RISK FACTORS IN CONNECTION WITH THE PLAN** ...................... 81

A.  Non-confirmation of the Plan. .................................................................... 81

B.  Nonconsensual confirmation. ..................................................................... 82

-ii-

# TABLE OF CONTENTS
(continued)

**Page**

C.      Claim objections. ................................................................... 82

D.      Distributions. ........................................................................ 82

E.      Jurisdiction. .......................................................................... 82

F.      Administrative insolvency. ................................................... 82

G.      Debtors have no duty to update. ........................................... 83

H.      Amendment, waiver, modification, or withdrawal of plan. ........................... 84

I.      Non-occurrence or delayed occurrence of the Effective Date. ....................... 84

J.      Conversion to Chapter 7. ...................................................... 84

K.      Dismissal of the Chapter 11 Cases. ..................................... 85

L.      Cost of administering the Debtors' Estates. ......................... 85

VII. PLAN CONFIRMATION AND CONSUMMATION .................................. 85

A.      The Confirmation Hearing. .................................................. 85

B.      Plan Confirmation Requirements Under the Bankruptcy Code. ................... 86

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............ 89

A.      Chapter 7 Liquidation. ......................................................... 89

B.      Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code. ............. 90

C.      Dismissal of the Debtors' Chapter 11 Cases. ....................... 90

IX. CERTAIN FEDERAL TAX CONSEQUENCES ......................................... 90

A.      General. ................................................................................ 91

X. RECOMMENDATION AND CONCLUSION ............................................. 92

## **<u>EXHIBITS</u>**

Exhibit 1        Debtors' Joint Chapter 11 Plan of Liquidation dated April 18, 2024

Exhibit 2        Liquidation Analysis

# I.

# <u>INTRODUCTION</u>

On December 20, 2023 (the "**<u>Petition Date</u>**"),[3] Bird Global, Inc. ("**<u>Bird Global</u>**"), Bird Rides, Inc. ("**<u>Bird Rides</u>**"), Bird US Holdco, LLC ("**<u>Bird US Holdco</u>**"), Bird US Opco, LLC ("**<u>Bird US Opco</u>**"), and Skinny Labs, Inc. ("**<u>Spin</u>**," and together with Bird Global, Bird Rides, Bird US Holdco, Bird US Opco, the "**<u>Debtors</u>**")[4] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, as now in effect or as hereafter amended (the "**<u>Bankruptcy Code</u>**").  The Debtors' Chapter 11 Cases are being jointly administered under the caption *In re Bird Global, Inc.,* Case No. 23-20514-CLC (Jointly Administered).

The Debtors submit this disclosure statement (the "**<u>Disclosure Statement</u>**"), pursuant to section 1125 of the Bankruptcy Code, and rule 3017 of the Federal Rules of Bankruptcy Procedure, as now in effect or as hereafter amended (the "**<u>Bankruptcy Rules</u>**"), in connection with the solicitation of votes on their proposed *Debtors' Joint Chapter 11 Plan of Liquidation,* dated as of April 18, 2024 (as it may be amended, modified or supplemented from time to time in accordance with the provisions of the Plan or the Bankruptcy Code and Bankruptcy Rules, the "**<u>Plan</u>**") and attached hereto as **<u>Exhibit "1"</u>**.  The Debtors believe that confirmation and implementation of the Plan is in the best interests of the Debtors' Estates, Creditors and all other interested parties.

This Disclosure Statement and the other documents described herein are being furnished by the Debtors to Creditors in the Debtors' Chapter 11 Cases pending before the United States Bankruptcy Court for the Southern District of Florida (the "**<u>Bankruptcy Court</u>**").  This Disclosure Statement is intended to provide adequate information of a kind, and in sufficient detail, to enable the Debtors' Creditors to make an informed judgment about the Plan, including whether to accept or reject the Plan.  This Disclosure Statement sets forth certain information regarding: (1) the Debtors' prepetition operating and financial history; (2) the Debtors' need to file for relief under chapter 11 of the Bankruptcy Code; (3) significant events that have occurred to date in the Debtors' Chapter 11 Cases; (4) the terms of the Plan; (5) the manner in which distributions will be made under the Plan; (6) certain effects of confirmation of the Plan; (7) certain risk factors associated with the Plan; and (8) the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

This Disclosure Statement is subject to the Bankruptcy Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan.  **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN.  ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN**.

---

[3] Any term not explicitly defined herein shall have the meaning attributed to it in the Plan (defined herein).

[4] The Debtors together with their non-debtor Affiliates who collectively owned and operated the Bird Rides enterprise across the globe are hereafter collectively referred to as "<u>Bird</u>."

12929356-10

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. To the extent that the information provided in this Disclosure Statement and the Plan (including any Plan Supplements) conflict, the terms of the Plan (including any Plan Supplements) will control. Terms not otherwise specifically defined herein will have the meanings attributed to them in the Plan. Each definition in this Disclosure Statement and in the Plan includes both the singular and plural. Headings are for convenience or reference only and shall not affect the meaning or interpretation of this Disclosure Statement.

## THE PLAN

THE FOLLOWING IS A BRIEF SUMMARY OF CERTAIN OF THE MORE SIGNIFICANT MATTERS CONTEMPLATED BY OR IN CONNECTION WITH THE CONFIRMATION OF THE PLAN. THUS, THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT "1"**. THIS SUMMARY ONLY HIGHLIGHTS CERTAIN SUBSTANTIVE PROVISIONS OF THE PLAN. CONSIDERATION OF THIS SUMMARY WILL NOT, NOR IS IT INTENDED TO, YIELD A THOROUGH UNDERSTANDING OF THE PLAN. CONSIDERATION OF THIS SUMMARY IS NOT A SUBSTITUTE FOR A FULL AND COMPLETE READING OF THE PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO REVIEW THE PLAN CAREFULLY. THE PLAN, IF CONFIRMED, WILL BE BINDING ON EACH OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS THERETO.

**A.     Overview of Chapter 11 and the Plan Confirmation Process.**

Chapter 11 of the Bankruptcy Code allows debtors to reorganize or to liquidate and wind up their affairs for the benefit of the debtors and their creditors. Upon the commencement of a chapter 11 case, an estate is created comprised of all the legal and equitable interests of a debtor as of the date the petition is filed, which typically remain in control of the debtor as a debtor-in-possession.

On March 8, 2024, the Bankrupt Court entered the *Order (I) Authorizing and Approving (A) The Sale of Substantially All of The Debtors' Assets Free And Clear of All Liens, Claims, And Encumbrances and (B) The Assumption And Assignment of Certain Executory Contracts And Unexpired Leases In Connection Therewith, And (II) Granting Related Relief* [ECF No. 464] (the "Sale Order") authorizing the sale of substantially all of the Debtors' assets to Bird Rides Acquisition Corp. and its designee(s) (the "Purchaser"). The transactions contemplated by the Sale Order and the Stalking Horse Bid Agreement (as defined in the Sale Order) closed on March 22, 2024 and the Debtors have discontinued substantially all of their operations. The Debtors remain in possession of their remaining property without the oversight of a trustee.

On January 5, 2024, the U.S. Trustee appointed an Official Committee of Unsecured Creditors [ECF No. 118], as amended on January 7, 2024 [ECF No. 119] (the "Committee"). The Committee remains in place and will continue to be through the Effective Date of the Plan.

Pursuant to section 362 of the Bankruptcy Code, the filing of a chapter 11 petition imposes an automatic stay of all attempts by creditors or third parties to collect or enforce prepetition claims

against a debtor or otherwise interfere with its property or business, unless relief from the automatic stay is obtained from the Bankruptcy Court.

The Bankruptcy Code is designed to encourage the parties-in-interest in a chapter 11 case to negotiate the terms of a chapter 11 plan so that it may be confirmed. A chapter 11 plan is the vehicle for satisfying or otherwise addressing the claims against and the interests in the debtor. Confirmation of a chapter 11 plan makes it binding on the debtor and all of its creditors and the prior obligations owed by the debtor to such parties are compromised in exchange for the obligations specified in the plan.

After a chapter 11 plan has been filed, the holders of impaired claims against the debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to holders of Claims against the Debtors entitled to vote under section 1125 of the Bankruptcy Code in connection with the Debtors' solicitation of votes on the Plan.

**B.      Debtors' Recommendation and Plan Overview.**

In general, the Plan provides for the appointment of a Liquidating Trustee and the Tort Claims Trustee (solely for purposes of administering the Tort Claims Trust) from and after the Effective Date. The Liquidating Trustee will carry out and implement the provisions of the Plan that do not address, classify or treat Class 6 Tort Claims. The rights and duties of the Liquidating Trustee include: (1) undertaking the Claims reconciliation process; (2) making distributions to Holders of Allowed Claims (other than Class 6 Tort Claims) in accordance with the Plan; (3) exercising reasonable business judgment to direct and control the wind down, liquidation, sale and/or abandonment of the Excluded Assets; (4) exercising its reasonable business judgement to direct and control the dissolution, liquidation, striking off, or similar action to wind down each of the Debtors; (5) determining whether to prosecute Retained Causes of Action on behalf of the Debtors and their Estates, electing not to pursue any Retained Causes of Action, and determining whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Retained Causes of Action; and (6) preparing and filing any and all informational returns, reports, statements, or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law.

The Plan also provides for: (1) the Settling Insurers and the Purchaser to contribute the Insurance Settlement Proceeds to Tort Claims Trust for the benefit of Tort Claimants; (2) the appointment of the Tort Claims Trustee, as well as a Tort Claims Administrator who will administer and analyze, assign relative values to, and allocate Trust Assets to Holders of Tort Claims pursuant to the Tort Claim ADR Procedures. The Debtors believe that the Plan will allow for a prompt resolution of the Debtors' Chapter 11 Cases and will achieve the best possible result for all creditors and holders of interests, including all Holders of General Unsecured Claims and Tort Claims. The following is a brief overview of the Plan and is qualified by reference to the Plan itself.

C.      **Summary of Classification and Treatment of Claims Under the Plan.**

After the sale of the Acquired Assets, the remaining assets in the Estates include principally Cash and the Excluded Assets (*see* Liquidation Analysis attached hereto as **Exhibit "2"**).  A brief summary of the Classes established under the Plan, including the treatment and voting rights of each Class, is set forth below.  A complete description of the treatment of each class is set forth in Article III of the Plan and Article V of this Disclosure Statement. Parties should refer to those sections for a complete description of the proposed treatment for each class.

| Class | Type of Claim or Interest | Status | Treatment | Entitled to Vote | Estimated Amount of Allowed Claims / Approximate Percentage Recovery |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Except to the extent that a holder of an Allowed Other Priority Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable classification and treatment, each holder of an Allowed Other Priority Claim shall receive the full unpaid amount of such Allowed Other Priority Claim in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date such Allowed Other Priority Claim becomes Allowed or as soon as practicable thereafter, and (iii) the date such Allowed Other Priority Claim is payable under applicable non-bankruptcy law; *provided, however*, that the Debtors shall not pay any premium, interest or penalty in connection with such Allowed Other Priority Claim. Distributions to the Holders of Allowed Claim 1 Claim shall be made from the Priority Claims Reserve. | No. Deemed to accept the Plan. | $1,024,100/100% |
| 2 | Senior DIP Deficiency Claim | Impaired | Senior DIP Deficiency Claim is deemed allowed in the amount of reasonably documented unreimbursed fees and expenses not to exceed $1,000,000. The Holder of the Senior DIP Deficiency Claim shall provide such documentation to the Liquidating Trustee within 30 days of the Effective Date.  Subject to and in accordance with the Distribution Waterfall, after payment of the Excess Professional Fee Claims and the Additional DIP Funding Claim, the Holder of the Allowed Senior DIP Deficiency Claim shall receive fifty percent (50%) of the Talon Proceeds, if any, until the Allowed Senior DIP Deficiency Claim is paid in full.  The foregoing Distributions shall be made on the Effective Date or as soon as | Yes | $309,700-1,000,000/31%-49% |

| Class | Type of Claim or Interest | Status | Treatment | Entitled to Vote | Estimated Amount of Allowed Claims / Approximate Percentage Recovery |
|---|---|---|---|---|---|
| | | | practicable thereafter. Notwithstanding anything in the Final DIP Financing Order to the contrary, as of the Effective Date the Holder of the Senior DIP Deficiency Claim shall not receive or retain any other property under the Plan. | | |
| 3 | Additional DIP Funding Claim | Impaired | The Class 3 Additional DIP Funding Claim is deemed Allowed in the amount of $2,220,000. Subject to and in accordance with the Distribution Waterfall, the Holder of the Allowed Additional DIP Funding Claim shall receive a Pro Rata share of the proceeds, if any, of the Liquidating Trust Assets (net of expenses) until such time as the Allowed Additional DIP Funding Claim plus interest as set forth herein is paid in full. The foregoing distributions shall be made on the Effective Date or as soon as practicable thereafter. | Yes | $2,200,000/0%-100% |
| 4 | Miscellaneous Secured Claims | Impaired | The Liens securing each Class 4 Claim are junior and subordinate to the Liens and Claims of the Prepetition First Lien Parties, the Prepetition Second Lien Parties, the Senior DIP Parties, the Junior DIP Parties and the Junior DIP Agent. Accordingly, each Allowed Class 4 Claim is deemed unsecured and will be treated as a Class 5 General Unsecured Claim. | Yes | $3,431,100/0%-2%[5] |
| 5 | General Unsecured Claims | Impaired | Except to the extent that a holder of an Allowed General Unsecured Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable classification or treatment of such claim, each holder of an Allowed General Unsecured Claim shall receive subject to and in accordance with the Distribution Waterfall (x) fifty percent (50%) of the Talon Proceeds, if any, until the Allowed Senior DIP Deficiency Claim is paid in full, then one hundred percent (100%) of any additional Talon Proceeds, plus (y) its Pro Rata share of the proceeds of remaining Liquidating Trust Assets (net of expenses) other than Talon Proceeds. The foregoing | Yes | $600,535,813.83[6]/1% or greater depending upon the results of claims reconciliation and monetization of Excluded Assets |

[5] Class 4 Claims are treated as General Unsecured Claims pursuant to the Plan.
[6] This figure is found in the Numerical Claims Register in the record at ECF No. 558.

12929356-10

| Class | Type of Claim or Interest | Status | Treatment | Entitled to Vote | Estimated Amount of Allowed Claims / Approximate Percentage Recovery |
|---|---|---|---|---|---|
| | | | distributions shall be made on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date such General Unsecured Claim becomes Allowed or as soon as practicable thereafter, and (iii) the date such Allowed General Unsecured Claim is payable under applicable non-bankruptcy law; *provided, however*, that neither the Debtors nor the Liquidating Trustee shall pay any premium, interest or penalty in connection with such Allowed General Unsecured Claim. | | |
| 6 | Tort Claims | Impaired | The Plan establishes the Tort Claims Trust for the benefit of Holders of Allowed Tort Claims, which claims are and shall be channeled to the Tort Claims Trust pursuant to Section 13.6 of the Plan.  Each holder of a Tort Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its claim against the Debtors or any of the Released Parties, a Distribution of the Tort Claims Trust Assets by the Tort Claims Trustee, in accordance with the Plan, the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.  In no event shall a holder of a Tort Claim be entitled to any other or further recovery from or against any of the Debtors or the Insurance Settlement Released Parties or any of their property or assets. | Yes | $Unliquidated / pro rata portion of $10 Million in Insurance Settlement Proceeds % |
| 7 | Subordinated Claims | Impaired | Except to the extent that a Holder of a Subordinated Claim agrees to a less favorable classification and treatment, each holder of a Subordinated Claim shall receive its Pro Rata share of the net proceeds of Excluded Assets, if any, remaining after the making of the payments set forth in Article II and Article III, Section 3.2(a) through Section 3.2(e) of the Plan, inclusive. Distributions to Holders of Claims in Class 7 shall be made only after Claims in Classes 1 through 6 of the Plan, inclusive, have been paid in full. | Yes | $270,558,100/0% |

| Class | Type of Claim or Interest | Status | Treatment | Entitled to Vote | Estimated Amount of Allowed Claims / Approximate Percentage Recovery |
|---|---|---|---|---|---|
| 8 | Equity Interests | Impaired | The Holders of Equity Interest shall not receive nor retain any property under the Plan.  Class 8 Equity Interests shall be extinguished as of the Effective Date of the Plan. | No. Deemed to Reject the Plan. | $780,890/0% |

**D.      Summary of Voting Requirements for Plan Confirmation.**

(i)      **In General.**

Creditors should refer only to this Disclosure Statement and the Plan to determine whether to vote to accept or reject the Plan.  Under the Bankruptcy Code, only holders of Claims that are "impaired" are entitled to vote to accept or reject the Plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

An impaired class of creditors votes to accept a plan if the holders of at least two-thirds (2/3) in dollar amount, and more than one-half (1/2) in number, of those creditors that actually cast Ballots vote to accept such plan.  Those classes that are not impaired are not entitled to vote and are deemed to accept a plan.  Those classes that are not entitled to a distribution and will not retain property under a plan are deemed to reject a plan.

A class of interest holders is deemed to accept a plan if the holders of at least two-thirds (2/3) in amount of those interest holders that actually cast Ballots vote to accept such plan.  A class of interest holders is impaired, not entitled to vote, and deemed to reject the plan if the plan treats such holders by providing that they will retain no property and receive no distributions under the plan.

Any Claim in an Impaired Class that is subject to a pending objection or is scheduled as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing the Claim for the purpose of voting on the Plan.

Pursuant to the Bankruptcy Code, only creditors who actually vote on the Plan will be counted for purposes of determining whether the required number of acceptances have been obtained.  Failure to deliver a properly completed ballot by the Voting Deadline (as defined herein) will result in an abstention; consequently, the vote will neither be counted as an acceptance or rejection of the Plan.

(ii)     **Impaired Classes Entitled to Vote.**

The Claims in Classes 2 (Senior DIP Deficiency Claim), 3 (Additional DIP Funding Claims), 4 (Miscellaneous Secured Claims), 5 (General Unsecured Claims), 6 (Tort Claims), and 7 (Subordinated Claims), are both Impaired and entitled to vote to accept or reject the Plan.

(iii)    **Unimpaired Class Deemed to Accept the Plan.**

Claims in Class 1 (Other Priority Claims) are Unimpaired and the vote of Holders of such Claims in this Class will not be solicited because they are deemed to accept the Plan under Bankruptcy Code section 1126(f).

(iv)    **Impaired Class Deemed to Reject the Plan and Does Not Vote.**

Under Bankruptcy Code section 1126(g), the following Class is deemed to have rejected the Plan: Class 8 (Equity Interests).  The vote of Holders of such Interests in this Class will not be solicited.

(v)     **Voting Deadline.**

The Debtors have engaged Epiq Corporate Restructuring, LLC as their agent to assist in the transmission of voting materials with respect to the Plan.  If a Creditor holds a Claim classified in a voting Class of Claims under the Plan, the Creditor's acceptance or rejection of the Plan is important and must be in writing and submitted on time.  The record date for determining which Creditors may vote on the Plan is [•], 2024, the "**Voting Record Date**").  The voting deadline is [•], 2024 at 11:59 p.m. (prevailing Pacific Time) (the "**Voting Deadline**").

(vi)    **Voting Instructions.**

IN ORDER FOR A VOTE TO BE COUNTED, THE BALLOT MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND **ACTUALLY RECEIVED** BY EPIQ CORPORATE RESTRUCTURING, LLC BY THE VOTING DEADLINE AT THE ADDRESS PRINTED ON THE BALLOT.

(vii)   **Ballots.**

Creditors must use only the Ballot or Ballots sent to them with the notice of this Disclosure Statement.  If a Creditor has multiple Claims that it is entitled to vote, it should receive multiple Ballots.  IF A CREDITOR RECEIVES MORE THAN ONE BALLOT, THEN THE CREDITOR SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM AND SHOULD COMPLETE AND RETURN ALL OF THEM.

(viii)  **Additional Information.**

If you have any questions about (1) the procedure for voting on your Claim; (2) the package of materials that you have received; (3) the amount of your Claim; (4) obtaining or replacing a Ballot; or (5) obtaining an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Debtors' counsel, Berger Singerman LLP, 1450 Brickell

Avenue, Suite 1900, Miami, Florida 33131, Attn: Paul Steven Singerman, Esq., tel. 305.714.4343, email: singerman@bergersingerman.com; Jordi Guso, Esq. tel. 305.714.4375, email: jguso@bergersingerman.com; Robin J. Rubens, Es., tel. 305.714.4385, email: rrubens@bergersingerman.com, or Clay B. Roberts, Esq., tel. 305.714.4377, email: croberts@bergersingerman.com.

## II.

## BACKGROUND INFORMATION

### A.    Overview of Business Operations.

(i)    Historically through December 2023.

Prior to the sale of substantially all of the Debtors' assets, the Debtors were a micromobility company that was committed to providing affordable, environmentally friendly on-demand transportation solutions to communities across the world. Founded in 2017, the Debtors were the first enterprise to deploy shared electric scooters in the United States, providing an entirely new category for short-distance transportation relying entirely on renewable energy. Bird partnered with cities to bring lightweight, electric vehicles (such as e-scooters and e-bikes) to residents and visitors in an effort to replace car trips by providing an alternative sustainable transportation options. Bird was the largest micromobility operator in North America by market share and was a leader in environmentally friendly electric transportation. Bird operated in approximately 300 markets globally with over 200,000 vehicles in cities across the United States and the globe, with over 175 million rides completed on Bird vehicles as of December 2023. Bird took a collaborative, community-first approach to micromobility, working closely with the cities in which it operates to provide a reliable and affordable transportation option for people who live, work and visit.

Bird's micromobility offerings included its core vehicle-sharing business and operations, a white-label offering where partners purchase vehicles from Bird and pay service and license fees for the use of Bird's platform ("**Platform**"), and sales of Bird designed vehicles for personal use ("**Retail Sales**").

(ii)    Sharing Business.

Bird's core vehicle-sharing business and operations ("**Sharing**") provided riders with on-demand access to Bird vehicles (e-scooters and e-bikes), enabling them to locate, unlock, and pay for rides through Bird's mobile application (the "**Bird App**"). Riders could download the Bird App on both Android and iOS smartphone platforms and become an eligible rider following a brief onboarding process. Riders could then use the Bird App to locate nearby vehicles and "unlock" a vehicle to begin a trip. The trip was completed when the vehicle was parked in a designated area.

Bird generated revenue from trips taken on its shared vehicles. For a single ride, riders typically paid a fixed unlock fee to access the vehicle in addition to a market-level, per minute price for each minute the vehicle is in use. Riders generally paid for trips in one of two ways: (i) "pay-per-ride" where a rider charged the cost of the ride to a credit card on file or (ii) through a preloaded "wallet" where the cost of the trip was redeemed from the wallet balance. Bird generated

-9-

the substantial majority of its revenue from the Sharing business, with approximately $231 million in annual revenue in 2022 related to the Sharing business.

The Debtors also expanded the Sharing business to new markets in various regions around the world, including EMEA and other select markets in Canada, Australia, and South Korea. The non-U. S. business (currently being wound down) is operated by non-Debtor Affiliates in local markets, which are all owned directly or indirectly by Bird Global. The Debtors made significant investments to build the infrastructure necessary to support a global platform, including obtaining regulatory approvals and permits, building relationships with local city partners, and developing a network of Fleet Managers (defined below) to facilitate in-market operations globally. The Debtors' continued presence in these markets provided a strategic foothold to continue to scale operations, increase brand awareness, and achieve profitability.

For the quarter ended September 2023, the Debtors deployed on average approximately 80,000 vehicles in a given day for Sharing operations. Deployed vehicles constituted a portion of the Debtors' total fleet and were strategically deployed depending on a variety of factors, including weather, historical demand, time of day, and day of the week. Vehicles that were not deployed include vehicles being recharged, repaired, or held in storage.

The Debtors had multiple generations of Scooters used in their global fleet. Each generation had key innovations and updates, including improved in-market longevity.



Local in-market operations for Bird's Sharing business were either managed with the support of a network of local logistic providers (the "**Fleet Managers**") or through Bird's in-house teams ("**In-House**"). Prior to the second quarter of 2020, substantially all of Bird's in-market operations were conducted In-House. After temporarily pausing operations at the onset of COVID-19 in March 2020, Bird rapidly shifted to the Fleet Manager operating model as a way to quickly relaunch and provide safe and socially distanced transportation options for its global city partners. While Bird continued to operate certain of its operations primarily under the Fleet

Manager operating model to expand into new markets and positively impact year-round unit economics, segments of Bird's business successfully operated in-house since inception, making it a viable and profitable operating model in select cities.

Fleet Managers typically managed logistics for fleets of 100 or more Bird-owned vehicles in their local markets, driving meaningful scale as Bird expands into small to mid-sized cities. There were approximately 300 Fleet Managers operating for Bird globally, with approximately 220 in the United States. With the support of Bird's central operations team and advanced technology platform, Fleet Managers managed the day-to-day logistics responsibilities required for proper fleet management, including deploying, repairing, relocating, and charging Bird vehicles. Through a revenue share model, Fleet Managers made money on rides taken on the vehicles in their care, creating built-in economic incentives to ensure these vehicles are properly maintained, and strategically placed to align with local demand. There were no upfront fees to Bird associated with becoming a Fleet Manager, and Fleet Managers typically utilized existing tools and resources to manage their fleet. As such, the Fleet Manager program provided economic advancement opportunities to local businesses.

Bird closely monitored the usage of its vehicles ("**Rides**") as a key indicator of the usage and scale of the Sharing business. Bird calculated Rides as the total number of paid and unpaid trips completed by customers of its Sharing business. Rides decreased in 2023 as Bird has exited certain jurisdictions. Rides are seasonal to a certain degree and Bird typically experiences higher levels of activity in the second and third quarters as a result of improved weather conditions in the Northern Hemisphere and lower levels of activity in the first and fourth quarters as weather conditions worsened.

Bird kept track of the number of Rides per deployed vehicle per day ("**RPD**"), which represented the rate at which its vehicles were utilized by riders. Bird calculated RPD as the total number of Rides divided by total number of vehicles available to riders through the Sharing Business (the "**Deployed Vehicles**") each calendar day. Bird calculated Deployed Vehicles on a pro-rata basis over a 24-hour period, wherein two vehicles deployed for a combined period of 24 hours equate to one Deployed Vehicle. Deployed Vehicles constituted a portion of Bird's total fleet, and Bird strategically deployed vehicles depending on a variety of factors, including weather, historical demand, time of day, and day of the week. If a vehicle was charging, under repair, or temporarily missing, it was not considered a Deployed Vehicle. During the winter months, Bird proactively placed portions of its fleet in reserve to align with seasonal demand and preserve its asset base. As such, Deployed Vehicle volumes tended to fluctuate seasonally.

Bird experienced a decrease in Rides within its Sharing Business due to a variety of factors, including the exit from jurisdictions Bird operated in that were high volume but low profitability during 2022, and changes in availability of Deployed Vehicles in productive locations. For the nine months ending November 30, 2023, Rides saw a decrease of 36% compared to the same period last year. Commensurate with the decrease in Rides, Sharing Revenue decreased by $31 million, or 20%, for the nine months ended September 30, 2023, compared to the same period the prior year. Revenues outperformed Rides, as Revenue per Ride increased.

    (iii)    <u>Platform Business</u>.

Bird offered a white labeled version of its products and technology referred to as the "Platform." Through the Platform, Bird sold fleets of Bird vehicles to its Platform partners for them to operate in their local markets. Bird also received a service and license fee for access to its systems so the vehicles can be used by riders.

Bird's Platform business earned revenues through the sale of vehicles to its platform partners, as well as through per-ride service and license fees for use of Bird's proprietary software platform and tools. Rides in the Platform segment for the nine months ended September 2023 decreased 39% as compared to the prior year. Prior to its acquisition by Bird Global, Inc. pursuant to the BC Share Purchase Agreement (defined herein), Bird Canada (defined herein) was Bird's most successful Platform partner. Prior to its acquisition, Bird Canada also made significant vehicle purchases to update its fleet, which were included in Platform revenues. Those Platform revenues attributable to the sale of vehicles to Bird Canada do not recur as Bird Canada is now a subsidiary of Bird and new vehicle additions would be considered capital investments. Bird anticipated future vehicle sales to Platform partners, though the timing and volume of such purchases was uncertain.

    (iv)    <u>Retail Sales Business</u>.

Bird previously sold Bird vehicles for personal use ("**Retail Sales**") through select retail and wholesale channels. In 2019, Bird launched the first Bird designed vehicle available for consumer purchase—the Bird One Scooter—designed and engineered for everyday use. Since then, Bird expanded its consumer product line to include updated vehicles designs, including "stow and go" Scooters, as well as a Bird-designed electric bike. In 2022, Retail Sales generated approximately $13.3 million in annual revenue. In May 2022, Bird announced that it would discontinue its Retail Sales portfolio offering, simplify its business model and realign its resources to prioritize Sharing operations within its existing regions. Bird provided warranty services to its former Retail Sales customers.

**B.**     **The Corporate Structure and Governance of the Debtors.**

    (i)    <u>Bird</u>.

The Debtors, all of which are organized under the laws of the State of Delaware, are part of a corporate structure whose ultimate parent is Bird Global. An organizational chart reflecting the Debtors' corporate structure (including its non-Debtor affiliates) was filed on the docket in these Chapter 11 Cases. [ECF No. 49].

    (ii)    <u>Public Listing of Bird Global Shares</u>.

On May 4, 2021, Bird Global was formed as a wholly owned subsidiary of Bird Rides for the purpose of effectuating the transactions contemplated by the Business Combination Agreement (defined below), including a merger with a publicly listed special purpose acquisition company (SPAC) and to thereafter serve as the publicly traded parent company of Bird Rides.

-12-

On October 7, 2020, Switchback II Corporation ("**Switchback**"), a Cayman Islands exempted company, was formed for the purpose of effecting a business combination involving Switchback and one or more businesses. On January 12, 2021, Switchback completed an initial public offering pursuant to which certain of its securities became listed and publicly traded on the New York Stock Exchange (the "NYSE") under the symbols "SWBK.U," "SWBK," and "SWBK WS." 28. On May 11, 2021, Switchback entered into an agreement (the "**Business Combination Agreement**") with Bird Global and Bird Rides, among others, pursuant to which it was agreed that (i) Switchback would reincorporate to the State of Delaware by merging with and into Bird Global (with Bird Global surviving the merger as a publicly traded entity) (the "**Domestication Merger**"), and (ii) Bird Rides would merge into a wholly owned subsidiary of Bird Global (with Bird Rides surviving this subsequent merger as a wholly owned subsidiary of Bird Global) (the "**Bird Rides Merger**").

On November 3, 2021, the Domestication Merger was completed. On November 4, 2021, the Bird Rides Merger was completed. Upon completion of the Domestication Merger, Switchback securities ceased trading on the NYSE and securities of Bird Global began trading on the NYSE under the symbols "BROS" and "BROS WS."

(iii)    Bird Canada Acquisition and Management Changes.

On December 30, 2022, and effective as of January 3, 2023, Bird Global entered into a share purchase agreement (the "**BC Share Purchase Agreement**") with 1393631 B.C. Unlimited Liability Company, a British Columbia unlimited liability company and indirect wholly owned subsidiary of Bird Global, Bird Canada Inc. ("**Bird Canada**"), and the owners of all Bird Canada shares (the "**BC Sellers**"). Pursuant to the BC Share Purchase Agreement, among other things, the Bird Global acquired from the BC Sellers 100% of the issued and outstanding shares of Bird Canada in exchange for the issuance by Bird to the BC Sellers of an aggregate principal amount of $27.0 million of its 12.0% Convertible Senior Secured Notes due 2027 (the "**Second Lien Notes**"), 728,175 shares of Bird Global's Class A common stock (the "**Class A Common Stock**"), and a nominal amount of cash consideration (such transaction, the "**Bird Canada Acquisition**"). The purpose of the Bird Canada Acquisition was to add additional profitable operations to Bird's Global platform, while consolidating Bird's North American operations.

The terms of the Second Lien Notes issued in connection with the Bird Canada Acquisition are governed by that certain Note Purchase Agreement, dated as of December 30, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "**Note Purchase Agreement**"), by and among the Bird Global, as issuer, the several purchasers from time to time party thereto (collectively, the "**Second Lien Noteholders**") and U.S. Bank Trust Company, National Association, as collateral agent (the "**Second Lien Agent**"). The Note Purchase Agreement and the Second Lien Notes are described further herein.

Bird Canada was Bird's most successful Platform partner. Prior to the Bird Canada Acquisition, Bird Canada operated independently, using Bird branding, vehicles, and technology to successfully establish micromobility programs across several Canadian cities. Following the Bird Canada Acquisition, Bird Global combined with Bird Canada, with the BC Sellers primarily receiving the Second Lien Notes as consideration. The acquisition added additional profitable operations to Bird's global platform consolidated North American operations.

-13-

Upon the closing of the Bird Canada Acquisition, certain management changes occurred. Stewart Lyons, the CEO of Bird Canada, joined Bird as President. Michael Washinushi joined Bird as Chief Financial Officer. JJ Bitove, the Chief Financial Officer and co-founder of Bird Canada, joined Bird as VP, Corporate Development and Strategy. Each of the new members of management brought significant industry experience. In addition to the management changes, Bird also saw changes to its board of directors with the inclusion of John Bitove, Antonio Occhionero and Kevin Talbot.

(iv)    Spin Acquisition.

On September 19, 2023, Bird Global entered into that certain Stock Purchase Agreement (the "**Spin Acquisition Agreement**") with Spin, acquiring 100% of the stock of Spin in exchange for agreed upon consideration of approximately $19 million before adjustments, which is comprised of (a) $10 million in cash, (b) $6 million in the form of a secured vendor take-back promissory note (the "**VLB Note**"), and (c) $3 million in hold-back consideration comprised of $1 million in cash and $2 million of Bird's Class A Common Stock, par value $0.0001 per share (such transaction, the "**Spin Acquisition**"). The Spin purchase price was subject to an adjustment for any net working capital adjustments identified during the ninety (90) days immediately following the acquisition.

Spin is a micromobility company with operations throughout North America. The purpose of Bird's acquisition of Spin was to gain access to new city permits, new markets, and new vehicles.

**C.    The Prepetition Capital Structure of the Debtors.**

As of the Petition Date, the Debtors were liable for approximately $108.9 million in aggregate financial debt obligations (excluding trade debt and potential rejection damages). These obligations arose under a senior secured credit facility and two note issuances. Bird Global is an obligor under each of the funded-debt obligations as either a borrower, issuer, or guarantor. The table below summarizes the Debtors' prepetition capital structure.

| Financial Debt Obligation | Principal Outstanding |
|---|---|
| First Lien Credit Facility | $41.5 million |
| Second Lien Notes | $67.4 million |
| VTB Note | Disputed (as described herein) |

(i)    First Lien Obligations - First Lien Credit Facility.

On April 27, 2021, Bird Opco, Bird Holdco, MidCap Financial Trust, as administrative agent (the "**First Lien Agent**"), and certain other lenders thereto (the "**First Lien Lenders**") entered into that certain Loan and Security Agreement (as amended, restated, supplemented or

otherwise modified from time to time, the "**First Lien Credit Agreement**") pursuant to which Bird could finance its future vehicle capital expenditures (the "**First Lien Credit Facility**").

The First Lien Credit Agreement was amended a number of times between 2021 and 2023. The amendments that Bird negotiated to the First Lien Credit Agreement have allowed Bird to reduce cash outlays that are variable based on revenue in favor of more predictable payment streams and to reduce the amount of reserved cash Bird is required to hold so that it could improve its liquidity position.

The First Lien Credit Facility is secured by first priority, duly perfected and enforceable lien on substantially all assets of the Debtors, including the Debtors' equity interests in certain non-Debtor affiliates.

As of the Petition Date, the outstanding principal balance under the First Lien Credit Facility, inclusive of the First Lien Bridge Loan (as defined in the First Day Declaration), is not less than $41,455,322.40, plus accrued and unpaid interest of not less than $2,833,148.50 and all other Prepetition First Lien Obligations.

(ii)     Second Lien Obligations - Note Purchase Agreement.

In connection with the Bird Canada Acquisition (as defined above), Bird Global, as issuer, the Second Lien Agent and the Second Lien Noteholders from time-to-time party thereto, entered into the Note Purchase Agreement dated December 30, 2022 (as amended thereafter). Pursuant to the Note Purchase Agreement, Bird Global issued and sold an aggregate principal amount of $30.1 million of its Second Lien Notes. The Second Lien Notes were issued and sold in a private placement to certain "accredited investors" conducted pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended. The terms of the Second Lien Notes are governed by the Note Purchase Agreement.

The Second Lien Notes are secured by liens on substantially all assets of the Debtors, including the Debtors' equity in certain non-Debtor affiliates, which liens are junior and subordinate to the liens of the First Lien Agent.

The First Lien Agent, the Second Lien Agent, and the Second Lien Noteholders are parties to that certain Subordination and Intercreditor Agreement, dated, December 30, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "**Intercreditor Agreement**"). The Intercreditor Agreement sets forth the relative rights and priorities between the First Lien Lenders, the First Lien Agent, the Second Lien Lenders, and the Second Lien Agent.

As of the Petition Date, the outstanding principal balance under the Note Purchase Agreement is not less than $63,850,000, plus approximately $7,180,000.00 in accrued and unpaid interest thereon (including PIK interest), attorneys' fees and costs.

(iii)     The VTB Note.

On September 19, 2023, in connection with Bird's acquisition of Spin, Bird Rides issued to Tier Mobility SE ("**Tier Mobility**") the VTB Note in the principal amount of $6 million. Under

-15-

the Spin Acquisition Agreement and the VTB Note, Spin, as the guarantor and as a wholly owned subsidiary of Bird Rides, delivered to Tier Mobility a guarantee and security agreement secured by certain assets of Spin, certain existing and new licenses and permits, and all amounts received, or receivable, under any, or all of, the foregoing licenses and permits, and all rents, profits, and products of the foregoing. Bird Global guaranteed the Note on an unsecured basis. The principal amount of the note was to be repaid in three installments, which are or were due on October 19, 2023, December 31, 2023, and April 24, 2024, respectively, together with interest thereon. The VTB Note bears interest at the rate of 8.0% per annum from September 19, 2023, until the unpaid balance is paid in full.

As of the Petition Date, the amount owing under the VTB Note was contingent on the Bird Rides and Tier Mobility settling the final working capital balance of Spin, and any amount greater than a working capital target is to be offset against the final amount owing under the VTB Note. As of the Petition Date, the closing working capital showed a negative balance owed on the VTB Note of $2.2 million.

    (iv)    <u>Unsecured Debt</u>.

The Debtors have no funded unsecured debt. In the ordinary course, prior to the sale of substantially all of their assets, the Debtors incurred trade debt with certain vendors and suppliers in connection with the operation of their business. In addition, the Debtors have other potential and contingent liabilities related to, among other things, ongoing litigation which relate to the Tort Claims Trust.

**III.**

**<u>EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASES</u>**

The Debtors were a growth-stage enterprise which invested significant resources to develop the Bird Platform and expand Sharing operations to new markets around the world. Since Bird's inception, investments and overhead costs exceeded revenues. As a result, the Debtors incurred net losses since inception. The Debtors incurred approximately $235.2 million and $471.3 million in operating losses in 2021 and 2022, respectively. Bird has incurred recurring losses and negative cash flows and has an accumulated deficit of $1.6 billion as of September 30, 2023.

The Debtors eventually consumed most of their growth stage capital. As a result, in the fourth quarter of 2022, Bird's then management considered a restructuring or bankruptcy to deal with its difficult liquidity position. A bankruptcy at that time was avoided through the completion of the Bird Canada Acquisition in December 2022, which: (a) raised $27 million in new capital, and (b) added the profitable Bird Canada business to Bird. As part of the Bird Canada Acquisition, Bird Global's management team changed completely, adding a new President, CFO, and VP, Corporate Development and Strategy.

The Debtors announced in November 2022 that they had discovered an error in their business systems that impacted the recognition of revenue in their financial statements for 2020 and 2021 and the quarterly periods ended March 31, 2022, and June 30, 2022. In particular, for certain customers with insufficient preloaded "wallet" balances, the Debtors' business systems recorded revenue for uncollected balances following the completion of certain rides that should

-16-

not have been recorded. The error resulted in an overstatement of Sharing revenue for the impacted periods and an understatement of deferred revenue in the balance sheets as of the end of each impacted period. The Debtors promptly filed amended annual and quarterly reports for the impacted periods on November 18, 2022.

The Debtors are defendants in over 100 lawsuits, most of which relate to personal injury claims relating to riders' accidents while riding Bird scooters. Moreover, pursuant to the Debtors' permits to operate in certain cities, the Debtors are also required to indemnify those cities in connection with lawsuits brought against the cities relating to Bird scooter use. Prior to their Chapter 11 Cases, the Debtors incurred significant litigation expense each month in connection with defending and settling litigation claims. Due to the filing of the Debtors' Chapter 11 Cases, and as discussed in Section IV(J), below, the extension of the automatic stay and issuance of preliminary injunctive relief issued by the Bankruptcy Court in a related adversary proceeding commenced by the Debtors, these litigation expenses have been significantly reduced, but not eliminated.

Since inception, the Debtors have funded most of their costs and expenditures through capital raises (both equity and debt) and rider revenue. In 2023, the Debtors faced difficulty raising capital and instead relied on cost cuts, reduced capital expenditures, and stretched vendor payments to conserve cash.

As described above, on September 25, 2023, Bird Global's shares of Class A Common Stock and Warrants were subject to a delisting notice from the NYSE, and on September 29, 2023, began trading on the OTCQX, which is more volatile than the NYSE and resulted in a continued diminution in value of Bird Global's shares further impacting Bird's ability to raise capital in the public markets.

As of the Petition Date, the Debtors had approximately $3.25 million in unrestricted cash and cash equivalents.

Given the foregoing, the Debtors made the difficult but necessary decision to seek relief under Chapter 11 of the Bankruptcy Code in an effort to restructure their finances for the benefit of their economic stakeholders.

## IV.

## EVENTS OCCURRING DURING DEBTORS' CHAPTER 11 CASES

### A.    Bankruptcy Filings, Hearings, and Certain Orders of the Bankruptcy Court.

On the Petition Date, the Debtors commenced their Chapter 11 Cases by filing voluntary petitions under chapter 11 of the Bankruptcy Code.  The Debtors are debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  As described in more detail herein, the Debtors have sold the Acquired Assets, other than the Retained Causes of Action and other Excluded Assets, to pursuant to Sale Order.

-17-

Prior to the first-day hearing held by the Bankruptcy Court on December 22, 2023, the Bankruptcy Court entered orders which permitted (i) joint administration of the Debtors' Chapter 11 Cases [ECF No. 29]; and (ii) the filing of a consolidated Case Management Summary [ECF No. 19] which, among other things, identifies the locations from which the Debtors operate, a list of officers and directors serving during the 1-year period preceding the Petition Date, and gross income for 2022 and 2023 up to the Petition Date.  On the Petition Date, the Debtors filed their Consolidated Case Management Summary with the Bankruptcy Court [ECF No. 36].

On December 22, 2023, the Bankruptcy Court held an initial hearing to consider certain "first day" matters and subsequently entered orders that, among other things:

- Approved the proposed form of notice of the commencement of the Chapter 11 Cases and the proof of claim form to be used by creditors when filing claims in the Debtors' Chapter 11 Cases [ECF No. 57];

- Authorized the Debtors to (a) file (i) a consolidated creditor matrix and (ii) a consolidated list of the top 30 unsecured creditors and (b) redact certain personally identifiable information for individual creditors and parties in interest [ECF No. 58];

- Authorized the Debtors to pay prepetition sales, use, trust fund and similar obligations [ECF No. 59];

- Authorized the Debtors to maintain and continue administering their insurance policies, including payment of any outstanding premiums [ECF No. 60];

- Authorized the Debtors to pay workforce obligations and continue employee benefit plans and other practices [ECF No. 61];

- Authorized the Debtors to continue using their existing cash management system, bank accounts and business forms on an interim basis [ECF No. 62], as amended [ECF No. 93];[7]

- Authorized the Debtors to pay prepetition claims of lien claimants and confirm the administrative expense status of outstanding prepetition orders on a final basis [ECF No. 63];

- Authorized the Debtors to maintain and administer customer programs and to honor or pay certain related prepetition obligations in the ordinary course of business on a final basis [ECF No. 64];

---

[7] The Bankruptcy Court conducted a further hearing on January 22, 2024, and thereafter entered a second Order authorizing the Debtors' to maintain their cash management system and setting a final hearing for February 5, 2024 [ECF No. 226]. On February 7, 2024, the Court authorized the Debtors to maintain their cash management system on a final basis [ECF No. 286].

- Authorized the Debtors to pay prepetition claims of critical vendors and confirm the administrative expense status of outstanding prepetition orders on a final basis [ECF No. 65];

- Authorized the Debtors to use cash collateral and obtain post-petition financing on an interim basis [ECF No. 66]; and

- Approved the Debtors' retention of Epiq Corporate Restructuring, LLC as the Debtors' notice, claims, and solicitation agent [ECF No. 74].

By Order dated January 12, 2024, the Bankruptcy Court prohibited utility providers from altering, refusing, or discontinuing services, deeming providers having received adequate assurance of payment of post-Petition Date services under Section 366 of the Bankruptcy Code and setting procedures by which providers could challenge the adequacy of insurance [ECF No. 144].

**B.     Motions to Assume or Reject Unexpired Leases and Executory Contracts.**

Pursuant to the Sale Order, the Bankruptcy Court authorized the Debtors' assumption and assignment of Assumed Contracts (as defined in the Sale Order), with the Purchaser having the right through one day prior to the Closing Date the final list of executory contracts and unexpired leases it would acquire at Closing.   Separately, the Bankruptcy Court entered several orders authorizing the Debtors' rejection of Non-Assumed Contracts – executory contracts and unexpired leases not acquired by the Purchaser.

**C.     Confirmation for Authority for AIG International Group, Inc. to Pay Defense Costs.**

By amended Order dated February 27, 2024, the Bankruptcy Court confirmed AIG International Group, Inc.'s authority to pay defense costs, specifically including attorney's fees incurred by counsel defending the former officers and directors of Bird Global in pending Securities Litigation Matters and Pending SEC Investigation as provided for in the Policies (as these terms were defined in the Order) [ECF No. 393].

**D.     Order Approving Stipulation With Liberty Mutual Insurance Company.**

By Order dated April 4, 2024, the Bankruptcy Court approved a Stipulation entered into between the Debtors, the Purchaser and Liberty Mutual Insurance Company ("**Liberty Mutual**") which confirms the assumption and assignment of certain rider liability and primary and excess automobile insurance policies to the Purchaser and sets forth a payment schedule by which outstanding obligations owed to Liberty Mutual will be paid. [ECF No. 543].

**E.     Retention and Employment of Bankruptcy Professionals; Compensation Procedures;  Ordinary Course Professionals.**

The Bankruptcy Court held a hearing on January 22, 2024, at which it considered and approved, on a final basis, the Debtors' retention and employment of the following professionals: (i) Schwartz Semerdjian Cauley & Evans LLP, as special counsel [ECF No. 198]; (ii) Stradling Yocca Carlson & Rauth, P.C., as special counsel [ECF No. 199]; (iii) Edlin Gallagher Huie +

-19-

Blum, as special counsel [ECF No. 200]; (iv) Lewis Brisbois Bisgaard & Smith, LLP, as special counsel [ECF No. 201]; (v) Berger Singerman LLP, as general bankruptcy counsel to the Debtors [ECF No. 209]; (vi) Cassel Salpeter & Co., LLC as investment bankers to the Debtors [ECF No. 208]; and (vii) Teneo Capital LLC, as financial advisor to the Debtors [ECF No. 211]. At that January 22, 2024, hearing, the Bankruptcy Court approved procedures for monthly and interim compensation and reimbursement of expenses for bankruptcy professionals [ECF No. 227].

By Order dated January 29, 2024, the Bankruptcy Court approved the retention of certain professional service firms to represent the Debtors in intellectual property, employment, litigation, and tax matters, as ordinary course professionals, and the timing and procedures by which such professionals would be compensated and reimbursed for expenses incurred in connection with their representation [ECF No. 228].

## F.    Appointment of Creditors' Committee; Retention of Financial Advisor and Counsel.

On January 5, 2024 the U.S. Trustee appointed the Committee [ECF No. 118], as amended on January 7, 2024 [ECF No. 119]. The members of the Committee are Vodafone US, Inc., Alesia Truxell, and Lloyd's of London Syndicates 1969 & 1971 (together, "**Underwriters**"). On March 1, 2024, the Bankruptcy Court approved the retention of Fox Rothschild LLP as counsel to the Committee [ECF No. 408], and Berkley Research Group, LLC as financial advisors to the Committee [ECF No. 411].

## G.    Meeting of Creditors.

The Bankruptcy Court's *Notice of Chapter 11 Bankruptcy Case* [ECF No. 41] set the section 341 meeting of creditors for February 2, 2024, at 10:00 a.m.  The meeting of creditors occurred on that date [ECF No. 247 (notice by U.S. Trustee confirming conclusion of 341 meeting)].

## H.    Schedules of Assets and Liabilities and Statements of Financial Affairs.

Rule 1007(c) of the Bankruptcy Rules requires that a debtor file its Schedules of Asset and Liabilities and Statements of Financial Affairs (collectively, the "**Schedules/SOFAs**") within 14 day after the commencement of the debtor's bankruptcy case.  On December 26, 2023, the Debtors filed an *ex parte* motion requesting an extension of time, from January 3, 2024 through and including January 19, 2024, to file their Schedules/SOFAs [ECF No. 72] (the "**Schedules/SOFA Extension Motion**").  On December 27, 2023, the Bankruptcy Court entered an order approving the Schedules/SOFA Extension Motion [ECF No. 81].  On January 19, 2024, the Debtors filed their Schedules/SOFAs [ECF Nos. 174, 178].

## I.    JUSDA Supply Chain Management Corp.

On January 18, 2024, the Debtors' filed their *Emergency Motion for Entry of an Order (I) Enforcing the Automatic Stay; (II) Compelling JUSDA to Grant Immediate Access to Warehouse Storing Property of the Debtors; (III) Compelling Performance of the Executory Contracts Between the Debtors and JUSDA; (IV) Sanctioning JUSDA; and (V) Granting Related Relief* [ECF No. 164] (the "**JUSDA Motion**") through which they sought entry of an Order granting then

immediate access to a warehouse owned or controlled by Jusda Supply Chain Management Corp. ("**JUSDA**") containing parts inventory owned by the Debtors. On January 22, 2024, the Bankruptcy Court conducted an initial hearing on the JUSDA Motion, and by Order dated January 26, 2024 [ECF No. 212], set an evidentiary hearing for February 28, 2024, which was subsequently continued to March 15, 2024 (by agreement). A judicial settlement conference ("**JSC**") was scheduled with Hon. Paul G. Hyman, Jr. for March 12, 2024. Prior to the JSC, the Debtors and JUSDA resolved the JUSDA Motion and JUSDA's claims against the Debtors. On March 14, 2024, the Bankruptcy Court entered an agreed Order [ECF No. 485] which memorialized the resolution of the JUSDA Motion and JUSDA's claims against the Debtors.

**J.      Adversary Proceeding to Extend Automatic Stay to Suits Against Third Party Non-Debtor Cities.**

On January 24, 2024, the Debtors filed commenced an adversary proceeding (the "**Adversary Proceeding**") against 41 individuals by filing their *Complaint for Extension of the Automatic Stay and for Injunctive Relief*, Adv. Pro. No. 24-ap-01010 seeking an extension of the automatic stay provisions of 11 U.S.C. § 362(a) and injunctive relief as to lawsuits against non-Debtors, that is, the "City Litigations." On January 26, 2024, the Bankruptcy Court entered an *Order Granting Debtors' Emergency Motion to Extend the Automatic Stay and for a Preliminary Injunction* granting the relief sought in an initial motion seeking the same relief on a preliminary basis [AP ECF No. 10].[8]

On February 16, 2024, the Debtors filed their *Amended Complaint for Extension of the Automatic Stay and for Injunctive Relief* [AP ECF No. 15], adding 14 individuals as party defendants. On February 16, 2024, the Debtors filed a second motion to preliminarily extend the automatic stay and for a preliminary injunction with respect to the newly added 14 defendants [AP ECF No. 16] (the "**Second Motion**"). The Committee filed a joinder to the Second Motion [AP ECF No. 25], as did Apollo Syndicate Management Limited [AP ECF No. 26]. By Order dated March 11, 2024, the Court granted the Second Motion. [AP ECF No. 42].

The Bankruptcy Court set a scheduling conference in the Adversary Proceeding for May 7, 2024, at 10:00 a.m. [AP ECF No. 22, ¶ 1].

**K.      Motions for Relief From Stay**.

Several parties filed motions for relief from stay in these Chapter 11 Cases. The Bankruptcy Court has denied several stay relief motions through which the moving parties sought authority to continue litigating personal injury state court lawsuits to proceed solely against available insurance, if any. *See, e.g.*, [ECF No. 386] (denying motion filed by Robert H. Choate, Jr.); [ECF No. 433] (denying stay relief motion filed by Alesia Truxell, Administratrix of the Estate of Lawrence Chertik, III, and Lawrence J. Chertik, Jr., Jacob Speller and Jennifer Vining); [ECF No. 434] (denying stay relief motion filed by Alexander Deayala); and [ECF No. 532] (denying stay relief motion filed by Sawyer Clayton).

The Bankruptcy Court also denied a stay relief motion filed by Talon Auto, Inc. and Scooter Removal, Inc. through which they sought authority to continue litigating a state court

---

[8] "AP ECF No." refers to an entry on the Bankruptcy Court's docket in the Adversary Proceeding.

lawsuit in order to, among other things, establish liens as against hundreds of e-scooters owned by Bird Rides under California law [ECF No. 387].

By Order dated April 9, 2024, the Bankruptcy Court entered an agreed Order granting a motion for relief from the automatic stay filed by Mr. and Mrs. Podber (collectively, the "Podbers"), so that an arbitrator in a state court arbitration involving the Podbers and Bird Rides could render its merits decision, but denying the motion to the extent it sought to proceed against available insurance, if any, in the event the arbitrator were to issue a monetary award in favor of the Podbers [ECF No. 556] (the "**Podber Stay Relief Order**"). Pending before the Bankruptcy Court is a motion seeking limited rehearing of the Podber Stay Relief Order to the extent it granted stay relief so that the arbitrator could render his merits decision, [ECF No. 564], which motion has been set for hearing on April 18, 2024. Underwriters filed a joinder in the limited motion for rehearing and objection to the underlying stay relief motion filed by the Podbers [ECF No. 580]. The Committee filed a Statement in support of the limited motion for rehearing [ECF No. 583].

## L.    Debtor in Possession Financing.

In the ordinary course of their businesses, the Debtors required the use of cash collateral and incremental postpetition financing to fund their working capital, routine payables and other costs of administration.   The Debtors sought and received approval from the Bankruptcy Court to obtain, (i) on an interim basis, post-petition financing from the DIP Lenders (the "**Interim DIP Financing**") as reflected in the interim order authorizing such post-petition financing [ECF No. 66] (the "**Interim DIP Financing Order**"), and (ii) on a final basis, post-petition financing from the DIP Lenders (the "**Final DIP Financing**" and together with the Interim DIP Financing, collectively, the "**DIP Financing**"), as reflected in the final order authorizing such post-petition financing [ECF No. 296] (the "**Final DIP Financing Order**" and together with the Interim DIP Financing Order, collectively, the "**DIP Financing Orders**"). The total DIP Financing advanced to the Debtors pursuant to the DIP Financing Orders was $25.1 million.

Pursuant to the Global Settlement Term Sheet (defined herein), the Debtors sought to incur an additional $2,200,000 in debtor in possession financing (the "Additional DIP Funding") which was provided by the Junior DIP Lenders and approved by the Court. [ECF No. 506].

## M.    Global Settlement and Plan Support Agreement Term Sheet

On March 6, 2024, the Debtors filed that certain *Global Settlement and Plan Support Agreement Term Sheet* (the "**Global Settlement Term Sheet**") [ECF No. 455] between and among (i) the Debtors; (ii) the Senior DIP Lenders (as defined therein); (iii) the Junior DIP Lenders (as defined therein), (iv) the Purchaser, in its then capacity as Stalking Horse Bidder; and (v) the Committee pursuant to which the parties agreed, among other things, to (a) amend the Asset Purchase Agreement to increase the amount of the Assumed Liabilities (as defined the Asset Purchase Agreement) from a maximum of $2.0 million to a maximum of $3.0 million; (b) provide for additional debtor-in-possession financing of $2.2 million by the Participating Second Lien Lenders; (c) allocate the Plan Cash to fund the administration of the Plan, and (c) outline the terms of the Plan and the parties' commitment to support, and not oppose, confirmation of a Plan that incorporates and is otherwise consistent with, the Global Settlement Term Sheet.

-22-

**N.    Sale of the Purchased Assets.**

On March 6, 2024, the Court conducted an evidentiary hearing on the *Debtors' Expedited Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Entry Into the Stalking Horse Bid Agreement with the Stalking Horse Bidder, Subject to the Bidding Procedures and the Sale Hearing, (II) Approving Bidding Procedures, (III) Scheduling the Bid Deadlines and the Auction, (IV) Scheduling A Sale Hearing (V) Approving the Form and Manner Of Notice Thereof, (VI) Approving Contract Procedures, and (VII) Granting Related Relief* (the "Sale Motion") [ECF No. 96] and subsequently entered the Sale Order authorizing the sale of substantially all of the Debtors' assets to the Purchaser.  Pursuant to the Asset Purchase Agreement, as modified by the Global Settlement Term Sheet, the Purchaser provided the following consideration:

- The assumption of all obligations owing to the Senior DIP Parties in the approximate amount of $65 million;

-  A credit bid by the Second Lien Lenders in the approximate amount of $79 million;

- The assumption of the Assumed Liabilities (as defined in the Asset Purchase Agreement);

- The assumption and payment of all Cure Claims; and

- Payment of $500,000 to the Debtors at Closing.

Additionally, at Closing the Second Lien Lenders advanced the $2,200,000 of Additional DIP Funding contemplated by the Global Settlement Term Sheet and approved in the Sale Order.

**O.    Retained Causes of Action.**

On and after the Effective Date of the Plan, the Liquidating Trustee will retain all of the Retained Causes of Action (to be identified in the Plan Supplement), with proceeds of such Retained Causes of Action to be distributed subject to the Distribution Waterfall.

On the Effective Date of the Plan, subject to the terms of the Sale Order, the Liquidating Trustee will be authorized to pursue pre-suit settlements or initiate litigation with respect to non-settled matters involving Retained Causes of Action.

**P.    Negotiations Resulting in the Distribution to the Holders of Allowed General Unsecured Creditors (Class 5) of the Plan.**

Both before and during the course of these Chapter 11 Cases, the Debtors have engaged in arms-length negotiations with the Senior DIP Lenders, the Senior DIP Agent, the Junior DIP Lenders, the Purchaser, and the Committee regarding the terms of the Plan, and in particular with respect to the proposed distributions to the Holders of Allowed General Unsecured Claims in Class 5 of the Plan.  As a result of these good faith and consensual negotiations lasting for more than two months, the Debtors, the Senior DIP Lenders, the Senior DIP Agent, the Junior DIP Lenders, the Purchaser, and the Committee have agreed to the terms of a distributional structure under the

-23-

Plan which will create what the Debtors believe is a meaningful distribution to the Holders of Allowed General Unsecured Claims in Class 5 of the Plan.  Importantly, in the absence of the proposed distribution structure reflected in the Plan, the Debtors believe that there would be no possible distribution at all to Holders of Allowed General Unsecured Claims in Class 5 of the Plan due to the existing priority and secured claims in the Debtors' Chapter 11 Cases possessing a higher priority of repayment under the Bankruptcy Code compared to Allowed Claims of General Unsecured Creditors in Class 5 of the Plan.

The principal terms of the distribution structure under the Plan in favor of the Class of General Unsecured Claims (Class 5) include, among other things:

(i)     Subject to and in accordance with the Distribution Waterfall, fifty percent (50%) of the Talon Proceeds, if any, until the Allowed Senior DIP Deficiency Claim is paid in full, then one hundred percent (100%) of any additional Talon Claim Proceeds, plus

(ii)    Subject to and in accordance with the Distribution Waterfall, a *pro rata* portion of the proceeds of all other Excluded Assets.[9]

The Talon Proceeds consist of any recovery received on account of that certain lawsuit pending in the Superior Court of the State of California in the Central Courthouse in the County of San Diego styled *Bird Rides, Inc. v. Talon Auto, Inc., John Heinkel, Scooter Removal LLC, Daniel Borelli, and Boardwalk Electric Rides*, Case No. 37-2019-00015016-CU-BT-CTL (the "**Talon Lawsuit**").  The Talon Lawsuit is an action seeking damages against certain defendants for improperly impounding Bird Rides-operated scooters and charging fees for the return of such scooters. The defendants' actions caused significant harm to Bird Rides due to damage to Bird Rides' property, lost business, reputational harm, and other damages.  Bird Rides asserts multiple causes of action against the defendants in the Talon Lawsuit, including, trespass to property, conversion, civil theft, and violations of certain California statutes.

The Debtors further believe that the Excluded Assets which will be transferred to the Liquidating Trust on the Effective Date include certain assets that could result in meaningful distributions to creditors from the Liquidating Trustee.

In conclusion, the Debtors believe that the outcome of the extensive negotiations between and among the Senior DIP Lenders, the Senior DIP Agent, the Junior DIP Lenders, the Purchaser, and the Committee during the past two months is in the best interests of the Debtors' creditors, and in particular, for the Holders of Allowed General Unsecured Claims (Class 5).

**Q.     Negotiations Resulting in Insurance Settlement Agreement and Funding of Tort Claims Trust.**

In the ordinary course of business, the Debtors maintained general liability insurance. Most recently, the Debtors obtained insurance from the Underwriters for the period February 1,

---

[9] As defined in the Plan, "**Excluded Assets**" means those assets of the Debtors not sold and conveyed to the Purchaser pursuant to the Asset Purchase Agreement or not conveyed to the Tort Claims Trust as Trust Assets.

2020 through June 30, 2024. Several of the municipalities who issued permits or licenses for the Debtors to operate are additional insureds or co-insureds under the Debtors' policies of insurance. In certain locations, the Debtors are also required to indemnify and hold the municipalities harmless from any claims or causes of action regarding the rental or use of the Debtors' vehicles.

Furthermore, the terms of use between Bird and/or Spin and its riders provide that any disputes arising from the rental or use of the Debtors' vehicles are to be adjudicated by arbitration. Moreover, the terms of use also obligates riders to indemnify and hold Bird and/or Spin harmless for any claim or disputes arising from a rider's use or rental of Bird or Spin micromobility vehicles.

Presently, the Debtors assert that they have the following insurance coverage available:

| Policy Year | Policy Name | SIR | Total Pending Cases | Pending PI Cases | Pending City Cases | Limits Remaining (approximate) |
|---|---|---|---|---|---|---|
| 3/1/2018-2/28/2019 | Great American | N/A | 39 | 39 | 0 | $2.8M |
| 3/1/2019-1/31/2020 | AIG | N/A | 37 | 29 | 8 | $1M |
| 2/1/2020-5/31/2021 | Underwriters | $250K | 38 | 21 | 17 | $10M |
| 6/1/2021-5/31/2022 | Underwriters | $250K | 46 | 28 | 18 | $10M |
| 6/1/2022-7/31/2023 | Underwriters | $500K | 25 | 17 | 8 | $10M |
| 8/1/2023-6/30/2024 | Underwriters | $1M | 2 | 1 | 1 | $10M |

The Debtors' insurance policies require the Debtors to meet certain obligations, including self-insured retention obligations, as a condition of Underwriters' obligation to honor or pay claims. During the most recent policy period, the Debtors' self-insured retention obligation is $1 million per claim (the "**SIR Obligations**"). Underwriters asserts that they are not obligated to honor or pay any claim until such time as the Debtors satisfy all obligations under the policies, including their SIR Obligations. The Debtors dispute this position. Additionally, disputes have arisen between the Municipalities, the Debtors and the Purchaser regarding the extent of the Municipalities' right to indemnification under applicable permits.

Following extensive, arm's length, good faith negotiations, Underwriters, the Debtors and the Purchaser reached an agreement that is memorialized in the Insurance Settlement Agreement which provides, among other things, for: (1) Underwriters and the Purchaser to contribute $10 million to fund the Tort Claims Trust, (2) all Tort Claims to be channeled to the Tort Claims Trust, and (3) the adjudication or reconciliation of Tort Claims though an efficient, arbitration proceeding that is intended to facilitate a prompt distribution from the Tort Claims Trust to the Holders of Tort

Claims.  The Insurance Settlement Agreement, which is <u>Exhibit 1</u> to the Plan, is an integral part of the Plan.[10]

**V.**

**THE CHAPTER 11 PLAN**

**A.**     **Treatment of Claims and Equity Interests Under the Plan.**

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT "1"**.

The Claims against the Debtors are divided into Classes according to their seniority and other criteria.  The Classes of Claims for each of the Debtors and the funds and other property to be distributed under the Plan are described more fully below.

THE DEBTORS BELIEVE THAT THE PLAN AFFORDS CREDITORS THE POTENTIAL FOR THE GREATEST REALIZATION OF THE VALUE OF THE DEBTORS' ASSETS.

(i)     Administrative Expense Claims.

Except as provided in Sections A(iv), F(ii) and F(iii), below with respect to the treatment of Professional Compensation Claims, the Senior DIP Deficiency Claim and the Additional DIP Funding Claim, each Holder of an Allowed Administrative Expense Claim shall receive on account of the Allowed Administrative Expense Claim and in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Expense Claim, Cash equal to the unpaid portion of such Allowed Administrative Expense Claim, as soon as practicable upon the earlier to occur of the Effective Date or ten (10) Business Days after the entry of a Final Order allowing such Administrative Expense Claim; *provided, however,* that Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases assumed by the Purchaser in accordance with the Asset Purchase Agreement shall be paid by the Purchaser in the ordinary course of business in accordance with the terms and conditions of any agreement or course of dealing relating thereto. Administrative Expense Claims must be filed on or before the Administrative Expense Claims Bar Date[11] or shall be forever barred, waived and released.  Administrative Expense Claims are Unimpaired.

---

[10] On April 18, 2024, the Court will consider a motion filed by the Debtors seeking establishment of a deadline by which the Holders of Tort Claims must file a proof of claim and approving the form and manner of notice of the Tort Claims Bar Date [ECF No. 540].

[11] On April 18, 2024, the Court will consider a motion filed by the Debtors seeking establishment of a deadline by which applications (other than filed by Epiq Corporate Restructuring, LLC) seeking administrative expense status must be filed (the "**Admin. Exp. Claim Bar Date Motion**") [ECF No. 521], that is, a deadline that is twenty-eight (28) days after the Bankruptcy Court enters on its docket an Order granting the Admin. Exp. Claim Bar Date Motion.

-26-

(ii)     Superpriority Administrative Expense Claims under the Final DIP Financing Order.

Except as provided in Section 3.2(b) and 3.2(c) in the Plan with respect to the Senior DIP Deficiency Claim and the Additional DIP Funding Claim, all Claims of the DIP Lenders under the Final DIP Financing Order were satisfied and released as of the Closing.

(iii)     Cure Claims.

Pursuant to the Asset Purchase Agreement, Cure Claims are an obligation of the Purchaser and have been or shall be paid by the Purchaser and not the Debtors.

(iv)     Professional Compensation Claims.

On or prior to the deadline set by the Bankruptcy Court for Professionals to file final fee applications, each Professional shall file with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Confirmation Hearing; excluding, however, Cassel Salpeter & Co., LLC, the Debtors' investment bankers, whose compensation was approved in the Sale Order and paid by the Debtors at Closing and, therefore, is not required to file a final application for compensation.  The Debtors shall pay the Allowed Professional Compensation Claims of each Professional up to the amounts in the Professional Funded Reserve Account in accordance with the Orders of the Bankruptcy Court and the Global Settlement Term Sheet.  From and after the Confirmation Date until the Effective Date, the Debtors, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, shall pay the reasonable fees and necessary and documented expenses of the Professionals during such period, up to the amount in the Professional Funded Reserve Account; provided, however, that any Excess Professional Fee Claims may be paid from proceeds of Excluded Assets in accordance with the Distribution Waterfall.

(v)     Priority Tax Claims.

To the extent not previously paid or expressly assumed by the Purchaser pursuant to the Asset Purchase Agreement and/or the Global Settlement Term Sheet, the Debtors or the Liquidating Trustee, as applicable, shall pay each holder of an Allowed Priority Tax Claim, in satisfaction of such Allowed Priority Tax Claim, the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the later of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law; *provided, however*, that the Debtors shall not pay any premium, interest or penalty in connection with such Allowed Priority Tax Claim.

(vi)     Statutory Fees.

Notwithstanding any other provisions of the Plan to the contrary, the Debtors shall pay the U.S. Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), within fifteen (15) days of the entry of the Plan Confirmation Order, for pre-confirmation periods and simultaneously file all the Monthly Operating Reports for the relevant periods, indicating the disbursements for the relevant period.

-27-

In addition, the Liquidating Trustee shall pay the U.S. Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), based upon all post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), based upon all post-confirmation disbursements made by the Liquidating Trustee until the earlier of the closing any Chapter 11 Case by the issuance of a Final Decree by the Bankruptcy Court, or upon the entry of an Order by the Bankruptcy Court dismissing any Chapter 11 Case or converting any Chapter 11 Case to another chapter under the United States Bankruptcy Code.  The Liquidating Trustee shall provide to the U.S. Trustee upon the payment of each post-confirmation payment, and concurrently filed with the Court, consolidated, Post-Confirmation Quarterly Operating reports indicating all the combined disbursements for the relevant period.

Notwithstanding anything in the Plan or the Plan Confirmation Order to the contrary, no statutory fees shall be assessed or be payable on any Distributions made by the Tort Claims Trustee after the Effective Date, including Distributions to the holders of Tort Claims.

## B.      Classification of Claims and Equity Interests.

(i)      Summary.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Expense Claims and Priority Tax Claims, as described in Section A(i) and A(v), above, respectively.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and Distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

(ii)      Formation of Debtor Groups for Convenience Only.

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, tabulating votes, and making Distributions with respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of any Debtor's business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, constitute a substantive consolidation of any of the Debtors, or cause the transfer of any assets.  Except as otherwise provided by or permitted under the Plan, all Debtors continue to exist as separate legal entities.

Holders of Allowed Claims or Allowed Interests may assert such Claims against or Interests in the Debtors obligated with respect to such Claims or Interest, and such Claims and Interests shall be entitled to share in the recovery provided for the applicable Claim against or Interest in the Debtors based upon the full Allowed amount of such Claims or Interests. Notwithstanding the foregoing, the holder of such a Claim or Interest that asserts such Claim against or Interest in more than one Debtor shall be entitled only to a single Distribution on account of such Claim or Interest.

-28-

(iii)    Summary of Classification.

The Plan designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are: (i) Impaired or Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests.  All of the potential Classes for the Debtors are set forth in the Plan and in the table in Section I(C), above.

(iv)    Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of, as applicable, the Debtors, the Liquidating Trustee, or the Trustee of the Tort Claims Trust in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

(v)    Elimination of Vacant Classes.

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.  Any Claim or Interest in a Class that is considered vacant under the Plan shall receive no distribution.

**C.    Voting Classes; Presumed Acceptance by Non-Voting Classes.**

If a Class contains Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

**D.    Voting Classes; Acceptance and Rejection.**

(i)    <u>Acceptance by Certain Impaired Classes</u>.  Only Holders of Allowed Claims in Classes 2, 3, 4, 5, 6 and 7 are entitled to vote to accept or reject the Plan.  An Impaired Class of Claims shall have accepted the Plan if (i) the Holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  Holders of Claims in Classes 2, 3, 4, 5, 6 and 7 will receive ballots containing detailed voting instructions.

(ii)    <u>Deemed Accepted by Impaired Class</u>.  Holders of Claims in Class 1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such Holders are not entitled to vote, and the votes of such Holders will not be solicited with respect to those Claims.

(iii)    <u>Deemed Rejection by Impaired Class</u>.  Holders of Claims or Interests in Class 8 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to those Claims.

**E.    Confirmation Pursuant to Section 1129(a)(1) and 1129(b) of the Bankruptcy Code.**

In the event that any Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority required by section 1129(a) of the Bankruptcy Code, the Debtors reserve the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief, or (b) alter, amend or modify the Plan in accordance with Article XV, § 15.1 of the Plan.  The Debtors shall exercise the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

**F.    Treatment of Claims and Equity Interests.**

(i)    <u>Other Priority Claims (Class 1)</u>.  Except to the extent that a holder of an Allowed Other Priority Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable classification and treatment, each Holder of an Allowed Other Priority Claim shall receive the full unpaid amount of such Allowed Other Priority Claim in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date such Allowed Other Priority Claim becomes Allowed or as soon as practicable thereafter, and (iii) the date such Allowed Other Priority Claim is payable under applicable non-bankruptcy law; *provided, however*, that the Debtors shall not pay any premium, interest or penalty in connection with such Allowed Other Priority Claim. Distributions to the Holders of Allowed Claim 1 Claim shall be made from the Priority Claims Reserve.

(ii)    <u>Senior DIP Deficiency Claim (Class 2)</u>. Senior DIP Deficiency Claim is deemed allowed in the amount of reasonably documented unreimbursed fees and expenses not to exceed $1,000,000.  The Holder of the Senior DIP Deficiency Claim shall provide such documentation to the Liquidating Trustee within 30 days of the Effective Date.  Subject to and in accordance with the Distribution Waterfall, after payment of the Excess Professional Fee Claims and the Additional DIP Funding Claim, the Holder of the Allowed Senior DIP Deficiency Claim shall receive fifty percent (50%) of the Talon Proceeds, if any, until the Allowed Senior DIP Deficiency Claim is paid in full.  The foregoing Distributions shall be made on the Effective Date or as soon as practicable thereafter.  Notwithstanding anything in the Final DIP Financing Order to the contrary, as of the Effective Date the Holder of the Senior DIP Deficiency Claim shall not receive or retain any other property under the Plan.

(iii)    <u>Additional DIP Funding Claim (Class 3)</u>.  The Class 3 Additional DIP Funding Claim is deemed Allowed in the amount of $2,220,000.  Subject to and in accordance with the Distribution Waterfall, the Holder of the Allowed Additional DIP Funding Claim shall receive a Pro Rata share of the proceeds, if any, of the

-30-

Liquidating Trust Assets (net of expenses) until such time as the Allowed Additional DIP Funding Claim plus interest as set forth herein is paid in full. The foregoing distributions shall be made on the Effective Date or as soon as practicable thereafter.

(iv)    <u>Miscellaneous Secured Claims (Class 4)</u>. The Liens securing each Class 4 Claim are junior and subordinate to the Liens and Claims of the Prepetition First Lien Parties, the Prepetition Second Lien Parties, the Senior DIP Parties, the Junior DIP Parties and the Junior DIP Agent. Accordingly, each Allowed Class 4 Claim is deemed unsecured and will be treated as a Class 5 General Unsecured Claim.

(v)    <u>General Unsecured Claims (Class 5)</u>. Except to the extent that a holder of an Allowed General Unsecured Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable classification or treatment of such claim, each holder of an Allowed General Unsecured Claim shall receive subject to and in accordance with the Distribution Waterfall (x) fifty percent (50%) of the Talon Proceeds, if any, until the Allowed Senior DIP Deficiency Claim is paid in full, then one hundred percent (100%) of any additional Talon Proceeds, plus (y) its Pro Rata share of the proceeds of remaining Liquidating Trust Assets (net of expenses) other than Talon Proceeds. The foregoing distributions shall be made on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date such General Unsecured Claim becomes Allowed or as soon as practicable thereafter, and (iii) the date such Allowed General Unsecured Claim is payable under applicable non-bankruptcy law; *provided, however*, that neither the Debtors nor the Liquidating Trustee shall pay any premium, interest or penalty in connection with such Allowed General Unsecured Claim.

(vi)    <u>Tort Claims (Class 6)</u>.   The Plan establishes the Tort Claims Trust for the benefit of Holders of Allowed Tort Claims, which claims are and shall be channeled to the Tort Claims Trust pursuant to Section 13.6 of the Plan. Each holder of a Tort Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its claim against the Debtors or any of the Released Parties, a Distribution of the Tort Claims Trust Assets by the Tort Claims Trustee, in accordance with the Plan, the Tort Claims Trust Agreement and the Tort Claim ADR Procedures. In no event shall a holder of a Tort Claim be entitled to any other or further recovery from or against any of the Debtors or the Insurance Settlement Released Parties or any of their property or assets.

(vii)    <u>Subordinated Claims (Class 7)</u>. Except to the extent that a holder of a Subordinated Claim agrees to a less favorable classification and treatment, each holder of a Subordinated Claim shall receive its Pro Rata share of the net proceeds of Excluded Assets, if any, remaining <u>after</u> the making of the payments set forth in Article II and Article III, Section 3.2(a) through 3.2(e) of the Plan, inclusive. Distributions to Holders of Claims in Class 7 shall be made only after Claims in Classes 1 through 6 of the Plan, inclusive, have been paid in full.

(viii)    <u>Equity Interests (Class 8)</u>. The Holders of Equity Interest shall not receive nor retain any property under the Plan.  Class 8 Equity Interests shall be extinguished as of the Effective Date of the Plan.

**G.    Means for Implementation of the Plan.**

(i)    Joint Chapter 11 Plan.

The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor.  In consideration for the classification, Distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action and controversies resolved pursuant to the Plan.  The entry of the Plan Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests is fair, equitable and is within the range of reasonableness.  Distributions made to Holders of Allowed Claims are intended to be indefeasible.

(ii)    Means for Implementation of Plan and Source of Funding for Distributions.

The Plan will be implemented through receipt of (a) the Plan Cash which shall be used by the Liquidating Trustee to begin the administration of the Plan; (b) the Priority Claims Reserve which shall be used to make Distributions to the holders of Allowed Priority Claims; (c) the remaining Additional DIP Funding; (d) proceeds of the Talon Claim and Excluded Assets which shall be used to make Distributions to the Holders of Allowed Claims in Classes 2, 3, 4, 5 and 7, as provided in the Plan; and (e) proceeds of the Insurance Settlement Agreement which shall be used to fund the Tort Claims Trust for the benefit of Holders of Allowed Claims in Class 6.

(iii)    Corporate of Action.

All actions contemplated to be performed by the Debtors pursuant to the Plan, or any corporate action to be taken by or required of the Debtors, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the shareholders, partners, members or managers of the Debtors.  All Persons, the Liquidating Trustee, Governmental Units, title agencies, licensing agencies and offices of recordation may rely upon the authority vested in the Debtors' officers, or managers to act on the Debtors' behalf in order to effectuate the Plan and the transactions contemplated herein.

(iv)    Post-Effective Date Governance of the Debtors.

Effective as of immediately prior to the Effective Date, automatically and without further action, each existing member of the board of managers or directors of the Debtors, as applicable, will be deemed to have resigned or will be deemed to have been terminated. Each Debtor shall be deemed to have issued one share or one member interest, as applicable, to be held nominally by the Liquidating Trustee for purposes of administering the Plan.

-32-

On and after the Effective Date, (a) the Liquidating Trustee, in substitution for the management and the board of managers of the Debtors, shall be authorized and empowered, without action of the Debtors' respective members, or boards of managers, or managers (if any), to take any and all such actions as the Liquidating Trustee may determine are necessary or appropriate in the Liquidating Trustee's business judgment to implement, effectuate, consummate and perform any and all actions, documents, or transactions contemplated by the Plan or the Plan Confirmation Order as reasonably required to implement the Plan and the wind up the Debtors subject to the terms of the Plan, and (b) the Liquidating Trustee shall act for the Debtors in the same fiduciary capacity as applicable to the board of managers or board of directors of the Debtors existing immediately prior to the Effective Date.  Prior to the Effective Date, one or more of the Debtors may provide the Liquidating Trustee with one or more Debtor's Power of Attorney.  On and after the Effective Date, the Liquidating Trustee may elect such additional managers, directors and officers as the Liquidating Trustee deems necessary to implement the Plan and the actions contemplated in the Plan.  The Liquidating Trustee shall also have the sole and exclusive power to act by written consent, including to appoint or remove any directors, managers or officers at any time with or without cause.

(v)    Establishment of Liquidating Trust.

On the Effective Date, the Liquidating Trust shall be established and become effective for the benefit of the Liquidating Trust Beneficiaries.  The powers, authority, responsibilities, and duties of the Liquidating Trust, and the Liquidating Trustee are set forth in and shall be governed by the Plan and the Liquidating Trust Agreement.  The Liquidating Trust Agreement shall provide for the Distribution of the Liquidation Trust Assets to the Liquidating Trust Beneficiaries.  In the event of any conflict between the terms of Article VI of the Plan, and the terms of a Liquidating Trust Agreement as such conflict relates to the establishment of a Liquidating Trust, the terms of Article VI of the Plan shall govern.  The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

(a)    *Purpose of Liquidating Trust.*

The Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and in compliance with Rev. Proc.  94-45, 1994-2 C.B. 684, for, among other purposes, the purpose of (i) receiving and holding the Liquidating Trust Assets; (ii) administering, disputing, objecting to, compromising, or otherwise resolving all Disputed  Claims; (iii) making Distributions to the Liquidating Trust Beneficiaries in accordance with the Plan and the Liquidating Trust Agreement; (iv) maximizing recoveries for the benefit of the Liquidating Trust Beneficiaries, with no objective to continue or engage in the conduct of a trade or business in accordance with Treasury Regulation Section 301.7701-4(d).  The Liquidating Trust shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.  Subject to the DOF Election, the Liquidating Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes within the meaning of sections 671 through 679 of the Tax Code and, to the extent permitted by applicable law, for state and local income tax purposes, with the Liquidating Trust Beneficiaries treated as the sole grantors and owners of the Liquidating

-33-

Trust. To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes). To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes).

Except as otherwise provided in the Plan or the other Plan Documents, pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) and (c) of the Bankruptcy Code, on the Effective Date, all of the Excluded Assets shall vest in the Liquidating Trustee free and clear of all Liens, Claims, charges, or other encumbrances. All privileges with respect to the property of the Estates, including the attorney/client privilege, to which the Debtors are entitled shall automatically vest in, and may be asserted by or waived on behalf of, the Liquidating Trustee.

(b)     *Liquidating Trust Assets.*

The Liquidating Trust shall consist of Liquidating Trust Assets. On the Effective Date, and in accordance with sections 1123 and 1141 of the Bankruptcy Code, all title and interest in all of the Excluded Assets, which constitute all assets of the Debtors that have not been distributed on or prior to the Effective Date, sold and conveyed pursuant to the Sale Transaction, or contributed to the Tort Claims Trust on the Effective Date, shall irrevocably and automatically vest in the Liquidating Trust, free and clear of all liens, Claims, encumbrances and Interests (legal, beneficial or otherwise) for the benefit of the Liquidating Trust Beneficiaries. Upon the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors shall have no interest in or with respect to the Liquidating Trust Assets or Liquidating Trust. Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors and their respective predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust in accordance with this Section. For all U.S. federal income tax purposes, and subject to the DOF Election described in subsection (g), below (and Section 6.6(h) of the Plan), all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms herein as a transfer to the Liquidating Trust Beneficiaries, followed by a transfer of such assets by such Liquidating Trust Beneficiaries to the Liquidating Trust, and the Liquidating Trust Beneficiaries will be treated as the grantors and owners thereof. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, to the maximum extent provided by section 1146(a) of the Bankruptcy Code. In connection with the transfer of such Liquidating Trust Assets, any attorney client privilege, work product privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidating Trust shall vest in the Liquidating Trust and its representatives, and the Debtors and the Liquidating Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The Liquidating Trustee shall agree to accept and hold the Liquidating Trust Assets in the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries, subject to the terms of the Plan and the Liquidating Trust Agreement. The Debtors, the Liquidating Trustee, and

-34-

any party under the control of such parties will execute any documents or other instruments and shall take all other steps as necessary to cause title to the Liquidating Trust Assets to be transferred to the Liquidating Trust.

(c)    *Non-Transferability of Liquidating Trust Interests.*

The Liquidating Trust Interests shall be non-transferable other than if transferred by will, intestate succession or otherwise by operation of law.

(d)    *Administration of Liquidating Trust.*

The Liquidating Trust shall be administered by the Liquidating Trustee pursuant to the Liquidating Trust Agreement and the Plan.  In the event of an inconsistency between the Plan and a Liquidating Trust Agreement as such conflict relates to anything other than the establishment of a Liquidating Trust, the Liquidating Trust Agreement shall control.

(e)    *Liquidating Trustee.*

(1)    Appointment of the Liquidating Trustee.

The Liquidating Trustee shall be selected by the Committee in consultation with the Debtors.  Upon the occurrence of the Effective Date, the Liquidating Trustee shall also be deemed appointed to serve as the trustee and administrator of the Liquidating Trust established pursuant to the Plan and the Liquidating Trust Agreement.  The Liquidating Trustee, subject to the terms and conditions of the Plan and the Liquidating Trust Agreement, shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and the Liquidating Trust Agreement, as applicable.

(2)    Liquidating Trustee as Representative of the Estate.

From and after the Effective Date, the Liquidating Trustee shall act as the exclusive representative of the Estate for all purposes; *excluding, however*, all matters involving the funding and administration of the Tort Claims Trust which shall be administered exclusively by the Tort Claims Trustee in accordance with the Plan and the Tort Claims Trust Documents.  Any successor Liquidating Trustee appointed pursuant to the Liquidating Trust Agreement shall be bound by and comply with the terms of the Plan and the Liquidating Trust Agreement.

(3)    Responsibilities and Authority of the Liquidating Trustee.

The responsibilities and authority of the Liquidating Trustee shall be as set forth in the Liquidating Trust Agreement, and shall include, among others, the following rights and responsibilities, which shall be the exclusive rights and responsibilities of the Liquidating Trustee: (i) preserving and liquidating the Liquidating Trust Assets; (ii) administering and paying taxes for the Liquidating Trust, including, among other things, (A) filing tax returns for the Liquidating Trust, and (B) representing the interest and account of the Liquidating Trust before any taxing

-35-

authority in all matters including, without limitation, any action, suit, proceeding, or audit; (iii) retaining and paying, without the need for retention or fee applications, professionals in connection with the Liquidating Trustee's performance of its duties under the Plan and the Liquidating Trust Agreement; (iv) distributing information statements as required for U.S. federal income tax and other applicable tax purposes to the Liquidating Trust Beneficiaries; (v) filing an application for entry by the Bankruptcy Court of a final decree closing the Chapter 11 Case; (vi) making Distributions to Liquidating Trust Beneficiaries in accordance with the Plan and Liquidating Trust Agreement; (vii) objecting to, reconciling, seeking to subordinate, compromising, defending or prosecuting any Retained Causes of Action, or settling all Claims as set forth in the Plan; (viii) making Distributions to the Liquidating Trust Beneficiaries in accordance with the Plan and Liquidating Trust Agreement; (ix) requesting an expedited determination of taxes, including with respect to any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code; and (x) such other responsibilities as may be vested in the Liquidating Trustee pursuant to the Plan and the Liquidating Trust Agreement, or an order of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of the Plan.

(4)    *Powers of the Liquidating Trustee.*

The Liquidating Trustee shall have the power and authority to perform the acts described in the Liquidating Trust Agreement, in addition to any powers granted by law or conferred to it by any other provision of the Plan, including without limitation any set forth herein, provided however, that enumeration of the following powers shall not be considered in any way to limit or control the power and authority of the Liquidating Trustee to act as specifically authorized by any other provision of the Plan, the Liquidating Trust Agreement, and/or any applicable law, and to act in such manner as the Liquidating Trustee may deem necessary or appropriate to take any act deemed appropriate by the Liquidating Trustee, including, without limitation, to discharge all obligations assumed by the Liquidating Trustee or provided herein and to conserve and protect the Liquidating Trust or to confer on the creditors the benefits intended to be conferred upon them by the Plan.

The powers of the Liquidating Trustee shall be as set forth in the Liquidating Trust Agreement, and shall include, among others, the following: (i) the power to invest funds of the Liquidating Trust (in demand and time deposits, or other temporary, liquid investments, except as otherwise determined to be reasonably necessary to maintain the value of the assets and to further the liquidating purpose of the Liquidating Trust), and withdraw, make Distributions, and pay taxes and other obligations owed by the Liquidating Trust from such funds in accordance with the Plan and the Liquidating Trust Agreement; (ii) the power to engage and compensate, without prior Bankruptcy Court order or approval, employees and professionals to assist the Liquidating Trustee with respect to its responsibilities; or (iii) such other powers as may be vested in or assumed by the Liquidating Trustee pursuant to the Plan, the Liquidating Trust Agreement, or by an order of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of the Plan.

On and after the Effective Date, the Liquidating Trustee shall take commercially reasonable actions as required, consistent with applicable non-bankruptcy law and consistent with the implementation of the Plan, and when appropriate in the discretion of the Liquidating Trustee, to dissolve, liquidate, strike off or take such other similar action with respect to each Debtor (including the cancellation of all Interests in a Debtor pursuant to the Confirmation Order) and complete the winding down of such Debtor as expeditiously as practicable without the necessity

-36-

for any other or further actions to be taken by or on behalf of such Debtor or its shareholders or members, or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate governmental authorities or complying with the laws and procedures governing the winding down of any such Debtor; provided, however, that the foregoing does not limit the Liquidating Trustee's ability to otherwise abandon an Interest in a Debtor.  The Liquidating Trustee may, to the extent required by applicable non-bankruptcy law, maintain a Debtor as a limited liability company or corporation, as applicable, in good standing until such time as all aspects of the Plan pertaining to such Debtor and the winding down of such Debtor is complete.

(5)    *Compensation of the Liquidating Trustee.*

The Liquidating Trustee shall be compensated as set forth in the Liquidating Trust Agreement.  The Liquidating Trustee shall fully comply with the terms, conditions and rights set forth in the Plan and the Liquidating Trust Agreement.  The Liquidating Trustee (and any Liquidating Trustee's retained professionals) shall not be required to file a fee application to receive compensation.

(6)    *Retention and Payment of Professionals.*

The Liquidating Trustee shall have the right, without Bankruptcy Court approval, to retain the services of attorneys, accountants, and other professionals and agents, to assist and advise the Liquidating Trustee in the performance of his, her, or its duties, and to compensate and reimburse expenses of such professionals in accordance with the Liquidating Trust Agreement.  For the avoidance of doubt, the Liquidating Trust can retain any professional currently retained by the Creditors' Committee.

(f)    *Liquidating Trust Expenses.*

The Liquidating Trustee may, in the ordinary course of business and without the necessity for any application to, or approval of, the Bankruptcy Court, pay any accrued but unpaid Liquidating Trust expenses.  All Liquidating Trust expenses shall be charged against and paid from the Liquidating Trust Assets.

(g)    *DOF Election.*

The Liquidating Trust Agreement shall require the Liquidating Trustee to elect to treat that portion of the Liquidating Trust Assets subject to the Disputed Claims as a disputed ownership fund described in Treasury Regulation Section 1.468B-9 (the "DOF Election") unless, as of the Trust Election Date, either all of the Liquidating Trust Assets subject to Disputed Claims have been distributed to the Liquidating Trust Beneficiaries or the percentage of the Liquidating Trust Assets subject to Disputed Claims distributable to each of the Liquidating Trust Beneficiaries has become fixed and determinable.

(h)    *Cash Investments.*

The Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom); *provided*, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or

-37-

under applicable IRS guidelines, rulings or other controlling authorities.

(i)      *No Revesting of Liquidating Trust Assets.*

No Liquidating Trust Asset will revest in any Debtor on or after the date such asset is transferred to the Liquidating Trust, but will vest upon such transfer in the Liquidating Trust to be administered by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement.

(j)      *Distribution of Liquidating Trust Assets.*

The Liquidating Trustee shall distribute to the Liquidating Trust Beneficiaries on account of their Liquidating Trust Interests on a semi-annual basis or with such other frequency as the Liquidating Trustee determines in the exercise of its business judgment, Cash representing its net income plus all net proceeds from the sale of its assets (including any Cash received from the Debtors and treating any permissible investment as Cash for purposes of Section 6.9 of the Plan, less such amounts that may be reasonably necessary to (i) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (ii) pay reasonably incurred or anticipated expenses (including, without limitation, any taxes imposed on or payable by the Debtors or the Liquidating Trust or in respect of the Liquidating Trust Assets), or (iii) satisfy other liabilities incurred or anticipated by such Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement; *provided*, *however*, that such Liquidating Trustee shall not be required to make a Distribution pursuant to Section 6.9 of the Plan if such Liquidating Trustee determines that the expense associated with making the Distribution would likely utilize a substantial portion of the amount to be distributed, thus making the Distribution impracticable. The Liquidating Trustee shall make Distributions from the segregated Liquidating Trust Assets for the benefit of the Holders of Allowed Administrative Expenses in accordance with the Plan or the Liquidating Trust Agreement. Notwithstanding anything herein to the contrary, the Liquidating Trustee shall comply with the Distribution Waterfall in connection with any Distributions to be made hereunder.

(k)      *Liquidating Trust Mechanics.*

(1)      Federal Income Tax Treatment of Liquidating Trust.

The U.S. federal income tax classification of the Liquidating Trust will be determined pursuant to subsection (b) and/or (c) below, as applicable.

(2)      Disputed Claims Resolved Before Trust Election Date.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by such Liquidating Trustee), for all United States federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) shall treat the transfer of Liquidating Trust Assets to a Liquidating Trust as (i) a transfer of Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (ii) the transfer by such beneficiaries to a Liquidating Trust of

-38-

Liquidating Trust Assets in exchange for the related Liquidating Trust Interests. Subject to subsection (l), below (and Section 6.11 of the Plan); (i) the Liquidating Trust is structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" for U.S. federal income tax purposes within the meaning of Sections 671 through 679 of the Tax Code to the Liquidating Trust Beneficiaries, consistent with the terms of the Plan, and the Liquidating Trust Agreement shall provide as such; (ii) Liquidating Trust Beneficiaries shall be treated as the beneficiaries and grantors of the Liquidating Trust; (iii) the sole purpose of the Liquidating Trust shall be the liquidation and Distribution of the Liquidating Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d), including the resolution of Allowed Claims in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business; (iv) all parties (including the Debtor, Liquidating Trust Beneficiaries, and the Liquidating Trustee) shall report consistently with such treatment (including the deemed receipt of the Liquidating Trust Assets, subject to applicable liabilities and obligations, by the Liquidating Trust Beneficiaries, followed by the deemed transfer of such Liquidating Trust Assets to the Liquidating Trust); (v) all parties shall report consistently for federal income tax purposes, and otherwise, with the valuation (as determined pursuant to subsection (l), below (and Section 6.11 of the Plan) of the Liquidating Trust Assets transferred to the Liquidating Trust as determined by the Liquidating Trustee (or its designee); (vi) the Liquidating Trustee shall be responsible for filing returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a); (vii) the Liquidating Trustee shall annually send to each Liquidating Trust Beneficiary a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes; and (viii) all items of income, deductions and credit loss of the Liquidating Trust shall be allocated for federal income tax purposes to the Liquidating Trust Beneficiaries based on their respective interests in the Liquidating Trust, in such manner as the Liquidating Trustee deems reasonable and appropriate. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. For the purpose of this Section (k)(2) (and Section 6.10(b) of the Plan), the terms "party" and "Liquidating Trust Beneficiary" shall not include the United States or any agency or department thereof, or any officer or employee thereof acting in such capacity.

(3)     Disputed Claims Unresolved by Liquidating Trust Election Date.

If all Disputed Claims have not been resolved by the Trust Election Date, then the Liquidating Trustee will elect to treat that portion of the Liquidating Trust Assets subject to the Disputed Claims as a "disputed ownership fund" as described in and governed by Treasury Regulation Section 1.468B-9, and all impacted parties (including the Debtor, and solely to the extent applicable, Liquidating Trust Beneficiaries, and the Liquidating Trustee), solely with respect to the impacted assets, shall report for United States federal, state, and local income tax purposes consistently with such election. The Liquidating Trustee shall file all income tax returns with respect to any income attributable to the disputed ownership fund and shall pay the U.S. federal, state, and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit, or loss allocable thereto. Any taxes imposed on the disputed ownership fund or its assets will be paid out of the assets of the disputed ownership fund (including any assets of the Liquidating Trust allocable to Disputed Claims) and any subsequent Distributions in respect of the allowance or disallowance of such claims will be reduced accordingly. In the event, and to the extent, that any Cash in any disputed ownership

-39-

fund is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of the disputed ownership fund, assets of the disputed ownership fund (including those otherwise distributable) may be sold to pay such taxes. The undisputed portion of the Liquidating Trust Assets will be treated as held in a grantor trust, with deemed Distribution to and contribution from the Liquidating Trust Beneficiaries, as described in the immediately preceding paragraph.

To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes).

(l)      Tax Reporting.

Allocations of Liquidating Trust taxable income among Liquidating Trust Beneficiaries (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims, if such income is otherwise taxable at the Liquidating Trust) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, other than, if applicable, assets allocable to Disputed Claims) to the Holders of Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from a Liquidating Trust. Similarly, taxable loss of a Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating Distribution of the remaining Liquidating Trust Assets. The tax book value of Liquidating Trust Assets for purpose of this paragraph shall equal their fair market value on the date Liquidating Trust Assets are transferred to a Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the Liquidating Trust Assets are transferred to a Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of Liquidating Trust Assets. Such valuation shall be made available from time to time to all parties to the Liquidating Trust (including, without limitation, the Debtors and Liquidating Trust Beneficiaries), to the extent relevant to such parties for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

(m)      Dissolution.

The Liquidating Trustee and Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and a Liquidating Trust Agreement, or (ii) the Liquidating Trustee determines, in its sole discretion, that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit; *provided*, *however*, that in no event shall a Liquidating Trust be dissolved later than three (3) years from the creation of such Liquidating Trust pursuant to Section 6.12 of the Plan unless the Bankruptcy Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to

-40-

exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trustee shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash less than $100.00; *provided that*, if any Distribution is not made pursuant to Section 6.12 of the Plan, such Distribution shall be added to any subsequent Distribution to be made on behalf of such holder's Allowed Claim. If either (i no further Distribution shall be made by the Liquidating Trustee and any surplus Cash shall be donated and distributed to one or more of the following organizations (each of which qualifies as a tax-exempt organization under Section 501(c)(3) of the Tax Code), (a) the Bankruptcy Bar Foundation of the Bankruptcy Bar Association of the Southern District of Florida, or (b) Legal Services of Greater Miami, Inc.

(n)     Post-Effective Date Reporting.

No later than the 20th day of the month following the end of each calendar quarter, the Liquidating Trustee shall File with the Bankruptcy Court and serve on the Office of the United States Trustee quarterly reports summarizing the Post-Confirmation receipts received and disbursements made by the Liquidating Trustee in the prior quarter.

(o)     Effectuating Documents; Further Transactions.

On and after the Effective Date, the Liquidating Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

(p)     Withholding and Reporting Requirements.

(1)     *Withholding Rights*. In connection with the Plan, to the extent applicable, the Liquidating Trustee and/or any party issuing any instrument or making any Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such

-41-

Distribution.  Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, to not make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations, including requiring as a condition to the receipt of a Distribution, the compliance with subsection (p)(2), below (and Section 6.15(b) of the Plan).  The Liquidating Trustee reserves the right to allocate all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.  Additionally, in the case of a non-Cash Distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (a) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (b) pay the withholding tax using its own funds and retain such withheld property.

(2)     *Forms*. Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to the Liquidating Trustee or such other Person designated by the Liquidating Trustee (which entity shall subsequently deliver to the Liquidating Trustee any such forms received) an executed IRS Form W-9 or (if the payee is a foreign Person) the appropriate IRS Form W-8 (including all relevant attachments).  If such request is made by the Liquidating Trustee or such other Person designated by the Liquidating Trustee and the holder fails to comply before the date that is 90 calendar days after the request is made, the amount of such Distribution shall irrevocably revert to the Liquidating Trustee and, the holder shall be forever barred from asserting any right to such Distribution against any Debtors, the Debtors' Estates and the Liquidating Trustee.

(q)     Exemption From Certain Transfer Taxes.

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, (i) the issuance, Distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors, (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, or (iii) any sale by any Debtor consummated post-Confirmation, and any other transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, sales tax, use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local

-42-

government officials or agents to forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

        (r)       Preservation of Retained Causes of Action.

**The Debtors expressly reserve any and all Retained Causes of Action**.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Retained Cause of Action against them as any indication that the Debtors or the Liquidating Trustee will not pursue any and all available Retained Causes of Action against them.**

Except as otherwise provided in the Plan or a Final Order of the Bankruptcy Court, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Retained Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that each Debtor had immediately prior to the Effective Date on behalf of the respective Debtor's Estate or itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Retained Causes of Action against parties with a relationship with the Debtor, other than the Debtor Released Parties and the Released Parties.

On and after the Effective Date, the Liquidating Trustee shall have standing to and may pursue such Retained Causes of Action.

Subject to the Sale Order, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidating Trustee shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent, notice to or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court subject to the terms of the Plan.  Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself.

        (s)       Closing of the Chapter 11 Cases.

After the Chapter 11 Cases of the Debtors have been fully administered, and all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Liquidating Trustee shall promptly seek authority from the Bankruptcy Court to close the Debtors' Chapter 11 Cases in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

(t)        Notice of Effective Date.

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors or the Liquidating Trustee shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

**H.        Tort Claims Trust.**

(i)        Purpose and Funding of the Tort Claims Trust.

(a)        <u>Purpose</u>. The Tort Claims Trust shall be established for the purposes of assuming any and all liability of the Insurance Settlement Released Parties for Tort Claims, which are and shall be channeled exclusively to the Tort Claims Trust pursuant to Section 13.6 of the Plan, receiving the Tort Claim Trust Assets from the Debtors, and distributing the Tort Claims Trust Assets to Holders of Tort Claims pursuant to the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.

(b)        <u>Funding</u>. On the Effective Date, after the payment of fees assessed pursuant to 28 U.S.C. § 1930(a)(6) as provided in Section 2.6 of the Plan, the Debtors shall deliver the Trust Assets plus any interest thereon to the Tort Claims Trustee.

(ii)        Establishment of Tort Claims Trust; Conflict With Plan or Plan Confirmation Order.

(a)        On the Confirmation Date, the Tort Claims Trust shall be established pursuant to the Tort Claims Trust Agreement and the Trust Documents. The Tort Claims Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder. The Debtors is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Tort Claims Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3).

(b)        The Tort Claims Trust Agreement and the Trust Documents are incorporated herein by reference. In the event of any conflict between the Tort Claims Trust Agreement and the Trust Documents, on the one hand, and the Plan or the Plan Confirmation Order, on the other hand, the Tort Claims Trust Agreement and the Trust Documents shall control; *provided, however*, that in the event of any conflict between the Tort Claims Trust Agreement and the Trust Documents, on the one hand, and the Insurance Settlement Agreement or the Plan provisions incorporating and implementing the Insurance Settlement Agreement, on the other hand, the Insurance Settlement Agreement and the Plan provisions incorporating and implementing the Insurance Settlement Agreement shall control.

(iii)    Distributions and Payments from the Tort Claims Trust.

    (a)    General Corpus. The following Distributions and payments will be made from the Tort Claims Trust Assets:

        (1)    <u>Distributions</u>. Distributions on Class 6 Claims as determined by the Tort Claims Trustee in accordance with the Tort Claims Trust Agreement, and the Tort Claim ADR Procedures.

        (2)    <u>Administrative Fees</u>. All fees, costs and expenses of administering the Tort Claims Trust as provided in the Plan and the Tort Claims Trust Agreement including: (i) as reasonably necessary to meet current and estimated future liabilities of the Tort Claims Trust and/or the Tort Claims Trustee and to maintain the value of the Tort Claims Trust Assets; (ii) to pay reasonable administrative expenses (including any taxes imposed on the Tort Claims Trust and any professional fees of the Tort Claims Trustee and his Professionals); (iii) the fees and costs of the Tort Claims Reviewer;  and (iv) to satisfy other liabilities incurred by the Tort Claims Trust in accordance with the Plan or the Tort Claims Trust Agreement.  The fees and costs of the Liquidating Trustee or any Professional of the Liquidating Trustee shall not be paid by the Tort Claims Trust or Tort Claims Trust Assets.

        (3)    <u>Indemnity</u>. The Tort Claims Trust's obligations to defend, indemnify or hold harmless any Person are expressly set out in the Plan and/or the Tort Claims Trust Agreement.

(iv)    <u>Tax Matters; Medicare/Medicaid/SSA Reporting and Set-Asides.</u>

    (a)    The Tort Claims Trust shall not be deemed to be the same legal entity as the Debtors, but only the assignee of certain assets of the Debtors and a representative of the Estate for delineated purposes within the meaning of Section 1123(b)(3) of the Bankruptcy Code. The Tort Claims Trust is expected to be tax exempt. The Tort Claims Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 et seq., as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 et seq., and Florida law and the regulations promulgated thereunder, and shall pay from the Tort Claims Trust Assets all taxes, assessments, and levies upon the Tort Claims Trust, if any.

    (b)    Before making any Distribution of Tort Claims Trust Assets to any Beneficiary of the Tort Claims Trust, the Tort Claims Trustee shall (i) obtain written certification from the Tort Claimant to receive such a Distribution or their counsel that: (a) he or she has complied with reporting, and if necessary established any set-asides, required by applicable federal, state and local laws and regulations regarding settlements with minors and

-45-

Medicare/Medicaid/SSA with respect to such Tort Claimant; (b) the Tort Claimant acknowledges that Medicare's interests in reimbursement for any incurred medical expenses that have been paid by Medicare have either already been satisfied and Medicare has acknowledged such satisfaction or will be satisfied from the Distribution of Tort Claims Trust Assets to the Tort Claimant; (c) satisfaction of Medicare's interests from the Distribution of Tort Claims Trust Assets to the Tort Claimant shall be the sole and exclusive responsibility of each individual Tort Claimant and each individual Tort Claimant agrees to provide proof of such satisfaction to the Tort Claims Trustee upon request; (d) each Tort Claimant agrees that the duties of each Tort Claimant stated in this paragraph are non-delegable and failure to perform such duties shall provide the Insurance Settlement Released Parties with a right to recover any monies paid caused by the failure to satisfy Medicare's interests including any additional expenses incurred and attorney fees; and (e) the Tort Claimant acknowledges and understands that the Settling Insurers, Municipalities are required to report any payment to a Medicare beneficiary in settlement of a claim under a liability insurance policy or self-insurance to Medicare (CMS); and (ii) provide a copy of such certification to the Debtors or Liquidating Trustee, as applicable, and the Settling Insurers.

(v)     Appointment of the Trustee.

The initial Tort Claims Trustee shall be identified in the Plan Supplement. The Tort Claims Trustee shall commence serving as the Tort Claims Trustee on the Effective Date; provided, however, that the Tort Claims Trustee shall be permitted to act in accordance with the terms of the Tort Claims Trust Agreement prior to the Confirmation Date as may be agreed by the Debtors and the Settling Insurers and approved by the Bankruptcy Court.

(vi)    Rights and Responsibilities of Trustee.

Subject to Section H(ii)(b), above (and 7.2(b) of the Plan), the Tort Claims Trustee shall be deemed the Estate's representative in accordance with Section 1123 of the Bankruptcy Code solely to make distributions to the holder of Class 6 Claims in accordance with the Trust Agreement and the Tort Claim ADR Procedures. The Tort Claims Trustee: (1) shall make timely Distributions and not unduly prolong the duration of the Tort Claims Trust; (2) may request an expedited determination of taxes of the Tort Claims Trust under Section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Tort Claims Trust for all taxable periods through the dissolution of the Tort Claims Trust; and (3) may retain professionals, including legal counsel, accountants, financial advisors, auditors, and other agents on behalf of the Tort Claims Trust, and at the Trust's sole expense, as necessary or desirable to carry out the obligations of the Tort Claims Trustee hereunder and under the Tort Claims Trust Agreement.

(vii)   Investment Powers; Permitted Cash Expenditures.

All funds held by the Tort Claims Trust shall be invested in an interest bearing, collateralized bank account that complies with the Guidelines of the U.S. Trustee. The Tort Claims

Trustee may expend the cash of the Tort Claims Trust in accordance with the Plan and the Tort Claims Trust Agreement.

(viii)    Registry of Beneficial Interests.

To evidence the beneficial interest in the Tort Claims Trust of each holder of such an interest, the Tort Claims Trustee shall maintain a registry of beneficiaries.

(ix)    Non-Transferability of Interests.

Any transfer of an interest in the Tort Claims Trust shall not be effective until and unless the Tort Claims Trustee receives written notice of such transfer.

(x)    Termination.

The Tort Claims Trust shall terminate after the liquidation, administration and Distribution of the Tort Claims Trust Assets in accordance with the Tort Claims Trust Agreement and the Tort Claim ADR Procedures and the full performance by the Tort Claims Trustee of all other duties and functions set forth in the Plan or in the Tort Claims Trust Agreement.

(xi)    Immunity; Liability; Indemnification.

(a)    The Liquidating Trustee, the Insurance Settlement Released Parties and the Tort Claims Trustee and any duly designated agent or representative of the Tort Claims Trustee, and any of their respective employees, agents, representatives, or professionals, shall not be liable for the act or omission of any other employee, agent, representative, or professional of the Tort Claims Trustee, except that the Tort Claims Trustee shall be liable for its specific acts or omissions resulting from such Tort Claims Trustee's misconduct, gross negligence, fraud, or breach of the fiduciary duty of loyalty. The Tort Claims Trustee may, in connection with the performance of its functions and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors, and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons. Notwithstanding such authority, the Tort Claims Trustee shall not be under any obligation to consult with its attorneys, accountants, financial advisors, or agents, and its determination not to do so shall not result in the imposition of liability on the Tort Claims Trustee unless such determination is based on the Tort Claims Trustee's recklessness, gross negligence, willful misconduct, or fraud.

(b)    To the fullest extent permitted by applicable law, the Tort Claims Trust shall defend, protect, hold harmless, and indemnify the Insurance Settlement Released Parties from and against any and all claims, demands, judgments, awards, penalties, liens, damages, losses, expenses, costs and fees, and liabilities of any kind arising out of or relating to or in any way involving

-47-

or connected with the Barred Claims, the Tort Claims, the Channeled Claims or the Underwriters Policies.

(c)     No recourse shall ever be had, directly or indirectly, against the Tort Claims Trustee personally, or against any employee, contractor, agent, attorney, accountant or other professional retained in accordance with the terms of the Tort Claims Trust Agreement or the Plan by the Tort Claims Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or Tort Claims Trust Agreement whatsoever executed by the Tort Claims Trustee in implementation of this Tort Claims Trust Agreement or the Plan, or by reason of the creation of any indebtedness by the Tort Claims Trustee under the Plan for any purpose authorized by the Tort Claims Trust Agreement or the Plan, it being expressly understood and agreed that all such liabilities, covenants, and agreements of the Tort Claims Trust whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Tort Claims Trust Assets or such part thereof as shall under the term of any such Tort Claims Trust Agreement be liable therefore or shall be evidence only of a right of payment out of the Tort Claims Trust Assets. Notwithstanding the foregoing, the Tort Claims Trust may be held liable for its recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had directly against the Tort Claims Trustee. The Tort Claims Trust shall not be covered by a bond.

(d)     The Tort Claims Trust shall defend, indemnify and hold harmless, the Tort Claims Trustee, its officers, directors, agents, representatives, and employees to the fullest extent that a corporation or trust organized under the laws of Florida is entitled to indemnify and defend its directors, trustees, officers and employees against any and all liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties hereunder.

(e)     (i)     Additionally, the Debtors or the Liquidating Trustee, as applicable, and each of its respective agents, who was or is a party, or is threatened to be made a party to any threatened or pending judicial, administrative or arbitrative action, by reason of any act or omission of the Tort Claims Trust or Tort Claims Trustee or respective agents, with respect to: (i) the Chapter 11 Cases and any act or omission undertaken by them prior to the commencement thereof, (ii) the assessment or liquidation of any Class 6 Claims, (iii) the administration of the Tort Claims Trust and the implementation of the Tort Claim ADR Procedures, or (iii) any and all activities in connection with the Tort Claims Trust Agreement, shall be indemnified and defended by the Tort Claims Trust, to the fullest extent that a corporation or trust organized under the laws of Florida is from time to time entitled to indemnify and defend its officers, directors, trustees and employees, against reasonable expenses, costs and fees (including

-48-

attorneys' fees and costs), judgments, awards, amounts paid in settlement and liabilities of all kinds incurred by the Debtors or Liquidating Trustee, and their respective professionals, officers, and directors, in connection with or resulting from such action, suit or proceeding, provided such expenditures have been approved by the Tort Claims Trust in advance, such approval not to be unreasonably withheld.

(ii)    Reasonable expenses, costs, and fees (including attorneys' fees and costs) incurred by or on behalf of a Tort Claims Trustee, the Debtors, the Liquidating Trustee, and their respective agents in connection with any action, suit or proceeding, whether civil, administrative, or arbitrative, from which they are entitled to be indemnified by the Tort Claims Trust, shall be paid by the Tort Claims Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of such Tort Claims Trustee, the Debtors, the Liquidating Trustee, and their respective agents, to repay such amount in the event that it shall be determined ultimately by Final Order that such Tort Claims Trustee, the Debtors, the Liquidating Trustee, and their respective professionals, officers and directors is not entitled to be indemnified by the Tort Claims Trust.

(xii)    Treatment of Tort Claims.

(a)    <u>Trust Liability</u>. On the Effective Date, the Tort Claims Trust shall automatically and without further act or deed assume any and all liability of the Debtors and the Insurance Settlement Released Parties for Tort Claims, which are and shall be channeled exclusively to the Tort Claims Trust pursuant to Section Q hereof (and Section 13.6 of the Plan), and upon receipt of the Tort Claims Trust Assets from the Debtors shall have the sole and exclusive responsibility for preserving, managing and distributing the Trust Assets pursuant to the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.

(b)    <u>Distributions to Tort Claimants</u>. Tort Claimants shall receive Distributions from the Tort Claims Trust Assets in the amount(s) and at the time(s) provided for in the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.  Any payment to a Tort Claimant constitutes payment for damages on account of property damage or personal physical injuries or sickness arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended. For the avoidance of doubt, Tort Claimants' recovery on their Class 6 Claims shall be limited to the Distributions they are entitled to, if any, from the Tort Claims Trust Assets in the amount(s) and at the time(s) provided for in the Tort Claims Trust Agreement and the Tort Claim ADR Procedures, and they shall not be entitled to collect personally or otherwise any additional amounts whatsoever on account of their Tort Claims from the Debtors, the Liquidating Estates, Liquidating Trustee, or the Insurance Settlement Released Parties, or from the property or assets of the Liquidating Trustee

-49-

or the Insurance Settlement Released Parties, even if they do not receive a Distribution pursuant to the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.

(c) <u>Dismissal of Pending Litigation</u>. The Tort Claimants shall within ten (10) days of receipt of their respective Distribution from the Tort Claims Trust, file a notice of dismissal with prejudice of all Claims against the Debtors and/or the Insurance Settlement Released Parties, as applicable, in any presently pending lawsuit with each party to bear their own fees and costs. In the event that any Tort Claim asserted against the Debtors or any of the Insurance Settlement Released Parties in any lawsuit currently pending in any state or federal court is not dismissed as and when provided herein, the Tort Claims Trustee, the Liquidating Trustee and/or the Insurance Settlement Released Parties, as applicable, shall be authorized to apply to the applicable court and request that such lawsuit be dismissed, and in connection therewith such court shall be entitled to rely on the Plan and the Plan Confirmation Order in dismissing such lawsuit.

(d) <u>Objections and Litigation After the Effective Date</u>. As of the Effective Date, the Tort Claims shall be analyzed exclusively by the Tort Claims Reviewer pursuant to the Tort Claim ADR Procedures. The Liquidating Trustee, the Settling Insurers and Municipalities shall have no right to object to any Tort Claim or any role in analyzing, assigning relative values to, and allocating Tort Claims Trust Assets to any Tort Claim.

(e) <u>Claim Withdrawal</u>. A Tort Claimant may withdraw his or her Tort Claim at any time on written notice to the Tort Claims Trustee. If withdrawn, (a) the Tort Claim will be withdrawn with prejudice and may not be reasserted, and such Tort Claimant shall still be subject to all of the terms and conditions of the Plan, including without limitation the releases of the Debtors and the Insurance Settlement Released Parties set forth in subsection P hereof (and Section 13.7 of the Plan) and the Channeling Injunction set forth in subsection Q hereof (and Section 13.6 of the Plan); and (b) any reserve maintained by the Tort Claims Trust on account of such Tort Claim shall revert to the Tort Claims Trust as a Tort Claims Trust Asset for Distribution in accordance with the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.

## I. Insurance Settlement Agreement.

(i) **Insurance Settlement Agreement**.

The Insurance Settlement Agreement is incorporated and made part of the Plan as if set forth fully therein. Upon the Plan Confirmation Order becoming a Final Order, the Insurance Settlement Agreement is and shall be fully binding on the Debtors, the Liquidating Trustee, the Insurance Settlement Released Parties, the Tort Claimants, the Tort Claims Trust, the Tort Claims

-50-

Trustee, the Barred Persons, and all other Persons and Entities, along with the successors or assigns of any of the foregoing.

(ii)    **Additional Documentation; Non-Material Modifications.**

From and after the Effective Date, the Tort Claims Trustee, the Settling Insurers, Municipalities, the Purchaser and/or the Tort Claimants, as applicable, shall be authorized to enter into, execute, adopt, deliver, or implement all notes, contracts, security agreements, instruments, releases, and other agreements or documents necessary to effectuate the agreements contained in the Insurance Settlement Agreement without further order of the Bankruptcy Court. Additionally, the Tort Claims Trustee, the Settling Insurers, Municipalities, the Purchaser and the Tort Claimants, as applicable, may make technical or immaterial alterations, amendments, modifications, or supplements to the terms of the Insurance Settlement Agreement. A class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or supplemented under this Section (and Section 8.2 of the Plan), if the proposed alteration, amendment, modification, or supplement does not materially and adversely change the treatment of the Claims within such class. An order of the Bankruptcy Court approving any amendment or modification made pursuant to this Section shall constitute an order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

(iii)    **Conflict.**

Except as expressly provided in the Plan, neither the Plan nor the Plan Confirmation Order shall amend, modify, waive, or alter in any way the Insurance Settlement Agreement or any of the Settling Insurers, Municipalities or Purchaser's rights and/or the Debtors', the Tort Claims Trustee and Liquidating Trustee's obligations thereunder.  In the event of any conflict between the Plan, on the one hand, and the Insurance Settlement Agreement, on the other hand, the Insurance Settlement Agreement shall control.

(iv)    **Motion to Approve Insurance Settlement Agreement, Including Bar Order**.

The Court should approve the Insurance Settlement Agreement with the Settling Insurers and entry of the Bar Order pursuant to Bankruptcy Rule 9019(a), and Sections 105(a) and 1123(b)(3)(A) of the Bankruptcy Code. Bankruptcy Rule 9019(a) provides, in part, that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Bankruptcy Rule 9019(a).  Section 105(a) of the Bankruptcy Code authorizes the Bankruptcy Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). Section 1123(b)(3)(A) of the Bankruptcy Coder provides that a Chapter 11 plan may provide for settlements of any claim or interest belonging to a debtor or bankruptcy estate. 11 U.S.C. § 1123(b)(3)(A).

The Bankruptcy Court should approve the Settlement Agreement because it represents a fair and equitable compromise, falls within the range of reasonableness, and satisfies all the factors set forth in *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990) ("Justice Oaks"). As set forth below, the Settlement Amount will allow the Debtors to make a meaningful distribution to its Tort Claims while also significantly reducing administrative expenses, by providing a mechanism which allows the Debtors to resolve Tort Claims without costly and protracted litigation through trial and potentially the appellate level.  In addition, the Debtors submit that the

-51-

Bar Order is fair and equitable because it satisfies the elements set forth in *Matter of Munford, Inc.*, 97 F.3d 449 (11th Cir. 1996) ("Munford"). In addition, the Bar Order is an essential part of the compromise, and without it, there would be no settlement.

"It has long been the law that approval of a settlement in a bankruptcy proceeding is within the sound discretion of the court and will not be disturbed or modified on appeal unless approval in an abuse of discretion." *In re Litten*, No. 05–34756–BKC–SHF, 2007 WL 2020159, at *1 (Bankr. S.D. Fla. July 5, 2007) (citing *In re Arrow Air, Inc.*, 85 B.R. 886, 890-891 (Bankr. S.D. Fla. 1988)). There is a general policy encouraging settlements and favoring compromises in chapter 11 cases. *In re Bicoastal Corp.*, 164 B.R. 1009, 1016 (Bankr. M.D. Fla. 1993); *see also Florida Trailer and Equip. Co. v. Deal*, 284 F.2d 567, 571 (5th Cir. 1960). The Supreme Court requires that court-approved settlements be "fair and equitable." *See Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

To establish whether a settlement is fair and equitable, courts in the Eleventh Circuit look to a four factor test identified in *Justice Oaks*: (i) the probability of success in litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. 898 F.2d at 1549. It is not required that a bankruptcy court consider all four *Justice Oaks'* factors when approving a proposed settlement. *See, e.g., Chira v. Saal et al. (In re Chira)*, 567 F.3d 1307, 1313 (11th Cir. 2009) (affirming bankruptcy court's approval of settlement agreement where bankruptcy court explicitly evaluated only two of the four *Justice Oaks* factors).

In ruling on a proposed compromise, a court should not substitute its own judgment for that of a trustee or debtor in possession. *See McMasters v. Morgan (In re Morgan)*, No. 11-11241, 2011 WL 3821102, at *1 (11th Cir. Aug. 29, 2011) (affirming bankruptcy court order approving "settlement because it was the Trustee's best business judgment that the settlement be approved"). Nor is the Court's task to determine whether the settlement was the best result that the trustee or debtor-in-possession could have obtained. *See Cosoff v Rodman (In re W.T. Grant)*, 699 F.2d 599, 608, 613 (2d Cir. 1983). Rather, the court should "canvass the issues and see whether the settlement fall[s] below the lowest point in the range of reasonableness." *Id.* at 608. The concept of the "range of reasonableness" has been defined as "a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion ...." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

This Court has the inherent power under the Bankruptcy Code, including Section 105(a), to issue any order necessary or appropriate to carry out the provisions of the Bankruptcy Code, specifically including a litigation bar order. *Munford*, 97 F.3d at 454-55 (finding bankruptcy court had authority under section 105(a) of the Bankruptcy Code to enter order barring claims against certain defendants, and noting that absent entry of the bar order the non-debtor defendant would not have entered into the settlement agreement). The Eleventh Circuit observed that (i) public policy favors settlements; (ii) the cost of litigation can be burdensome on a bankruptcy estate; and (iii) "bar orders play an integral role in facilitating settlements." *Munford*, 97 F.3d at 455; *see also, e.g., In re S&I Investments*, 421 B.R. 569, 583-586 (Bankr. S.D. Fla. 2009) (approving a bar order as part of a settlement with the estate, and noting that "a party may seek a channeling injunction and

-52-

bar order at the time that it requests the court's approval of its proposed settlement agreement.") (citing *Munford, supra*).  Under *Munford*, a bankruptcy court should consider whether the bar order is essential or integral to the proposed settlement, that is, whether the settling party would have entered into the settlement without the benefit of a bar order, and whether the settlement is fair and equitable. 97 F.3d at 455.

Following extensive negotiations, the Debtors and the Insurance Settlement Released Parties, reached a settlement subject to approval by the Bankruptcy Court through the Plan, to resolve any and all disputes regarding the availability and extent to which the Settling Insurers' may be responsible to provide coverage for Tort Claims along with other Insurance Settlement Released Parties.  As consideration for the  settlement of the Debtors' coverage clams, and to buy back the Settling Insurers' Policies, the Settling Insurers and Purchasers have agreed to pay an aggregate sum of $10,000,000.00 to the Tort Claims Trust (to be established pursuant to the Plan and Plan Confirmation Order) and have agreed to waive their rights to receive any distributions on account of their respective claims filed against the Debtors' Estates which are substantial.

Prior to making the decision to settle with the Settling Insurers and the Purchaser, the Debtors considered several alternative strategies for monetizing its insurance assets, including filing a declaratory action to determine Underwriters obligations under the Settling Insurers' Policies or potentially assigning the Settling Insurers' Policies to the Liquidating Trust for post-confirmation coverage litigation. Ultimately, the Debtors determined that the interests of Tort Claimants in this case would be best served by achieving certainty with respect to a very substantial insurance contribution rather than risking the cost, extensive delay, and uncertain outcome of litigation in pursuit of the theoretical possibility of a larger recovery at some point in the distant future which would ultimately be wholly inadequate to address the Tort Claims by virtue of available limits of the Settling Insurers' Policies and for which several of the applicable policy years have previously been exhausted.

Although the Debtors believe they have strong arguments supporting their position on the SIR coverage issues, there exists a split in authority among bankruptcy courts in the Eleventh Circuit and other jurisdictions regarding whether a bankrupt insured's inability to satisfy the SIR requirements under its policies precludes the availability of insurance coverage. The Settling Insurers believe they have compelling arguments and are likely to raise numerous complex legal and factual issues that would need to be resolved before any court could make a decision on whether the Settling Insurers' Policies provide coverage absent satisfaction of the SIRs, the extent of such coverage, and also whether other policy exclusions and exceptions may apply to preclude additional Tort Claims. Even though the Debtors believe they will ultimately prevail, a successful coverage defense asserted by the Settling Insurers could significantly hamper the Debtors' ability to compensate any of its Tort Claimant. Additionally, while protracted litigation would without question result in increased costs, reducing the funds available for distribution to Tort Claimants and all other creditors in these cases, it is unlikely that the result of such litigation would be more favorable than the proposed terms of the Insurance Settlement Agreement.

For these reasons, the Insurance Settlement Agreement is fair and equitable and falls well above the lowest point in the range of reasonableness and, therefore, it should be approved. Underwriters and the Purchaser are contributing $10 million in return for entry of the Bar Order. Under the Insurance Settlement Agreement, Tort Claims are being channeled to the Tort Claims

Trust and will be resolved pursuant to the Tort Claim ADR Procedures. The Bankruptcy Court has denied several motions seeking relief from the automatic stay which sought to liquidate Tort Claims and proceed against available insurance, Section IV(K), above, based, in part, on a global mechanism—now reflected in the Insurance Settlement Agreement—so that all Tort Claims would be treated equally, as opposed to multitude of existing Tort Claimants engaging in the proverbial race to the courthouse in an attempt to secure as much of any available insurance proceeds that might be available, to the detriment of all other similarly situated Tort Claimants. *See Sumy v. Schlossberg,* 777 F.2d 921, 932 (4th Cir. 1985) (noting "bankruptcy law's longstanding principle of equal treatment of similarly situated creditors….").

None of the Insurance Settlement Released Parties would have entered into the Insurance Settlement Agreement absent entry of the Bar Order rendering it essential and integral to the Insurance Settlement Agreement. *See Munford,* 97 F.3d at 455 (after analyzing whether an order was essential and and considering whether it was fair and equitable the court held that, "[b]ut for the bankruptcy court's bar order," the parties "would not have entered into the settlement agreement"); *see also In re Jiangbo Pharm., Inc.*, 520 B.R. 316, 323 (Bankr. S.D. Fla. 2014) ("The evidence before the Court shows that the Bar Order is an integral part of the Amended Settlement without which it would not be consummated."); *In re Rothstein Rosenfeldt Adler, P.A.*, No. 09-34791-BKC-RBR, 2010 WL 3743885 (Bankr. S.D. Fla. 2010).

The Bar Order is also essential or integral because, without it, the Settling Insurers and the Purchaser would not have agreed to fund the Settlement Amount of $10 million to the Debtors' Estates exclusively for the benefit of Tort Claimants to be made available to the Tort Claimants in a manner that treats them equally.  Moreover, the Bar Order is fair and equitable.  The Bar Order advances the longstanding policy of encouraging settlement, and as discussed below, the Insurance Settlement Agreement satisfies all of the enumerated *Justice Oaks* factors as well. The Tort Claims are unquestionably related to the Debtors' Chapter 11 Cases as they involve substantial liabilities and claims that are interrelated with the various insurance coverage issues and disputes that involve, but are not limited to: (i) the determination of liability and the extent of coverage available to satisfy any of the Tort Claims based on the Debtors' obligations arising under the Settling Insurers' Policies which includes exhaustion of the SIR obligation with respect to each Tort Claim; (ii) the exclusions, indemnification, and binding arbitration provisions under the rental agreements which govern the majority of the Tort Claimants' contractual rights with respect to their Tort Claims; and (iii) the contracts and agreements between the Debtors and various municipalities and governmental agencies which require the Debtors to indemnify them against the Tort Claims.  The Insurance Settlement Agreement creates a means whereby Tort Claimants may recover against applicable insurance policies for years where the limits of coverage have already been exhausted and/or could potentially be exhausted to only satisfy a small percentage of Tort Claims.

The claims to be barred are interrelated with the issue of whether insurance coverage will be made available, the goal of every Tort Claimant since the Debtor-Defendants unequivocally lack funds to satisfy the Tort Claimants' Tort Claims. *See United States v. Hartog,* 597 B.R. 673, 681 (S.D. Fla. 2019) (to meet the interrelatedness factor "[t]here must be 'some nexus' between the barred claims and the bankruptcy case.") (citation omitted). The issue of whether an SIR must be met before coverage is provided is complex, that is, it will necessarily include an analysis of three (3) Insurance Policies issued by Underwriters, the SIR applicable to each Tort Claimants' Claim, the Debtor-Defendants' ability, if at all, to satisfy the SIR, and conflicting caselaw in the

-54-

absence of a controlling published Eleventh Circuit decision to guide the Court's analysis. Finally, litigation between the Debtors and Underwriters regarding their respective obligations under the Underwriters' Policies will undoubtedly deplete the Estates' scarce resources. *See Brophy v. Salkin,* 550 B.R. 595, 599-600 (S.D. Fla. 2015) (discussing considerations under *Munford* for approval of litigation bar orders, and concluding that the bankruptcy court did not abuse its discretion in approving a settlement which included a litigation bar order).

Application of the *Justice Oaks* factors, discussed below, further supports approval of the Insurance Settlement Agreement.

(1)    The probability of success in litigation.

The parties have been engaged in extensive settlement negotiations to resolve multiple, complex insurance coverage issues and disputes that have arisen by and between the Settling Insurers and the Debtors including but not limited to whether certain policy exclusions or other provisions apply to bar a large number of Tort Claims, and provisions in the policies that require the Debtors to exhaust the SIRs before any insurance coverage obligations are triggered as well as conflicting bankruptcy provisions that require coverage even in the absence of satisfaction of SIRs. Indeed, the issue of whether an SIR must be exhausted before coverage is provided is complex and there exists conflicting caselaw on the issue in the Eleventh Circuit and nation-wide.

The Underwriters' Policies at issue provide that Debtors are responsible for an SIR that ranges from $250,000 to upwards of $1,000,000 per occurrence for each and every Tort Claim covered under the Settling Insurers' Policies. Since the inception of the Settling Insurers' policies, the Debtors have generally been responsible for their own defense and indemnity costs up to the amount of their self-insured retentions. Underwriters' coverage attaches only when the Debtors have exhausted the required SIR for each occurrence. However, after the Petition Date, a dispute has arisen between the Debtors and the Settling Insurers regarding whether the Debtors can now be relieved of their SIR obligations for a significant aspect of the coverage while requiring the Settling Insurers to provide coverage above the SIR.

The Insurance Settlement Agreement also resolves considerable risk, expense, and delay from the continued defense and litigation of the hundreds of Tort Claims pending in multiple state and federal courts all over the United States. In particular, the Insurance Settlement Agreement prevents a race to the courthouse by all of these Tort Claimants, instead funneling the proceeds of the settlement and sale to a Tort Claim Trust for orderly administration and distribution exclusively to holders of Tort Claims. Further, the Insurance Settlement Agreement disposes of potentially expensive legal disputes with the Settling Insurers surrounding the coverage disputes, SIR obligations, and exhaustion of policy limits.

Finally, litigation by the Debtors and Underwriters will undoubtedly deplete the Estates' scarce resources. *See Brophy v. Salkin,* 550 B.R. 595, 599-600 (S.D. Fla. 2015) (discussing considerations under *Munford* for approval of litigation bar orders, and concluding that the bankruptcy court did not abuse its discretion in approving a settlement which included a litigation bar order).

With respect to the SIR issue, the Debtors and Underwriters disagree on Underwriters' obligations to provide coverage above the SIR absent the exhaustion of the SIR. The Debtors rely on a bankruptcy clause in the Insurance Policies subscribed to by Underwriters to providing that non-payment of an SIR does not relieve Underwriters of the obligation to provide coverage above the SIR. *See, e.g.,* Insurance Policy No. B080120117U23, Self Insured Retention Liability Insurance, Endorsement No. 3 (¶5(d)) ("The insolvency, bankruptcy, receivership or any refusal or inability to pay the [SIR] of you and/or any insurer insuring such [SIR] shall not operate to: … (d) relieve us from the payment of any Bodily Injury or Property Damage or Personal Injury or Advertising Injury Liability under this Policy."); *accord Sturgill, et al. v. Beach at Mason Ltd. P'ship,* No. 1:14-cv-0784 (WOB), 2015 WL 6163787, at *2 (S.D. Ohio Oct. 20, 2015) ("the great weight of authority from other jurisdictions holds under [a similar "bankruptcy" clause], that the insured's failure to pay a SIR does not relieve the insurer of its contractual duties under the policy.") (citing cases, including *In re OES Envtl., Inc.,* 319 B.R. 266, 269 (M.D. Fla. Aug. 3, 2004) and *In re Firearms Import and Export Corp.,* 131 B.R. 1009, 1014 (S.D. Fla. 1991)).  The Debtors believe they would prevail on the issue of whether Underwriters is obligated to provide coverage absent payment of the SIR.

However, Underwriters' legal position is that, under their Insurance Policies, payment of an SIR is a condition precedent before it is required to provide coverage even where a "bankruptcy" clause is present. *See, e.g.,* Insurance Policy No. B080120117U23, Split Self-Insured Retention and Deductible Endorsement ("The Named Insured's bankruptcy, insolvency, inability to pay, failure to pay, or refusal to pay the Retained Limit will not increase our obligations under the policy. In the event there is insurance, whether or not applicable to an 'occurrence', offense, claim or 'suit' within the Retained Limit, the Named Insured will continue to be responsible for the full amount of the Retained Limit *before* the limits of insurance under this policy apply.") (emphasis supplied); *accord State Nat. Ins. Co. v. Lamberti,* 362 F. App'x 76, 78 n.2 (11th Cir. 2010) (unpublished) ("[a]n SIR is similar, but not identical, to a deductible. A deductible is deducted from the overall policy limits, whereas the SIR is not. Also, unlike with a deductible, the insurer is not liable until the insured has paid the whole of its SIR.")).

Underwriters believe they would prevail on the issue of whether there exists an obligation to provide coverage absent satisfaction of the SIR because, according to Underwriters, the specific language present in the Underwriters' Policies is distinguishable from the language present in the cases cited by the Debtors and prevailing Florida law hold that insurance contracts are to be construed according to the plain language of the policies as bargained for by the parties. See e.g. *Auto-Owners Ins. Co. v. Anderson,* 756 So.2d 29, 34 (Fla. 2000).  Underwriters submit that the majority of courts in the Eleventh Circuit and other jurisdictions deciding these issues with the same or similar policy language, as the Settling Insurers' Policies, have concluded that an unexhausted SIR precludes an insurer's obligations under the policy. S*ee Allied World Assurance Co. v. Lee Mem'l Health Sys.*, No., 2019 WL 1970609, at FN3 (M.D. Fla. 2019); *State Nat. Ins. Co. v. White,* No. WL 5024258, (M.D. Fla. 2011), aff'd, 482 F. App'x 434 (11th Cir. 2012) (discussing the duty to reimburse defense costs under a policy subject to a SIR and noting that the SIR did not impose a duty to defend on the insurer). This includes bankruptcy courts as well.  *See In re Apache Prod. Co.*, 311 B.R. 288, 297 (Bankr. M.D. Fla. 2004) (finding that, based on the plain language of the policy, the insured "must exhaust the SIR amount before [the insurer's] obligation to defend arises."). *Id.*; *see also In re Kismet Products, Inc.*, WL 6872750 (Bankr. N.D. Ohio 2007) (applying Ohio law); *Pak-Mor Manuf. Co. v. Royal Surplus Lines Ins. Co.*, 2005 WL

3487723 (W.D. Tex.2005) (applying Texas law); *In re iHeartMedia, Inc.*, No. 18-31274 (Bankr. S.D. Tex. May 28, 2019) (holding that "[A]n SIR policy predicates an insurer's obligation to pay a claim on a prior payment by the policy holder."); *In re Tailored Brands, Inc.*, No. 20- 33900, 2021 WL 2021472 (Bankr. S.D. Tex. 2021) (holding that the debtor was required to exhaust its $500,000 self-insured retention before the policy's coverage took effect).

(2)    The difficulties, if any, to be encountered in the matter of collection.

In terms of the litigation and defense by the Debtors, Underwriters, or any of the other Settlement Insurance Settlement Released Parties, this factor is neutral here as they are all defending Tort Claims, and not asserting them. However, to the extent the Insurance Settlement Agreement and the Bar Order are not approved and either the Settling Insurers or any of the Settlement Released Parties incur any defense costs or liability with respect to the multitude of Tort Claims, it would undoubtedly increase their respective claims filed in these cases against the Debtors' Estates diluting any potential distribution to all creditors in the Debtors' cases.

With regard to the insurance coverage disputes, to the extent the Debtors were ultimately successful in any coverage litigation, historically only a handful of claims have breached the SIR on prior policies (which had a lower SIR), and no claims have breached the SIR under the Policies, going all the way back to 2020.  Therefore, even if Underwriters were deemed to be liable for judgments above the SIR, few Tort Claimants, if any, would recover anything.  Assuming solely for the sake of argument that there are collectible judgments, the Debtors would not be entitled to collect on any of the policy proceeds, rather any remaining funds under the Settling Insurers' Policies would become available to satisfy Tort Claims on a first come - first serve basis, creating a race to the courthouse and in light of the anticipated defense costs. In that regard, the Debtors have also considered the significant benefit of the prompt receipt of the Settlement Amounts from the Settling Insurers and the Purchaser to be critical to the timely settlement of the Tort Claims and believe this provides the best mechanism to treat all Tort Claimants equitably, outweighing the potential recover greater proceeds, which would never be collectible to satisfy the majority of the Tort Claims.

(3)    The complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it.

The Debtors have little doubt that, absent approval of the Insurance Settlement Agreement, and entry of the Bar Order, the Settling Insurers would vigorously contest any challenge to their rights and obligations under the Policies and litigate any alleged duty to provide coverage absent satisfaction  of the Debtors' contractual SIR obligations—funds the Debtors simply do not have— and such litigation would be fact-intensive, time consuming, and expensive for the reasons explained above, precluding an efficient administration of the Debtors' Estates.  Also, the Debtors utilized a London based insurance broker to procure the Policies, meaning that discovery would need to be conducted abroad, adding significant time and expense to any litigation.  Indeed, there exists a meaningful probability that any litigation against Underwriters could result in returns less than the proposed Settlement Amount listed above, net of litigation costs and the time value of money.

-57-

Furthermore, it is necessary to take into account that the continued defense of the hundreds of lawsuits and claims pending simultaneously in different jurisdictions around the United States is inherently complicated. It is also prohibitively expensive and would cost the Debtors millions of dollars in legal fees and expenses. The lingering potential liabilities associated with defending against the Tort Claims is an additional factor also weighs in favor of approval of the Insurance Settlement Agreement.

> (4) The paramount interest of the creditors and a proper deference to their reasonable views in the premises.

Litigation over the Debtors' liability with respect to the Tort Claims would be lengthy, complex, and costly. Even if holders of Tort Claims were ultimately able to establish liability vis-à-vis the Debtors or other Insurance Settlement Released Parties, such a process would: (a) delay—likely by years—money getting to Tort Claimants and (b) materially reduce recoveries due to litigation costs (even if in the form of contingency fees).

Absent approval of the Insurance Settlement Agreement it is likely that numerous Tort Claimants, would continue to seek stay relief to liquidate their Tort Claims in varied forms, which the Debtor-Defendants lack the funds to defend on the merits, and in the event they are successful or receive a default judgment—would likely attempt to proceed against the Settling Insurers' Policies. Even assuming the SIRs could be satisfied or the coverage issues were decided in favor of the Debtors, the applicable policy proceeds would be insufficient to provide coverage to the vast majority of Tort Claimants obtaining inflated judgments by default. Stated differently, the only fair, equitable and efficient manner to deal with the volume and amount of the Tort Claims is to treat them equally as has been provided for in the Insurance Settlement Agreement. It is in the best interests of the Debtors Creditors, generally, and the Tort Claimants, specifically, that the Insurance Settlement Agreement be approved in order to avoid a situation where only a handful of Tort Claims receive insurance proceeds while many others are left with zero chance of recovery.

In that regard, approval of the Insurance Settlement Agreement serves the interests of Tort Claimants, because it facilitates establishment of the Tort Claims Trust exclusively for the payment of Tort Claims and avoids diminution of the funds caused by the defense of claims in the tort system and the application of the SIRs. In addition to such tangible benefits, intangible benefits to Tort Claimants include the avoidance of (i) protracted litigation in the tort system; (ii) uncertainty about the outcome of tort litigation and coverage litigation; (iii) delays in payment inherent in tort litigation; and (iv) loss of privacy.

Finally, the Insurance Settlement Agreement does not provide a release for any co-defendants other than the Insurance Settlement Released Parties—which are again, basically the parties who would be covered under the Insurance Policies being compromised (and who need to be released in order to effectuate the Insurance Settlement Agreement for the reasons discussed herein). Accordingly, nothing prevents any of the Tort Claimants, or counsel representing them, from continuing to pursue, for example, any co-defendants that may otherwise be found liable for their Tort Claims. Tort Claimants are only being enjoined from pursuing claims against the Released Parties and the Settling Insurers. They will be free to pursue other parties that have liability for the Tort Claims. Thus, there are Tort Claimants that will retain the ability to be paid in full just not from the few parties being released in these bankruptcy cases.

-58-

In short, the Insurance Settlement Agreement is fair and equitable, and well above the lowest point in the range of reasonableness. The Debtors' decision to enter into the Insurance Settlement Agreement is one made well within the scope of their business judgment and it should be approved, specifically including entry of the Bar Order.

(v)    **Approval of the Sale of Insurance Policies Free and Clear of All Interests.**

Insurance Settlement Agreement contemplates that the Settling Insurers' Policies will be sold back to them in a free and clear sale under Section 363 of the Bankruptcy Code.

Property of the estate may be sold outside of the ordinary course of business. See 11 U.S.C. § 363(b). "[D]ebtors who wish to utilize § 363(b) to dispose of property of the estate must demonstrate that such disposition has a valid business justification." *240 N. Brand Partners, Ltd. v. Colony GFP Partners, L.P. (In re 240 N. Brand Partners, Ltd.)*, 200 B.R. 653, 659 (B.A.P. 9th Cir. 1996). "In addition to proving that the proposed sale has a valid business justification, the debtor must also show that the sale is proposed in good faith." Id. To sell property of the estate free of all interests, one of the following conditions must be satisfied: (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f).

For all of the reasons stated above, the Debtors have demonstrated that the proposed Insurance Settlement Agreement which includes the sale of the Settling Insurers' Policies has a valid business justification and is being proposed in good faith. The sale resolves the insurance coverage disputes that risk leaving the Tort Claimants with no access to insurance proceeds and no entity providing overarching administration of Claims for the benefit of the Debtors' Tort Claimants. The sale will effectuate the orderly administration of Tort Claims in accordance with the Plan, and ADR Claims Procedures including allowing Tort Claimants to pursue other co-defendant for their Tort Claims where appropriate. The proposed sale was negotiated in good faith at arms-length by sophisticated counsel. The proposed sale is supported by valuable consideration, including the prompt payment of approximately Ten Million ($10,000,000.00) dollars. Moreover, grounds exist to sell the insurance policies free and clear of all interests under 11 U.S.C. §§ 363(f)(1), (2), and (5).

In fact, supplemental injunctions have been upheld in the precise scenario present here: the sale of insurance policies back to insurers pursuant to Sections 363(b) and (f) of the Bankruptcy Code. See, *e.g., In re Roman Catholic Bishop of Stockton*, No. 14-20371, 2017 WL 118013, at 8-9 (Bankr. E.D. Cal. Jan. 10, 2017); *In re Sunland, Inc*., WL 7011747 (Bankr. D.N.M. Dec. 11, 2014). Courts have noted that supplemental injunctions under Section 105(a) are permissible in aid of other provisions of the Code such as Section 363(f). See *In re Roman Catholic Bishop of Stockton*, 2017 WL 118013, I*n re Sunland, Inc*., 2014 WL 7011747.

Applying a business judgment standard, bankruptcy courts have routinely approved insurance policy "buy-backs" (such as the one contemplated under the Insurance Settlement Agreement) under Sections 363(b) and (f) of the Bankruptcy Code. *See, e.g., In re Johns Manville*

*Corp.*, 837 F.2d at 93 (affirming bankruptcy court "authority to approve the settlements and to channel claims arising under the policies to the proceeds of the settlement"); *In re Dow Corning Corp.*, 198 B.R. 214, 222 n.7 (Bankr. E.D. Mich. 1996) (proper test for approval of insurance settlements under either Bankruptcy Rule 9019 or section 363(b) of the Bankruptcy Code is the business judgment standard); *In re Congoleum Corp.*, 627 B.R. 62, 70 (Bankr. D.N.J. 2021); *In re Flintkote Co.*, Bankr. Case No. 04-11300, 2012 Bankr. LEXIS 6006, at *77-84 (Bankr. D. Del. Dec. 21, 2012) (listing orders approving policy buybacks in advance of confirmation of the plan in case involving numerous asbestos claims); *In re CFB Liquidating Corp*., No. 01- 5483 (RLE), 2012 WL 3929289, at *8-14 (Bankr. N.D. Cal. Sep. 7, 2012) (order confirming plan involving insurance buybacks with several insurers in asbestos case); *In re Jensen Farms et al*., No. 12-20982 HRT (Bankr. D. Colo. Oct. 25, 2012) [ECF No. 185] (approving buyback of policy in case involving listeria outbreak and wrongful death suits); *In re Roman Catholic Archbishop of Portland in Oregon*, Bankr. Case No. 304-37154 (ELPL) 1 (Bankr. D. Ore. Feb. 2, 2007) (orders approving policy buybacks in advance of plan by several insurers in case involving numerous sex-abuse claims); *In re Delaco Co*., Bankr. Case No. 04-10899 (Bankr. S.D.N.Y. July 29, 2005 & Aug. 1, 2005) (orders approving policy buybacks in advance of plan by several insurers in case involving numerous product liability suits).

The Debtors' decision to sell the Policies to the Settling Insurers is based upon sound business judgment. The Settlement Amount of $10,000,000.00 is fair and reasonable consideration for the sale of the Settling Insurers' Policies. Also, in light of the uncertainty of coverage liability, as well as the necessary delay and cost of proving liability, settlement is preferable and a better business decision compared to a case-by-case adjudication of each Tort Claims. In the exercise of its business judgment, the Debtors have determined that a sale of the Settling Insurers' Policies within the context of the Insurance Settlement Agreement is in the best interests of the Estates and its creditors, including the Tort Claimants. The proceeds from the sale of the Settling Insurers' Policies will be used exclusively for the payment of the Tort Claims and funding the administration of such Claims.

## J.    Distributions.

### (i)    Manner of Cash Payments Under the Plan.

Any Distribution pursuant to the Plan, to the extent posted in the United States mail, shall be deemed made when deposited by the Liquidating Trustee or Tort Claims Trustee (or their respective agent(s)), as applicable, into the United States mail.  At the option of the Liquidating Trustee or Tort Claims Trustee, as applicable, any Cash payment to be made pursuant to the Plan shall be made by check drawn on a domestic bank, by wire transfer, or by ACH, from a domestic bank, or other method mutually agreed upon by the holder of the Allowed Claim and the Liquidating Trustee or Tort Claims Trustee.  Whenever any Distribution to be made under the Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding governance Business Day, but shall be deemed to have been made on that due date.

(ii)     **Entity Making Distributions.**

Distributions to Holders of Allowed Claims (other than Allowed Tort Claims) shall be made by the Liquidating Trustee.  Distributions to the Holders of Allowed Tort Claims shall be made by the Tort Claims Trustee pursuant to the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.  The Liquidating Trustee shall hold the Disputed Claims Reserve for all Claims (other than Tort Claims) that will receive a distribution under the Plan.  Neither the Liquidating Trustee nor the Tort Claims Trustee shall be required to give any bond or surety or other security for the performance of their duties, unless otherwise ordered by the Bankruptcy Court.

(iii)    **Distribution Dates.**

Distributions to Holders of Claims shall be made as provided in Article II, Article III, Article IV, and Article V of the Plan.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

(iv)     **Record Date for Distributions.**

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date. The Liquidating Trustee or Tort Claims Trustee, as applicable, shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  In making any Distribution with respect to any Claim, the Liquidating Trustee or Tort Claims Trustee, as applicable, shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that was known to the Debtors as of the Record Date.

(v)      **Delivery of Distributions**.

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the Holders of Allowed Claims shall be made by the Liquidating Trustee or Tort Claims Trustee, as applicable, at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim filed by such holder or (b) the last known address of such holder if no proof of Claim is filed or if the Liquidating Trustee or Tort Claims Trustee, as applicable, have not been notified in writing of a change of address.

(vi)     **Undeliverable and Unclaimed Distributions**.

In the event that any Distribution to any holder of an Allowed Claim made by the Liquidating Trustee or Tort Claims Trustee, as applicable, is returned as undeliverable, the Liquidating Trustee or Tort Claims Trustee, as applicable, shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until the Liquidating Trustee or Tort Claims Trustee, as applicable, has

-61-

determined the then current address of such holder; *provided, however*, that all Distributions to Holders of Allowed Claims made by the Liquidating Trustee or Tort Claims Trustee, as applicable, that are unclaimed for a period of ninety (90) days after the date of the first attempted Distribution shall have its, his or her Claim for such undeliverable Distribution deemed satisfied and will be forever barred from asserting any such Claim against the Liquidating Trustee or Tort Claims Trustee, as applicable, or any of their properties. Any Distributions which are undeliverable or have not been negotiated within the time set forth above shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Liquidating Trustee or Tort Claims Trustee, as applicable. The Liquidating Trustee or Tort Claims Trustee, as applicable, shall have no further obligation to make any Distribution to the holder of such Claim on account of such Claim, and any entitlement of any holder of such Claim to any such Distributions shall be extinguished and forever barred.

> (vii)    **Compliance with Tax Requirements**.

The Liquidating Trustee or Tort Claims Trustee, as applicable, may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or Distribution on account of Claims; *provided*, *however*, that the Liquidating Trustee or Tort Claims Trustee, as applicable, shall not make any such withholdings described in this paragraph (other than routine tax withholdings with respect to employee-related claims (if any)) from any payment or Distribution on account of Claims without first filing a notice with the Court (and serving such notice on the holder of the Claim) describing the nature and amount of the proposed withholding and providing the Creditor an opportunity to object. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such Holders of the Claims. The Liquidating Trustee or Tort Claims Trustee, as applicable, shall be authorized to collect such tax information from the Holders of Claims (including social security numbers or other tax identification numbers) as they in their sole discretion deems necessary to effectuate the Plan. In order to receive Distributions under the Plan, all Holders of Claims shall identify themselves to the Liquidating Trustee or Tort Claims Trustee, as applicable, and provide all tax information the Liquidating Trustee or Tort Claims Trustee, as applicable, deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable to each holder). The Liquidating Trustee or Tort Claims Trustee, as applicable, may refuse to make a Distribution to any holder of a Claim that fails to furnish such information within the time period specified by the Liquidating Trustee or Tort Claims Trustee, as applicable, and such Distribution shall be deemed an unclaimed Distribution under the Plan, and, provided further that, if the Liquidating Trustee or Tort Claims Trustee, as applicable, fail to withhold in respect of amounts received or distributable with respect to any such holder and such Debtors are later held liable for the amount of such withholding, such holder shall reimburse the Liquidating Trustee or Tort Claims Trustee, as applicable, for such liability. Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, and (b) no Distributions shall be required to be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Liquidating Trustee or Tort Claims Trustee, as applicable, for the payment and satisfaction of such tax obligations or has, to the Tort Claims Trustee or Liquidating Trustee's, as applicable,  satisfaction, established an exemption therefrom.

(viii)  **No Payments of Fractional Dollars**.

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

(ix)  **Interest on Claims**.

Except as specifically provided for in the Plan or the Plan Confirmation Order or required by the Bankruptcy Code, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest on any Claim accruing on or after the Petition Date.  Interest shall not accrue on any General Unsecured Claim that is a Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim.  Except as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for post-petition interest or similar charges.

(x)  **No Distributions in Excess of Allowed Claim Amounts**.

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of such Claim.

(xi)  **Setoff and Recoupment**.

The Liquidating Trustee may set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that any of the Liquidating Trustee or Tort Claims Trustee, as applicable, or the Estate may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Liquidating Trustee or Tort Claims Trustee, as applicable, or the Estate of any right of setoff or recoupment that any  of them may have against the holder of any Claim.  Any such setoffs or recoupments may be challenged in Bankruptcy Court.  Notwithstanding any provision in the Plan to the contrary, nothing herein shall bar any creditor from asserting its setoff or recoupment rights to the extent permitted under section 553 or any other provision of the Bankruptcy Code; *provided, however*, that such setoff or recoupment rights are or have been timely asserted; *provided further, however*, that all rights of the Liquidating Trustee or Tort Claims Trustee, as applicable, and the Estate with respect thereto are reserved.  A creditor shall be deemed to have timely asserted its setoff or recoupment rights if it has asserted such rights in a timely-filed proof of claim or in any other manner reasonably calculated to give the Debtors or Liquidating Trustee notice thereof.

(xii)  *De Minimis* **Distributions; Charitable Donation**.

Notwithstanding anything to the contrary in the Plan, the Liquidating Trustee or Tort Claims Trustee, as applicable, shall not be required to make a Distribution to any Holder of an Allowed Claim if the dollar amount of the Distribution is less than $10.00 or otherwise so small that the cost of making that Distribution exceeds the dollar amount of such Distribution.  On or

about the time that the final Distribution is made, the Liquidating Trustee or Tort Claims Trustee, as applicable, may make a donation of undistributable funds as defined by Local Rule 3011-1(C)(1), in the reasonable discretion of the Liquidating Trustee or Tort Claims Trustee, as applicable, to one or more of the following organizations (each of which qualifies for not-for-profit status under section 501(c)(3) of the Tax Code) with undistributable funds if, in the reasonable judgment of the Liquidating Trustee or Tort Claims Trustee, as applicable, the cost of calculating and making the final Distribution of the undistributable funds remaining is excessive in relation to the benefits to the or Holders of Claims who would otherwise be entitled to such Distributions: (i) the Bankruptcy Bar Foundation of the Bankruptcy Bar Association of the Southern District of Florida; or (ii) Legal Services of Greater Miami, Inc.

(xiii)    **Withholding from Distributions**.

Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from Distributions pursuant to the Plan.  The Liquidating Trustee or Tort Claims Trustee, as applicable, may withhold from amounts distributable pursuant to the Plan to any Person or Entity any and all amounts, determined in the reasonable discretion of the Liquidating Trustee or Tort Claims Trustee, as applicable, required to be withheld by any law, regulation, rule, ruling, directive, or other governmental requirement.  The Liquidating Trustee or Tort Claims Trustee, as applicable, shall not make any such withholdings described in this paragraph (other than routine tax withholdings with respect to employee-related claims (if any)) from any payment or Distribution on account of Allowed Claims without first filing a notice with the Court (and serving such notice on the Holder of such Allowed Claim) describing the nature and amount of the proposed withholding and providing the Creditor an opportunity to object.

(xiv)    **Distributions in Satisfaction; Allocation**.

Except for the obligations expressly imposed by the Plan and the property and rights expressly retained under the Plan, if any, the Distributions and rights that are provided in the Plan shall be in complete satisfaction and release of all Claims, liabilities in, Liens on, obligations of and Equity Interests in the Debtors and their Estate, whether known or unknown, that arose or existed prior to the Effective Date.  Distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest (if any).

(xv)    **No Distributions on Late-Filed Claims**.

Except as otherwise provided in a Final Order of the Bankruptcy Court, any Claim as to which a proof of Claim was required to be filed and was first filed after the applicable bar date in the Chapter 11 Cases, including, without limitation, the General Bar Date, the Administrative Expense Claims Bar Date, the Tort Claims Bar Date, and any bar date established in the Plan or in the Plan Confirmation Order or other order of the Bankruptcy Court, shall automatically be deemed a late-filed Claim that is disallowed in the Chapter 11 Cases, without the need for (a) any further action by the Liquidating Trustee or Tort Claims or Trustee, as applicable, or (b) an order of the Bankruptcy Court.  Nothing in this paragraph is intended to expand or modify the applicable bar dates or any orders of the Bankruptcy Court relating thereto.

K.      **Procedures for Disputed Claims.**

The provisions in this Section (and Article X of the Plan) shall apply to Disputed Claims in Classes 1 through 5, and Class 7.  The provisions of this Section (and Article X of the Plan) shall not apply to Claims in Class 6, which shall be resolved as provided in the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.

(i)      **Disputed Claims Reserve**.

The Liquidating Trustee will withhold from the property that would otherwise be distributed to Holders of Claims within a given Class an amount sufficient to be distributed on account of Claims that are not Allowed Claims within that Class as of the Effective Date, and shall place such withheld property in a Disputed Claims Reserve, which thereafter will be retained and administered by the Liquidating Trustee, as applicable.

(ii)      **Resolution of Disputed Claims**.

The Liquidating Trustee shall have the right to make and file Objections to Claims in the Bankruptcy Court, provided however that the Purchaser shall have the right to file objections to Priority Claims.  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, all Disputed Claims shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

(iii)      **Objection Deadline**.

All objections to Disputed Claims shall be filed no later than the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing, with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

(iv)      **Estimation of Claims**.

At any time, the Liquidating Trustee may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Liquidating Trustee has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Claim, the Liquidating Trustee may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

(v)     **No Distributions Pending Allowance**.

Notwithstanding any other provision in the Plan, if any portion of a Claim is Disputed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  Upon allowance, a holder of the Allowed Disputed Claim shall receive any Distributions that would have been made up to the date of allowance to such holder under the Plan had the Disputed Claim been allowed on the Effective Date.

(vi)    **Disallowed Claims**.

All Claims held by Persons or Entities against whom or which any of the Debtors or the Liquidating Trustee has commenced an Avoidance Action shall be deemed Disallowed Claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such Disallowed Claims shall not be entitled to vote to accept or reject the Plan. Claims that are deemed Disallowed Claims pursuant to this Section (and Section 10.6 of the Plan) shall be disallowed for all purposes (including for purposes of receiving Distributions) until the Avoidance Action against such Person or Entity has been settled or resolved by Final Order and any sums due to the Debtors or the Liquidating Trustee from such Person or Entity have been paid.

(vii)   **Resolution of Claims**.

On and after the Effective Date and except for objections to Claims filed by the Purchaser, the Liquidating Trustee shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court. Pursuant to section 510 of the Bankruptcy Code, the Liquidating Trustee reserves the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**L.      Executory Contracts and Unexpired Leases.**

(i)     **General Treatment; Rejected if not Previously Assumed**.

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, upon the Effective Date, all executory contracts and unexpired leases that exist between the Debtors and any Person or Entity shall be deemed rejected by the Debtors, except for any executory contract or unexpired lease (i) that has been assumed and assigned to the Purchaser, (ii) has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (iii) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Effective Date, (iv) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (or (v) is a D&O Liability Insurance Policy. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such assumption or rejection pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption or rejection is in the best interests of the Debtors, the Liquidating Trustee, the Estate, and all parties in interest in the Chapter 11 Cases.

-66-

(ii)    **Bar to Claims Arising from Rejection, Termination or Expiration**.

Claims created by the rejection of executory contracts or unexpired leases (including, without limitation, the rejection provided in Section 10.1 of the Plan ("General Treatment; Rejected if not Previously Assumed") or the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date must be filed with the Bankruptcy Court and served on the Liquidating Trustee no later than thirty (30) days after (a) the *date of the entry of any order of the Bankruptcy Court authorizing rejection*, with respect to any executory contract or unexpired lease rejected by the Debtors or otherwise pertaining to such order, or (b) *the Confirmation Date*, with respect to any executory contract or unexpired lease that is deemed rejected pursuant to Section 10.1 of the Plan ("General Treatment; Rejected if not Previously Assumed"). Any rejection claim for which a proof of claim is not filed and served within the time provided herein will be forever barred from assertion and shall not be enforceable against the Debtors, or the Estates, assets, properties, or interests in property, or the Liquidating Trustee, or the Estates, assets, properties, or interests in property. Nothing contained herein shall be deemed an admission by the Debtors that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtors or the Liquidating Trustee of any objections to such Claim if asserted.

(iii)    **Assumption of Executory Contracts and Unexpired Leases**.

(a)    Proof of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed and Assigned. Any and all proofs of claim relating to executory contracts or unexpired leases that have been assumed and assigned in the Chapter 11 Cases will be deemed amended and superseded by the applicable Cure Claim, are assumed by the Purchaser pursuant to the Asset Purchase Agreement and, pursuant to Section 365(k) of the Bankruptcy Code, shall be expunged, stricken and disallowed as against the Debtors, the Estates, the Liquidating Trustee and their respective properties.

(b)    Assumption of D&O Liability Insurance Policies. Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Debtors will be deemed to have assumed all D&O Liability Insurance Policies pursuant to Sections 105 and 365(a) of the Bankruptcy Code. Entry of the Plan Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan or Plan Confirmation Order, confirmation of the Plan will not discharge, release, impair, or otherwise modify any obligations, including but not limited to, indemnity obligations of the insurers under the D&O Liability Insurance Policies assumed by the foregoing assumption of the D&O Liability Insurance Policies, any agreements, documents, and instruments related thereto.

(iv)    **Indemnification and Reimbursement**.

Subject to the occurrence of the Effective Date, all Allowed Claims against the Debtors for indemnification, defense, reimbursement, or limitation of liability of current or former directors,

officers, or employees of the Debtors against any Claims, costs, liabilities or causes of action as provided in the Debtors' operating agreement, bylaws, other organizational documents, or applicable law, shall, to the extent such indemnification, defense, reimbursement, or limitation is owed in connection with one or more events or omissions occurring before the Petition Date, be (i) paid only to the extent of any applicable insurance coverage, and (ii) to the extent a proof of Claim has been timely filed and is Allowed, be treated as Subordinated Claims to the extent such Claims are not covered by any applicable insurance, including deductibles.  Nothing contained in the Plan shall affect the rights of directors, officers or employees under any insurance policy or coverage with respect to such Claims, costs, liabilities or Causes of Action or limit the rights of the Debtors or the Debtors' Estates to object to or otherwise contest or challenge Claims or rights asserted by any current or former officer, director or employee of the Debtors. Any D&O Liability Insurance Policy to which one or more of the Debtors is a party as of the Effective Date, shall be deemed executory and shall be assumed by the Debtors on behalf of the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless any such D&O Liability Insurance Policy was previously assumed and assigned under the Asset Purchase Agreement, was rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court, or is the subject of a motion to reject pending on the Effective Date, and coverage for defense and indemnity under any D&O Liability Insurance Policy shall remain available to all individuals within the definition of "Insured" in such D&O Liability Insurance Policy.

(v)      **Reservation of Rights**.

Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or that the Debtors or the Estates have any liability thereunder. Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, Retained Causes of Action, or other rights of the Debtors, Liquidating Trustee, or the Tort Claims Trustee of the Tort Claims Trust under any executory or non-executory contract or any unexpired or expired lease.  Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

## M.      Conditions Precedent to the Effective Date.

(i)      **Conditions Precedent to the Effective Date.**

The following are conditions precedent to the Effective Date that must be satisfied or waived:

The Court shall have entered the Plan Confirmation Order, in form and substance reasonably acceptable to the Committee, the Settling Insurers and the Purchaser, and the Plan Confirmation Order shall have become a Final Order.

(a)      There shall be no stay or injunction in effect with respect to the Plan Confirmation Order.

(b)     The Plan Documents shall have been duly executed and delivered; *provided, however*, that no party to any document requiring execution or delivery may unreasonably withhold its execution and delivery of such document to prevent this condition precedent from occurring.

(c)     The Plan Cash and the Cash comprising the Priority Claims Reserve shall have been delivered to the Liquidating Trustee, subject in all events to the terms of the Plan.

(d)     The Liquidating Trust Assets and the Tort Claims Trust Assets shall have been delivered to the Liquidating Trustee and the Tort Claims Trustee, respectively.

(ii)    Waiver.

Notwithstanding the foregoing conditions in Article XII of the Plan, the Debtors reserve the right to waive the occurrence of or modify any condition precedent. Any such written waiver of a condition precedent set forth in Section 12.1(b) and (c) of the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date or Confirmation Date (as applicable) shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

**N.      Effect of Confirmation; Indemnification, Release, Injunction and Related Provisions.**
Compromise and Settlement.

Pursuant to section 363 and 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests. The entry of the Plan Confirmation Order shall constitute approval of the Insurance Settlement Agreement and the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromises or settlements are fair, equitable, reasonable and in the best interests of the Debtors, the Estate and Holders of Claims and Equity Interests.

(ii)    Vesting of Assets.

Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, the Excluded Assets shall vest in the Liquidating Trustee free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan or the Plan Confirmation Order.

Except as otherwise provided in the Plan, on the Effective Date, title to the Tort Claims Trust Assets shall vest in the Tort Claims Trust free and clear of all Claims, Liens, encumbrances, charges, and other Interests. On the Effective Date, the Tort Claims Trust shall automatically and without further act or deed assume any and all liability of the Debtors and the Insurance Settlement Released Parties for Tort Claims, which are and shall be channeled exclusively to the Tort Claims

-69-

Trust pursuant to Section Q hereof (and Section 13.6 of the Plan), and upon receipt of the Tort Claims Trust Assets from the Debtors shall have the sole and exclusive responsibility for preserving, managing and distributing the Tort Claims Trust Assets pursuant to the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.

      (iii)    Binding Effect.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the provisions of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Liquidating Trustee, the Trustee, the Tort Claims Trustee, the Released Parties, the Insurance Settlement Released Parties, the Holders of Barred Claims, the Holders of Channeled Claims, and any Holder of a Claim against, or Equity Interest in, the Debtors and each of their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan or received a Distribution under the Plan. For the avoidance of doubt, confirmation of the Plan does not provide the Debtors with a discharge under section 1141 of the Bankruptcy Code because the Debtors and their Estates will be wound down in accordance with the Plan.

      (iv)    Sale Order

Nothing contained in the Plan, the Disclosure Statement, or the Plan Confirmation Order, constitutes or shall be construed to (a) be inconsistent with the terms of the Sale Order or any modification or amendment to the Sale Order; or (b) waive, release, alter, modify or impair the obligations of the Debtors and the Purchaser under the Asset Purchase Agreement, the Transition Services Agreement and the Sale Order.

      (v)    Term of Injunctions or Stays. Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, including any Order entered in the Adversary Proceeding (whether interlocutory or Final), all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

**O.**    **Channeling Injunction.**

      (i)    In furtherance of the Insurance Settlement Agreement:

          (1)    any and all Channeled Claims, are channeled to and shall be paid solely and exclusively from the Tort Claims Trust, which shall assume any and all liability of the Debtors and the Insurance Settlement Released Parties for such Tort Claims; and

          (2)    all Persons or Entities who have held or asserted, hold or assert, or may in the future hold or assert a Channeled Claim against the Debtors or the Insurance Settlement Released Parties are hereby permanently and forever

-70-

barred, estopped, stayed, and enjoined from taking any action, directly or indirectly, or commencing or continuing any suit, action, or other proceeding on, or asserting, enforcing, or attempting to assert or enforce, any Channeled Claim against the Debtors or the Insurance Settlement Released Parties, or any of their property or assets, including without limitation:

(3)     pursuing or seeking to pursue, by any manner or means, any Channeled Claim against the Debtors or the Insurance Settlement Released Parties;

(4)     continuing or commencing, or seeking to continue or commence, by any manner or means, any action or proceeding of any kind with respect to any Channeled Claim against the Debtors or the Insurance Settlement Released Parties, or any of their property or assets;

(5)     enforcing, attaching, collecting or recovering, or seeking to enforce, attach, collect or recover, by any manner or means, any judgment, award, decree, or order with respect to any Channeled Claim against the Debtors or the Insurance Settlement Released Parties, or any of their property or assets;

(6)     creating, perfecting or enforcing, or seeking to create, perfect or enforce, by any manner or means, any lien, claim or encumbrance of any kind with respect to any Channeled Claim against the Debtors or the Insurance Settlement Released Parties, or any of their property or assets; and

(7)     asserting, implementing or effectuating, or seeking to assert, implement or effectuate, by any manner or means, with respect to any Channeled Claim, any right of setoff, recoupment, indemnification, subrogation or other similar right of any kind, against:

(a)     the Debtors or the Insurance Settlement Released Parties;

(b)     any obligation due to any of any of the Debtors or the Insurance Settlement Released Parties; or

(c)     the property or assets of the Debtors or the Insurance Settlement Released Parties.

The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation.  In the event of a violation of the Channeling Injunction, the Debtors or Liquidating Trustee, as applicable, the Tort Claims Trustee, and the Insurance Settlement Released Parties, may seek an order from the Bankruptcy Court enforcing the Channeling Injunction and enjoining such violation and, in connection therewith, may seek an award of costs (including reasonable attorneys' fees and expenses) against the Person or Entity who is found to have violated the Channeling Injunction, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

P.    **Releases.**

(i)    <u>Releases by the Debtors and Estates.</u>

(a)    Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, each of the Debtors and their current and former Affiliates and Representatives and the Estate shall be deemed to have provided a full, complete, unconditional and irrevocable release to the Released Parties (and each such Released Party so released shall be deemed released by the Debtors and their current and former Affiliates and Representatives and the Estates), from any and all Claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that the Debtors would have been legally entitled to assert or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of the Debtors or the Estates, including those in any way related to the Chapter 11 Cases or the Barred Claims, which release shall include any and all Retained Causes of Action, if any, against the Released Parties, or any of them; *provided*, *however*, that nothing in Section 13.7(a)(1) of the Plan shall release or be interpreted as a release of the Purchaser's obligations under the Asset Purchase Agreement, the Global Settlement Term Sheet, the Sale Order or any other documents executed by the Purchaser at the Closing.

(b)    Without limiting in any fashion the releases by the Debtors and the Estates of the Released Parties as provided in Section 13.7(a)(1) of the Plan above, notwithstanding anything contained in the Plan to the contrary and subject only to the Plan Confirmation Order becoming a Final Order, the Debtors and the Estates hereby fully, finally, and completely remise, release, acquit and forever discharge the Insurance Settlement Released Parties from any and all Claims, whether actual or alleged, known or unknown, accrued or unaccrued, existing or potential, or suspected or unsuspected, which release shall include, but shall not be limited to, any and all Tort Claims for coverage under the Underwriters Policies arising out of or relating to or in any way involving the Chapter 11 Cases, the Plan or the Barred Claims, whether for wrongful death, personal injury, emotional distress, property damage, economic loss, environmental damage, remediation or exposure, or any other form of loss, expense, or other benefit covered or potentially covered under the Underwriters Policies. For the avoidance of doubt,

nothing contained herein is intended to release Claims or Causes of Action related to the D&O Liability Underwriters Policies against any former directors and officers and officers who are not Released Parties.

(ii)    <u>Releases by Holders of Claims</u>.  To the fullest extent permitted by applicable law, except as otherwise provided in Section 13.7(b) of the Plan, as of the Effective Date, each Person or Entity, other than the Debtors, who votes to accept the Plan, or is deemed to accept the Plan, or abstains from voting on the Plan, or receives or accepts a Distribution under the Plan or the Tort Claim ADR Proceedings, or receives a release under the Plan, shall be deemed to fully, completely, unconditionally, irrevocably, and forever release the Released Parties of and from any and all Claims and Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors and its current and former Affiliates and Representatives, whether direct, derivative, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise, and which, for the avoidance of doubt, shall include Claims arising out of or relating to the Chapter 11 Cases, the Plan, or the Barred Claims; *provided, however*, that nothing in Section 13.7(b) of the Plan shall release or be interpreted as a release of any of the Released Parties' or Liquidating Trustee's rights or obligations under the Plan (including with respect to Retained Causes of Action) or the Insurance Settlement Agreement; *provided, further, that* the releases set forth in Section 13.7(b) of the Plan shall not release any person or entity from any Retained Causes of Action, or any rights or obligations under the Global Settlement Term Sheet, the Asset Purchase Agreement, the Sale Order, or the Plan or Claims resulting from an act or omission determined by a Final Order of a court of competent jurisdiction to have constituted fraud, willful misconduct or gross negligence, provided that, each such Released Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, its actions or inactions.

(iii)    <u>Release by Trustee</u>. Notwithstanding anything contained in the Plan to the contrary and subject only to the Plan Confirmation Order becoming a Final Order, in consideration of and pursuant to the Insurance Settlement Agreement, the Tort Claims Trustee shall be deemed to fully, completely, unconditionally, irrevocably and forever release the Insurance Settlement Released Parties from any and all Claims and Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the

federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors and its current and former Affiliates and Representatives, whether direct, derivative, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise, and which, for the avoidance of doubt, shall include Tort Claims and any other Claims arising out of or relating to the Chapter 11 Cases or the Plan.

(iv)     Entry of the Plan Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in Section 13.7(d) of the Plan pursuant to Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action released by this Plan; (b) in the best interests of the Debtors and all Holders of Claims; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to the assertion of any Claim or Cause of Action thereby released.

(v)     EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING, WITHOUT LIMITATION, THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542 (WHICH STATES, "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY").

Q.     **Exculpation.**

Notwithstanding anything contained in the Plan the contrary, the Exculpated Parties shall neither have nor incur any liability relating to the Chapter 11 Cases to any Person or Entity for any and all Claims and Causes of Action arising after the Petition Date and through the Effective Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan or distributing property thereunder, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other post-petition act taken or omitted to be taken in connection with the Chapter 11 Cases; *provided*, *however* that the exculpation set forth in Section 13.8 of the Plan shall not exculpate any Person or Entity from Claims resulting from an act or omission determined by a Final Order of the Bankruptcy Court to have constituted fraud, willful misconduct or gross negligence; *provided that*, each such Released Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, its actions or inactions; *provided further*, *however*, nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 4-1.8(h) of the Florida Rules of Professional Conduct. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability. The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.

R.     **Bar Order.**

In furtherance of the Insurance Settlement Agreement, and for good and valuable consideration provided by the Insurance Settlement Released Parties, upon the Plan Confirmation Order becoming a Final Order:

(i)     All Persons and Entities holding a Barred Claim, including without limitation all Barred Persons, shall be permanently and forever barred, estopped, stayed, and enjoined from taking any action, directly or indirectly, or commencing or continuing any suit, action, or other proceeding on, or asserting, enforcing, or attempting to assert or enforce, any Barred Claim against the Insurance Settlement Released Parties, or any of their property or assets, including without limitation:

(a)     pursuing or seeking to pursue, by any manner or means, any Barred Claim against the Insurance Settlement Released Parties;

(1)     continuing or commencing, or seeking to continue or commence, by any manner or means, any action or proceeding of any kind with respect to any Barred Claim against the Insurance Settlement Released Parties, or any of their property or assets;

(2)     enforcing, attaching, collecting or recovering, or seeking to enforce, attach, collect or recover, by any manner or means, any judgment, award, decree, or order with respect to any Barred Claim against the

-75-

Insurance Settlement Released Parties, or any of their property or assets;

(3)     creating, perfecting or enforcing, or seeking to create, perfect or enforce, by any manner or means, any lien, claim or encumbrance of any kind with respect to any Barred Claim against the Insurance Settlement Released Parties, or any of their property or assets; and

(4)     asserting, implementing or effectuating, or seeking to assert, implement or effectuate, by any manner or means, with respect to any Barred Claim, any right of setoff, recoupment, indemnification, subrogation or other similar right of any kind, against:

(1)     the Insurance Settlement Released Parties;

(2)     any obligation due to any of the Insurance Settlement Released Parties; or

(3)     the property or assets of the Insurance Settlement Released Parties.

The Bar Order is an integral part of the Plan and is essential to the Plan's consummation and implementation. Absent the entry of the Bar Order, the Settling Insurers, the Purchaser and Municipalities will not contribute the Insurance Settlement Proceeds or provide the other accommodations agreed to in the Plan. In the event of a violation of the Bar Order, any of the Insurance Settlement Released Parties may seek an order from the Bankruptcy Court enforcing the Bar Order and enjoining such violation and, in connection therewith, may seek an award of costs (including reasonable attorneys' fees and expenses) against the Person or Entity who is found to have violated the Bar Order, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

## S.     Injunction.

Except as otherwise expressly provided for in the Plan, from and after the Effective Date, all Persons and Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, the Liquidating Trustee, the Estates, and their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim or Equity Interest, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or satisfied or to be released or satisfied pursuant to the Plan or the Plan Confirmation Order.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtors, the Liquidating Trustee, the Estate, and their successors and assigns and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to the Plan or the Plan Confirmation Order or (b) such Claims, Equity Interests,

actions or assertions of Liens relate to property that will be distributed pursuant to the Plan or the Plan Confirmation Order.

The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests against the Debtors or any of their assets or properties solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to the Plan or the Plan Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to the Plan or the Plan Confirmation Order.  On the Effective Date, all such Claims against, and Equity Interests in, the Debtors shall be satisfied and released in full.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Persons and Entities are permanently enjoined on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released pursuant to the Plan or Plan Confirmation Order, from:

     (i)     commencing or continuing in any manner any action or other proceeding of any kind against the Debtors, the Liquidating Trustee, the Estates and their successors and assigns and their assets and properties;

     (ii)    enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtors, the Liquidating Trustee, the Estates and their successors and assigns and their assets and properties;

     (iii)   creating, perfecting or enforcing any encumbrance of any kind against the Debtors, the Liquidating Trustee, the Estates and their successors and assigns and their assets and properties; and

     (iv)   commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder).

On and after the Effective Date, all Persons and Entities other than the Liquidating Trustee are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any claim, debt, right, or Retained Cause of Action of the Debtors for which the Liquidating Trustee retains sole and exclusive authority to pursue in accordance with the Plan.

**T.     Release of Liens**.

Except as otherwise provided herein or in any contract, instrument, release or other agreement or document created, or continuing in effect, pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estate distributed under the Plan shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert, as applicable, to the Debtors or Liquidating Trustee.

**U.    Retention of Jurisdiction.**

Notwithstanding the entry of the Plan Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors, the Liquidating Trustee, and the Plan as is legally permissible, including, without limitation, jurisdiction to:

(i)    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim against the Debtors, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of Claims;

(ii)    grant, deny or otherwise resolve any and all applications of Professionals or Persons retained in the Chapter 11 Cases by the Debtors for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(iii)    resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired leases to which a Debtors is party or with respect to which a Debtors may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

(iv)    ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan, including by resolving any disputes regarding, as applicable, the Debtors' or Liquidating Trustee's entitlement to recover assets held by third parties;

(v)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Liquidating Trustee after the Effective Date;

(vi)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

(vii)    resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

(viii)    issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

(ix)    enforce Articles within the Plan;

-78-

(x)     resolve any cases, controversies, suits or disputes with respect to the releases, injunction, channeling injunction, Bar Order and other provisions contained in Article XIII of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions, including, without limitation, awarding attorneys' fees to the Released Parties;

(xi)    enter and implement such orders as necessary or appropriate if the Plan Confirmation Order is modified, stayed, reversed, revoked or vacated;

(xii)   resolve any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Plan Confirmation Order, or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

(xiii)  enter an order and a Final Decree closing the Chapter 11 Cases.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## V.     Miscellaneous Provisions.

(i)     Modification of Plan.

Subject to the limitations contained in the Plan, and the terms and conditions of the Insurance Settlement Agreement, the Debtors reserve the right in there sole discretion, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify the Plan prior to the entry of the Plan Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; *provided, however*, that any pre-Confirmation Date amendments shall not materially or adversely affect the interests, rights or treatment of any Allowed Claims or Equity Interests under the Plan; and after the entry of the Plan Confirmation Order, the Liquidating Trustee may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

(ii)    Revocation of Plan.

Subject to the limitations contained in the Insurance Settlement Agreement, the Debtors reserve the right in their sole discretion to revoke or withdraw the Plan prior to the entry of the Plan Confirmation Order, and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan or if entry of the Plan Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity

-79-

Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

(iii)     Successors and Assigns.

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

(iv)     Governing Law.

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, unless otherwise stated, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without giving effect to the principles of conflict of laws thereof.

(v)     Reservation of Rights.

The Plan shall have no force or effect unless and until the Effective Date occurs.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtors with respect to the Holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

(vi)     Section 1125(e) Good Faith Compliance.

Confirmation of the Plan shall act as a finding by the Court that the Debtors and each of their Representatives have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

(vii)     Further Assurances.

The Debtors, all Holders of Claims receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Plan Confirmation Order.

(viii)     Service of Documents.

Any pleading, notice or other document required herein to be served on or delivered to the Debtors shall be sent by both email and first class, certified U.S. mail, postage prepaid as follows:

> **To the Debtors:**     Christopher Rankin
> Chief Restructuring Officer
> c/o Rankin Partners Inc.
> 18 King St. East, Suite 1400
> Toronto, ON

-80-

M5C 1C4 Canada
chris@rankinpartners.com

**With a copy to:**    Berger Singerman LLP
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
Telephone: 305-755-9500
Attn:   Paul Steven Singerman, Esq.
        singerman@bergersingerman.com
        Jordi Guso, Esq.
        jguso@bergersingerman.com

(ix)    **Filing of Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

(x)    **Bankruptcy Rule 9019 Request; Impact**

The Plan, including the Plan Supplement or other Plan Document, may provide for one or more compromises or settlements. Pursuant to Bankruptcy Rule 9019, the Debtors hereby request approval of all compromises and settlements included in the Plan, and entry of the Plan Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019 and Section 1123(b)(3)(A) of the Bankruptcy Code, of any such compromise or settlement.

**VI.**

**<u>RISK FACTORS IN CONNECTION WITH THE PLAN</u>**

Parties in interest should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

**A.**    **Non-confirmation of the Plan.**

Although the Debtors believe that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion, that modifications of the Plan will not be required for Confirmation, or that such modifications would not necessitate re-solicitation of votes. Finally, there can be no assurances that the Plan will receive sufficient votes for Confirmation. The Bankruptcy Code requires that a chapter 11 plan comply with certain requirements (including, but not limited to, the requirements of section 1129 of the Bankruptcy Code) in order to be confirmed. The Bankruptcy Court may determine that one or more of those requirements is not satisfied with respect to the Plan. If the Bankruptcy Court makes such a determination, the Debtors could be required to restart the solicitation process and (i) seek the approval of a new disclosure statement, (ii) solicit or re-solicit votes from the Holders of Claims or Interests, and/or (iii) seek the confirmation of a newly

-81-

proposed plan. Additionally, should the Plan fail to be approved, confirmed, or consummated, then non-Debtor parties in interest may be in a position to file alternative plans pursuant to section 1121 of the Bankruptcy Code. As such, non-confirmation of the Plan would likely entail significantly greater risk of delay, expense, and uncertainty to the Debtors and their Estates.

**B.      Nonconsensual confirmation.**

In the event that any impaired class of Claims or Interests entitled to vote on a plan of reorganization or liquidation does not accept such plan of reorganization or liquidation, respectively, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one (1) impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

**C.      Claim objections.**

The Debtors may object to a proof of claim filed by or on behalf of a holder of a Claim. The distribution estimates set forth in this Disclosure Statement are not applicable to any holder of any Claim whose Claim is or may be subject to an objection. Any such holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

**D.      Distributions.**

While the Debtors have endeavored to project what they believe are likely distributions, if any, to be made to parties holding Allowed Claims, there can be no certainty that the projections will be accurate and that Holders will receive the distributions described in the Plan.

The projections will necessarily be affected by, among other things: (i) recoveries generated in connection with the liquidation of all of the Debtors' remaining assets; (ii) the outcome of objections to Claims; and (iii) the cost and expenses of such actions and generally administering and winding down the Debtors' Estates.

**E.      Jurisdiction.**

After the Effective Date, the Bankruptcy Court or another court of competent jurisdiction may find that the Bankruptcy Court does not have jurisdiction to enforce certain provisions of the Plan with respect to the non-Debtors.

**F.      Administrative insolvency.**

Section 1129(a)(9)(A) of the Bankruptcy Code states that in order for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim brought under section 507(a)(2) or 507(a)(3) of the Bankruptcy Code (*i.e.*, allowed administrative expense claims) receive cash equal to the full allowed amount of such claim, unless such holder agrees to different treatment. Additionally, section 1129(a)(9)(C) of the Bankruptcy Code states that in order for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim entitled to priority under section 507(a)(8) of the Bankruptcy Code (*i.e.*, allowed priority tax claims), receives on account

of such claim regular installment payments in the allowed amount of the claim within five years after the date of the order for relief, and in a manner that is not less favorable than the most favored nonpriority unsecured claim under such plan, unless the holder of the claim agrees to different treatment. Finally, other priority claims may similarly be required to receive a certain treatment under section 1129(a)(9) of the Bankruptcy Code (such as cash equal to the full allowed amount of such claim). The Debtors presently believe that they have sufficient Cash to pay all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims and/or that they will be able to reach agreements with the Holders of such Claims as to any different treatment of such Claims, as necessary. However, if the Debtors are administratively insolvent, then the Bankruptcy Court may not confirm the Plan and the Bankruptcy Court may convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, either or both of which possible outcomes would likely entail significantly greater risk of delay, expense, and uncertainty to the Debtors and their Estates.

## G.    Debtors have no duty to update.

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

No representations outside the Disclosure Statement are authorized. No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

No legal or tax advice is provided to you by this Disclosure Statement. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or to object to Confirmation of the Plan.

Nothing contained herein or in the Plan shall constitute a representation of the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Interests. Holders of Claims and/or Interests should seek advice from their own independent tax, legal or other professional advisors based on their own individual circumstances.

No reliance should be placed on the fact that any particular litigation claim, including but not limited to Causes of Action or Retained Causes of Action, or a projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Liquidating Trustee may seek to investigate, file, and prosecute Retained Causes of Action and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether

this Disclosure Statement identifies such Retained Causes of Action or objections to such Claims or Interests.

Except as provided in the Plan, the vote by a holder of a Claim for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, Retained Causes of Action, or rights of the Debtors (or any entity, as the case may be) to object to that holder's Claim or Interest, or to recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims, Causes of Action, or Retained Causes of Action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

**H.     Amendment, waiver, modification, or withdrawal of plan.**

Under certain circumstances, the Debtors may, prior to the Confirmation or the substantial consummation of the Plan and subject to the provisions of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 and the Plan, amend the terms of the Plan or waive any conditions thereto, if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the Holders of Claims cannot presently be foreseen, but may include a change in the economic impact of the Plan on some or all of the Classes or a change in the relative rights of such Classes.

The Debtors' advisors have relied upon information provided by the Debtors or by the Debtors' former employees in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

**I.     Non-occurrence or delayed occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date will occur shortly after the Confirmation Date following the satisfaction of any applicable conditions precedent, there can be no assurance as to the precise timing of the Effective Date. If the conditions precedent to the Effective Date, as described in Article XII of the Plan, have not occurred or have otherwise been waived by the date that is ninety (90) calendar days after the entry of the Confirmation Order or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, then, upon filing a notice with the Bankruptcy Court, the Debtors may deem the Plan null and void in all respects. Under such circumstances, no distributions would be made under the Plan, the Debtors and all Holders of Claims and Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to all Claims and Interests would remain unchanged.

**J.     Conversion to Chapter 7.**

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtors, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established

-84-

by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in smaller or no distributions being made to the Debtors' creditors than as provided for in the Plan.

**K.      Dismissal of the Chapter 11 Cases.**

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtors, one or more of the Chapter 11 Cases may be dismissed by order of the Bankruptcy Court.

**L.      Cost of administering the Debtors' Estates.**

Liquidation of the Debtors' remaining assets and the disbursement of the proceeds of such liquidation, as well as the winddown of the Debtors will require certain administrative costs that may vary based on a variety of factors, including many out of the Debtors' control. Such administrative costs cannot be predicted with certainty and may affect recoveries under the Plan.

**VII.**

**<u>PLAN CONFIRMATION AND CONSUMMATION</u>**

**A.      The Confirmation Hearing.**

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan (the "**<u>Confirmation Hearing</u>**"). On, or as promptly as practicable after the filing of the Plan and this Disclosure Statement, the Bankruptcy Court will schedule a hearing to consider whether to conditionally approval of this Disclosure Statement (the "**<u>Disclosure Statement Hearing</u>**"). Prior to the Disclosure Statement Hearing, the Debtors may file a request with the Bankruptcy Court to approve certain aspects of the plan approval process, such as approving the form of ballots which Creditors will use to vote for or against approval of the Plan. If the Bankruptcy Court approves the Disclosure Statement, the Debtors will request, pursuant to the requirements of the Bankruptcy Code and the Bankruptcy Rules, that the Bankruptcy Court schedule the Confirmation Hearing. Notice of the Confirmation Hearing through the order approving the Disclosure Statement (the "**<u>Confirmation Hearing Notice</u>**") will be provided to all known Creditors or, if applicable, their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Pursuant to Bankruptcy Code section 1128(b), any party in interest may object to confirmation of a plan of reorganization or liquidation. Subject to the terms of the Confirmation Hearing Notice, any objection to confirmation of the Plan must otherwise be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Debtor(s), the basis for the objection and the specific grounds of the objection, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon: (1) *the Debtors*, c/o (i) Chief Restructuring Officer, 18 King St. East, Suite 1400, Toronto, Ontario, M5C 1C4 Canada (Attn: Christopher Rankin, chris@rankinpartners.com) and (ii) *bankruptcy counsel for the Debtors*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 (Attn: Paul Steven

-85-

Singerman, Esq. (singerman@bergersingerman.com) and Jordi Guso, Esq. (jguso@bergersingerman.com); (2) *counsel for (i) the Committee,* Fox Rothschild LLP, 321 N. Clark Street, Ste. 1600, Chicago, IL 60654 and One Biscayne Tower, 2 S. Biscayne Blvd., Ste. 2750, Miami, FL 33131 c/o (i) Gordon E. Gouveia, Esq. (Attn: GGouveia@foxrothschild.com), and (ii) Robert F. Elgidely, Esq. (Attn: RElgidely@foxrothschild.com), respectively; (3) *counsel for the Prepetition First Lien Lenders and Senior DIP Lenders,* 1271 Avenue of the Americas, New York, NY 10020 c/o Hugh Murtagh, Esq. (Attn: Hugh.Murtaugh@lw.com); (4) *counsel for the Participating Second Lien Lenders and Junior DIP Lenders,* 100 Southeast Second Street, Ste. 4400, Miami, FL 33131 c/o Paul J. Battista, Esq. (Attn: PBattista@Venable.com); (5) *the Office of the U.S. Trustee*, 51 SW First Avenue, Room 1204, Miami, Florida 33130; and (6) *counsel for Lloyd's of London Syndicates 1969 & 1971*, Markowitz, Ringel, Trusty & Hartog, P.A., 9130 S. Dadeland Blvd., Ste. 1800, Miami, FL 33156 c/o (i) Jerry M. Markowitz, Esq. (Attn: jmarkowitz@mrthlaw.com) and Rachel Rubio, Esq. (rrubio@mrthlaw.com), and (ii) Fields Howell LLP, 9155 S. Dadeland Blvd., Ste. 1012, Miami, FL 33156 c/o Greg Mast, Esq. (Attn: gmast@fieldshowell.com) and Armando Rubio, Esq. (Attn: arubio@fieldshowell.com), and such other parties as the Bankruptcy Court may order, so as to be actually received no later than the objection deadline, date and time designated in the Confirmation Hearing Notice.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan. UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING CONFIRMATION OF THE PLAN.

## B.      Plan Confirmation Requirements Under the Bankruptcy Code.

In order for the Plan to be confirmed, the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and these Chapter 11 Cases. The Bankruptcy Code also requires that: (1) the Plan be accepted by the requisite votes of Creditors except to the extent that confirmation despite dissent is available under Bankruptcy Code section 1129(b); (2) the Plan be feasible (that is, there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan without needing further financial reorganization not contemplated by the Plan); and (3) the Plan is in the "best interests" of all Creditors (that is, Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code). To confirm the Plan, the Bankruptcy Court must find that all of the above conditions are met, unless the applicable provisions of Bankruptcy Code section 1129(b) are employed to confirm the Plan, subject to satisfying certain conditions, over the dissent or deemed rejections of Classes of Claims.

(i)      Best Interests of Creditors.

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (1) accepts a plan or (2) receives or retains under a plan property of a value, as of the effective date of such plan, that is not less than

the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the effective date of such plan.

The Debtors, with the assistance of their professionals, have prepared the Liquidation Analysis attached hereto as **Exhibit "2"**.  The Liquidation Analysis is based upon a hypothetical liquidation in a chapter 7 case.  In preparing the Liquidation Analysis, the Debtors have taken into account the nature, status and underlying value of the Debtors' assets, the ultimate realizable value of such assets, and the extent to which such assets are subject to liens and security interests.  In addition, the Liquidation Analysis also reflects the required time and resources necessary to effectuate an orderly wind down of the Estates.  The Liquidation Analysis provides an estimate of the Cash on hand in the Estates as of the expected Effective Date of the Plan.

Based upon the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 would result in smaller or no distributions being made to Creditors than those provided for in the Plan because of: (a) the likelihood that the remaining assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion; (b) the additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals; and (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation.  In the opinion of the Debtors, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford the Holders of Claims as great a realization potential as afforded to them under the Plan.

Accordingly, the Debtors believe that in a chapter 7 liquidation, Holders of Claims would receive less than such Holders would receive under the Plan.  There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(ii)    Feasibility of the Plan.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan. Pursuant to the Plan, the Liquidating Trustee, if any, shall be vested with the Debtors' remaining assets for liquidating and distributions in accordance with the Plan. Therefore, the Bankruptcy Court's confirmation of the Plan is not likely to be followed by liquidation or the need for any further reorganization.

(iii)    Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, that, except as described below, each class of claims or equity interests that is impaired under a plan, accepts such plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  As a general matter under the Bankruptcy Code, a class is "impaired," unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such claim or equity interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest

-87-

receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in the number of the claims in that class, but for the purpose of considering both the dollar amount and the number, a plan proponent counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated under the Plan), such Class shall be deemed to have voted to accept the Plan.

(iv)    Section 1129(b).

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as: (a) the plan otherwise satisfies the requirements for confirmation; (b) at least one impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class; and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

(v)    No Unfair Discrimination.

The "no unfair discrimination" test requires that the plan not provide for unfair treatment with respect to classes of claims or interests that are of equal priority, but are receiving different treatment under the plan.

(vi)    Fair and Equitable.

The fair and equitable requirement applies to classes of claims of different priority and status, such as secured versus unsecured. A plan satisfies the fair and equitable requirement if no class of claims receives more than 100% of the allowed amount of the claims in such class. Further, if a class of claims is considered a dissenting class, i.e., a Class of Claims that is deemed to reject the Plan because the required majorities in amount and number of votes is not received from the Class (a "**Dissenting Class**"), the following requirements apply:

-88-

(a)    Class of Secured Claims.

Each holder of an impaired secured claim (a) retains its liens on the subject property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim, or (b) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

(b)    Class of Unsecured Creditors.

Either (a) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c)    Class of Equity Interests.

Either (a) each interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock and (ii) the value of the stock, or (b) the holders of interests that are junior to the interests of the dissenting class will not receive any property under the plan.

The Debtors believe the Plan does not "discriminate unfairly" and will satisfy the "fair and equitable" requirement notwithstanding that certain Classes of Claims and Equity Interests are deemed to reject the Plan because no Class that is junior to such Class will receive or retain any property on account of the Claims and Equity Interests in such Class and the Plan does not provide for unfair treatment with respect to Classes of Claims or Equity Interests that are of equal priority.

## VIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe the Plan is in the best interests of their Creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following three alternatives may be available to the Debtors: (a) a liquidation of the Debtors' assets pursuant to chapter 7 of the Bankruptcy Code; (b) an alternative plan of reorganization or liquidation may be proposed and confirmed; or (c) the Debtors' Chapter 11 Cases may be dismissed.

## A.    Chapter 7 Liquidation.

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Debtors' Chapter 11 Cases may be converted to liquidation cases under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed, pursuant to applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that such a liquidation would result in smaller or no distributions being made to the Debtors' Creditors than those provided for in the Plan because: (a) the likelihood that the remaining

-89-

assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion; (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals; and (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation. The Debtors have found that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**B.      Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code.**

If the Plan is not confirmed, the Debtors may propose a different plan, which might involve an alternative means for reorganization or liquidation of the Debtors' assets. However, the Debtors believe that the terms of the Plan provide for an orderly and efficient liquidation of the Debtors' assets and will result in the realization of the most value for Holders of Claims against the Debtors' Estates.

**C.      Dismissal of the Debtors' Chapter 11 Cases.**

Dismissal of the Debtors' Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*. Upon dismissal of the Debtors' Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the various creditors of the Debtors, and possibly resulting in costly and protracted litigation in various jurisdictions. Most significantly, dismissal of the Debtors' Chapter 11 Cases would permit secured creditors to foreclose upon any assets that are subject to their Liens. Dismissal will also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtors. The Debtors believe that these actions could lead ultimately to the liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that dismissal of the Debtors' Chapter 11 Cases is not a preferable alternative to the Plan.

**IX.**

**CERTAIN FEDERAL TAX CONSEQUENCES**

THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.

ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## A.    General.

The following discussion summarizes certain material U.S. federal income tax consequences to the Debtors and Holders entitled to vote on the Plan.  This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "Service").  There can be no assurance that the Service will not take a contrary view, no ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein.  Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to Holders of Claims or the Debtors.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only.  The tax treatment of a Holder may vary depending upon such Holder's particular situation.  This summary does not address all of the tax consequences that may be relevant to a holder, including any alternative minimum tax consequences and does not address the tax consequences to a Holder that has made an agreement to resolve its claim in a manner not explicitly provided for in the Plan.  This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, holders that have a "functional currency" other than the United States dollar and Holders that have acquired Claims in connection with the performance of services.  The following summary assumes that the Claims are held by Holders as "capital assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the holder receives Distributions under the Plan in more than one taxable year; (iii) whether the holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the holder.  Therefore, each holder should consult its tax advisor for information that may be relevant

-91-

to its particular situation and circumstances, and the particular tax consequences to such holder of the transactions contemplated by the Plan.

## X.

## RECOMMENDATION AND CONCLUSION

The Debtors believe the Plan is in the best interests of their Estates, Creditors and other interested parties and urge the Holders of Impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their ballots.

Dated: April 18, 2024

**BIRD GLOBAL, INC.**, *et al.*

**BERGER SINGERMAN LLP**
*Counsel for Debtors and Debtors-in-Possession*
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Tel: (305) 755-9500

By:   */s/ Christopher Rankin*
Name:  Christopher Rankin
Title:    Chief Restructuring Officer

By: */s/ Jordi Guso*
            Paul Steven Singerman, Esq.
            Florida Bar No. 378860
            singerman@bergersingerman.com
            Jordi Guso, Esq.
            Florida Bar No. 0863580
            jguso@bergersingerman.com

-92-

<u>**EXHIBIT "1"**</u>

**DEBTORS' JOINT CHAPTER 11 PLAN OF LIQUIDATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| BIRD GLOBAL, INC., *et al.*,[1] | Case No. 23-20514-CLC |
| Debtors. | (Jointly Administered) |

**DEBTORS' JOINT CHAPTER 11 PLAN OF LIQUIDATION**

**BERGER SINGERMAN, LLP**
Paul Steven Singerman
Florida Bar No. 378860
Jordi Guso
Florida Bar No. 863580
Robin J. Rubens
Florida Bar No. 959413
Clay B. Roberts
Florida Bar No. 116058
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
Telephone: (305) 755-9500
Telecopier: (305)714-4340
Email: singerman@bergersingerman.com
            jguso@bergersingerman.com
            rrubens@bergersingerman.com
            croberts@bergersingerman.com

*Attorneys for Debtors and Debtors-in-Possession*

Dated:  April 18, 2024

---

[1]    The address of the Debtors is 392 Northeast 191st Street, #20388, Miami, FL 33179.  The last four digits of the Debtors' federal tax identification numbers are: (i) Bird Global, Inc. (3155); (ii) Bird Rides, Inc. (9939); (iii) Bird US Holdco, LLC (8390); (iv) Bird US Opco, LLC (6873); and (v) Skinny Labs, Inc. (8176).

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION** .......................... 1

    1.1    Defined Terms ............................................................. 1

    1.2    Rules of Interpretation ........................................ 18

    1.3    Exhibits ...................................................... 19

**ARTICLE II ADMINISTRATIVE, PRIORITY AND UNCLASSIFIED CLAIMS** ........... 19

    2.1    Administrative Claims in General ............................. 19

    2.2    Superpriority Administrative Expense Claims under the Final DIP Financing Order .................................................. 20

    2.3    Cure Claims ................................................ 20

    2.4    Professional Compensation Claims ............................ 20

    2.5    Priority Tax Claims ......................................... 20

    2.6    Statutory Fees ............................................. 20

**ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS** ................................................... 21

    3.1    Summary .................................................. 21

    3.2    Classification and Treatment of Claims and Equity Interests............ 22

**ARTICLE IV ACCEPTANCE, REJECTION, AMENDMENT AND REVOCATION OR WITHDRAWAL OF THE PLAN** ........................ 25

    4.1    Classes Entitled to Vote .................................... 25

    4.2    Acceptance by Class of Claims............................... 25

    4.3    Nonconsensual Confirmation................................ 26

    4.4    Revocation or Withdrawal; No Admissions .................... 26

    4.5    Amendment of Plan Documents ............................. 26

    4.6    Claims Paid and Payable by Third Parties..................... 26

    4.7    Special Provision Governing Unimpaired Claims................ 27

**ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN** ................... 27

    5.1    Joint Chapter 11 Plan....................................... 27

    5.2    Means for Implementation of Plan and Source of Funding for Distributions............................................... 27

    5.3    Corporate Action.......................................... 27

    5.4    Post-Effective Date Governance of the Debtors ................ 28

# TABLE OF CONTENTS
(continued)

**Page**

**ARTICLE VI LIQUIDATING TRUST** ...................................................................... 28

    6.1     Establishment of Liquidating Trust ........................................... 28

    6.2     Purpose of Liquidating Trust ..................................................... 28

    6.3     Liquidating Trust Assets ............................................................ 29

    6.4     Non-Transferability of Liquidating Trust Interests.................... 30

    6.5     Administration of Liquidating Trust........................................... 30

    6.6     Liquidating Trustee.................................................................... 30

    6.7     Cash Investments ...................................................................... 33

    6.8     No Revesting of Liquidating Trust Assets ................................. 33

    6.9     Distribution of Liquidating Trust Assets ................................... 33

    6.10    Liquidating Trust Mechanics .................................................... 34

    6.11    Tax Reporting ........................................................................... 35

    6.12    Dissolution ............................................................................... 36

    6.13    Post-Effective Date Reporting .................................................. 37

    6.14    Effectuating Documents; Further Transactions ................... 37

    6.15    Withholding and Reporting Requirements ........................... 37

    6.16    Exemption From Certain Transfer Taxes ............................. 38

    6.17    Preservation of Retained Causes of Action .......................... 38

    6.18    Closing of the Chapter 11 Cases ............................................. 39

    6.19    Notice of Effective Date ........................................................... 39

**ARTICLE VII TORT CLAIMS TRUST** ................................................................. 39

    7.1     Purpose and Funding of the Tort Claims Trust.......................... 39

    7.2     Establishment of Tort Claims Trust; Conflict With Plan or Plan Confirmation Order................................................................... 40

    7.3     Distributions and Payments from the Tort Claims Trust .......... 40

    7.4     Tax Matters; Medicare/Medicaid/SSA Reporting and Set-Asides ..................... 41

    7.5     Appointment of the Tort Claims Trustee ................................... 41

    7.6     Rights and Responsibilities of Tort Claims Trustee.................. 42

    7.7     Investment Powers; Permitted Cash Expenditures ............... 42

    7.8     Registry of Beneficial Interests................................................ 42

    7.9     Non-Transferability of Interests................................................ 42

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 7.10 | Termination | 42 |
| 7.11 | Immunity; Liability; Indemnification | 42 |
| 7.12 | Treatment of Tort Claims | 44 |

**ARTICLE VIII INSURANCE SETTLEMENT AGREEMENT** ..... 45

| | | |
|---|---|---|
| 8.1 | Insurance Settlement Agreement | 45 |
| 8.2 | Additional Documentation; Non-Material Modifications | 45 |
| 8.3 | Conflict | 46 |

**ARTICLE IX PROVISIONS GOVERNING DISTRIBUTIONS** ..... 46

| | | |
|---|---|---|
| 9.1 | Manner of Cash Payments Under the Plan | 46 |
| 9.2 | Entity Making Distributions | 46 |
| 9.3 | Distribution Dates | 47 |
| 9.4 | Record Date for Distributions | 47 |
| 9.5 | Delivery of Distributions | 47 |
| 9.6 | Undeliverable and Unclaimed Distributions | 47 |
| 9.7 | Compliance with Tax Requirements | 48 |
| 9.8 | No Payments of Fractional Dollars | 48 |
| 9.9 | No Interest on Claims | 49 |
| 9.10 | No Distribution in Excess of Allowed Amount of Claim | 49 |
| 9.11 | Setoff and Recoupment | 49 |
| 9.12 | De Minimis Distributions; Charitable Donation | 49 |
| 9.13 | Intentionally Omitted | 50 |
| 9.14 | Withholding from Distributions | 50 |
| 9.15 | Distributions in Satisfaction; Allocation | 50 |
| 9.16 | No Distributions on Late-Filed Claims | 50 |

**ARTICLE X DISPUTED CLAIMS** ..... 51

| | | |
|---|---|---|
| 10.1 | Disputed Claims Reserve | 51 |
| 10.2 | Resolution of Disputed Claims | 51 |
| 10.3 | Objection Deadline | 51 |
| 10.4 | Estimation of Claims | 51 |
| 10.5 | No Distributions Pending Allowance | 52 |

# TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| 10.6 | Disallowed Claims | 52 |
| 10.7 | Resolution of Claims | 52 |
| **ARTICLE XI** | **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** | 52 |
| 11.1 | General Treatment; Rejected if not Previously Assumed | 52 |
| 11.2 | Bar to Claims Arising from Rejection, Termination or Expiration | 53 |
| 11.3 | Assumption of Executory Contracts and Unexpired Leases | 53 |
| 11.4 | Indemnification and Reimbursement | 54 |
| **ARTICLE XII** | **CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE** | 54 |
| 12.1 | Conditions Precedent to the Effective Date | 54 |
| 12.2 | Waiver | 55 |
| **ARTICLE XIII** | **EFFECT OF CONFIRMATION; INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS** | 55 |
| 13.1 | Compromise and Settlement | 55 |
| 13.2 | Vesting of Assets | 55 |
| 13.3 | Binding Effect | 56 |
| 13.4 | Sale Order | 56 |
| 13.5 | Term of Injunctions or Stays | 56 |
| 13.6 | Channeling Injunction | 56 |
| 13.7 | Releases | 57 |
| 13.8 | Exculpation | 60 |
| 13.9 | Bar Order | 61 |
| 13.10 | Injunction | 62 |
| 13.11 | Release of Liens | 63 |
| **ARTICLE XIV** | **RETENTION OF JURISDICTION** | 63 |
| **ARTICLE XV** | **MISCELLANEOUS PROVISIONS** | 65 |
| 15.1 | Modification of Plan | 65 |
| 15.2 | Revocation of Plan | 65 |
| 15.3 | Successors and Assigns | 65 |
| 15.4 | Governing Law | 65 |

**TABLE OF CONTENTS**
(continued)

**Page**

15.5    Reservation of Rights ...................................................................... 66

15.6    Intentionally Omitted ...................................................................... 66

15.7    Section 1125(e) Good Faith Compliance .......................................... 66

15.8    Further Assurances ......................................................................... 66

15.9    Service of Documents ..................................................................... 66

15.10   Filing of Additional Documents ...................................................... 67

15.11   Intentionally Omitted ...................................................................... 67

15.12   Bankruptcy Rule 9019 Request; Impact .......................................... 67

**EXHIBITS**

Exhibit 1    –    Insurance Settlement Agreement
Exhibit 2    –    Liquidating Trust Agreement

# INTRODUCTION

Bird Global, Inc., Bird Rides, Inc., Bird US Holdco, LLC, Bird US Opco, LLC, and Skinny Labs, Inc., as debtors and debtors-in-possession (the "Debtors") propose this Joint Chapter 11 Plan of Liquidation (including all addenda, exhibits, schedules, and other attachments hereto, as any of the same may be amended from time to time, all of which are incorporated herein by reference, the "Plan") pursuant to the provisions of Chapter 11 of the Bankruptcy Code (as defined in ARTICLE I, § 1.1 herein ("Defined Terms")).

For a discussion of the Debtors' history, business, operations, assets and liabilities, for a summary and analysis of the Plan, risk factors, liquidation analysis, tax implications and alternatives to the Plan, reference should be made to the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Liquidation*, dated April 18, 2024, as such disclosure statement may be amended, modified or supplemented (the "Disclosure Statement").

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3018 AND IN THIS PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

## ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

1.1    Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    **Acquired Assets** means the property described in the Asset Purchase Agreement and acquired by the Purchaser at Closing.

2.    **Additional DIP Funding** means $2,220,000, plus interest, in additional secured, post-petition financing advanced to the Debtors at Closing by the Purchaser as designee of and on behalf of the Junior DIP Lenders, the terms of which are set forth in the Supplemental DIP Loan Order and Global Settlement Term Sheet.

3.    **Additional DIP Funding Claim** means the Claim in the amount of $2,220,000 on account of the Additional DIP Funding, plus interest thereon at the rate of 12% per annum as of the Closing as classified and treated in Section 2.2 of the Plan.

4.    **Additional Insured(s)** means any Person or Entity who qualifies as an additional insured under the terms of the Underwriters' Policies, including but not limited to any Person or Entity the Debtors were required to add as an additional insured under the Policies: (a)

pursuant to written contracts, agreements, regulations, local ordinances and/or terms and conditions in certain permit applications and permits issued by various entities or municipalities; or (b) under any oral or implied agreement where a certificate of insurance was issued showing that Person or Entity as an Additional Insured, all as specified by the Policies. For purposes of the Insurance Settlement Agreement, Additional Insureds include Charleston, SC, Long Beach, CA, Los Angeles, CA, New Port News, VA, Sacramento, CA, Salt Lake City, UT, San Diego, CA, San Francisco, CA, Santa Clara, CA, Santa Monica, CA, Tempe, AZ, Washington, D.C., Orlando, FL, Chicago, IL, Portland, OR, Providence, RI, and St. Louis, IL.

5.      **Additional Insured Claim** means a Claim of an Additional Insured Claimant, any Claim by any Person or Entity against Underwriters that, directly or indirectly, arises from, relates to or is in connection with a Tort Claim, including any such Claim for defense, indemnity, contribution, or similar relief.

6.      **Additional Insured Claimant** means an Additional Insured who has a Claim or may have a Claim or right against the Debtors and/or Underwriters.

7.      **Administrative Expense Claim** means any right to payment for any cost or expense of administration of these Chapter 11 Cases asserted or arising under sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including, any (i) actual and necessary cost or expense of preserving the Debtors' Estate or operating the Debtors' business arising on or after the Petition Date, (ii) cost, indebtedness or contractual obligation duly and validly incurred by the Debtors in the ordinary course of business arising on or after the Petition Date, and (iii) fees or charges assessed against any of the Debtors' Estates under section 1930 of title 28 of the United States Code; *excluding, however*, (i) Superpriority Administrative Expense Claims under the Final DIP Financing Order; (ii) Cure Claims; and, (iii) Professional Compensation Claims which shall be treated as provided in Sections 2.2 through 2.4 of the Plan.

8.      **Administrative Expense Claims Bar Date** means the date set by the Bankruptcy Court as the last day to File all requests for payment of Administrative Expense Claims.

9.      **Adversary Proceeding** means the adversary proceeding styled *Bird Global, Inc., et al. v. Gregory Amundson, et al.*, Case No. 24-01010-CLC pending before the Bankruptcy Court.

10.     **Allowed Claim** means a Claim Allowed in the particular category or Class identified.

11.     **Allowed** means with reference to any Claim (a) any Claim against the Debtors that has been listed in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (b) any Claim listed on the Schedules or included in a timely filed proof of Claim, as to which no objection to allowance has been, or subsequently is, interposed in accordance with Section 10.2 of the Plan or prior to the expiration of such other applicable period of limitation fixed by the Bankruptcy Code, the

Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such Final Order is in favor of the respective holder, or (c) any Claim expressly allowed by a Final Order or pursuant to the terms of the Plan..

12.     **Approved Budget** shall have the meaning set forth in the Final DIP Financing Order.

13.     **Asset Purchase Agreement** means the *Asset Purchase Agreement* dated as of December 22, 2023, between the Debtors and Purchaser as amended from time to time, including by the Global Settlement Term Sheet and the Transition Services Agreement.

14.     **Assets** means all legal or equitable prepetition and postpetition interests of the Debtors in any and all real or personal property of any nature, including any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, accounts, chattel paper, tax refunds, cash, deposit accounts, reserves, deposits, equity interests, contractual rights, intellectual property rights, claims, causes of actions, assumed executory contracts and unexpired leases, other general intangibles, and the proceeds, products, offspring, rents or profits thereof.

15.     **Assigned Contract** means each contract assumed by the Debtors and assigned to the Purchaser pursuant to the terms of the Sale Order and the Asset Purchase Agreement and other orders of the Bankruptcy Court.

16.     **Avoidance Actions** means any and all causes of action which a trustee, debtors-in-possession, the estate or other appropriate party in interest, if appropriate, may assert under sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code (other than those which are released or dismissed as part of and pursuant to the Plan or any previous Order of the Bankruptcy Court).

17.     **Ballot** means the form of approved ballot accompanying the approved Disclosure Statement upon which Holders of Claims entitled to vote on the Plan shall indicate their acceptance or rejection of the Plan in accordance with the instructions regarding voting.

18.     **Bankruptcy Code** means title 11 of the United States Code, as in effect on the Petition Date and as thereafter amended, as applicable in these Chapter 11 Cases.

19.     **Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of Florida (Miami Division) having jurisdiction over these Chapter 11 Cases and, to the extent of any withdrawal of the reference under section 157 of title 28 of the United States Code, the United States District Court for the Southern District of Florida.

20.     **Bankruptcy Rules** means (a) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under section 2075 of title 28 of the United States Code, (b) the Federal Rules of Civil Procedure, as amended and promulgated under section 2072 of title 28 of the United States Code, (c) the Local Rules of the United States Bankruptcy Court for the Southern District of Florida and the guidelines and requirements of the U.S. Trustee, and (d) any standing orders governing practice and procedure issued by the

Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto to the extent applicable to these Chapter 11 Cases or proceedings herein, as the case may be.

21.     **Bar Date** means February 28, 2024, which was established by the Bankruptcy Court as the deadline for filing and serving all proofs of claim (other than with respect to Governmental Unit Claims, Administrative Expense Claims, and Tort Claims) against the Debtors in these Chapter 11 Cases.

22.     **Bar Date for Governmental Unit Claims** means June 17, 2024, which was established by the Bankruptcy Court as the deadline for Governmental Units to file and serve all proofs of claim against the Debtors in these Chapter 11 Cases, including, without limitation, claims for Taxes.

23.     **Bar Order** means the provisions of this Plan, the Insurance Settlement Agreement and the Plan Confirmation Order that shall permanently bar, prohibit, enjoin and restrain the filing, commencing, prosecuting, conducting, asserting or continuing in any manner, directly, indirectly or derivatively all Barred Claims, as more particularly described in ARTICLE XIII, Section 13.9, hereof.

24.     **Barred Claims** means all Claims against the Debtors and/or the Insurance Settlement Released Parties.

25.     **Barred Persons** means all Persons and Entities having Claims against the Debtors and/or any of the Insurance Settlement Released Parties.

26.     **Beneficial Holder** means the Entity holding the beneficial interest in a Claim.

27.     **Bidding Procedures Order** means the *Order Granting Debtors' Expedited Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Entry into the Stalking Horse Bid Agreement with the Stalking Horse Bidder, Subject to the Bidding Procedures and the Sale Hearing, (II) Approving Bidding Procedures, (III) Scheduling the Bid Deadlines and the Auction, (IV) Scheduling a Hearing to Consider the Transaction, (V) Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Procedures, and (VII) Granting Related Relief* entered by the Bankruptcy Court on January 25, 2024 [ECF No. 202].

28.     **Business Day** means any day other than a Saturday, Sunday or a Legal Holiday (as such term is defined in Federal Bankruptcy Rule 9006(a)).

29.     **Cash** means legal tender accepted in the United States of America for the payment of public and private debts, currently denominated in United States Dollars.

30.     **Cause of Action** or **Causes of Action** means, individually or collectively and without limitation, any and all actions, claims, rights, defenses, third-party claims, damages, executions, demands, crossclaims, counterclaims, suits, causes of action, choses in action, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, accounts receivable, notes receivable and claims whatsoever, whether known,

unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly, indirectly or derivatively, at law, in equity or otherwise, accruing to the Debtors, or the Estates, whether sounding in tort or contract, and any and all proceeds of the foregoing.

31.     **Channeled Claims** means any Tort Claim against any of the Debtors and/or any of the Insurance Settlement Released Parties.

32.     **Channeling Injunction** means the injunction imposed pursuant to Section 13.6 of the Plan.

33.     **Chapter 11 Cases** means the chapter 11 cases of the Debtors pending before the Bankruptcy Court, under lead Case No. 23-20514-CLC (Jointly Administered).

34.     **Claim** means (a) an asserted or unasserted right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured; (c) any past, present and future claims, causes of action, obligations, rights, suits, judgments, remedies, interests, actions, liabilities, demands, duties, injuries, damages, liens, interest, expenses, fees, or costs of whatever kind or nature (including attorney's fees and expenses), whether foreseen or unforeseen, known or unknown, asserted or unasserted, contingent or matured, liquidated or unliquidated, whether in tort, contract, extra-contractual or otherwise, whether statutory, at common law or in equity, including but not limited to claims for breach of contract, breach of the implied covenant of good faith and fair dealing, bad faith, unfair claim settlement practices, statutory or regulatory violations, for indemnity or contribution, or punitive, compensatory, exemplary, extra-contractual, statutory or other damages or relief of any type, including, without limitation:  (i) all claims for wrongful death, personal injury, emotional distress, property damage, economic loss, or environmental damage, remediation or exposure including, without limitation, any Tort Claim against a Municipality (whether asserted or unasserted); (ii) all claims on payment and performance bonds; (iii) all claims relating to the Underwriters' Policies including, without limitation, the issuance of the Underwriters' Policies, coverage under the Underwriters' Policies, the defense of litigation arising out of a Tort Claim, or any act or omission of any Settling Insurer of any type for which the Debtors, the Debtors' Insurers, or any Claimant might or may seek relief in connection with the Underwriters' Policies; and (iv) any other "claim," as that term is defined in section 101(5) of the Bankruptcy Code.

35.     **Claimant** means the holder of a Claim.

36.     **Claims Objection Bar Date** means the first Business Day that is one hundred eighty (180) calendar days after the Effective Date; provided that the Claims Objection Bar Date may be extended pursuant to an order of the Bankruptcy Court upon motion Filed by the Liquidating Trustee or the Purchaser with respect to Priority Claims.

37.     **Class** means a group of substantially similar Claims or Interests as classified in a particular class under the Plan pursuant to sections 1122 and 1123 of the Bankruptcy Code.

38.     **Closing** means the closing of the purchase and sale of the Acquired Assets and the consummation of the other transactions contemplated by the Asset Purchase Agreement as approved in the Sale Order.

39.     **Closing Date** means March 22, 2024, the date the Closing took place.

40.     **Collateral** means any property or interest in property of the Estates of the Debtors subject to a lien, charge or other encumbrance to secure the payment or performance of a Claim, which lien, charge or other encumbrance is not subject to avoidance or is otherwise invalid under the Bankruptcy Code or applicable state law.

41.     **Committee** means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

42.     **Confirmation Date** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

43.     **Confirmation Hearing** means the duly noticed hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to Bankruptcy Code section 1128, including any continuances thereof.

44.     **Creditor** means any Entity who holds a Claim against any of the Debtors.

45.     **Cure** means a Claim for all unpaid monetary obligations, or adequate assurance of cure or compensation, or other amounts as may be agreed upon by the parties or as determined by the Bankruptcy Court, under an executory contract or unexpired lease (whether assumed or assumed and assigned) by any Debtor pursuant to section 365 of the Bankruptcy Code or the Plan.

46.     **Cure Claim** means a Claim for Cure.

47.     **Debtors** means Bird Global, Inc., Bird Rides, Inc., Bird US Holdco, LLC, Bird US Opco, LLC, and Skinny Labs, Inc., including in their capacity as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

48.     **D&O Liability Insurance Policies** means the insurance policies identified in the Plan Supplement, including any run-off or tail policies, agreements, amendments, addenda, documents or instruments related thereto that provide coverage for Causes of Action that may exist against any of the Debtors' current or former directors, managers, members, officers and employees, subject in all events to the other terms of this Plan.

49.     **DIP Lenders** means the Senior DIP Parties and the Junior DIP Parties.

50.     **Disallow or Disallowed** means, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in the Debtors which (i) has been disallowed, in whole or part, by a Final Order of the Bankruptcy Court, (ii) has been withdrawn and/or waived by agreement of the Debtors and the Holder thereof, in whole or in part, (iii) has been withdrawn, in whole or in part, by the Holder thereof; (iv) if listed in the Schedules as zero or as Disputed, contingent or unliquidated and in respect of which a Proof of Claim or a Proof of Interest, as applicable, has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code or any Final Order of the Bankruptcy Court or other applicable bankruptcy law, (v) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any Proof of Claim or Proof of Interest, or (vi) is deemed to be Filed under applicable law or order of the Bankruptcy Court or which is required to be Filed by order of the Bankruptcy Court but as to which such Proof of claim or Proof of Interest was not timely or properly Filed.  In each case a Disallowed Claim or Disallowed Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

51.     **Disallowed Claim** means a Claim, or any portion thereof, that is Disallowed.

52.     **Disallowed Interest** means an Interest, or any portion thereof, that is Disallowed.

53.     **Disclosure Statement** means that certain *Disclosure Statement For Debtors' Joint Chapter 11 Plan of Liquidation*, including the schedules and exhibits attached thereto, as amended, modified or supplemented from time to time, that is prepared and will be distributed (upon approval of the Bankruptcy Court) in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law.

54.     **Disputed** means with respect to a Claim or Interest, any Claim or Interest that has not been Allowed by a Final Order as to which (a) a Proof of Claim or Interest has been Filed with the Bankruptcy Court, or is deemed Filed under applicable law or order of the Bankruptcy Court, and (b) an Objection to such Claim or Interest has been or may be timely Filed or deemed Filed under applicable law by the Debtors or any other party in interest, and any such Objection has not been (i) withdraw, (ii) overruled or denied by a Final Order or (iii) granted by a Final Order.  For purposes of the Plan, a Claim or Interest that has not been Allowed by a Final Order shall be considered a Disputed Claim or Interest, whether or not an Objection has been or may be timely Filed, to the extent (A) the amount of the Claim or Interest specified in the Proof of Claim or Interest exceeds the amount of any corresponding Claim or Interest in the Schedules, (B) the classification of the Claim or Interest specified in the Proof of claim or Interest differs from the classification of any corresponding Claim or Interest listed in the Schedules, (C) any corresponding Claim or Interest has been listed in the Schedules as zero or as Disputed, contingent or unliquidated, (D) no corresponding Claim or Interest has been listed in the Schedules or (E) such Claim or Interest is reflected as zero or as unliquidated or contingent in the Proof of Claim or Interest Filed in respect thereof.

55.     **Disputed Claim** means a Claim, or any portion thereof, that is Disputed.

56. **Disputed Claims Reserve** means the reserve funds created pursuant to ARTICLE X herein.

57. **Distribution** means each distribution of Cash or property to Holders of Allowed Claims pursuant to and under the terms of this Plan by the Liquidating Trustee or Tort Claims Trustee, as applicable, on each Distribution Date.

58. **Distribution Agent** means the Person or Entity responsible for making Distributions under the Plan. Distributions to the holders of Allowed Claims in Classes 1-5 and 7 shall be made by the Liquidating Trustee. Distributions to the holders of Tort Claims shall be made by the Tort Claims Trustee pursuant to the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.

59. **Distribution Date** means the date or dates on which a Holder of an Allowed Claim shall receive a Distribution of property under the terms of the Plan.

60. **Distribution Waterfall** means with respect to the Distribution of proceeds of Excluded Assets (other than Talon Proceeds and Distributions by the Tort Claims Trust), the following order of priority:

(i)    First, to pay or reserve for the cost of monetizing the Excluded Assets, including the fees and expenses of the Liquidating Trustee and professionals retained by the Liquidating Trustee incurred in connection therewith;

(ii)   Second, *Pro Rata* for payment of (A) the Excess Professional Fee Claims, and (B) the Additional DIP Funding Claim, until paid in full; and

(iii)  Third, *Pro Rata* to the holders of Allowed General Unsecured Claims in Class 5.

61. **Effective Date** means the date selected by the Debtors that is (a) at least fifteen (15) days following occurrence of the Confirmation Date; and (b) no more than five (5) Business Days following the first date on which no stay of the Plan Confirmation Order is in effect and all conditions to the Effective Date set forth in ARTICLE XI**I** hereof have been satisfied or, if waivable, waived pursuant to Section 12.2 hereof.

62. **Entity** means an entity as defined in section 101(15) of the Bankruptcy Code.

63. **Equity Interests** means as of the Petition Date, any and all currently owned equity interests, ownership interests or shares in the Debtors and issued by the Debtors prior to the Petition Date (including, without limitation, all capital stock, stock certificates, common stock, preferred stock, partnership interests, rights, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in any of the Debtors, partnership interests in any of the Debtors' stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights and liquidation preferences, puts, calls or commitments of any character whatsoever relating to any such equity, ownership interests or shares of capital

stock of the Debtors or obligating any Debtors to issue, transfer or sell any shares of capital stock) whether or not certificated, transferable, voting or denominated "stock" or a similar security.

64. **Estate** means, with regard to the Debtors, each estate created by the commencement by the Debtors of the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code, and shall be deemed to include, without limitation, any and all rights, powers, and privileges and Causes of Action of the Debtors and any and all Assets and interests in property, whether real, personal or mixed, rights, causes of action, avoidance powers or extensions of time that the Debtors or the Estates shall have had as of the Petition Date, or which the Estate acquired after the commencement of these Chapter 11 Cases; *excluding, however*, Acquired Assets).

65. **Excess Professional Fee Claims** means the Professional Compensation Claims of the Professionals retained by the Committee solely to the extent that such Professional Compensation Claims exceed $1,450,000 as of the Effective Date.

66. **Excluded Assets** means those assets or property of the Debtors' Estates under Section 541 of the Bankruptcy Code not sold, conveyed or assigned to the Purchaser pursuant to the Asset Purchase Agreement or not conveyed to the Tort Claims Trust as Tort Claims Trust Assets, and which shall be contributed to the Liquidating Trust on the Effective Date as Liquidating Trust Assets, including, but not limited to, Retained Causes of Action.

67. **Exculpated Parties** means the Senior DIP Parties, the Junior DIP Parties, the Junior DIP Agent (which shall include U.S. Bank Trust Company, National Association as collateral agent for the Junior DIP Parties), and each of their respective officers, directors, members, employees, Representatives, counsel, advisors, agents, parents, subsidiaries and affiliates, and each of their respective successors and assigns, the Debtors and their Professionals including, Berger Singerman LLP, Teneo Capital, LLC, Teneo Strategy, LLC, Cassel Salpeter & Co., LLC, the Committee including its members in their capacity as such and its Professionals including Fox Rothschild LLP and Berkeley Research Group LLC, John Ivan Bitove, Kevin Talbot, Antonio Occhionero, Philip Evershed, Philip Ryan, Racquel Russell, Jim Mutrie, Robert Comin, John Jason Bitove, Stewart Lyons, Michael Washinushi, H. Joseph Prodan, Clint Johnson, Harvey L. Tepner, and Christopher Rankin.

68. **File or Filed** means file or filed with the Bankruptcy Court in these Chapter 11 Cases.

69. **Final Decree** means the final decree entered by the Bankruptcy Court after the Effective Date and pursuant to section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022.

70. **Final Order** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any Chapter 11 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or

-9-

any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing has been denied or resulted in no modification of such order, *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order, shall not cause such order not to be a Final Order.

71.    **Final DIP Financing Order** means the *Final Order (1) Authorizing The Debtors to (A) Obtain PostPetition Financing, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [ECF No. 296], entered by the Bankruptcy Court on February 8, 2024.

72.    **General Unsecured Claims** means Claims against the Debtors that are not Administrative Claims, Professional Compensation Claims, Cure Claims, Priority Tax Claims, Other Priority Claims, Senior DIP Deficiency Claims, Additional DIP Funding Secured Claims, Tort Claims, Subordinated Claims or Equity Interests.  Miscellaneous Secured Claims are treated as General Unsecured Claims, pursuant to Section 3.2(d) of the Plan.

73.    **Global Settlement Term Sheet** means the *Global Settlement and Plan Support Agreement Term Sheet* by and between the Debtors, the Committee, the Senior DIP Parties, the Junior DIP Parties and the Purchaser dated as of March 6, 2024.

74.    **Holder** means the legal or Beneficial Holder of a Claim or Interest (and, when used in conjunction with a Class or type of Claim or Interest, means a Holder of a Claim or Interest in such Class or of such type).

75.    **Impaired** shall have the meaning ascribed to it in section 1124 of the Bankruptcy Code when used with reference to a Claim or an Interest.

76.    **Injunction** means one or more orders of the Bankruptcy Court, which shall include the Plan Confirmation Order, permanently releasing and enjoining the enforcement, prosecution, continuation or commencement of any Tort Claims that any Person or Entity holds or asserts or may in the future hold or assert against the Debtors and/or the Insurance Settlement Released Parties.

77.    **Insurance Program** shall have the meaning ascribed to such term in the Insurance Settlement Agreement.

78.    **Insurance Settlement Agreement** means the *Settlement, Release and Policy Buyback Agreement* between the Debtors, Settling Insurers and the Purchaser attached as Exhibit "1" to this Plan.

79.    **Insurance Settlement Proceeds** means $10 million in Cash.

80.    **Insurance Settlement Released Parties** means the Settling Insurers' Parties, all Named Insureds, Additional Insureds, the Purchaser Parties and the Debtors, and is intended to include each Municipality or government Entity.

81.    **Intercompany Claims** means Claims of any parent or affiliate of any Debtor against any other Debtor, whether asserted or unasserted, contingent, disputed, undisputed or unliquidated that are not Acquired Assets under the Asset Purchase Agreement.

82.    **IRC** means the Internal Revenue Code of 1986, as amended from time to time.

83.    **Junior DIP Agent** shall have the meaning ascribed to such term in the Final DIP Financing Order.

84.    **Junior DIP Parties** shall have the meaning ascribed to such term in the Final DIP Financing Order.

85.    **Lien** means a charge against, interest in or other encumbrance upon property to secure payment of a debt or performance of an obligation.

86.    **Liquidating Trust** means the trust created on the Effective Date in accordance with the provisions of Article VI of the Plan and a Liquidating Trust Agreement, for the benefit of holders of Allowed Claims, as determined by the Liquidating Trustee consistent with the purposes of any such Liquidating Trust pursuant to ARTICLE VI of the Plan.

87.    **Liquidating Trust Agreement** means the Liquidating Trust Agreement to be attached as **Exhibit 2** to this Plan which will be filed with the Plan Supplement.

88.    **Liquidating Trust Assets** means the Excluded Assets of each Debtor to be transferred to the Liquidating Trust for the benefit of Holders of Allowed Claims; *excluding, however*, the Holders of Tort Claims.

89.    **Liquidating Trust Beneficiaries** means the Holders of Allowed Claims in Class 2, 3 and 5.

90.    **Liquidating Trust Interests** means the non-certificated beneficial interests of the Liquidating Trust allocable to Liquidating Trust Beneficiaries in accordance with the terms, conditions, and priorities set out in the Plan and the Liquidating Trust Agreement entitling each Liquidating Trust Beneficiary to Distributions (if any) of the Liquidating Trust.

91.    **Liquidating Trustee** means the Person who, as of the Effective Date, shall exercise the authority set forth in ARTICLE VI of the Plan pursuant to the Liquidating Trust Agreement in accordance with the terms of the Plan.

92.    **Local Rules** means the Local Rules of the United States Bankruptcy Court for the Southern District of Florida and the guidelines and requirements of the U.S. Trustee for the Southern District of Florida.

93. **Miscellaneous Secured Claims** means Claims that are secured by Liens other than the Claims of the Prepetition First Lien Parties, the Prepetition Second Lien Parties, the Senior DIP Parties, and the Junior DIP Parties.

94. **Municipality** means all of the cities in which the Debtors previously operated, including Charleston, SC, Long Beach, CA, Los Angeles, CA, New Port News, VA, Sacramento, CA, Salt Lake City, UT, San Diego, CA, San Francisco, CA, Santa Clara, CA, Santa Monica, CA, Tempe, AZ, Washington, D.C., Orlando, FL, Chicago, IL, Portland, OR, Providence, RI, and St. Louis, IL.

95. **Municipal Claims** means Claims of a Municipality arising from or relating to arising out of the use, placement, operation, transportation, renting, leasing, and/or recovery of the Debtors' vehicles and/or arising out of the operation of the Debtors' business, including but not limited to claims for indemnification under any permit or license issued by a Municipality to the Debtors, or Claims against the Debtors' insurers, including as additional insureds.

96. **Non-Assumed Contracts** means any contracts to which any Debtors is a party but that are not Assigned Contracts.

97. **Objection** means any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to Disallow, determine, liquidate, classify, reclassify or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Expense Claim) or Interest other than a Claim or an Interest that is Allowed.

98. **Person** means an individual, a corporation, a limited liability company, a partnership, an association, a joint stock company, a joint venture, an unincorporated organization, or a governmental unit as defined in section 101(41) of the Bankruptcy Code.

99. **Petition Date** means December 20, 2023.

100. **Plan** means the Debtors' Joint Chapter 11 Plan of Liquidation and all exhibits annexed hereto or referenced herein, as it may be amended, modified or supplemented from time to time in accordance with the provisions of the Plan or the Bankruptcy Code and Bankruptcy Rules.

101. **Plan Cash** means $275,000 in Cash paid by the Purchaser to the Debtors on the Closing pursuant to the Asset Purchase Agreement.

102. **Plan Confirmation Order** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as such order may be amended, modified or supplemented.

103. **Plan Documents** means all documents that aid in effectuating the Plan, including, without limitation, all addenda, exhibits, schedules, and the Plan Supplement.

104.  **Plan Supplement** means the supplement, if any, to the Plan containing certain documents and forms of documents specified in the Plan, which documents and forms shall be filed with the Bankruptcy Court no later than ten (10) days prior to the commencement of the hearing on confirmation of the Plan.

105.  **Prepetition First Lien Parties** shall have the meaning ascribed to such term in the Final DIP Financing Order.

106.  **Prepetition Second Lien Parties** shall have the meaning ascribed to such term in the Final DIP Financing Order.

107.  **Priority Claim** means a Claim to the extent that it is of a kind described in, and entitled to priority under, sections 507(a)(2), (a)(3), (a)(4), (a)(5), (a)(6), (a)(7) or (a)(9) of the Bankruptcy Code, that is not a Priority Tax Claim.

108.  **Priority Claims Reserve** means Cash in the amount of $1,024,000.00 funded to the Debtors at Closing by the Purchaser to be held in escrow pending the Effective Date, and to be utilized by the Debtors or the Liquidating Trustee, as the case may be, to make Distributions on account of Allowed Priority Claims and to the extent not used to make Distributions on account of Allowed Priority Claims, then refunded to the Purchaser as designee of and on behalf of the Junior DIP Lenders, as provided in the Global Settlement Term Sheet.

109.  **Priority Tax Claim** means any Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

110.  **Pro Rata** means the proportion (expressed as a percentage) that the amount of a Claim in a particular Class or Classes bears to the aggregate amount of all Claims (including Disputed Claims but excluding disallowed Claims) in such Class or Classes, unless this Plan provides otherwise.

111.  **Professional** means a Person (a) employed in these Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 329, 330 and 331 of the Bankruptcy Code or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

112.  **Professional Compensation Claim** means a Claim of a Professional retained in the Chapter 11 Cases by the Debtors or the Committee pursuant to a Final Order in accordance with sections 327 of the Bankruptcy Code, for compensation or reimbursement of actual and necessary costs and expenses relating to services incurred after the Petition Date and prior to and including the Effective Date.

113.  **Professional Funded Reserve Account** means the funds in the account maintained by Berger Singerman LLP in accordance with paragraph 13(b) of the Final DIP Financing Order for the benefit of Professionals, with such funds allocated for the benefit of each Professional in the amount set forth in the Approved Budget for each Professional.

114. **Proof of Claim** means any proof of Claim Filed with the Bankruptcy Court with respect to any of the Debtors pursuant to Bankruptcy Rules 3001 or 3002.

115. **Proof of Interest** means any proof of Interest Filed with the Bankruptcy Court with respect to any of the Debtors pursuant to Bankruptcy Rule 3002.

116. **Purchaser** means Bird Scooter Acquisition Corp. or its successors, assigns or designees, as purchaser, under the Asset Purchase Agreement.

117. **Purchaser Parties** means Purchaser and: (i) each of its past, present and future parents, subsidiaries, affiliates, and divisions, (ii) each of their respective past, present, and future parents, subsidiaries, affiliates, holding companies, merged companies. related companies, divisions, joint ventures, and acquired companies holding companies, merged companies. related companies, divisions, joint ventures, and acquired companies; (iii) each of their respective past, present and future directors, officers, managers, members, shareholders, employees, partners, principals, agents, attorneys, lenders, joint ventures, joint venturers, representatives, and managing agents, insurers, reinsurers, and associated third-parties; and (iv) each of their respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons or entities acting on behalf of, by, through or in concert with them.

118. **Record Date** means the date the Disclosure Statement is conditionally approved by the Bankruptcy Court.

119. **Released Parties** means each of the Senior DIP Parties, the Junior DIP Parties, the Junior DIP Agent (which shall include U.S. Bank Trust Company, National Association as collateral agent for the Junior DIP Parties), and each of their respective officers, directors, members, employees, Representatives, counsel, advisors, agents, parents, subsidiaries and affiliates, and each of their respective successors and assigns, the Debtors' Professionals including, Berger Singerman LLP, Teneo Capital, LLC, Teneo Strategy, LLC, Cassel Salpeter & Co., LLC, the Committee including its members in their capacity as such and its Professionals including Fox Rothschild LLP and Berkeley Research Group LLC,  John Ivan Bitove, Kevin Talbot, Antonio Occhionero, Philip Evershed, Philip Ryan, Racquel Russell, Jim Mutrie (subject to the qualifications set forth in the last sentence of this definition), Robert Comin, John Jason Bitove, Stewart Lyons, Michael Washinushi, H. Joseph Prodan, Clint Johnson, Harvey L. Tepner, and Christopher Rankin; *provided, however*, that Released Parties shall not include any former officer or director of the Debtors (other than those explicitly identified in this definition), regardless of whether the officer or director resigned, was removed by corporate action, or otherwise terminated.  The extent of the releases provided to the Released Parties is subject to the provisions in Article XIII of the Plan. Notwithstanding anything to the contrary in this Plan, Jim Mutrie is a Released Party only to the extent of any acts and omissions that occurred after the merger of Bird Canada Inc. with the Debtors on or about December 30, 2022; provided, however, that any damages with respect to any Retained Causes of Action against Jim Mutrie shall be payable solely from and limited to the extent of available coverage under the D&O Liability Insurance Policies.

120. **Releasing Parties** means each Person or Entity who: (i) votes to accept the Plan; (ii) is deemed to accept the Plan; (iii) abstains from voting on the Plan; (iv) receives or accepts a Distribution under the Plan or the Tort Claim ADR Procedures; or (v) receives a release under the Plan.

121. **Rejection Claim** means a Claim for damages resulting from the rejection of an executory contract by the Debtors pursuant to Section 10.2 of the Plan.

122. **Representatives** means, with regard to an Entity (including the Debtors), any current officers, directors, employees, attorneys, Professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including their respective officers, directors, employees, independent contractors, members and professionals).

123. **Reinstated** or **Reinstatement** means (i) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (a) curing any such default that occurred before or after the Petition Date, other than a default of a kind specific in section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim as such maturity existed before such default; (c) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitled the Holder of such Claim; *provided, however*, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence or which prohibit certain transactions or actions contemplated by the Plan, or conditioning such transactions or action on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement.

124. **Retained Causes of Action** means all Causes of Action of the Debtors or their Estates other than (i) Causes of Action acquired by the Purchaser under the Asset Purchase Agreement, and (ii) any Cause of Action released, settled or compromised pursuant to the Insurance Settlement Agreement, the Final DIP Financing Order, or the Asset Purchase Agreement, or this Plan. Retained Causes of Action include Causes of Action against the Debtors' former directors, managers, members, officers and employees who are not Released Parties and Retained Causes of Action shall otherwise be identified in the Plan Supplement subject to the terms and conditions set forth in Section 6.17 hereof.

125. **Sale Order** means the *Order (I) Authorizing and Approving (A) The Sale of Substantially All of The Debtors' Assets Free And Clear of All Liens, Claims, And Encumbrances and (B) The Assumption And Assignment of Certain Executory Contracts And Unexpired Leases In Connection Therewith, And (II) Granting Related Relief* entered by the Bankruptcy Court on March 8, 2024 [ECF No. 464], as may be amended or supplemented by other orders of the Court.

126. **Sale Transaction** means the transactions contemplated by the Asset Purchase Agreement, approved in the Sale Order and consummated at the Closing.

127. **Schedule of Assumed Contracts and Unexpired Leases** means the schedules and exhibits Filed with the Bankruptcy Court identifying (i) the executory contracts and unexpired leases assumed by the Debtors and assigned to the Purchaser; and (ii) the amount of Cure Claims with respect to each executory contract or unexpired lease assumed and assigned to the Purchaser.

128. **Scheduled** means as set forth on the Schedules.

129. **Schedules** means the Schedules of Assets and Liabilities and the Statements of Financial Affairs Filed by the Debtors in accordance with Bankruptcy Code section 521 and Federal Bankruptcy Rule 1007, as the same may be amended from time to time prior to the Effective Date in accordance with Federal Bankruptcy Rule 1009.

130. **Secured Tax Claims** means all Claims for Taxes against the Debtors that are secured by a Lien on, or security interest in, real property of the Debtors, or that has the benefit of rights of setoff under section 553 of the Bankruptcy Code, but only to the extent of the value of the creditor's interest in the Debtors' interest in such property, or to the extent of the amount subject to setoff, which value shall be determined as provided in section 506 of the Bankruptcy Code.

131. **Senior DIP Parties** shall have the meaning ascribed to such term in the Final DIP Financing Order.

132. **Senior DIP Deficiency Claim** means the Senior DIP Agent's Claim for unpaid fees and expenses as of the Effective Date, not to exceed $1,000,000.

133. **Settling Insurers** means the underwriting members of Lloyd's Syndicate 1969 and 1971.

134. **Settling Insurers' Parties** means the Settling Insurers and: (i) each of their past, present and future parents, subsidiaries, affiliates, and divisions; (ii) each of their respective past, present, and future parents, subsidiaries, affiliates, holding companies, merged companies. related companies, divisions, joint ventures, and acquired companies; (iii) each of their respective past, present and future directors, officers, shareholders, employees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and managing agents, claims handling administrators, affiliates, insurers, reinsurers, and associated third-parties; and (iv) each of their respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons or entities acting on behalf of, by, through or in concert with them.

135. **Subordinated Claims** means all claims subordinated by order of the Bankruptcy Court, by the terms of this Plan or by Final Judgment at any time prior to the entry of a Final Decree, including Intercompany Claims.

136.  **Supplemental DIP Loan Order** means that certain *Order Granting Debtors' Expedited Supplemental Motion (i) Authorizing the Debtors to Obtain Postpetition Financing, (ii) Authorizing the Debtors to use Cash Collateral, (iii) Granting Adequate Protection to Senior Secured Lenders, (iv) Granting Liens and Superpriority Claims, and (v) Modifying the Automatic Stay on a Final Basis*, dated March 21, 2024 [ECF No. 506].

137.  **Talon Causes of Action** means any of the Debtors' Claims and Causes of Action against Talon Auto Inc., et al., or as same may hereafter be amended.

138.  **Talon Claims** means the Proofs of Claim filed by Scooter Removal LLC and against the Estates, including Claims Nos. 10449, 10450, 10452, 10453, and 10455, or as same may hereafter be amended.

139.  **Talon Proceeds** means the proceeds, if any, of the Talon Causes of Action.

140.  **Tax Code** means the United States Internal Revenue Code of 1986, as amended.

141.  **Taxes** means all income, alternative minimum, net worth or gross receipts, capital, value added, franchise, profits, excise, sales, use, employment, withholding, property, payroll or other taxes, assessments, or governmental charges, together with any interest, penalties, additions to tax, fines, and similar amounts relating thereto, imposed or collected by any federal, state, local or foreign governmental authority on or from the Debtors.

142.  **Tort Claimant** means any Person or Entity holding or potentially holding a Tort Claim.

143.  **Tort Claim ADR Procedures** are the procedures described in <u>Schedule 3</u> to the Insurance Settlement Agreement, which are incorporated as though fully set forth herein.

144.  **Tort Claims** means all Claims, whether asserted or unasserted, held by any Person or Entity against the Debtors, the Settling Insurers' Parties, the Purchaser Parties or any Person or Entity who may claim to be an Insured, Additional Insured, or otherwise claim to be entitled to coverage under any of the Underwriters' Policies or Insurance Program for bodily or personal injury, tort claim, or property damage related to, or arising out of the use, placement, operation, transportation, renting, leasing, and/or recovery of the Debtors' micro-mobility vehicles and/or arising out of the operation of the Debtors' businesses.  Tort Claims include Municipal Claims but exclude the Talon Claims.

145.  **Tort Claims Administrator** means the Person identified in the Plan Supplement who will analyze, assign relative values to, and allocate Trust Assets to holders of Tort Claims pursuant to the Tort Claim ADR Procedures.

146.  **Tort Claims ADR Procedures** means the *Tort Claim Protocol and Alternative Dispute Resolution Procedures* attached as <u>Schedule 3</u> to the Insurance Settlement Agreement.

147. **Tort Claims Bar Date** means the date set by the Bankruptcy Court as the deadline for Tort Claimants to File Tort Claims.

148. **Tort Claims Trust** means the trust established by the Plan and the Trust Agreement for the benefit of Tort Claims and approved by the Confirmation Order.

149. **Tort Claims Trust Agreement** means the trust agreement establishing the Tort Claims Trust which is <u>Schedule 4</u> to the Insurance Settlement Agreement.

150. **Tort Claims Trust Assets** means the Insurance Settlement Proceeds and interest thereon.

151. **Trust Documents** means the Tort Claims Trust Agreement and such additional documents as may be executed in connection with the Tort Claims Trust Agreement.

152. **Tort Claims Trustee** means the Trustee of the Tort Claims Trust who shall be appointed by the Plan Confirmation Order.

153. **Transition Services Agreement** means the Transition Services Agreement executed by the Debtors, as sellers, and the Purchaser at Closing.

154. **Trust Election Date** means the date by which the Liquidating Trustee must, if necessary, elect to treat the relevant portion of the Liquidating Trust Assets subject to Disputed Claims as a "disputed ownership fund" pursuant to Treasury Regulation Section 1.468B-9.

155. **Underwriters' Policies** means the policies of insurance identified in <u>Schedule 1</u> of the Insurance Settlement Agreement.

156. **U. S. Trustee** means the Office of the United States Trustee.

157. **Unimpaired** means any Claim that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

1.2    <u>Rules of Interpretation</u>

(a)    For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and the neutral gender; (b) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions and where indicated subject to the agreement of the parties thereto; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words ''herein,'' "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference

12867436-16

only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

        (b)    The provisions of Federal Rule of Bankruptcy Procedure 9006(a) shall apply in computing any period of time prescribed or allowed hereby.

        (c)    All references herein to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

    1.3    <u>Exhibits</u>

All exhibits and schedules, if any, to the Plan are incorporated into and are part of the Plan as if set forth herein.  All exhibits and schedules to the Plan, shall be filed with the Clerk of the Bankruptcy Court not later than three (3) days prior to the deadline set by the Bankruptcy Court to vote to accept or reject the Plan.  Such exhibits may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court.  Holders of Claims or Equity Interests may also obtain a copy of such exhibits, once filed, from the Debtors' counsel by a written request sent to the following address:

Berger Singerman LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Phone: 305-755-9500
Facsimile: 305-714-4340
ATTN: Paul Steven Singerman, Esquire
singerman@bergersingerman.com
Jordi Guso, Esquire
jguso@bergersingerman.com

**ARTICLE II**
**<u>ADMINISTRATIVE, PRIORITY AND UNCLASSIFIED CLAIMS</u>**

    2.1    <u>Administrative Claims in General</u>

Except as provided in Sections 2.4, 3.2(b) and 3.2(c) below with respect to the treatment of Professional Compensation Claims, the Senior DIP Deficiency Claim and the Additional DIP Funding Claim, each Holder of an Allowed Administrative Expense Claim shall receive on account of the Allowed Administrative Expense Claim and in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Expense Claim, Cash equal to the unpaid portion of such Allowed Administrative Expense Claim, as soon as practicable upon the earlier to occur of the Effective Date or ten (10) Business Days after the entry of a Final Order allowing such Administrative Expense Claim; *provided, however,* that Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during

-19-

the Chapter 11 Cases assumed by the Purchaser in accordance with the Asset Purchase Agreement shall be paid by the Purchaser in the ordinary course of business in accordance with the terms and conditions of any agreement or course of dealing relating thereto. Administrative Expense Claims must be filed on or before the Administrative Expense Claims Bar Date or shall be forever barred, waived and released.  Administrative Expense Claims are Unimpaired.

2.2     Superpriority Administrative Expense Claims under the Final DIP Financing Order

Except as provided in Section 3.2(b) and 3.2(c) below with respect to the Senior DIP Deficiency Claim and the Additional DIP Funding Claim, all Claims of the DIP Lenders under the Final DIP Financing Order were satisfied and released as of the Closing.

2.3     Cure Claims

Pursuant to the Asset Purchase Agreement, Cure Claims are an obligation of the Purchaser and have been or shall be paid by the Purchaser and not the Debtors.

2.4     Professional Compensation Claims

On or prior to the deadline set by the Bankruptcy Court for Professionals to file final fee applications, each Professional shall file with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Confirmation Hearing; *excluding, however*, Cassel Salpeter & Co., LLC, the Debtors' investment bankers, whose compensation was approved in the Sale Order and paid by the Debtors at Closing and, therefore, is not required to file a final application for compensation.  The Debtors shall pay the Allowed Professional Compensation Claims of each Professional up to the amounts in the Professional Funded Reserve Account in accordance with the Orders of the Bankruptcy Court and the Global Settlement Term Sheet.  From and after the Confirmation Date until the Effective Date, the Debtors, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, shall pay the reasonable fees and necessary and documented expenses of the Professionals during such period, up to the amount in the Professional Funded Reserve Account; *provided, however*, that any Excess Professional Fee Claims may be paid from proceeds of Excluded Assets in accordance with the Distribution Waterfall.

2.5     Priority Tax Claims

To the extent not previously paid or expressly assumed by the Purchaser pursuant to the Asset Purchase Agreement and/or the Global Settlement Term Sheet, the Debtors or the Liquidating Trustee, as applicable, shall pay each holder of an Allowed Priority Tax Claim, in satisfaction of such Allowed Priority Tax Claim, the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the later of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law; *provided, however*, that the Debtors shall not pay any premium, interest or penalty in connection with such Allowed Priority Tax Claim.

2.6     Statutory Fees

Notwithstanding any other provisions of the Plan to the contrary, the Debtors shall pay the U.S. Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), within fifteen (15) days of the entry of the Plan Confirmation Order, for pre-confirmation periods and simultaneously file all the Monthly Operating Reports for the relevant periods, indicating the disbursements for the relevant period.

In addition, the Liquidating Trustee shall pay the U.S. Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), based upon all post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), based upon all post-confirmation disbursements made by the Liquidating Trustee until the earlier of the closing any Chapter 11 Case by the issuance of a Final Decree by the Bankruptcy Court, or upon the entry of an Order by the Bankruptcy Court dismissing any Chapter 11 Case or converting any Chapter 11 Case to another chapter under the United States Bankruptcy Code. The Liquidating Trustee shall provide to the U.S. Trustee upon the payment of each post-confirmation payment, and concurrently filed with the Court, consolidated, Post-Confirmation Quarterly Operating reports indicating all the combined disbursements for the relevant period.

Notwithstanding anything in the Plan or the Plan Confirmation Order to the contrary, no statutory fees shall be assessed or be payable on any Distributions made by the Tort Claims Trustee after the Effective Date, including Distributions to the holders of Tort Claims.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

3.1     Summary

(a)     In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims and Priority Tax Claims, as described in ARTICLE II.

(b)     A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and Distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

(c)     The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, tabulating votes, and making Distributions with respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of any Debtor's business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, constitute a substantive consolidation of any of the Debtors, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors continue to exist as separate legal entities.

(d)       Holders of Allowed Claims or Allowed Interests may assert such Claims against or Interests in the Debtors obligated with respect to such Claims or Interest, and such Claims and Interests shall be entitled to share in the recovery provided for the applicable Claim against or Interest in the Debtors based upon the full Allowed amount of such Claims or Interests. Notwithstanding the foregoing, the holder of such a Claim or Interest that asserts such Claim against or Interest in more than one Debtor shall be entitled only to a single Distribution on account of such Claim or Interest.

(e)       Summary of Classification and Treatment of Classified Claims and Equity Interests.

| Class | Claim | Status | Entitled to Vote? |
|-------|-------|--------|-------------------|
| 1 | Other Priority Claims | Unimpaired | No; Deemed to Accept the Plan. |
| 2 | Senior DIP Deficiency Claim | Impaired | Yes. |
| 3 | Additional DIP Funding Claim | Impaired | Yes. |
| 4 | Miscellaneous Secured Claims | Impaired | Yes. |
| 5 | General Unsecured Claims | Impaired | Yes. |
| 6 | Tort Claims | Impaired | Yes. |
| 7 | Subordinated Claims | Impaired | Yes. |
| 8 | Equity Interests | Impaired | No. Deemed to Reject the Plan. |

3.2    Classification and Treatment of Claims and Equity Interests

(a)    **Other Priority Claims (Class 1)**

(i)       **Classification**: Class 1 consists of Other Priority Claims.

(ii)      **Treatment**: Except to the extent that a holder of an Allowed Other Priority Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable classification and treatment, each holder of an Allowed Other Priority Claim shall receive the full unpaid amount of such Allowed Other Priority Claim in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date such Allowed Other Priority Claim becomes Allowed or as soon as practicable thereafter, and (iii) the date such Allowed Other Priority Claim is payable under applicable non-bankruptcy law; *provided, however*, that the Debtors shall not pay any premium, interest or penalty in connection with such Allowed Other Priority Claim. Distributions to the Holders of Allowed Claim 1 Claim shall be made from the Priority Claims Reserve.

(iii)    **Voting**: Class 1 is Unimpaired, and therefore, the holders of Other Priority Claims in Class 1 are not entitled to vote to accept or reject the Plan.

(b)    **Senior DIP Deficiency Claim (Class 2)**

(i)    **Classification**: Class 2 consists of the Senior DIP Deficiency Claim.

(ii)    **Treatment**: Senior DIP Deficiency Claim is deemed allowed in the amount of reasonably documented unreimbursed fees and expenses not to exceed $1,000,000. The Holder of the Senior DIP Deficiency Claim shall provide such documentation to the Liquidating Trustee within 30 days of the Effective Date. Subject to and in accordance with the Distribution Waterfall, after payment of the Excess Professional Fee Claims and the Additional DIP Funding Claim, the Holder of the Allowed Senior DIP Deficiency Claim shall receive fifty percent (50%) of the Talon Proceeds, if any, until the Allowed Senior DIP Deficiency Claim is paid in full. The foregoing Distributions shall be made on the Effective Date or as soon as practicable thereafter. Notwithstanding anything in the Final DIP Financing Order to the contrary, as of the Effective Date the Holder of the Senior DIP Deficiency Claim shall not receive or retain any other property under the Plan.

(iii)    **Voting**: Class 2 is Impaired and is entitled to vote to accept or reject the Plan.

(c)    **Additional DIP Funding Claim (Class 3)**

(i)    **Classification**: Class 3 consists of the Additional DIP Funding Claim.

(ii)    **Treatment**: The Class 3 Additional DIP Funding Claim is deemed Allowed in the amount of $2,220,000. Subject to and in accordance with the Distribution Waterfall, the Holder of the Allowed Additional DIP Funding Claim shall receive a Pro Rata share of the proceeds, if any, of the Liquidating Trust Assets (net of expenses) until such time as the Allowed Additional DIP Funding Claim plus interest as set forth herein is paid in full. The foregoing distributions shall be made on the Effective Date or as soon as practicable thereafter.

(iii)    **Voting**: Class 3 is Impaired and is entitled to vote to accept or reject the Plan.

(d)    **Miscellaneous Secured Claims (Class 4)**

(i)    **Classification:** Class 4 consists of Miscellaneous Secured Claims.

(ii)    **Treatment**: The Liens securing each Class 4 Claim are junior and subordinate to the Liens and Claims of the Prepetition First Lien Parties, the Prepetition Second Lien Parties, the Senior DIP Parties, the Junior DIP Parties and the Junior DIP Agent. Accordingly, each Allowed Class 4 Claim is deemed unsecured and will be treated as a Class 5 General Unsecured Claim.

(iii)    **Voting**: Class 4 is Impaired and, therefore, the holders of Miscellaneous Secured Claims in Class 4 are entitled to vote to accept or reject the Plan.

(e)    **General Unsecured Claims (Class 5)**

(i)    **Classification**: Class 5 consists of General Unsecured Claims.

(ii)    **Treatment**: Except to the extent that a holder of an Allowed General Unsecured Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable classification or treatment of such claim, each holder of an Allowed General Unsecured Claim shall receive subject to and in accordance with the Distribution Waterfall (x) fifty percent (50%) of the Talon Proceeds, if any, until the Allowed Senior DIP Deficiency Claim is paid in full, then one hundred percent (100%) of any additional Talon Proceeds, plus (y) its Pro Rata share of the proceeds of remaining Liquidating Trust Assets (net of expenses) other than Talon Proceeds. The foregoing distributions shall be made on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date such General Unsecured Claim becomes Allowed or as soon as practicable thereafter, and (iii) the date such Allowed General Unsecured Claim is payable under applicable non-bankruptcy law; *provided, however*, that neither the Debtors nor the Liquidating Trustee shall pay any premium, interest or penalty in connection with such Allowed General Unsecured Claim.

(iii)    **Voting**: Class 5 is Impaired and, therefore, the holders of Allowed General Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan.

(f)    **Tort Claims (Class 6)**

(i)    **Classification**: Class 6 consists of the Tort Claims.

(ii)    **Treatment**: The Plan establishes the Tort Claims Trust for the benefit of holders of Allowed Tort Claims, which claims are and shall be channeled to the Tort Claims Trust pursuant to Section 13.6 hereof. Each holder of a Tort Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its claim against the Debtors or any of the Released Parties, a Distribution of the Tort Claims Trust Assets by the Tort Claims Trustee, in accordance with this Plan, the Tort Claims Trust Agreement and the Tort Claim ADR Procedures. In no event shall a holder of a Tort Claim be entitled to any other or further recovery from or against any of the Debtors or the Insurance Settlement Released Parties or any of their property or assets.

(iii)    **Voting**: Class 6 is Impaired and, therefore, the holders of Tort Claims in Class 6 are entitled to vote to accept or reject the Plan.

(g)    **Subordinated Claims (Class 7)**

(i)    **Classification**: Class 7 consists of Subordinated Claims.

(ii)    **Treatment**: Except to the extent that a holder of a Subordinated Claim agrees to a less favorable classification and treatment, each holder of a Subordinated Claim

-24-

shall receive its Pro Rata share of the net proceeds of Excluded Assets, if any, remaining <u>after</u> the making of the payments set forth in ARTICLE II and ARTICLE III, Section 3.2(a) through 3.2(e) of this Plan, inclusive.  Distributions to Holders of Claims in Class 7 shall be made only after Claims in Classes 1 through 6 of this Plan, inclusive, have been paid in full.

(iii)    **Voting**: Class 7 is Impaired and, therefore, is entitled to vote to accept or reject the Plan.

(h)    **Equity Interests (Class 8)**

(i)    **Classification**: Class 8 consists of Equity Interests.

(ii)    **Treatment**: The holders of Equity Interest shall not receive nor retain any property under the Plan.  Class 8 Equity Interests shall be extinguished as of the Effective Date of the Plan.

(iii)    **Voting**: Class 8 is Impaired and is deemed to have rejected the Plan.

## ARTICLE IV
## ACCEPTANCE, REJECTION, AMENDMENT AND
## <u>REVOCATION OR WITHDRAWAL OF THE PLAN</u>

4.1    <u>Classes Entitled to Vote</u>

Each holder of a Claim, as of the Record Date, in an Impaired Class, other than those Classes that are deemed to reject the Plan, shall be entitled to vote to accept or reject the Plan, subject to applicable law.  Class 1 is deemed to have accepted the Plan.  Votes from holders of Claims in Classes 2, 3, 4, 5, 6 and 7 will be solicited as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.  Class 8, Equity Interests, is deemed to reject the Plan and, therefore, the vote in Class 8 will not be solicited.

4.2    <u>Acceptance by Class of Claims</u>

Impaired Class of Claims shall be deemed to accept the Plan if (a) holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  For purposes of calculating the number of Allowed Claims in a Class of Claims that have voted to accept or reject the Plan under section 1126(c) of the Bankruptcy Code, all Allowed Claims in such Class held by one Entity or any Affiliate thereof shall be aggregated and treated as one Allowed Claim in such Class.  For purposes of any Claim in any Impaired Class that is Disputed as to its amount only, the holder of such claim shall be entitled to vote on the Plan as if such holder held an Allowed Claim in an amount equal to the undisputed portion of such Claim.

4.3     Nonconsensual Confirmation

In the event that any Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority required by section 1129(a) of the Bankruptcy Code, the Debtors reserves the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief, or (b) alter, amend or modify the Plan in accordance with ARTICLE XIV.  The Debtors shall exercise the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

4.4     Revocation or Withdrawal; No Admissions

*Right to Revoke or Withdraw*.  Subject to the limitations contained in the Insurance Settlement Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors in their sole discretion.

*Effect of Withdrawal or Revocation; No Admissions*.  If the Debtors revokes or withdraws the Plan or if entry of the Plan Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of either of the Debtors or any other Entity; or (c) constitute an admission of any sort by either of the Debtors or any other Entity.

4.5     Amendment of Plan Documents

From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the Plan and any documents attached to such Plan Supplement, Exhibits to the Plan Supplement and Exhibits to the Plan shall be as provided in such Plan Supplement, Exhibits to the Plan Supplement and Exhibits to the Plan and their respective attachments.

4.6     Claims Paid and Payable by Third Parties

A Claim shall be disallowed without an objection thereto having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, (i) to the extent that the Claim is an Assumed Liability under the Asset Purchase Agreement, or (ii) to the extent the holder of such Claim receives payment in full in cash on account of such Claim from a party that is not the Debtors, Liquidating Trustee or the Tort Claims Trustee of the Tort Claims Trust.  To the extent that a holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor, Liquidating Trustee or the Tort Claims Trustee of the Tort Claims Trust on account of such Claim, such holder shall repay, return, or deliver any Distribution held by or transferred to the holder to the applicable Debtor, Liquidating Trustee or the Tort Claims Trustee of the Tort Claims Trust to the extent the holder's total recovery on account of such Claim

from the third party and under the Plan exceeds the amount of such Allowed Claim as of the date of any such Distribution.

4.7     Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights with respect to any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**ARTICLE V**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

5.1     Joint Chapter 11 Plan

The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor.  In consideration for the classification, Distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action and controversies resolved pursuant to the Plan.  The entry of the Plan Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests is fair, equitable and is within the range of reasonableness.  Distributions made to Holders of Allowed Claims are intended to be indefeasible.

5.2     Means for Implementation of Plan and Source of Funding for Distributions

The Plan will be implemented through receipt of (a) the Plan Cash which shall be used by the Liquidating Trustee to begin the administration of the Plan; (b) the Priority Claims Reserve which shall be used to make Distributions to the holders of Allowed Priority Claims; (c) the remaining Additional DIP Funding; (d) proceeds of the Talon Claim and Excluded Assets which shall be used to make Distributions to the Holders of Allowed Claims in Classes 2, 3, 4, 5 and 7, as provided in the Plan; and (e) the proceeds of the Insurance Settlement Agreement which shall be used to fund the Tort Claims Trust for the benefit of Holders of Allowed Claims in Class 6.

5.3     Corporate Action

All actions contemplated to be performed by the Debtors pursuant to the Plan, or any corporate action to be taken by or required of the Debtors, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the shareholders, partners, members or managers of the Debtors.  All Persons, the Liquidating Trustee, Governmental Units, title agencies, licensing agencies and offices of recordation may rely upon the authority vested in the Debtors' officers, or managers to act on the Debtors' behalf in order to effectuate the Plan and the transactions contemplated herein.

5.4     Post-Effective Date Governance of the Debtors

Effective as of immediately prior to the Effective Date, automatically and without further action, each existing member of the board of managers or directors of the Debtors, as applicable, will be deemed to have resigned or will be deemed to have been terminated. Each Debtor shall be deemed to have issued one share or one member interest, as applicable, to be held nominally by the Liquidating Trustee for purposes of administering the Plan.

On and after the Effective Date, (a) the Liquidating Trustee, in substitution for the management and the board of managers of the Debtors, shall be authorized and empowered, without action of the Debtors' respective members, or boards of managers, or managers (if any), to take any and all such actions as the Liquidating Trustee may determine are necessary or appropriate in the Liquidating Trustee's business judgment to implement, effectuate, consummate and perform any and all actions, documents, or transactions contemplated by the Plan or the Confirmation Order as reasonably required to implement the Plan and the wind up the Debtors subject to the terms of this Plan, and (b) the Liquidating Trustee shall act for the Debtors in the same fiduciary capacity as applicable to the board of managers or board of directors of the Debtors existing immediately prior to the Effective Date. Prior to the Effective Date, one or more of the Debtors may provide the Liquidating Trustee with one or more Debtor's Power of Attorney. On and after the Effective Date, the Liquidating Trustee may elect such additional managers, directors and officers as the Liquidating Trustee deems necessary to implement the Plan and the actions contemplated in the Plan. The Liquidating Trustee shall also have the sole and exclusive power to act by written consent, including to appoint or remove any directors, managers or officers at any time with or without cause.

## ARTICLE VI
## LIQUIDATING TRUST

6.1     Establishment of Liquidating Trust

On the Effective Date, the Liquidating Trust shall be established and become effective for the benefit of the Liquidating Trust Beneficiaries. The powers, authority, responsibilities, and duties of the Liquidating Trust, and the Liquidating Trustee are set forth in and shall be governed by the Plan and the Liquidating Trust Agreement. The Liquidating Trust Agreement shall provide for the Distribution of the Liquidating Trust Assets to the Liquidating Trust Beneficiaries. In the event of any conflict between the terms of this ARTICLE VI and the terms of a Liquidating Trust Agreement as such conflict relates to the establishment of a Liquidating Trust, the terms of this ARTICLE VI shall govern. The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

6.2     Purpose of Liquidating Trust

The Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d)

and in compliance with Rev. Proc. 94-45, 1994-2 C.B. 684, for, among other purposes, the purpose of (i) receiving and holding the Liquidating Trust Assets; (ii) administering, disputing, objecting to, compromising, or otherwise resolving all Disputed Claims; (iii) making Distributions to the Liquidating Trust Beneficiaries in accordance with this Plan and the Liquidating Trust Agreement; d (iv) maximizing recoveries for the benefit of the Liquidating Trust Beneficiaries, with no objective to continue or engage in the conduct of a trade or business in accordance with Treasury Regulation Section 301.7701-4(d). The Liquidating Trust shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement. Subject to the DOF Election, the Liquidating Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes within the meaning of sections 671 through 679 of the Tax Code and, to the extent permitted by applicable law, for state and local income tax purposes, with the Liquidating Trust Beneficiaries treated as the sole grantors and owners of the Liquidating Trust. To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes). To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes).

Except as otherwise provided in the Plan or the other Plan Documents, pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) and (c) of the Bankruptcy Code, on the Effective Date, all of the Excluded Assets shall vest in in the Liquidating Trustee free and clear of all Liens, Claims, charges, or other encumbrances. All privileges with respect to the property of the Estates, including the attorney/client privilege, to which the Debtors are entitled shall automatically vest in, and may be asserted by or waived on behalf of, the Liquidating Trustee.

### 6.3    Liquidating Trust Assets

The Liquidating Trust shall consist of Liquidating Trust Assets. On the Effective Date, and in accordance with sections 1123 and 1141 of the Bankruptcy Code, all title and interest in all of the Excluded Assets, which constitute all assets of the Debtors that have not been distributed on or prior to the Effective Date, sold and conveyed pursuant to the Sale Transaction, or contributed to the Tort Claims Trust on the Effective Date, shall irrevocably and automatically vest in the Liquidating Trust, free and clear of all liens, Claims, encumbrances and Interests (legal, beneficial or otherwise) for the benefit of the Liquidating Trust Beneficiaries. Upon the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors shall have no interest in or with respect to the Liquidating Trust Assets or Liquidating Trust. Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors and their respective predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust in accordance with this Section 6.3. For all U.S. federal income tax purposes, and subject to the DOF Election described in Section 6.6(h) below, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms herein as a transfer to the Liquidating Trust Beneficiaries, followed by a transfer of such assets by such Liquidating Trust Beneficiaries to the Liquidating Trust, and the Liquidating Trust

-29-

Beneficiaries will be treated as the grantors and owners thereof. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, to the maximum extent provided by section 1146(a) of the Bankruptcy Code. In connection with the transfer of such Liquidating Trust Assets, any attorney client privilege, work product privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidating Trust shall vest in the Liquidating Trust and its representatives, and the Debtors and the Liquidating Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The Liquidating Trustee shall agree to accept and hold the Liquidating Trust Assets in the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries, subject to the terms of the Plan and the Liquidating Trust Agreement. The Debtors, the Liquidating Trustee, and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as necessary to cause title to the Liquidating Trust Assets to be transferred to the Liquidating Trust.

6.4    Non-Transferability of Liquidating Trust Interests

The Liquidating Trust Interests shall be non-transferable other than if transferred by will, intestate succession or otherwise by operation of law.

6.5    Administration of Liquidating Trust

The Liquidating Trust shall be administered by the Liquidating Trustee pursuant to the Liquidating Trust Agreement and the Plan. In the event of an inconsistency between the Plan and a Liquidating Trust Agreement as such conflict relates to anything other than the establishment of a Liquidating Trust, the Liquidating Trust Agreement shall control.

6.6    Liquidating Trustee

(a)    *Appointment of the Liquidating Trustee*

The Liquidating Trustee shall be selected by the Committee in consultation with the Debtors. Upon the occurrence of the Effective Date, the Liquidating Trustee shall also be deemed appointed to serve as the trustee and administrator of the Liquidating Trust established pursuant to the Plan and the Liquidating Trust Agreement. The Liquidating Trustee, subject to the terms and conditions of the Plan and the Liquidating Trust Agreement, shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and the Liquidating Trust Agreement, as applicable.

-30-

(b)    *Liquidating Trustee as Representative of the Estate*

From and after the Effective Date, the Liquidating Trustee shall act as the exclusive representative of the Estate for all purposes; *excluding, however*, all matters involving the funding and administration of the Tort Claims Trust which shall be administered exclusively by the Tort Claims Trustee in accordance with the Plan and the Tort Claims Trust Documents. Any successor Liquidating Trustee appointed pursuant to the Liquidating Trust Agreement shall be bound by and comply with the terms of this Plan and the Liquidating Trust Agreement.

(c)    *Responsibilities and Authority of the Liquidating Trustee*

The responsibilities and authority of the Liquidating Trustee shall be as set forth in the Liquidating Trust Agreement, and shall include, among others, the following rights and responsibilities, which shall be the exclusive rights and responsibilities of the Liquidating Trustee: (i) preserving and liquidating the Liquidating Trust Assets; (ii) administering and paying taxes for the Liquidating Trust, including, among other things, (A) filing tax returns for the Liquidating Trust, and (B) representing the interest and account of the Liquidating Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, or audit; (iii) retaining and paying, without the need for retention or fee applications, professionals in connection with the Liquidating Trustee's performance of its duties under this Plan and the Liquidating Trust Agreement; (iv) distributing information statements as required for U.S. federal income tax and other applicable tax purposes to the Liquidating Trust Beneficiaries; (v) filing an application for entry by the Bankruptcy Court of a final decree closing the Chapter 11 Case; (vi) making Distributions to Liquidating Trust Beneficiaries in accordance with the Plan and Liquidating Trust Agreement; (vii) objecting to, reconciling, seeking to subordinate, compromising, defending or prosecuting any Retained Causes of Action, or settling all Claims as set forth herein; (viii) making Distributions to the Liquidating Trust Beneficiaries in accordance with the Plan and Liquidating Trust Agreement; (ix) requesting an expedited determination of taxes, including with respect to any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code; and (x) such other responsibilities as may be vested in the Liquidating Trustee pursuant to this Plan and the Liquidating Trust Agreement, or an order of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of this Plan.

(d)    *Powers of the Liquidating Trustee*

The Liquidating Trustee shall have the power and authority to perform the acts described in the Liquidating Trust Agreement, in addition to any powers granted by law or conferred to it by any other provision of the Plan, including without limitation any set forth herein, *provided however*, that enumeration of the following powers shall not be considered in any way to limit or control the power and authority of the Liquidating Trustee to act as specifically authorized by any other provision of this Plan, the Liquidating Trust Agreement, and/or any applicable law, and to act in such manner as the Liquidating Trustee may deem necessary or appropriate to take any act deemed appropriate by the Liquidating Trustee, including, without limitation, to discharge all obligations assumed by the Liquidating Trustee or provided herein and to conserve and protect the Liquidating Trust or to confer on the creditors the benefits intended to be conferred upon them by this Plan.

The powers of the Liquidating Trustee shall be as set forth in the Liquidating Trust Agreement, and shall include, among others, the following: (i) the power to invest funds of the Liquidating Trust (in demand and time deposits, or other temporary, liquid investments, except as otherwise determined to be reasonably necessary to maintain the value of the assets and to further the liquidating purpose of the Liquidating Trust), and withdraw, make Distributions, and pay taxes and other obligations owed by the Liquidating Trust from such funds in accordance with this Plan and the Liquidating Trust Agreement; (ii) the power to engage and compensate, without prior Bankruptcy Court order or approval, employees and professionals to assist the Liquidating Trustee with respect to its responsibilities; or (iii) such other powers as may be vested in or assumed by the Liquidating Trustee pursuant to this Plan, the Liquidating Trust Agreement, or by an order of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of this Plan.

On and after the Effective Date, the Liquidating Trustee shall take commercially reasonable actions as required, consistent with applicable non-bankruptcy law and consistent with the implementation of the Plan, and when appropriate in the discretion of the Liquidating Trustee, to dissolve, liquidate, strike off or take such other similar action with respect to each Debtor (including the cancellation of all Interests in a Debtor pursuant to the Confirmation Order) and complete the winding down of such Debtor as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of such Debtor or its shareholders or members, or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate governmental authorities or complying with the laws and procedures governing the winding down of any such Debtor; *provided, however*, that the foregoing does not limit the Liquidating Trustee's ability to otherwise abandon an Interest in a Debtor. The Liquidating Trustee may, to the extent required by applicable non-bankruptcy law, maintain a Debtor as a limited liability company or corporation, as applicable, in good standing until such time as all aspects of the Plan pertaining to such Debtor and the winding down of such Debtor is complete.

(e)    <em>Compensation of the Liquidating Trustee</em>

The Liquidating Trustee shall be compensated as set forth in the Liquidating Trust Agreement. The Liquidating Trustee shall fully comply with the terms, conditions and rights set forth in this Plan and the Liquidating Trust Agreement. The Liquidating Trustee (and any Liquidating Trustee's retained professionals) shall not be required to file a fee application to receive compensation.

(f)    <em>Retention and Payment of Professionals</em>

The Liquidating Trustee shall have the right, without Bankruptcy Court approval, to retain the services of attorneys, accountants, and other professionals and agents, to assist and advise the Liquidating Trustee in the performance of his, her, or its duties, and to compensate and reimburse expenses of such professionals in accordance with the Liquidating Trust Agreement. For the avoidance of doubt, the Liquidating Trust can retain any professional currently retained by the Creditors' Committee.

(g)    *Liquidating Trust Expenses*

The Liquidating Trustee may, in the ordinary course of business and without the necessity for any application to, or approval of, the Bankruptcy Court, pay any accrued but unpaid Liquidating Trust expenses.  All Liquidating Trust expenses shall be charged against and paid from the Liquidating Trust Assets.

(h)    *DOF Election*

The Liquidating Trust Agreement shall require the Liquidating Trustee to elect to treat that portion of the Liquidating Trust Assets subject to the Disputed Claims as a disputed ownership fund described in Treasury Regulation Section 1.468B-9 (the "DOF Election") unless, as of the Trust Election Date, either all of the Liquidating Trust Assets subject to Disputed Claims have been distributed to the Liquidating Trust Beneficiaries or the percentage of the Liquidating Trust Assets subject to Disputed Claims distributable to each of the Liquidating Trust Beneficiaries has become fixed and determinable.

6.7    Cash Investments

The Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom); *provided*, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

6.8    No Revesting of Liquidating Trust Assets

No Liquidating Trust Asset will revest in any Debtor on or after the date such asset is transferred to the Liquidating Trust, but will vest upon such transfer in the Liquidating Trust to be administered by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement.

6.9    Distribution of Liquidating Trust Assets

The Liquidating Trustee shall distribute to the Liquidating Trust Beneficiaries on account of their Liquidating Trust Interests on a semi-annual basis or with such other frequency as the Liquidating Trustee determines in the exercise of its business judgment, Cash representing its net income plus all net proceeds from the sale of its assets (including any Cash received from the Debtors and treating any permissible investment as Cash for purposes of this Section 6.9), less such amounts that may be reasonably necessary to (i) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (ii) pay reasonably incurred or anticipated expenses (including, without limitation, any taxes imposed on or payable by the Debtors or the Liquidating Trust or in respect of the Liquidating Trust Assets), or (iii) satisfy other liabilities incurred or anticipated by such Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement; *provided*, *however*, that such Liquidating Trustee shall not be required to make a Distribution pursuant to this Section 6.9 of the Plan if such Liquidating Trustee determines that the expense associated with making the Distribution would likely utilize a substantial portion of the amount to be distributed, thus making the Distribution impracticable.

-33-

The Liquidating Trustee shall make Distributions from the segregated Liquidating Trust Assets for the benefit of the holders of Allowed Administrative Expenses in accordance with the Plan or the Liquidating Trust Agreement. Notwithstanding anything herein to the contrary, the Liquidating Trustee shall comply with the Distribution Waterfall in connection with any Distributions to be made hereunder.

6.10    Liquidating Trust Mechanics

(a)    *Federal Income Tax Treatment of Liquidating Trust.*

The U.S. federal income tax classification of the Liquidating Trust will be determined pursuant to subsection (b) and/or (c) below, as applicable.

(b)    *Disputed Claims Resolved Before Trust Election Date*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by such Liquidating Trustee), for all United States federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) shall treat the transfer of Liquidating Trust Assets to a Liquidating Trust as (i) a transfer of Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (ii) the transfer by such beneficiaries to a Liquidating Trust of Liquidating Trust Assets in exchange for the related Liquidating Trust Interests. Subject to Section 6.11; (i) the Liquidating Trust is structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" for U.S. federal income tax purposes within the meaning of Sections 671 through 679 of the Tax Code to the Liquidating Trust Beneficiaries, consistent with the terms of the Plan, and the Liquidating Trust Agreement shall provide as such; (ii) Liquidating Trust Beneficiaries shall be treated as the beneficiaries and grantors of the Liquidating Trust; (iii) the sole purpose of the Liquidating Trust shall be the liquidation and Distribution of the Liquidating Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d), including the resolution of Allowed Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iv) all parties (including the Debtor, Liquidating Trust Beneficiaries, and the Liquidating Trustee) shall report consistently with such treatment (including the deemed receipt of the Liquidating Trust Assets, subject to applicable liabilities and obligations, by the Liquidating Trust Beneficiaries, followed by the deemed transfer of such Liquidating Trust Assets to the Liquidating Trust); (v) all parties shall report consistently for federal income tax purposes, and otherwise, with the valuation (as determined pursuant to Section 6.101 below) of the Liquidating Trust Assets transferred to the Liquidating Trust as determined by the Liquidating Trustee (or its designee); (vi) the Liquidating Trustee shall be responsible for filing returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a); (vii) the Liquidating Trustee shall annually send to each Liquidating Trust Beneficiary a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes; and (viii) all items of income, deductions and credit loss of the Liquidating Trust shall be allocated for federal income tax purposes to the

-34-

Liquidating Trust Beneficiaries based on their respective interests in the Liquidating Trust, in such manner as the Liquidating Trustee deems reasonable and appropriate. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. For the purpose of this Section 6.10(b), the terms "party" and "Liquidating Trust Beneficiary" shall not include the United States or any agency or department thereof, or any officer or employee thereof acting in such capacity.

(c)    *Disputed Claims Unresolved by Liquidating Trust Election Date*

If all Disputed Claims have not been resolved by the Trust Election Date, then the Liquidating Trustee will elect to treat that portion of the Liquidating Trust Assets subject to the Disputed Claims as a "disputed ownership fund" as described in and governed by Treasury Regulation Section 1.468B-9, and all impacted parties (including the Debtor, and solely to the extent applicable, Liquidating Trust Beneficiaries, and the Liquidating Trustee), solely with respect to the impacted assets, shall report for United States federal, state, and local income tax purposes consistently with such election. The Liquidating Trustee shall file all income tax returns with respect to any income attributable to the disputed ownership fund and shall pay the U.S. federal, state, and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit, or loss allocable thereto. Any taxes imposed on the disputed ownership fund or its assets will be paid out of the assets of the disputed ownership fund (including any assets of the Liquidating Trust allocable to Disputed Claims) and any subsequent Distributions in respect of the allowance or disallowance of such claims will be reduced accordingly. In the event, and to the extent, that any Cash in any disputed ownership fund is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of the disputed ownership fund, assets of the disputed ownership fund (including those otherwise distributable) may be sold to pay such taxes. The undisputed portion of the Liquidating Trust Assets will be treated as held in a grantor trust, with deemed Distribution to and contribution from the Liquidating Trust Beneficiaries, as described in the immediately preceding paragraph.

To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes).

6.11    <u>Tax Reporting</u>

(a)    Allocations of Liquidating Trust taxable income among Liquidating Trust Beneficiaries (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims, if such income is otherwise taxable at the Liquidating Trust) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, other than, if applicable, assets allocable to Disputed Claims) to the holders of Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from a Liquidating Trust. Similarly, taxable loss of a Liquidating Trust shall be allocated by reference to the manner in which an economic loss

would be borne immediately after a hypothetical liquidating Distribution of the remaining Liquidating Trust Assets. The tax book value of Liquidating Trust Assets for purpose of this paragraph shall equal their fair market value on the date Liquidating Trust Assets are transferred to a Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(b)    As soon as reasonably practicable after the Liquidating Trust Assets are transferred to a Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of Liquidating Trust Assets. Such valuation shall be made available from time to time to all parties to the Liquidating Trust (including, without limitation, the Debtors and Liquidating Trust Beneficiaries), to the extent relevant to such parties for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

6.12    Dissolution

(a)    The Liquidating Trustee and Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and a Liquidating Trust Agreement, or (ii) the Liquidating Trustee determines, in its sole discretion, that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit; *provided*, *however*, that in no event shall a Liquidating Trust be dissolved later than three (3) years from the creation of such Liquidating Trust pursuant to this Section 6.12 of the Plan unless the Bankruptcy Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

(b)    If at any time the Liquidating Trustee determines, in reliance upon such professionals as the Liquidating Trustee may retain, (i) that the expense of administering a Liquidating Trust so as to make a final Distribution to Liquidating Trust Beneficiaries is likely to exceed the value of the assets remaining in such Liquidating Trust, (ii) all Allowed Claims (other than those whose Distributions are deemed undeliverable under the Plan) have been paid in full, or (iii) the amount of any final Distributions to holders of Allowed Claims would be $100.00 or less and the aggregate amount of Cash available for Distributions to holders of Allowed General Unsecured Claims is less than $25,000.00, then, such Liquidating Trustee may apply to the Bankruptcy Court for authority to (a) reserve any amount necessary to dissolve such Liquidating Trust, (b) donate any balance to one or more of the following organizations (each of which qualifies as a Tax Code section 501(c)(3) tax-exempt organization): (1) the Bankruptcy Bar Foundation of the Bankruptcy Bar Association of the Southern District of Florida, or (2) Legal Services of Greater Miami, Inc., and (c) dissolve such Liquidating Trust.

(c)     The Liquidating Trustee shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash less than $100.00; *provided that*, if any Distribution is not made pursuant to this Section 6.12(c) of the Plan, such Distribution shall be added to any subsequent Distribution to be made on behalf of such holder's Allowed Claim.  If either (i no further Distribution shall be made by the Liquidating Trustee and any surplus Cash shall be donated and distributed to one or more of the following organizations (each of which qualifies as a tax-exempt organization under Section 501(c)(3) of the Tax Code), (a) the Bankruptcy Bar Foundation of the Bankruptcy Bar Association of the Southern District of Florida, or (b) Legal Services of Greater Miami, Inc.

6.13    Post-Effective Date Reporting

No later than the 20th day of the month following the end of each calendar quarter, the Liquidating Trustee shall File with the Bankruptcy Court and serve on the Office of the United States Trustee quarterly reports summarizing the Post-Confirmation receipts received and disbursements made by the Liquidating Trustee in the prior quarter.

6.14    Effectuating Documents; Further Transactions

(a)     On and after the Effective Date, the Liquidating Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

6.15    Withholding and Reporting Requirements

(a)     *Withholding Rights.*  In connection with the Plan, to the extent applicable, the Liquidating Trustee and/or any party issuing any instrument or making any Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such Distribution.  Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, to not make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations, including requiring as a condition to the receipt of a Distribution, the compliance with Section 6.15(b) below.  The Liquidating Trustee reserves the right to allocate all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.  Additionally, in the case of a non-Cash Distribution that is subject to withholding, the distributing party has the right, but not the

obligation, to withhold an appropriate portion of such distributed property and either (a) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (b) pay the withholding tax using its own funds and retain such withheld property.

(b)     *Forms.*     Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to the Liquidating Trustee or such other Person designated by the Liquidating Trustee (which Entity shall subsequently deliver to the Liquidating Trustee any such forms received) an executed IRS Form W-9 or (if the payee is a foreign Person) the appropriate IRS Form W-8 (including all relevant attachments). If such request is made by the Liquidating Trustee or such other Person designated by the Liquidating Trustee and the holder fails to comply before the date that is 90 calendar days after the request is made, the amount of such Distribution shall irrevocably revert to the Liquidating Trustee and, the holder shall be forever barred from asserting any right to such Distribution against any Debtors, the Debtors' Estates and the Liquidating Trustee.

6.16     Exemption From Certain Transfer Taxes

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, (i) the issuance, Distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors, (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, or (iii) any sale by any Debtor consummated post-Confirmation, and any other transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, sales tax, use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local government officials or agents to forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

6.17     Preservation of Retained Causes of Action

**The Debtors expressly reserve any and all Retained Causes of Action**. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Retained Cause of Action against them as any indication that the Debtors or the Liquidating Trustee will not pursue any and all available Retained Causes of Action against them.**

Except as otherwise provided in the Plan or a Final Order of the Bankruptcy Court, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Retained Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that each Debtor had immediately prior to the Effective Date on behalf of the respective Debtor's Estate or itself in accordance with any provision of the Bankruptcy Code or

any applicable non-bankruptcy law, including, without limitation, any affirmative Retained Causes of Action against parties with a relationship with the Debtor, other than the Debtor Released Parties and the Released Parties.

On and after the Effective Date, the Liquidating Trustee shall have standing to and may pursue such Retained Causes of Action.

Subject to the Sale Order, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidating Trustee shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent, notice to or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court subject to the terms of this Plan.  Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself.

6.18    Closing of the Chapter 11 Cases

After the Chapter 11 Cases of the Debtors have been fully administered, and all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Liquidating Trustee shall promptly seek authority from the Bankruptcy Court to close the Debtors' Chapter 11 Cases in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

6.19    Notice of Effective Date

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors or the Liquidating Trustee shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

**ARTICLE VII**
**TORT CLAIMS TRUST**

7.1    Purpose and Funding of the Tort Claims Trust

(a)    Purpose.  The Tort Claims Trust shall be established for the purposes of assuming any and all liability of the Insurance Settlement Released Parties for Tort Claims, which are and shall be channeled exclusively to the Tort Claims Trust pursuant to Section 13.6 hereof, receiving the Tort Claims Trust Assets from the Debtors, and distributing the Tort Claims Trust Assets to holders of Tort Claims pursuant to the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.

(b)    Funding.  On the Effective Date, after the payment of fees assessed pursuant to 28 U.S.C. § 1930(a)(6) as provided in Section 2.6 of this Plan, the Debtors shall deliver the Trust Assets plus any interest thereon to the Tort Claims Trustee.

7.2    Establishment of Tort Claims Trust; Conflict With Plan or Plan Confirmation Order

(a)    On the Confirmation Date, the Tort Claims Trust shall be established pursuant to the Tort Claims Trust Agreement and the Trust Documents. The Tort Claims Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder. The Debtors is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Tort Claims Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3).

(b)    The Tort Claims Trust Agreement and the Trust Documents are incorporated herein by reference.  In the event of any conflict between the Tort Claims Trust Agreement and the Trust Documents, on the one hand, and the Plan or the Plan Confirmation Order, on the other hand, the Tort Claims Trust Agreement and the Trust Documents shall control; *provided, however*, that in the event of any conflict between the Tort Claims Trust Agreement and the Trust Documents, on the one hand, and the Insurance Settlement Agreement or the Plan provisions incorporating and implementing the Insurance Settlement Agreement, on the other hand, the Insurance Settlement Agreement and the Plan provisions incorporating and implementing the Insurance Settlement Agreement shall control.

7.3    Distributions and Payments from the Tort Claims Trust

(a)    General Corpus.  The following Distributions and payments will be made from the Tort Claims Trust Assets:

(i)    Distributions.  Distributions on Class 6 Claims as determined by the Tort Claims Trustee in accordance with the Tort Claims Trust Agreement, and the Tort Claim ADR Procedures.

(ii)    Administrative Fees.  All fees, costs and expenses of  administering the Tort Claims Trust as provided in the Plan and the Tort Claims Trust Agreement including: (i) as reasonably necessary to meet current and estimated future liabilities of the Tort Claims Trust and/or the Tort Claims Trustee and to maintain the value of the Tort Claims Trust Assets; (ii) to pay reasonable administrative expenses (including any taxes imposed on the Tort Claims Trust and any professional fees of the Tort Claims Trustee and his Professionals); (iii) the fees and costs of the Tort Claims Reviewer;  and (iv) to satisfy other liabilities incurred by the Tort Claims Trust in accordance with the Plan or the Tort Claims Trust Agreement.  The fees and costs of the Liquidating Trustee or any Professional of the Liquidating Trustee shall not be paid by the Tort Claims Trust or Tort Claims Trust Assets.

-40-

(iii)    <u>Indemnity</u>.    The Tort Claims Trust's obligations to defend, indemnify or hold harmless any Person are expressly set out in the Plan and/or the Tort Claims Trust Agreement.

7.4    <u>Tax Matters; Medicare/Medicaid/SSA Reporting and Set-Asides</u>

(a)    The Tort Claims Trust shall not be deemed to be the same legal Entity as the Debtors, but only the assignee of certain assets of the Debtors and a representative of the Estate for delineated purposes within the meaning of Section 1123(b)(3) of the Bankruptcy Code. The Tort Claims Trust is expected to be tax exempt. The Tort Claims Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 et seq., as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 et seq., and Florida law and the regulations promulgated thereunder, and shall pay from the Tort Claims Trust Assets all taxes, assessments, and levies upon the Tort Claims Trust, if any.

(b)    Before making any Distribution of Tort Claims Trust Assets to any Beneficiary of the Tort Claims Trust, the Tort Claims Trustee shall (i) obtain written certification from the Tort Claimant to receive such a Distribution or their counsel that: (a) he or she has complied with reporting, and if necessary established any set-asides, required by applicable federal, state and local laws and regulations regarding settlements with minors and Medicare/Medicaid/SSA with respect to such Tort Claimant; (b) the Tort Claimant acknowledges that Medicare's interests in reimbursement for any incurred medical expenses that have been paid by Medicare have either already been satisfied and Medicare has acknowledged such satisfaction or will be satisfied from the Distribution of Tort Claims Trust Assets to the Tort Claimant; (c) satisfaction of Medicare's interests from the Distribution of Tort Claims Trust Assets to the Tort Claimant shall be the sole and exclusive responsibility of each individual Tort Claimant and each individual Tort Claimant agrees to provide proof of such satisfaction to the Tort Claims Trustee upon request; (d) each Tort Claimant agrees that the duties of each Tort Claimant stated in this paragraph are non-delegable and failure to perform such duties shall provide the Insurance Settlement Released Parties with a right to recover any monies paid caused by the failure to satisfy Medicare's interests including any additional expenses incurred and attorney fees; and (e) the Tort Claimant acknowledges and understands that the Settling Insurers are required to report any payment to a Medicare beneficiary in settlement of a claim under a liability insurance policy or self-insurance to Medicare (CMS); and (ii) provide a copy of such certification to the Debtors or Liquidating Trustee, as applicable, and the Settling Insurers.

7.5    <u>Appointment of the Tort Claims Trustee</u>

The initial Tort Claims Trustee shall be identified in the Plan Supplement. The Tort Claims Trustee shall commence serving as the Tort Claims Trustee on the Effective Date; *provided, however*, that the Tort Claims Trustee shall be permitted to act in accordance with the terms of the Tort Claims Trust Agreement prior to the Confirmation Date as may be agreed by the Debtors and the Settling Insurers and Municipalities and approved by the Bankruptcy Court.

7.6     Rights and Responsibilities of Tort Claims Trustee

Subject to Section 7.2(b), the Tort Claims Trustee shall be deemed the Estate's representative in accordance with Section 1123 of the Bankruptcy Code solely to make Distributions to the holder of Class 6 Claims in accordance with the Tort Claims Trust Agreement and the Tort Claim ADR Procedures. The Tort Claims Trustee: (1) shall make timely Distributions and not unduly prolong the duration of the Tort Claims Trust; (2) may request an expedited determination of taxes of the Tort Claims Trust under Section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Tort Claims Trust for all taxable periods through the dissolution of the Tort Claims Trust; and (3) may retain professionals, including legal counsel, accountants, financial advisors, auditors, and other agents on behalf of the Tort Claims Trust, and at the Trust's sole expense, as necessary or desirable to carry out the obligations of the Tort Claims Trustee hereunder and under the Tort Claims Trust Agreement.

7.7     Investment Powers; Permitted Cash Expenditures

All funds held by the Tort Claims Trust shall be invested in an interest bearing, collateralized bank account that complies with the Guidelines of the U.S. Trustee. The Tort Claims Trustee may expend the cash of the Tort Claims Trust in accordance with the Plan and the Tort Claims Trust Agreement.

7.8     Registry of Beneficial Interests

To evidence the beneficial interest in the Tort Claims Trust of each holder of such an interest, the Tort Claims Trustee shall maintain a registry of beneficiaries.

7.9     Non-Transferability of Interests

Any transfer of an interest in the Tort Claims Trust shall not be effective until and unless the Tort Claims Trustee receives written notice of such transfer.

7.10    Termination

The Tort Claims Trust shall terminate after the liquidation, administration and Distribution of the Tort Claims Trust Assets in accordance with the Tort Claims Trust Agreement and the Tort Claim ADR Procedures and the full performance by the Tort Claims Trustee of all other duties and functions set forth herein or in the Tort Claims Trust Agreement.

7.11    Immunity; Liability; Indemnification

(a)     The Liquidating Trustee, the Insurance Settlement Released Parties and the Tort Claims Trustee and any duly designated agent or representative of the Tort Claims Trustee, and any of their respective employees, agents, representatives, or professionals, shall not be liable for the act or omission of any other employee, agent, representative, or professional of the Tort Claims Trustee, except that the Tort Claims Trustee shall be liable for its specific acts or omissions resulting from such Tort Claims Trustee's misconduct, gross negligence, fraud, or breach of the fiduciary duty of loyalty. The Tort Claims Trustee may, in connection with the performance of its

-42-

functions and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors, and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons. Notwithstanding such authority, the Tort Claims Trustee shall not be under any obligation to consult with its attorneys, accountants, financial advisors, or agents, and its determination not to do so shall not result in the imposition of liability on the Tort Claims Trustee unless such determination is based on the Tort Claims Trustee's recklessness, gross negligence, willful misconduct, or fraud.

(b)    To the fullest extent permitted by applicable law, the Tort Claims Trust shall defend, protect, hold harmless, and indemnify the Insurance Settlement Released Parties from and against any and all claims, demands, judgments, awards, penalties, liens, damages, losses, expenses, costs and fees, and liabilities of any kind arising out of or relating to or in any way involving or connected with the Barred Claims, the Tort Claims, the Channeled Claims or the Underwriters' Policies.

(c)    No recourse shall ever be had, directly or indirectly, against the Tort Claims Trustee personally, or against any employee, contractor, agent, attorney, accountant or other professional retained in accordance with the terms of the Tort Claims Trust Agreement or the Plan by the Tort Claims Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or Tort Claims Trust Agreement whatsoever executed by the Tort Claims Trustee in implementation of this Tort Claims Trust Agreement or the Plan, or by reason of the creation of any indebtedness by the Tort Claims Trustee under the Plan for any purpose authorized by the Tort Claims Trust Agreement or the Plan, it being expressly understood and agreed that all such liabilities, covenants, and  agreements of the Tort Claims Trust whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Tort Claims Trust Assets or such part thereof as shall under the term of any such Tort Claims Trust Agreement be liable therefore or shall be evidence only of a right of payment out of the Tort Claims Trust Assets. Notwithstanding the foregoing, the Tort Claims Trust may be held liable for its recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud; and if liability on such grounds is established, recourse may be had directly against the Tort Claims Trustee. The Tort Claims Trust shall not be covered by a bond.

(d)    The Tort Claims Trust shall defend, indemnify and hold harmless, the Tort Claims Trustee, its officers, directors, agents, representatives, and employees to the fullest extent that a corporation or trust organized under the laws of Florida is entitled to indemnify and defend its directors, trustees, officers and employees against any and all liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties hereunder.

(i)    Additionally, the Debtors or the Liquidating Trustee, as applicable, and each of its respective agents, who was or is a party, or is threatened to be made a party to any threatened or pending judicial, administrative or arbitrative action, by reason of any act or omission of the Tort Claims Trust or Tort Claims Trustee or respective agents, with respect to: (i) the Chapter 11 Cases and any act or omission undertaken by them prior to the commencement thereof, (ii) the assessment or liquidation of any Class 6 Claims, (iii) the administration of the Tort Claims Trust and the implementation of the Tort Claim ADR

-43-

Procedures, or (iii) any and all activities in connection with the Tort Claims Trust Agreement, shall be indemnified and defended by the Tort Claims Trust, to the fullest extent that a corporation or trust organized under the laws of Florida is from time to time entitled to indemnify and defend its officers, directors, trustees and employees, against reasonable expenses, costs and fees (including attorneys' fees and costs), judgments, awards, amounts paid in settlement and liabilities of all kinds incurred by the Debtors or Liquidating Trustee, and their respective professionals, officers, and directors, in connection with or resulting from such action, suit or proceeding, provided such expenditures have been approved by the Tort Claims Trust in advance, such approval not to be unreasonably withheld.

(ii)     Reasonable expenses, costs, and fees (including attorneys' fees and costs) incurred by or on behalf of a Tort Claims Trustee, the Debtors, the Liquidating Trustee, and their respective agents in connection with any action, suit or proceeding, whether civil, administrative, or arbitrative, from which they are entitled to be indemnified by the Tort Claims Trust, shall be paid by the Tort Claims Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of such Tort Claims Trustee, the Debtors, the Liquidating Trustee, and their respective agents, to repay such amount in the event that it shall be determined ultimately by Final Order that such Tort Claims Trustee, the Debtors, the Liquidating Trustee, and their respective professionals, officers and directors is not entitled to be indemnified by the Tort Claims Trust.

7.12     Treatment of Tort Claims

(a)     Trust Liability.    On the Effective Date, the Tort Claims Trust shall automatically and without further act or deed assume any and all liability of the Debtors and the Insurance Settlement Released Parties for Tort Claims, which are and shall be channeled exclusively to the Tort Claims Trust pursuant to Section 13.6 hereof, and upon receipt of the Tort Claims Trust Assets from the Debtors shall have the sole and exclusive responsibility for preserving, managing and distributing the Trust Assets pursuant to the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.

(b)     Distributions to Tort Claimants.    Tort Claimants shall receive Distributions from the Tort Claims Trust Assets in the amount(s) and at the time(s) provided for in the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.  Any payment to a Tort Claimant constitutes payment for damages on account of property damage or personal physical injuries or sickness arising from an occurrence, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended. For the avoidance of doubt, Tort Claimants' recovery on their Class 6 Claims shall be limited to the Distributions they are entitled to, if any, from the Tort Claims Trust Assets in the amount(s) and at the time(s) provided for in the Tort Claims Trust Agreement and the Tort Claim ADR Procedures, and they shall not be entitled to collect personally or otherwise any additional amounts whatsoever on account of their Tort Claims from the Debtors, the Estates, Liquidating Trustee, or the Insurance Settlement Released Parties, or from the property or assets of the Liquidating Trustee or the Insurance Settlement Released Parties, even if they do not receive a Distribution pursuant to the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.

(c)     <u>Dismissal of Pending Litigation</u>.  The Tort Claimants shall within ten (10) days of receipt of their respective Distribution from the Tort Claims Trust, file a notice of dismissal with prejudice of all Claims against the Debtors and/or the Insurance Settlement Released Parties, as applicable, in any presently pending lawsuit with each party to bear their own fees and costs. In the event that any Tort Claim asserted against the Debtors or any of the Insurance Settlement Released Parties in any lawsuit currently pending in any state or federal court is not dismissed as and when provided herein, the Tort Claims Trustee, the Liquidating Trustee and/or the Insurance Settlement Released Parties, as applicable, shall be authorized to apply to the applicable court and request that such lawsuit be dismissed, and in connection therewith such court shall be entitled to rely on the Plan and the Plan Confirmation Order in dismissing such lawsuit.

(d)     <u>Objections and Litigation After the Effective Date</u>.  As of the Effective Date, the Tort Claims shall be analyzed exclusively by the Tort Claims Reviewer pursuant to the Tort Claim ADR Procedures. The Liquidating Trustee, the Settling Insurers and Municipalities shall have no right to object to any Tort Claim or any role in analyzing, assigning relative values to, and allocating Tort Claims Trust Assets to any Tort Claim.

(e)     <u>Claim Withdrawal</u>.  A Tort Claimant may withdraw his or her Tort Claim at any time on written notice to the Tort Claims Trustee. If withdrawn, (a) the Tort Claim will be withdrawn with prejudice and may not be reasserted, and such Tort Claimant shall still be subject to all of the terms and conditions of the Plan, including without limitation the releases of the Debtors and the Insurance Settlement Released Parties set forth in Section 13.7 hereof and the Channeling Injunction set forth in Section 13.6 hereof; and (b) any reserve maintained by the Tort Claims Trust on account of such Tort Claim shall revert to the Tort Claims Trust as a Tort Claims Trust Asset for Distribution in accordance with the Tort Claims Trust Agreement and the  Tort Claim ADR Procedures.

**ARTICLE VIII**
**INSURANCE SETTLEMENT AGREEMENT**

8.1     <u>Insurance Settlement Agreement</u>

The Insurance Settlement Agreement is hereby incorporated and made part of the Plan as if set forth fully herein. Upon the Plan Confirmation Order becoming a Final Order, the Insurance Settlement Agreement is and shall be fully binding on the Debtors, the Liquidating Trustee, the Insurance Settlement Released Parties, the Tort Claimants, the Tort Claims Trust, the Tort Claims Trustee, the Barred Persons, and all other Persons and Entities, along with the successors or assigns of any of the foregoing.

8.2     <u>Additional Documentation; Non-Material Modifications</u>

From and after the Effective Date, the Tort Claims Trustee, the Settling Insurers, Municipalities, the Purchaser and/or the Tort Claimants, as applicable, shall be authorized to enter into, execute, adopt, deliver, or implement all notes, contracts, security agreements, instruments, releases, and other agreements or documents necessary to effectuate the agreements contained in the Insurance Settlement Agreement without further order of the Bankruptcy Court. Additionally,

the Tort Claims Trustee, the Settling Insurers, Municipalities, the Purchaser and the Tort Claimants, as applicable, may make technical or immaterial alterations, amendments, modifications, or supplements to the terms of the Insurance Settlement Agreement. A class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or supplemented under this Section, if the proposed alteration, amendment, modification, or supplement does not materially and adversely change the treatment of the Claims within such class. An order of the Bankruptcy Court approving any amendment or modification made pursuant to this Section shall constitute an order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

8.3     Conflict

Except as expressly provided in the Plan, neither the Plan nor the Plan Confirmation Order shall amend, modify, waive, or alter in any way the Insurance Settlement Agreement or any of the Settling Insurers, Municipalities or Purchaser's rights and/or the Debtors', the Tort Claims Trustee and Liquidating Trustee's obligations thereunder.  In the event of any conflict between the Plan, on the one hand, and the Insurance Settlement Agreement, on the other hand, the Insurance Settlement Agreement shall control.

**ARTICLE IX**
**PROVISIONS GOVERNING DISTRIBUTIONS**

9.1     Manner of Cash Payments Under the Plan

Any Distribution pursuant to the Plan, to the extent posted in the United States mail, shall be deemed made when deposited by the Liquidating Trustee or Tort Claims Trustee (or their respective agent(s)), as applicable, into the United States mail.  At the option of the Liquidating Trustee, or Tort Claims Trustee, as applicable, any Cash payment to be made pursuant to the Plan shall be made by check drawn on a domestic bank, by wire transfer, or by ACH, from a domestic bank, or other method mutually agreed upon by the holder of the Allowed Claim and the Liquidating Trustee or Tort Claims Trustee.  Whenever any Distribution to be made under the Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on that due date.

9.2     Entity Making Distributions

Distributions to holders of Allowed Claims (other than Allowed Tort Claims) shall be made by the Liquidating Trustee.   Distributions to the holders of Allowed Tort Claims shall be made by the Tort Claims Trustee pursuant to the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.  The Liquidating Trustee shall hold the Disputed Claims Reserve for all Claims (other than Tort Claims) that will receive a Distribution under the Plan.  Neither the Liquidating Trustee nor the Tort Claims Trustee shall be required to give any bond or surety or other security for the performance of their duties, unless otherwise ordered by the Bankruptcy Court.

9.3     Distribution Dates

Distributions to holders of Claims shall be made as provided in ARTICLE II, ARTICLE III, ARTICLE IV and ARTICLE VI of this Plan.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

9.4     Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date. The Liquidating Trustee or Tort Claims Trustee, as applicable, shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  In making any Distribution with respect to any Claim, the Liquidating Trustee or Tort Claims Trustee, as applicable, shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that was known to the Debtors as of the Record Date.

9.5     Delivery of Distributions

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made by the Liquidating Trustee or Tort Claims Trustee, as applicable, at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim filed by such holder or (b) the last known address of such holder if no proof of Claim is filed or if the Liquidating Trustee or Tort Claims Trustee, as applicable, have not been notified in writing of a change of address.

9.6     Undeliverable and Unclaimed Distributions

In the event that any Distribution to any holder of an Allowed Claim made by the Liquidating Trustee or Tort Claims Trustee, as applicable is returned as undeliverable, the Liquidating Trustee or Tort Claims Trustee, as applicable, shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until the Liquidating Trustee or Tort Claims Trustee, as applicable, has determined the then current address of such holder; *provided, however*, that all Distributions to holders of Allowed Claims made by the Liquidating Trustee or Tort Claims Trustee, as applicable, that are unclaimed for a period of ninety (90) days after the date of the first attempted Distribution shall have its, his or her Claim for such undeliverable Distribution deemed satisfied and will be forever barred from asserting any such Claim against the Debtors, the Liquidating Trustee or Tort Claims Trustee, as applicable, or any of their properties.  Any Distributions which are undeliverable or have not been negotiated within the time set forth above shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Liquidating

-47-

Trustee or Tort Claims Trustee, as applicable. The Liquidating Trustee or Tort Claims Trustee, as applicable, shall have no further obligation to make any Distribution to the holder of such Claim on account of such Claim, and any entitlement of any holder of such Claim to any such Distributions shall be extinguished and forever barred.

9.7    Compliance with Tax Requirements

The Liquidating Trustee or Tort Claims Trustee, as applicable, may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or Distribution on account of Claims; *provided*, *however*, that the Liquidating Trustee or the Tort Claims Trustee, as applicable, shall not make any such withholdings described in this paragraph (other than routine tax withholdings with respect to employee-related claims (if any)) from any payment or Distribution on account of Claims without first filing a notice with the Court (and serving such notice on the holder of the Claim) describing the nature and amount of the proposed withholding and providing the Creditor an opportunity to object. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such holders of the Claims. The Liquidating Trustee or Tort Claims Trustee, as applicable, shall be authorized to collect such tax information from the holders of Claims (including social security numbers or other tax identification numbers) as they in their sole discretion deems necessary to effectuate the Plan. In order to receive Distributions under the Plan, all holders of Claims shall identify themselves to the Liquidating Trustee or the Tort Claims Trustee, as applicable, and provide all tax information the Liquidating Trustee or the Tort Claims Trustee, as applicable, deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable to each holder). The Liquidating Trustee or Tort Claims Trustee, as applicable, may refuse to make a Distribution to any holder of a Claim that fails to furnish such information within the time period specified by the Liquidating Trustee or Tort Claims Trustee, as applicable, and such Distribution shall be deemed an unclaimed Distribution under the Plan, and, provided further that, if the Liquidating Trustee or Tort Claims Trustee, as applicable, fail to withhold in respect of amounts received or distributable with respect to any such holder and such Debtors are later held liable for the amount of such withholding, such holder shall reimburse the Liquidating Trustee or Tort Claims Trustee, as applicable, for such liability. Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, and (b) no Distributions shall be required to be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Liquidating Trustee or Tort Claims Trustee, as applicable, for the payment and satisfaction of such tax obligations or has, to the Tort Claims Trustee or Liquidating Trustee's, as applicable, satisfaction, established an exemption therefrom.

9.8    No Payments of Fractional Dollars

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under

-48-

the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

9.9     No Interest on Claims

Except as specifically provided for in this Plan or the Plan Confirmation Order or required by the Bankruptcy Code, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest on any Claim accruing on or after the Petition Date. Interest shall not accrue on any General Unsecured Claim that is a Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim. Except as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for post-petition interest or similar charges.

9.10     No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of such Claim.

9.11     Setoff and Recoupment

The Liquidating Trustee may set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that any of the Liquidating Trustee or Tort Claims Trustee, as applicable, or the Estate may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Liquidating Trustee or Tort Claims Trustee, as applicable, or the Estate of any right of setoff or recoupment that any of them may have against the holder of any Claim. Any such setoffs or recoupments may be challenged in Bankruptcy Court. Notwithstanding any provision in the Plan to the contrary, nothing herein shall bar any Creditor from asserting its setoff or recoupment rights to the extent permitted under section 553 or any other provision of the Bankruptcy Code; *provided, however*, that such setoff or recoupment rights are or have been timely asserted; *provided further, however*, that all rights of the Liquidating Trustee or Tort Claims Trustee, as applicable, and the Estate with respect thereto are reserved. A Creditor shall be deemed to have timely asserted its setoff or recoupment rights if it has asserted such rights in a timely-filed proof of claim or in any other manner reasonably calculated to give the Debtors or Liquidating Trustee notice thereof.

9.12     De Minimis Distributions; Charitable Donation

Notwithstanding anything to the contrary in the Plan, the Liquidating Trustee or Tort Claims Trustee, as applicable, shall not be required to make a Distribution to any Holder of an Allowed Claim if the dollar amount of the Distribution is less than $10.00 or otherwise so small that the cost of making that Distribution exceeds the dollar amount of such Distribution. On or about the time that the final Distribution is made, the Liquidating Trustee or Tort Claims Trustee, as applicable, may make a donation of undistributable funds as defined by Local Rule 3011-

-49-

1(C)(1), in the reasonable discretion of the Liquidating Trustee or Tort Claims Trustee, as applicable, to one or more of the following organizations (each of which qualifies for not-for-profit status under section 501(c)(3) of the Tax Code) with undistributable funds if, in the reasonable judgment of the Liquidating Trustee or Tort Claims Trustee, as applicable, the cost of calculating and making the final Distribution of the undistributable funds remaining is excessive in relation to the benefits to the or holders of Claims who would otherwise be entitled to such Distributions: (i) the Bankruptcy Bar Foundation of the Bankruptcy Bar Association of the Southern District of Florida; or (ii) Legal Services of Greater Miami, Inc.

9.13    Intentionally Omitted

9.14    Withholding from Distributions

Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from Distributions pursuant to the Plan.  The Liquidating Trustee or Tort Claims Trustee, as applicable, may withhold from amounts distributable pursuant to the Plan to any Person or Entity any and all amounts, determined in the reasonable discretion of the Liquidating Trustee or Tort Claims Trustee, as applicable, required to be withheld by any law, regulation, rule, ruling, directive, or other governmental requirement.  The Liquidating Trustee or Tort Claims Trustee, as applicable, shall not make any such withholdings described in this paragraph (other than routine tax withholdings with respect to employee-related claims (if any)) from any payment or Distribution on account of Allowed Claims without first filing a notice with the Court (and serving such notice on the Holder of such Allowed Claim) describing the nature and amount of the proposed withholding and providing the Creditor an opportunity to object.

9.15    Distributions in Satisfaction; Allocation

Except for the obligations expressly imposed by the Plan and the property and rights expressly retained under the Plan, if any, the Distributions and rights that are provided in the Plan shall be in complete satisfaction and release of all Claims against, liabilities in, Liens on, obligations of and Equity Interests in the Debtors and their Estate, whether known or unknown, that arose or existed prior to the Effective Date.  Distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest (if any).

9.16    No Distributions on Late-Filed Claims

Except as otherwise provided in a Final Order of the Bankruptcy Court, any Claim as to which a proof of Claim was required to be filed and was first filed after the applicable bar date in the Chapter 11 Cases, including, without limitation, the General Bar Date, the Administrative Expense Claims Bar Date, the Tort Claims Bar Date, and any bar date established in the Plan or in the Plan Confirmation Order or other order of the Bankruptcy Court, shall automatically be deemed a late-filed Claim that is disallowed in the Chapter 11 Cases, without the need for (a) any further action by the Liquidating Trustee or Tort Claims Trustee, as applicable, or (b) an order of the Bankruptcy Court.  Nothing in this paragraph is intended to expand or modify the applicable bar dates or any orders of the Bankruptcy Court relating thereto.

# ARTICLE X
# DISPUTED CLAIMS

The provisions of this ARTICLE X shall apply to Disputed Claims in Classes 1 through 5, and Class 7.  The provisions of this ARTICLE X shall not apply to Claims in Class 6, which shall be resolved as provided in the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.

## 10.1    Disputed Claims Reserve

The Liquidating Trustee will withhold from the property that would otherwise be distributed to holders of Claims within a given Class an amount sufficient to be distributed on account of Claims that are not Allowed Claims within that Class as of the Effective Date, and shall place such withheld property in a Disputed Claims Reserve, which thereafter will be retained and administered by the Liquidating Trustee, as applicable.

## 10.2    Resolution of Disputed Claims

The Liquidating Trustee shall have the right to make and file Objections to Claims in the Bankruptcy Court, provided however that the Purchaser shall have the right to file objections to Priority Claims.  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, all Disputed Claims shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

## 10.3    Objection Deadline

All objections to Disputed Claims shall be filed no later than the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing, with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

## 10.4    Estimation of Claims

At any time, the Liquidating Trustee may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Liquidating Trustee has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Claim, the Liquidating Trustee may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

12867436-16

10.5    No Distributions Pending Allowance

Notwithstanding any other provision in the Plan, if any portion of a Claim is Disputed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  Upon allowance, a holder of the Allowed Disputed Claim shall receive any Distributions that would have been made up to the date of allowance to such holder under the Plan had the Disputed Claim been allowed on the Effective Date.

10.6    Disallowed Claims

All Claims held by Persons or Entities against whom or which any of the Debtors or the Liquidating Trustee has commenced an Avoidance Action shall be deemed Disallowed Claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such Disallowed Claims shall not be entitled to vote to accept or reject the Plan. Claims that are deemed Disallowed Claims pursuant to this Section 10.6 shall be disallowed for all purposes (including for purposes of receiving Distributions) until the Avoidance Action against such Person or Entity has been settled or resolved by Final Order and any sums due to the Debtors or the Liquidating Trustee from such Person or Entity have been paid.

10.7    Resolution of Claims

On and after the Effective Date and except for objections to Claims filed by the Purchaser, the Liquidating Trustee shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.  Pursuant to section 510 of the Bankruptcy Code, the Liquidating Trustee reserves the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**ARTICLE XI**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

11.1    General Treatment; Rejected if not Previously Assumed

**Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, upon the Effective Date, all executory contracts and unexpired leases that exist between the Debtors and any Person or Entity shall be deemed rejected by the Debtors, except for any executory contract or unexpired lease (i) that has been assumed and assigned to the Purchaser, (ii) has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (iii) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Effective Date, (iv) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (or (v) is a D&O Liability Insurance Policy.  Subject to the occurrence of the Effective Date, entry of the Plan Confirmation Order shall constitute approval of such**

assumption or rejection pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption or rejection is in the best interests of the Debtors, the Liquidating Trustee, the Estate, and all parties in interest in the Chapter 11 Cases.

11.2    Bar to Claims Arising from Rejection, Termination or Expiration

**Claims created by the rejection of executory contracts or unexpired leases (including, without limitation, the rejection provided in Section 11.1 ("General Treatment; Rejected if not Previously Assumed") or the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date must be filed with the Bankruptcy Court and served on the Liquidating Trustee no later than thirty (30) days after (a) the *date of the entry of any order of the Bankruptcy Court authorizing rejection*, with respect to any executory contract or unexpired lease rejected by the Debtors or otherwise pertaining to such order, or (b) *the Confirmation Date*, with respect to any executory contract or unexpired lease that is deemed rejected pursuant to Section 11.1 ("General Treatment; Rejected if not Previously Assumed"). Any rejection claim for which a proof of claim is not filed and served within the time provided herein will be forever barred from assertion and shall not be enforceable against the Debtors, or the Estates, assets, properties, or interests in property, or the Liquidating Trustee, or the Estates, assets, properties, or interests in property. Nothing contained herein shall be deemed an admission by the Debtors that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtors or the Liquidating Trustee of any objections to such Claim if asserted.**

11.3    Assumption of Executory Contracts and Unexpired Leases

(a)    Proof of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed and Assigned.  Any and all proofs of claim relating to executory contracts or unexpired leases that have been assumed and assigned in the Chapter 11 Cases will be deemed amended and superseded by the applicable Cure Claim, are assumed by the Purchaser pursuant to the Asset Purchase Agreement and, pursuant to Section 365(k) of the Bankruptcy Code, shall be expunged, stricken and disallowed as against the Debtors, the Estates, the Liquidating Trustee and their respective properties.

(b)    Assumption of D&O Liability Insurance Policies.  Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Debtors will be deemed to have assumed all D&O Liability Insurance Policies pursuant to Sections 105 and 365(a) of the Bankruptcy Code. Entry of the Plan Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan or Plan Confirmation Order, confirmation of the Plan will not discharge, release, impair, or otherwise modify any obligations, including but not limited to, indemnity obligations of the insurers under the D&O Liability Insurance Policies assumed by the foregoing assumption of the D&O Liability Insurance Policies, any agreements, documents, and instruments related thereto.

11.4    Indemnification and Reimbursement

Subject to the occurrence of the Effective Date, all Allowed Claims against the Debtors for indemnification, defense, reimbursement, or limitation of liability of current or former directors, officers, or employees of the Debtors against any Claims, costs, liabilities or causes of action as provided in the Debtors' operating agreement, bylaws, other organizational documents, or applicable law, shall, to the extent such indemnification, defense, reimbursement, or limitation is owed in connection with one or more events or omissions occurring before the Petition Date, be (i) paid only to the extent of any applicable insurance coverage, and (ii) to the extent a proof of Claim has been timely filed and is Allowed, be treated as Subordinated Claims to the extent such Claims are not covered by any applicable insurance, including deductibles.  Nothing contained in the Plan shall affect the rights of directors, officers or employees under any insurance policy or coverage with respect to such Claims, costs, liabilities or Causes of Action or limit the rights of the Debtors or the Debtors' Estates to object to or otherwise contest or challenge Claims or rights asserted by any current or former officer, director or employee of the Debtors.  Any D&O Insurance Policy to which one or more of the Debtors is a party as of the Effective Date, shall be deemed executory and shall be assumed by the Debtors on behalf of the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless any such D&O Insurance Policy was previously assumed and assigned under the Asset Purchase Agreement, was rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court, or is the subject of a motion to reject pending on the Effective Date, and coverage for defense and indemnity under any D&O Insurance Policy shall remain available to all individuals within the definition of "Insured" in such D&O Insurance Policy.

## ARTICLE XII
## CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

12.1    Conditions Precedent to the Effective Date

The following are conditions precedent to the Effective Date that must be satisfied or waived:

(a)    The Court shall have entered the Plan Confirmation Order, in form and substance reasonably acceptable to the Committee, the Settling Insurers and the Purchaser, and the Plan Confirmation Order shall have become a Final Order.

(b)    There shall be no stay or injunction in effect with respect to the Plan Confirmation Order.

(c)    The Plan Documents shall have been duly executed and delivered; *provided, however*, that no party to any document requiring execution or delivery may unreasonably withhold its execution and delivery of such document to prevent this condition precedent from occurring.

(d)    The Plan Cash and the Cash comprising the Priority Claims Reserve shall have been delivered to the Liquidating Trustee, subject in all events to the terms of the Plan.

(e)    The Liquidating Trust Assets and the Tort Claims Trust Assets shall have been delivered to the Liquidating Trustee and the Tort Claims Trustee, respectively.

12.2    Waiver

Notwithstanding the foregoing conditions in ARTICLE XII, the Debtors reserve the right to waive the occurrence of or modify any condition precedent.  Any such written waiver of a condition precedent set forth in Section 12.1 (b) and (c) may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date or Confirmation Date (as applicable) shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## ARTICLE XIII
## EFFECT OF CONFIRMATION; INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS

13.1    Compromise and Settlement

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests.  The entry of the Plan Confirmation Order shall constitute approval of the Insurance Settlement Agreement and the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromises or settlements are fair, equitable, reasonable and in the best interests of the Debtors, the Estates and holders of Claims and Equity Interests.

13.2    Vesting of Assets

Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, the Excluded Assets shall vest in the Liquidating Trustee free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan or the Plan Confirmation Order.

Except as otherwise provided in the Plan, on the Effective Date, title to the Tort Claims Trust Assets shall vest in the Tort Claims Trust free and clear of all Claims, Liens, encumbrances, charges, and other Interests.  On the Effective Date, the Tort Claims Trust shall automatically and without further act or deed assume any and all liability of the Debtors and the Insurance Settlement Released Parties for Tort Claims, which are and shall be channeled exclusively to the Tort Claims Trust pursuant to Section 13.6 hereof, and upon receipt of the Tort Claims Trust Assets from the Debtors shall have the sole and exclusive responsibility for preserving, managing and distributing the Tort Claims Trust Assets pursuant to the Tort Claims Trust Agreement and the Tort Claim ADR Procedures.

13.3    Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the provisions of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Liquidating Trustee, the Tort Claims Trustee, the Released Parties, the Insurance Settlement Released Parties, the holders of Barred Claims, the holders of Channeled Claims, and any holder of a Claim against, or Equity Interest in, the Debtors and each of their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan or received a Distribution under the Plan.  For the avoidance of doubt, confirmation of the Plan does not provide the Debtors with a discharge under section 1141 of the Bankruptcy Code because the Debtors and their Estates will be wound down in accordance with the Plan.

13.4    Sale Order

Nothing contained in the Plan, the Disclosure Statement, or the Plan Confirmation Order, constitutes or shall be construed to (a) be inconsistent with the terms of the Sale Order or any modification or amendment to the Sale Order; or (b) waive, release, alter, modify or impair the obligations of the Debtors and the Purchaser under the Asset Purchase Agreement, the Transition Services Agreement and the Sale Order.

13.5    Term of Injunctions or Stays

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, including any Order entered in the Adversary Proceeding (whether interlocutory or Final), all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

13.6    Channeling Injunction

(a)    **In furtherance of the Insurance Settlement Agreement:**

(i)    **any and all Channeled Claims, are hereby channeled to and shall be paid solely and exclusively from the Tort Claims Trust, which shall assume any and all liability of the Debtors and the Insurance Settlement Released Parties for such Tort Claims; and**

(ii)    **all Persons or Entities who have held or asserted, hold or assert, or may in the future hold or assert a Channeled Claim against the Debtors or the Insurance Settlement Released Parties are hereby permanently and forever barred, estopped, stayed, and enjoined from taking any action, directly or indirectly, or commencing or continuing any suit, action, or other proceeding on, or asserting, enforcing, or attempting to assert or enforce, any Channeled Claim against the Debtors or the Insurance Settlement Released Parties, or any of their property or assets, including without limitation:**

-56-

(1)      pursuing or seeking to pursue, by any manner or means, any Channeled Claim against the Debtors or the Insurance Settlement Released Parties;

(2)      continuing or commencing, or seeking to continue or commence, by any manner or means, any action or proceeding of any kind with respect to any Channeled Claim against the Debtors or the Insurance Settlement Released Parties, or any of their property or assets;

(3)      enforcing, attaching, collecting or recovering, or seeking to enforce, attach, collect or recover, by any manner or means, any judgment, award, decree, or order with respect to any Channeled Claim against the Debtors or the Insurance Settlement Released Parties, or any of their property or assets;

(4)      creating, perfecting or enforcing, or seeking to create, perfect or enforce, by any manner or means, any lien, claim or encumbrance of any kind with respect to any Channeled Claim against the Debtors or the Insurance Settlement Released Parties, or any of their property or assets; and

(5)      asserting, implementing or effectuating, or seeking to assert, implement or effectuate, by any manner or means, with respect to any Channeled Claim, any right of setoff, recoupment, indemnification, subrogation or other similar right of any kind, against:

a.      the Debtors or the Insurance Settlement Released Parties;

b.      any obligation due to any of any of the Debtors or the Insurance Settlement Released Parties; or

c.      the property or assets of the Debtors or the Insurance Settlement Released Parties.

The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation.  In the event of a violation of the Channeling Injunction, the Debtors or Liquidating Trustee, as applicable, the Tort Claims Trustee, and the Insurance Settlement Released Parties may seek an order from the Bankruptcy Court enforcing the Channeling Injunction and enjoining such violation and, in connection therewith, may seek an award of costs (including reasonable attorneys' fees and expenses) against the Person or Entity who is found to have violated the Channeling Injunction, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

13.7    Releases

(a)    **Releases by the Debtors and the Estates**.

(1)    Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Released

Parties, each of the Debtors and their current and former Affiliates and Representatives and the Estate shall be deemed to have provided a full, complete, unconditional and irrevocable release to the Released Parties (and each such Released Party so released shall be deemed released by the Debtors and their current and former Affiliates and Representatives and the Estates), from any and all Claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that the Debtors would have been legally entitled to assert or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of the Debtors or the Estates, including those in any way related to the Chapter 11 Cases or the Barred Claims, which release shall include any and all Retained Causes of Action, if any, against the Released Parties, or any of them; *provided*, *however*, that nothing in this Section 13.7(a)(1) shall release or be interpreted as a release of the Purchaser's obligations under the Asset Purchase Agreement, the Global Settlement Term Sheet, the Sale Order or any other documents executed by the Purchaser at the Closing.

(2)     Without limiting in any fashion the releases by the Debtors and the Estates of the Released Parties as provided in Section 13.7(a)(1) above, notwithstanding anything contained in the Plan to the contrary and subject only to the Plan Confirmation Order becoming a Final Order, the Debtors and the Estates hereby fully, finally, and completely remise, release, acquit and forever discharge the Insurance Settlement Released Parties from any and all Claims, whether actual or alleged, known or unknown, accrued or unaccrued, existing or potential, or suspected or unsuspected, which release shall include, but shall not be limited to, any and all Tort Claims for coverage under the Underwriters' Policies arising out of or relating to or in any way involving the Chapter 11 Cases, the Plan or the Barred Claims, whether for wrongful death, personal injury, emotional distress, property damage, economic loss, environmental damage, remediation or exposure, or any other form of loss, expense, or other benefit covered or potentially covered under the Underwriters' Policies.  For the avoidance of doubt, nothing contained herein is intended to release Claims or Causes of Action related to the D&O Liability Insurance Policies against any former directors and officers who are not Released Parties.

(b)     <u>Releases by Holders of Claims</u>.  To the fullest extent permitted by applicable law, except as otherwise provided in this Section 13.7(b), as of the Effective Date, each of the Releasing Parties shall be deemed to fully, completely, unconditionally, irrevocably, and forever release each of the Released Parties of and from any and all Claims and Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole

or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors and its current and former Affiliates and Representatives, whether direct, derivative, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise, and which, for the avoidance of doubt, shall include Claims arising out of or relating to the Chapter 11 Cases, the Plan, or the Barred Claims; *provided, however*, that nothing in this Section 13.7(b) shall release or be interpreted as a release of any of the Released Parties' or Liquidating Trustee's rights or obligations under the Plan (including with respect to Retained Causes of Action) or the Insurance Settlement Agreement; *provided, further, that* the releases set forth in this Section 13.7(b) shall not release any person or entity from any Retained Causes of Action, or any rights or obligations under the Global Settlement Term Sheet, the Asset Purchase Agreement, the Sale Order, or this Plan or Claims resulting from an act or omission determined by a Final Order of a court of competent jurisdiction to have constituted fraud, willful misconduct or gross negligence, provided that, each such Released Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, its actions or inactions.

(c)      **Release by Tort Claims Trustee**.  Notwithstanding anything contained in the Plan to the contrary and subject only to the Plan Confirmation Order becoming a Final Order, in consideration of and pursuant to the Insurance Settlement Agreement, the Tort Claims Trustee shall be deemed to fully, completely, unconditionally, irrevocably and forever release the Insurance Settlement Released Parties from any and all Claims and Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors and its current and former Affiliates and Representatives, whether direct, derivative, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise, and which, for the avoidance of doubt, shall include Tort Claims and any other Claims arising out of or relating to the Chapter 11 Cases or the Plan.

(d)      Entry of the Plan Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in  Section 13.7 pursuant to Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action released by this Plan; (b) in the best interests of the Debtors and all holders of Claims; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to the assertion of any Claim or Cause of Action thereby released.

(e)      EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH

-59-

ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING, WITHOUT LIMITATION, THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542 (WHICH STATES, "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY").

13.8    Exculpation

Notwithstanding anything contained herein the contrary, the Exculpated Parties shall neither have nor incur any liability relating to the Chapter 11 Cases to any Person or Entity for any and all Claims and Causes of Action arising after the Petition Date and through the Effective Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan or distributing property thereunder, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other post-petition act taken or omitted to be taken in connection with the Chapter 11 Cases; *provided*, *however* that the exculpation set forth in this Section 13.8 shall not exculpate any Person or Entity from Claims resulting from an act or omission determined by a Final Order of the Bankruptcy Court to have constituted fraud, willful misconduct or gross negligence; *provided that*, each such Released Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, its actions or inactions; *provided further*, *however*, nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to rule 4-1.8(h) of the Florida Rules of Professional Conduct. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability. The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.

13.9    Bar Order

**In furtherance of the Insurance Settlement Agreement, and for good and valuable consideration provided by the Insurance Settlement Released Parties, upon the Plan Confirmation Order becoming a Final Order:**

(a)    **All Persons and Entities holding a Barred Claim, including without limitation all Barred Persons, shall be permanently and forever barred, estopped, stayed, and enjoined from taking any action, directly or indirectly, or commencing or continuing any suit, action, or other proceeding on, or asserting, enforcing, or attempting to assert or enforce, any Barred Claim against the Insurance Settlement Released Parties, or any of their property or assets, including without limitation:**

(1)    **pursuing or seeking to pursue, by any manner or means, any Barred Claim against the Insurance Settlement Released Parties;**

(2)    **continuing or commencing, or seeking to continue or commence, by any manner or means, any action or proceeding of any kind with respect to any Barred Claim against the Insurance Settlement Released Parties, or any of their property or assets;**

(3)    **enforcing, attaching, collecting or recovering, or seeking to enforce, attach, collect or recover, by any manner or means, any judgment, award, decree, or order with respect to any Barred Claim against the Insurance Settlement Released Parties, or any of their property or assets;**

(4)    **creating, perfecting or enforcing, or seeking to create, perfect or enforce, by any manner or means, any lien, claim or encumbrance of any kind with respect to any Barred Claim against the Insurance Settlement Released Parties, or any of their property or assets; and**

(5)    **asserting, implementing or effectuating, or seeking to assert, implement or effectuate, by any manner or means, with respect to any Barred Claim, any right of setoff, recoupment, indemnification, subrogation or other similar right of any kind, against:**

a.    **the Insurance Settlement Released Parties;**

b.    **any obligation due to any of the Insurance Settlement Released Parties; or**

c.    **the property or assets of the Insurance Settlement Released Parties.**

**The Bar Order is an integral part of the Plan and is essential to the Plan's consummation and implementation. Absent the entry of the Bar Order, the Insurance Settlement Released Parties will not contribute the Insurance Settlement Proceeds or provide**

**the other accommodations agreed to in the Plan.  In the event of a violation of the Bar Order, any of the Insurance Settlement Released Parties may seek an order from the Bankruptcy Court enforcing the Bar Order and enjoining such violation and, in connection therewith, may seek an award of costs (including reasonable attorneys' fees and expenses) against the Person or Entity who is found to have violated the Bar Order, and such other legal or equitable remedies as are just and proper, after notice and a hearing.**

13.10   <u>Injunction</u>

Except as otherwise expressly provided for in the Plan, from and after the Effective Date, all Persons and Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, the Liquidating Trustee, the Estates, and their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim or Equity Interest, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or satisfied or to be released or satisfied pursuant to the Plan or the Plan Confirmation Order.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtors, the Liquidating Trustee, the Estate, and their successors and assigns and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to the Plan or the Plan Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to the Plan or the Plan Confirmation Order.

The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests against the Debtors or any of their assets or properties solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to the Plan or the Plan Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to the Plan or the Plan Confirmation Order.  On the Effective Date, all such Claims against, and Equity Interests in, the Debtors shall be satisfied and released in full.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Persons and Entities are permanently enjoined on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released pursuant to the Plan or Plan Confirmation Order, from:

(a)    commencing or continuing in any manner any action or other proceeding of any kind against the Debtors, the Liquidating Trustee, the Estates and their successors and assigns and their assets and properties;

        (b)     enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtors, the Liquidating Trustee, the Estates and their successors and assigns and their assets and properties;

        (c)     creating, perfecting or enforcing any encumbrance of any kind against the Debtors, the Liquidating Trustee, the Estates and their successors and assigns and their assets and properties; and

        (d)     commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder).

On and after the Effective Date, all persons and entities other than the Liquidating Trustee are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively or otherwise) on account of or respecting any claim, debt, right, or Retained Cause of Action of the Debtors for which the Liquidating Trustee retains sole and exclusive authority to pursue in accordance with the Plan.

### 13.11    Release of Liens

Except as otherwise provided herein or in any contract, instrument, release or other agreement or document created, or continuing in effect, pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estate distributed under the Plan shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert, as applicable, to the Debtors or Liquidating Trustee.

## ARTICLE XIV
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Plan Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors, the Liquidating Trustee, and the Plan as is legally permissible, including, without limitation, jurisdiction to:

        (a)     allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim against the Debtors, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of Claims;

        (b)     grant, deny or otherwise resolve any and all applications of Professionals or Persons retained in the Chapter 11 Cases by the Debtors for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(c)     resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired leases to which a Debtors is party or with respect to which a Debtors may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

(d)     ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan, including by resolving any disputes regarding, as applicable, the Debtors' or Liquidating Trustee's entitlement to recover assets held by third parties;

(e)     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Liquidating Trustee after the Effective Date;

(f)     enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

(g)     resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

(h)     issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

(i)     enforce Articles within this Plan;

(j)     resolve any cases, controversies, suits or disputes with respect to the releases, injunction, channeling injunction, Bar Order and other provisions contained in Article XII, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions, including, without limitation, awarding attorneys' fees to the Released Parties;

(k)     enter and implement such orders as necessary or appropriate if the Plan Confirmation Order is modified, stayed, reversed, revoked or vacated;

(l)     resolve any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Plan Confirmation Order, or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

(m)     enter an order and a Final Decree closing the Chapter 11 Cases.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal or

failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XV
## MISCELLANEOUS PROVISIONS

### 15.1    Modification of Plan

Subject to the limitations contained in the Plan, and the terms and conditions of the Insurance Settlement Agreement, the Debtors reserve the right in there sole discretion, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify the Plan prior to the entry of the Plan Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; *provided, however*, that any pre-Confirmation Date amendments shall not materially or adversely affect the interests, rights or treatment of any Allowed Claims or Equity Interests under the Plan; and after the entry of the Plan Confirmation Order, the Liquidating Trustee may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 15.2    Revocation of Plan

Subject to the limitations contained in the Insurance Settlement Agreement, the Debtors reserve the right in their sole discretion to revoke or withdraw the Plan prior to the entry of the Plan Confirmation Order, and to file subsequent chapter 11 plans.  If the Debtors revokes or withdraws the Plan or if entry of the Plan Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

### 15.3    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### 15.4    Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, unless otherwise stated, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without giving effect to the principles of conflict of laws thereof.

15.5    Reservation of Rights

The Plan shall have no force or effect unless and until the Effective Date occurs. Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtors with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

15.6    Intentionally Omitted

15.7    Section 1125(e) Good Faith Compliance

Confirmation of the Plan shall act as a finding by the Court that the Debtors and each of their Representatives have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

15.8    Further Assurances

The Debtors, all holders of Claims receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Plan Confirmation Order.

15.9    Service of Documents

Any pleading, notice or other document required herein to be served on or delivered to the Debtors shall be sent by both email and first class, certified U.S. mail, postage prepaid as follows:

**To the Debtors:**       Christopher Rankin
Chief Restructuring Officer
61 The Kingsway
Toronto, Ontario
M8X 2T3 Canada
Chris@rankinpartners.com

**With a copy to:**       Berger Singerman LLP
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
Telephone: 305-755-9500
Attn:   Paul Steven Singerman, Esq.
       singerman@bergersingerman.com
       Jordi Guso, Esq.
       jguso@bergersingerman.com

15.10   Filing of Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

15.11   Intentionally Omitted

15.12   Bankruptcy Rule 9019 Request; Impact

The Plan, including the Plan Supplement or other Plan Document, may provide for one or more compromises or settlements.  Pursuant to Bankruptcy Rule 9019, the Debtors hereby requests approval of all compromises and settlements included in the Plan, and entry of the Plan Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019 and Section 1123(b)(3)(A) of the Bankruptcy Code, of any such compromise or settlement.

[Signatures appear on the following page.]

Dated:  April 18, 2024

**BIRD GLOBAL, INC., *et al.*,**

**BERGER SINGERMAN LLP**
*Counsel for Debtors and*
*Debtors-in-Possession*
1450 Brickell Avenue, Suite 1900
Miami, FL  33131
Tel: (305) 755-9500
Fax: (305) 714-4340

By: ___*/s/ Christopher Rankin*_____
     Name: Christopher Rankin
     Title: Chief Restructuring Officer

By: ___*/s/ Jordi Guso*_____
     Paul Steven Singerman
     Florida Bar No. 378860
     singerman@bergersingerman.com
     Jordi Guso
     Florida Bar No. 0863580
     jguso@bergersingerman.com

12867436-16

**EXHIBIT 1**

**INSURANCE SETTLEMENT AGREEMENT**

Exhibit 1

## SETTLEMENT, RELEASE AND POLICY BUYBACK AGREEMENT

This Settlement, Release, and Policy Buyback Agreement (the "Agreement") is made as of April 18th, 2024, by and between Bird Global, Inc., Bird Rides, Inc, Bird US Holdco, LLC, Bird US Opco, LLC, and Skinny Labs, Inc. (collectively the "Debtors"), Blue Jay Transit, Inc. as assignee of Bird Scooter Acquisition Corp. (the "Purchaser"), and Lloyd's London Syndicates 1969 and 1971 (collectively "Underwriters")

## RECITALS

WHEREAS, on December 20, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"). The Debtors' Chapter 11 cases (collectively, the "Bankruptcy Cases") are being jointly administered under lead case, *In re: Bird Global, Inc*., Case No. 23-20514-CLC ("Jointly Administered"); and

WHEREAS, prior to the Petition Date, the Debtors contracted with Underwriters to provide general liability insurance coverage related to the operation of their businesses and Underwriters subscribed to the policies of insurance that were issued to the Debtors and certain of their non-debtor affiliates, as named insureds, described and identified in Schedule "1" hereto (as renewed, amended, modified, endorsed or supplemented from time to time, collectively, the "Underwriters' Policies"); the Underwriters' Policies include any and all policies of insurance that: (a) were subscribed to by Underwriters or by any Underwriters Party to or on behalf of any of the Debtors; (b) under which any or all of the Debtors are an Insured, Named Insured, or Additional Insured; or (c) under which Debtors, Additional Insureds, and/or any third party or co-defendant may contend they are entitled to coverage or benefits; and

WHEREAS, under the Underwriters' Policies and all agreements related thereto (collectively, the "Insurance Program"), Underwriters subscribe to, *inter alia*, certain commercial general liability insurance for specified policy periods subject to certain limits, self-insured retentions, exclusions, terms, and conditions, as more particularly described therein; and the insureds, including one or more of the Debtors, are required to perform certain monetary and non-monetary obligations including, among other monetary obligations, the payment of insurance premiums, deductibles, self-insured retention amounts, expenses including, but not limited to, allocated loss adjustment expenses, retrospective premiums up to certain loss limits for each occurrence assessments, surcharges, all as more particularly described in the Insurance Program (collectively, the "Obligations"); and

WHEREAS, prior to the Petition Date, numerous Tort Claims (as defined below) were asserted by various individuals and/or entities against the Debtors and a myriad of other third parties, including municipalities claiming indemnity against Debtors or Additional Insured status (as defined below) under the Underwriters' Policies; and

WHEREAS, the Tort Claims are unsecured, contingent, unliquidated, and/or disputed and the other third parties, municipalities, and Additional Insureds believe they have meritorious

1

defenses to the Tort Claims, and absent this Agreement, would insist on fully litigating the liability issues, a process that could take years and result in no recovery for the majority of the Tort Claimants; and

WHEREAS, Underwriters contend that most of the Tort Claims fall below the Debtors' self-insured retention Obligations thereby not triggering Underwriters' obligations under the Underwriters' Policies, including the obligation to provide a defense to the Insureds or Additional Insureds; and

WHEREAS, Tort Claims against the Debtors were stayed pursuant to §362 of the Bankruptcy Code upon the filing of the Bankruptcy Cases; and

WHEREAS, on January 24, 2024, the Debtors commenced an adversary proceeding against 56 Tort Claimants styled *Bird Global, Inc. et al. vs. Gregory Amundson, et al.,* Adversary Case No. 24-01010-CLC (the "Related Adversary Case"), to obtain an extension of the automatic stay and a preliminary injunction prohibiting those Tort Claimants from prosecuting their Tort Claims against municipalities and other defendants whom Debtors are contractually bound to defend and indemnify (the "Municipality Tort Claims"); and

WHEREAS, the Bankruptcy Court has entered one or more preliminary injunctions enjoining the prosecution of the Municipality Tort Claims for an initial 180 days following the Petition Date; and

WHEREAS, certain disputes have arisen or may arise in the future between Underwriters and the Debtors regarding the respective rights and obligations under the Underwriters' Policies and the Insurance Program, including the extent of the Debtors' Obligations and available coverage under the Underwriters' Policies (the "Coverage Disputes"); and

WHEREAS, given the substantial time and expense the Parties will incur to litigate the Coverage Disputes and the Tort Claims (including the Municipality Tort Claims), the limited financial resources of the Debtors, the risks of litigation, the potential for appeals, and the risk of delay in monetizing the Tort Claims against the Debtors, without admitting liability or any other concession as to the validity of the positions or arguments advanced by each other, the Debtors and Underwriters have agreed to compromise, and fully and finally resolve any and all Coverage Disputes between and among them on the terms set forth in this Agreement, which include (i) the funding of the Tort Claim Settlement Fund for the benefit of the Tort Claimants, (ii) the efficient resolution of the Tort Claims pursuant to the procedures described herein with the aim of providing a prompt distribution to the Holders of Tort Claims, and (iii) the channeling of the Tort Claims exclusively to the Tort Claims Trust; and

WHEREAS, on March 8, 2024, the Bankruptcy Court entered an *Order (I) Authorizing and Approving (A) The Sale of Substantially All of The Debtors' Assets Free and Clear Of All Liens, Claims, and Encumbrances and (B) The Assumption and Assignment Of Certain Executory Contracts And Unexpired Leases In Connection Therewith, and (II) Granting Related Relief* (the "Sale Order"), pursuant to which the Court approved the sale of substantially all the Debtors' assets

2

to the Purchaser, including the assumption and assignment of certain essential municipal permits, insurance policies, and other material contracts to the Purchaser; and

WHEREAS, subject to the terms of this Agreement, the Purchaser has agreed to contribute to the Tort Claim Settlement Fund and in exchange (i) certain municipalities have consented to the Debtors' assignment and Purchaser's assumption of various essential permits to operate in such municipalities in accordance with the Sale Order; and (ii) Underwriters have consented to the Debtors' assignment and Purchaser's assumption of the Underwriters' Excluded Policies (as defined below); and

WHEREAS, the Parties intend that this Agreement be approved by the Bankruptcy Court pursuant to the Plan Confirmation Order and is expressly contingent on the approval of the Releases, the Channeling Injunction, and the Bar Order (each as defined below) provided for herein and in the Plan.

NOW, THEREFORE, in consideration of the forgoing Recitals and the mutual covenants contained in this Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound, and subject to the approval of the Bankruptcy Court, the Parties agree as follows:

## I.     ARTICLE 1 DEFINITIONS

As used in this Agreement, the following terms shall have the meanings set forth below or in the Recitals. Capitalized terms not defined below, herein, or in the Recitals shall have the meanings given to them in the Plan and the Bankruptcy Code. In the event of a conflict, the definitions in this Agreement shall control.

1.     "Additional Insured" or "Additional Insureds" means any Person or entity who qualifies as an additional insured under the terms of the Underwriters' Policies and/or Underwriters' Excluded Policies (collectively, the "Policies"), including but not limited to any Person or entity the Debtors were required to add as an additional insured under the Policies: (a) pursuant to written contracts, agreements, regulations, local ordinances and/or terms and conditions in certain permit applications and permits issued by various entities or municipalities; or (b) under any oral or implied agreement where a certificate of insurance was issued showing that Person or entity as an Additional Insured, all as specified by the Policies. For purposes of this Agreement only, Additional Insureds include, but are not limited to, the Cities where the Debtors previously operated, and include, but are not limited to: Charleston, SC, Long Beach, CA, Los Angeles, CA, Newport News, VA, Sacramento, CA, Salt Lake City, UT, San Diego, CA, San Francisco, CA, Santa Clara, CA, Santa Monica, CA, Tempe, AZ, Washington, D.C., Orlando, FL, Chicago, IL, Portland, OR, Providence, RI, and St. Louis, MO.

2.     "Additional Insured Claim" means a Claim of an Additional Insured Claimant or any Claim by any Person or entity against Underwriters that, directly or indirectly, arises from, relates to or is in connection with a Tort Claim, including any such Claim for defense, indemnity, contribution, or similar relief.

3.      "<u>Additional Insured Claimant</u>" means an Additional Insured who has a Claim or may have a Claim or right against the Debtors and/or Underwriters.

4.      "<u>Approval Date</u>" means the date on which the Approval Order becomes a Final Order.

5.      "<u>Approval Order</u>" means the Plan Confirmation Order and any other Order entered by the Bankruptcy Court which approves this Agreement.

6.      "<u>Bar Order</u>" means the provisions of this Agreement, the Plan, and the Plan Confirmation Order that shall permanently bar, prohibit, enjoin and restrain the filing, commencing, prosecuting, conducting, asserting or continuing in any manner, directly, indirectly or derivatively of all Claims, as more particularly described in Section 2.2.2 hereof.

7.      "<u>Channeled Claim</u>" means any Tort Claim against any of the Debtors and/or any of the Insurance Settlement Released Parties.

8.      "<u>Channeling Injunction</u>" means the provisions of this Agreement, the Plan, and the Plan Confirmation Order that (i) shall permanently release and enjoin the enforcement, prosecution, continuation, liquidation, or commencement of any Tort Claim, and (ii) shall channel such Tort Claims to and paid solely and exclusively from the Tort Claims Trust, all as more particularly described in Section 2.2.1 hereof.

9.      "<u>Claim</u>" or "<u>Claims</u>" means (a) an asserted or unasserted right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured; (c) any past, present and future claims, causes of action, obligations, rights, suits, judgments, remedies, interests, actions, liabilities, demands, duties, injuries, damages, liens, interest, expenses, fees, or costs of whatever kind or nature (including attorney's fees and expenses), whether foreseen or unforeseen, known or unknown, asserted or unasserted, contingent or matured, liquidated or unliquidated, whether in tort, contract, extra-contractual or otherwise, whether statutory, at common law or in equity, including but not limited to claims for breach of contract, breach of the implied covenant of good faith and fair dealing, bad faith, unfair claim settlement practices, statutory or regulatory violations, for indemnity or contribution, or punitive, compensatory, exemplary, extra-contractual, statutory or other damages or relief of any type, including, without limitation: (i) all claims for wrongful death, personal injury, emotional distress, property damage, economic loss, or environmental damage, remediation or exposure including, without limitation, any Tort Claim against a Municipality (whether asserted or unasserted); (ii) all claims on payment and performance bonds; (iii) all claims relating to the Policies (but subject to  any Exceptions under the Policies) including, without limitation, the issuance of the Policies, coverage under the Policies, the defense of litigation arising out of a Tort Claim, or any act or omission of any Settling Insurer of any type for which the Debtors, the Debtors' Insurers,

4

or any Claimant might or may seek relief in connection with the Policies including with respect to any claims arising out of or relating to or in any way involving, in whole or in part, directly or indirectly, whether through a direct claim cross-claim, third-party claim, contribution, rescission, injunctive or declaratory relief, subrogation claim, class action or otherwise and (iv) any other "claim," as that term is defined in section 101(5) of the Bankruptcy Code.

10.     "Estates" means, with regard to the Debtors, each estate created by the commencement by the Debtors of the Chapter 11 Cases pursuant to § 541 of the Bankruptcy Code.

11.     "Execution Date" means the date all Parties have executed the Agreement.

12.     "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any Chapter 11 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing has been denied or resulted in no modification of such order, *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order, shall not cause such order not to be a Final Order.

13.     "Insurance Settlement Released Parties" means Underwriters, the Underwriters' Parties, all Named Insureds, Additional Insureds, the Purchaser, the Purchaser Parties, the Debtors and includes any Person or entity the Debtors are contractually bound to indemnify including a Municipality or government entity.

14.     "Interests" means all liens, claims, encumbrances, interests, and other rights of any nature, whether at law or in equity, including but not limited to direct action claims, insurance coverage claims, Claims, Tort Claims, and any rights, claims, or interests by, or on behalf of any other Person or entity who may claim to be an insured, Named Insured, Additional Insured, or otherwise claim to be entitled to any insurance coverage or benefits for any Claims or any rights to contribution, indemnity, defense, subrogation, or similar relief related to or arising from the Debtors under the Policies and the Insurance Program.

15.     "Named Insureds" means any Person or entity identified as a Named Insured or Additional Named Insured under the Underwriters' Policies.

16.     "Parties" means Debtors, Purchaser and Underwriters.

17.     "Person" means and includes any natural person or persons, a group of natural persons acting as individuals, a committee, a board of directors, or any other group of

5

natural individuals acting in a collegial capacity, an individual or entity including any corporation, limited liability company, partnership, general partnership, limited partnership, limited liability partnership, limited liability company or limited partnership, a proprietorship, association, joint stock company, joint venture, or any other unincorporated association, business organization or enterprise, any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality thereof, and any successor in interest, heir, executor, estate, personal executor, personal or legal representative, administrator, trust, trustee, trustee in bankruptcy, assignee for the benefit of creditors, or receiver of any person or entity.

18.     "Plan" means the Debtors' Joint Chapter 11 Plan of Liquidation and all exhibits annexed thereto or referenced therein, as it may be amended, modified or supplemented from time to time in accordance with the provisions of the Plan or the Bankruptcy Code and Bankruptcy Rules, in form and substance reasonably acceptable to Underwriters insofar as it relates to or in any way involves the Tort Claims, Underwriters' Policies, Underwriters' Excluded Policies, the Tort Claims Settlement Fund, or the Tort Claims Settlement Trust that among other things: (a) incorporates the terms of this Agreement and Schedules attached hereto; (b) requests approval of this Agreement as part of the Plan Confirmation Order; (c) establishes the Tort Claims Trust for the benefit of Holders of Tort Claims; (d) provides that the Settlement Amount pursuant to this Agreement shall be held exclusively for the Tort Claims Trust, including the payment of expenses of the Tort Claims Trust and cost of the Tort Claims ADR Procedures; (e) provides for the establishment, funding and administration, and approval of the Tort Claims ADR Procedure; (f) provides for full and complete releases by Holders of Tort Claims and the Trustee of the Tort Claims Trust of any and all Claims against each of the Insurance Settlement Released Parties; (g) releases, enjoins, and forever bars all Persons and entities, including, without limitation, Holders of Tort Claims and the Trustee of the Tort Claims Trust from suing on or otherwise pursing relief from each of the Insurance Settlement Released Parties for any and all Claims; (h) provides for the Channeling Injunction; and (i) provides for and approves of the sale of the Underwriters' Policies (other than the Underwriters' Excluded Policies) back to Underwriters, such that they will be treated as if the Underwriters' Policies never existed.

19.     "Plan Confirmation Order" means a Final Order of the Bankruptcy Court in the Bankruptcy Cases, in form and substance reasonably acceptable to Underwriters and the Purchaser, that confirms the Plan and incorporates and approves the Agreement.

20.     "Purchaser Contribution" means the lump sum payment of Two Million and 00/100 Dollars ($2,000,000.00) to be made on behalf of the Purchaser as part of the total Settlement Amount to the Tort Claim Settlement Fund. The Purchaser Contribution shall be advanced pursuant to a separate agreement by and between Underwriters and the Purchaser.

21.     "Purchaser Parties" means Purchaser and includes: (a) each of its past, present and future parents, subsidiaries, affiliates, and divisions, (b) each of their respective past, present, and future parents, subsidiaries, affiliates, holding companies, merged companies. related companies, divisions, joint ventures, and acquired companies holding companies,

merged companies. related companies, divisions, joint ventures, and acquired companies; (c) each of their respective past, present and future directors, officers, managers, members, shareholders, employees, partners, principals, agents, attorneys, lenders, joint ventures, joint venturers, representatives, and managing agents, insurers, reinsurers, and associated third-parties; and (d) each of their respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons or entities acting on behalf of, by, through or in concert with them.

22.    "Settlement Amount" means sum of Ten Million and 00/100 Dollars ($10,000,000.00) consisting of a lump sum payment of Eight Million and 00/100 Dollars ($8,000,000.00) to be made by or on behalf of Underwriters and the Purchaser Contribution of Two Million and 00/100 Dollars ($2,000,000.00), which amount is referred to in the Plan as the "Insurance Settlement Proceeds".

23.    "Tort Claim" means all Claims, whether asserted or unasserted, held by any Person or Entity against the Debtors, Underwriters, the Underwriters' Parties, the Purchaser Parties or any Person or Entity who may claim to be an Insured, Additional Insured, or otherwise claim to be entitled to coverage under any of the Policies or Insurance Program for bodily or personal injury, tort claim, or property damage related to, or arising out of the use, placement, operation, transportation, renting, leasing, and/or recovery of the Debtors' micro-mobility vehicles and/or arising out of the operation of the Debtors' businesses, including but not limited to, any Municipal Claim (as that term is defined under the Plan).

24.    "Tort Claimant" means any Person or entity holding or potentially holding a Tort Claim and also includes any Person or entity that may possess or assert any indirect Tort Claims by virtue of possessing any rights or entitlement of contribution, indemnification, or subrogation against the Debtors, Underwriters, the Underwriters' Parties, the Purchaser, the Purchaser Parties, or any other Person or entity who may be an Insured, Named Insured, Additional Insureds, or any co-defendant in any underlying proceeding.

25.    "Tort Claims Settlement Fund" means all assets and other corpus of the Tort Claims Trust inclusive of the Settlement Amount established exclusively for distribution to the Holders of allowed Tort Claims after payment of all other amounts required by this Agreement and the Plan, including, but not limited to: (a) all required statutory fees; and (b) all costs and expenses of administration of the Tort Claims Trust.

26.    "Tort Claims ADR Procedures" means the alternative dispute resolution protocol and procedures for determining eligibility and allowance of Tort Claims, liquidating allowed Tort Claims, and making distributions to the Holders of all allowed Tort Claim that is contained in the attached Schedule "3" that shall be approved by the Plan Confirmation Order.

27.    "Tort Claims Bar Date" means the date set by the Bankruptcy Court as the deadline for Tort Claimants to File Tort Claims.

28.    "Tort Claim Defenses" means any legal, equitable, or contractual defense that any of the Debtors, Named Insureds, Additional Insureds, Underwriters, the Purchaser, the

7

Purchaser Parties or any third party or co-defendant may have or may have under bankruptcy law or applicable non-bankruptcy law to the validity or amount of, or liability for, any Tort Claim, including any applicable statutes of limitation or repose.

29.     "Tort Claims Trust" means the trust to be established pursuant to this Agreement, the Plan, and Plan Confirmation Order for the benefit of Tort Claims.

30.     "Tort Claims Trust Agreement" means the form of trust agreement that is attached hereto as Schedule "4" that shall be included in the Plan and approved by the Plan Confirmation Order.

31.     "Underwriters" means collectively, those Certain Underwriters at Lloyd's, London subscribing to the Policies, including but not limited to the underwriting members of Syndicates Numbers 1969 and 1971 and are referred to in the Plan as the "Settling Insurers".

32.     "Underwriters Party" or "Underwriters' Parties" means Underwriters and includes: (a) each of their past, present and future parents, subsidiaries, affiliates, and divisions; (b) each of their respective past, present, and future parents, subsidiaries, affiliates, holding companies, merged companies. related companies, divisions, joint ventures, and acquired companies; (c) each of their respective past, present and future directors, officers, shareholders, employees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and managing agents, claims handling administrators, affiliates, insurers, reinsurers, and associated third-parties; and (d) each of their respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons or entities acting on behalf of, by, through or in concert with them. The Underwriters' Parties are referred to in the Plan as the Settling Insurers' Parties.

33.     "Underwriters' Policies" means the policies of insurance that: (a) are identified on the attached Schedule "1"; (b) under which any or all of the Debtors are an insured, Named Insured, or Additional Insured; or (c) under which Debtors, Additional Insureds, and/or any of the other Insurance Settlement Released Parties may contend they are entitled to coverage or benefits.

34.     "Underwriters' Excluded Policies" means those policies of insurance identified on the attached Schedule "2" that have been cured and assumed by the Purchaser as part of the Sale Order with the consent of Underwriters. For the avoidance of doubt, none of the Claims or Tort Claims identified in or contemplated by this Agreement (which consist of Claims or Tort Claims that accrued on or before the Closing Date (as defined in the Plan)) are subject to any coverage under the Underwriters' Excluded Policies.

35.     "Unknown Tort Claim" means any Tort Claim that is neither filed nor deemed filed on or by the Tort Claims Bar Date and is held by a Person or entity who: (a) asserts was incurred between the Tort Claims Bar Date and the Plan Effective Date; (b) has a Tort Claim that was barred by the statute of limitations as of the Tort Claims Bar Date but is no longer barred by the applicable statute of limitations for any reason, including the

enactment of legislation that revives previously time-barred Tort Claims; or (c) has a Tort Claim that is otherwise allowed by subsequent order of the Bankruptcy Court.

1. **ARTICLE 2 THE SETTLEMENT, RELEASE AND BUYBACK AGREEMENT**

1.1. Subject to the terms and conditions of this Agreement: (a) Underwriters shall pay or cause the Debtors to be paid the sum of Eight Million and 00/100 Dollars ($8,000,000.00), as provided for herein, in full and final settlement of all responsibilities under and arising out of the Underwriters' Policies and in consideration of the sale of the Underwriters' Policies to Underwriters free and clear of all Interests or Claims; and (b) Purchaser shall pay or cause the Debtors to be paid the sum of Two Million and 00/100 Dollars ($2,000,000.00) as provided herein and conditioned upon Purchaser and the Purchaser Parties receiving the benefit of the Releases, the Channeling Injunction, and the Bar Order provided herein and pursuant to the Plan. Both Underwriters' and the Purchaser's obligations to pay the settlement amounts hereunder are several, not joint, in nature; provided, however, that the failure or either Underwriters or the Purchaser to pay and deliver its portion of the Settlement Amount shall result in this Agreement being void ab initio and of no further force and effect.

1.2. The Settlement Amount shall be paid to the Debtors or their designee within five (5) business days of the Plan Confirmation Order becoming a Final Order.

1.3. Debtors shall hold the Settlement Amount in the trust account of their counsel for the benefit of Holders of Tort Claims until such time as the Tort Claims Trust is established and shall not commingle the Settlement Amount with any other assets of the Estates.

1.4. The Settlement Amount is the maximum amount that Underwriters and the Purchaser shall be obligated to pay under this Agreement, including on account of any and all Claims under, arising out of, relating to, or in connection with the Underwriters' Policies or Insurance Program (including all Channeled Claims). The Parties further agree that subject to the entry of the Plan Confirmation Order approving this Agreement: (a) under no circumstances will Underwriters, the Underwriter Parties, the Purchaser or the Purchaser Parties ever be obligated to make any additional payments to or on behalf of the Debtors, their Estates, or any other Person or entity or any Tort Claimants in connection with this Agreement or in connection with any of the Underwriter Policies, in each case with respect to any Claims that, directly or indirectly, arise out of, relate to, or are in connection with any Tort Claims, including any Channeled Claims; (b) all limits of liability of the Underwriters' Policies, including all per occurrence and aggregate limits, are and shall be deemed to be fully and properly exhausted and the Parties further agree that the Settlement Amount set forth in Section 2.1 includes, respectively, the full purchase price of the Underwriters' Policies and consideration for the Releases, the Channeling Injunction, the Bar Order and other protections afforded by this Agreement, respectively; and (c) all obligations of Underwriters and the Underwriters' Parties under the Underwriters' Policies and Insurance Program are and shall be deemed to be extinguished.

1.5. Subject to entry of the Plan Confirmation Order and the Plan Confirmation Order becoming a Final Order, Debtors agree that the Settlement Amount is the maximum

amount that Underwriters, the Underwriters' Parties, the Purchaser and the Purchaser Parties shall be obligated to pay with respect to all Claims and Tort Claims and Debtors have not at any time on or after the Petition Date, entered into, and shall not henceforth enter into any settlements of any Claims pursuant to which Underwriters may be obligated to pay any amounts under the Underwriters' Policies; provided, however, that nothing in this Agreement shall bar or prohibit Debtors from making distributions to the Holders of allowed Claims under and pursuant to the Plan.

1.6.    The Parties agree and represent that the consideration to be provided by Underwriters and the Purchaser pursuant to this Agreement (including the Settlement Amount) constitutes fair and reasonable exchanges for the benefits granted to Underwriters, the Underwriters' Parties, the Purchaser and the Purchaser Parties in this Agreement (including the Releases, the Channeling Injunctions and the Bar Order provided herein and in the Plan).

1.7.    Effective upon the delivery of the Settlement Amount, the Debtors agree and confirm that (a) any and all of Debtors' outstanding tenders to Underwriters for defense and/or indemnity of any Claims shall be deemed withdrawn; (b) Debtors shall not tender to Underwriters any Claims; (c) Debtors will not request that the Underwriters fund any judgments or settlements of any Claims; and (d) Underwriters shall have no further obligation to pay, handle, object to, or otherwise respond to any Claims.

1.8.    Nothing in this Agreement is intended to be or shall be construed as a waiver of any Party's rights or obligations under the Underwriters' Excluded Policies and except as expressly set forth herein, the Plan and Plan Confirmation Order shall have no effect on the Underwriters' Excluded Policies.

1.9.    Nothing in this Agreement precludes the Parties from internally allocating payments or receipt of payments made under this Agreement in such manner as each Party sees fit. Any such allocation by any of the Parties shall not be binding on the other Parties.

**2.    ARTICLE 3 THE BANKRUPTCY COURT APPROVAL OF THE AGREEMENT AND JOINT PLAN OF LIQUIDATION**

2.1.    This Agreement and the transactions contemplated hereby are contingent on the filing of the Plan that incorporates and is consistent, in all material respect, with this Agreement. In the event of a conflict between the Plan and this Agreement, this Agreement shall control and shall be deemed incorporated in the Plan to the extent necessary to effect such a result.

2.2.    The Debtors shall diligently prosecute confirmation of the Plan which shall include the following features:

2.2.1.    The Plan and Plan Confirmation Order shall include the Channeling Injunction pursuant to §105(a) of the Bankruptcy Code which provides that: (i) any and all Channeled Claims shall be channeled to and paid solely and exclusively from the Tort Claims Trust, which shall assume any and all liability of the Debtors and the Insurance Settlement Released Parties for such Tort Claims; and (ii) All Persons or Entities who have

held or asserted, hold or assert, or may in the future hold or assert a Channeled Claim against the Debtors or the Insurance Settlement Released Parties are hereby permanently and forever barred, estopped, stayed, and enjoined from taking any action, directly or indirectly, or commencing or continuing any suit, action, or other proceeding on, or asserting, enforcing, or attempting to assert or enforce, any Channeled Claim against the Debtors or the Insurance Settlement Released Parties, or any of their property or assets, including without limitation (1) pursuing or seeking to pursue, by any manner or means, any Tort Claim against the Debtors or any of the Insurance Settlement Released Parties; continuing or commencing, or seeking to continue or commence, by any manner or means, any action or proceeding of any kind with respect to any Tort Claim against the Debtors or any of the Insurance Settlement Released Parties, or any of their property or assets; (2) continuing or commencing, or seeking to continue or commence, by any manner or means, any action or proceeding of any kind with respect to any Tort Claim against the Debtors or any of the Insurance Settlement Released Parties under the Policies or other agreement; (3) enforcing, attaching, collecting or recovering, or seeking to enforce, attach, collect, or recover, by any manner or means, any judgment, award, decree, or order with respect to any Tort Claim against the Debtors or any of the Insurance Settlement Released Parties, or any of their property or assets; (4) creating, perfecting, or enforcing, or seeking to create, perfect, or enforce, by any manner or means, any lien, claim or encumbrance of any kind with respect to any Tort Claim against the Debtors or any of the Insurance Settlement Released Parties, or any of their property or assets; and (5) asserting, implementing or effectuating or seeking to assert, implement, or effectuate, by any manner or means, with respect to any Tort Claim, any right of setoff, recoupment, indemnification, subrogation, or any similar right of any kind, against: (a) the Debtors or the Insurance Settlement Released Parties; (b) any obligation due to any of the Debtors or the Insurance Settlement Released Parties; or (c) the property or assets of the Debtors or the Insurance Settlement Released Parties.

2.2.2.     The Plan and Plan Confirmation Order shall also include, and the Debtors shall be obligated to obtain the entry of, a Bar Order pursuant to 11 U.S.C. § 105(a) of the Bankruptcy Code to facilitate this Agreement and the terms and provisions contained herein, and as an essential, material and integral element of Underwriters and the Purchaser entering into this Agreement (without which Underwriters and the Purchaser would not enter into this Agreement or pay the Settlement Amount), which Bar Order shall permanently bar, prohibit, enjoin and restrain the filing, commencing, prosecuting, conducting, asserting or continuing in any manner, directly, indirectly or derivatively, any suit, action, cause of action, crossclaim, counterclaim, third-party claim, or other demand (including, without limitation, any and all of the Claims, which includes without limitation, any and all of the Tort Claims, all of which Claims are being released and barred herein) in any federal or state court or any other judicial or non-judicial proceeding (including, without limitation, any proceeding in any judicial, arbitral, mediation, administrative, or other forum) by any Barred Person (as defined below and in the Plan) against or affecting any of the Debtors or any of the Insurance Settlement Released Parties, that arises from, relates to, or derives from the Debtors or transactions involving or related to the Debtors' Estates, and which are based in whole and/or in part on any allegation, claim, demand, cause of action, matter or fact directly or indirectly relating in any way to or arising in connection with the Debtors, the Insurance Settlement Released Parties, the Underwriters'

11

Policies and/or the facts and circumstances underlying any Claim, including the Tort Claims, that have been made or could be made, including in connection with any Tort Claim or otherwise, whether or not asserted therein (collectively the "Barred Claims"). For purposes of the Bar Order, "Barred Persons" shall have the same meaning as set forth in the Plan and means any Persons and/or Entities having Claims against the Debtors or the Insurance Settlement Released Parties and their respective current and former officers, directors, shareholders, members, managers, employees, agents, attorneys, affiliates, parent companies, subsidiaries, partners, joint ventures, joint venturers, co-venturers, reinsurers, claim administrators, Representatives and associated third parties, whether or not that Person or entity filed a proof of claim, proof of interest, or otherwise has asserted any Claim against the Debtors' Estates. In the event such potential Holder of a Tort Claim timely objects and the Parties and/or the Bankruptcy Court do not resolve or overrule the objection to the satisfaction of the Insurance Settlement Released Parties, then any of the Insurance Settlement Released Parties shall have the right to withdraw from the Agreement without the need for Bankruptcy Court approval or the consent of any Party, and the Agreement shall then be null and void. The intent and purpose of the Bar Order are to enjoin directly the most expansive and comprehensive group of third parties, whether such party is known or unknown, identified or unidentified, suspected or unsuspected, named or unnamed class action members or potential class action members from pursuing any and all Claims or causes of action against the Insurance Settlement Released Parties, including that would implicate any of the Policies. Notwithstanding anything herein to the contrary, the Bar Order shall not relieve the Parties from their obligations under this Agreement. To be clear, the Bar Order shall prevent any and all actions related to any of the Tort Claims against and/or that may implicate the Insurance Settlement Released Parties and/or any of the Policies and Insurance Program.

     2.2.3.   The Plan and Plan Confirmation Order shall: (a) identify Underwriters, the Underwriters' Parties, the Purchaser and the Purchaser Parties as parties protected by the Releases, the Channeling Injunction and the Bar Oder; (b) contain a list of all other Insurance Settlement Released Parties which includes all Persons or entities protected by the Releases, the Channeling Injunction and Bar Oder; and (c) provide as follows:

        (a)   In consideration of the Releases, the Channeling Injunction, the Bar Oder and other covenants set forth herein, subject to the occurrence of the Effective Date of the Plan, each of the Debtors:

        (i) Irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Claims and/or Interests they have or might have now or in the future against the Insurance Settlement Released Parties with respect to any and all Tort Claims, any contribution, subrogation, indemnification, or other similar Claims arising from or relating to any Tort Claims, and any of the Underwriters' Policies; and

        (ii)   Consents to the sale of Underwriters' Policies in accordance with this Agreement, understanding that it will be as if the Underwriters' Policies never existed, and to the contribution of the Settlement Amount to the Tort Claims Trust, as provided in this Agreement.

12

2.2.4.  The Parties intend to comply with the Medicare Secondary Payer Act ("MSPA") and agree that the Plan and Plan Confirmation Order, as applicable, shall provide that:

2.2.5.  Before making any distribution of Trust Assets to any Tort Claimant from the Tort Claims Trust, the Trustee shall (i) obtain written certification from the Tort Claimant to receive such a distribution or their counsel that: (a) he or she has complied with reporting, and if necessary established any set-asides, required by applicable federal, state and local laws and regulations regarding settlements with minors and Medicare/Medicaid/SSA with respect to such Tort Claimant; (b) the Tort Claimant acknowledges that Medicare's interests in reimbursement for any incurred medical expenses that have been paid by Medicare have either already been satisfied and Medicare has acknowledged such satisfaction or will be satisfied from the distribution of Trust Assets to the Tort Claimant; (c) satisfaction of Medicare's interests from the distribution of Trust Assets to the Tort Claimant shall be the sole and exclusive responsibility of each individual Tort Claimant and each individual Tort Claimant agrees to provide proof of such satisfaction to the Trustee upon request; (d) each Tort Claimant agrees that the duties of each Tort Claimant stated in this paragraph are non-delegable and failure to perform such duties shall provide Underwriters with a right to recover any monies paid caused by the failure to satisfy Medicare's interests including any additional expenses incurred and attorney fees; and (e) the Tort Claimant acknowledges and understands that the Settling Insurers (as defined in the Plan) are required to report any payment to a Medicare beneficiary in settlement of a claim under a liability insurance policy or self-insurance to Medicare (CMS); and (ii) provide a copy of such certification to the Debtors or Plan Administrator, as applicable, and the Settling Insurers.

2.2.6.  The Tort Claims Trust shall defend, indemnify, and hold Underwriters, the Underwriters Parties and the Purchaser Parties harmless from any Medicare Claims.

2.3.    The form and manner of notice of the hearing to confirm the Plan (as amended to the satisfaction of Underwriters or the Purchaser) are subject to advance approval by Underwriters and the Purchaser, which approval shall not be unreasonably withheld. Prior to entry of the Plan Confirmation Order, the Debtors shall continue to oppose any further motions to lift stay pursuant to 11 U.S.C. §362 of the Bankruptcy Code as to any Tort Claim.

2.4.    If the Plan Confirmation Order (or any other order of the Bankruptcy Court relating to this Agreement) shall be appealed by any Person or Entity (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Debtors shall take all reasonable steps to defend against such appeal, petition or motion: *provided however*, that nothing herein shall preclude the Parties, at the election of Underwriters or the Purchaser, from consummating the Agreement and the transactions contemplated herein if the Plan Confirmation Order has been entered and has not been stayed and Underwriters or Purchaser, in their sole discretion, waive in writing the requirement that the Plan Confirmation Order be a Final Order.

2.5.    The Parties shall not take any appeal from, or seek to reopen, reargue or obtain reconsideration of, or otherwise contest or challenge in any way, directly or indirectly, the Plan Confirmation Order (or any other order of the Bankruptcy Court relating to this Agreement), except to the extent that any such order shall be inconsistent with the terms hereof.

2.6.    The Parties shall cooperate in seeking and obtaining Bankruptcy Court approval of the Agreement and the Plan. Such cooperation shall include, without limitation, consulting with each other concerning the status of the Bankruptcy Cases including the status of the Plan, and Debtors providing Underwriters and the Purchaser with drafts of requested motions, notices, certificates of service, proposed orders and any such other pleadings and documents relating to this Agreement.

2.7.    Any amendments to the Plan, in so far as they relate to this Agreement, shall be in all respects consistent with this Agreement and shall, in all material respects be acceptable to Underwriters and the Purchaser, whose acceptance shall not be unreasonably withheld. Any amendments to the Plan in so far as they relate to this Agreement shall not deprive the Underwriters, the Underwriters' Parties, the Purchaser or the Purchaser Parties of any right or benefit under this Agreement or otherwise adversely affect their Interests under this Agreement.

2.8.    Provided none is in default of its obligations under this Agreement, none of the Parties shall file any motion, adversary proceeding, response, objection, or other pleading or document in the Bankruptcy Cases requesting the entry of any order or granting any other relief which could conflict with, supersede, abrogate, nullify, modify ,or restrict the terms of this Agreement and/or the rights of any Parties hereunder, or in any way prevent or interfere with the consummation or performance of the Agreement and the transactions contemplated herein.

2.9.    In the event that the Bankruptcy Cases are dismissed or converted to a case under Chapter 7 after the Plan Confirmation Order has been entered, the Parties agree that all terms, conditions, promises and obligations set forth in this Agreement shall survive and shall be and shall remain binding on the Parties and any successors or assigns of the Parties including the Debtors, Underwriters and the Purchaser, and the Plan Confirmation Order shall so provide.

### 3.    ARTICLE 4 RELEASES AND SALE FREE AND CLEAR

3.1.    Subject to the provisions of Section 6.2 of this Agreement and effective upon the receipt of the Settlement Amount by the Debtors or their designee:

(a)    without any further action of the Parties, Debtors on behalf of themselves and the Estates hereby fully, finally, and completely remise, release, acquit and forever discharge each of the other Insurance Settlement Released Parties from any and all past, present and future Claims that directly or indirectly, arise out of, relate to, or are in connection with the Tort Claims or Underwriters' Policies, including any Channeled Claims, and all Claims that, directly or indirectly, arise from, relate to, are filed in, or are

asserted in connection with the Debtors' Bankruptcy Cases (the "Releases"). The Releases of the Insurance Settlement Released Parties under this Section 4.1 shall include, but shall not be limited to, any and all Claims for coverage, indemnification, contribution, subrogation or otherwise under the Policies arising out of or relating to or in any way involving the Tort Claims whether for wrongful death, personal injury, emotional distress, property damage, economic loss, environmental damage, remediation or exposure, or any other form of loss, expense, or other benefit covered or potentially covered under the Policies or Insurance Program;

(b)     the Debtors on behalf of themselves and the Estates, hereby withdraw any and all requests, demands, or tenders for defense or indemnity previously submitted to Underwriters under the Underwriter Policies arising out of or relating to or in any way involving the Tort Claims, and further surrender, relinquish, and release any further right to tender or present any Claims whatsoever to Underwriters to the Underwriters' Parties under the Underwriters' Policies or Insurance Program. Furthermore, by virtue of the foregoing Releases and the Approval Order, Underwriters shall have no duty to defend or indemnify Debtors, on behalf of themselves and the Estates, or any other insured and Additional Insured under the Underwriters' Policies with respect to any past, present, or future Claim, nor shall Underwriters have any other duty or obligation whatsoever to any Tort Claimant or any other Person or entity with respect to any and all Claims; and

(c)     the Parties expressly waive any and all rights they may have under any contract, statute, code, regulation, ordinance, or at common law, which may limit or restrict the effect of a general release as to Claims released herein and in the Plan and the Approval Orders.

3.2.    The Releases of the Underwriters' Parties and the Purchaser Parties as set forth in 3.1 above are not intended to, and shall not, extend to or otherwise release or discharge any rights, privileges, benefits, duties, or obligations of any of the Parties by reason of, or otherwise arising under the Agreement, the Plan or the Plan Confirmation Order.

3.3.    Effective upon the receipt of the Settlement Amount by the Debtors or their designee, Underwriters hereby buy back the Underwriters' Policies that were issued to the Debtors and the Debtors' Interests in those policies, free and clear of all liens, Claims and Interests of all Persons or Entities, including the Interests of the Debtors, any other Person or entity claiming coverage by, through, or on behalf of any of the Debtors, any other insurer and any Tort Claimant. This sale is pursuant to §§363(b), (f), and (m) of the Bankruptcy Code. The Parties acknowledge and agree, and the Plan Confirmation Order shall find and conclude, that: (a) Underwriters are good faith purchasers of the Underwriters' Policies and Interests within the meaning of §363(m) of the Bankruptcy Code; (b) the consideration exchanged constitutes a fair and reasonable settlement of the Parties Coverage Disputes and of their respective rights and obligations relating to the foregoing Underwriters' Policies and Interests and constitutes reasonably equivalent value; (c) the Releases in this Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy laws; (d) upon the Plan Conformation Order becoming a Final Order, the Underwriters' Policies and Interests shall be terminated and

15

of no further force and effect and treated as if they never existed; (e) payment of the Settlement Amount by Underwriters constitutes Underwriters' full and complete performance of any and all obligations under the Underwriters' Policies and with respect to the foregoing Interests, including any performance owed to the Debtors and Tort Claimants with respect to the Underwriters' Policies subscribed to that were issued to the Debtors; (f) all Interests the Debtors and may have had, may presently have, or in the future may have in the Underwriters' Policies subscribed to that were issued to the Debtors and are released pursuant to the terms of this Agreement as of the Effective Date of the Plan; (g) the Debtors meet the requirements to complete the sale of the Underwriters' Policies and Interests free and clear of any liens or other Interests; and (h) the Debtors accept the payment of the Settlement Amount set forth in Section 1.1 in accordance with this Agreement in full and complete satisfaction of all Underwriters and the Underwriters Parties' past, present, and future obligations, including any obligations to any of the Debtors under Underwriters' Policies or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever arising out of or related in any way, whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, and regardless of whether or not such Claims arise from, relate to, or are in connection with the Channeled Claims, the Bankruptcy Cases, or otherwise under the Underwriters' Policies.

3.4.    Release and Waiver by the Insurance Settlement Released Parties: Upon the Plan Confirmation Order becoming a Final Order, exclusive of the obligations, requirements, and duties expressly set forth in this Agreement, the Plan, the Confirmation Order, the Sale Order, any other Order of the Bankruptcy Court creating obligations of the Debtors and the Asset Purchase Agreement, the Underwriters' Parties and the Purchaser Parties, on behalf of themselves, their agents, officers, directors, legal representatives, attorneys, subsidiaries, affiliates, successors, heirs, and assigns, fully and unconditionally wave, release, remise, and forever discharge the Debtors from all known and unknown claims or causes of action, suits, debts, sums of money, accounts, covenants, bonds, or obligations set forth in contracts, controversies, or obligations set forth in the Underwriters' Policies and Insurance Program, including attorneys' fees and costs, claims, and demands whatsoever, both in law and an equity that either Underwriters or the Purchaser ever had, now have, or may have against the Debtors or their estates, by reason of any manner, cause or thing whatsoever from the beginning of time to the date of this Agreement, arising out of or in any way relating to the Bankruptcy Cases; provided, however, that this release shall not constitute or be deemed to constitute a release or waiver of any of the rights obtained by, or any of the obligations imposed upon, the Parties pursuant to this Agreement.  In no event shall this release constitute or be deemed to constitute a release or waiver of any rights by Underwriters or the Purchaser against one another and/or or any third parties.

3.5.    Other than payment of the Additional DIP Funding Claim (as defined in the Plan) or as expressly set forth in the Plan, Underwriters and the Purchaser further waive their right to receive any distribution pursuant to the Plan including on account of any proof of claims and/or claims that could be asserted under any provisions of the Bankruptcy Code against the Debtors, or their estates, including but not limited to any claims pursuant to § 502 of the Bankruptcy Code, or any other applicable law.

3.6.    Debtors represent and warrant that they have not sold, assigned, transferred, conveyed, or otherwise disposed of any Claims that are the subject of the Releases set forth in Section 3.1 above.

3.7.    The Parties acknowledge that there may be changes in the law with respect to interpretation of coverage under the Underwriters' Policies or otherwise and/or that the Parties may hereafter discover facts different from, or in addition to, those which they now believe to be true with respect to any and all of the Claims and entities herein released. Nevertheless, the Parties hereby agree that the Releases set forth above, and the releases provided for in the Plan and approved by the Approval Orders, shall be and remain effective in all respects, notwithstanding any changes in the law and/or the discovery of such additional or different facts.

3.8.    The Releases set forth in Section 3.1 above shall not apply to or have any effect on the Underwriters' rights to any claim for reinsurance in connection with the Underwriters' Policies, nor shall Underwriters' assertion of any claim for reinsurance affect its obligations under this Agreement.

3.9.    Subject to the other provisions of this Agreement, to the extent that the Releases set forth in Section 3.1 above run in favor of any Persons or entities who are not signatories hereto, this Agreement is declared to be made for their respective benefits.

## 4.    ARTICLE 5 REPRESENTATIONS

4.1.    Each of the Parties separately represents and warrants as follows:

(d)    Subject to the entry of the Approval Order, each has the requisite power and authority to enter into this Agreement and to perform the obligations imposed on it by this Agreement subject only to approval of the Bankruptcy Court;

(e)    Subject to the entry of the Approval Order, the execution and delivery of and the performance of the obligations contemplated by this Agreement have been approved by duly authorized representatives of the Party and by all other necessary actions of the Party;

(f)    It has expressly authorized its undersigned representative to execute this Agreement on the Party's behalf as its duly authorized agent;

(g)    It has not and will not sell, assign, transfer, convey, or otherwise dispose of any rights or interests under the Underwriters' Policies and any Claims that it is releasing in this Agreement except as otherwise contemplated herein with respect to the Underwriters' Excluded Policies. Moreover, the Debtors and Purchaser represent, warrant, and agree that they will not in any way assist any Person or entity in the establishment of any Claim against Underwriters that arises out of, results from, or in any way relates to Underwriters' investigation, handling, defense, or settlement of Claims released under this Agreement, except as ordered by a court of competent jurisdiction. In the event that a subpoena or discovery requests are served upon the Debtors or Purchaser, the Debtors or

Purchaser shall give prompt notice to Underwriters and adequate opportunity to respond to any such subpoena or discovery request.

(h)     This Agreement has been thoroughly negotiated and analyzed by its counsel and has been executed and delivered in good faith, pursuant to arm's length negotiations, and for reasonable value and valuable consideration.

(i)     Nothing in this Agreement, including the Schedules hereto, shall be construed as or deemed to be an admission or evidence that any binder, certificate, or policy of insurance was, in fact, issued and/or affords coverage in connection with any Claims.

(j)     Each will use commercially reasonable efforts to seek entry of the Approval Orders.

## 5.     ARTICLE 6 MISCELLANEOUS PROVISIONS

5.1.     <u>Conditions Precedent.</u> Subject to Section 5.2 below, this Agreement is expressly subject to satisfaction of the following conditions having performed, waived or otherwise excused:(a) that the Plan Confirmation Order shall have been entered and shall have become a Final Order; (b) Underwriters and the Purchaser pay the Settlement Amount to the Debtors; and (c) the Release, the Channeling Injunction, and Bar Oder are approved by a Final Order of the Bankruptcy Court.

5.2.     <u>Termination Rights</u>. Any Party may terminate this Agreement if the Bankruptcy Court does not enter the Approval Order or if the Approval Order does not become a Final Order on or before the 120th day following the Execution Date. In the event that this Agreement is terminated by one or more of the Parties: (a) this Agreement shall be deemed null and void; (b) Underwriters and the Purchaser shall not be obligated to pay Settlement Amount to the Debtors (or if either Party already paid the Settlement Amount, the Debtors shall return the respective payments to each Party); (c) the Parties shall have all of the claims, defenses, rights and obligations under or with respect to the Underwriters' Policies that they would have had absent this Agreement; and (d) any and all otherwise applicable statutes of limitations or repose, or other time-related limitations, shall be deemed to have been tolled for the period from the Execution Date through the date that the Agreement is terminated.

5.3.     <u>Amendments</u>. Neither this Agreement nor any term set forth herein may be changed, waived, discharged, or terminated except by a writing signed by each of the Parties (or their successors or assigns).

5.4.     <u>No Precedential Value</u>. This Agreement and the Tort Claims ADR Procedure shall be without precedential value, and they are not intended to be, nor shall they be construed as, an interpretation of any insurance policies. This Agreement shall not be used as evidence, or in any other manner, in any court or other dispute resolution proceeding to create, prove, or interpret the obligations of Underwriters under the Underwriters' Policies, *provided*, *however*, that, subject to Section 5.17 of this Agreement below, this Agreement may be used as evidence in any defense of or by Underwriters of any obligations arising

18

under the Underwriters' Policies. The Parties acknowledge that this is a settlement of a disputed claim.

5.5.     Agreement Voluntarily Entered Into by Each of The Parties. This Agreement is executed voluntarily by each of the Parties without any duress or undue influence on the part, or on behalf, of any of them. The Parties represent and warrant to each other that they have read and fully understand each of the provisions of this Agreement and have relied on the advice and representations of competent legal counsel of their own choosing.

5.6.     Interpretation. This Agreement has been negotiated at arm's length and between and among Persons sophisticated and knowledgeable in the matters dealt with in this Agreement. In addition, this Agreement was drafted by experienced and knowledgeable legal counsel for each of the Parties. Accordingly, no Party shall be presumptively entitled to have any provisions of the Agreement construed against the other Parties in accordance with any rule of law, legal decision, or doctrine. To the extent that any dispute arises as to the meaning of this Agreement, in whole or in part, it shall be construed in accordance with the Parties' intent to preclude future liability and exposure for the Parties to claims, rights, and causes of action, except to the extent covered by the Tort Claims Settlement Fund.

5.7.     No Admission of Liability. The Parties agree that this Agreement is the result of a compromise and that the execution and delivery of this Agreement by any of the Parties shall not constitute or be construed as an admission of any liability, a course of performance, or wrongdoing on the part of any of them. The Parties acknowledge that this Agreement is not, and cannot be construed as, an admission by any of the Parties that any claim, cause of action, demand, defense, indemnity, or other coverage obligation exists under the Underwriters' Policies, or that Underwriters have any other obligation of any nature whatsoever with respect to the Underwriters' Policies. By entering into this Agreement, the Parties have not waived nor will they be deemed to have waived any right, obligation, privilege, defense or position they may have asserted or might assert in connection with any Claims, matter, Person, entity or insurance policy outside the scope of this Agreement. Except as otherwise expressly provided in Section 2.9 above, no Person other than the Parties hereto shall have any legally enforceable rights or benefits under this Agreement.

5.8.     No Fraudulent Transfer. This Agreement, having been negotiated at arm's length in settlement of bona fide disputes and supported by adequate consideration, is not a preference under 11 U.S.C. §547, a fraudulent conveyance under 11 U.S.C. §§546 or 548, or avoidable under any other applicable bankruptcy or non-bankruptcy law. The Parties agree that the rights and interests being transferred hereunder are being transferred in exchange for reasonably equivalent value and that upon the Execution Date, the Parties shall be deemed estopped and barred from challenging the reasonably equivalent value of the amount paid pursuant to the Agreement. The Parties agree to assert in any proceeding challenging this Agreement or seeking to avoid any part of this Agreement that this Agreement was for equivalent value as set forth above, was reached in good faith and was negotiated with the advice of counsel.

19

5.9.    <u>Attorneys' Fees, Costs, and Expenses.</u> Each of the Parties shall bear its or his own costs, attorneys' fees, and expenses in connection with the negotiations and preparation of this Agreement; provided, however, that the Debtors' professionals may seek an award of the fees and expenses incurred by them in obtaining Bankruptcy Court approval of the Agreement which, if awarded, shall be paid from the first proceeds of the Settlement Amount.

5.10.    <u>Entire and Integrated Agreement.</u> This Agreement, along with the Schedules and attachments hereto, and the Approval Order, is intended by the Parties as a final expression of their agreement and is intended to be a complete and exclusive statement of the agreement and understanding of the Parties with respect to the subject matters contained herein. This Agreement supersedes any and all prior promises, representations, warranties, agreements, understandings, and undertakings between or among the Parties with respect to such subject matters, and there are no promises, representations, warranties, agreements, understandings, or undertakings with respect to such subject matters other than those set forth or referred to herein.

5.11.    <u>No Third-Party Beneficiaries</u>. Except for those parties included in the Releases, Channeling Injunction, and the Bar Order provided herein, nothing in this Agreement is intended or shall be construed to give any Person or entity not otherwise referred to or named herein, other than the Parties and their respective successors and permitted assigns and the Insurance Settlement Released Parties any legal or equitable right, remedy, or claim under or in respect to this Agreement or any provisions contained herein; this Agreement and any conditions and provisions hereof being and intended to be for the sole and exclusive benefit of the Parties, and for the benefit of no other Person or entity. Notwithstanding the foregoing, neither this Agreement nor the rights and obligations set forth herein shall be assigned without the prior written consent of the other Parties, except that this Section shall not prohibit any assignment by Underwriters or Purchaser (a) made by merger, consolidation, or operation of law or (b) to a Person or entity who succeeds to all or substantially all of their respective assets.

5.12.    <u>Agreement Regarding Documents and Electronically Stored Data.</u> Prior to the Petition Date, the Debtors retained various legal counsel to defend Debtors and Additional Insureds in connection with Claims that had been asserted, or which might be asserted, including but not limited to in the Tort Claims. In connection with these representations, counsel retained by the Debtors took possession of and/or copied certain paper documents and records and may have obtained items of electronically stored information and/or other electronic media (collectively the "<u>Tort Claim Records</u>"). As a further consideration for this Agreement, Debtors and Purchaser agree that effective on the Approval Date and without the necessity of any further action by Underwriters, Debtors, and Purchaser, as applicable, shall request its former counsel to provide Underwriters with copies of the Tort Claim Records, whether paper documents or electronically stored information.

5.13.    <u>Severability</u>. If any provisions of this Agreement or the application thereof, shall for any reason or to any extent be construed by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, and application of such provisions to other circumstances, shall remain in effect and be interpreted so as best to

reasonably effect the intent of the Parties. Notwithstanding the foregoing, all of the conditions precedent in this Agreement will remain in full force and effect following any determination that any other provisions of this Agreement are invalid or unenforceable.

5.14.    <u>Notice.</u> Any notice or request required or desired to be given pursuant to this Agreement shall be sufficient if made in writing and sent by first class mail, postage prepaid, facsimile, or e-mail to the Parties at the addresses set forth below or to such other Persons as any of them may designate in writing from time to time:

**(a)**    As to Debtors:

> Christopher Rankin
> Chief Restructuring Officer
> 61 The Kingsway
> Toronto, Ontario
> M8X 2T3 Canada
> chris@rankinpartners.com

> With a copy to:

> Berger Singerman LLP
> 1450 Brickell Avenue, Suite 1900
> Miami, Florida 33131
> Telephone: 305-755-9500
> Attn:   Paul Steven Singerman, Esq.
>             singerman@bergersingerman.com
>             Jordi Guso, Esq.
>             jguso@bergersingerman.com

**(b)**    As to Underwriters:

> c/o Apollo
> One Bishopsgate
> London, United Kingdom EC2N 3AQ
> Attn:   Ian Beckett

> With a copy to:

> Markowitz, Ringel, Trusty & Hartog, P.A.
> 9130 S. Dadeland Blvd., Suite 1800
> Miami, FL 33156
> Attn:   Jerry M. Markowitz, Esq.
>             jmarkowitz@mrthlaw.com

> -and-

Fields Howell, LLP
301 S. State Street, Suite N200
Newtown, PA 18940
Attn:  Gregory L. Mast, Esq.
       gmast@fieldshowell.com

**(c)**   As to Purchaser:

Blue Jay Transit, Inc.
382 NE 191st Street
PMB 20388
Miami, FL 33179-3899
Attn:  Stewart Lyons
       stewart.lyons@bird.co

With a copy to:

Venable LLP
100 SE 2nd St Fl 44
Miami, FL 33131
Attn:  Paul J. Battista, Esq.
       pjbattista@venable.com

5.15.   <u>Headings</u>. The section titles, captions, and headings contained in this Agreement are inserted as a matter of convenience and for reference, and shall in no way be construed to define, limit, or extend the scope of this Agreement or the effect of any of its provisions.

5.16.   <u>Recitals</u>. The recitals set forth at the beginning of this Agreement shall not be admissible to prove the truth of the matters asserted in any action or proceeding involving any of the Parties (other than an action or proceeding brought to enforce the terms of this Agreement), nor do any of the Parties intend such recitals to constitute admissions of fact by any of them.

5.17.   <u>Agreement Inadmissible</u>. Any evidence of the terms or negotiations, or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes establishing any rights, duties, or obligations of the Parties, except in (a) an action or proceeding to enforce the terms or effect of this Agreement, (b) proceedings before the Bankruptcy Court to secure the Approval Order, or (c) any possible action or proceeding between Underwriters and any of its reinsurers bearing responsibility for any of obligations of Underwriters under this Agreement. Except as set forth herein, this Agreement shall not be used as evidence or in any other manner in any court or dispute resolution proceeding to create, prove, or interpret the Parties' rights or obligations to each other or to any other Person.

5.18.   <u>Additional Necessary Documents</u>. The Parties, and each of them, agree to execute such additional documents as may be reasonably required in order to carry out the purpose and intent of this Agreement, or to evidence anything contained herein.

5.19.   <u>Execution in Counterparts</u>. This Agreement may be signed in multiple counterparts and the separate signature pages executed by Parties may be combined to create a document binding on all of the Parties and together shall constitute one and the same instrument.

5.20.   <u>Governing Law</u>. This Agreement, and any proceeding that may be based upon, arise out of or relate or be incidental to this Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether now existing or hereafter arising (each, a "<u>Transaction Dispute</u>"), will be exclusively governed by and construed and enforced in accordance with the internal laws of the State of Florida, without giving effect to any law or rule that would cause the laws of any jurisdiction other than the State of Florida to be applied, except to the extent that such Laws are superseded by the Bankruptcy Code.

5.21.   <u>Jurisdiction</u>. The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute, and any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court.

5.22.   <u>Rules of Construction</u>. As used in this Agreement, the singular and masculine gender shall mean also mean the plural and feminine or neuter, as may be appropriate, "it" shall include "he" and "she"; and "each" and "all" includes "each" and "every." Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively; (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (c) the words "Include," "includes" or "Including" shall be deemed to be followed by the words "without limitation," and (d) the word "or" shall be disjunctive but not exclusive, References to this Agreement and other documents shall be deemed to include all subsequent amendments and other modification thereto.

[Signatures appear on the following page.]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below.

**Bird Global, Inc.; Bird Rides, Inc., Bird US Holdco, LLC, Bird US Opco, LLC, and Skinny Labs, Inc., as debtors and debtors-in-possession**

_____

By:     Christopher Rankin
Title:   Chief Restructuring Officer

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below.

**On behalf of  Lloyd's Syndicate 1969 and Lloyd's Syndicate 1971**

By:     _____
Title:   _____
Date:   _____

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below.

**On behalf of Blue Jay Transit, Inc.**

By:     _____
Title:   _____
Date:   _____

**Schedule 1**

**Underwriters' Policies**

| Policy Number | Policy Period | Insured |
|---|---|---|
| B0595XN5736018 | 10/03/2018 - 03/01/2019 | Bird Rides, Inc. |
| B0595XN5846019 | 02/01/2019 - 02/01/2020 | Bird Rides, Inc. |
| B0509BOWCN2000078 | 02/01/2020 - 02/01/2021 | Bird Rides, Inc. |
| B0509BOWCN2000277 | 02/01/2020 - 02/01/2021 | Bird Rides, Inc. |
| B0509BOWCN2150090 | 06/01/2021 - 06/01/2022 | Bird Rides, Inc. |
| B0509BOWCN2250539 | 06/01/2022 - 06/01/2023 | Bird Global, Inc., Bird Rides, Inc., Green Squrl LLC dba Sherpa Scoot Rides, Inc. |
| B0509BOWCN2250534 | 06/01/2022 - 06/01/2023 | Bird Global, Inc., Bird Rides, Inc., Green Squrl LLC dba Sherpa Scoot Rides, Inc. |
| B080120117U20 | 03/08/2020 - 03/08/2021 | Skinny Labs Inc. d/b/a Spin; Spin Mobility GmbH; Spin Mobility Ltd. |
| B080120117U21 | 03/08/2021 - 03/08/2022 | Skinny Labs Inc. d/b/a Spin; Spin Mobility GmbH; Spin Mobility Ltd. |
| B080120117U22 | 03/08/2022 - 03/08/2023 | Skinny Labs Inc. d/b/a Spin; Spin Mobility GmbH; Spin Mobility Ltd. |

**Schedule 2**

**<u>Underwriters' Excluded Policies</u>**

| <u>Policy Number</u> | <u>Policy Period</u> | <u>Insured</u> |
|---|---|---|
| B080120117U23 | 03/08/2023 - 03/08/2024 | Skinny Labs Inc. d/b/a Spin; Spin Mobility GmbH; Spin Mobility Ltd. |
| B0509BOWCN2350710 | 08/01/2023 - 07/01/2024 | Bird Global, Inc., Bird Rides, Inc., Green Squrl LLC dba Sherpa Scoot Rides, Inc. |
| B0509BOWCN2350711 | 08/01/2023 - 07/01/2024 | Bird Global, Inc., Bird Rides, Inc., Green Squrl LLC dba Sherpa Scoot Rides, Inc. |

**Schedule 3**

**<u>Tort Claims ADR Procedures</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| BIRD GLOBAL, INC., et al., | Case No. 23-20514-CLC |
| Debtors. | Jointly Administered |
| _____/ | |

## [PROPOSED][1] TORT CLAIMS PROTOCOL AND ALTERNATIVE DISPUTE RESOLUTION PROCEDURES

The *Tort Claims Protocol and Alternative Dispute Resolution Procedures* (hereinafter the "ADR Procedures") contained herein provide the procedures for resolving all Tort Claims as defined in the *Debtors' Joint Chapter 11 Plan of Reorganization* proposed by Bird Global, Inc., and its Debtor Affiliates, in *In re Bird Global, Inc., et al.*, Case No. 23-20514-CLC (Bankr. S.D. FL [*  ], 2024) [Docket No. [*  ]] (as it may be further amended or modified, the "Plan"), as provided in and required by the Plan and the Tort Claims Trust Agreement (the "Tort Claims Trust Agreement").[2] The Plan and the Tort Claims Trust Agreement establish the Tort Claims Trust for the exclusive benefit of the Holders of Tort Claims, and provide for the appointment of an independent Tort Claims Administrator to evaluate and resolve the Tort Claims in accordance with these ADR Procedures. The Tort Claims Trustee is required to implement and administer these ADR Procedures in accordance with the Tort Claims Trust Agreement and the Plan.

## SECTION 1.

## INTRODUCTION

**1.1**    **Purpose**. The purpose of the Tort Claims Trust is to, among other things, assume all potential liability for all Tort Claims, to hold, preserve, maximize and administer the Tort Claims Trust Assets, and to establish procedures to liquidate and make a Distribution to all Tort Claim Beneficiaries as further set forth herein in accordance with § 502 of the Bankruptcy Code and applicable law (each, an "Allowed Tort Claim"), determine the allowed amount of each Tort Claim (the "Allowed Claim Amount"), and direct the making of Distributions to the Holders of Allowed Tort Claims. These ADR Procedures are adopted pursuant to the Plan and Tort Claims Trust Agreement and have been approved as reasonable by the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court").

---

[1]    Certain of the deadlines and other information contained in these [Proposed] ADR Procedures are blank. The Parties will solicit the views of the Tort Claims Trustee prior to finalizing the ADR Procedures, all of which shall be subject to the approval of the Bankruptcy Court at or before the Confirmation Hearing.

[2]    Capitalized terms used but not defined herein shall have the meaning set forth in the Debtors' Joint Plan of Liquidation and the Tort Claims Trust Agreement.

1

  **1.2** **Interpretation**. The ADR Procedures apply solely to the adjudication, resolution, allowance or disallowance of Tort Claims. Except as may otherwise be provided below, nothing in the ADR Procedures shall be deemed to create a substantive right for any Tort Claimant. The rights and benefits provided herein to Holders of Tort Claims shall vest in such Holders as of the Effective Date.

**SECTION 2**

**OVERVIEW**

  **2.1** **Tort Claim Trust Goals**. The Tort Claims Trust shall implement and administer these ADR Procedures in consultation with the Tort Claims Administrator and Tort Claims Trust Professionals with the goals of securing the just, speedy, and cost-efficient determination of every Tort Claim, providing substantially similar treatment to Holders of Tort Claims in accordance with these ADR Procedures, and promote the efficient and prompt distribution of the Tort Claims Trust Assets to the Holders of Allowed Tort Claims. To achieve this goal, these ADR Procedures set forth procedures for evaluating, adjudicating or resolving Tort Claims, and distributing the Tort Claims Trust Assets to Holders of Allowed Tort Claims. These ADR Procedures set forth herein shall be the sole and exclusive method by which the Holder of a Tort Claim may seek allowance and distribution on account of such Tort Claim.

  **2.2** **Summary of ADR Procedures**. The ADR Procedures are intended to provide a mechanism for the Tort Claims Administrator and Tort Claimants to evaluate and consensually resolve all Tort Claims. Under the ADR Notice and Immediate Claim Settlement Offer Procedure, after receiving notification of their inclusion in the ADR Procedures, Tort Claimants will complete and return the ADR Notice and Claim Form (as defined below) and provide such information to the Tort Claims Administrator as may be reasonably necessary. Upon receipt of the completed ADR Notice and Claim Form, the Tort Claims Administrator will determine if the Tort Claim gives rise to any causes of action against the Debtors and/or the Insurance Settlement Released Parties. The Tort Claims Administrator then has the opportunity to review the documents and information provided by the Tort Claimants to fully assess the validity and extent of any claims and/or damages relating to the Tort Claim. The Offer Exchange Procedures (as defined below) are intended to provide the Tort Claims Administrator and the Tort Claimants the opportunity to exchange written settlement offers and engage in informal settlement negotiations after they have evaluated the Tort Claim. If the Tort Claims Administrator and the Tort Claimant are unable to resolve the Tort Claim during this process, they may proceed to the Informal Resolution Procedures which is intended to allow the parties to meet and attempt to resolve the Tort Claim consensually without the participation of a third-party intermediary. Finally, the last step is an Arbitration Procedure that is intended to provide a more formal mechanism for amicable resolution of any remains and disputed Tort Claims. The Arbitration Procedure is based upon the terms of use (the "Terms of Use") governing the consumers' rental and use of the micro-mobility vehicles made available by the Debtors (the "Vehicles") and includes generally accepted arbitration procedures of professional alternative dispute resolution organizations. To the extent the Tort Claimants elect to have any third party co-defendant(s) participate in the Arbitration Procedure, the costs and fees of the Arbitrator shall be initially borne by the Tort Claims Trust, without prejudice to "fee shifting" if the Tort Claims Trustee prevails on its objection to the allowance of the Tort Claim, in which event the Tort Claimant shall be solely liable for the cost of the arbitration, consistent with the Terms of Use governing the use or rental of the Vehicles. The Binding Arbitration Procedure is intended to provide a final and formal mechanism for resolution of disputed Tort Claims simultaneously through joint binding Arbitration.

2

      **2.3**     **General Principles**. To achieve maximum fairness and efficiency, and recoveries for Holders of Allowed Tort Claims, these ADR Procedures are founded on the following principles:

          A.     Objective Tort Claim eligibility criteria;

          B.     Clear and reliable proof requirements;

          C.     Administrative transparency;

          D.     A rigorous review and evidentiary process that requires the Tort Claims Administrator to determine Allowed Tort Claims amounts in accordance with applicable law;

          E.     Prevention and detection of any fraud; and

          F.     Independence of the Tort Claims Trustee and the Tort Claims Administrator.

      **2.4**     **Exclusivity**. These ADR Procedures shall be the sole and exclusive method by which a Tort Claimant may seek the allowance and a Distribution on account of any Tort Claim.

      **2.5**     **Confidentiality and Privilege**. All information that the Tort Claims Administrator or the Tort Claims Trustee receives in connection with the evaluation or payment of a Tort Claim shall be treated as confidential and shall be protected by all applicable state and federal privileges, including those directly applicable to settlement communications and shall not be disclosed absent an Order of the Bankruptcy Court compelling such disclosure or the written consent of the Tort Claimant (or such Tort Claimant's counsel of record). All information that the Tort Claims Administrator receives from any Tort Claimant (including from counsel to such Claimant) shall be subject to the settlement and mediation privilege and receipt of such information by the Tort Claims Administrator shall not constitute a waiver of any attorney-client privilege or attorney work-product claim or any similar privilege or doctrine.

      **2.6**     **Governing Law**. Except for purposes of determining the allowance or the value of any Tort Claim, administration of these ADR Procedures shall be governed by, and construed in accordance with, the laws of the State of Florida. As provided in the Terms of Use, the review and adjudication of the allowance (or disallowance) and the amount of a Tort Claim under these ADR Procedures shall be governed by, and construed in accordance with, the laws of the State of California.

      **2.7**     **Statute of Limitations or Repose.** The statute of limitations and statute of repose applicable to any Tort Claim shall be determined pursuant to the laws of the jurisdiction where such Tort Claim accrued.

      **2.8**     **Conflict with Plan**. The terms of the Plan or the Plan Confirmation Order shall prevail if there is any conflict between the terms of the Plan or the Plan Confirmation Order and the terms of these ADR Procedures.

      **2.9**     **Res Judicata Effect**. Any adjudication made by the Tort Claims Administrator or arbitrator pursuant to the ADR Procedures shall have no preclusive, res judicata, judicial estoppel or similar effect outside of these Bankruptcy Cases as against any joint tortfeasor who is not an Insurance

Settlement Agreement Released Party, nor may any such determination be admissible in or used against any Tort Claimant in any other matter, case, or proceeding.

**2.10    Document Access**. If requested, the Tort Claims Administrator shall grant Tort Claimants access to relevant, otherwise discoverable, non-privileged information and documents the Tort Claims Trust receives from the Debtors, the Insurance Settlement Released Parties, or any other cooperating third-parties to facilitate their submissions with respect to their Tort Claims. Such access may include non-privileged information and documents provided to the Tort Claims Trust by Tort Claimants that are not confidential and are relevant to the Tort Claimants' Tort Claims or other Allowed Tort Claims.

## SECTION 3

## DEFINITIONS AND RULES OF INTERPRETATION

**3.1    Incorporation of Plan Definitions**. Capitalized terms used but not defined in these ADR Procedures shall have the meanings ascribed to them in the Plan, the Insurance Settlement Agreement or the Bankruptcy Code.

**3.2.    Interpretation; Application of Definitions and Rules of Construction**. For purposes of these ADR Procedures, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference to a person as a  Holder of a Tort Claim includes that person's successors and assigns; (c) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to these ADR Procedures as a whole and not to any particular article, Section, subsection, or clause; (d) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation;" (e) any effectuating provisions of these ADR Procedures may be reasonably interpreted by the Tort Claims Trustee or the Tort Claims Administrator in such a manner that is consistent with the overall purpose and intent of these ADR Procedures without further notice to or action, order, or approval of the Bankruptcy Court; (f) the headings in these ADR Procedures are for convenience of reference only and shall not limit or otherwise affect the provisions hereof; (g) in computing any period of time prescribed or allowed by these ADR Procedures unless otherwise expressly provided herein, the provisions of Bankruptcy Rule 9006(a) shall apply; (h) "or" is not exclusive; and (i) all provisions requiring the consent of a Person or entity shall be deemed to mean that such consent shall not be unreasonably withheld.

## SECTION 4

## ADR PROCEDURES ADMINISTRATION

**4.1    Administration**. Pursuant to the Plan and the Tort Claims Trust Agreement, these ADR Procedures shall be administered by the Tort Claims Trustee in consultation with the Tort Claims Administrator, who is a neutral third party retained to review and reconcile the Tort Claims. The Tort Claims Trustee shall assist the Tort Claims Administrator in the administration and resolution of the Tort Claims in accordance with these ADR Procedures and provide information necessary for the Tort Claim Administrator to implement these ADR Procedures.

12898017-6

**4.2    Powers and Obligations.** The powers and obligations of the Tort Claims Trustee, and the Tort Claims Administrator are set forth in the Plan and Tort Claims Trust Agreement. The Tort Claims Administrator is a neutral administrator of the Tort Claims and as set forth herein, is responsible for reviewing each of the Tort Claims in accordance with these ADR Procedures. The Tort Claims Administrator's adjudication of each Tort Claim shall be the final review, subject only to reconsideration as set forth below.

**4.3    Cooperation Agreement**. The Tort Claims Administrator may require information, documentation, and/or require the participation of the Insurance Settlement Released Parties to evaluate Tort Claims pursuant to the ADR Procedures. To ensure the cooperation of any necessary parties, the Tort Claims Administrator may ask any of the Insurance Settlement Released Parties to enter into a cooperation agreement (the "Cooperation Agreement") in the form to be attached hereto as Exhibit [__] which provides for the preservation and protection of the parties' respective confidential and privileged information.

## SECTION 5

## CLAIMANT ELIGIBILITY

**5.1    Tort Claims.** The ADR Procedures apply to the Holders of Tort Claims that accrued on or before March 22, 2024 and which may be unsecured, unliquidated or liquidated, contingent, disputed, adjudicated in any arbitration, state or district court proceeding and/or settled pursuant to a written agreement involving bodily injury, including wrongful death, property damage, and the like against any of the Debtors and/or the arising out of the use, placement, operation, transportation, renting, leasing, and/or recovery of the Debtors' Vehicles and/or arising out of the operation of the Debtors' business, including any claim that is related thereto by way of, without limitation, subrogation, contribution, or indemnification. For the avoidance of doubt, Tort Claims do not include (a) workers' compensation Claims; (b) Claims arising under a real property lease against the Debtors; (c) Claims relating to the Debtors' securities; or (d) Claims by any employees, former employees, or contractors of the Debtors arising from their employment, employment agreements or contracts and/or related to the WARN Act.

**5.2    Tort Claims Submission Deadline**. Any Tort Claimant that has not filed a timely Proof of Claim on or before the Tort Claims Bar Date shall be forever barred from asserting such Tort Claim against any of the Insurance Settlement Released Parties and such Tort Claim shall be forever waived, barred and disallowed as against each of the Insurance Settlement Released Parties and not eligible for adjudication under these ADR Procedures or any Distribution under the Tort Claims Trust.

**5.3    Eligibility of Tort Claims**. To be eligible to receive any distribution from the Tort Claims Trust on account of a Tort Claim, a Tort Claimant must:

(1)    have a valid Tort Claim;

(2)    have timely filed a properly completed Proof of Claim on or before the Tort Claims Bar Date;

(3)    submit supporting documentation and evidence to the Tort Claims Administrator as provided below;

5

(4)    execute and deliver a Tort Claim Release Agreement as provided below; and

(5)    complete and provide any such other forms, information, documents, or other requirements set forth herein as reasonably necessary for the Tort Claims Trustee to effectuate any Distribution as otherwise may be approved hereunder.

**5.4    Disallowed Claims**. In the event that a Tort Claimant submits materials that are insufficient (as determined by the Tort Claims Administrator in accordance with these ADR Procedures) to satisfy the eligibility requirements contained in Section 5.3 above, the Tort Claim Administrator shall provide notice of each deficiency to such Tort Claimant and automatically defer adjudication of the related Tort Claim for a minimum of 30 days, to afford the Tort Claimant a fair opportunity to cure any such deficiencies. If the Tort Claimant fails to either timely supplement his or her Tort Claim with materials sufficient to resolve any deficiencies identified by the Tort Claims Administrator, or fails timely respond to the deficiency notice, then upon expiration of 30 days (or such other period as determined by the Tort Claims Administrator), the Tort Claim shall automatically be a Disallowed Tort Claim and the Tort Claim Administrator shall send a Disallowed Tort Claim Notice to such Tort Claimant. The Holder of such Disallowed Tort Claim shall not receive a Distribution from the Tort Claims Trust but shall remain bound by the terms of the Plan and Plan Confirmation Order.

**5.5    Withdrawal of Claims**. A Tort Claimant can irrevocably withdraw a Tort Claim at any time upon written notice to the Tort Claims Trustee. If withdrawn, (a) the Tort Claim will be withdrawn with prejudice and may not be reasserted, and such Tort Claimant shall remain bound by the terms of the Plan and the Plan Confirmation Order, including without limitation the releases of the Insurance Settlement Released Parties in Section 13.7 of the Plan, the Channeling Injunction of Section 13.6, and the Bar Order of Section 13.9 thereof; and (b) any reserve maintained by the Tort Claims Trust on account of such Tort Claim shall revert to the Tort Claims Trust as a Tort Claims Trust Asset for Distribution in accordance with the Tort Claims Trust Agreement and the Plan.

**5.6    Recovery Only With Respect to a Single Individual Tort Claim.** A Tort Claimant may assert no more than one Tort Claim pursuant to the ADR Procedures, and may recover only in respect of such singular Tort Claim from the Tort Claims Trust, based on the Tort Claim asserted in the Tort Claimant's Proof of Claim. For the avoidance of doubt, after filing his or her Proof of Claim, a Tort Claimant may not allege or seek to assert an additional or different Tort Claim unless otherwise allowed by the Tort Claims Administrator in his or her discretion.

**5.7    Tort Claims Previously Settled but Unpaid**. If, prior to the Closing Date (i) a Tort Claimant submitted his or her Tort Claim to the Debtors or participated in a mediation or arbitration proceeding for settlement consideration, and either: (ii) an arbitration was completed; or (iii) a written settlement agreement was entered into between the Debtors and the Tort Claimant to settle the Tort Claim for an amount certain, but the arbitrator did not release his or her judgment or the Debtors were unable to process the related transfer of settlement funds before the Petition Date, then such Tort Claimant may submit his or her Tort Claim Form to the Tort Claims Administrator and assert allowance of the Tort Claim in the amount agreed to or adjudicated prior to the Petition Date. A Tort Claimant must provide the Tort Claims Administrator with a copy of his or her executed settlement agreement, or other documentation evidencing that an arbitration award or settlement was reached prior to the Closing Date to support his or her Tort Claim. The Tort Claims Administrator shall allow the Tort Claim and it will be

6

eligible to receive a Distribution from the Tort Claims Trust without being required to participate in any further ADR Procedures hereunder.

**5.8    Tort Claims Previously Settled and Paid**. Any Tort Claimant who previously (i) reached a settlement with the Debtors related to a Tort Claim, (ii) submitted a release, and/or (iii) received payment with respect to his or her Tort Claim, shall not have an Allowed Tort Claim and shall not receive any Distribution from the Tort Claims Trust.

**5.9.    Tort Claims Previously Rejected or Dismissed**. Any Tort Claimant who filed a Tort Claim in any arbitration forum, or state or federal court prior to the Petition Date which was thereafter dismissed with prejudice and is not the subject of a pending appeal shall not be eligible to recover any payment whatsoever from the Tort Claims Trust.

**5.10    Tort Claims Otherwise Subject to Final Judgment**. Any Tort Claimant who filed a Tort Claim in any arbitration forum, or state or federal court, and whose Tort Claim was adjudicated and resulted in a final unfavorable judgment (e.g., a defense verdict) and is the not the subject of a pending appeal shall not be eligible to recover any payment whatsoever from the Tort Claims Trust.

**5.11    Non-Responsive Tort Claimants.** Except for those Tort Claimants who (a) have submitted a Reconsideration Request (as set forth below), or (b) (i) hold Tort Claims as a representative on behalf of a deceased or incompetent individual, and (ii) are required to obtain court approval before accepting any Allowed Tort Claim, Allowed Tort Claimants shall have 30 days from the date an offer is made by the Tort Claims Administrator to accept such offer. In the event that a Tort Claimant neither accepts such settlement offer within 30 days nor falls under either exception (a) or (b) of this Section, such Tort Claimant's Tort Claim shall be deemed waived and ineligible for compensation from the Tort Claims Trust and the Tort Claims Administrator may in his or her discretion, file a motion with the Bankruptcy Court, on notice to the Tort Claimant to seek the entry of an order striking and disallowing the Tort Claim.

**5.12    Non-Compensatory Damages and Other Theories of Liability**. In determining the amount of any Distribution to Tort Claimants, punitive damages and damages that can be classified as economic damages that do not compensate the Tort Claimant for property, bodily injury and/or emotional distress or mental anguish attributable to their bodily injury shall not be considered or allowed, even if these damages could have been considered or allowed under applicable non-bankruptcy law. Any distribution to a Tort Claimant shall be solely because of property damage, bodily injury and/or emotional distress or mental anguish attributable to the bodily injury to such Tort Claimant.

**5.13    Post-petition Interest**. No Holder of an Allowed Tort Claim shall receive or recover interest accruing on or after the Petition Date on any such Allowed Tort Claim.

**5.14    Release and Dismissal of Pending Litigation**. No Tort Claimant shall receive a Distribution until such Tort Claimant has executed and delivered to the Tort Claim Trust the "Tort Claim Release Agreement" in a form to be filed as part of a supplement prior to the Plan Confirmation Hearing and to attached hereto as Exhibit "A". Each Tort Claimant must release all Claims against the Debtors and the Insurance Settlement Released Parties. Upon request, the Tort Claims Trustee must provide copies of all executed Tort Claim Release Agreements to the Insurance Settlement Released Parties. For the avoidance of doubt, nothing herein shall require a Tort Claimant to release any Person that is not the Debtors or an Insurance Settlement Released Party. In addition, each Tort Claimant shall within ten (10)

days of receipt of a Distribution file a notice of dismissal with prejudice of all Tort Claims against the Debtors and any Insurance Settlement Released Parties, in any pending litigation with each party to bear its own fees and costs. In the event that any Tort Claim asserted against the Debtors or any Insurance Settlement Released Parties in any pending litigation shall be not have been dismissed as and when provided herein, the Tort Claim Trustee and/or the Insurance Settlement Released Parties shall be authorized to apply to the applicable court and request that such litigation be dismissed, and in connection therewith such court shall be entitled to rely on the Plan, the Plan Confirmation Order and these ADR Procedures in dismissing such lawsuit.

     **5.15**    **Duty to Negotiate in Good Faith**. During the period of these ADR Procedures, each Tort Claimant and the Tort Claims Administrator shall negotiate in good faith in an attempt to reach an agreement for the compromise of the Tort Claims; provided, however, that any dispute as to the underlying value of the Tort Claim shall not, in and of itself, constitute bad faith.

     **5.16**    **Failure to Comply with ADR Procedures**. If, absent written agreement by the Tort Claims Administrator and any Tort Claimant, a Tort Claimant fails to comply with the ADR Procedures, negotiate in good faith, or cooperate with the Tort Claims Administrator, or any participating third party co-defendant, if applicable, as may be necessary to effectuate the ADR Procedures, may result in the disallowance of the Tort Claim at the discretion of the Tort Claims Administrator and such Tort Claimant's Tort Claim shall be deemed waived and ineligible for a Distribution from the Tort Claims Trust and the Tort Claims Administrator may in his or her discretion, file a motion with the Bankruptcy Court, on notice to the Tort Claimant to seek the entry of an order striking and disallowing the Tort Claim.

     **5.17**    **Admissibility of ADR Proceedings**. Other than as expressly provided herein, the submission of any Tort Claim to the ADR Procedures, the positions of the parties during compliance with the ADR Procedures, and any other admissions made during the ADR Procedures, shall not be admissible for any purpose in any case, matter, or proceeding including, without limitation, trial by any party or Joint Tortfeasor, or any proceeding under 11 U.S.C. § 502, and are expressly determined by the provisions herein not to be admissions by either party. Such positions and statements shall remain confidential among the parties and any arbitrator and protected by Rule 408 of the Federal Rules of Evidence.

## SECTION 6

## STAGE 1 - NOTICE OF ADR PROCEDURES AND OPTIONS

     **6.1**    **ADR Notice and Claim Information and Settlement Demand Form**. No later than thirty (30) days following the Effective Date, or as soon thereafter as is practicable, the Tort Claims Administrator shall publish and cause to be served the claims materials for all Tort Claims, substantially in the form annexed hereto as Exhibit "B", to all known Holders of Tort Claims (the "ADR Notice") which shall include: (b) the Claim Information and Settlement Demand Form (the "Claim Form"; (b) a HIPAA Release Form in a form to be filed as part of a supplement prior to the Plan Confirmation Hearing (the "HIPAA Release"); and (c) a Tort Claims Release Agreement in a form to be filed as part of a supplement prior to the Plan Confirmation Hearing and attached hereto as Exhibit "C". The ADR Notice shall inform Tort Claimants that their Tort Claim is channeled to the Tort Claims Trust, is subject to the ADR Procedures, and if appropriate, provide them with the option to either (i) accept any Immediate Claim Settlement Offer (as hereinafter defined) that in the discretion of the Trust Claim Administrator may be included; or (ii) request the Claimant complete and sign under penalty of perjury and return to the Tort

Claims Administrator the ADR Notice and Claim Form together with all requested documents to support the Tort Claim which shall be evaluated by the Tort Claims Administrator to determine whether the Tort Claim is eligible to receive a Distribution from the Tort Claims Trust. The applicable HIPAA Release and Tort Claim Release Agreement shall be made available for completion electronically and may be executed by a Tort Claimant or his or her legal Representative via Adobe Sign or DocuSign, or a similar authorized electronic signature and notarization program, or such other simplified and expedient means established by the Trust Claims Administrator.

      A. <u>Response Deadline</u>. The ADR Notice shall require the Claimant to respond so that the Tort Claims Administrator will actually receive a response from the Tort Claimant no later than forty-five (45) days after the date on which the ADR Notice is served (the "<u>Tort Claimant Response Deadline</u>").

      B. <u>Sufficiency of Service of Notice and Communications</u>. For purposes of the ADR Procedures, service on a Tort Claimant and any communications (including responses) shall be deemed adequate if such service is provided to the Tort Claimant (i) at the email address(es) of their counsel, if counsel has appeared, specified in their filed Proof of Claim or in the pending litigation, if any; (ii) if Tort Claimant does not have counsel, then at the email address(es) of Tort Claimant, if known; and (iii) by mail, where the Debtors have a record of a physical address for the Tort Claimant. Service on the Tort Claims Trust by any Tort Claimant and any communications (including responses) to the Tort Claims Trust shall be deemed adequate if made by email at the email addresses set forth in the ADR Notice or if made by using a regularly recognized overnight delivery service sent to the Tort Claims Trust addresses set forth in the ADR Notice.

      C. <u>Effect of Failure to Respond</u>. Failure of a Tort Claimant to sign and return the ADR Notice and/or an Immediate Claim Settlement Offer will be deemed as a failure to comply with the ADR Procedures. The Tort Claimant's ability to proceed with and participate further in the ADR Procedures will be at the discretion of the Tort Claims Administrator as set forth in Sections 5.11 and 5.16 above.

## SECTION 7

## STAGE 2 - IMMEDIATE CLAIM SETTLEMENT OFFERS

**7.1    Immediate Claim Settlement Offers**. The Tort Claims Administrator may, but is not required to, include in the ADR Notice an offer to allow the Tort Claim in the amount asserted by the Tort Claimant or any such lesser amount as determined in the discretion of the Tort Claims Administrator ""<u>Immediate Claim Settlement Offer</u>").

**7.2    Acceptance of Immediate Settlement Offer.** If an Immediate Claim Settlement Offer is included in the ADR Notice, the Tort Claimant shall have the option to sign and return the Immediate Claim Settlement Offer on or before the Response Deadline without being required to provide any additional information set forth in the ADR Notice and Claim Form. A Tort Claimant who elects to accept an Immediate Claim Settlement Offer in response to the ADR Notice or at such later time as such an offer is made to the Tort Claimant in the discretion of the Tort Claim Administrator, shall be entitled to the allowance of its Tort Claim in the amount contained in the Immediate Settlement Offer.

7.3     **Rejection of Immediate Settlement Offer**. If a Tort Claimant elects to reject the Immediate Claim Settlement Offer, the Tort Claimant must complete and return the ADR Notice and the Claim Form by the Response Deadline and as otherwise set forth below.

7.4     **Effect of Election**. A Tort Claimant who elects to accept an Immediate Claim Settlement Offer shall have no further claims or remedies with respect to the Tort Claim he or she has against the Tort Claims Trust, the Debtors or the Insurance Settlement Released Parties. Tort Claimants that accept an Immediate Claim Settlement Offer will not be eligible to receive any further Distribution pursuant to these ADR Procedures.

## SECTION 8

## STAGE 3 - OFFER EXCHANGE PROCEDURES

8.1     **Offer Exchange Procedures** The third stage of the ADR Procedures will be the settlement offer and exchange procedure, requiring the parties to exchange information and settlement offers and thereby provide the opportunity to resolve the Tort Claim on a consensual basis without any further litigation (the "Offer Exchange Procedures").

A.     Tort Claimant's Demand. The Claim Form contained in the ADR Notice requires that in the event a Tort Claimant (1) does not receive an Immediate Claim Settlement Offer; or (2) elects to reject an Immediate Claim Settlement Offer, the Tort Claimant must make a settlement demand, which may include a request for a reasonable amount of supplemental information or clarification of information from the Tort Claims Administrator (the "Tort Claimant's Demand"). The Tort Claimant's Demand must also provide the Tort Claims Administrator with certain information and documentation that will enable the Tort Claims Administrator to evaluate the Tort Claim and the Tort Claimant's Demand.

(1)     The Tort Claimant must return the completed ADR Notice and the Claim Form by the Response Deadline. The Tort Claimant shall not be required to provide duplicative information to the extent the Tort Claimant has already provided the requested claim information as supporting documentation attached to any timely filed Proof of Claim in the Cases.

(2)     The Tort Claimant's Demand may not exceed the amount of the Tort Claimant's most recent timely-filed Proof of Claim, if one was filed. For the avoidance of doubt, this does not mean that if a Tort Claimant filed a claim which did not make a specific demand, the claimant is limited to demanding zero. The Claimant's Tort Demand may liquidate any unliquidated amounts asserted in a Proof of Claim. The Claimant may not return the Claim Form with an unknown, unliquidated, indefinite, contingent, or similar description of the Tort Claim or the amount thereof.

B.     Response to Demand. Within thirty (30) days after the Tort Claims Administrator's receipt of a Tort Claimant's Demand, the Tort Claim Administrator shall serve a response on the Claimant and their counsel, if identified (the "Response"). The Response shall either: (1) accept the Tort Claimant's Demand; (2) make a counter-offer to settle the Tort Claim for a different amount (the "Offer"); or (3) request additional information.

(1)  Acceptance of Claim. The Tort Claim Administrator may accept the Tort Claim as asserted in the Tort Claimant's Demand. In such event, the Tort Claim will be deemed Allowed and receive a Distribution from the Tort Claim Trust.

(2)  Offer. The Tort Claim Administrator may make a written good faith offer of settlement based upon its review of the Tort Claim.

(3)  Additional Information. The Tort Claim Administrator may request a reasonable amount of supplemental information or clarification of information to assist in a good faith evaluation of any particular Tort Claim. The Tort Claimant shall serve such additional reasonable information so that the Tort Claim Administrator actually receive such information within 30 days of the mailing (or e-mailing if the Tort Claimant has counsel) of such request. If the Tort Clamant timely responds to such a request, the time period within which the Tort Claim Administrator may otherwise respond to the Tort Claimant's Demand shall be extended until 30 days after the Tort Claim Administrator has actually received the supplemental information. The Tort Claim will not be processed further until the additional information requested has been provided by the Tort Claimant to the Tort Claim Administrator.

C.  Tort Claimant's Reply. The Tort Claimant shall have 30 days after service of the Offer within which to reply (the "Reply Deadline"). The Tort Claimant's reply shall be in writing and signed by the Tort Claimant or an authorized representative.

(1)  If the Offer is accepted, the Tort Claim shall have an Allowed Tort Claim and receive a Distribution as set forth below.

(2)  If the Offer is rejected, or the Tort Claimant does not respond by the Reply Deadline, the Tort Claim will automatically advance to the next stage of the ADR Procedures. If the Tort Claimant does not respond by the Reply Deadline, the Tort Claim Administrator may seek relief in accordance with Sections 5.11 and 5.16.

**8.2  Confidentiality of Offer Exchange Procedures**. All offers made and communications exchanged during the Offer Exchange Procedures shall be provided to the Tort Claim Administrator. All such communications shall be confidential among and between the Tort Claim Administrator, any participating third-parties, if applicable and the Tort Claimant. No party shall disclose the contents of such offers or communications without the prior written consent of each of the other parties. Any and all statements and offers made during the Offer Exchange Procedures shall be subject to Federal Rule of Evidence 408 and shall not be subject to discovery in any subsequent proceeding.

## STAGE 3 - ALTERNATIVE PROCEDURES

**8.3  Tort Claim Determination of Allowance.** If the Tort Claims Administrator determines the Tort Claimant has established his or her Tort Claim by a preponderance of the evidence, the Tort Claim shall be allowed. If necessary, the Tort Claims Administrator can ask for additional information to make this determination. The Tort Claimant may refuse such a request at his or her own risk, including but not limited to disallowance of his or her Tort Claim.

**8.4     Tort Claim Amount Determination**. Once the Tort Claims Administrator determines a Tort Claim is allowed, the Tort Claims Administrator shall then determine the amount of such Tort Claim after considering all of the facts and evidence presented by the Tort Claimant in the Tort Claimant's filed Proof of Claim and any supplementary materials or information submitted to the Tort Claims Administrator. The Tort Claims Administrator may consider the credibility of the Tort Claimant and the facts alleged in support of the Tort Claim and, in the Tort Claims Administrator's sole discretion, reduce or deny the Tort Claim. After all Tort Claims have been evaluated, the Tort Claim Administrator shall determine the dollar value for each Tort Claim and the Tort Claimant's pro rata share of the Tort Claims Trust Assets, after accounting for necessary holdbacks to pay administrative fees and costs.

**8.5     Determinations by the Tort Claims Administrator**. The Tort Claims Administrator shall notify each Tort Claimant in writing of the expected monetary distribution with respect to the Allowed Tort Claim, which distribution may be greater or smaller than the actual distribution to be received based on the outcome of any remaining disputed or unresolved Tort Claims and the funds ultimately available for distribution. The Tort Claims Administrator's determination shall be final unless the Tort Claimant makes a timely request for reconsideration by the Tort Claims Administrator. The Tort Claimant shall not have a right to any other appeal of the Tort Claims Administrator's point award. Determinations shall be sent, in the case of a Tort Claimant represented by a lawyer to the Tort Claimant's attorney by email and, in the case of a *pro se* Tort Claimant, both by email, if one is provided, and by express courier.

**8.6     Requests for Reconsideration**. The Tort Claimant may request reconsideration by delivering a written request for reconsideration to the Tort Claims Administrator within [* ] calendar days after the date of mailing of the notice of the preliminary monetary distribution. Each written request must be accompanied by a non-refundable check for the reconsideration fee, of $[* ] hundred dollars. The Tort Claimant, with the request for reconsideration, may submit additional evidence and argument in support of such request. The Tort Claimant's monetary distribution amount may go up or down as a result of his or her request for reconsideration. The Tort Claims Administrator shall have sole discretion to determine how to respond to the request for reconsideration. The Tort Claims Administrator's determination of such request for reconsideration shall be final and not subject to any further reconsideration, review or appeal by any party, including the Bankruptcy Court.

## SECTION 9

## STAGE 4 - INFORMAL RESOLUTION PROCEDURES

**9.1     Informal Resolution Procedures**. If a settlement is not reached as a result of the Offer Exchange Procedures outlined in Section 8 above, then the Tort Claim Administrator, the Tort Claimant or counsel for the Tort Claimant, if represented by counsel, will meet in-person or over Zoom within [_ ] days to negotiate further to determine if a resolution can be reached (the "Informal Resolution Procedures").

## SECTION 10

## STAGE 5 - BINDING ARBITRATION

**10.1     Binding Arbitration**. If any Tort Claims are not resolved pursuant to the Offer Exchange Procedures or the Informal Resolution Procedures set forth in Sections 7 through 9 above, the next stage

of the ADR Procedures will be Arbitration. The following arbitration procedures will apply (the "Arbitration Procedures").

**10.2.    Designation of Arbitrator**. The Tort Claims Administrator shall select in his sole discretion, a single arbitrator (the "Arbitrator") to serve as the sole trier of fact and final arbiter as to the entitlement and amount of each disputed Tort Claim.

A.    Arbitrator Qualifications. The Arbitrator shall have the following minimum qualifications: (1) a current or retired member of a state bar; (2) experience in tort litigation of the type of case for which he or she is proposed; (3) demonstrable experience or familiarity with the applicable law of the jurisdiction where the claim would otherwise be tried; and (4) demonstrable experience or familiarity with courts and verdicts in the jurisdiction where the claim would otherwise be tried. For Tort Claims in the asserted amount of One Million ($1,000,000) Dollars or more, the Arbitrator shall have the additional qualification of five or more years' experience as a neutral. The Arbitrator shall be impartial and neutral and shall not have any financial or personal interest in or relation to the Tort Claim, the Bankruptcy Cases or, except where otherwise agreed by the parties, in any related matters.

**10.3    Manner and Notice of Arbitration.** The Tort Claims Administrator shall serve a Notice of Arbitration (the "Arbitration Notice"), in a form to be filed as part of a supplement prior to the Plan Confirmation Hearing and attached hereto as Exhibit "D", on the Tort Claimant within [* ] days after the completion of the Informal Resolution Procedures or at such earlier date as the Tort Claims Administrator determines to be appropriate.

A.    Representation by Counsel. Any party may be represented by legal counsel, although the participation of legal counsel shall not be required to conduct the Arbitration Procedures.

B.    Status Conference. Within [* ] days of his or her appointment, the Arbitrator shall conduct a global status conference at which Tort Claimant and the Tort Claims Administrator will be required to confer with respect to global procedural and substantive matters affecting the Arbitration of the applicable Tort Claim, including but not limited the selection of date(s), location(s), and time(s) for Arbitration to be scheduled. The Arbitrator may enter such procedural or substantive orders of general or special application which are consistent with the terms of these Arbitration Procedures as the Arbitrator deems appropriate. Such orders shall be confidential among the Arbitrator, the Tort Claimants, the Tort Claims Administrator, and any other party (a) that the Tort Claims Administrator determines is necessary in connection and consistent with his duties and responsibilities, and (b) who agrees to be bound by the confidentiality provisions of these Arbitration Procedures.

**10.4    Arbitration Statements**.

A.    Opening Statement. On or before [* ] days prior to the scheduled Arbitration, the Tort Claimant shall serve on the Arbitrator and the Tort Claims Administrator by email and no later than by 5:00 p.m. (PST), a non-confidential (as between the parties and the Arbitrator), pre-arbitration statement (the "Opening Statement"), not to exceed 10 pages, excluding any attachments, setting forth all of the Claimant's claims and identifying each and every cause of action or theory the Tort Claimant asserts, including a short and plain statement of the facts and

13

law upon which the Tort Claimant relies for recovery and maintains entitle it to relief. The Tort Claimant shall include, as exhibits or annexes to the Opening Statement, any documents, affidavits, or other evidentiary materials on which the Claimant relies, but which are not attached to the Claimant's Proof of Claim.

B.    Response Statement. On or before [* ] days after service of the Opening Statement, the Tort Claims Administrator shall serve on the Arbitrator and the Tort Claimant, by email and no later than by 5:00 p.m. (PST), a non-confidential (as between the parties and the Arbitrator) response statement (the "Response Statement") not to exceed 10 pages, excluding attachments. The Response shall include such information as the Tort Claims Administrator deems appropriate. In preparing the Response Statement, the Tort Claims Administrator and his or her counsel shall be entitled to consult with such Persons or entities as they deem appropriate including but not limited to Insurance Settlement Released Parties, provided that the confidentiality of documents is preserved in the manner set forth below.

C.    Additional Materials. At the Arbitrator's discretion and direction, the parties may submit additional, confidential letters or statements to the Arbitrator only, addressing settlement amounts and such related negotiation matters as the Arbitrator may request.

**10.5    Location and Scheduling of Arbitration**. Following the Status Conference, the Arbitrator, Tort Claimant and the Tort Claims Administrator shall reasonably confer regarding the time, duration, and location of the Arbitration. All Arbitration sessions may take place virtually.

**10.6    Arbitration Hearings**. Hearings on each Tort Claim shall last no more than two hours, subject to such extensions as the Arbitrator determines are required by the circumstances of each case. The Tort Claimant and the Tort Claims Trustee shall, in general, be entitled to equal time for their respective presentations. The parties may submit such depositions, documentary evidence, affidavits, and live testimony as they deem appropriate and as may be allowed by the Arbitrator.

A.    Procedural and Evidentiary Rules. The Arbitrator shall determine and apply procedural and evidentiary rules in connection with the determination of each Tort Claim, taking generally into account, as applicable to an expedited proceeding such as that provided for herein, the Federal Rules of Bankruptcy Procedure, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence. The Arbitrator may extend deadlines for good cause.

B.    Final and Binding Ruling. After consideration of each Tort Claim, the Arbitrator shall enter a ruling with respect to each such Tort Claim, and shall award such amount as the Arbitrator determines appropriate by applying to each Tort Claim the same general standards for court awards for similar claims and without taking into account the amount of money available for distribution to creditors. In the event that the Arbitrator determines that a Tort Claim is not entitled to any award, the Arbitrator shall briefly specify the reasons for such determination and the Tort Claim shall be disallowed by the Tort Claims Administrator. The Arbitrator shall not otherwise specify the rationale for the respective awards. The Arbitrator's determination with respect to each Tort Claim shall be final and binding in accordance with Federal Rule of Bankruptcy Procedure 9019(c).

C.    Limitation on Ruling on Non-participating Parties. Notwithstanding anything herein to the contrary, the parties agree that the procedures set forth herein for the Arbitrator's determination of the amount of any Tort Claim, if any, as well as the actual determination thereof, are not

14

and shall not constitute a full and complete litigation of the merits of each such Tort Claim between the respective Tort Claimant and any non-participating joint tortfeasors such that the determination of any such Tort Claim shall not have any res judicata, collateral estoppel, or issue preclusion effect in any future proceedings, whether judicial or administrative in nature. Further, the Tort Claimants agree not to, and shall not, raise the issue(s) or defense(s) of res judicata, collateral estoppel, or issue preclusion in any future proceedings, whether judicial or administrative in nature, by reason of the determination of any Tort Claim hereunder.

**10.7     Fees and Costs of Arbitration**. The fees and costs of the Arbitrator shall be paid by the Tort Claims Trust. The Tort Claimant shall bear the cost and expense of its own counsel, experts, witnesses, and prosecution. If the arbitration results in the Tort Claim being disallowed, the fees and expenses of the arbitration may be assessed against the Tort Claimant, consistent with the Terms of Use.

**10.8     Confidentiality of Arbitration.** In addition to the inadmissibility provisions contained in **Section 6.7** above, all meetings and proceedings, including any statements made and evidence introduced during the Arbitration, shall be confidential among the Tort Claims Administrator, the Tort Claimant, and the Arbitrator, and no party shall disclose the contents of such meetings and proceedings without the prior written consent of each of the other parties. Any and all statements made and evidence introduced at these meetings and proceedings shall not be subject to discovery in any subsequent proceeding unless otherwise independently discoverable under the applicable rules, nor may the Arbitrator be compelled to disclose to any court or to any person outside the Arbitration Conference any of the records, reports, summaries, notes, communications, or other documents received or made by the Arbitrator while serving in such capacity. The Arbitrator may not testify or be compelled to testify regarding the Arbitration in connection with any arbitral, judicial or other proceeding. The Arbitrator will not be a necessary party in any proceedings relating to the Arbitration. Nothing contained in this paragraph prevents the Arbitrator from reporting the status, but not the substance, of the Arbitration efforts to any court.

**10.9     Duty to Participate in Arbitration Procedures** The failure of any party to participate in the Arbitration Procedures shall be governed by Local Bankruptcy Rule 9019-5(c)(iv)(B), and any such failure or any lack of good faith by any such party during the course of the Arbitration could result in the disallowance of the Tort Claim as set forth in Section 5.16.

## SECTION 11

## STAGE 6 - DISTRIBUTIONS UNDER THE TORT CLAIMS TRUST

**11.1     Distributions of Allowed Tort Claims**. Each Tort Claimant with an Allowed Tort Claim shall be entitled to a Distribution on account of such Allowed Tort Claim subject to sufficiency of funds in the Tort Claims Trust without regard to whether the Tort Claim arose prior to the commencement of the Bankruptcy Cases as follows:

A.     Distributions to Allowed Claims. No Distributions will be made to the Holders of Tort Claims unless and until such Tort Claims are Allowed Tort Claims. In the event that the sum of all Allowed Tort Claims exceeds the total then available for distribution from the Tort Claims Trust, the Tort Claims Trustee shall aggregate the total of all such Allowed Tort Claims and determine each Tort Claimant's relative percentage entitlement to distributions on a Pro Rata basis.

15

B.     Manner of Distribution. Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a Holder of an Allowed Tort Claim shall be made at the address of the Tort Claimant as set forth in the Proof of Claim or ADR Notice and Claim Form filed by such Holder unless the Tort Claims Trustee has been notified in writing of a change of address. All Distributions by the Tort Claims Trustee on account of Allowed Tort Claims shall be by check payable to the Tort Claimant if not represented by counsel and/or jointly payable to the Tort Claimant and his or her retained counsel identified on the Tort Claimant's Proof of Claim or Claim Form.

C.     Documents Establishing Legal Representation. Tort Claimants asserting a Tort Claim on behalf of a minor, incapacitated, or deceased person must, before any funds related to such Allowed Tort Claim may be distributed from the Tort Claims Trust, submit to the Tort Claims Trustee appropriate documentation confirming the Allowed Tort Claimant's legal authority to resolve the Tort Claim on behalf of the minor, incapacitated, or the deceased person and his/her estate. The Allowed Claim Amount for any such Allowed Tort Claim shall be set aside and held in escrow within the Tort Claims Trust pending the final resolution of various administrative issues involving the resolution of the Tort Claim including issues related to probate, guardianship, personal bankruptcy filings, or any lien resolution. Payment of Allowed Claims, once all applicable administrative issues related to a Tort Claimant's acceptance of his or her Allowed Claim Amount are resolved, the Tort Claims Trustees shall transfer to the Tort Claimant his or her net Allowed Claim Amount. Alternatively, if a Tort Claimant elected to receive his or her distribution pursuant to these ADR Procedures through his or her retained counsel, then the Tort Claims Trustee shall transfer the net Allowed Tort Claim amount to the retained counsel identified on the Tort Claimant's Proof of Claim or ADR Notice and Claim Form.

D.     Offsets. The Tort Claims Administrator shall have the right to offset or reduce payment of an Allowed Tort Claim, on a dollar-for-dollar basis, based on any amounts paid, agreed upon, or reasonably likely to be paid to the relevant Tort Claimant on account of his or her Tort Claim as against any third party (or that reduces the liability thereof under applicable law) from any source other than the Tort Claims Trust.

E.     Fees Precluded. No Tort Claimants shall receive on account of such Allowed Tort Claim more than the face amount of such award, provided, however, that in the event that all Tort Claims are paid in full under the ADR Procedures, then all Allowed Tort Claims shall be entitled to post-petition interest at the federal judgment rate. In addition, no Tort Claimant shall be entitled to the payment of attorneys' fees in addition to any Allowed Tort Claim.

F.     No Third-Party Distributions. No Distribution under the Tort Claims Trust shall be made on account of or on behalf of any allowed Tort Claim that is payable by any third party that is not the Tort Claims Trust. To the extent that any other third party, including any participating joint tortfeasor, if applicable agrees to satisfy in full or in part an allowed Tort Claim, then immediately upon such agreement, the applicable portion of such Tort Claim may be disallowed and expunged without further notice to any party, or action, approval, or Order of the Bankruptcy Court.

**11.2     Payment Date**. The Tort Claims Trustee shall make Distributions to Allowed Tort Claimants provided in Section 11.1 within thirty (30) days after entry of an order approving the Tort Claims Trustee's Final Report (as defined below), and shall make any further and final Distributions to Allowed Tort Claimants in such other amounts as are practicable and prudent in light of payments of the Tort Claims Trustee's administrative fees and expenses made to the Tort Claims Trustee and its

16

professionals under the Tort Claims Trust, and subject to the overriding principle of equality of distribution among all Tort Claimants. Whenever any payment or Distribution to be made under the Tort Claim Trust shall be due on a day other than a business day, such payment or distribution shall instead be made, without interest, on the immediately following business day.

11.3 **Undeliverable Distributions**. If any Distribution to a Holder of an Allowed Tort Claim is returned to the Tort Claims Trust as undeliverable, no further Distributions shall be made to such  unless and until the Tort Claims Trustee is notified in writing of such holder's then-current address or other necessary information for delivery, at which time such previously undeliverable Distribution shall be made to such Holder within ninety (90) days of receipt of such Holder's then-current address or other necessary information; provided, however, that any such undeliverable Distribution shall be deemed unclaimed property under 11 U.S.C. § 347(b) of the Bankruptcy Code at the expiration of 180 days after the date of the initial attempted Distribution. After such date, all unclaimed property or interests in property shall revert to the Tort Claims Trust automatically and without the need for any notice to or further order of the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheatment, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any Holder to such property or interest in property shall be discharged and forever barred.

11.4 **Non-Negotiated Distributions.** If any Distribution to a Holder of a Tort Claim is not negotiated for a period of 180 days after the Distribution, then such Distribution shall be deemed unclaimed property under 11 U.S.C. § 347(b) and re-vest in the Tort Claims Trust. After such date, all non-negotiated property or interests in property shall revert to the Tort Claims Trust automatically and without the need for any notice to or further order of the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheatment, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any Holder to such property or interest in property shall be discharged and forever barred.

11.5 **Tort Claims Trustee's Final Report**. The Tort Claims Trustee shall file a report (the "Tort Claims Trustee's Final Report") with the Bankruptcy Court under seal setting forth all Distribution awards on Allowed Tort Claims and, if applicable, such relative Distribution percentages, which Tort Claims Trustee's Final Report will be filed under seal as set forth herein, and the information contained therein shall be deemed confidential. The Tort Claims Trustee shall serve a notice of filing of the Tort Claims Trustee's Report on the Tort Claimants and other parties in interest. Within 20 days after such service, any Tort Claimant or other party in interest may request a copy of the Tort Claims Trustee's Final Report by providing to the Tort Claims Trustee's counsel a written request therefor, together with a duly executed and binding confidentiality agreement by a Tort Claimant or other party in interest, in a form to be specified as an exhibit to the Plan. Upon timely receipt by the Tort Claims Trustee of such request and confidentiality agreement, the Tort Claims Trustee shall promptly provide a copy of the Tort Claims Trustee's Final Report to such Tort Claimant or other party in interest.

11.7 **Satisfaction of Claims**. Except as otherwise specifically provided in the Plan, any Distributions made on account of any Tort Claim pursuant to the Plan, the Tort Claims Trust Agreement, and the ADR Procedures shall be in complete and final satisfaction, settlement, and discharge of and exchange for the Tort Claim.

11.8 **Minimum Cash Distributions.** The Tort Claims Trust and Tort Claims Administrator shall not be required to make any Distribution of Cash less than twenty dollars ($20) to any Holder of an Allowed Tort Claim.

12898017-6

**11.9    Dismissal of Pending Litigation**. The Tort Claimants shall within ten (10) days of receipt of their respective Distribution from the Tort Claims Trust, file a notice of dismissal with prejudice of all Tort Claims against the Debtors and any other Insurance Settlement Released Parties as required by Section 5.4 of these ADR Procedures.

## SECTION 12

## MISCELLANEOUS

**12.1    Severability**. Should any provision contained in these ADR Procedures be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the ADR Procedures. The Tort Claims Administrator or the Tort Claims Trustee may amend these ADR Procedures and/or the Tort Claims Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of any party hereunder.

**12.2    Notice**. Whenever notice or service of papers is required under the ADR Procedures, it shall be given in the manner provided in the relevant section as follows:

If to the Tort Claims Trustee:

with copies to:

If to the Tort Claims Administrator:

with copies to:

**EXHIBIT A**

**COOPERATION AGREEMENT**

[TO BE FILED BEFORE THE PLAN CONFIRMATION DATE]

**EXHIBIT B**

**ADR NOTICE AND CLAIM FORM**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| BIRD GLOBAL, INC., et al., | Case No. 23-20514-CLC |
| Debtors. | Jointly Administered |

_____/

## **ADR NOTICE AND DEADLINE FOR SUBMISSION OF INFORMATION**

Incident Date: _____

Claim No(s).:_____

Claimant: _____

Address: _____

Claimant's Attorney (if known): _____

Deadline to Respond ("Response Deadline"): _____

You are receiving this notice (the "ADR Notice") because your Tort Claim against Bird Global, Inc. and its affiliated debtors (collectively, the "Debtors") or against any Indemnitees has been submitted to alternative dispute resolution pursuant to the alternative dispute resolution procedures (the "ADR Procedures") approved and established by Order of the United States Bankruptcy Court for the Southern District of Florida entered in the above-captioned cases on _____, 2024 [DE No. [ *]] (the "Plan Confirmation Order"). The ADR Procedures will be implemented, administered, and coordinated by the Tort Claims Administrator.

A copy of the ADR Procedures, as approved by the Plan Confirmation Order, is annexed hereto. Any terms not defined herein or in any subsequent notices that you may receive regarding the ADR Procedures shall have the meanings attributed to them in the ADR Procedures and the Plan Confirmation Order.

**YOU SHOULD CONSIDER CONSULTING A LAWYER.** Your participation in these ADR Procedures may either be by you or, if applicable, by a lawyer that has filed an appearance on your behalf in the Bankruptcy Court or the court in which your previously filed lawsuit or other proceeding is pending.

The Tort Claims Administrator has reviewed your Proof of Claim and offers the amount set forth in the attached Immediate Claim Settlement Offer in full satisfaction of your Tort Claim(s). You must respond to the Immediate Claim Settlement Offer either by:

(1)    signing this ADR Notice and completing the Immediate Claim Settlement Offer and accepting such offer; or

12937273-5

(2)      by rejecting the offer and completing the attached Tort Claim Information and  Settlement Demand Form.

If you accept the offer, you do not need to complete the Tort Claim Information and Settlement  Demand Form. If you reject the offer, you must complete and return the Claim Information and  Settlement Demand Form, which must include a settlement demand. **If you do not return this signed ADR Notice and the Immediate Claim Settlement Offer so that it is received by the Tort Claims Administrator by the Response Deadline, resolution of your Tort Claim will be governed by Section VII of the ADR Procedures. The Tort Claimant's ability to proceed with and participate in the ADR Procedures will be at the discretion of the Tort Claims Administrator. Any settlement reached pursuant to these ADR Procedures will be paid by the Tort Claims Trust. Pursuant to the Plan Confirmation Order, you must waive and release any and all claims against the Debtors, their Estates, and the Insurance Settlement Released Parties, to receive such payment(s).**

**If you do not accept the Immediate Claim Settlement Offer, or if no Immediate Claim  Settlement Offer was made, you are required to complete and return this ADR Notice and the attached Claims Information and Settlement Demand Form. You must complete all sections of the Claims Information and Settlement Demand Form, including (1) the Section I Settlement Demand which is the amount you offer to settle your Tort Claim for; and (2) the Section II Claim information section, along with all supporting documentation. The ADR Notice and the Claims Information and Settlement Demand Form must be returned to the Tort Claims Administrator by the Response Deadline. Failure to return this ADR Notice and the Claims Information and Settlement Demand Form by the Response Deadline will be deemed as a failure to comply with the ADR Procedures under Section VII thereof. The Tort Claimant's right to proceed with and participate in the ADR Procedures will be at the discretion of The Tort Claim Administrator.**

**Pursuant to the ADR Procedures and Plan Confirmation Order, your Settlement Demand may not (i) include or make an unliquidated, unknown, or similar demand; and/or (ii) exceed the amount of, or improve the priority set forth in, your most recent timely-filed proof of claim asserting a Tort Claim. For the avoidance of doubt, this does not mean that if you filed a Proof of Claim asserting a Tort Claim that did not make a specific demand, you are limited to demanding zero.**

**I HAVE READ AND UNDERSTAND THIS NOTICE.**

Date: _____

_____
Tort Claimant Signature or Authorized Person

_____
Print Claimant or Authorized Person Name

**EACH TORT CLAIMANT MUST SIGN THIS ADR NOTICE. ADDITIONAL TORT CLAIMANTS  MUST SIGN AND PRINT THEIR NAME ON A SEPARATE SHEET.**

*[optional]*

## IMMEDIATE CLAIM PAYMENT OFFER

Based on a review of documentation relating to your Tort Claim, the Tort Claims Administrator has determined that you have asserted your Tort Claim in the amount of $_____, and hereby offers to pay such Tort Claim in the amount of $[_____].

If you agree to payment of your Tort Claim by the Tort Claims Trust in the amount of $_____, please sign below and return this form to the Tort Claims Administrator at the addresses set forth in the ADR Procedures. If you accept this offer, you are not required to submit any additional documentation or information with the return of this form. If you do not accept this offer, you must complete and return the ADR Notice and the Claims Information and Settlement Demand Form according to the instructions set forth in the ADR Notice and the ADR Procedures.

**Payment of your Tort Claim by the Tort Claims Trust does not entitle you to any other cash payments from the Debtors and, if paid by the Tort Claims Trust you will be deemed to have satisfied, waived and released any and all Claims against the Debtors, their Estates, the Insurance Settlement Released Parties, the Tort Claims Trust and its professionals.**

I agree to allowance of my Tort Claim as set forth in this Immediate Claim Payment Offer

Date: _____

_____
Claimant Signature or Authorized Person

_____
Print Claimant or Authorized Person Name

_____
Relationship to Claimant if Authorize Person

EACH TORT CLAIMANT MUST SIGN THIS FORM. ADDITIONAL TORT CLAIMANTS MUST SIGN AND PRINT THEIR NAMES ON A SEPARATE SHEET.

SIGNATURE OF ATTORNEY

Date: _____

_____
Attorney for Claimant Signature

_____
Print  Attorney for Claimant Signature

12937273-5

## CLAIM INFORMATION AND SETTLEMENT DEMAND FORM[1]

### I.    SETTLEMENT DEMAND

**YOU MUST INCLUDE AN OFFER FOR WHICH YOU WOULD SETTLE YOUR TORT CLAIM. PLEASE NOTE THAT IF YOUR OFFER IS ACCEPTED BY THE TORT CLAIMS ADMINISTRATOR, THE TORT CLAIMS TRUST SHALL PAY SUCH TORT CLAIM AND YOU WILL BE DEEMED TO HAVE SATISFIED, WAIVED AND RELEASED ANY AND ALL CLAIMS AGAINST THE DEBTORS, THEIR ESTATES, THE INSURANCE SETTLEMENT RELEASED PARTIES, THE TORT CLAIMS TRUST AND ITS PROFESSIONALS.   IN ACCORDANCE WITH THE PLAN AND ADR PROCEDURES, THE INFORMATION PROVIDED BY YOU IN THIS FORM SHALL BE CONFIDENTIAL AND USED SOLELY TO EVALUATE AND ADJUDICATE YOUR TORT CLAIM.**

Amount for which you offer to settle the Tort Claim: $ _____

### II.    CLAIM INFORMATION

### TORT CLAIMANT MUST PROVIDE THE FOLLOWING INFORMATION:

1.    Name, address, and telephone number of counsel: _____

2.    Names, addresses, and telephone numbers of all Tort Claimants: _____

3.    Debtor against whom the Tort Claim is asserted: _____

4.    Your date of birth: _____

5.    Date of injury: _____

6.    Where did the incident occur? _____

_____

[1] Tort Claimant is not required to provide information duplicative of supporting documentation attached to the relevant Proof of Claim filed in the Chapter 11 Cases.

12937273-5

Please specify the location and address.

7.      Are you pursuing this Tort Claim against any other party? Yes ☐ No ☐
If yes, against whom (list the name, the addresses and counsel for each party, if known)?

_____

_____

Attach additional sheets if necessary.

8.      Did you notify the Debtor(s) in writing of the incident? (If yes, attach a copy of such writing.)
        Yes ☐ No ☐

9.      Is there a pending lawsuit regarding your Tort Claim? If yes, identify the court where the lawsuit is pending, the case number and the judge, if known and attach a copy of the complaint.

_____

_____

10.      What type of injuries or damages do you have arising from the incident? Provide a medical description of any injuries. (Please state if the Tort Claim is based, in whole or in part, on an injury or damages to someone else.)

_____

_____

11.      How did the injury occur?

_____

_____

12.      Did you miss any work as a result of the incident? If so, how many days?

_____

_____

13.      Provide the name and address of your employer(s) and your salary or rate of pay at the time of the incident.

_____

_____

14.      Was anyone else injured or did anyone else sustain damages at the time of the incident? (If yes, list the names and addresses.)

_____

_____

15.      List the names, addresses and phone numbers of all witnesses and people with relevant knowledge of your Tort Claim (including, but not limited to, any representatives or agents of the Debtors).

_____

_____

12937273-5

16.    Are treatments still being provided for any injury? Yes ☐ No ☐

_____

_____

(If yes, provide the name and address of any and all doctors that are currently treating you for such injury and the nature of the treatment).

17.    Physician Data

a.    Provide the name and address of any physician, clinic or hospitals that have treated this injury. Include treatment dates. (Attach additional sheets if necessary)

_____

_____

_____

b.    Itemize all damages you claim, including any damages for emotional distress, loss of consortium or pain and suffering.

_____

_____

_____

c.    Provide the total amount of the medical bills you incurred as a result of suffering your injury.

_____

_____

_____

d.    Itemize any other expenses you incurred as a result of the incident for which you are making a Tort Claim.

_____

_____

_____

e.    Provide a list of medical expenses and amounts paid by your insurance company as a result of your injury.

_____

_____

_____

f.    Provide the name, address and policy number of your insurance company.

_____

_____

_____

12937273-5

18.    Attach the following documents:

a.    All medical records and bills for medical services received by the Tort Claimant as a result of the injury allegedly caused by the Debtor(s);

b.    Autopsy/Coroner report, if applicable;

c.    Death Certificate, if applicable; and

d.    Photographs, videotapes, and any other documentation you wish to be considered in the evaluation of your Claim.

*[Signature Page Follows]*

**NOTICE: UNDER FEDERAL LAW, CRIMINAL PENALTIES MAY BE IMPOSED FOR FILING A TORT CLAIM CONTAINING FALSE OR MISLEADING STATEMENTS.**

**I declare under penalty of perjury that the foregoing statements are true and correct.**

Date: _____

_____
Claimant Signature or Authorized Person

_____
Print Claimant or Authorized Person Name

_____
Relationship to Claimant if Authorize Person

SIGNATURE OF ATTORNEY

Date: _____

_____
Attorney for Claimant Signature

_____
Print Attorney for Claimant Signature

**EACH TORT CLAIMANT MUST SIGN THIS FORM. ADDITIONAL CLAIMANTS MUST SIGN AND PRINT THEIR NAMES ON A SEPARATE SHEET.**

12937273-5

**EXHIBIT C**

**FORM RELEASE**

[TO BE FILED BEFORE THE PLAN CONFIRMATION DATE]

**EXHIBIT D**

**ARBITRATION NOTICE**

[TO BE FILED BEFORE THE PLAN CONFIRMATION DATE]

**Schedule 4**

**Tort Claims Trust Agreement**

## TORT CLAIMS TRUST AGREEMENT

This TORT CLAIMS TRUST AGREEMENT dated as of [_____], 2024 (the "Trust Agreement") is made and entered into by and between Bird Global, Inc., Bird Rides, Inc., Bird US Holdco, LLC, Bird US Opco, LLC, and Skinny Labs, Inc., as debtors and debtors-in-possession (the "Debtors") and [_____], not individually but solely as trustee (the "Trustee").  Unless otherwise specifically defined herein, capitalized terms used in this Trust Agreement shall have the meanings assigned to them in the Joint Plan or attributed to them in the Bankruptcy Code (as each is hereafter defined).

## RECITALS

A.    On December 20, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Cases"). The Cases are being jointly administered under lead case styled I*n re: Bird Global, Inc.*, Case No. 23-20514-CLC.  From and after the Petition Date, Debtors continued in possession of their property and continued to operate and manage its business as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.    On [_____], 2024, the Bankruptcy Court entered the *Order (I) Approving on a Final Basis the Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, and  (II) Confirming Joint Chapter 11 Plan of Liquidation* [D.E. No. ___] (the "Plan Confirmation Order") pursuant to which the Bankruptcy Court confirmed the *Debtors' Joint Chapter 11 Plan of Liquidation* dated [_____] 2024  (the "Joint Plan") [D.E. No. ____].

C.    The Joint Plan and Plan Confirmation provide for, *inter alia*: (i) the creation of the Tort Claims Trust for the exclusive benefit of the Beneficiaries of Allowed Class 6 Tort Claims; (ii) the receipt of the Trust Assets from the Debtors;  (iii) the assumption by the Tort Claims Trust of any and all liability of the Settling Insurers and the Insurance Settlement Released Parties, which are and shall be channeled exclusively to the Tort Claims; (iii) the administration and liquidation of the Trust Assets and the distribution of the proceeds therefrom to the Beneficiaries in accordance with this Trust Agreement, the Tort Claims ADR Procedures, the Joint Plan and the Plan Confirmation Order, and (iv) the payment of administrative expenses and indemnity obligations in accordance with this Trust Agreement and the Joint Plan.

D.    Pursuant to Treasury Regulation § 301.7701-4 (d), the Tort Claims Trust is being created for the primary purpose of liquidating the Trust Assets in an expeditious but orderly manner for the benefit of the Beneficiaries with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to and consistent with the liquidating purpose of the Tort Claims Trust and the Joint Plan.

E.    The Tort Claims Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes, pursuant to §§ 671-677 of the IRC, with Beneficiaries to be treated as the grantors of the Tort Claims Trust and deemed to be the beneficial owners of the Trust Assets (subject to the rights of the creditors of the Tort Trust).

1

F.      Pursuant to the Joint Plan and the Plan Confirmation Order, the Trustee was duly appointed as a representative of the Estate pursuant to §§ 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code.

**NOW, THEREFORE**, pursuant to the Joint Plan, the Plan Confirmation Order, and the Insurance Settlement Agreement, in consideration of the premises and the provisions in the Joint Plan, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, it is agreed as follows:

## ARTICLE I
## AGREEMENT OF TRUST

**1.1.    CREATION AND NAME.** The Debtors hereby create a trust known as the "Tort Claims Trust" which is the trust provided for in the Joint Plan.

**1.2.    PURPOSE**. The purpose of the Tort Claims Trust is to: (i) assume any and all liability of the Debtors, the Settling Insurers and the Insurance Settlement Released Parties for all Tort Claims, which are and shall be channeled exclusively to the Tort Claims Trust; (ii) receive the Trust Assets from the Debtors; and (iii) distribute the Trust Assets to the Tort Claims Beneficiaries pursuant to this Trust Agreement and in accordance with the Tort Claims ADR Procedures attached hereto as Exhibit A (the "Tort Claims ADR Procedures"). In connection therewith, the Tort Claims Trust shall hold, manage, protect and monetize the Trust Assets (as defined in Section 1.3 below) in accordance with the terms of the Trust Agreement for the benefit of the Beneficiaries (as defined in Section 1.5 below). All Tort Claims shall be resolved exclusively in accordance with the terms of this Trust Agreement and the Tort Claims ADR Procedures and no distribution to any Beneficiary shall occur outside of the Tort Claims Trust or the Tort Claims ADR Procedures.

**1.3.    TRANSFER OF ASSETS**. Pursuant to and on the Effective Date of the Joint Plan, Debtors will cause the Trust Assets to be irrevocably transferred, absolutely granted, assigned, conveyed, set over and delivered to the Trustee, to be held in trust and for the uses and purposes stated herein and in the Joint Plan. The Trustee hereby agrees to accept and hold the Trust Assets and together with any income or gain earned thereon and proceeds derived therefrom, (collectively, the "Trust Assets") in trust for the Beneficiaries subject to the terms of this Trust Agreement, the Tort Claims ADR Procedures, and the Joint Plan. Additional assets may subsequently   be transferred to the Tort Claims rust in accordance with the Joint Plan, and the Tort Claims Trust shall receive such assets if so transferred pursuant to this Trust Agreement. Debtors shall execute and deliver any and such other documents to the Tort Claims Trust as the Trustee reasonably requests to effectuate the transfer and assignment of any assets comprising all or a portion of the Trust Assets to the Tort Claims Trust. The Trustee is hereby authorized to file with governmental authorities any documents necessary or helpful to establish the Tort Claims Trust.

**1.4.    IRREVOCABILITY**. The Tort Claims Trust is irrevocable. The Debtors shall not alter, amend, revoke or terminate the Tort Claims Trust. The Debtors shall have no power or authority to direct the Trustee to return any of the Trust Assets to the Bankruptcy Estates.

**1.5.    BENEFICIARIES**. The Beneficiaries of the Tort Claims Trust are Holders of Allowed Class 6 Tort Claims. The Beneficiaries shall be subject to the terms of the Joint Plan, the Plan Confirmation Order, this Trust Agreement, the Tort Claims ADR Procedures and any and all other Tort Claims Trust documents, including without limitation, all forms or other documents attached to the Tort Claims ADR Procedures.

**1.6.    ACCEPTANCE OF ASSETS AND ASSUMPTION OF LIABILITIES.**

(a)    In furtherance of the purposes of the Tort Claims Trust, the Trustee hereby accepts the trusteeship of the Tort Claims Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance and delivery of Trust Assets to the Tort Claims Trust, subject to the terms and conditions set forth in this Trust Agreement, the Joint Plan and the Plan Confirmation Order. The Tort Claims Trust shall succeed to all of the Debtors' respective rights, title, and interest, including all legal privileges, in the Trust Assets and neither the Debtors nor any other person or entity transferring any settlement funds will have any further equitable or legal interest in, or with respect to, the Tort Claims Trust, or the Trust Assets; provided, however, that the Trustee succeeds to the Debtors' legal privileges solely with respect to the Trust Assets and not as to any other assets of the Debtors or their Estates.

(b)    In furtherance of the purposes of the Tort Claims Trust, the Trustee, on behalf of the Tort Claims Trust, hereby expressly assumes all responsibility for preserving, managing and distributing Trust Assets to the Beneficiaries. Tort Claims will be evaluated by the Tort Claims Reviewer in accordance with the Tort Claims ADR Procedures. After payment of any administrative fees and expenses of the Tort Claims Trust and establishment of any reserves that the Trustee determines are adequate, the Trustee shall make distributions of the Trust Assets to Beneficiaries in accordance with the evaluation and determination by the Tort Claims Reviewer pursuant to the Tort Claims ADR Procedures. In consideration of and as a condition to receiving a distribution from the Tort Claims Trust, each Tort Claims Beneficiary shall be required to execute and deliver to the Debtors, the Settling Insurers and the Insurance Settlement Release Parties, a Tort Claimant Supplemental Release (hereafter, a "Supplemental Release") in the form attached hereto as Exhibit B.

(c)    The Trustee shall have all the rights, powers and duties set forth in this Trust Agreement and the Joint Plan, and available under applicable law, for accomplishing the purpose of the Tort Claims Trust. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Tort Claims Trust  and in accordance with applicable law. The Trustee shall have the authority to bind the Tort Claims Trust within the limitations set forth herein and in the Joint Plan, but shall for all purposes  hereunder be acting in the capacity as Trustee, and not individually.

(d)    In furtherance of the purposes of the Tort Claims Trust, the Trustee assumes responsibility for, (i) making distributions to the Tort Claims Beneficiaries; (ii) receiving, collecting, liquidating, maintaining and distributing the Trust Assets in accordance with the Trust Agreement; and (iii) fulfilling all other obligations of the Tort Claims Trust under this Trust Agreement and the Joint Plan. The Tort Claims Trust will be administered consistent with the liquidating purpose of the Tort Claims Trust and with no objective to continue or to engage in the

12948107-2

conduct of a trade or business, except to the extent reasonably necessary to preserve the liquidation value of the Trust Assets or as otherwise provided in the Joint Plan.

(e)     All Trust expenses and all liabilities of the Tort Claims Trust shall be payable by the Trustee solely out of the Trust Assets; provided, however, that to the extent the Trustee is personally liable for any expenses or  liabilities of the types described in Sections 5.1 and 5.2 hereof, such expense and liabilities shall be payable by the Trustee out of the Trustee's assets.

**ARTICLE II**
**CORPUS OF THE TRUST**

**2.1.     TRUST COMPOSITION**. The Trust Assets shall consist of the proceeds of Insurance Settlement Agreement in the amount of Ten Million ($10,000,000) Dollars and any and all other property transferred to the Tort Claims Trust on the Effective Date pursuant to the Joint Plan. The Trustee may receive and accept the transfer of additional contributions or settlement funds in the future including (but not limited to) all rights of every kind, nature and description transferred to the Trust pursuant to the Joint Plan, and/or further orders of the Bankruptcy Court.

**2.2.     TRANSFER TO TRUSTEE**. From and after the Effective Date of the Joint Plan, pursuant to, and at such times set forth in the Joint Plan or other orders of the Bankruptcy Court, title to and all rights and interests in the Trust Assets shall be transferred to the Trustee free and clear of all Liens, claims, encumbrances or Interests of any kind in such property of any other Person or entity (including all Liens, claims, encumbrances or Interests of creditors of or holders of claims against Interests in the Debtors) in  accordance with §§ 1123 and 1146(a) of the Bankruptcy Code, except as otherwise expressly provided for in the Joint Plan or the Plan Confirmation Order. The Trustee, on behalf of the Trust, shall receive the Trust Assets when they are transferred to the Tort Claims Trust.

**2.3.     TRUSTEE'S RIGHT TO AND TITLE AND INTEREST IN TRUST ASSETS**.  Upon the transfer of the Trust Assets, the Trustee succeeds to all of the Debtors', the Estates', the Settling Insurers', and the Insurance Settlement Released Parties' right to and title and Interest in the Trust Assets, and the Debtors, the Estates, the Settling Insurers, and the Insurance Settlement Released Parties will have no further right to or title or Interest in or with respect to the Trust Assets or this Tort Claims Trust, except and as provided herein, in the Joint Plan or the Plan Confirmation Order.  Notwithstanding anything contained in this Section 2.3 to the contrary, the Debtors, the Estates, the Settling Insurers, and the Insurance Settlement Released Parties shall retain all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding Channeled Claims that have under applicable law or by agreement including but not limited to all defenses to coverage, the existence, primacy, and/or scope of available coverage under any alleged applicable policy.

**2.4.     NO TAX ON TRANSFERS TO TRUST.**  Pursuant to §1146(a) of the Bankruptcy Code, the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Trust, including any deeds, bills of sale or assignments executed in connection with any transfer to the Tort Claims Trust, or receipt, or disposition/sale of assets by

4

the Tort Claims Trust contemplated by the Joint Plan, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax or other similar tax.

**2.5.    SPENDTHRIFT PROVISION**. To the fullest extent permitted by law, neither the principal nor income of the Tort Claims Trust, in whole or part, shall be subject to any legal or equitable claims of creditors of any Beneficiary or others, nor to legal process, nor be voluntarily or involuntarily transferred, assigned, anticipated, pledged or otherwise alienated or encumbered except as may be ordered by the Bankruptcy Court.

**2.6.    TRUST CORPUS**. The entirety of the Tort Claims Trust's corpus shall be available to pay Tort Claimants and authorized administrative fees and expenses of the Trust, the Tort Claims Trust and the Tort Claims Reviewer. The Tort Claims Trust Corpus shall be allocated, administered, and distributed in accordance with the Join Plan, the Plan Confirmation Order, and the Tort Claims ADR Procedures.

## ARTICLE III
## POWERS AND DUTIES OF TRUSTEE

**3.1.    POWERS AND DUTIES**. The Trustee shall have, in addition to any other powers and discretions conferred on the Trustee by applicable trust law (to the extent not inconsistent with applicable Bankruptcy law and/or the Joint Plan), the Joint Plan and other provisions in this instrument, the following powers and discretions:

(a)    To act as custodian of, receive, control, manage and dispose of all Trust Assets for the benefit of the Beneficiaries as the Trustee deems appropriate to accomplish the purpose of the Tort Claims Trust, in accordance with the terms of this Trust Agreement, the Joint Plan, and the Plan Confirmation Order;

(b)    To protect and enforce the rights in and to the Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(c)    To open and maintain bank accounts on behalf of, deposit funds therein and draw checks thereon, as appropriate under this Trust Agreement, the Joint Plan and the Plan Confirmation Order;

(d)    To obtain all reasonably necessary insurance coverage with respect to any property that is or may in the future become a Trust Asset;

(e)    To incur on behalf of the Tort Claims Trust, and pay from the Trust Assets, all fees, costs and expenses of administering the Tort Claims Trust as provided in this Trust Agreement and the Joint Plan. These fees, costs and expenses include: (i) fees of the bankruptcy claims, noticing and distribution agent(s); (ii) fees and costs of Professionals employed by the Trustee, such as the fees and expenses of the Tort Claims Reviewer, investment advisors, accountants, agents, managers, attorneys-at-law, actuaries or auditors;

and (iii) the premiums charged by insurers, including, but not limited to, professional liability insurers. In no event, however, shall the Tort Claims Trust incur or the Trustee be responsible to pay any statutory U.S. Trustee Fees related to the distribution of the Tort Claims Trust Assets;

(f)     In accordance with the evaluation made by the Tort Claims Reviewer pursuant to the Tort Claims ADR Procedures, to make distributions to Beneficiaries in accordance with the Joint Plan;

(g)     In its discretion, to rely of the authenticity of the signature of the Tort Claims Reviewer, and the accuracy of the information set forth by, and the reasonableness of the determination of, the Tort Claims Reviewer in the administration of the Tort Claims ADR Procedures and assessment of the Class 6 Claims without any verification or confirmation;

(h)     To pay from the Trust Assets all indemnification obligations as provided in this Trust Agreement and the Joint Plan that become due prior to the termination of the Tort Claims Trust;

(i)     To make distributions from the Trust Assets to holders of Allowed Tort Claims pursuant to this Trust Agreement, the Tort Claims ADR Procedures , and the Joint Plan;

(j)     In its discretion, as a party in interest, to seek enforcement of any provision of the Joint Plan or the Plan Confirmation Order pertaining to the Tort Claims Trust;

(k)     To retain any attorney-at-law, the Tort Claims Reviewer, consultant, expert, accountant, investment advisor, bankruptcy management company or such other agents and advisors as are necessary and appropriate to effectuate the purpose of, and maintain and administer, the Tort Claims Trust and shall be entitled to rely on advice given by such advisors within his, her, or its areas of competence;

(l)     _____ shall serve as the Tort Claims Reviewer for the Trustee on the terms to be approved by the Bankruptcy Court. The Trustee may subsequently remove any Tort Claims Reviewer for cause. For purposes of this Trust Agreement, "cause" shall mean (i) the willful and continued refusal by the Tort Claims Reviewer to perform the Tort Claims Reviewer's duties as set forth in this Trust Agreement, the Tort Claims ADR Procedures, and the Joint Plan, (ii) gross negligence, misconduct, fraud, embezzlement, or theft, (iii) a breach of fiduciary duty, or (iv) other cause as the Trustee shall in good faith determine. In the event the Tort Claims Reviewer resigns, is removed, or is otherwise unable to perform the Tort Claims Reviewer's obligations, the Trustee shall have exclusive authority to appoint a new Tort Claims Reviewer. Nothing contained in this Trust Agreement shall prohibit the Trustee from also serving as the Tort Claims Reviewer if the Trustee determines that serving as both the Trustee and the Tort Claims Reviewer is in the best interest of the Tort Claims Trust and the Tort Claims Beneficiaries.

(m)     To make, sign, execute, acknowledge and deliver any documents that may be necessary or appropriate to effectuate the purpose of the Tort Claims Trust or to maintain and administer the Tort Claims Trust;

(n)     To file a motion with the Bankruptcy Court, with notice to the  parties in interest, for a modification of the provisions of this Trust Agreement if the Trustee determines that such modification is necessary to conform to legal and/or administrative requirements and to the purpose of the Tort Claims Trust;

(o)     Upon any event terminating the Tort Claims Trust, to defer distribution of Trust Assets for a reasonable period of time determined by the Trustee to be required to wind up the assets of the Tort Claims Trust, including the time needed to provide for the payment of debts and expenses of the Tort Claims Trust, although Beneficiaries' rights to distributions shall vest immediately;

(p)     To comply with Bankruptcy Code  §345 with regard to the investment of Trust Assets;

(q)     To establish such accounts, funds and reserves, as required by the Joint Plan, for ease of administration. Nothing in this provision shall restrict the Trustee's authority to pool such accounts, funds or reserves for investment purposes or require separate bank accounts for such accounts, funds or reserves;

(r)     Notwithstanding anything in the Joint Plan or this Trust Agreement to the contrary, (i) the Trustee shall distribute the Trust Assets to the Tort Claims Beneficiaries in accordance with this Trust Agreement and the Tort Claims ADR Procedures upon the resolution of all Tort Claims, and (ii) the indemnification obligations imposed upon the Tort Claims Trust and the Trust Assets shall irrevocably terminate on the date that the Tort Claims Trust terminates; *provided*, however, that the Trustee's personal liability, if any, for any expenses or liabilities of the types described in Sections 5.1 and 5.2 hereof shall survive termination of the Tort Claims Trust;

(s)     The right to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution; and

(t)     The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**3.2.     OBLIGATIONS OF THE TRUSTEE**. Notwithstanding anything in this Trust Agreement to the contrary, the Trustee shall:

(a)     Comply with all federal, state and local laws and regulations regarding settlements with minors, Medicare/Medicaid/Social Security reporting and set-asides, and other similar issues, including reporting any payment to a Medicare beneficiary in

settlement of a claim under a liability insurance policy or self-insurance to Medicare (CMS);

(b)     Before making any distribution of Trust Assets to any Beneficiary of the Tort Claims Trust, the Trustee shall (i) obtain written certification from each Tort Claims Beneficiary to receive such a distribution or their counsel that: (A) he or she has complied with reporting, and if necessary established any set asides, required by applicable federal, state and local laws and regulations regarding settlements with minors and Medicare/Medicaid/SSA with respect to such Tort Claimant; (B) the Tort Claimant acknowledges that Medicare's interests in reimbursement for any incurred medical expenses that have been paid by Medicare have either already been satisfied and Medicare has acknowledged such satisfaction or will be satisfied from the distribution of Trust Assets to the Tort Claimant; (C) satisfaction of Medicare's interests from the distribution of Trust Assets to the Tort Claimant shall be the sole and exclusive responsibility of each individual Tort Claimant and each individual Tort Claimant agrees to provide proof of such satisfaction to the Trustee upon request; (D) each Tort Claimant agrees that the duties of each Tort Claimant stated in this paragraph are non-delegable and failure to perform such duties shall provide the Settling Insurers and the Insurance Settlement Released Parties with a right to recover any monies paid caused by the failure to satisfy Medicare's interests including any additional expenses incurred and attorneys' fees; and (E) the Tort Claimant acknowledges and understands that the Settling Insurers are required to report any payment to a Medicare beneficiary in settlement of a Claim under any liability insurance policy or self-insurance to Medicare (CMS); and (ii) provide a copy of such certification, and of the executed Tort Claimant Supplemental Release to the Debtors and to the Settling Insurers;

(c)     The Tort Claims Trust is obligated to defend, indemnify, and hold harmless the Debtors and the Insurance Settlement Released Parties from any reporting, filing obligations, payments, or Claims related to Medicare Claims reporting and payment obligations, whether relating to past conditional payments made, future payments to be made, or otherwise arising out of, relating to, or in connection with Tort Claims, including any obligations owing or potentially owing under MMSEA or MSPA and any claims related to the Tort Claims Trust's obligations under the Plan, the Trust Documents, and the Plan Documents. The Tort Claims Trust shall not be required to create a reserve for this potential obligation;

(d)     Before remitting funds to any Tort Claimant's counsel, or to the Tort Claimant if such Tort Claimant is acting pro se, in respect of any Channeled Claim, the Trustee shall obtain (i) a certification from said Tort Claimant (or such Tort Claimant's authorized decedent's estate representative) that said Tort Claimant has provided or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Channeled Claim and (ii) that the Tort Claimant indemnifies the Tort Claims Trust for any such obligations; and

(e)     Pursuant to the Plan, Plan Confirmation Order, and the Tort Claims ADR Procedures, to cooperate with the Settling Insurers, including providing information

8

relating to the Tort Claims submitted to the Tort Claims Trust including: (i) the total number of Tort Claims filed, pending, settled, dismissed or allowed, as well as the total indemnity paid and total expense incurred; and (ii) for each Channeled Claim that has been resolved by through the Tort Claims ADR Procedures: (A) the Tort Claimant's name; (B) the last four digits of the Tort Claimant's social security number; (C) the names of the entity or entities the Tort Claimant identified as responsible for its Tort Claims; (D) the date of the incident giving rise to the Tort Claims; (E) the claim numbered used to identify the Tort Claims; and (F) the amount of distribution made to the Tort Claims Beneficiary. The Trustee in its discretion may satisfy its obligations under this subsection by providing a report (the "Report") concerning Tort Claims activity with respect to the time period that is subject of any request of the Debtors or the Settling Insurers for relevant files, information, and documents and including the information identified above. If the Trustee exercises its discretion to provide a Report, the Trustee shall still be obligated to make available to the Settling Insurers documents relating to the Tort Claims subject of the Report.

**3.3.     LIMITATIONS ON THE TRUSTEE**. Notwithstanding anything in this Trust Agreement to the contrary, the Trustee shall not do or undertake any of the following:

(a)     To guaranty any debt;

(b)     To loan Trust Assets;

(c)     To make any transfer or distribution of Trust Assets other than those authorized by this Trust Agreement, the Joint Plan or the Plan Confirmation Order, and the ADR Tort Claims Procedures;

(d)     To engage in any trade or business; and

(e)     To engage in any investments or activities inconsistent with the treatment of the Tort Claims Trust as a liquidating trust within the meaning of Treasury Regulation §301.7701-4(d).

**ARTICLE IV**
**TERMINATION OF THE TORT CLAIMS TRUST**

**4.1.     WHEN TERMINATION SHALL OCCUR.** The Trustee shall terminate the Tort Claims Trust after its liquidation and the administration and distribution of the Trust Assets in accordance with this Trust Agreement and the Joint Plan and the Trustee's full performance of all other duties and functions set forth in this Trust Agreement and the Joint Plan. Notwithstanding anything to the contrary in the Joint Plan or the Trust Agreement, the Trustee may terminate the Tort Claims Trust  at any time after completing distribution of the Trust Assets to the Tort Claimants, subject to giving ten (10) days' notice to the Settling Insurers and the Insurance Settlement Released Parties. The Tort Claims Trust may not be terminated at any time by the Tort Claims Beneficiaries.

**4.2.    TERMINATION PROCEDURES**. After termination of the Tort Claims Trust and solely for the purpose of liquidating and winding up its affairs, the Trustee shall continue to act as Trustee until its duties hereunder have been fully performed. The Trustee shall retain the books, records, documents and files that shall have been delivered to or created by the Trustee until distribution of all the Trust Assets. For purposes of this provision Trust Assets will be deemed distributed when all funds in the Tort Claims Trust have been fully distributed. At the Trustee's discretion, all of the books,  records, documents and files may be destroyed at any time following the later of:

(a)    the first anniversary of the final distribution of the Trust Assets; and

(b)    the date until which the Trustee is required by applicable law to retain such books, records, documents and files; provided that, notwithstanding the foregoing, the Trustee shall not destroy or discard any books, records, documents or files relating to  the Tort Claims Trust without giving the Debtors, the Settling Insurers, the Insurance Settlement Released Parties, and the Beneficiaries reasonable prior written notice thereof.

**4.3.    DISCHARGE, EXCULPATION AND EXONERATION**. Upon termination  of the Tort Claims Trust and accomplishing of all activities described in this Article, the Trustee and his professionals shall be discharged and exculpated from liability for any act or omission taken or omitted to be taken by the Trustee in good faith; provided, however, that this discharge and exculpation from liability shall not apply to acts or omissions taken or omitted to be taken on account of the recklessness, gross negligence, willful misconduct, knowing and material  violation of law or fraud of the Trustee or his designated agents or representatives or  Professionals). The Trustee may, at the expense of the Tort Claims Trust, seek an Order of the Bankruptcy  Court confirming the discharges, exculpations and exoneration referenced in the preceding  sentence.

## ARTICLE V
## IMMUNITY, LIABILITY AND INDEMNIFICATION OF TRUSTEE

**5.1.    LIMITATIONS ON LIABILITY**. Neither the Trustee nor any of its duly designated agents or representatives or Professionals shall be liable for any act or omission taken or omitted to be taken by the Trustee in good faith; provided, however, that this limitation on liability shall not apply to any acts or omissions taken or omitted to be taken by the Trustee on account of the recklessness, gross negligence, willful misconduct, knowing and material  violation of law, or fraud of the Trustee or its designated agents or representatives or Professionals. The Trustee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys-at-law, accountants, financial advisors and agents and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons.  Notwithstanding such authority, the Trustee shall be under no obligation to consult with its attorneys-at-law, accountants, financial advisors or agents, and its good faith determination not to do so shall not result in the imposition of liability on the Trustee, unless such determination is based on the Trustee's recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud.

**5.2.    NO RECOURSE AGAINST TRUSTEE PERSONALLY**.  No recourse shall ever be had, directly or indirectly, against the Trustee personally, or against any employee, contractor, agent, attorney-at-law, accountant or other Professional retained in accordance with the terms of this Trust Agreement or the Joint Plan by the Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or trust agreement whatsoever executed by the Trustee in implementation of this Trust Agreement or the Joint Plan, or by reason of the creation of any indebtedness by the Trustee under the Joint Plan for any purpose authorized by this Trust Agreement or the Joint Plan, it being expressly understood and agreed that any such promise, contract, instrument, undertaking, obligation, covenant or trust agreement entered into by the Trustee, whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Trust Assets and shall be evidence only of a right of payment out of the Trust Assets.  Notwithstanding the foregoing, the Trustee and any of its duly designated agents or representatives or Professionals may be held personally liable for  acts or omissions taken or omitted to be taken by the Trustee on account of the recklessness, gross negligence, willful misconduct, knowing and material violation of law, or fraud of the Trustee or its designated agents or representatives or Professionals.  The Tort Claims Trust will not be covered by a bond.

**5.3.    INDEMNIFICATION.**

(a)    The Trustee, using Trust Assets, shall defend, indemnify and hold harmless the Trustee, his agents, representatives and employees to the fullest extent that a corporation or trust organized under the laws of Florida is entitled to defend, indemnify and hold harmless its trustees, officers, directors, agents, representatives, and employees against any and all costs (including attorneys' fees and costs) judgments, awards, amounts paid in settlement, liabilities, expenses, claims, damages or losses incurred by them in the performance of their duties hereunder; provided that  either the Trustee nor its officers, directors, agents, representatives or employees shall be defended, indemnified or held harmless in any way for any liability, expense, claim, damage or loss for which they are ultimately liable under Section 5.1.

(b)    To the fullest extent permitted by applicable law, the Tort Claims Trust shall defend, protect, hold harmless, and indemnify the Settling Insurers and the Insurance Settlement Released Parties from and against any and all claims, demands, judgments, awards, penalties, liens, damages, losses, expenses, costs and fees, and liabilities of any kind arising out of or relating to or in any way involving or connected with the Tort Claims, the Channeled Claims, or the Settling Insurers' Insurance Policies.

**5.4.    OTHER    DUTIES,    OBLIGATIONS,    AND    INDEMNIFICATION RESPONSIBILITIES**.  To the extent not expressly provided for herein, the Tort Claims Trust will also assume all duties, obligations, and indemnification responsibilities as provided in the Joint Plan and the Insurance Settlement Agreement.

## ARTICLE VI
## COMPENSATION AND EXPENSE REIMBURSEMENT
## OF TRUSTEE AND ITS AGENTS

**6.1. TRUSTEE COMPENSATION**. The Trustee shall be entitled to receive compensation from the Trust Assets as detailed in Exhibit C.

**6.2. COMPENSATION OF TRUST**. Any Person retained by the Trustee pursuant to this Trust Agreement, the Joint Plan, or pursuant to the Tort Claims ADR Procedures will be entitled to reasonable compensation for services rendered.

**6.3. REIMBURSEMENT OF EXPENSES**. Any and all reasonable and necessary costs and expenses incurred by the Trustee and any Person retained by the Trustee and the Claims Reviewer in performing his or her respective duties under this Trust Agreement or in accordance with the Tort Claims ADR Procedures, will be reimbursed by the Trustee from the Trust Assets.

## ARTICLE VII
## SUCCESSOR TRUSTEES

**7.1. VACANCY CAUSED BY TRUSTEE DEATH, INCAPACITY, RESIGNATION, OR REMOVAL**.

(a) The Trustee may resign upon thirty (30) days' written notice to be filed with the Bankruptcy Court. The Trustee shall, within thirty (30) days after such resignation takes effect, deliver to the successor Trustee all of the Trust Assets which were in the possession of the Trustee along with a complete list of Trust Assets and a complete accounting of all transactions engaged by the Trustee while serving as such.

(b) The Bankruptcy Court may remove a Trustee following notice and a hearing and upon finding that the Trustee has engaged in a breach of fiduciary duty, mismanagement or gross negligence. The removal will take effect upon the date the Bankruptcy Court specifies. In the event of removal, the Trustee shall, within thirty (30) days after such removal takes effect, deliver to the successor Trustee all of the Trust Assets which were in the possession of the Trustee along with a complete list of Trust Assets and a complete accounting of all transactions engaged in by the Trustee while serving as such.

**7.2. OUTGOING TRUSTEE OBLIGATIONS**. In the event of the resignation or removal of the Trustee, the outgoing Trustee shall:

(a) Execute and deliver by the effective date of resignation or removal such documents, instruments, records and other writings as may be reasonably requested by the successor Trustee to effect such resignation or removal and the conveyance of Trust Assets then held by the resigning or removed Trustee to the successor Trustee;

12

12948107-2

(b)      Deliver to the successor Trustee all documents, instruments, records and other writings relating to the Trust Assets as may be in the possession or under the control of the resigning or removed Trustee;

(c)      Otherwise assist and cooperate in effecting the assumption of the resigning or removed Trustee's obligations and functions by the successor Trustee; and

(d)      The resigning removed or departed Trustee hereby irrevocably appoints the successor Trustee (and any interim trustee) as its attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such resigning or removed Trustee is obligated to perform under this Trust Agreement. Such appointment shall not be affected by the subsequent disability or incompetence of the Trustee making such appointment. The Bankruptcy Court also may enter such orders as are necessary to effect the termination of the appointment of the Trustee and the appointment of the successor Trustee.

**7.3.     APPOINTMENT OF SUCCESSOR TRUSTEE**. Any vacancy in the office of Trustee, including the death, incapacity, resignation or removal of the Trustee or successor Trustee, shall be filled pursuant to further order of the Bankruptcy Court.

**7.4.     PRESERVATION OF RECORD OF CHANGES IN TRUSTEES**. A copy of each instrument of resignation, removal, appointment and acceptance of appointment shall be attached to an executed counterpart of this Trust Agreement.

## ARTICLE VIII
## TRUSTEE REPORTING AND DISCHARGE

**8.1.     ANNUAL ACCOUNTINGS**. The Trustee shall prepare, at least annually, and upon termination of the Tort Claims Trust, a written accounting of the administration of the Tort Claims Trust listing the current assets (with fair market values) and detailing all transactions that occurred during the period covered by such accounting. Each such accounting shall be filed with the Bankruptcy Court. Copies of such accounting shall be available to the Settling Insurers, the Insurance Settlement Released Parties, and the Tort Claims Beneficiaries upon request.

**8.2.     APPROVAL OF ACCOUNTINGS AND DISCHARGE OF THE TRUSTEE**. The Trustee may file with the Bankruptcy Court a motion for approval of any accounting described in Section 8.1. Upon the entry of an order of the Bankruptcy Court approving any such accounting, the Trustee shall be discharged from all liability, with respect to all assets listed and transactions detailed in such accounting, to the Trust, any Beneficiary or any Person who or which has had or may then or thereafter have a claim against the Trust for acts or omissions in the Trustee's capacity as the Trustee or in any other capacity contemplated by this Trust Agreement or the Joint Plan.

## ARTICLE IX
## SECTION 468B SETTLEMENT FUND

**9.1.    GENERALLY**. In accordance with the Joint Plan, the Trustee will take all reasonable steps to ensure that the Trust will qualify and remain a "Designated" or "Qualified" Settlement Fund within the meaning of §468 of the Internal Revenue Code of 1986, as amended (the "Tax Code"), and the regulations promulgated pursuant thereto. Debtors are the "transferors" within the meaning of Treasury Regulation §1.468B-1(d)(1). The Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation §1.46B-2(k)(3).  It is further intended that the transfers to the Trust will satisfy the requirement of §461(h)(1) of the Tax Code and Treasury Regulation §1.461-1 (a)(2).

**9.2.    EMPLOYER IDENTIFICATION NUMBER**. Upon establishment of the Trust, the Trustee shall apply for an employer identification number for the Trust in accordance  with Treasury Regulation §1.468B-2(k)(4).

**9.3.    RELATION-BACK ELECTION**. If applicable, the Trustee and Debtors shall fully cooperate in filing a relation-back election under Treasury Regulation §1.468B 1(j)(2), to treat the Trust as coming into existence as a settlement fund as of the earliest possible  date.

**9.4.    FILING REQUIREMENTS**. The Trustee shall cause to be filed on behalf of  the Trust, all required federal, state, and local tax returns in accordance with the provisions of Treasury Regulation §1.468B-2(k)(1). Debtors or Reorganized Debtor shall file an election statement(s) satisfying the requirements of Treasury Regulation §1.468B- 1(k)(2)(ii) so that the Trust is treated as a grantor trust under §671 of the Tax Code and the regulations promulgated thereunder. The election statement shall be included with the Trust's first timely filed trust income tax return. Debtors shall supply to the Trustee and to the Internal Revenue Service the statement described in Treasury Regulation §1.468B-3(e)(2) no later than February 15th of the year following each calendar year in which Debtors of the Estates make a transfer to the Trust.

**9.5.    BROAD POWERS OF THE TRUSTEE**. The Trustee is empowered to take all actions, including such actions as may be consistent with those expressly set forth above, as they may be consistent with those expressly set forth above, as the Trustee deems necessary to reasonably ensure that the Trust is created as a "Designated" or "Qualified" settlement fund under §468B of the Tax Code and the regulations promulgated pursuant thereto. Further, the Trustee may, unilaterally and without court order, amend, either in whole or in part, any administrative provision of this Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with the foregoing.

## ARTICLE X
## BENEFICIARIES AND DISTRIBUTIONS
## TO BENEFICIARIES

**10.1.    NAMES AND ADDRESSES**. The Trustee shall keep a register (the "Register") in which the Trustee shall at all times maintain the names and addresses of the Beneficiaries and  the distributions made to the Beneficiaries pursuant to this Trust Agreement and the Tort Claims ADR

12948107-2

Procedures. The Trustee may rely upon this Register for the purposes of delivering distributions or notices. In  preparing and maintaining this Register, the Trustee may rely on the name and address of each holder of an allowed Tort Claims as set forth in a Proof of Claim filed  by such holder, or proper notice of a name or address change, which has been delivered by such Beneficiary to the Trustee. The Trustee may deliver distributions and notices to counsel for any Beneficiary identified in such Beneficiary's proof of claim or proper notice of a name or address change.

**10.2.    RIGHTS OF BENEFICIARIES**. The rights of a Beneficiary under this Trust Agreement and the Tort Claims ADR Procedures shall, upon the death or incapacity of an individual Beneficiary, pass to the legal representative of such Beneficiary. A Beneficiary shall have no title to, right to, possession of, management of, or control of the Trust Assets, or any right to call for a partition or division of the Trust Assets. Title to all the Trust Assets shall be vested in the Trustee, and the sole interest of the Beneficiaries shall be the rights and benefits given to such Persons under this Trust Agreement and the Tort Claims ADR Procedures.

**10.3.    SUPPLEMENTAL RELEASE**. In consideration of and as a condition to receiving a distribution from the Trust, each Tort Claimant shall be required to execute and deliver to the Debtors, the Settling Insurers, and the Released Parties a Supplemental Release.

**10.4.    RESOLUTION OF ALL TORT CLAIMS AND DISPUTED TORT CLAIMS.**

(a)    If and only when all Tort Claims are determined and approved by the Tort Claims Reviewer pursuant to the Tort Claims ADR Procedures shall the Trustee be responsible to make Distributions to the Beneficiaries. If at such time the Trustee determines that the aggregate value of the Allowed Tort Claims exceed the available Trust Assets, all Beneficiaries shall receive pro rata distributions based on the value of their Allowed Tort Claims.

(b)    Each Beneficiary shall receive a Distribution of the Trust Assets in full satisfaction, settlement, release, and discharge of and in exchange for its Tort Claims against the Debtors, the Settling Insurers, or any of the Released Parties, in accordance with the Joint Plan, the Trust Agreement and the Tort Claims ADR Procedures. In no event shall any Beneficiary be entitled to any other or further recovery from or against the Debtors, the Estates, the Settling Insurers, and the Released Parties, or any of their property or assets.

(c)    Each Beneficiary shall only be entitled to assert and receive  a Distribution on no more than one individual Tort Claims.

**10.5.    TAX IDENTIFICATION NUMBERS**. In order to receive Distributions, all Beneficiaries shall be required to provide tax information to the Trustee to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes.

(a)    The Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign,

state or local tax law with respect to any payment or Distribution. All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed or paid for all purposes of this Trust Agreement.

(b)    The Trustee shall be authorized to collect such tax information (including tax identification numbers) as in his or her sole discretion is deemed necessary to effectuate the Joint Plan, the Plan Confirmation Order and this Trust Agreement.

(c)    The Trustee may refuse to make a payment or Distribution unless or until such information is delivered; provided however, that, upon the delivery of such information, the Trustee shall make such delayed payment or Distribution, without interest. Notwithstanding the foregoing, if a person fails to furnish any tax information reasonably requested by the Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such Distribution shall irrevocably revert to the Trust. In no event shall any escheat to any federal, state or local government or any other entity.

**10.6.    DOCUMENTS ESTABLISHING LEGAL REPRESENTATION**. In addition to complying with the provisions contained in Sections 3.2(a) and (b) above, any Tort Claimant asserting an individual claim on behalf of a minor, incapacitated, or deceased person must, before any funds related to such Tort Claims may be distributed from the Tort Claims Trust, submit to the Trust appropriate documentation confirming the Allowed Tort claimant's legal authority to resolve the Tort Claims on behalf of the minor, incapacitated, or the deceased person and his/her estate.

**10.7.    BENEFICIARIES REPRESENTED BY COUNSEL**.

(a)    Distributions to any Beneficiary who has indicated on his or her Proof of Claim Form that he or she is represented by an attorney shall be made jointly to the Tort Trust Beneficiary and the attorney (or law firm). If a Tort Trust Beneficiary is not represented by an attorney, distributions shall be made payable to the Beneficiary.

(b)    Each Beneficiary's counsel fees will be deducted and paid from the Tort Claimant's individual recovery and shall not be paid from the gross amount available for distribution from the Tort Claims Trust.

(c)    The Trustee shall issue a Form 1099 to each unrepresented Beneficiary and holder of Allowed Class 6 Claim that receive a distribution pursuant to the Trust Agreement, and the Tort Claims ADR Procedures in the amount of such distribution. If such Tort Trust Beneficiary has indicated on his or her Proof of Claim Form that he or she is represented by an attorney, the Trustee shall issue a Form 1099 to such attorney.

**10.8.   DELIVERY OF DISTRIBUTIONS, UNDELIVERABLE DISTRIBUTIONS, AND UNCASHED CHECKS**.

(a)     All distributions to any Beneficiary that has indicated on his or her Proof of Claim Form that he or she is represented by an attorney, shall be made at the address of the attorney indicated on the Proof of Claim Form. All distributions to any Beneficiary that has not indicated on his or her Proof of Claim Form that he or she is represented by an attorney shall be made at the address of the Beneficiary indicated on the Proof of Claim Form.

(b)     In the event that any distribution to any Beneficiary is returned as undeliverable, no further distributions to such Beneficiary shall be made unless and until the Trustee is notified of such Beneficiary's, his or her attorney's, then-current address, at which time the missed distribution shall be made to such Beneficiary or his or her attorney, as applicable, without interest. All demands for undeliverable distributions shall be made on or before one hundred and eighty (180) days after the date such undeliverable distribution was initially made. Thereafter, the amount represented by such undeliverable distribution shall irrevocably revert to the Trust, and any Tort Claims in respect of such undeliverable distribution shall be discharged and forever barred from assertion against the Tort Trust, the Debtors, the Settling Insurers, and the Released Parties and their respective property.

(c)     In the event that any distribution to any Beneficiary remains uncashed for one hundred and eighty (180) days, the amount represented by such distribution shall irrevocably revert to the Tort Trust, and any Tort Claims in respect of such uncashed distribution shall be discharged and forever barred from assertion against the Tort Trust, the Debtor and its property.

(d)     Notwithstanding anything to the contrary in the Joint Plan, the Trustee, as applicable, shall not be required to make a Distribution to any Beneficiary if the dollar amount of the Distribution is less than $10 or otherwise so small that in the reasonable judgment of the Trustee, the cost of calculating and making the final Distribution of the undistributable funds remaining is excessive in relation to the benefits to the or holders of Tort Claims who would otherwise be entitled to such Distributions.  On or about the time that any final Distribution is made or thereafter, the Trustee may make a donation of any undistributable funds, any surplus funds, any undeliverable and/or uncashed distributions as defined by Local Rule 3011-1(C)(1), in the reasonable discretion of the Trustee to one or more of the following organizations (each of which qualifies for not-for-profit status under section 501(c)(3) of the Tax Code) with undistributable funds: (i) the Bankruptcy Bar Foundation of the Bankruptcy Bar Association of the Southern District of Florida; or (ii) Legal Services of Greater Miami, Inc.

(e)     The Tort Claims Beneficiaries 'Interests in the Tort Claims Trust shall not (i) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly and any purported assignment, conveyance, pledge or transfer shall be null and void *ab initio*; (ii) be evidenced by a certificate or other

17

instrument; (iii) possess any voting rights except as provided in the Joint Plan; (iv) give rise to any right or rights to participate in the management or administration of the Tort Claims Trust or the Trust Assets; (v) entitle the holders thereof to seek the removal or replacement of the Trustee or the Tort Claims Reviewer, whether by petition to the Bankruptcy Court or any other court or otherwise; (vi) entitle the holders thereof to receive any interest on Distributions; and (vii) give rise to any rights to seek a partition or division of the Trust Assets. Beneficiaries shall have no interest of any kind in any of the Trust Assets; rather, the Beneficiaries shall have an undivided beneficial interest only in cash assets of but only to the extent such cash assets are declared by the Trustee to be distributable as Distributions in accordance with the Trust Agreement and the Tort Claims ADR Procedures.

(f)     No Distribution contemplated by the Joint Plan, the Trust Agreement, or the Tort Claims ADR Procedures shall be made on account of any allowed Tort Claims that is payable by a third party or other insurer that is not the Tort Claims Trust or the Trustee, until the Tort Claimant has exhausted all remedies with respect to such third-party or alternative insurance policy. To the extent that another third-party has agreed to satisfy in full or in part an allowed Tort Claims, then immediately upon such agreement, the applicable portion of such claim may be disallowed and expunged without further notice to any party, or action, approval, or Order of the Bankruptcy Court.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

**11.1.   INCORPORATION OF PLAN AND PLAN CONFIRMATION ORDER**. The Joint Plan and the Plan Confirmation Order are incorporated herein by reference. In the event of any conflict between this Trust Agreement and any Tort Claims Trust Documents, on the one hand, and the Joint Plan or the Plan Confirmation Order on the other hand, this Trust Agreement and the Tort Claims Trust Documents shall control; provided, however, that in the event of any conflict between this Trust Agreement and the Tort Claims Trust Documents, on the one hand, and the Insurance Settlement Agreement, the Settlement Approval Order or the Joint Plan provisions incorporating and implementing the Insurance Settlement Agreement, on the other hand, the Insurance Settlement Agreement, the Settlement Approval Order and the Joint Plan provisions incorporating and implementing the Insurance Settlement Agreement shall control.

**11.2.   NOTICES**. All notices or deliveries required or permitted hereunder shall be  given as directed in the Joint Plan, to the following:

If to the Tort Claims Trust or Trustee:

If to a Beneficiary:

Counsel who signed the Beneficiary's Proof of Claim or, for an unrepresented claimant, to the address for the claimant provided in the  Proof of Claim.

**11.3.   WAIVER**. No failure or delay of any party to exercise any right or remedy pursuant to this Trust Agreement shall affect such right or remedy or constitute a waiver by such party of any right or remedy pursuant thereto. Resort to one form of remedy shall not constitute a waiver of alternative remedies.

**11.4.   REIMBURSEMENT OF COSTS**. If the Trustee or the Tort Claims Trust, as the case may  be, is the prevailing party in a dispute regarding the provisions of this Trust Agreement or the  enforcement thereof, the Trustee or the Tort Claims Trust, as the case may be, shall be entitled to collect any  and all costs, reasonable and documented out-of- fees, from the non-prevailing party incurred in connection with such dispute or enforcement  action.

**11.5.   ENTIRETY OF TRUST AGREEMENT**. This Trust Agreement supersedes  any and all prior oral discussions and agreements with respect to the subject matter hereof. This  Trust Agreement, together with the Exhibits hereto, the Insurance Settlement Agreement, the  Settlement Approval Order, the Joint Plan, and the Plan Confirmation Order, contain the sole and  entire understanding and agreement with respect to the subject matter thereof.

**11.6.   COUNTERPARTS**. This Trust Agreement may be executed in two or more counterparts, with the same effect as if all signatures on such counterparts appeared on one document, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**11.7.   CAPTIONS**.  The captions of Articles and Sections are included for convenience only and are to be disregarded in interpreting this Trust Agreement.

**11.8.   INDEPENDENT LEGAL AND TAX COUNSEL**. All parties to this Trust Agreement have been represented by counsel and advisors (collectively referred to as "Counsel" of their own selection in this matter. Consequently, the parties agree that the language in all parts of this Trust Agreement shall in all cases be construed as a whole according to its fair meaning and neither strictly for nor against any party. It is specifically acknowledged and understood that this Trust Agreement has not been submitted to, nor reviewed or approved by, the Internal Revenue Service or the taxing authorities of any state or territory of the United States of  America.

**11.9.   APPLICABLE LAW**. This Trust Agreement shall be administered under, governed by, and enforced according to the laws of the State of Florida applicable to contracts  and trust agreements made and to be performed therein, except that all matters of federal tax law and the Tort Claims Trust's compliance with  §468B of the Tax Code and treasury Regulations thereunder shall be governed by federal tax law, and all matters of federal bankruptcy law shall be governed by federal bankruptcy law. Each party hereto and each Beneficiary hereof hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to a trial by jury in any legal proceeding arising out of or relating to this Trust Agreement.

12948107-2

**IN WITNESS WHEREOF**, Debtors and the Trustee execute this Trust Agreement as of the date set forth in the opening paragraph.

**Trustee:**

_____

By:
Printed Name:
Title:

**Bird Global, Inc.; Bird Rides, Inc., Bird US Holdco, LLC, Bird US Opco, LLC, and Skinny Labs, Inc., as debtors and debtors-in-possession**

_____

By:      Christopher Rankin
Title:   Chief Restructuring Officer
Date:    April [●], 2024

20

**EXHIBIT 2**

**LIQUIDATING TRUST AGREEMENT**

(Will be provided in the Plan Supplement)

Exhibit 2

12867436-

**EXHIBIT "2"**

**LIQUIDATION ANALYSIS**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

|  |  |
|---|---|
| In re:<br><br>BIRD GLOBAL, INC., *et al.*,[1]<br><br>    Debtors. | Chapter 11 Cases<br><br>Case No. 23-20514-CLC<br><br>(Jointly Administered) |

## LIQUIDATION ANALYSIS

### Introduction

The above-captioned, affiliated debtors and debtors-in-possession (each, a "Debtor" and, collectively, the "Debtors"), with the assistance of their restructuring, legal, and financial advisors, have prepared the following hypothetical liquidation analysis (the "Liquidation Analysis"), in connection with the *Debtors' Joint Plan of Liquidation*, dated April 18, 2024 [ECF No. __] (as amended, supplemented, or modified from time to time, the "Plan") and the related *Disclosure Statement for Debtors' Joint Plan of Liquidation*, dated April 18, 2024 [ECF No. __] (as amended, supplemented, or modified from time to time, the "Disclosure Statement") pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[2]

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless each holder of an impaired Claim against or Interest in the Debtors either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To demonstrate that the proposed Plan satisfies the "best interests" of creditors test, under section 1129(a)(7) of the Bankruptcy Code, the Debtors, with the assistance of their advisors, have prepared the following Liquidation Analysis, which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis. As reflected in more detail in the Liquidation Analysis, the Debtors believe that the value of the distributions provided to each holder of Allowed Claims under the Plan would not be less than under a hypothetical chapter 7 liquidation, and the Plan therefore satisfies the "best interests" test with respect to each of the Debtors.

---

[1] The address of the Debtors is 392 Northeast 191st Street, #20388, Miami, FL 33179. The last four digits of the Debtors' federal tax identification numbers are: (i) Bird Global, Inc. (3155); (ii) Bird Rides, Inc. (9939); (iii) Bird US Holdco, LLC (8390); (iv) Bird US Opco, LLC (6873); and (v) Skinny Labs, Inc. (8176).

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Disclosure Statement.

**Statement of Limitations**

The determination of the proceeds and costs of a hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize (either in whole or in part) in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. Although the Debtors consider the estimates and assumptions set forth herein to be reasonable under the circumstances, such estimates and assumptions are inherently subject to significant uncertainties and contingencies beyond the Debtors' control. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable and good faith estimate of the recoveries that would result if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code and is not intended and should not be used for any other purpose.

This Liquidation Analysis does not include estimates for federal or state tax consequences that may be triggered upon the liquidation and sale of assets in the manner described above. Such tax consequences could be material (including the allocation of all items of income and loss and, upon completion of all distributions, the recognition and allocation of cancellation of debt income to equity holders). The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants.

**NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A CHAPTER 7 LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.**

**Basis of Presentation**

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Expense Claims and chapter 7 administrative expense claims such as wind-down costs, chapter 7 trustee fees, the chapter 7 trustee's professionals' fees, and tax liabilities. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan.

**NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE BY THE DEBTORS (OR ANY OTHER PARTY) OF ANY CLAIMS BY OR AGAINST THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE**

CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

## Conversion Date and Appointment of a Chapter 7 Trustee

The Liquidation Analysis has been prepared assuming that the Debtors converted the cases from Chapter 11 Cases to chapter 7 cases on May 29, 2024 (the "Conversion Date"). Except as otherwise noted herein, the Liquidation Analysis is based upon the unaudited financial statements of the Debtors estimated as of the Conversion Date and those values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date. On the Conversion Date, it is assumed that the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") to oversee the liquidation of the Debtors' estates, during which time all of the Debtors' major assets would be sold and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law. There can be no assurance that the liquidation would be completed in a limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties-in-interest.

## Additional Global Notes & Assumptions

The Liquidation Analysis should be read in conjunction with the following notes and assumptions:

1. ***Additional Claims***. The cessation of business in a liquidation is likely to trigger the assertion of additional Claims. Upon conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code would entail the setting of an additional bar date and would provide creditors or parties in interest with the ability to assert other or additional claims against the Debtors and their estates. *See* Fed. R. Bankr. P. 3002(c). Consequently, claims asserted or allowed against the Debtors' estates could be materially higher in a chapter 7 liquidation.

2. ***Chapter 7 Liquidation Costs and Length of Liquidation Process***. The Debtors have assumed that liquidation would occur over approximately twelve (12) to eighteen (18) months in order to pursue orderly sales of substantially all the remaining assets and collect receivables as well as to arrange distributions and to administer and wind down the Debtors' estates. In an actual liquidation, the wind-down process and time period(s) could vary significantly thereby impacting recoveries. For example, the potential for priority, contingent, and other claims, litigation, rejection costs, and the final determination of Allowed Claims could substantially impact both the timing and amount of the distribution of the asset proceeds to creditors. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Trustee, including expenses associated with selling the Debtors' assets, will

12936319-4

be entitled to payment in full prior to any distribution to Administrative Expense Claims and Other Priority Claims. The estimate used in the Liquidation Analysis for these expenses includes estimates for operational expenses and certain legal, accounting, and other professionals, as well as an assumed 3% fee payable to the Trustee based upon the amount of liquidated assets. It is assumed that chapter 7 administrative expense claims and other priority claims, and Trustee fees, are entitled to payment in full prior to any distribution to holders of any other Claims, and it is further assumed that such payments would be surcharged against the value of the Debtors' encumbered assets.

3.    ***Distribution of Net Proceeds***. Priority Claims, Priority Tax Claims, Administrative Expense Claims, Senior DIP Deficiency Claims, Additional DIP Funding Claims, Miscellaneous Secured Claims, Trustee's professional fees, and other claims that may arise in a chapter 7 liquidation scenario would need to be paid in full from the liquidation proceeds before the balance of those proceeds will be made available to pay holders of Allowed Claims in the following two classes of unsecured claims: Tort Claims and General Unsecured Claims. Under the absolute priority rule, no junior creditor may receive any distribution until all senior creditors are paid in full, and no holder of Interests may receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

## Conclusion

The Debtors have determined that confirmation of the Plan will provide creditors with a recovery that is not less than what they would otherwise receive in connection with a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and as such believe that the Plan satisfies the requirement of 1129(a)(7) of the Bankruptcy Code.

## Specific Notes to the Liquidation Analysis:

### *Sources of Proceeds*

A.    ***Cash & Cash Equivalents***. The Debtors assume they will have $1,509,100 as of the Conversion Date. This projected Cash balance represents "Excluded Cash" as defined in the Asset Purchase Agreement which was approved by the Court on March 8, 2024, less expenses anticipated to be paid through plan confirmation date including professional fees, U.S. trustee fees, employee and board costs.

B.    ***Contracts not Assigned to Seller or Rejected***. With the exception of professional contracts for post-petition services and employment contracts for employees that remained with the Debtors post-Sale Transaction, all known executory contracts and unexpired leases that were not assumed by the Buyer as defined under the Sale Order were rejected effective as of the sale date or shortly thereafter.

C.    ***Professional Fee Retainers***. In accordance with the engagement letters filed in applications for employment with the Court, the Debtors funded retainers for their professionals in the amount of approximately $525,000. The analysis assumes that these

retainers have been drawn down as a result of pre- and post-petition services provided by the Debtors' professionals. As of the Conversion Date, the Debtors estimate that between 0% and 20% of the professional fee retainers funded remain undrawn.

D.  ***Equity in Excluded Entities***.  In the Sale Transaction, the Purchaser did not acquire certain entities in the sale of substantially all of the Debtors assets include: Bird US Holdco, LLC, Spin Mobility S.A.S., Spin Mobility Unipessoal LDA, Spin Mobility Inc., Spin Mobility GmbH, Spin Mobility, Unipessoal LDA, and Spin Mobility SL (the "Excluded Entities"). The Debtors do not believe that any of the Excluded Entities have realizable asset value as of the Conversion Date.

E.  ***Tax Assets***.  The Debtors' financial operations resulted in the accumulation of material net operating losses (the "NOLs") during the pre-petition period.  As disclosed in the Schedules of Assets and Liabilities filed by the Debtors on the dockets for the Chapter 11 Cases, the Debtors relied on the NOLs estimated as of the close of business on December 19, 2023 in order to estimate the book value of these tax assets.  Because the sale of the NOLs would require a sale of the equity interests of the Debtor entities, which no longer have operations, the Debtors expect that any tax benefit associated with the NOLs would be disallowed, resulting in zero recovery value associated with the Debtors' tax assets.

F.  ***Talon Claim Proceeds***.  The Talon Claim Proceeds consist of any recovery received on account of the Talon Lawsuit (as described in the Disclosure Statement).  No recovery or related litigation costs have been attributed to the Talon Claim Proceeds due to, among other issues, the cost of such litigation, the uncertainty of the outcome, anticipated disputes regarding these matters and defenses to the Talon Lawsuit.

G.  ***Avoidance Claims.***  The Liquidation Analysis does not include recoveries resulting from any potential preference claims, fraudulent conveyance litigation, or other avoidance actions, if such actions exist.  No recovery or related litigation costs have been attributed to any potential avoidance actions under the Bankruptcy Code due to, among other issues, the cost of such litigation, the uncertainty of the outcome, anticipated disputes regarding these matters and defenses to claims should they exist.  Further, at the Closing, the Purchaser acquired the Avoidance Claims against certain of the Debtors' key vendors and suppliers identified by the Purchaser and those claims have been released by the Purchaser.

***Creditor Recovery Waterfall/Use of Proceeds - Wind Down Costs***

H.  ***Administrative Claims – Debtors Professionals.***  The Debtors expect that certain of its professionals will have incurred costs through the Conversion Date that are in excess of their Professional Fee Retainers. As such, the Debtors expect the conversion of the case to chapter 7 would give rise to administrative professional fee claims of $65,000 – $115,000.

I.  ***Administrative Claims – U.S. Trustee Fee.***  Prior to the Conversion Date, the Debtors estimate that in aggregate they will owe approximately $25,000 in U.S. Trustee fees for the

second quarter of 2024 under 28 U.S.C. § 1930(a)(6), on account of disbursements made prior to the Conversion Date.

J. ***Chapter 7 Trustee Fee.***  The Liquidation Analysis assumes that the Trustee would be compensated in accordance with the guidelines of Bankruptcy Code section 326. For the purposes of this Liquidation Analysis, the Debtors assume that such fees would be approximately three percent (3%) of gross distributions.

K. ***Chapter 7 Legal Professional Fees***.  For the purposes of the Liquidation Analysis, compensation for the Trustee's attorneys during the chapter 7 case is estimated to be 4% to 8% of total liquidation proceeds.

*Creditor Recovery Waterfall/Use of Proceeds – Allowed Claims*

L. ***Class 1 – Other Priority Claims***.

- The Debtors estimate that there will be approximately $1,024,100 in Other Priority Claims as of the Conversion Date.

- The Other Priority Claims estimate is based off of: (1) accrued pre-petition employee wage and severance claims subject to a per Claimant cap of $15,150 pursuant to section 507(a)(4) of the Bankruptcy Code; (2) unreconciled Priority Tax Claims filed on the Court's docket as of March 1, 2024; and (3) an estimate for future Priority Tax Claims not yet filed on the Court's docket as of March 1, 2024.

- The Liquidation Analysis projects that holders of Other Priority Claims will receive a full recovery in a chapter 7 liquidation.  However, the value of these Claims remains subject to change as the Debtors work through the reconciliation of Priority Tax Claims and could rise after the Conversion Date.

M. ***Class 2 – Senior DIP Deficiency Claim***.

- The Debtors estimate that there will be approximately $398,500 of Senior DIP Deficiency Claims as of the Conversion Date.

- The Senior DIP Deficiency Claim estimate is based information provided by counsel to the Holder of the Senior DIP Deficiency Claims.

- The Liquidation Analysis projects holders of the Senior DIP Deficiency Claim will receive between 45% to 97% recovery in a chapter 7 liquidation.

N. **Class 3 – Additional DIP Funding Claims**.

- The Debtors estimate that there will be approximately $2,200,000 in Additional DIP Funding Claims as of the Conversion Date.

- The Liquidation Analysis projects that holders of Additional DIP Funding Claims will recover nothing in a chapter 7 liquidation.

O. **Class 4 – Miscellaneous Secured Claims**

- The Debtors estimate that there will be approximately $3,431,100 in Miscellaneous Secured Claims as of the Conversion Date. This Claim is estimated as of December 19, 2023.

- The Liquidation Analysis projects that holders of Miscellaneous Secured Claims will recover nothing in a chapter 7 liquidation.

P. **Class 5 – General Unsecured Claims**

- The Debtors estimate that there will have been approximately $600,535,813.83[3] in General Unsecured Claims filed as of the Conversion Date.

- The Liquidation Analysis projects that holders of General Unsecured Claims will recover nothing in a chapter 7 liquidation.

Q. **Class 6 – Tort Claims**

- The Debtors cannot estimate the total amount of Tort Claims because most of such Claims would be unliquidated as of the Conversion Date.

- The Liquidation Analysis projects that holders of Tort Claims will recover nothing in a chapter 7 liquidation.

R. **Class 7 – Subordinated Claims**

- The Debtors estimate that there will be approximately $270,558,100 in Subordinated Claims as of the Conversion Date.

- The Liquidation Analysis projects that holders of Subordinated Claims will recover nothing in a chapter 7 liquidation.

---

[3] This figure is found in the Numerical Claims Register in the record at ECF No. 558.

12936319-4

S.  *Class 8 – Equity Interests*

- The value included for Equity Interests is based on Market Capitalization as of March 25, 2024.

- The Liquidation Analysis projects that holders of Equity Interests will recover nothing in a chapter 7 liquidation.

**Bird Global Inc. & Subsidiaries**
Liquidation Analysis
*As of 5/29/2024*

| Bird Global Inc. & Subsidiaries<br>$ in 000's | Notes | Est. Value /Book Value | Percent Recovery Low | Percent Recovery High | Est. Recovery Low | Est. Recovery High |
|---|---|---|---|---|---|---|
| **Sources of Proceeds** | | | | | | |
| Cash and Cash Equivalents | [A] | $ 1,509.1 | 100% | 100% | $ 1,509.1 | $ 1,509.1 |
| Contracts not Assigned to Seller or Rejected | [B] | - | 0% | 0% | - | - |
| Professional Fee Retainers | [C] | 525.0 | 0% | 20% | - | 105.0 |
| Equity in Excluded Entities | [D] | - | 0% | 0% | - | - |
| Tax Assets | [E] | 2,680,431.8 | 0% | 0% | - | - |
| Talon Claim Proceeds | [F] | - | 0% | 0% | - | - |
| Avoidance Claims | [G] | - | 0% | 0% | - | - |
| **Gross Liquidation Proceeds** | | **$ 2,682,465.9** | **0.1%** | **0.1%** | **$ 1,509.1** | **$ 1,614.1** |
| | | | | | | |
| **Creditor Recovery Waterfall / Use of Proceeds** | | | | | | |
| | | | | | | |
| **I. Wind Down Costs** | | | | | | |
| Administrative Claims - Debtors Professionals | [H] | *n/a* | *n/a* | *n/a* | $ (115.0) | $ (65.0) |
| Administrative Claims - U.S. Trustee Fee | [I] | *n/a* | *n/a* | *n/a* | (25.0) | (25.0) |
| Chapter 7 Trustee Fee | [J] | *n/a* | *n/a* | *n/a* | (45.3) | (48.4) |
| Chapter 7 Legal Professional Fees | [K] | *n/a* | *n/a* | *n/a* | (120.7) | (64.6) |
| **Total Chapter 7 Costs** | | | | | **$ (306.0)** | **$ (203.0)** |
| | | | | | | |
| **Net Assets Available for Distribution** | | | | | **$ 1,203.1** | **$ 1,411.1** |
| | | | | | | |
| **II. Allowed Claims** | | **Est. Claim Value** | | | | |
| Other Priority Claims | [L] | 1,024.1 | 100% | 100% | $ 1,024.1 | $ 1,024.1 |
| Senior DIP Deficiency Claim | [M] | 398.5 | 45% | 97% | 179.0 | 387.0 |
| Additional DIP Funding Claims | [N] | 2,200.0 | 0% | 0% | - | - |
| Miscellaneous Secured Claims | [O] | 3,431.1 [1] | 0% | 0% | - | - |
| General Unsecured Claims | [P] | 600,535.8 [2] | 0% | 0% | - | - |
| Tort Claims | [Q] | Unliquidated | 0% | 0% | - | - |
| Subordinated Claims | [R] | 270,558.1 [1] | 0% | 0% | - | - |
| Equity Interest | [S] | 780.89 [3] | 0% | 0% | - | - |
| **Total Creditor Recovery ($)** [4] | | | | | **$ 1,203.1** | **$ 1,411.1** |
| *Total Creditor Recovery (%)* | | | | | **0%** | **0%** |
| | | | | | | |
| **Total Equity Recovery ($)** | | | | | **$ -** | **$ -** |
| *Total Equity Recovery (%)* | | | | | **0%** | **0%** |

Notes:
[1] *Estimated Claim Value as of December 19, 2023*
[2] *This figure is found in the Numerical Claims Register in the record at ECF No. 558*
[3] *Estimated Claim Value based on Market Capitalization as of March 25, 2024*
[4] *Note that under the Plan for Reorganization as currently contemplated, General Unsecured claims are expected to receive $275K and Tort Claims are expected to receive between $10.0 - $13.0mm*